UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **MAGISTRATE NO. 21-MJ-75 (RMM)** |
| | : | |
| **TIMOTHY LOUIS HALE-CUSANELLI,** | : | |
| Defendant. | : | |

**MOTION FOR EMERGENCY STAY AND
FOR REVIEW OF RELEASE ORDER**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves this Court to, first, stay Defendant's release pending trial, and second, review the decision by the Magistrate Judge from the District of New Jersey to deny the government's motion for pre-trial detention. In support thereof, the government states the following:

**I.   BACKGROUND**

   **A.   Procedural Posture**

On January 15, 2021, Defendant was arrested in his home state of New Jersey on an arrest warrant issued from the United States District Court for the District of Columbia by Magistrate Judge Robin M. Meriweather in connection with a Criminal Complaint charging the defendant with Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, in violation of 18 U.S.C. §§ 1752(a)(1), (a)(2), Violent Entry and Disorderly Conduct on Capitol Grounds, in violation of 18 U.S.C. §§ 5104(e)(2)(D), and (e)(2)(G), and Obstructing a Law Enforcement Officer During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3).

At his initial appearance in the District of New Jersey, the United States made a motion to detain the defendant without bond pending trial. The defendant is subject to detention pursuant

1

to 18 U.S.C. § 3142(f)(2)(B), which provides for detention where there is a serious risk that, if released, the defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness. The presiding magistrate judge denied the government's detention motion and issued an order releasing the defendant with certain conditions. Following this, the government orally moved to stay the defendant's release pending an appeal by the government. The magistrate judge granted this motion and ordered that Defendant's release will be stayed until January 22, 2021.

### B. Statement of Facts

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was also closed to members of the public. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.

As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there. Among those persons was Defendant Timothy Louis Hale-Cusanelli, who traveled from his home in Colts Neck, New Jersey, to participate. Defendant is enlisted in the United States Army Reserves, and also works as a contractor at Naval Weapons Station Earle where he maintains a "Secret" security clearance and has access to a variety of munitions.

Defendant's participation in the insurrection was reported to the Naval Criminal Investigation Service ("NCIS") by a Confidential Human Source ("CHS"). Defendant spoke directly to the CHS about his participation in the events at the United States Capitol, and showed CHS photographs and video of his actions. (Docket Entry 1, Attachment 1). CHS later recorded a conversation with Defendant, on NCIS-approved recording equipment, wherein Defendant admitted to entering the Capitol and encouraging other members of the mob to "advance" – giving directions via both voice and hand signals. Id. Defendant told CHS that if there had been more rioters they could have taken over the entire building. Defendant also told CHS that Defendant had taken a flag and flagpole that he observed another rioter throw "like a javelin" at a Capitol Police officer, which Defendant described as a "murder weapon." Defendant stated his intent to destroy or dispose of the flag and flagpole as soon as he could. Id.

Immediately after his arrest on January 15, 2021, Defendant waived his *Miranda* rights and participated in an interview with myself and other special agents from NCIS and the Federal Bureau of Investigation ("FBI"). This interview was both audio and video recorded. Defendant stated that he marched to the Capitol as part of a large crowd of people after attending President Trump's January 6, 2021, rally. Defendant stated he believed there was a strong chance, President Trump would be with them. Defendant stated that when he got to the Capitol grounds, he saw law enforcement — which he described as wearing bright yellow reflective vests — using pepper spray and rubber bullets in an attempt to keep the mob from entering the Capitol building.

Defendant admitted that law enforcement's efforts to keep the mob out of the building "encouraged" him and others to move forward in an attempt to breach the building and interrupt the certification of the Electoral College results. Defendant described that he had been exposed to various chemical irritants as part of his military training, and that he had been trained in methods

to overcome such exposure. Defendant stated that, because of that training, as well as the cloth mask he was wearing, he was able to continue moving forward even after having been exposed to pepper spray. Defendant admitted to encouraging others to "advance" past law enforcement officers into the Capitol building, and further admitted using hand and voice signals to direct their movements.

Defendant stated that he never put his hands on anyone, but admitted that he did call a female law enforcement officer a "cunt" when she and other officers administered pepper spray. Defendant acknowledged that some individuals in the mob fought with law enforcement officers, and stated that he observed an officer being pulled into the crowd and assaulted. Defendant admitted that he did nothing to assist the officer.

