# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 21-cr-37 (TNM)** |
| | **:** | |
| **TIMOTHY LOUIS HALE-CUSANELLI,** | **:** | |
| | **:** | |
| Defendant. | **:** | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S
## MOTION FOR CONDITIONAL RELEASE

The United States of America, by and through its attorney, the United States Attorney

for the District of Columbia, hereby files its Opposition to Defendant's "Motion to Modify Bond

to Place the Defendant on Conditional Release Pending Trial" (Docket Entry 13); Defendant's

"Motion to Amend/Correct" that Motion (Docket Entry 14); and Defendant's "Supplement" to

that Motion (Docket Entry 15) (hereinafter referred to collectively as "Def. Motion"). The bases

for this opposition are as follows.

## FACTUAL BACKGROUND AND PROCEDURAL POSTURE

On January 5, 2021, Defendant was enlisted in the United States Army Reserves and

worked as a security contractor at Naval Weapons Station ("NWS") Earle in Colts Neck, New

Jersey,[1] where he maintained a "Secret" security clearance. On January 6, 2021, Defendant

traveled from New Jersey to Washington, D.C. to participate in the "Stop the Steal" rally. While

in Washington, D.C. for that event, Defendant recorded videos of himself protesting in a variety

of locations, commenting on the attendance of certain groups at the rally, screaming at and

---

[1] Since his arrest, Defendant has been administratively discharged from the United States
Army Reserves and has been "barred" from NWS Earle – meaning that he is not permitted to enter
that facility for any reason.

interfering with United States Capitol Police officers, climbing a scaffolding to enter the United States Capitol building through doors that had been kicked open by rioters, and chanting "Stop the Steal" with other protesters. Defendant posted some of these videos to social media.

Defendant's actions at the Capitol were reported to the Naval Criminal Investigation Service ("NCIS") by a Confidential Human Source ("CHS"). Defendant spoke directly to CHS about his actions at the capitol, and showed CHS photographs and video. CHS later recorded a conversation with Defendant, on NCIS-approved recording equipment, wherein Defendant again admitted his conduct and spoke at length about what his participation in the Capitol riot meant to him.

On January 15, 2021, Defendant was charged via criminal complaint with violating 18 U.S.C. §§ 231(a)(3), 1752(a)(1), (2); and 40 U.S.C. § 5104(e)(2)(D), (G), and an arrest warrant was issued. (Docket Entry 1). Defendant was arrested on the warrant that same day, after which Special Agents from NCIS and the Federal Bureau of Investigation ("FBI") executed a search warrant on his residence. Defendant waived his *Miranda* rights and participated in an interview with Special Agents that lasted more than five hours, during which time Defendant confessed to his conduct and admitted that he had intended to interfere with the Certification of the Electoral College vote and that he had done so.

Defendant had his initial appearance in the District of New Jersey on January 19, 2021. During that hearing, the presiding magistrate judge ordered Defendant's release with conditions, but delayed his release to allow the United States to appeal. The United States promptly filed an Emergency Motion for Emergency Stay and Review of that Release Order,[2] as well as a Motion

---

[2] The United States' Emergency Motion for Emergency Stay and Review of the Release Order contained an analysis of the Bail Reform Act factors based on facts known to the United States at that time. (Docket Entry 3). The United States incorporates that document by reference

to Transport Defendant to this District forthwith. (Docket Entries 3, 4). This Court signed both orders the same day. (Docket Entries 5, 6).

On March 2, 2021, Defendant filed his "Motion to Modify Bond to Place the Defendant on Conditional Release Pending Trial" (Docket Entry 13). That same day, Defendant filed a "Motion to Amend/Correct" that Motion, to reflect that Defendant had not been "honorably discharged" from the United States Army. (Docket Entry 14). On March 7, 2021, Defendant filed a "Supplement" to that Motion, and attached a letter of reference on Defendant's behalf. (Docket Entry 16). This opposition follows.

## ARGUMENT

### 1.    United States' Bases for Detention

The United States moves the Court to order that Defendant be detained without bond pending trial pursuant to 18 U.S.C. § 3142(f)(2)(B) because there is a serious risk that, if released, Defendant will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness. Much of the United States' evidence in this case was gathered by CHS, and Defendant has shown an intent to obstruct or destroy evidence: he deleted his Facebook, Instagram, and Twitter accounts before he was arrested; he deleted videos of the Based Hermes Show from YouTube before he was arrested; he hid the suit and tie that he wore to the Capitol at an undisclosed location before he was arrested; and he discussed with CHS his intent to destroy additional evidence so as not to be arrested with it.

---

into this opposition, as though it was re-stated in full. The United States will also supplement that analysis with evidence that has been discovered since January 19, 2021.

2.        **Defendant's Proffer of Evidence is Not Compelling**

In response to the United States' Emergency Motion for Emergency Stay and Review of the Release Order (Docket Entry 3), Defendant raises a number of arguments suggesting that he is not a danger to the community and should be released. As noted more fully below, none of Defendant's arguments are compelling, and the United States has met its burden of showing by clear and convincing evidence that Defendant would pose a danger to the community if released.

