# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Decided July 7, 2021

No. 21-3029

UNITED STATES OF AMERICA,
APPELLEE

v.

TIMOTHY LOUIS HALE-CUSANELLI,
APPELLANT

————

On Appeal of a Pretrial Detention Order
(No. 1:21-cr-00037-1)

————

*Jonathan Zucker*, appointed by the court, was on the appellant's Memorandum of Law and Fact.

*Ann M. Carroll*, *Chrisellen R. Kolb*, and *Nicholas P. Coleman*, Assistant U.S. Attorneys, were on appellee's Memorandum of Law and Fact.

Before: TATEL, WILKINS, and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*:   Timothy Hale-Cusanelli, who was arrested in connection with the incident at the United States Capitol on January 6, 2021, appeals from orders of the District Court ordering him detained pending trial, and denying

2

reconsideration of that ruling in light of *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021). Hale-Cusanelli challenges the District Court's conclusion that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community. We affirm.

## I.

On January 6, 2021, Hale-Cusanelli, who was then enlisted in the Army Reserves and worked as a Navy contractor in New Jersey, traveled to Washington, D.C., to attend the "Stop the Steal" rally. He wore a suit and tie and did not bring with him any form of weapon. Def.'s Mot. for Modification of Bond to Place the Def. on Conditional Release Pending Trial ("Def.'s Mot. for Conditional Release") at 3, 10–11, *United States v. Hale-Cusanelli*, No. 1:21-cr-37, ECF No. 13 (D.D.C. Mar. 2, 2021). Hale-Cusanelli eventually made his way to the United States Capitol, where he entered through doors that had already been kicked open. Opp'n to Def.'s Mot. for Conditional Release at 2, *Hale-Cusanelli*, No. 1:21-cr-37, ECF No. 18 (D.D.C. Mar. 12, 2021). He apparently left the Capitol after learning that someone had been shot.

Hale-Cusanelli later admitted to a Confidential Human Source ("CHS") that he had participated in the events at the Capitol on January 6. *Id.* The CHS reported Hale-Cusanelli to the Naval Criminal Investigation Service ("NCIS") and then, in cooperation with NCIS, recorded a conversation with Hale-Cusanelli.[1] *Id.*; Mot. for Emergency Stay & for Review of Release Order at 4, *Hale-Cusanelli*, No. 1:21-cr-37, ECF No. 3 (D.D.C. Jan. 19, 2021). In that conversation, Hale-Cusanelli admitted to using voice and hand signals to urge other members

---

[1] The record does not contain a transcript of the recorded conversation. Consequently, all quotations in this memorandum are as presented by the parties.

3

of the mob at the Capitol to "advance." Mot. for Emergency Stay & for Review of Release Order at 4, *Hale-Cusanelli*, No. 1:21-cr-37, ECF No. 3 (D.D.C. Jan. 19, 2021). He further admitted to picking up a flagpole that someone else had thrown "like a javelin" at a police officer, and referring to it as a "murder weapon." *Id.* Hale-Cusanelli is not accused of using or threatening to use the flagpole as a weapon. *See id.* Later, Hale-Cusanelli admitted to NCIS and FBI agents that he had used his military training and a face covering to protect himself after he was exposed to pepper spray. *Id.* at 4–5.

In the recorded conversation with the CHS, Hale-Cusanelli described "the adrenaline, the rush, the purpose" he felt on January 6, which he compared to "civil war." Opp'n to Def.'s Mot. for Conditional Release at 19, ECF No. 18 (D.D.C. Mar. 12, 2021). The government described part of the conversation as follows:

> [Hale-Cusanelli] stated that it was "only a matter of time" before a civil war broke out "along partisan lines," but that "they" don't want to fire the first shot because all of the guns and resources are in Republican hands, and Republicans make up 70% of the military. [Hale-Cusanelli] then said that, in the event of civil war, "it's not going to be New York and California winning the day, it's going to be the good old boys f[ro]m the Midwest, Texas, and Arkansas." [Hale-Cusanelli] told CHS that he "really wishes" there would be a civil war. When CHS interrupted and said "but a lot of people would die," [Hale-Cusanelli] replied "Thomas Jefferson said the tree of liberty should be refreshed with the blood of patriots and tyrants."

