1

          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA

2
_____

3   United States of America,    ) Criminal Action
                                  ) No. 1:21-cr-00037-TNM-1
4                    Plaintiff,   )
                                  ) **Motion Hearing** (via Zoom)
5   vs.                           )
                                  )
6   Timothy Louis Hale-Cusanelli, ) Washington, D.C.
                                  ) October 6, 2021
7                    Defendant.   ) Time:  4:00 p.m.
_____

8
              Transcript of **Motion Hearing** (via Zoom)
9                         Held Before
           The Honorable Trevor N. McFadden (via Zoom)
10                 United States District Judge
_____

11
                   A P P E A R A N C E S
12
   For the Government:    **Kathryn E. Fifield**
13 (via Zoom)             **Emily Miller**
                          **Karen P. Seifert**
14                        UNITED STATES ATTORNEY'S OFFICE
                          FOR THE DISTRICT OF COLUMBIA
15                        555 Fourth Street, Northwest
                          Washington, D.C. 20001
16
   For the Defendant:     **Jonathan W. Crisp**
17 (via Zoom)             CRISP AND ASSOCIATES, LLC
                          4031 North Front Street
18                        Harrisburg, Pennsylvania 17110
_____

19
   Stenographic Official Court Reporter:
20 (via Zoom)             Nancy J. Meyer
                          Registered Diplomate Reporter
21                        Certified Realtime Reporter
                          333 Constitution Avenue, Northwest
22                        Washington, D.C. 20001
                          202-354-3118
23

24

25

1     P R O C E E D I N G S

2    (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the
3 limitations of technology associated with the use of
technology, including but not limited to telephone and video
4 signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
5 reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7    THE COURTROOM DEPUTY:  We are on the record in

8 criminal matter -- I'm sorry.  Excuse me.  We're on the record

9 in criminal matter 21-37, United States of America v. Timothy

10 Louis Hale-Cusanelli.

11    Present for the government are Kathryn Fifield, Karen

12 Seifert, and Emily Miller.  Present for the defendant is

13 Jonathan Crisp.  Also present is the defendant,

14 Mr. Hale-Cusanelli.

15    THE COURT:  Good afternoon, folks.

16    Can -- I guess we already have the attorneys' names on

17 the record.  We're here at -- for a motion hearing on the

18 government's motion to continue trial.  I've read the briefs,

19 both parties'.

20    Ms. Fifield, anything further the government wishes to

21 say?

22    Well, actually, let me say before I hear from you, I

23 want to flag one additional issue that the parties haven't

24 really discussed.  And not surprisingly, since it's not

25 entirely apparent to you-all, perhaps, but obviously we're

1    operating here in district court under unusual circumstances

2    given COVID.  The Chief Judge has issued a series of standing

3    orders limiting the number of trials that we are starting and

4    holding in the courthouse at any one time.

5        This is -- we've got a couple choke points.  One is the

6    need to pick juries, criminal juries in particular, in the

7    ceremonial courtroom because that's the only courtroom that's

8    large enough to accommodate a socially distant venire panel;

9    and then, secondly, the issue of just trying to limit the total

10   number of juries that we have in the courthouse at any one

11   time.

12       And while I believe that standing order technically

13   expires before November 9th, I think as -- as a practical

14   matter, it will certainly be standing.  My colleagues and I are

15   certainly anticipating that, you know, we're only going to be

16   running a certain number of jury trials as of next month.

17       And part of that means that we're only picking juries on

18   Mondays and Wednesdays because we need to have -- allow -- and

19   so picking one jury on a Monday and one jury on a Wednesday.

20   Because we need to allow for extra time.  And I think in this

21   case, if -- if it went forward, I believe it would be the first

22   January 6th case, I -- you know, we haven't discussed -- my

23   guess is we need to have a special jury panel, which would

24   probably lengthen things as well.

25       So right now we don't even have room in the courthouse

1    to have the trial on Monday -- or I'm sorry -- Tuesday,

2    November 9th.  We have a co-defendant criminal trial, detained

3    defendants, from 2020 that's beginning on November 8th and

4    would -- would have precedence over this case for that Monday

5    and Tuesday.

6         There is a -- a grand jury that's sitting -- being

7    impaneled on Wednesday, the 10th, and so it's just -- it's kind

8    of a logistical nightmare for us to try to get in.  And,

9    frankly, as I look at the cases that are going around this

10   time, I must say they -- I don't see any case as recent as this

11   one.  They're almost all 2020, 2019 cases with -- usually also

12   with detained defendants who have been waiting much longer than

13   Mr. Hale-Cusanelli.

14        So I wanted to flag that for the parties.  I think in

15   addition to the issues the parties have discussed, I am just

16   facing logistical issues related to COVID and the court

17   protocols that I have to juggle with.

18        So, anyway, having said that, Ms. Fifield, anything that

19   the government wanted to elaborate or respond on to from the

20   defense motion?

21             MS. FIFIELD:  Emily --

22             MS. MILLER:  Your Honor, I'm going to actually pop in

23   on this one.  I'm sorry.  Go ahead.

24        This is Emily Miller, for the record.

25        I just wanted to amplify some of the arguments that we

1    made in our motion and our reply, and also just to put the

2    status of the matters on the record.  I understand -- or

3    intuit, in any event, from everything that the Court said, it

4    doesn't appear logistically we're going to be able to go

5    forward on November 9th, even if the Court were disinclined to

6    grant our motion, but I really wanted to let the Court know why

7    the Court should, in fact, be inclined to grant our motion and

8    find as an alternative basis for a speedy -- for a continuance

9    for reasons therein.

10            So if the Court will give me a little bit of the floor

11   and be patient with me, I would love to put some of that

12   information on the record.

13            THE COURT:  Okay.

14            MS. MILLER:  First of all, Your Honor, I just wanted

15   to say as a preliminary matter, I realize that probably the

16   most relevant fact to our motion is how diligent are we being

17   in providing the discovery materials in this unprecedented

18   case.  And so I just wanted to summarize for the Court what

19   we've done since July 30, 2021, when the Court set this matter

20   for trial in this case.

