UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No.: 21-CR-37 (TNM) |
| | : | |
| TIMOTHY LOUIS HALE-CUSANELLI, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S MOTION IN LIMINE TO ALLOW A CERTAIN
WITNESS TO TESTIFY USING PSEUDONYM INSTEAD OF GIVEN NAME**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully requests that, because of security concerns, the Court permit a certain government witness to testify using a pseudonym instead of his given name. In support of this motion, the government states the following:

**BACKGROUND**

**A. Factual Background**

On January 6, 2021, the defendant, Timothy Hale-Cusanelli, was a United States Army Reservist who resided on Naval Weapons Station (NWS) Earle in Colts Neck, New Jersey and held a "Secret" level Security Clearance.[1] The defendant traveled to Washington, D.C., on January 6, 2021, and participated in the attack on the United States Capitol (hereinafter, "the Capitol breach") that took place later that day.

In the early afternoon on January 6, before the U.S. Capitol was breached, the defendant was near the front of the crowd pushing toward the building on its West Side. As he moved toward the building, he passed barriers that had been knocked aside and witnessed rioters fighting law

---

[1] Hale-Cusanelli was discharged from the United States Army effective June 3, 2021. He received an "Other than Honorable Discharge" and a reduction in rank from Sergeant (E-5) to PV1 (E-1).

enforcement officers who were attempting to hold the mob back. The defendant moved toward the Capitol, using his military training to withstand the effects of OC spray, and continued as law enforcement officers threw flashbangs to disperse the crowd, despite losing his hearing at one point. The defendant urged fellow rioters to advance on the Capitol using vocal and tactical-hand signals. As the defendant moved closer to the Capitol, he witnessed rioters' collective assault on the law enforcement line guarding the Capitol, leading to the moment when the conflict between law enforcement officials and the rioters—in the defendant's words—"blew up." The defendant entered the Capitol through the Senate Wing Door at approximately 2:14 p.m., moments after the first rioter breached the building through a nearby broken window.

After the riot, the defendant admitted his conduct and explained his motive for participating in the riot to a Confidential Human Source ("CHS"). In his conversation with the CHS, the defendant could not find words to describe how exhilarating January 6 was, due to "the adrenaline, the rush, the purpose" that he felt. The defendant told the CHS that the closest comparison to what he experienced would be "civil war," and stated that if there had been more rioters, they could have taken the entire Capitol and held it. The defendant stated that he "really wishes" for a civil war and that it would be "only a matter of time" before such a war breaks out. When the CHS asked about the likelihood of significant fatalities, the defendant replied: "Thomas Jefferson said the tree of liberty should be refreshed with the blood of patriots and tyrants." The defendant further admitted his conduct and motive in an interview with law enforcement officials, during which he stated that he had intended to interfere with the certification of the 2020 Presidential Election and had done so.

B. Procedural Background

On March 9, 2022, the defendant was charged by superseding indictment with violations

of 18 U.S.C. §§ 1512(c)(2), 2 (obstructing an official proceeding); 18 U.S.C. § 1752(a)(1) and (2) (unlawful entry and disorderly conduct on restricted grounds); and 40 U.S.C. § 5104(e)(2)(D) and (G) (disruptive or disorderly conduct and parading, demonstrating, or picketing in Capitol Buildings). The obstruction charge carries a maximum statutory penalty of twenty years. A trial in this matter is set for May 23, 2022.

### C. Additional Background Concerning the Investigation and the CHS

#### 1. *Media Coverage of the Case*

The investigation into the January 6, 2021, breach of the United States Capitol and its corresponding prosecutions have been widely publicized. In particular, Hale-Cusanelli's case has been closely followed and it is clear that members of the public have taken a strong interest in the case. Undersigned government counsel and the investigative team have received multiple contacts from individuals with no involvement in Hale-Cusanelli's case and no apparent personal connection to Hale-Cusanelli inquiring about and seeking to provide input on behalf of Hale-Cusanelli.

Supporters of Hale-Cusanelli, including family members and friends, have also been actively and publicly advocating for Hale-Cusanelli. Two associates have appeared on internet radio shows discussing Hale-Cusanelli's case.

A family member of Hale-Cusanelli has established a fundraising and advocacy organization called "Patriot Freedom Project," which promotes detained Capitol breach defendants. That family member appears to operate two Twitter accounts, @patriot_J6 and @patriotCHD, which regularly post updates about January 6 cases, including the defendant's case. In online appearances and on Twitter, this family member refers to detained Capitol breach defendants as "political prisoners." A fundraising campaign on givesendgo.com titled

"Free Tim Hale" has raised $13,133 as of this writing.

