UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :     CASE NO. 21-CR-37 (TNM) |
| v. | : |
| | : |
| TIMOTHY LOUIS HALE-CUSANELLI, | : |
| | : |
| Defendant. | : |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO TRANSFER VENUE

    Defendant Timothy Louis Hale-Cusanelli, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to another district (the Southern District of Ohio, the District of Maryland, the Eastern District of Virginia, the Northern District of West Virginia, the District of Connecticut, the Eastern District of North Carolina, or the Western District of Pennsylvania). (ECF No. 66.) Defendant fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.

**FACTUAL BACKGROUND**

    At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the United States Capitol building. The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election. With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol.  At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building.  Members of

1

the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows. Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to – and did – evacuate the chambers.

As of January 6, 2021, Defendant was enlisted in the United States Army Reserves and worked as a security contractor at Naval Weapons Station Earle in Colts Neck, New Jersey,[1] where he maintained a "Secret" security clearance. On January 6, 2021, Defendant traveled from New Jersey to Washington, D.C. to participate in the "Stop the Steal" rally. While in Washington, D.C. for that event, Defendant recorded videos of himself protesting in a variety of locations, screaming at and interfering with United States Capitol Police officers, climbing a scaffolding to enter the United States Capitol building through doors that had been kicked open by rioters, and chanting "Stop the Steal" with other protesters. Defendant posted some of these videos to social media.

Defendant's actions at the Capitol were reported to the Naval Criminal Investigation Service ("NCIS") by a confidential human source. Defendant spoke directly to the source about his actions at the Capitol, and showed the source photographs and video. The source later recorded a conversation with Defendant, wherein Defendant again admitted his conduct and spoke at length about his participation in the Capitol riot. During that conversation, Defendant stated that the closest comparison to what he experienced on January 6, 2021, would be "civil war," and that if there had been more rioters, they could have taken the entire Capitol building and held it. Defendant also admitted to taking a flag and flagpole that he observed another rioter throw "like a

---

[1] Since his arrest, Defendant has been administratively discharged from the Army Reserves and barred from entering the Navy's Earle facility.

2

javelin" at a Capitol Police officer, which Defendant described as a "murder weapon." In his conversation with the source, Defendant expressed his intent to destroy or dispose of the flag and flagpole as soon as he could. Before January 6, 2021, Defendant openly espoused a White supremacist and Nazi sympathizer ideology in conversations with coworkers and social media postings.

As a result of the actions of Defendant and hundreds of others, on January 6, 2021, Congress was forced to halt its proceedings and evacuate the House and Senate Chambers. After the building was secured later that day, Congress reconvened and completed counting, certifying, and declaring the Electoral College vote result.

## **PROCEDURAL BACKGROUND**

On January 15, 2021, Defendant was charged by complaint for his actions on January 6, 2021, when large crowds breached the U.S. Capitol Building as Congress convened a Joint Session to certify the Electoral College vote in the 2020 Presidential Election. (ECF No. 1-1.) Two weeks later, the grand jury charged him with several federal offenses based on the same conduct. (ECF No. 9.) Following a Superseding Indictment, Defendant stands charged with obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); entering and remaining in a restricted building or ground, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five). (ECF No. 59.)

Defendant now moves for a change of venue. (ECF No. 66.) He contends that a change of venue is required for three primary reasons: (1) prejudice should be presumed based on the

impact of January 6 on Washington, D.C. residents, (2) prejudice should be presumed based on the pretrial publicity surrounding the events of January 6, and (3) the trial should be transfer based on convenience to the Defendant. Mtn. at 2.  Each of Defendant's arguments is without merit, and the motion should be denied.

## ARGUMENT

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted).  Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite

earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

I. **The Impact of January 6 on Washington D.C. Does Not Support a Presumption of Prejudice.**

First, Defendant wrongly contends that a D.C. jury could not be impartial because the extensive damage caused to the Capitol region and the subsequent disruption to the lives of the residents in the aftermath surrounding January 6. *See* Mtn. at 4-5. But January 6 is now more than a year in the past. Many D.C. residents do not live or work near the Capitol. There is no reason to believe that the District's entire population of 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized. *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon). In *Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice." *Skilling*, 561 U.S. at 384 (quotation omitted). "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.* In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors. There is no reason to presume prejudice.[2]

---

[2] Defendant's argument regarding the impact of the January 6 Riot on the District of Columbia suggests that no impartial jury can be seated in this District in any January 6 case, which

## II. The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.

Defendant next contends that prejudice should be presumed based on pretrial publicity, without waiting for the Court to determine during voir dire whether an impartial jury can be selected. *See* Mtn. at 5. But, "[t]he mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process"). Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau v.*

---

itself undermines any argument that Defendant's case is singular or that he faces "extreme circumstances." Further, any such argument is contradicted by parallel January 6 proceedings in this District. As of this writing, multiple juries have been seated in this District in January 6 cases following thorough voir dire. And every judge in this District to address a motion to transfer venue in a January 6 case thus far has denied that motion. *See United States v. Brooks*, No. 21-cr-503-RCL (D.D.C. Jan. 24, 2022); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022); *United States v. Fitzsimons*, No. 21-cr-158 (RC) (D.D.C. Dec. 14, 2021) (Minute Order); *United States v. Reffitt*, No. 21-cr-32 (DLF) (D.D.C. Oct. 15, 2021) (Minute Order); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (APM) (D.D.C. Sept. 14, 2021).