During the interview, Defendant provided agents with the passcode to his cell phone and agents subsequently reviewed the photos and videos that he took at the Capitol on January 6, 2021. One of those videos showed law enforcement officers in bright yellow vests on what appears to be the West Side of the United States Capitol building, while Defendant stated ". . . the revolution will be livestreamed." Another video taken inside the Capitol building shows rioters chanting "stop the steal, stop the steal." When asked by agents whether he understood that his actions had, in fact, obstructed and interfered with Congress' certification of the Electoral College results, Defendant conceded that they had.

    **C.**    **Order for Release**

After an initial appearance and hearing in the District of New Jersey on January 15, 2021, the presiding magistrate judge issued an Order of Release for the defendant with certain conditions. On that same day, the United States orally sought a stay of the Order pending this

Motion for Review. The magistrate judge granted that request and delayed Defendant's release until January 22, 2021.

## III. ARGUMENT

### A. This Court Has the Authority to Stay and Review the Release Order

Title 18, U.S.C. § 3145(a) states:

**(a) Review of a release order –** If a person is ordered released by a magistrate, …

> (1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release
> . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pre-trial detention. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not previously raised. In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. As the legislative history of the 1984 Bail Reform Act amendments shows:

> [T]he language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving violence. . .

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3195-3196.[1]

---

[1] To that end, it is worthwhile recalling Congress' intent in 1984 when it enacted the current

**B. The Bail Reform Act Factors All Weigh in Favor of Detention**

The United States is seeking detention pending trial pursuant to 18 U.S.C. § 3142(f)(2)(B) because there is a serious risk that, if released, Defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness. Consequently, the government requests review of the magistrate judge's decision to release the defendant and seeks a further stay of the order from this Court.

As the Court is aware, there are four factors under Section 3142(g) that the Court should analyze in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. Each of these factors weighs in favor of pretrial detention in this case.

---

version of the Bail Reform Act:

> Many of the changes in the Bail Reform Act reflect the . . . determination that Federal bail laws must . . . give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released. . . . The constraints of the Bail Reform Act fail to grant the Courts the authority to impose conditions of release geared toward assuring community safety, or the authority to deny release to those defendants who pose an especially grave risk to the safety of the community. . . . *This broad base of support for giving judges the authority to weigh risks to community safety in pretrial release decisions is a reflection of the deep public concern, which the Committee shares, about the growing problem of crimes committed by persons on release.*

See S.Rep. No. 225, 98th Cong., 2d Sess. 307, reprinted in 1984 U.S. Code Cong. & Ad. News 3182, 3486-3487. (Emphasis added.)

### A. **The Nature and Circumstances of the Offenses Weigh in Favor of Detention**

The nature and circumstances of the charged offenses weigh heavily in favor of detention. Defendant, a member of the United States Army Reserve and security contractor at Naval Weapons Station Earle, knowingly and willfully participated in an insurrection that was designed to prevent the United States Congress from certifying the results of the 2020 Presidential election. As part of that insurrection, Defendant not only stormed the Capitol and threatened Capitol Police officers, he utilized his military training to assist other insurrectionists – giving instructions to "advance" and using both hand and voice signals.

### C. **The Weight of the Evidence Weighs in Favor of Detention**

The weight of the evidence against Defendant also weighs strongly in favor of detention. In addition to his confession to federal agents, Defendant admitted his involvement to at least one other person and memorialized his crime via photograph and digital video. Moreover, given the sheer number of photographs and videos taken at the Capitol on January 6, 2021 – as well as surveillance footage from inside the Capitol building – the United States anticipates that its evidence against Defendant will increase now that federal agents have confirmed (by watching Defendant's videos) that he entered through the West Side of the Capitol building.

### C. **The Defendant's History and Characteristics Weigh in Favor of Detention**

Defendant's history and characteristics also weigh in favor of detention, notwithstanding his military service and lack of felony convictions. Defendant is an avowed white supremacist and Nazi sympathizer who posts video opinion statements on YouTube proffering extreme political opinions and viewpoints under the title the "Based Hermes Show." Defendant also posts similar content in other forums.