A.        **John Getz's "Letter of Support" Contradicts Statements Made by Himself, and Others, to NCIS During the Investigation**

Defendant filed a supplement to his Motion for Conditional Release on March 7, 2021. (Docket Entry 16, 16-1). That supplement contained an undated, unsigned letter of support authored by Sergeant John Getz, the first paragraph of which reads as follows:

> Sir or Ma'am, I am writing to you today regarding Timothy Hale-Cusanelli. I have known Mr. Hale for a little over two years. In that time, I served as his supervisor at Naval Weapon [sic] Station Earle for the past year and a half. I was appalled at how he was slandered in the press in regards to him being a "white supremacist". I have never known him to be this way. I know that our co-workers would agree. For example, he was close with an African-American co-worker for whom he would frequently buy breakfast. Never have I seen Mr. Hale treat any of his African-American co-workers differently than anybody else, nor have I heard any distasteful jokes or language leave his mouth. I believe the media to have severely exaggerated this particular character trait.

(Docket Entry 16-1, at 1) (emphasis added). The problem with Sergeant Getz's letter, as undersigned counsel notified counsel for Defendant on March 7, 2021, is that it directly contradicts a statement he made to NCIS after Defendant's arrest.

On January 20 and 21, 2021, NCIS Special Agents interviewed 44 members of the NWS Earle Security Forces, all of whom would have interacted with Defendant on duty. The Special Agents asked them a defined set of pre-written questions regarding Defendant's actions on January 6, 2021, Defendant's expression of a white supremacist ideology, and the security of NWS Earle.

Prior to asking any questions, the Special Agents advised each interviewee that they were being interviewed as part of an NCIS inquiry and that their answers were subject to 18 U.S.C. § 1001. No questions were asked until the interviewee gave a verbal acknowledgement of that fact.

Sergeant Getz was among those interviewed on January 20, 2021, and his statements to NCIS directly refute the highlighted portions of his "letter of support" filed at Docket Entry 16-1. For example, the report of interview notes that:

> 4. When asked if S/HALE-CUSANELLI ever expressed beliefs about race or White Supremacy, GETZ stated S/HALE-CUSANELLI would make racial jokes and wouldn't be quiet about it. He stated "they had words" about S/ HALE-CUSANELLI'S jokes.

> 6. When asked if he had any concerns regarding S/HALE-CUSANELLI that he would like to discuss, GETZ replied that he knew S/HALE-CUSANELLI was a Nazi sympathizer and Holocaust denier, but nothing about S/HALE-CUSANELLI's statements struck him as dangerous.

> 7. RA asked how GETZ felt about S/HALE-CUSANELLI'S statements and opinions and GETZ replied that he had conversations with S/HALE-CUSANELLI where he told him to knock it off. RA asked what behavior or statements prompted that conversation and GETZ replied that S/HALE-CUSANELLI would walk up to new people and ask "You're not Jewish, are you?". He described S/HALE-CUSANELLI's demeanor as "joking but not." That prompted GETZ to tell him to cut it out.

Sergeant Getz also told the Special Agent that Defendant denied having attended the Capitol riot, until Sergeant Getz stated that he had seen Defendant's Facebook posts. Sergeant Getz reviewed the SA's notes as to each question before the interview ended, and confirmed that all of the notes were accurate and that all of his statements were truthful.

NCIS Special Agents traveled to Sergeant Getz's home on March 9, 2021, to confirm his authorship of the letter filed as Docket Entry 16-1[3], and to inquire as to the differences between

---

[3] This inquiry was undertaken because, when counsel for Defendant disclosed the letter to undersigned counsel prior to his filing the supplement, it was undated, unsigned, and disclosed in an editable Microsoft Word format. In that format, the document could have been edited or

that letter and his prior statement to NCIS. Sergeant Getz invited the Special Agents into his home and answered questions cooperatively. Sergeant Getz reviewed the letter, confirmed that he'd written every word, and signed the letter in the agents' presence. Sergeant Getz also reviewed the report of interview from January 20, 2021, and confirmed that the recording of his statements was accurate and that his answers to NCIS were truthful.

When asked to explain the obvious discrepancy, Sergeant Getz informed the agents that he was contacted by C.H. — whom Defendant now proffers as a potential third party custodian to monitor his conditional release — and asked to write a letter of support for Defendant's bond hearing. Sergeant Getz stated that he did not feel compelled to include his observations of Defendant's conduct, as reported to NCIS, in his letter to the Court. Sergeant Getz elaborated that he wanted to "speak positively" about Defendant for the bond hearing, and because he was not personally offended by Defendant's conduct. Sergeant Getz further stated that, although he felt obligated to report the information to NCIS, he did not feel obligated to include it in his letter – in part, because he had already reported it to NCIS.