4

*Id.* at 20.

On January 15, 2021, Hale-Cusanelli was arrested on a criminal complaint in Colts Neck, New Jersey. A magistrate judge in the District of New Jersey ordered him released with conditions but temporarily stayed that ruling. On January 19, Chief Judge Howell stayed the New Jersey court's release order pending review by the District Court here. On January 29, Hale-Cusanelli was indicted on seven counts involving trespass and disorderly conduct in connection with the events on January 6. Indictment at 1–4, *Hale-Cusanelli*, No. 1:21-cr-37, ECF No. 9 (D.D.C. Jan. 29, 2021). The indictment does not allege that Hale-Cusanelli assaulted anyone, damaged any property, or organized any of the events on January 6. *See id.*

Hale-Cusanelli is 31 years old and, prior to his arrest, resided in Colts Neck, New Jersey, where he worked at Naval Weapons Station Earle as a private security officer. Def.'s Mot. for Conditional Release at 2. At the time of his arrest, he had been enlisted in the Army Reserves for approximately 11 years. *Id.*

After his arrest, NCIS interviewed 44 of Hale-Cusanelli's coworkers, and 34 of them described him "as having extremist or radical views pertaining to the Jewish people, minorities, and women." Opp'n to Def.'s Mot. for Conditional Release at 6–7. Those coworkers reported that Hale-Cusanelli had made various abhorrent statements, including that babies born with disabilities should be shot, that "Hitler should have finished the job," and that "Jews, women, and blacks were on the bottom of the totem pole." *Id.* at 7. Hale-Cusanelli's coworkers also described him as "unstable," observed that he had reported to work wearing a "Hitler mustache," and noted that he had discussed leaving his employment "in a blaze of glory" shortly before January 6. *Id.* at 7–8.

5

Prior to January 6, Hale-Cusanelli used a YouTube channel to upload a series of videos under the name the "Based Hermes Show." Hale-Cusanelli characterized these videos as "a platform to talk about local New Jersey politics." Def.'s Mot. for Conditional Release at 14. He deleted the videos after January 6, but the government was able to recover some clips from his phone. Opp'n to Def.'s Mot. for Conditional Release at 17. In the recovered clips, Hale-Cusanelli expressed racist and anti-Semitic sentiments. *Id.* at 17–19. Also recovered from Hale-Cusanelli's phone were a number of memes expressing similar views. *Id.* at 13–16.

Hale-Cusanelli's criminal history is limited. In 2010, he was arrested with three other codefendants after one of them used a homemade PVC launcher (*i.e.*, a potato gun) to fire frozen corn cobs at a home in Howell Township, New Jersey. Suppl. to Def.'s Memorandum of Law & Fact ("Suppl.") at 50–64, *Hale-Cusanelli*, No. 21-3029 (D.C. Cir. May 27, 2021). On the potato gun were the words "WIDOWMAKER" and "WHITE IS RIGHT," as well as a drawing of the Confederate flag. *Id.* at 59. Hale-Cusanelli additionally had a "punch dagger"—*i.e.*, a short-bladed dagger designed so that the blade protrudes from the front of an individual's fist—in his possession at the time. *Id.* Each member of the group was charged with conspiracy to commit criminal mischief and possession of a weapon. *Id.* Hale-Cusanelli ultimately pleaded guilty to disorderly conduct. *Id.* at 14.

A police report describing the potato-gun incident provided further details, but Hale-Cusanelli did not bring these details to the District Court's attention. According to the police report, one of the arrested officers concluded that "[i]t does not appear that there was any bias-related intent involved with this particular offense." *Id.* at 59. The officer stated that he was not aware of any black individuals residing at the home, and that one of Hale-Cusanelli's codefendants admitted he had

6

targeted the home because of a prior dispute with one of its residents over bicycles. *Id.*

According to the government, two harassment complaints were filed against Hale-Cusanelli in February and March 2020. *Id.* at 9–10. The complaints were both filed by Jewish individuals who accused him of posting online their names and addresses. *Id.* at 10. No further details are available in the record.