21            With respect to the case-specific material, I defer

22   largely to Ms. Fifield, but also to AUSA Karen Seifert, as the

23   Court, I believe -- I think the Court is familiar with

24   Ms. Seifert, and she's extremely experienced and she joined the

25   case yesterday.  I believe that she disclosed the native format

1    files of some photos that were already provided in a different

2    format in discovery and a few additional surveillance clips

3    from the Capitol.  But my understanding is now having joined

4    the case, she has been diligently going over the files with a

5    fine-tooth comb, and her intention is to properly disclose any

6    other materials she comes across.

7        In terms of my shop, the discovery team, so to speak,

8    which is really where I have the most personal knowledge, on

9    September 3, the government modified its contract with Axon,

10   which is our evidence.com vendor.  And pursuant to that

11   modification, we have funded the Capitol breach instance of

12   evidence.com.  And we purchased licenses that will enable all

13   legal defense teams to gain access to a discovery -- defense

14   discovery version of evidence.com.

15       Let me just acknowledge right up front, this environment

16   is not currently available or accessible to defense counsel.

17   FPD has agreed to serve as the discovery liaison for defense

18   counsel in all Capitol breach cases, regardless of whether

19   defendants are CJA, retained counsel, FPD, whoever their lawyer

20   is.

21       And they have been -- given the volume of cases, they

22   now need to match discovery for -- diligently working with the

23   defender services national litigation support team to create a

24   structure for distributing the evidence.com licenses to defense

25   counsel.  And based on what's been shared with us, FPD expects

1    to make its initial contact with the entire Capitol breach

2    defense bar no later than October 11.  And at that time we'll

3    provide a point of contact for all their discovery-related

4    inquiries, procedures for obtaining a license to access

5    evidence.com and even -- even putting together a quick start

6    guide for defense counsel to use with evidence.com.

7         With that all being said, we are not awaiting the

8    distribution of those licenses to share footage for the defense

9    instance because it does exist and we want the materials to be

10   accessible as soon as defense lawyers do have access.  And so

11   as of last night, we exposed more than four terabytes of U.S.

12   Capitol Police surveillance footage.  It's basically about

13   5,000 of the 7,000 relevant hours -- relevant hours of footage

14   from the Capitol, from the U.S. Capitol Police.  It was over

15   15,000 files.

16        And we've also shared the majority of the body-worn

17   camera footage from -- from the duration of the riot from the

18   Metropolitan Police Department.  So there were several agencies

19   that responded that had body-worn camera, but this was about --

20   a little over 1600 or almost 1700 files of body-worn camera

21   that have been shared already to the defense instance and will

22   be accessible once defense lawyers have their licenses.

23        It's -- I wanted to let the Court know, because I think

24   it's going to be very relevant to this defendant's position

25   here, that we also expect to provide on a rolling basis in the

1   next one to six weeks information that includes, in terms of

2   digital footage:  the remainder of the Capitol surveillance

3   footage, which includes all the interior footage.  And this

4   defendant is alleged to have gone inside the Capitol.  The

5   remainder of the body-worn camera footage -- so what we haven't

6   yet provided from MPD, as well as the other four agencies that

7   gave us footage; video from --

8            THE COURT:  Ms. Miller, can I just ask something.  So

9   when you say you provided, that means Mr. Crisp has 5,000 of

10  the 7,000 relevant hours?

11           MS. MILLER:  No.  Sorry.  That's why I was saying we

12  made it accessible to the -- it's in the defense instance.  And

13  when Mr. Crisp gets his license, he will have access to all of

14  that.

15           But that's what FPD's been coordinating for the last

16  couple of weeks.  It's not just about rolling out the licenses.

17  It's managing the data; it's making sure that when they make

18  this database accessible to all these different lawyers that

19  they can lock down the permissions correctly so that lawyer A

20  can't see what lawyer B is doing, and that kind of thing, to

21  protect people's privilege.  So they're really -- it's a whole

22  work process or workflow that they're dealing with.  And that's

23  why it takes some time.  It's not just sending an email and

24  saying here's your license.

25           They're also looking into things like what do they do if

 1     footage is sensitive or highly sensitive.  Are there ways to

 2     help ensure that it's not shared beyond the confines of the

 3     legal defense team, if that's appropriate, and things like

 4     that.  So those are the kinds of issues that they've been

 5     managing.

 6          But once this all goes out, then Mr. Hale-Cusanelli's

 7     attorney, Mr. Crisp, will have access to whatever we've

 8     provided over there.

 9          THE COURT:  Okay.  You think that's the week of

10     November 11th?

11          MS. MILLER:  No.  I think that's, like, next week.

12          THE COURT:  That he can have access to it?

13          MS. MILLER:  That -- well, what they've said is that

14     next week FPD will reach out to defense counsel for the first

15     time, provide a point of contact at FPD for being discovery

16     liaison; and provide information about how to get licenses, how

17     to access evidence.com, and even -- they're even creating a

18     quick start guide.

19          I don't have the insight of the exact logistics of when

20     they will roll out licenses or to whom first or whether

21     everything will be ready, as they're saying, on October 11th,

22     but based on what they've said to me a few days ago, this is

23     the most recent information that I have.

24          THE COURT:  Okay.  Thanks.  I misunderstood.

25          MS. MILLER:  But what I was saying is in the next one

1    to six weeks, we're going to provide, in addition to what we've

2    already given to that instance -- which is the stuff I

3    mentioned:  the 5,000 hours of U.S. Capitol Police surveillance

4    footage and the sixteen to seventeen hundred body-worn camera

5    files -- we're going to be turning over the remainder of the

6    Capitol surveillance footage, which includes the interior

7    footage, the remainder of the body-worn camera footage, the

8    footage from MPD's electronic surveillance unit of nonuniformed

9    officers who filmed part of the riot, U.S. Secret Service video

10   of The Ellipse, as well as tools that I think I've mentioned

11   before that we created for trying to help defense counsel

12   identify the relevant footage within that mass of things.

13        Like camera maps we've created or radio GPS for officers

14   to try and find people who might have relevant body-worn

15   camera.  And even our own offices internally created body-worn

16   camera tracker.

17        So that's the status of digital materials that we've

18   provided and then a preview of what's going to be coming soon.