### 2. Impact on CHS

The media coverage of this case has had an impact on the CHS. On one of the aforementioned Youtube "podcasts," a friend of Hale-Cusanelli specifically mentioned the CHS and described the CHS as someone Hale-Cusanelli "thought of as a friend." The friend made clear that s/he is aware of the identity of the CHS. The host of the podcast on which the friend appeared repeatedly referred to the CHS as a "rat" who "entrapped" Hale-Cusanelli in cooperation with the government.

The CHS is familiar with defendant Hale-Cusanelli from NWS Earle, where both lived and worked. Hale-Cusanelli was the elected leader of the employee union on NWS Earle, and the CHS believes that Hale-Cusanelli developed strong support from former coworkers. The CHS believes these former coworkers will be easily able to identify him and his whereabouts.

The notoriety of Hale-Cusanelli's case, Hale-Cusanelli's personal reach, and the online advocacy of his supporters put the CHS in fear that they would be the subject of harassment and reprisals in connection with this case. The CHS made plans to move from NWS Earle after assisting with this investigation. The CHS has changed addresses and phone numbers multiple times since moving and deleted his social media profiles in an effort to obscure his identity. The CHS took these prophylactic steps on the basis of his credible concern for his safety if his identity became known to the public.

### ARGUMENT

The CHS should be permitted to testify using a pseudonym. By cooperating with the United States in connection with the investigation into Hale-Cusanelli, the CHS has been and will be exposed to a significant risk of harm. If the CHS's identity were to be made public,

radical activists closely following this case online and Hale-Cusanelli's personal connections could well take vengeance on the CHS. It is likely that if forced to testify using their real name in this case, that members of the public who support Hale-Cusanelli will target the CHS by contacting the CHS personally or waging an online harassment campaign. This risk can be mitigated through the implementation of the prophylactic measure of allowing the CHS to testify using a pseudonym. The defense is already aware of the true name of the CHS, thus allowing the defense team to have ample time to investigate and prepare for the cross-examination of these witnesses at trial. For this reason, the use of a pseudonym will not be prejudicial to the defendant. The government therefore requests that the Court permit the CHS to testify using a pseudonym instead of their given name.

The Confrontation Clause arose in response to the legal abuses that occurred in criminal trials in England prior to the seventeenth century. The Confrontation Clause was meant to protect against the use of anonymous accusers, individuals who signed declarations, did not attend trial, did not swear to the truth of their statements, and did not face the trier of fact or the defendant. *California v. Green*, 399 U.S. 149, 156 (1970). The purpose of the Confrontation Clause was to provide specific trial procedures to promote the reliability and the integrity of evidence presented in criminal trial. *Id.* at 356-57. This is accomplished by providing certain rights to the accused, including the right to cross-examine and physically confront one's accusers. The Clause also affords to the accused various layers of protection: that trials be set in a court of law; that the accused and the prosecution witnesses be present before the trier of fact; that the trier of fact be able to observe the demeanor and assess the credibility of the witnesses as they testify; and that witnesses give their statements under oath, subject to the

penalty of perjury. *Maryland v. Craig*, 497 U.S. 836, 845-46 (1990).[2]

The guarantees of the Confrontation Clause are not threatened here by allowing the CHS to testify under a pseudonym. The defendant is aware of the true identity of the witness as well as sufficient information to place the witnesses in the proper setting. The true identity of the CHS will merely remain under seal from the public to ensure the CHS's safety. The defendant would still have the opportunity to confront the CHS. He would have the opportunity for cross-examination, and the trier of fact would have the opportunity to assess the demeanor and credibility of the witnesses. In addition, the CHS would give testimony under oath, subject to the penalty of perjury.

This minimal protection will not affect the defendant's confrontation rights. *Alford v. United States*, 282 U.S. 687 (1931), and *Smith v. Illinois*, 390 U.S. 129 (1968), require as a constitutional minimum that a defendant be given an opportunity to place the prosecution's witness in their proper setting and to test the weight of their testimony and their credibility before the jury. In dicta, the majority in *Smith* suggested that a demonstrated risk to the safety of a witness could, in an appropriate case, justify some curtailment of the accused's right of confrontation, including cross-examination. 390 U.S. 129, 133-134 (White J., joined by Marshall J., concurring). Relying on *Smith*, courts have found that the confrontation rights of the accused are not absolute and should yield where the prosecution proves that the threat to the witness is actual and not the result of conjecture. *See United States v. Palermo*, 410 F.2d 468,