*Louisiana*, 373 U.S. 723 (1963).  In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people.  *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process.  *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity.  *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v. Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (trial of participant in 1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based. *Skilling*, 561 U.S. at 382-83. First, the Court considered the "size and characteristics of the community." *Id.* at 382. Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service. *Id.* at 382. Second, "although news stories about Skilling were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse." *Id.* at 383. "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias." *Id.*

Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity. *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011). And contrary to Defendant's contention, those factors do not support a presumption of prejudice in this case.

A. **Size and characteristics of the community**

Defendant suggests (at 5) that an impartial jury cannot be found in Washington, D.C., despite the District's population of approximately 700,000. Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*. The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found. In *Mu'Min v. Virginia*, 500 U.S.

8

415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected. And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)). There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled." *Id.*

### B. Nature of the pretrial publicity

Nor does this case involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Defendant cites to a handful of stories that are dated, Mtn. at 5-6, but Defendant is far from the most well-known of Riot defendants, and even when news stories are "not kind," *Skilling*, 561 U.S. at 382, or "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, that alone does not raise a presumption of prejudice. The news coverage of Defendant is "neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession." *Id.*

Defendant also complains (at 6) that some news articles have "referenced his appearance" in certain social media postings, an appearance that included a "Hitler mustache" alongside White Supremacist and pro-Nazi propaganda. (*See* ECF No. 18, at 12-13.) Defendant's concern that this media coverage might improperly "inflame[] emotions" if he is tried in the District is unavailing. While any media characterizations of Defendant would be inadmissible, photos and videos of Defendant that show his appearance or intent on January 6 – including the materials referenced in the news articles cited by Defendant – will be admissible and highly relevant at trial. (*See generally* Gov't Resp. to Def. Opp. Pursuant to FRE 404(b), ECF No. 68); *compare Sheppard*,

9

384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), *with Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial. Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

Defendant asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6. Mtn. at 6. But even "massive" news coverage of a crime does not require prejudice to be presumed. *Haldeman*, 559 F.2d at 61. And a comparatively small percentage of the news coverage of January 6 has focused on Defendant himself. Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 800 people. The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt. The Court can best assess during voir dire whether specific media coverage of Defendant has possibly impacted the jury.

In any event, any threat of such spillover prejudice is not limited to Washington, D.C. Much of the news coverage of January 6 has been national in scope. And, with respect to Defendant more specifically, the news stories he cites (Mtn 5-6) were published by media organizations with wide national circulation, not purely local outlets. *Id.* (citing articles by Insider, Inc., The Daily Beast, The Hill, and The Washington Post). There is, accordingly, no sound reason

to believe that a jury pool in Defendant's preferred districts would be substantially less likely to be aware of those news stories. *See Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest); *see also United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893, at *3 (D.D.C. Jan. 12, 2022) ("The fact that there has been ongoing media coverage of the breach of the Capitol and subsequent prosecutions, both locally and nationally, means that the influence of that coverage would be present wherever the trial is held." (internal quotation marks omitted)). Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

### C.     Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and Skilling's trial." *Skilling*, 561 U.S. at 383. In this case, 15 months have already elapsed since the events of January 6, and more time will elapse before trial. This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724. Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383. Moreover, only a relatively small percentage of the recent stories have mentioned Defendant himself, and much of the reporting has been national is scope, rather than limited to Washington, D.C.

### D.     The jury verdict

Because Defendant has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply. But the fact that *Skilling* considered this factor to be "of prime significance," *id.*, underscores how unusual it is to presume prejudice before trial. Ordinarily, a case should

proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice. In short, none of the *Skilling* factors support the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

**III.    Convenience Does Not Justify a Change of Venue.**

Defendant twice mentions a change of venue due to "convenience." Mtn. 1, 9. Conclusory references aside, however, Defendant makes no attempt to show any basis for a change of venue based on the "convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b). Nor could Defendant make such a showing if he tried. A change of venue would unquestionably not be convenient to for the government or its witnesses, the majority of whom are located in or near the District. And Defendant himself is currently detained in the District. At most, Defendant could perhaps argue that a change of venue would be convenient for his defense counsel. But Defendant has pointed to no instance in which this or any other Court has ordered a change of venue for convenience based on that consideration alone.

**IV.    Defendant's Request for Additional Remedies Should Be Denied**

Defendant also requests, in the alternative, that the Court undertake "certain remedial efforts" to "reduce the potential or presumed prejudice." Mtn. 7-8. He proposes not only "extensive voir dire," but also, among other things, using "written jury questionnaires about [pretrial] publicity," "excluding from the jury pool people who live in certain areas," "increasing the number of peremptory strikes," and "sequestering the jury." *Id.* (footnotes omitted). The government does not object to appropriate questioning during voir dire. Beyond that, however, Defendant has not shown that any of the other extraordinary steps he suggests are warranted. At a minimum, this Court should not undertake any such steps at this stage, before it has had the

12

opportunity to conduct voir dire and determine whether it adequately addresses Defendant's concerns.

## CONCLUSION

For the foregoing reasons, Defendant's motion to transfer venue should be denied. Additionally, this Court should deny as premature Defendant's request to undertake specific remedial efforts beyond appropriate questioning during voir dire.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Karen Seifert*
Karen P. W. Seifert
NY Bar No. 4742342
Assistant United States Attorney
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7527
Karen.Seifert@usdoj.gov

Kathryn E. Fifield
Wis. Bar No. 1097640
Trial Attorney
U.S. Department of Justice, Criminal Division
Detailed to the D.C. United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 320-0048
Kathryn.fifield@usdoj.gov