During the execution of a search warrant at Defendant's residence, federal agents recovered a copy of *Mein Kampf* by Adolf Hitler, which describes Hitler's anti-Semitic ideology and outlined his plans for what became Nazi Germany. Federal agents also recovered a copy of *The Turner Diaries* by William Luther Pierce, published under the pseudonym Andrew Macdonald, a novel which depicts a violent revolution in the United States which leads to the overthrow of the federal government, a nuclear war, and, ultimately, a race war which leads to the systematic extermination of non-whites. *Mein Kampf* and *The Turner Diaries* are considered "required reading" by those who are enmeshed in the White Supremacy movement. *See* Alexandra Alter, *How "The Turner Diaries' Incites White Supremacists*, New York Times Online (Jan. 12, 2021, updated Jan. 15, 2021), available at *https://www.nytimes.com/2021/01/12/books/turner-diaries-white-supremacists.html* (last visited January 18, 2021).

Although it might otherwise be possible to attribute the "Based Hermes Show" and an interest in *Mein Kampf* and *The Turner Diaries* to morbid curiosity or First Amendment expression, Defendant's actions and statements make plain his beliefs in White Supremacy, and his interest in participating in a civil war to preserve what he believes to be the proper order of American society. After returning home from storming the capitol, Defendant told a friend that he "couldn't describe how exhilarating it was" to participate in the protest. When asked how he would "recreate" that sensation, Defendant replied: "War. Civil war."

Defendant also expressed that the "system" is "getting more illegitimate every day" and "it's only a matter of time," before a civil war breaks out. Defendant further expressed that, in the event of a civil war, "it's going to be the fucking good old boys in the Midwest, Texas, and Arkansas," who prevail. When asked whether he really wanted there to be a civil war, Defendant said "yes," and quoted Thomas Jefferson, stating that "the tree of liberty must be refreshed with

the blood of patriots and tyrants." Defendant also stated that a civil war was the "best shot" for American society to get a "clear bill of health."

### D. The Danger to the Community Created by Defendant's Release Weighs in Favor of Detention

Defendant poses a substantial risk of danger to the community if he is released. Having sworn a duty to uphold and protect the Constitution against all enemies, foreign or domestic, Defendant literally abandoned his post to participate in an insurrection with the stated intent of obstructing the certification of the Electoral College vote. Defendant has not only embraced a dangerous, White Supremacist ideology, he preaches it on YouTube in hopes of luring more "patriots" to his cause. It is unclear how long Defendant has harbored a fantasy of participating in a second American civil war—a war in which "the fucking good old boys in the Midwest, Texas, and Arkansas" will provide American society with a "clear bill of health." It is clear, however, that he is no longer fantasizing – he now sees himself ready to refresh the tree of liberty with "the blood of patriots and tyrants."

Releasing Defendant from custody will only reinforce his belief that his cause is just. Given his impending debarment from Naval Weapons Station Earle, and his potential Administrative Separation from the U.S. Army Reserve, Defendant's release will likely leave him with nowhere to go and nothing to do except pursue his fantasy of participating in a civil war. If nothing else, the events of January 6, 2021, have exposed the size and determination of right-wing fringe groups in the United States, and their willingness to place themselves and others in danger to further their political ideology. Releasing Defendant to rejoin their fold and plan their next attack poses a potentially catastrophic risk of danger to the community.

**CONCLUSION**

This Court has the authority to stay the Magistrate Judge from the District of New Jersey's Order to release Defendant pending trial in this case. Moreover, this Court has the authority to overrule that decision and order that Defendant be detained and transferred to the District of Columbia pending trial. This case warrants such an exercise of the Court's authority. All four of the Bail Reform Act factors weigh heavily in favor of detention in this case, and there is no condition, or combination of conditions, that will ensure the safety of the community if Defendant is released.

>Respectfully submitted,
>MICHAEL R. SHERWIN
>Acting United States Attorney
>New York Bar No. 4444188
>
>By: */s/ James B. Nelson*
>JAMES B. NELSON
>D.C. Bar No. 1613700
>Assistant United States Attorney
>Federal Major Crimes Section
>555 4th Street, N.W.
>Washington, D.C. 20530
>(202) 252-6986
>james.nelson@usdoj.gov