In addition to the inherent conflict in Sergeant Getz's two statements, his assertion that "our co-workers would agree" with the content of his "letter of support" is also in conflict with statements made to NCIS. As noted, NCIS interviewed forty-four (44) of Defendant's co-workers on January 20 and 21, 2021 – including both U.S. Navy service members and contractors who, like Defendant, were employed by HBC. As reported by NCIS, thirty-four (34) of the forty-four (44) interviewees described Defendant "as having extremist or radical views pertaining to the

---

changed by anyone having access to it. Moreover, the "metadata" on the document indicated that it was authored on a version of Microsoft Word registered to another person (later identified as Sergeant Getz's wife). Undersigned counsel notified counsel for Defendant of all of the above, including the discrepancy between the letter and Sergeant Getz's prior statement to NCIS.

Jewish people, minorities, and women."[4]  A more detailed description of their responses are as follows.

### Defendant's White Supremacist Ideology

- When asked questions about Defendant's ideology, the majority of interviewees acknowledged that Defendant was a White Supremacist and/or gave examples, many of which were violent.

- One Navy Seaman recalled Defendant saying "babies born with any deformities or disabilities should be shot in the forehead." That Seaman also recalled Defendant saying that if he was a Nazi "he would kill all the Jews and eat them for breakfast, lunch, and dinner, and he wouldn't need to season them because the salt from their tears would make it flavorful enough."

- A Navy Petty Officer stated that Defendant talked constantly about Jewish people and remembered Defendant saying "Hitler should have finished the job."

- Another Navy Petty Officer stated that Defendant was a White Supremacist and remembered Defendant saying that "Jews, women, and blacks were on the bottom of the totem pole." That same Petty Officer stated that s/he considered Defendant to be "unstable," and that Defendant made them uncomfortable.

- Another Navy Petty Officer stated that it was well know that Defendant did not like minorities or Jews.

- Another Navy Petty Officer stated that Defendant referred to black people as "shit skinned minorities."

- An HBC contractor stated that he could tell that Defendant was a White Supremacist "from day one," and that Defendant stated that he "did not like the Jews because they caused all of the world's problems."  That HBC contractor recalled that Defendant shaved his facial hair into a "Hitler mustache"

### Reports of Defendant's Conduct

- An HBC supervisor stated that s/he was aware of multiple workplace issues regard Defendant, and specified: Defendant's "issues with women" and "talking about Jewish people."  The HBC supervisor also noted that s/he had to correct Defendant for wearing a "Hitler mustache" to work. That supervisor stated that, in advance of January 6, 2021, Defendant posted to the union reed board "major announcement coming soon" and "final

---

[4] The responses were summarized in an NCIS Report of Interview. The Report of Interview was disclosed to counsel for Defendant on March 7, 2021, after Defendant provided notice of Sergeant Getz's "letter of support."

countdown." The HBC supervisor recalled Defendant stating that he was going to leave HBC "in a blaze of glory."

- Another HBC contractor stated that no one wanted to report Defendant because he was "crazy" and people were afraid he would find out who reported him. That contractor reported that Defendant "100% had a problem with Jewish people" and that Defendant stated "they are ruining everything and did not belong here." That contractor stated that Defendant spoke of his dislike of Jews every day.

There is no good faith way to reconcile Sergeant Getz's "letter of support" with the statements made to NCIS by Defendant's colleagues, including Sergeant Getz himself. Sergeant Getz's subsequent interview shows that he made no effort to try to reconcile them—he simply did not feel compelled to provide this Court the same information that he gave NCIS. As such, the United States respectfully submits that Sergeant Getz's letter is, at best, intentionally incomplete and, at worst, intentionally false, rendering it wholly unworthy of the Court's consideration.

### B.      Defendant's Veiled Entrapment By Estoppel" Argument Falls Flat

Defendant further contends that he should not be detained because he was merely "following the entreaties of then commander in chief, President Trump[,]" and that it was "the duty of loyal citizens to 'stop the steal' by preventing the lection certification." (Docket Entry 13, at 17-18.) Defendant states that he "did not act out of criminal intent but out of conscience, albeit one that was manipulated by deception." Id. at 18. This argument has been summarily rejected by the Chief Judge of this Court. Memorandum Opinion (Docket Entry 23, at 21-27), United States v. Chrestman, 21-mj-218 (Howell, C.J., February 26, 2021).