## II.

On March 23, the District Court held a hearing to review the New Jersey magistrate judge's release order. After hearing from the parties, the District Court addressed the four 18 U.S.C. § 3142(g) factors and orally ruled that Hale-Cusanelli was dangerous within the meaning of the Bail Reform Act—*i.e.*, that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).

First, the District Court concluded that the "nature and circumstances of the offense" factor weighed "just slightly" in favor of release because Hale-Cusanelli was not charged with any offenses involving violence or destruction of property. Suppl. at 24–25. The District Court nonetheless expressed concern about Hale-Cusanelli's admission that he had urged others "to essentially storm the Capitol Building and enter it despite police presence, tear gas, fences and what have you." *Id.* at 25.

Second, the District Court concluded that the weight of the evidence against Hale-Cusanelli was "overwhelming" and that this factor therefore weighed in favor of detention. *Id*.

Third, the District Court addressed Hale-Cusanelli's history and characteristics. The court observed that "[t]his [was] the most difficult prong in this case." *Id*. at 26. The court

7

noted Hale-Cusanelli's lack of criminal history, his employment history, and the fact that he was a military veteran with a security clearance, all of which "sp[oke] in his favor." *Id*. However, the court expressed concern about his "well-documented history of racist and violent language" and the fact that he "has been generally engaged in hateful conduct, if not necessarily violent conduct toward a number of people with whom he's had contact." *Id*. The court observed that "we don't typically penalize people for what they say or think." *Id*. at 27. It "also d[id] take note" of the potato-gun incident, which it concluded was "some evidence of [Hale-Cusanelli] actually acting out on this, that this is not just language but actually action." *Id*.

Fourth, the District Court concluded that the danger Hale-Cusanelli posed to the community weighed in favor of detention given "all of the violent language . . . previously mentioned." *Id*. at 27–28. The court found "highly troubling" Hale-Cusanelli's statements to the CHS regarding "looking forward to a civil war" and "the tree of liberty need[ing] to be watered with the blood of patriots from time to time." *Id*. at 28. The court agreed "with the government's concern regarding potential escalation of violence at this point given all that has occurred." *Id*. The court also expressed concern for the safety of the CHS, noting that Hale-Cusanelli knew the CHS's identity, that he had previously made comments "about committing violence against those who he feels are pitted against him," and that he "has been willing to put these thoughts into action in the past." *Id*.

The District Court observed that "this is a close case in terms of the government meeting its burden under the Bail Reform Act," but the court ultimately concluded that "no condition or combinations of conditions will assure the safety of the community" were he released pending trial, and it ordered that Hale-Cusanelli be detained. *Id*. at 28–29; *see also*

8

Detention Order, *Hale-Cusanelli*, No. 1:21-cr-37, ECF No. 20 (D.D.C. Mar. 23, 2021).

On April 2, Hale-Cusanelli moved for reconsideration of the detention order in light of this Court's decision in *Munchel*, 991 F.3d 1273.  Def.'s Mot. For Recon., *Hale-Cusanelli*, No. 1:21-cr-37, ECF No. 21 (D.D.C. Apr. 2, 2021).   In a supplement, Hale-Cusanelli informed the District Court that the CHS's employment in New Jersey had ended, that the CHS had since moved "well in excess of 1500 miles" from where Hale-Cusanelli would be living, and that Hale-Cusanelli did not know (and could not easily find out) where the CHS is now living and working.  Suppl. to Def.'s Mot. For Recon. at 2 & n.2, *Hale-Cusanelli*, No. 1:21-cr-37, ECF No. 25 (D.D.C. Apr. 14, 2021).

On April 28, the District Court held a hearing on the motion for reconsideration and orally denied the motion.  The court distinguished *Munchel*, observing that the District Court's dangerousness determination in that case had relied primarily on the nature and circumstances of the charged offenses, whereas the court had concluded in this case that this factor actually "tilted toward release."  Suppl. at 37.  The court observed that, were it "just looking at what [Hale-Cusanelli] did on January 6th, he would be a free man right now."  *Id*. at 38.  Instead, the District Court observed that its dangerousness determination here was based on Hale-Cusanelli's animus toward certain groups of people, his having acted on that animus in the past, and the possibility that he would do so again in the future.   *Id*.   The court also rejected Hale-Cusanelli's suggestion that he was no longer a threat to the CHS because the CHS had moved, observing that Hale-Cusanelli "may well know where [CHS] has moved," and the CHS "may well have moved back."  *Id*. at 39.