19        With respect to documents, Deloitte, which is hosting

20   our Relativity database, has established a Capitol breach

21   defense Relativity workspace.  We have not yet modified our

22   contract to fund the additional hosting and support of that

23   database for the defense, largely because that presented a lot

24   more contractual and technical and legal challenges than the

25   Axon contract.

1        The Court can imagine, based on the nature of the

2    information that's going in there, which is documents, source

3    reports, interviews, bank records, travel records, it's

4    extremely sensitive material that will be shared among hundreds

5    of people.  It also raises issues about potential work product

6    needing to be -- as attorneys access it, we -- we don't want

7    the -- we don't want to accidentally spill our work product to

8    their database or, even worse, have theirs spill to ours,

9    protecting all the parties who are involved.

10        So that's been a harder lift, but we are expecting that

11    our contract modification will be completed this month and --

12    meaning that the defense should have access to the Relativity

13    database this month, I should say, subject to the caveat that

14    as they're doing evidence.com, FPD is going to have to work out

15    the structure for distributing the licenses and training people

16    on how to use the Relativity database.  And so I'm sure that's

17    going to take some extra time, but we are down the path.

18        As with evidence.com, we are not awaiting the

19    distribution of these Relativity licenses to share documents

20    that we've processed -- voluminous documents we've processed to

21    defense counsel.  The way that we're handling that is instead

22    of producing it from our database to a defense database, we are

23    just creating productions from our database and then rolling

24    them out to the AUSAs and having the AUSAs share those in

25    individualized productions in their cases.

1      So as of last night -- and I should say, last night a

2  number of disclosures were made to the defendant in this case.

3  We had issued three voluminous productions September 10, and

4  due to some misunderstanding and miscommunication among this

5  particular prosecution team, not -- those materials did not go

6  over at the time that they were available.

7      But we disclosed the -- that was all corrected last

8  night.  And so as of last night, the defense is now in

9  possession of 35 U.S. Capitol Police Office of Professional

10  Responsibility reports -- so OPR investigations -- into officer

11  conduct arising out of January 6th and 20 related digital

12  exhibits, as well as 42 Metropolitan Police Department Internal

13  Affairs Division reports and exhibits.  That's another 739

14  pages.

15      And I just want to let the Court and defense counsel

16  know that we're still processing some additional digital

17  exhibits for those reports, and we expect to get out about 30

18  more this week that actually consist of audio recordings of

19  officer statements.  And I know that officer statements about

20  what happened at the riot have been a significant source of

21  interest for defense counsel.  So I wanted to let everyone know

22  that that's coming.

23      In terms of the status of our own Relativity database,

24  we've populated over a hundred thousand documents at this

25  point, and we're doing our best to just go through them and

1   prioritize for production the materials that we believe are

2   going to be the most material to defense theories.  That's why

3   we've produced so far these MPD IAD and U.S. Capitol Police OPR

4   reports.

5        So for all of those reasons, Your Honor, we think we've

6   been extremely diligent and that, therefore, the ends of

7   justice are served by granting our motion.  They outweigh the

8   best interest of the public and the defendant in a speedy

9   trial.  We are -- all we are trying to do is ensure that the

10  defendant has access to all the materials to which he's

11  entitled and so he can identify any information he thinks can

12  assist in his defense.

13       And although we've exercised good faith and we've

14  exercised due diligence in our efforts to comply with these

15  unprecedented discovery obligations, just given the nature and

16  the volume of the material, we just have not had an adequate

17  opportunity to complete our discovery.  And as we stated in our

18  motion -- I won't reiterate here because I know I'm already

19  taking up a lot of the Court's time; thank you for your

20  patience -- much longer continuances have been granted in cases

21  involving defense objections, in cases involving detained

22  defendants, and in cases involving far less complexity in terms

23  of the volume and nature of the data.

24       Putting all that aside, I just want to be absolutely

25  clear that we not saying this will never end.  We are just

1    asking for a reasonable opportunity to produce the materials

2    that are most likely going to be relevant to this defendant,

3    the voluminous ones.

4         And I should say, in addition to the video that I

5    previewed for the Court we expect to provide that I think this

6    defendant would find relevant, we also plan in the next one to

7    six weeks to provide materials that include U.S. Capitol Police

8    action reports.  Those are about 50 to 60 of those.  That

9    includes statements by officers about the riot and what they

10   observed.

11        We've also been asked to collect a comprehensive --

12   comprehensive collect -- comprehensive folder of officer

13   statements, so whether they were giving interviews, you know,

14   to FBI agents in the course of all these Capitol breach

15   investigations, after action reports, the internal affairs

16   reports.  Wherever officers have described the riot, we're

17   trying to collect them all into one place and provide those in

18   an upcoming production so that defendants can read them.

19        I think as an especial note here -- as a special note

20   here, I think this defendant and the Court will find relevant

21   that we are actually collaborating with FPD to draft a plan

22   that will increase access by incarcerated defendants to

23   voluminous materials.  FPD is awaiting some additional

24   technological and logistical information before we present the

25   plan to the jail, but we are planning to schedule a meeting

1    with the jail and present that and expect to have more

2    information about that in the next couple of weeks.

3           But, you know, at the same time that I'm saying this

4    will end, I do need to just make sure that everyone understands

5    that we still do need additional time to do things like produce

6    the thousands of scoped Stored Communications Act accounts and

7    devices that have been searched and -- as well as to process

8    and review and produce the hundreds of thousands of documents,

9    not all of which have been ingested even by our team yet.

10          And what our plan to do is to just keep filing those

11   regular status memoranda with this Court and keep you apprised

12   of our progress and our diligence so that you know that we are

13   doing everything we can to get this defendant everything that

14   is material to his case before -- before his trial is set.

15          And I just wanted to address some of the arguments

16   specifically that remain in the defendant's opposition.  He

17   made both constitutional and Speedy Trial Act claims.  And I

18   just wanted to briefly say, first of all, the Speedy Trial Act

19   is not only about the defendant's time to prepare; it's about

20   the government's time to prepare.  And it expressly

21   contemplates that the Court can grant our motion over the

22   defense objection and allow us to do that.