---

[2] Even if the Confrontation Clause were impacted, it may nonetheless be limited by the trial court, just as with any other constitutional right. *See Peretz v. United States*, 501 U.S. 923, 936 (1991) ("The most basic rights of criminal defendants are...subject to waiver."). The privilege may be lost by consent, by express or implied waiver, by conduct, or by misconduct. *Diaz v. United States*, 223 U.S. 442, 450 (1912). Additionally, the confrontation rights of the accused are also limited by recognized hearsay exceptions. Because the fundamental aim of the Confrontation Clause is to promote the integrity of the fact-finding process, exceptions under the hearsay rules, when they are firmly rooted and have sufficient indicia of reliability, do not violate that right. *See White v. Illinois*, 502 U.S. 346, 355, 355 n.8 (1992).

472 (7th Cir. 1969).

The trial court is permitted to place reasonable limitations on the bounds of cross-examination without violating the Sixth Amendment. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also Maryland v. Craig*, 497 U.S. 836, 863 (1990) (Scalia, J., dissenting). Federal courts, under appropriate circumstances including safety concerns of the witnesses and their families, have permitted government witnesses to testify using pseudonyms. *See, e.g., United States v. Celis*, 608 F.3d 818, 833-34 (D.C. Cir. 2010) (in a drug trafficking conspiracy case involving the FARC, a protective order allowing government witnesses to testify under a pseudonym and limiting disclosure of their true identities did not impermissibly intrude upon a defendant's confrontation rights under the Sixth Amendment); *United States v. Machado-Erazo*, 951 F.Supp.2d 148, 154 (D.D.C. 2013) (where there was a genuine and continuing threat to the safety of a foreign police office, he was permitted to testify under a pseudonym, without disclosing his true identity to the defense); *see also United States v. Ramos-Cruz,* 667 F.3d 487, 500 (4th Cir. 2012) (it was within the court's discretion to allow two government witnesses to testify under pseudonyms and without revealing their names where a threat was actual and not a result of conjecture); *United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) (Israeli intelligence officers permitted to testify using pseudonyms where there exists legitimate safety concerns for witnesses); *United States v. Ellis*, 468 F.2d 638 (9th Cir. 1972) (Ninth Circuit affirmed district court's refusal to allow a defendant to elicit the witness's correct name, residence, and occupation because of potential harm to the witness); *United States v. Fuentes*, 988 F. Supp. 861 (E.D. Pa. 1977) (Confrontation Clause does not require an undercover narcotics agent's revelation of his true identity in open court, stating not permitting use of his true name during trial has [in our view] no constitutional significance). These courts have

generally required limited disclosure of the witness's identity to the necessary members of the defense team to allow for cross-examination sufficient to comply with the Confrontation Clause, but hold that there is no absolute right of an accused to have a jury hear a witness's true name and address.

If it becomes public that the CHS is assisting the United States against the defendant, it would only serve to further incite reprisals against the CHS by supporters of the defendant and ideological extremists. Because of the safety concerns present in this case, the United States submits that this Court should permit the CHS to testify using pseudonyms rather than their given name, and that the defense team be ordered not to further disclose the true name of these witnesses.

WHEREFORE, for the foregoing reasons, the government respectfully requests that the Court permit the CHS to testify using pseudonyms. A proposed Order is attached.

Respectfully submitted,

MATTHEW M. GRAVES<br>
United States Attorney<br>
DC Bar No. 481052

By:      /s/
Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Crim. Div.
(Detailed to the D.C. U.S. Attorney's Office)
Karen P. W. Seifert
Assistant United States Attorney
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 320-0048
Kathryn.fifield@usdoj.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Criminal No.: 21-CR-37 (TNM) |
| : | |
| TIMOTHY LOUIS HALE-CUSANELLI, : | |
| : | |
| Defendant. : | |

**ORDER**

Upon consideration of the Government's Motion to Allow a Certain Witness to Testify Using Pseudonym Instead of Given Name, and response thereto, and the entire record in this case, it is this hereby

ORDERED, that the Government's Motion to Allow a Certain Witness to Testify Using Pseudonym Instead of Given Name is GRANTED; it is further

ORDERED, that the witness identified by the government as CHS is permitted to testify using a pseudonym instead of their real names and it is further

ORDERED, that the defendant not publicly disclose the identities of the CHS.

_____                    _____
Date                                                    THE HONORABLE TREVOR N. MCFADDEN
                                                                    U.S. DISTRICT COURT JUDGE