As Chief Judge Howell wrote in Chrestman, the suggestion that former President Trump's words justified the Capitol rioters' actions rests on a false premise because the rioters "could not argue that they were at all uncertain as to whether they were at all uncertain whether their conduct ran afoul of the criminal law, given the obvious police barricades, police lines, and police orders restricting entry at the Capitol." Id. at 25. Rather, persons like Defendant who try to deflect blame

for their own conduct to former President Trump's words, would necessarily rely on the argument

that "though aware that his intended conduct was illegal, [he] acted under the belief President

Trump had waived the entire corpus of criminal law as it applied to the mob." <u>Id</u>. Chief Judge

Howell continued:

> <u>Even more troubling than the implication that the President can waive
> statutory law is the suggestion that the President can sanction conduct that strikes
> at the very heart of the Constitution and thus immunize from criminal liability those
> who seek to destabilize or even topple the constitutional order</u>. In addition to his
> obligation to faithfully execute the laws of the United States, including the
> Constitution, the President takes an oath to "preserve, protect and defend the
> Constitution." U.S. Const. art. II, § 1, cl. 8. He cannot, in keeping with his
> constitutional function and his responsibilities under Article II, lawfully permit
> actions that directly undermine the Constitution. Thus, a President cannot, within
> the confines of his constitutional authority, prevent the constitutionally mandated
> certification of the results of a Presidential Election or encourage others to do so on
> his behalf, nor can he direct an assault on the coequal Legislative branch of
> government. Were a President to attempt to condone such conduct, he would act
> ultra vires and thus without the force of his constitutional authority. <u>See</u>, <u>e.g.</u>,
> <u>Youngstown Sheet & Tube Co. v. Sawyer</u>, 343 U.S. 579, 588-89, 614 (1952)
> (enjoining actions taken by the President that exceeded his constitutional powers).
> <u>Put simply, even if former President Trump in fact, as defendant suggests, "told the
> assembled rabble what they must do</u>," (i.e., attack the Capitol and disrupt the
> certification of the electoral vote count) and "ratified their actions," Def.'s Mem. at
> 10, he acted "beyond [his] power" as President, <u>Cox</u>, 379 U.S. at 569, and <u>his
> statements would not immunize defendants charged with offenses arising from the
> January 6 assault on the Capitol from criminal liability</u>.

<u>Id</u>. at 26-27 (emphasis added).

Judge Lamberth recently confirmed that "I was following President Trump's Directive" is

not a valid argument in favor of pretrial release. <u>Memorandum Opinion</u> (Docket Entry 25, at 16),

<u>United States v. Chansley</u>, 21-cr-3-RCL (March 8, 2021). As Judge Lamberth noted,

> If defendant truly believes that the only reason he participated in an assault on the
> U.S. Capitol was to comply with President Trump's orders, this shows defendant's
> inability (or refusal) to exercise his independent judgement and conform his
> behavior to the law. <u>These are not the qualities of a person who can be trusted on
> conditional release</u>. Moreover, the fact that defendant attributes his actions on
> January 6th to President Trump does little to persuade the Court that defendant will
> not act in the same or similar ways again.

Chansley, (Docket Entry 25, at 16) (emphasis added).

### C.   That Defendant is not Charged with a Crime of Violence is not Dispositive of Detention

Defendant next contends that he should not be detained because he is not charged with a crime of violence, and "was merely one of the thousands that participated in the event and ended up getting swept along with the crowd." (Docket 13, at 11-12). This argument is both legally and factually incorrect.

Defendant's argument—that he should not be detained because he was not charged with a crime of violence—was specifically rejected by Judge Lamberth earlier this week. In ruling that the defendant would be detained pending trial, Judge Lamberth held:

> Though defendant was not charged with any of the offenses listed in § 3142([f])(1), defendant's conduct on and after January 6th indicates his willingness to resort to violence to undermine the legitimate functions of the United States government. Furthermore, Defendant's refusal to obey orders from law enforcement while inside the Capitol building indicates that he would not comply with conditions of release imposed to keep the public safe.

Chansley, (Docket Entry 25, at 16).

Furthermore, Defendant's focus on the names of the statutes he's charged with as the prime indicator of his dangerousness is out-of-step with the analysis that the judges in this District have taken. As Chief Judge Howell noted more than a month ago:

> The descriptions and . . . the title of those offenses to my mind don't even properly capture the scope of what [the defendant] is accused of doing here. The felony and misdemeanor charges . . . in some ways are too benign-sounding to describe what happened on January 6, 2021, at the U.S. Capitol.
>
> What happened on that day at the U.S. Capitol is criminal activity that is destined to go down in the history books of this country, of hundreds of Americans using force and violence against their own government to disrupt what we have been most proud of: A peaceful and Democratic transition of power.

Hearing Transcript, at 31, United States v. Barnett, Case No. 21-mj-13-GMH (Howell, C.J. January 28, 2021) (emphasis added).

Judge Kelly recently framed the question similarly, inquiring:

> [I]sn't it something that weighs strongly against your client about how serious and terrible that day was? In other words . . . it was an almost unique attack on the crown jewels of our country, the peaceful transfer of power. I mean, when you put it that way – and I don't – I think it's very fair to put it that way – it's almost a unique assault on America in American history, and I think that is something I have to weigh.

Hearing Transcript, at 48, United States v. Pezzola, Case No. 21-cr-52-TJK (March 1, 2021) (emphasis added).