9

Hale-Cusanelli appeals the District Court's March 23 detention order and April 28 order denying reconsideration. He asserts that the decision to detain him based on the danger he poses to the community was error.

## III.

We review release and detention orders pursuant to the Bail Reform Act, 18 U.S.C. § 3142 *et seq.*, for clear error. *Munchel*, 991 F.3d at 1282. "The clear error standard applies not only to the factual predicates underlying the district court's decision, but 'also to its overall assessment, based on those predicate facts, as to the risk of flight or danger presented by defendant's release.'" *United States v. Mattis*, 963 F.3d 285, 291 (2d Cir. 2020) (quoting *United States v. Abuhamra*, 389 F.3d 309, 317 (2d Cir. 2004)). This standard of review is highly deferential. We will find clear error only when "although there is evidence to support [a finding or a ruling], the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Munchel*, 991 F.3d at 1282 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). However, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Brockenborrugh*, 575 F.3d 726, 741 (D.C. Cir. 2009) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). If the District Court finds that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community," the District Court "shall order" detention before trial. 18 U.S.C. § 3142(e)(1).

Hale-Cusanelli primarily asserts that the District Court clearly erred in assessing his history and characteristics and the nature and seriousness of the danger he poses. *See* 18 U.S.C. § 3142(g). Regarding his history and characteristics, Hale-

10

Cusanelli argues that the District Court clearly erred in concluding that the potato-gun incident was "some evidence" that he had violently acted on his racist ideology. Specifically, Hale-Cusanelli points to portions of a police report that show that he had not fired the potato gun and that the codefendant who had fired the gun chose the house because of a prior dispute with one of its residents over bicycles, not out of any racial animus.  Hale-Cusanelli failed to raise this argument below.  Hale-Cusanelli also argues that the District Court erred by relying on his "civil war" comments to the CHS, because other parts of the conversation allegedly show that he did not really want violence to occur.  He also failed to make this argument below.  (In his defense, Hale-Cusanelli asserts that he did not receive the recording of the conversation from the prosecution until after the District Court ruled.)

It is not readily apparent that it was a "plain, clear, or obvious error," *see United States v. Sheffield*, 832 F.3d 296, 311 (D.C. Cir. 2016), for the District Court to observe that the potato-gun incident was at least "some evidence" of Appellant having acted violently based on his racist ideology.  Hale-Cusanelli points to the police report, which gave two reasons for its conclusion that "[i]t does not appear that that there was any bias[] involved" with the potato gun incident.  Suppl. at 59. The first was that the victim was not African American, but that is not dispositive given Appellant's prejudices against others—especially Jews—and the officer apparently made no effort to determine whether the victims were Jewish.  The second reason was that the actual shooter claimed he targeted the victim due to a dispute with his son related to stolen bicycles, and while the officer credited that explanation, the District Court was not required to agree.  The potato gun, moreover, bore the words "WHITE IS RIGHT," as well as a Confederate flag. *Id.*  As the district court noted, "we don't typically penalize people for what they say or think."  Suppl. at 27.  But given Appellant's deeply held and longstanding racist and anti-Semitic views, the

11

District Court could reasonably view it as more than a coincidence that Appellant was implicated in a violent incident involving a weapon with a white supremacist message on it.

Nor is it apparent that it was plain error for the District Court to rely upon Appellant's "civil war" statements to find that he was a danger to the community. Appellant contends that the District Court was not aware that he said "[w]hen I say I want civil war, it's not like I want to see people dead in the street" and that "civil war, not that I actually want that, I think that civil war is probably the simplest—not that the simplest solutions are always the best solutions—but I think it probably is the simplest solution, the most likely outcome, inevitably." Appellant's Mem. at 19 n.13. Even so, the District Court would have to weigh those statements against others where Appellant acknowledged that guns would be used in a civil war and that people would die, to which Appellant replied "Thomas Jefferson said the tree of liberty should be refreshed with the blood of patriots and tyrants." Opp'n to Def.'s Mot. for Conditional Release at 20. It is not obviously wrong to conclude that these statements, taken as a whole, demonstrate a potential danger to the community. This is particularly so when viewed with other statements Appellant made just prior to January 6, such as proclaiming a "final countdown" and an intention to leave his employment in a "blaze of glory." *Id.* at 7–8.