23          And for all the reasons we've already discussed many

24   times over, we believe that the requested continuance to allow

25   us to provide these discovery materials is amply supported by

1    the facts here and by the applicable precedent.

2         With respect to the constitutional violations, as we

3    noted in our pleading, it would be very rare for a

4    constitutional violation to exist, were it not to exist under

5    the Speedy Trial Act, but we don't believe there's been any

6    violation under the Speedy Trial Act here.  Moreover, the

7    defendant was arrested 264 days ago so he hasn't even triggered

8    a presumption of a constitutional violation yet.  There's --

9    there shouldn't even be a *Barker* inquiry yet.  He's a hundred

10   days shy of that presumption even kicking in, which is not

11   until next January.  But even if a year had passed, we do

12   believe that it would easily meet the constitutional test.

13        The main prejudice asserted by this defendant is he

14   doesn't like being incarcerated, but that incarceration is not

15   prejudicing his defense.  He's facing felonies with 5-year and

16   20-year maximums.  He's not being treated differently than any

17   other defendant in a reactive case where the Court determines

18   that someone poses a danger and we don't have the luxury of

19   putting everything together first.  And the case law we cited

20   in our pleadings, again, makes clear that defendants have been

21   held for far longer with no constitutional or statutory

22   violations being found.

23        And finally, Your Honor, we -- we believe that the

24   defendant's demand for a speedy trial in this case is somewhat

25   disingenuous and that what he's after is not a speedy trial, in

1    fact, but a dismissal.  And I say that because among other

2    things, he isn't saying that he's giving up his right to

3    materials that the government is seeking to produce to him.  To

4    the extent he's argued about those materials, his complaint has

5    been that we have not showed him the relevance of the

6    information that we're trying to produce.

7         But as we've said over and over, the one thing that I

8    think we can all agree on is the government doesn't exactly

9    know what it possesses.  We haven't even had our own

10   opportunity to digest that, and we certainly don't know what

11   this defendant will think is relevant within his terabytes of

12   discovery.  This is why we're trying to give them to him to

13   review.  He didn't file any motions in this case, even though

14   they were due September 24.  He hasn't filed Attachment A to

15   the protective order with the Court, which suggests he has not

16   shared any sensitive or highly sensitive materials with his

17   client; that is, counsel hasn't, assuming that he is in

18   compliance with the protective order that was agreed to by

19   prior counsel.

20        So for all of those reasons, Your Honor, we believe that

21   the Court should find that the ends of justice are served by

22   granting our motion to continue.

23            THE COURT:  Ms. Miller, I want to understand a couple

24   things.  So just big picture, it sounds to me like much, maybe

25   most, certainly not all, of the digital materials are in this

1    database that Mr. Crisp should be able to have access to within

2    the next couple weeks; am I understanding that correctly?

3           MS. MILLER:  I think that that's correct, Your Honor.

4    Certainly more is going to be coming over within the next

5    couple of weeks.

6           I do think it's going to take longer than that to deal

7    with the information that comes from search warrants.  I think

8    that -- that's much more complex, as both a legal and

9    technological matter, because first we need to quality check

10   all the results and ensure they're scoped before they go into

11   this database.  And there's a lot of devices and accounts at

12   issue.  So that's a legal concern.

13          And then we also have just the technological issue of

14   each account.  Each device is often searched with a different

15   tool or it's a different source of information.  Each one --

16          My child is now trying to break in.  I apologize.

17          And so each one requires a different technological

18   consideration, and we have delayed analyzing a number of them

19   just to try and help us determine, sort of, the best way to

20   share that information so that it makes sense when it goes over

21   to the defense side; it doesn't get unnecessarily broken apart

22   or become confusing.  So...

23          THE COURT:  And so my second question was the -- I

24   understand that the -- the Deloitte license hasn't been agreed

25   upon yet.  But am I correct in thinking that in that database

1    or in your side of the database is most of the documentary

2    evidence, and so once that is finalized, hopefully later this

3    month, Mr. Crisp will then have access to much, if not all, of

4    the discovery out there, you know, within the next month or

5    two?

6            MS. MILLER:  I think it's a little more complicated

7    than that.  At this point we have about a hundred thousand

8    documents in our database, but those documents, many of them,

9    still need to be reviewed, deduped, like reviewed for just

10   discoverability.

11           So essentially -- for example, we pulled over the FBI's

12   entire SENTINEL case file for all the riot cases.  It's

13   hundreds of thousands of documents.  And as I'm sure the Court

14   is well aware, there's going to be a lot of information that is

15   not discoverable within those materials.  So that -- that --

16   those kinds of documents need -- we need to sort them, organize

17   them, figure out what we possess.

18           We are also -- before we put -- send anything over to

19   Deloitte, having to look at it and make sure we cull out

20   anything that can be protected by 6(e).  That takes time

21   because of the ruling that said we can't give materials

22   protected by Rule 6(e) to an outside vendor.

23           So we're -- we're -- what I would say is our database is

24   not full.  And to the extent that we have documents in that,

25   we're not ready to just turn them over to the defense database.

1    It's not just that we have a hundred thousand documents and

2    once their work space is up we're going to hit send and provide

3    them.

4        We are adding staff.  We are figuring out ways to review

5    it using tools and staff.  So tools, like, deduping tools,

6    staff to just help us, experienced attorneys to look at things

7    and help us make discoverable determinations.  And we are going

8    to do that as fast as we can, but it's not that once the

9    defense workspace is available, they should expect to see

10   hundreds of thousands of documents in there.

11       To the contrary, I think what they should expect to see

12   is going to be the same stuff that we are producing between --

13   you know, from our Relativity instance to them.  The difference

14   will be that they now have a place they can search across all

15   of that, which will make it much more accessible for them so if

16   they want to look for a particular name or location, they can

17   go in and search across all of the materials instead of having

18   to read file by file and try to find things.

19       THE COURT:  I understand.  Okay.  Thank you, ma'am.

20   Those are the questions that I have for you.

21       Mr. Crisp, I'll hear from you.

22       MR. CRISP:  Your Honor, I think before we start, I'm

23   certainly happy to argue a few of the points that were raised,

24   but I don't know if it's a moot point based on the discussion

25   about where we are with the COVID restrictions.  So is that

1    what I'm getting is that this is, sort of, a fait accompli in

2    that sense?