Thus, Defendant's attempt to avoid pretrial detention by likening his conduct to that of simple trespassing is contrary to the holdings of other judges in this Court. Even if that were not the case, Defendant's suggestion that he was simply "swept away" is clearly untrue – as outlined below. Further, the fact that Defendant is not charged with a crime of violence has no bearing on this Court's inquiry. Congress saw fit to provide numerous bases for pretrial detention other than crimes of violence. See 18 U.S.C. §§ 3142(f)(1)(A)-(E), (f)(2)(A)-(B). As noted above, the United States is proceeding under one of those bases.

### D. Defendant's White Supremacist Ideology and Nazi Idolatry are Central to His Dreams of a "Civil War"

Defendant next contends that, notwithstanding the evidence outlined by his coworkers, there is no basis for the United States to refer to Defendant as either a White Supremacist or Nazi Sympathizer because he denied being those things during the post-arrest interview. (Docket Entry 13, at 14). Defendant further contends that the "Based Hermes Show," which he recorded and published to YouTube (and promptly deleted from YouTube after January 6) was "about local New Jersey politics." Id. Defendant again misstates what the evidence shows in this case. Not only

is Defendant's White Supremacist and Nazi Sympathizer ideology obvious from the evidence, that same ideology drives Defendant's enthusiasm for another Civil War. It is this enthusiasm, not the ideology itself, which forms the basis of Defendant's dangerousness and requires his pretrial detention.

### i.    *Defendant Holds a White Supremacist and Nazi Sympathizer*

As reported to NCIS, Defendant's ideology was no secret to his co-workers—nor could it have been. As indicated by multiple co-workers, Defendant shaved his facial hair into a "Hitler mustache," which he wore on duty at NWS Earle. The below photographs, which were digitally extracted from Defendant's cellular telephone, show him proudly displaying his "Hitler mustache" while on duty on April 26, 2020.

 

Lest there be any argument that the above photographs are a "one-off," or some sort of misguided joke, the following photographs, which were also digitally recovered from Defendant's cellular telephone, show Defendant posing with the mustache on April 21, 2020.



Defendant's affinity for Hitler and the Nazi party went far beyond facial hair, however, as demonstrated in these other images digitally recovered from Defendant's cellular telephone.



IT'S OK TO
CARE ABOUT
THE 50 MILLION
WHITES WHO DIED
IN WW2 INSTEAD
OF THE 250,000
DEAD COMMUNIST
JEWS WHO
STARTED IT

 

The last image is a cartoon depicting the Nazi Party as the savior of white Americans from the Republic and Democratic parties.

Neither is Defendant's ideology strictly limited to Nazi sympathy or a hatred of Jewish people. The photograph below, which was digitally extracted from Defendant's cellular telephone, shows him displaying the "OK" hand gesture, commonly utilized by White Supremacists to indicate "White Power,"[5] on August 16, 2019.



---

[5]See American Defamation League, HATE ON DISPLAY™ HATE SYMBOLS DATABASE, *available at* *https://www.adl.org/education/references/hate-symbols/okay-hand-gesture* (last visited March 11, 2021.

The digital extraction of Defendant's cellular telephone also recovered a video, a screenshot of which appears below, that shows him in a bathroom mirror on January 16, 2020, stating "that's right, you little bitch, I work out like I hate immigrants . . . intensely!"



The digital extraction of Defendant's cellular telephone also recovered also recovered a video, a screenshot of which appears below, that shows him attending a Black Lives Matter protest on June 6, 2020. In this screenshot, Defendant is seen holding what he describes as a "clipboard full of statistics" that he took with him to the protest hoping someone would "debate him" about the differences between the races.



Numerous examples of these "statistics" printouts – which Defendant utilized on the "Based Hermes Show" to bolster his assertions that the "white race" was superior – were recovered from Defendant's residence during the search warrant execution.

Consistent with those videos, Defendant had the following images saved to his phone, which were digitally extracted pursuant to a search warrant.







Defendant's characterization of the "Based Hermes Show" as a discussion of "local New Jersey politics" is equally unmoored from reality. Though Defendant deleted the video recordings of the "show" from YouTube, he did have a video clip of his January 6, 2020 show saved to his cellular phone – a screenshot of which appears below. That video, which was digitally extracted, shows a portion of a conversation about a politician's call for gun control, in which Defendant states: "We need more gun control?  Really?  Maybe we need more minority control. But you don't want to say that, because you don't want to lose votes," indicating that if there were fewer minorities, there would be fewer gun crimes.



On February 14, 2020, Defendant created a video of himself, wearing a suit, speaking into his bathroom mirror – apparently as a "practice run" for the Based Hermes show. In this video, Defendant stated "I'm not saying Hitler did nothing wrong, but did he do anything wrong?"



The following day, February 15, 2020, Defendant filmed what appears to be a "teaser" for the Based Hermes show, in which he says "hey guys, did you know the Jews did 9/11?  Of course you did…" and then encourages his viewers to tune in to hear more.