Appellant suggests, based on *Munchel*, that because he did not commit violence on January 6, he should not be found to pose a danger to the community. Appellant misreads *Munchel*. We did not hold in *Munchel* that only those persons who participated in violence on January 6 could properly be considered as posing a future danger to the community justifying pretrial detention. If that had been the case, we would have reversed the detention order (as proposed by the dissent) instead of remanding the case for

12

reconsideration. *Compare Munchel*, 991 F.3d at 1283–84, *with id*. at 1285 (Katsas, J., concurring in part and dissenting in part) ("[W]hereas my colleagues remand for a do-over, I would reverse outright.").  To the contrary, we explained in *Munchel* that a person could be deemed a danger to the community sufficient to justify detention even without posing a threat of committing violence in the future.  *Id*. at 1283 (describing the threat of corrupting a union as one such danger contemplated by Congress).  In the nearly forty years since the enactment of the Bail Reform Act, countless defendants have been detained even where the charged offense did not involve violence, based on drug charges, *see* 18 U.S.C. § 3142(f)(1)(C), being a repeat offender, *see id.* § 3142(f)(1)(D), a serious risk of obstruction of justice, *see id.* § 3142(f)(2)(B), or a serious risk of threats to prospective witnesses or jurors, *id*.  The point of *Munchel* was that everyone who entered the Capitol on January 6 did not necessarily pose the same risk of danger and the preventive detention statute should apply to the January 6 defendants the same as it applies to everyone else, not that the January 6 defendants should get the special treatment of an automatic exemption from detention if they did not commit violence on that particular day.

Here, the District Court made a forward-looking determination about the serious risk of obstruction of justice and threats to witnesses as the basis for detention.  The District Court found a risk to the CHS based on Appellant's prior statements about "committing violence against those who he feels are pitted against him."  Suppl. at 28.  The District Court also expressed concern for a "potential escalation of violence" by Appellant given his statements about how great he felt about the January 6 incident, his desire for a "civil war" to settle political differences, and his lengthy history of statements condoning violence against persons of other races and religions.  *Id.*  Significantly, we also know that Appellant admitted to the CHS that he directed people to advance on

13

January 6 and assumed a leadership role during the incident. The District Court reconsidered its ruling based on *Munchel* and pointed out that it "primarily relied on" Appellant's extensive history of statements condoning violence against those of other races and religions to find that he was a danger to the community. *Id.* at 38. And while the District Court mentioned that the potato-gun incident showed Appellant taking action based upon racial animus "[t]o a certain extent," the court was also aware of Appellant's numerous incendiary statements (such as his intent to leave his job "in a blaze of glory"), as well as the harassment complaints against Appellant for publicizing the names and addresses of Jewish individuals. *Id.*; *see also* Opp'n to Def.'s Mot. for Conditional Release at 7–8. Ultimately, the court explained that "his conduct in this case made me concerned that he was perhaps looking to act on these violent tendencies and violent comments in the past." Suppl. at 38. So even were we to conclude that the District Court erred by finding that the potato-gun incident was motivated by racial animus, it was not the sole basis of the ruling that Appellant posed a risk of escalating hate-motivated violence in the future. Furthermore, the District Court did not appear to rely upon the potato-gun incident at all in its ruling that Appellant posed a risk to witnesses, which is an independently sufficient basis for detention. Finally, even if the potato-gun was not motivated by racial bias, it is not completely exculpatory—it is still an incident where Appellant participated in violence as an act of retaliation, which is precisely the type of concern we should have when it comes to the risk to the CHS.

The District Court acknowledged that this was a close case, but it ruled that based on the totality of the circumstances, the government had met its burden. Reasonable minds might disagree on that determination, but our standard of review is for clear error, not to substitute our judgment for that of the District Court. We affirm.