3              THE COURT:  As I said, I think it would be very

4    difficult to do a trial this -- certainly on November 9th -- or

5    November 9th or thereabouts.

6              MR. CRISP:  Okay.

7              THE COURT:  I'll tell you my instinct -- I've got

8    trials basically back to back for the next several months.  My

9    instinct is to find a date in April, and I expect that to be

10   a firm date.

11             And I'm -- you know, I'm willing to give -- I'll also

12   tell you, I think as -- as a result, while I agree with

13   Ms. Miller that I'm not sure you've even reached the one-year

14   presumption on -- on your Sixth Amendment right, I'd be looking

15   to continue this until the spring.  And so I think my analysis

16   would then be assuming that there -- you have cleared that

17   initial bar.

18             So that's what I'm thinking, but you're -- you know,

19   I've changed my mind before, and I certainly want to allow you

20   to make your record here.

21             MR. CRISP:  So a couple points here.  I disagree with

22   counsel in saying that he is not being treated any differently.

23   I feel in terms of some of these other defendants that are in

24   this particular case, you know, the government has asserted

25   that they think he is a violent individual.  I don't think the

1    facts bear that out here in this case in terms of the charges,

2    in terms of his conduct.

3           So, you know, if they want to point to 10-, 12-year-old

4    remote-in-time instances and that's what they use as a

5    justification to detain, certainly there are a number of other

6    defendants that engaged in violent behaviors in this case who

7    have been released.  So I disagree with that proposition in

8    that regard.

9           And in terms of the -- the prejudice to my client, my

10   ability to actually continue to engage with him has been

11   prejudiced by obviously, in part, his detention and his -- his

12   ability to actually have access because of the way this has

13   been disclosed and because of the way this has played out.  So

14   there is absolutely a prejudice to him in that regard.  And I

15   disagree that there hasn't been because of the ability to not

16   disclose a lot of this information to him.

17          So the biggest fear that I have is that we're going to

18   come back here, you know -- and now you're positing April as a

19   potential date, and I understand that.  But I'm not sure that

20   even then the government's going to not turn around and say it

21   seems like an open-ended and indefinite inquiry in terms of

22   "while there could be additional information."

23          In looking at what was recently disclosed, certainly I

24   haven't had a chance to review every single thing because some

25   of it came yesterday.  What I would argue is it's much of the

1    same.  So you're seeing a lot of videos of people entering the

2    building.  You're seeing, you know, my client at various angles

3    going from one place to another, but we already have evidence

4    of the fact that he is in the building.  We have evidence of

5    where he is from Point A, B, to C and so on through the

6    building.  Do we need another 27 videos of that?  I'm not sure

7    that we do.  And I think if the government wants to make an

8    argument that he was in the building and he engaged in a

9    particular kind of behavior, they have the evidence they need

10   for that.

11        So -- and what concerns me is the argument that they're

12   going to produce this evidence at some point in time --

13   speaking to their motion, they -- they acknowledge a *Brady*

14   obligation but then in the next breath indicate the *Brady*

15   obligation is not something they have to do in any kind of

16   organized format.  So now we're being hit with additional

17   terabytes of information that have to go through this.  So, you

18   know, either -- the government had enough evidence at the time

19   of the indictment to prosecute and then represented as much.  I

20   don't see how any additional discovery at this point is going

21   to be any more beneficial to either party in this instance.

22        And if there's a question of him willing to waive

23   whether or not -- the production of material evidence, we are

24   willing to go forward with the evidence that exists at this

25   time, Judge.

1            THE COURT:  Okay.  Thank you.

2        All right.  I've considered the parties' arguments, I've

3    considered the -- the written submission from the parties, and

4    I will be granting the government's motion to continue at least

5    in part based on the following considerations:

6        I must consider, one, whether a continued trial would

7    violate the defendant's Sixth Amendment speedy trial rights;

8    and two, whether an ends of justice tolling of the Speedy

9    Trial Act is warranted.  I'll address those both in turn.

10       To determine whether the defendant's Sixth Amendment

11   right to a speedy trial has been violated, the Court must

12   consider four factors.  One is length of delay; the reason for

13   the delay; three is defendant's assertion of his right; and

14   fourth is prejudice to the defendant.  That's from *Barker v.*

15   *Wingo,* 407 U.S. 514, 530 from 1972.

16       I'll address each factor in turn.  I'm focusing on the

17   Sixth Amendment perspective for now.

18       That -- that first factor, the length of delay,

19   according to the United States Supreme Court, that factor

20   involves a double enquiry.  A speedy trial analysis is

21   triggered only if the defendant alleges a long enough interval

22   between accusation and trial, such that the delay becomes

23   presumptively prejudicial.  And that's from *Doggett v.*

24   *United States*, 505 U.S. 647, pages 651-52, from 1992.

25       Generally, a delay of one year is presumptively

1    prejudicial according to *United States v. Bikundi*, 926 F.3d

2    761, page 779 out of the D.C. Circuit in 2019.  And I should

3    say, I think *Bikundi* is a very recent and highly relevant

4    analysis from the circuit, a couple years ago, and it does

5    weigh heavily in my analysis.

6         If the defendant alleges a presumptively prejudicial

7    delay, the Court must consider the extent to which the delay

8    stretches beyond the bare minimum needed to trigger judicial

9    examination of the claim.  And that's from *Doggett*, page 652.

10   A longer delay favors the defendant.

11        However, the more complex the charge, the longer the

12   delay can be before it becomes unconstitutional according to

13   *Bikundi* at page 780; where the Court found that an 18-month

14   delay was justifiable in part because the charge of conspiracy

15   to commit health care fraud, conspiracy to money laundering

16   were complex, involved multiple defendants, and required

17   voluminous discovery.  Also *United States v.*

18   *Lopesierra-Gutierrez*, 708 F.3d 193 from the D.C. Circuit in

19   2013 where a three-and-a-half-year delay was justifiable in

20   part because the district court and numerous attorneys had to

21   untangle a complicated conspiracy, execute 15 extraditions,

22   fairly treat all 15 co-defendants, collect and decipher foreign

23   evidence, and coordinate with foreign witnesses.