Also on February 15, 2020, Defendant was offered an opportunity to participate as a "leader" in a new Facebook "group" that was "focusing on the Jews with a sprinkling of local/state bs". Defendant responded "sign me up."



Finally, Defendant's White Supremacist views are not newly-developed. Defendant was arrested on August 4, 2010, along with J.H. — whom Defendant now proffers as a potential third

18

party custodian to monitor his conditional release — and two other individuals. The individuals were arrested for using a "potato gun" made out of PVC pipe to shoot frozen corn at houses in Howell, New Jersey. The "potato gun" was emblazoned with the words "WHITE IS RIGHT" and a drawing of a confederate flag. Defendant was in possession of a "punch dagger" when he was arrested.[6]

### ii.        *Defendant's Ideology is at the Core of His Desire for Civil War*

Without more, Defendant's White Supremacist, Nazi Sympathizer ideology would not be grounds for pretrial detention. However, Defendant's statements to CHS make it clear that his ideology is the driving force behind his stated desire for a Civil War. Given that Defendant's desire for a civil war makes him a danger to the community, this Court can and must consider Defendant's ideology within the context of his dangerousness. "[T]he Supreme Court has explicitly held that courts may consider otherwise-protected speech to establish a defendant's motive or intent during the commission of some other unlawful conduct. Chansley, (Docket Entry 25, at 17) (quoting Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993) (holding that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent").

CHS recorded a conversation with Defendant on January 14, 2021, in which Defendant detailed his participation in the Capitol riot and expounded on what it meant to him. During that conversation, Defendant told CHS that he couldn't describe how exhilarating January 6 was, due to "the adrenaline, the rush, the purpose" that he felt. Defendant stated that the closest comparison to what he experienced would be "civil war," and stated that if there had been more rioters they

---

[6] A "punch dagger" also known as a "push dagger" is a short knife with a T-shaped handle designed to be grasped in the hand so that the blade protrudes from the front of one's fist – typically between the 2nd and 3rd finger.

could have taken the entire Capitol building and held it.

Defendant stated that it was "only a matter of time" before a civil war broke out "along partisan lines," but that "they" don't want to fire the first shot because all of the guns and resources are in Republican hands, and Republicans make up 70% of the military. Defendant then said that, in the event of civil war, "it's not going to be New York and California winning the day, it's going to be the good old boys form the Midwest, Texas, and Arkansas." Defendant told CHS that he "really wishes" there would be a civil war. When CHS interrupted and said "but a lot of people would die," Defendant replied "Thomas Jefferson said the tree of liberty should be refreshed with the blood of patriots and tyrants."

Defendant said that he did not want to be subservient to corporations, and wanted to kill Google, Twitter, and Facebook. Defendant stated that the "threat" to America was not outward, but inward, and that he did not think it was a foreign power that flew into the twin towers and blamed it on a "third world shithole." CHS asked Defendant who he thought was responsible for the twin towers, and Defendant replied "I don't know, but I bet they had big noses." Defendant continued, "imagine being so disgusting of a people that you need laws to keep people from hating you."

Defendant stated that if he was President he would purge both houses of Congress and give "some groups" 24 hours to leave the country. He would then set up regional governments, like "old Empires did."  Defendant then said that this was how the U.S. Government was supposed to be, because Thomas Jefferson said there should be a revolution every 10 years, and Benjamin Franklin said there should be a revolution every 30 years. Defendant said that he believed there should be a revolution "every few generations." Defendant then said that a civil war was probably the "simplest solution," the "most likely outcome," and the "best shot" to obtain "a clean bill of

health, as a society." CHS asked Defendant a follow-up question and Defendant asked twice "are you wearing a wire?" After convincing himself that CHS was not wearing a wire, Defendant stated that it was necessary to address the underlying causes for people's "retard-slave mentalities," and further stated "I don't think we can fix the problems that Jews cause if you don't address all the things they do."

### E. Defendant's Proposed Third-Party Custodians Will Not Protect the Community or Guarantee Defendant's Presence

Defendant now proffers two individuals, J.H. and C.H., as potential third-party custodians who would ensure Defendant's compliance with the Court's conditional release conditions. (Docket Entry 13, at 5-6). Neither of these individuals is a suitable third-party custodian.

As noted above, Defendant and J.H. were arrested together in 2010 during an incident involving a "potato gun" emblazoned with the words "WHITE IS RIGHT" and the Confederate Flag. J.H. was interviewed by NCIS following Defendant's arrest. During that interview, J.H. denied being the person that deleted Defendant's social media, and stated that "he shares most of the same views that [Defendant] has" but would not elaborate on that. J.H. stated that s/he was in "Facebook jail" because s/he posted that New Jersey Governor Phil Murphy should be beaten to death. J.H. stated that s/he stands by that comment. J.H. also requested the names of every law enforcement officer involved in arresting Defendant, and stated that "at the tail end of this you guys are going to be dealing with a lot of legal shit."