24        In this case, the government is requesting a 60-day

25   delay right now.  This would not be presumptively prejudicial

1    because the defendant would still have been incarcerated less

2    than a year.

3         But as I said, from a practical standpoint, I'm not

4    going to be in a position to try this case in January; and,

5    frankly, it really doesn't sound like the government thinks

6    that the case will be ready in January.  So I'm going to, as I

7    said, assume that we're looking at something mid to late spring

8    for a trial.  So I do think we're looking at more than a year

9    delay, which -- which gets the defendant over that initial

10   prong.

11        I find that the delay of approximately 14 months would

12   be presumptively prejudicial because it would exceed one year.

13   But that delay is only just over a year.  Thus, the delay only

14   slightly exceeds the bare minimum needed to trigger judicial

15   examination of Mr. Hale-Cusanelli's claim under *Doggett*,

16   page 652.

17        I believe the slight delay is justified for at least two

18   reasons:  First, the discovery in this case is -- as the

19   Court -- in the -- the U.S. Attorney's Office case, they're

20   right that discovery is unprecedented.  And as I said in

21   *Bikundi*, voluminous discovery is justified by exceeding one

22   year, due to voluminous discovery.

23        The other justification of the delay, which really is

24   unique to this -- the last couple years is this COVID and all

25   of the issues that I mentioned at the beginning.  Frankly, we

1    just are having a hard time doing jury trials, frankly.

2    There's a special complication by doing a January 6th trial

3    that quite possibly would require a special jury panel, even

4    more people coming in; we'd certainly need the ceremonial

5    courtroom for at least one, probably two or more days just to

6    select a jury.  And I just can't do that right now if all of

7    the older detained cases and the backlog here in this

8    courthouse.  And with the Chief Judge's standing order, it's

9    justified in light of the pandemic.

10          In sum, although I find a 14-month delay presumptively

11   prejudicial, I believe that the first factor ultimately favors

12   the government because the delay is justified and only slightly

13   exceeds one year.

14          The second factor is the reason for the delay; that

15   considers whether the government or the criminal defendant is

16   more to blame for that delay.  That's from *Doggett*, page 651.

17   A deliberate attempt to delay the trial in order to hamper the

18   defense should be weighted heavily against the government, but

19   a more neutral reason, such as negligence or overcrowded

20   courts, should be weighted less heavily according to *Barker* at

21   page 531.

22          If the defendant caused the delay, then his waiver may

23   be given effect under standard waiver doctrine.  That's

24   according to *Vermont v. Brillon*, 556 U.S. 81, page 90 from

25   2009.  Delays caused by the defendant included the defendant's

1   decision to make an interlocutory appeal.  That's from

2   *United States v. Loud Hawk*, 474 U.S. 302, page 316 from 1986.

3   Or any delay caused by the defendant's counsel.  That's from

4   *Brillon*, pages 90 and 91.  I also point to

5   *Lopesierra-Gutierrez*, 708 F.3d 193, where the Court found that

6   the defendant was more to blame for the delay because he filed

7   pretrial motions, took an interlocutory appeal, and sought a

8   continuance.

9         Here I think there are factors that weigh in both

10   directions.  I have in the past -- and I agree to -- to feel

11   some, you know, concern about the delay that this case has been

12   prosecuted by the government, particularly the way that -- you

13   know, contrary to -- not every federal criminal case I'm aware

14   before this year, the government has seemed to have indicted

15   first and investigated second, such that we have these, you

16   know -- we're nine months into the case and the government has

17   only turned over a fraction of the -- the discoverable

18   material.

19         I pointed to problems with this particular prosecution

20   team.  In the past, they discarded one set of counsel and there

21   were delays there.  As rightly admitted, that there were delays

22   just within the last couple of weeks of getting discovery out,

23   which the delays cut against the government, to a certain

24   extent.

25         However, the defendant is also responsible for some of

1    the delays.  He sought and successfully switched counsel once.

2    That was the cause for delay, in the summer.  He also appealed

3    his detention; that the courts have repeatedly recognized as

4    being something that justified delay.

5         And then the third issue here that the courts have not

6    addressed before, but is somewhat akin to overcrowding.  What

7    the *Barker* court recognized is that the pandemic has created a

8    substantial backlog in the courts and an inability for the --

9    for me to be able to try this case as quickly as I otherwise

10   would have liked to, and that's certainly not attributable to

11   the government.

12        So in short, I think that second factor, I weigh that as

13   neutral.  I think there's some blame all -- all around on that

14   one.

15        The third factor is the defendant's assertion of his

16   rights.  The courts must determine whether in due course the

17   defendant has asserted his right to a speedy trial.  That's

18   from *Doggett*, page 651.  Courts are required to look at when

19   the defendant asserted his right to the trial because delays in

20   raising that right cut against the defendant.  And I'm looking

21   to *United States v. Taplet*, 776 F.3d 875, page 881, from the

22   circuit in 2015; noting rejecting the defendant's speedy trial

23   claim in part because he waited 14 months after his arraignment

24   before filing a motion to dismiss under the Speedy Trial Act.

25   Also *Bikundi*, page 780, where the defendant failed to raise the

1    Speedy Trial Act -- rights until 16 months after her

2    arraignment.

3         Here, Mr. Hale-Cusanelli first objected to delays going

4    to trial in June of this year, despite the government moving

5    for tolling of the Speedy Trial Act numerous times prior to

6    June.  And as I recall, it was right around the time he sought

7    to switch counsel.  As I already said, it also delayed things.

8         He certainly, under Mr. Crisp, has been assiduous in

9    asserting his rights to a speedy trial, but I think that the

10   fact that he did not assert his rights for -- you know, frankly

11   about half his total time we discussed means that this factor

12   favors the defendant, but only weakly.

13        And the fourth factor is prejudice to the defendant.

14   Potentially prejudice includes, quote, oppressive pretrial

15   incarceration, anxiety, and concern of the accused, and the

16   possibility that the accused defense will be impaired by

17   dimming memories and loss of exculpatory evidence.  That's from

18   *Doggett*, page 654.