The digital extraction of Defendant's cellular telephone produced 423 pages of text messages between Defendant and J.H. which are replete the same ideology outlined above. The text messages further show that J.H. is unlikely to keep Defendant in compliance should the Court see fit to grant release conditions. Rather, the relationship between J.H. and Defendant suggests that J.H. will enable, if not encourage or participate in, whatever Defendant chooses to do

regardless of the Court's orders.

Likewise, C.H. is unlikely to ensure Defendant's compliance should the Court see fit to grant release conditions. The digital extraction produced 1209 pages of text messages between Defendant and C.H. and, while C.H. seems to genuinely care for Defendant, C.H. enables Defendant's behavior to almost the same degree as J.H. For example, Defendant sent C.H. this photo of him with a "Hitler mustache" in April 2020, and C.H.'s response was merely "I can't with you."



Moreover, as noted above, C.H. is responsible for securing Sergeant Getz's "letter of support," which reported only that portion of the truth that Sergeant Getz felt obliged to share with

the Court. It is unclear what role C.H. had in the content of the letter other than requesting that Sergeant Getz write it for Defendant's bond hearing.

### 3.     The Bail Reform Act Factors All Weigh in Favor of Detention

As the Court is aware, there are four factors under Section 3142(g) that the Court should analyze in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. Each of these factors weighs in favor of pretrial detention in this case.

### A.     The Nature and Circumstances of the Offenses Weigh in Favor of Detention

The nature and circumstances of the charged offenses weigh heavily in favor of detention. Defendant**,** a member of the United States Army Reserve and security contractor at Naval Weapons Station Earle, knowingly and willfully participated in an insurrection that was designed to prevent the United States Congress from certifying the results of the 2020 Presidential election. After attending former President Trump's speech on the ellipse, Defendant walked to the Capitol building and recorded much of his walk on video —screenshots of which are shown below—which was digitally recovered from his cellular telephone.

At the intersection of 6th Street NW and Pennsylvania Avenue NW, Defendant encountered an individual carrying an "America First" flag. This flag is the most notable symbol of the "Groyper Army," a loose network of alt-right supporters of white supremacist and "America First"

podcaster Nick Fuentes.[7] Upon seeing the individual with the flag, Defendant stated "America First is inevitable."



Defendant entered the Capitol grounds on the west side of the Capitol, and positioned himself on the south side of the Capitol building itself. From this location, Defendant recorded a brief video wherein he could be heard saying "This feels inevitable."



---

[7] American Defamation League, GROYPER ARMY, *available at* *https://www.adl.org/ resources/backgrounders/groyper-army* (last visited March 12, 2021.

Defendant moved forward to engage with and harass law enforcement officers. Defendant admitted to Special Agents that he encountered pepper spray and other chemical irritants while he was in the crowd outside the Capitol. Defendant further admitted that both the pepper spray and the Capitol Police officers' efforts to keep the mob out of the Capitol building "encouraged him and others to move forward in an attempt to breach the building. Defendant admitted that he had been trained in methods to overcome exposure to pepper spray, and that he used that training to advance even after having been exposed. The area in front of where Defendant was seen standing was the location of numerous assaults on Capitol police officers.



Defendant and others then moved to a location on the northern end of the building, where a scaffolding had been erected in advance of the Inauguration. That scaffolding was erected over stairwaus which could be used to access the locked doors and windows through which Defendant and other rioters eventually gained entry into the building.



Defendant admitted to encouraging others to "advance" past law enforcement officers into the Capitol building, and further admitted to using voice and hand signals to direct their movements. Rioters did advance and assemble at the base of these stairs before beginning to push in unison to breach the officers' line. After approximately thirty seconds of pushing and shoving, the rioters were able to breach the police line and advance up the stairs.



As Defendant moved toward the scaffolding and stairs, he recorded a video of himself addressing a female Capitol Police officer. As Defendant passed the officer, he can be heard to

yell "The revolution will be televised, cunt!" Defendant later admitted to law enforcement that he

recorded this video and addressed the officer because he had seen her administering pepper spray

into the crowd.



As Defendant climbed the steps, he took another short video in which he can be heard yelling

"Trump won!"



According to internal Capitol surveillance footage, Defendant entered the Capitol at

2:14pm through a door that had been kicked open from the inside by rioters who entered the

building when Proud Boy Dominic Pezzola smashed open a window with a riot shield.



Immediately after entering the Capitol, the surveillance video shows Defendant stomping dramatically on the Capitol floor and kicking the walls of the building.



Defendant then proceeded to walk around the inside the Capitol as though he is looking for something or someone.

 

Sometime later, Defendant reached the Capitol rotunda where he can be recorded a video in which he can be heard participating in a chant of "Stop the Steal!"