19        The circuit has found that the defendant is unlikely to

20   persuasively assert an impaired defense without identifying

21   specific, articulable prejudice.  That's from *United States v.*

22   *Tchibassa*, 452 F.3d 918, page 927.  And also *Taplet* at page 881

23   where the Court found no prejudice because the defendant failed

24   to offer a concrete explanation on how the delays prejudiced

25   his defense.

1          Such a showing is not essential to every speedy trial

2     claim because in such cases where the government is more at

3     fault with respect to the delay, the greater the presumption of

4     prejudice that the government must rebut.  That's from *Doggett*,

5     page 657-58.

6          Because I have not found that the government is more at

7     fault with respect to the delay, I believe that the

8     responsibility falls to the defendant to show specific

9     articulable prejudice.  I agree with Ms. Miller that the

10    defendant has not done so.  He points to oppressive pretrial

11    incarceration and is unable to fully participate in the

12    formation of his defense.  But I think a lot of that is,

13    frankly, just what any defendant would -- would face or any

14    incarcerated defendant would, while most federal defendants

15    are.

16         I certainly don't have -- haven't heard any concern

17    about loss of exculpatory evidence or dimming memories or the

18    types of very specific things that other courts have found with

19    the way that Sixth Amendment is factored.

20         For all those reasons, I find that granting the

21    government's motion would not violate the defendant's Sixth

22    Amendment Speedy Trial Act -- speedy trial prosecutorial

23    rights.  Weighing especially heavily in my decision are the

24    pandemic, which as I said, have led to the delays, which are

25    unfortunate for the defendant, but are not the responsibility

1    of the government.

2         That -- the fact that there's substantial discovery in

3    this case, as I've said, I'm not sure that this qualifies as a

4    complex case under the Speedy Trial Act, but I do think that

5    there is undeniably an incredible amount of discovery in this

6    case that does take it out of the mill run of the cases.

7         And I'm persuaded by the government's argument that

8    additional time is necessary to process the discovery and meet

9    its discovery obligations.  And then, finally, as I said, we're

10   only just looking at an extension that would push the defendant

11   slightly past that one-year mark, really start a trial

12   discussion.

13        I'll say, though, closing on that point, that I am

14   pretty -- the government certainly knows I try to move cases

15   along.  I am concerned this case has gone this long, and I'm

16   not one granting repeatedly or -- or lightly a continuance --

17   (inaudible due to loss in audio connection) -- coming to the

18   springtime.

19             THE COURT REPORTER:  I'm sorry, Judge.  I didn't hear

20   you.  "And I'm not one granting repeatedly or lightly" and --

21             THE COURT:  Continuances.  And I -- I think it would

22   be a very different analysis if we're coming to the spring and

23   the government is asking for another continuance.  I think a

24   lot of these factors that don't necessarily weigh or weigh

25   heavily for the defendant now might look very different, which

1    would be six months from now.

2         I also need to make an independent Speedy Trial Act

3    finding.  The Speedy Trial Act provides judges with

4    considerable flexibility.  That's from *Zedner v. United States*,

5    547 U.S. 489, page 498 from 2016, and also *United States v.*

6    *Rice*, 746 F.3d, 1074, page 1078 from the D.C. Circuit in 2014.

7         For the reasons I've already discussed, I do believe an

8    ends of justice tolling is warranted.  I look again

9    specifically to *Bikundi* where the D.C. Circuit found no Speedy

10   Trial Act violation despite an 18-month delay.  The circuit

11   noted that the district court tolled the Speedy Trial Act to

12   permit defense counsel and the government time to both produce

13   discovery and review discovery.  That's at page 777.  This is

14   similar to the reason the government asks for the tolling here.

15        And also, as I mentioned at the outset, the court is

16   operating under protocols limiting the number of trials that

17   can occur simultaneously and the order in which they can occur,

18   and also just incorporate by reference concerns that

19   Chief Judge Howell has gone through in her repeated standing

20   orders related to the tolling of the speedy trial clock due

21   to -- due to the pandemic.

22        So for all those reasons, I'm going to grant the

23   government's motion to continue.

24        I do want to pick another trial date now.  I'm going to

25   vacate all of the current -- the current briefing schedule.  I

1    do, though, think that the -- my requirement for the government

2    to have turned over any information that they would like to

3    admit at trial in its case in chief.  I directed the government

4    to turn any of that over by September 3rd.  And I am still

5    standing by that.

6         If the government wants to produce information that is

7    not already disclosed or evidence that has not already been

8    disclosed to Mr. Hale-Cusanelli, it would need to show why that

9    is appropriate despite the length of time, and that is in my

10   prior order.

11        All right.  Let's talk about trial dates.  How about

12   Monday, April 4th?  I've got basically two weeks there that I

13   think we should be able to wrap this trial up, if everybody is

14   available.

15        Ms. Fifield, any reason you don't think two weeks is

16   sufficient?

17        MS. SEIFERT:  Your Honor, Karen Seifert for the

18   United States.  Unfortunately, I have travel the week of the

19   10th; that is, like, spring break and Easter week for my

20   children's school.  So we've -- we already have tickets for

21   that week.

22        We could start on the 4th, but I wouldn't be available

23   when the jury was deliberating, which I think could be a

24   problem.  I don't anticipate that the trial would take more

25   than two or three days, but certainly I would want to travel

1    and not have it fold over into the next week.

2              THE COURT:  Okay.  Well, my kids are on spring break

3    the following week and then I have two weeks of -- two more

4    back-to-back trials.

5              All right.  So I'm looking at Monday, May 23rd.  Does

6    that work for the government?

7              MS. SEIFERT:  That is fine, Your Honor.  That -- I

8    will just -- the Court is aware that the following Monday is a

9    holiday, but obviously we'll just deal with any jurors who will

10   be out.

11             THE COURT:  Yeah.  Mr. Crisp, does that work for you?

12             MR. CRISP:  Yes, Your Honor.  We just now went an

13   entire two more months, essentially, in terms of this whole

14   delay.  So I -- we went from beginning of April to the end of

15   May, just based on the representation of the attorney that just

16   entered her appearance.  I've always considered that typically

17   trial counsel -- or government counsel are fungible in this

18   process, not in the same way that defense counsel are.