Defendant showed the above videos from his cellular telephone, as well as an assortment of photographs taken on January 6, 2021, to CHS. Defendant explained that he had taken part in storming the Capitol and that he might be "under some heat." CHS contacted NCIS to report Defendant's involvement and agreed record a future conversation with Defendant.

CHS was able to record a conversation with Defendant on January 14, 2021. During that conversation,t Defendant stated that he had been inside the Capitol building and he was concerned that he was facing a 10-year felony. Defendant showed CHS a media article referring to "military tactics" being used at the capitol, and admitted that he had used tactical hand signals and said "advance" a lot. Defendant said that he was not the only one at the Capitol who had "worn the uniform." This statement is corroborated by the digital extraction – Defendant accessed and saved this image on January 14, 2021:



Defendant stated that he had seen video of a Trump flag being thrown like a javelin at an officer and he believed it was the same flag that he had picked up and waved. Defendant explained that the flag was still in his truck and that he needed to "dispose" of it. Defendant stated that he also needed to dispose of a small American flag that he had waved in the Capitol, which was

hidden with his shirt and pants in a backpack at a friend's house. Defendant told CHS that he'd worn a suit inside the Capitol and that he didn't think he could wear it again for another month.

Defendant then relayed the information about the Capitol riot feeling like a civil war, and his desire to participate in a civil war, that is detailed above.

**B.    The Weight of the Evidence Weighs in Favor of Detention**

The weight of the evidence against Defendant is overwhelming and weighs strongly in favor of detention. In addition to his confession to federal agents, Defendant admitted his actions to CHS and his coworkers at NWS Earle. Defendant also memorialized his crime via photograph and digital video, and was viewed on surveillance footage from both inside and outside the Capitol.

**C.    The Defendant's History and Characteristics Weigh in Favor of Detention**

Defendant's history and characteristics also weigh in favor of detention, notwithstanding his military service and lack of felony convictions. Defendant's White Supremacist and Nazi Sympathizer ideology appears to be the driving force in his life. So much so that Defendant believes that a Civil War is "only a matter of time." This Civil War is something that Defendant "really wishes" would happen because it is the "simplest solution" and the "best shot" to obtain "a clean bill of health, as a society." Lest there be any question about what Defendant means by a "clean bill of health, as a society," Defendant stated "I don't think we can fix the problems that Jews cause if you don't address all the things they do."

**D.    The Danger to the Community Created by Defendant's Release Weighs in Favor of Detention**

Defendant poses a substantial risk of danger to the community if he is released. Having sworn a duty to uphold and protect the Constitution against all enemies, foreign or domestic, Defendant literally abandoned his post to participate in an insurrection with the stated intent of

31

obstructing the certification of the Electoral College vote. Defendant has not only embraced a dangerous, White Supremacist ideology, he has preached it on YouTube in hopes of luring more "patriots" to his cause. It is unclear how long Defendant has harbored a fantasy of participating in another Civil War—one in which "the fucking good old boys in the Midwest, Texas, and Arkansas" will provide American society with a "clear bill of health." It is clear, however, that he is no longer fantasizing – he now sees himself ready to refresh the tree of liberty with "the blood of patriots and tyrants."

Defendant's willful participation in the Capitol riot, and the subsequent exposure of his ideology, has resulted in his discharge from the U.S. Army Reserves and debarment from NWS Earle. If he is released pending trial, he will have nowhere to go and nothing to do but look for "the adrenaline, the rush, the purpose" that he found from squaring off against Capitol Police officers and storming the Capitol building on January 6, 2021. If nothing else, the events of January 6, 2021, exposed the size and determination of right-wing fringe groups in the United States, and their willingness to place themselves and others in danger to further their political ideology. This threat is, unfortunately, still a reality. See Rebecca Shabad, "Capitol Police Chief Warns Extremists 'Want to Blow Up the Capitol' When Biden Addresses Congress," NBC News Online (February 25, 2021), *available at https://www.nbcnews.com/politics/congress/capitol-law-enforcement-heads-detail-intelligence-failures-leading-jan-6-n1258829*. Releasing Defendant to rejoin their fold poses a potentially catastrophic risk of danger to the community.

## **CONCLUSION**

Defendant is eligible for Detention pursuant to 18 U.S.C. § 3142(f)(2)(B). All four of the Bail Reform Act factors weigh in favor of detention and there are no conditions, or combination

of conditions, which would reasonably assure the safety of the community if Defendant's motion for conditional release is granted.

WHEREFORE, the United States respectfully requests that this Court enter an order declaring that Defendant be detained without bond pending trial.

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

By:     */s/ James B. Nelson*
JAMES B. NELSON
D.C. Bar No. 1613700
Assistant United States Attorney
Federal Major Crimes Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-6986
james.nelson@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel via the Electronic Case Filing (ECF) system, on March 12, 2021.

By:      *<u>/s/ James B. Nelson</u>*
JAMES B. NELSON
D.C. Bar No. 1613700
Assistant United States Attorney
Federal Major Crimes Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-6986
james.nelson@usdoj.gov