19             So I would ask that you stick with your April date.  I

20   have a trial that's currently scheduled then, but I will move

21   it again.  Again, I'm objecting to any further delays.  I don't

22   want any additional delays beyond that, and I will make

23   whatever efforts I need to be available in April.

24             THE COURT:  Okay.  I appreciate that.  I'm not quite

25   ready to say that attorneys are fungible.  I think the

1    May date -- I understand your frustration, but, again, some of

2    that is, frankly, on my schedule and the fact that I have

3    back-to-back trials for most of the spring.

4         All right.  So we'll set this for a jury trial on

5    May 23rd at 9:00 a.m.  I think, obviously, we are talking a

6    ways out rather than -- well, let's go ahead and set a pretrial

7    date, pretrial conference date while we're all together.  How

8    about Friday, May 6th at 10:00 a.m.?  Does that work for the

9    government?

10              MS. SEIFERT:  Yes, Your Honor.

11              THE COURT:  And Mr. Crisp?

12              MR. CRISP:  Yes, Your Honor.

13              THE COURT:  Okay.  We'll set this for a pretrial

14   conference on Friday, May 6th at 10:00 a.m.  And then I

15   think -- why don't we go ahead and pick a continued status

16   conference in a couple months to see where things are and --

17        Obviously I do want to keep on top of the discovery

18   here, Ms. Miller.  I appreciate your -- your appearance and it

19   sounds to me, like, by December Mr. Crisp should have

20   substantial access to discovery materials.  And I know -- I

21   think Mr. Crisp has suggested in the prior hearings and

22   certainly other defense counsel suggested I should be setting

23   cutoff dates and what have you.  I'm not going to impose any

24   more at this time, but, Mr. Crisp, if you feel like you have --

25   are still being hamstrung by a lack of discovery, I certainly

1    will listen to you at that time.

2              MR. CRISP:  Your Honor, are we going -- one thing I

3    was going to ask -- two actual requests.  So resetting a

4    motions date for trial, when would that be?

5              THE COURT:  I was going to wait until our -- until

6    December to set that -- set -- tell me -- I mean, I can do it

7    now.  It's just --

8              MR. CRISP:  No, that's fine.  My only concern is

9    obviously based on the outcome here, I may file some motions

10   by -- I intend to file some motions based on this.  I don't

11   have to request time, so I'm assuming based on what Your Honor

12   is saying, I don't have file a motion on time based on the --

13             THE COURT:  No.  Correct.  Yeah, I -- I'm vacating

14   that motion schedule, and I won't hold it against you for

15   filing motions.

16             MR. CRISP:  May I ask another request of the Court?

17   I'm going to be filing -- and I'm trying to do this orally.

18   That will save me some time -- to have transcripts of the prior

19   proceedings in this case.

20             THE COURT:  So I think you need to file a CJA.

21             MR. CRISP:  I don't think I need that, but if that's

22   what the Court wishes, I can certainly do that.

23             THE COURT:  Okay.  So I'm looking at -- how about

24   Friday, December 17th?  Are the parties available for a status

25   conference, say, at 10:00 a.m.?

1          MS. SEIFERT:  That's fine for the government,

2     Your Honor.

3          THE COURT:  And Mr. Crisp?  This would be virtual.

4          MR. CRISP:  Your Honor, I would be in trial in

5     Savannah, so I can't -- I can't make that date.  So if we can

6     do it the week of the 29th of November, which would be the

7     3rd of December, would be better for me, or in the interim time

8     period between Christmas and New Year's would also work.

9          THE COURT:  All right.  How about Friday,

10     December 3rd?  Ms. Seifert?

11          MS. SEIFERT:  That's fine, Your Honor.

12          THE COURT:  And Mr. Crisp?

13          MR. CRISP:  Yes, Your Honor.  What time was that?

14          THE COURT:  At 10:00 a.m.  Sorry.

15          MR. CRISP:  Okay.

16          THE COURT:  All right.  So we'll set this for a

17     virtual status conference on Friday, December 3rd.

18          I am -- for all the reasons I previously stated, I am

19     tolling the speedy trial clock until Friday, December 3rd.

20          Anything further from the government that we should be

21     discussing today?

22          MS. SEIFERT:  Your Honor, I just wanted to ask about

23     a scheduling concern with respect to that pretrial conference

24     date, though that's certainly enough, you know, time in theory.

25     If we are having an extended panel for jury selection, my

1    understanding is we would need to tell the jury office before

2    the beginning of the month.  So I didn't know if Your Honor

3    wanted to set something maybe the week before in April so we

4    could discuss that, or if Your Honor -- maybe by then we'll

5    already have all these resolved.  Whatever the Court prefers.

6              THE COURT:  So, honestly, I haven't had to do this

7    before.  I -- I think -- so I appreciate you raising that.  I

8    think we will not be the first January 6th case at that point

9    and have a lot better sense how things are going by then.  So

10   I'm not sure.

11        Is that something that you would be expecting to file a

12   motion?

13             MS. SEIFERT:  No.  Honestly, when I -- my last trial

14   with Judge Bates, it was just -- we discussed it at our

15   pretrial conference, and then he just coordinated with the jury

16   office about the extended panel.  I think Your Honor is correct

17   that it's likely that in -- in these cases we may need even

18   beyond that normal extended panel, which I'm assuming if we're

19   not the first trial to go, that the Chief Judge and -- and the

20   other judges will come up with some sort of plan.

21        So I think it's fine to defer now and I can certainly

22   check in with the Court in April if the government does need to

23   file a request.

24             THE COURT:  Yeah.  Thanks for flagging that.  I think

25   we're good right now, but we can -- we can talk off-line

1    concerning this, you know, regardless of that, just if I need

2    your thoughts on a jury panel.

3             Great.  Okay.

4             And, Mr. Crisp, anything further for the defense?

5                MR. CRISP:  No, Your Honor.

6                THE COURT:  All right.  Thanks, folks.

7                (The proceedings concluded at 5:06 p.m.)

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                         Dated this 24th day of October, 2021.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25