```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,            .
                                     .
          Plaintiff,                 .    CR No. 21-0037 (TNM)
                                     .
     v.                              .
                                     .    Washington, D.C.
TIMOTHY LOUIS HALE-CUSANELLI,        .    Thursday, May 26, 2022
                                     .    1:33 p.m.
          Defendant.                 .
. . . . . . . . . . . . . . . . . .   .    Afternoon Session



                            DAY 4
                  TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE TREVOR N. MCFADDEN
                 UNITED STATES DISTRICT JUDGE



      APPEARANCES:

 For the Government:            KAREN P. SEIFERT, AUSA
                                KATHRYN E. FIFIELD, AUSA
                                U.S. Attorney's Office
                                601 D Street NW
                                Washington, DC 20530
                                (202) 252-7566


 For Defendant:                 JONATHAN W. CRISP, ESQ.
                                Crisp & Associates LLC
                                4031 North Front Street
                                Harrisburg, PA 17110
                                (717) 412-4676

 Court Reporter:                BRYAN A. WAYNE, RPR, CRR
                                U.S. Courthouse, Room 4704-A
                                333 Constitution Avenue NW
                                Washington, DC 20001
                                (202) 354-3186




 Proceedings reported by stenotype shorthand.
 Transcript produced by computer-aided transcription.
```

C O N T E N T S

TESTIMONY

TIMOTHY HALE-CUSANELLI:  Cross-Examination Cont' .......... 959
                         Redirect Examination.............. 981

\* \* \*

Jury Instructions ................................... 1010

Government Closing Argument ......................... 1032

Defense Closing Argument............................. 1060

Government Rebuttal Argument ........................ 1076

Closing Jury Instructions ........................... 1082

\* \* \*

<pre>
 1                    P R O C E E D I N G S

 2         THE COURT:  All right.  So, Mr. Crisp, I took another

 3    look at your defense theory of the case.  This feels like a

 4    closing argument to me.  In my experience, defense theories

 5    of the case are a paragraph or less.

 6       So, if you want me to say something like he denies he was

 7    aware of the certification or had the requisite knowledge or

 8    something like that, happy to do that, but I don't want to go

 9    through an element by element.

10         MR. CRISP:  And that's fine, Judge.  I'm happy to

11    condense it down.

12         THE COURT:  Great.  Thank you.

13       All right.  Ms. Seifert, any objection to the proposed

14    limiting instruction?

15         MS. SEIFERT:  Ms. Fifield is handling that, Your Honor.

16         THE COURT:  Okay.

17       (Defendant enters.)

18         THE COURT:  Mr. Hale-Cusanelli, you can just go right

19    over to the stand.

20         THE WITNESS:  Yes, Your Honor.

21       (Witness resumes the stand.)

22         MS. FIFIELD:  Do you mind if I speak briefly with

23    Mr. Crisp?

24         THE COURT:  Sure.

25       (Counsel conferring.)
</pre>

1          MS. FIFIELD:  My apologies, Your Honor.  I appreciate

2     your patience.  It's my understanding that defense has

3     obtained this instruction from the red book.  I understand

4     that there are not substantive alterations.  I'm not looking

5     at the specific instruction in my copy of the red book at this

6     moment, but to the extent it's consistent with the red book,

7     the government would not object.

8          THE COURT:  Okay.  It certainly looks along the right

9     lines to me.  You can take a last look; just let me know

10    before we do closings if you have any last-minute objections.

11       And Mr. Crisp, if you'll get me a narrowed-down version

12    of defendant's theory of the case.

13         MR. CRISP:  Yes, Your Honor.

14       (Jury in at 1:36 p.m.)

15         THE COURT:  All right.  Welcome back, ladies and

16    gentlemen.  We're ready to resume cross-examination of the

17    defendant.

18       Mr. Hale-Cusanelli, I'll remind you you're still under

19    oath.

20         THE WITNESS:  Yes, Your Honor.

21         THE COURT:  Ms. Seifert.

22         MS. SEIFERT:  Thank you, Your Honor.

23                   CROSS-EXAMINATION CONTINUED

24    BY MS. SEIFERT:

25    Q.   Mr. Hale-Cusanelli, before we broke, we were discussing

1    your conduct specifically around 2:35 to 2:40 p.m. on

2    January 6.  So I'd like to start there first.  You were

3    talking about when you were standing underneath the skylight

4    and making this waving motion in, and secondly, that you had

5    stated to your roommate, Mr. Jacobs, that you were trying to

6    get people to come down.  And I think I quoted the transcript

7    -- this is 100.T, page 10, line 9 -- that your words were,

8    "Like yo, we need more people to get down here."

9          Do you recall our conversation on that fact?

10   A.   Is that in the transcript you said?

11   Q.   Do you recall that that's what we were talking about

12   before we broke for lunch?

13   A.   I don't recall the specific words.  I do remember the

14   conversation, ma'am.

15   Q.   Okay.  So can we pull up 100.T, please, on page 10, and

16   this is admitted; if it can be shown to the jury, please.

17         We can do this a different way.  Why don't I bring the

18   transcript to you and I'll read it to you.

19         MS. SEIFERT:  May I approach the witness?

20         THE COURT:  You may.

21         MS. SEIFERT:  Okay.

22   BY MS. SEIFERT:

23   Q.   Okay.  So we're at the transcript, 100.T, page 10,

24   line 9, and you stated to your roommate, Mr. Jacobs, that

25   you said, or that when you were calling the people in, you

1    were thinking, "like yo, we need more people; get down here."

2    Was that your statement that you made?

3    A.    That is the statement.

4    Q.    Have I read it correctly?

5    A.    Yes.  It's a correct statement.

6    Q.    Okay.  And later in that same conversation, you stated

7    to Mr. Jacobs that if you had had more people you could have

8    cleared the building.  Correct?

9    A.    That was mentioned before, yes.

10   Q.    Sorry.  That's not my question.  I'm not talking about

11   the transcript.

12   A.    I apologize.

13   Q.    Later you said to Mr. Jacobs, "Let me tell you, if we

14   had had more people, we could have cleared the building."

15   Do you recall saying that?

16   A.    Yes, ma'am.

17   Q.    Okay.  And the building when you were speaking to

18   Mr. Jacobs, the building you're talking about clearing is

19   the U.S. Capitol building.  Correct?

20   A.    That sounds correct.  Yes, ma'am.

21   Q.    Okay.  You mentioned in your direct testimony that you

22   were standing outside the Capitol when you were confronted

23   with -- was it OC spray?  Is that what you stated?

24   A.    I believe it was CS spray, but yes, ma'am.

25   Q.    Okay.  So some kind of spray in your face.  Correct?

1    A.   Correct.

2    Q.   You also mentioned something called flash bangs.

3    Correct?

4    A.   Correct, ma'am.

5    Q.   And your testimony on direct was that the confrontation

6    with those items caused it to be harder for you to comprehend

7    what was going on.  Is that your testimony?

8    A.   My testimony, ma'am, is that I don't recall everything

9    that led up to it, but I think that might have had something

10   to do with it.  Yes, ma'am.

11   Q.   Okay.  And you're familiar from your background about

12   the use of nonlethal force such as OC spray.  Correct?

13   A.   Yes, ma'am.

14   Q.   And the use of nonlethal force such as flash bangs.

15   Correct?

16   A.   Yes, ma'am.

17   Q.   And you were on the front line at the U.S. Capitol's

18   west front when those items were in your mind deployed.

19   Is that correct?

20   A.   I'm sorry.  Can you repeat the question?

21   Q.   Let me rephrase that.  You were in close proximity to

22   the police when those items were deployed on the west front.

23   Correct?

24   A.   Yes, ma'am.

25   Q.   Close enough that it affected you.  Correct?

1      A.    Yes, ma'am.

2      Q.    And from your understanding and your background, you know

3      that when police use those nonlethal force items, OC spray and

4      flash bangs, what they are trying to do is to stop people from

5      progressing forward.  Correct?

6      A.    Yes.  And I should have left.

7      Q.    I'm just going to ask you to answer only the question

8      that I ask so we can move things along.  Okay?

9      A.    Yes, ma'am.

10     Q.    So you knew that that's what the police were trying to

11     communicate with you at the time when they deployed those

12     nonlethal force.  Correct?

13     A.    I wasn't thinking about it at the time but --

14     Q.    Correct?

15     A.    Yes, ma'am.

16     Q.    And you proceeded forward anyway.  Correct?

17     A.    Yes, ma'am.

18     Q.    And again, let's just make sure we don't talk over each

19     other for the sake of our court reporter.  Okay?

20     A.    Yes, ma'am.

21     Q.    Okay.  Now, if we could go to the video, which I believe

22     is 411, Mr. Casillas?  Thank you.  And I've asked you to start

23     playing this video --

24           (Jury indicates no video.)

25           MS. SEIFERT:  Could we turn the TV around, Your Honor?

1          THE COURT:  Yes.

2       (Pause.)

3          THE COURT:  Apparently the system gets tired.  It goes

4    to sleep in the afternoon.

5          MS. SEIFERT:  Don't we all.

6    BY MS. SEIFERT:

7    Q.   Okay.  We're at 411, and we're at 2:33:51 on the counter.

8    Mr. Hale-Cusanelli, you recognize yourself on the screen.

9    Correct?

10   A.   Yes, ma'am.

11   Q.   I'd like to play this video for approximately 20 seconds,

12   please.

13       (Video played.)

14       We can pause.

15       And Mr. Hale-Cusanelli, this is 2:33, so it's approximately

16   30 minutes after you climbed up those stairs to the west front.

17   Correct?

18   A.   Approximately, yes.

19   Q.   So 30 minutes after you had been -- in your testimony had

20   those items deployed against you.  Approximately.  Correct?

21   A.   Yes, ma'am.  Approximately.

22   Q.   Now, we're going to fast-forward this video just a little

23   bit to -- on the counter we'll go to 13:23, please.

24       Okay.  We're going to play it once and I want you to

25   keep an eye on where you are in the video, please, and then

1      I'll ask you some questions and we'll pause the video.  Okay?

2      A.   Yes, ma'am.

3           (Video played.)

4      Q.   Do you recognize yourself up here?

5      A.   Yes, ma'am.  I do.

6      Q.   Wearing that gray suit?

7      A.   Yes, ma'am.

8      Q.   Okay.  Just keep an eye on where you're standing, please.

9      Go ahead and play.

10          (Video played.)

11          Do you recognize yourself again in the center?

12     A.   Yes, ma'am, I do.

13     Q.   And play.

14          (Video played.)

15          And pause here.

16          And do you recognize yourself here?

17     A.   Yes, ma'am, I do.

18     Q.   Now, Mr. Casillas, would you mind going back again to

19     13:23?  Thank you.

20          Before we play, Mr. Hale-Cusanelli, your testimony on

21     direct was that you did not recognize that those individuals

22     who took that rioter to the ground were police officers until

23     after you interfered with the police officers by placing your

24     arm on the rioter and attempting to pull him away.

25          Is that correct that that's your testimony?

1    A.   That sounds correct.

2    Q.   Okay.  If we could play the video, please.

3         (Video played.)

4         And pause here.

5         Do you see those individuals that appear to be calling

6    out things and motioning people?

7    A.   The ones around me?

8    Q.   For instance, this young lady.  Do you see her?

9    A.   Oh.  Yes, ma'am.

10   Q.   Press play.

11        (Video played.)

12        Pause.

13        Do you see the individuals on the ground right there?

14   A.   Yes, ma'am.

15   Q.   And they're wearing black outfits?

16   A.   Correct.

17   Q.   Okay.  And do you see yourself?

18   A.   Yes, ma'am.

19   Q.   And this is 2:39:26.  And are you looking in the

20   direction of those folks?

21   A.   Most likely.

22   Q.   Okay.  We can play, please.

23        (Video played.)

24        And pause.

25        Do you see that you've run over to this side of the room?

1    A.   Yes, ma'am, I do.

2    Q.   Okay.  And now you're even closer to those folks who were

3    on the ground.  Is that fair?

4    A.   Yes, ma'am.

5    Q.   Okay.  And play.

6         (Video played.)

7         Pause.

8         See now you've backed up to this location right in the

9    center?  This is 2:39:37 p.m.

10   A.   Yes, ma'am.

11   Q.   And you're still oriented in the direction where that

12   commotion was.  Correct?

13   A.   I don't know if that's quite right, but I'm still facing

14   that side of the hallway, yes.

15   Q.   Okay.  Do you see these folks right here where I put the

16   X?

17   A.   With the X, not really.

18   Q.   Well, do you see where the X is?

19   A.   Oh, well, yes, ma'am.  Yes, ma'am.

20   Q.   And your face is still pointed in the direction of the X.

21   Correct?

22   A.   I don't --

23   Q.   This is the back of your body.

24   A.   I actually don't see my face on the screen there.

25   It looks like it cuts off at my shoulders, ma'am.

1   Q.   So is this the front or the back of your suit?

2   A.   That's the back, ma'am.

3   Q.   So fair to say that your face is pointing away from

4   this camera.

5   A.   Yes, ma'am, it is.

6   Q.   And towards the end of the hallway.

7   A.   Correct.

8   Q.   Okay.  And play, please.

9        (Video played.)

10       Pause.

11       How about now?  Do you see yourself?

12   A.   Yes, ma'am, I do see myself.

13   Q.   And for the record, this is 2:39:41 p.m.  You're still

14   facing away from the camera.  Correct?

15   A.   Correct.

16   Q.   Those individuals in the black, they're now directly

17   in front of you.  Correct?

18   A.   Yes.

19   Q.   And play.

20       (Video played.)

21       And pause.

22       And this is 2:39:46 p.m.  Do you see yourself here?

23   A.   Yes, ma'am.

24   Q.   Okay.  And now you've turned your body and you're

25   actually facing the individual on the ground and the two

1    people who are with him.  Correct?

2    A.   Yes, ma'am.

3    Q.   And your testimony is that you did not recognize until

4    after this point that those individuals in black were

5    United States armed police officers.

6    A.   Yes, ma'am.

7    Q.   We can take down the exhibit.  Thank you.

8         Now, we talked a little bit about -- and, Your Honor,

9    I'm getting close to wrapping up here.

10        We talked a little about your politics.  Fair to say

11   you're a supporter of Donald Trump?  Correct?

12   A.   Yes, ma'am.

13   Q.   And you don't like the current President Biden.  Correct?

14   A.   I'm not a fan of the current administration.

15   Q.   And you don't like Vice President Harris.  Correct?

16   A.   No, ma'am.

17   Q.   And fair to say you've said some pretty derogatory

18   things about those two individuals in your text messages

19   to your friends.  Correct?

20   A.   Yes, ma'am.  You're right.

21   Q.   And yesterday we heard your roommate state that you

22   thought Joe Biden was a puppet.  Was that a fair

23   characterization of your views?

24   A.   Depending on how we quantify that as puppet, but not

25   sure what it meant in that context.

1    Q.   So you think Joe Biden is a puppet.  Correct?

2    A.   I don't know what that means in that context, ma'am.

3    What am I agreeing to?

4    Q.   Okay.  So in the conversation yesterday with Mr. Jacobs

5    that you heard, he stated that you said that Joe Biden was a

6    puppet, that he was basically a front for corporations and

7    Jewish interests.  Is that fair?

8    A.   I think he's definitely beholden to corporate interests.

9    As for the Jewish thing, that was just -- I never said that

10   specifically.  But I think that's irony.

11   Q.   So your testimony today is that you don't have a problem

12   with the Democratic -- sorry.  Let's start with Joe Biden.

13   That you don't have a problem with Joe Biden because he is

14   a front for Jewish interests?  That does not bother you?

15   A.   I don't think he is a front for Jewish interests.

16   That doesn't make sense to me, ma'am.  Honestly, I think

17   Republicans are -- if we're honest, and if I can explain here,

18   I think if anyone supports Jewish interests the most, it's

19   probably Republicans because they're the biggest supporters

20   of Israel.

21   Q.   Okay.  And the Democratic Party, you don't think they're

22   intertwined with Jewish interests then?

23   A.   No.  That's just ironic humor.

24   Q.   You do think that Joe Biden's election was illegitimate.

25   Correct?

1    A.   I think it's legitimate because it was certified, but

2    I think it should have been investigated.

3    Q.   Well, let me go back.   On election night, and even before

4    the election, you thought that if Joe Biden was elected it

5    would have to have been because of election fraud.   Correct?

6    A.   That's what I thought.   Yes, ma'am.

7    Q.   And in fact on election night and into the morning of

8    the day of the election, you sent numerous text messages to

9    your friends about the fact that there were missing votes,

10    rigged ballots, thousands of votes showing up only for Biden.

11    Is that all correct?

12    A.   Yes, ma'am.

13    Q.   And you had numerous other messages after election day

14    where you discussed that the election of Joe Biden needed to

15    be challenged in the court system.   Correct?

16    A.   Yes, ma'am.

17    Q.   And you watched, for instance, testimony in Arizona

18    about the Arizona ballots being illegitimate.   Correct?

19    A.   That sounds right.

20    Q.   Okay.   And so you thought on the day of January 6 that

21    the election of Joe Biden was illegitimate.   Correct?

22    A.   On January -- yes, I did, ma'am.

23    Q.   You thought that when you entered into the United States

24    Capitol building.   Correct?

25    A.   Are we talking about the certification, or are we talking

1   about election day, ma'am?

2   Q.   On January 6 of 2021, when you entered into the

3   United States Capitol building, you thought the election

4   of Joe Biden was illegitimate.  Correct?

5   A.   The election?  Yes, ma'am.

6   Q.   That it was based on voter fraud.  Correct?

7   A.   Yes, ma'am.

8   Q.   And you've mentioned you've been politically informed.

9   You said you previously went to the inaugural of Donald Trump

10  back in 2017.  Correct?

11  A.   Yes, ma'am.  That's correct.

12  Q.   January of 2017.  Correct?

13  A.   Of 2017.  Yes, ma'am.

14  Q.   And you went to the inaugural at the U.S. Capitol

15  building.  Correct?

16  A.   No, ma'am.

17  Q.   Where did you go?

18  A.   I don't actually remember where it was.  It was really

19  just for the parade.  So it was somewhere in Washington, D.C.

20  Q.   Okay.  And you're politically informed.  You watched the

21  presidential debates.  Correct?

22  A.   Most of them, yes, ma'am.

23  Q.   And have you watched the State of the Union Address that

24  President Trump gave?

25  A.   I don't think I did, actually.  I could be wrong.

1    Q.   Now, you also stated on direct that you do not want

2    civil war to happen.  Is that your testimony today?

3    A.   Yes, ma'am.

4    Q.   But in your conversation with Mr. Jacobs, you actually

5    brought civil war into that conversation, didn't you?

6    A.   Yes.  Yes, ma'am.

7    Q.   Okay.  And so you were the first person to bring it up,

8    actually.  You stated -- if we could have 100.T, please, at

9    line 18.  And this is in evidence.  Sorry, page 18, line 24.

10   Actually, let's go up.  Let's start a little higher.

11       So in the prior page you had been talking about the

12   Capitol -- actually, if we can go one more page to the bottom

13   of page 17.  Thank you.  We'll start at 24.

14       Mr. Hale-Cusanelli, you stated, "It was really, like

15   I can't describe how exhilarating it was."  And then it

16   continues on to the next page.  "It was like a rush, like

17   an adrenaline, the fucking rush, the fucking purpose I can't

18   describe."

19       The CHS says, "I mean, how do you recreate that?"

20       You say, "War."

21       The CHS says, "Okay.  Well, war's not going to happen

22   in America."

23       You say, "Civil war."

24       The CHS says, "Civil war's not going to happen in America."

25       You say, "Not yet."

1          Did I read that correctly?

2     A.   Yes, ma'am, you did.

3     Q.   Okay.  And you're the first person to bring that up

4     in the conversation.  Correct?

5     A.   That's correct, ma'am.

6     Q.   And let's go on 100.T down to page 20.  And line 25,

7     please and here you are again.  I'm going to start reading.

8          Mr. Hale-Cusanelli stated, "I really wish there'd be a

9     civil war."

10         CHS says, "You really wish there would be a civil war?"

11         You say, "Yes."

12         CHS says, "Why?"

13         You say, "Because it would provide, it would provide

14    a clean slate."

15         Now, again, you bring that up in the conversation.

16    You weren't talking about civil war before then.  Correct?

17    A.   Correct, ma'am.

18    Q.   And your conversation with the CHS was not the only

19    time you brought up civil war with your friends, is it?

20    A.   Probably not.

21    Q.   Okay.  So, for instance, if we could have 350.5, and

22    we can go down to the bottom of -- sorry, to page 2, please.

23    If we can go down to the bottom of this page.

24         This text message is in February of 2020, so long

25    before the election itself.  Well, "long" is relative.

1    Several months before the election itself.  You state to your

2    friend Cynthia, "Adam Schiff is a clown, but so are most of

3    them."  And do you mean Democrats by that, sir?

4    A.   I'm sorry?

5    Q.   Do you mean Democrats by that?  Is that what you're

6    referring to?

7    A.   I don't know, actually.

8    Q.   Okay.  "Bernie supporters are sheep being led around by

9    a sellout with four houses.  Sometimes I wish they would try

10   to start shit so we can get the civil war started already."

11        Did I read that correctly?

12   A.   Yes, ma'am, you did.

13   Q.   Next page, please.  And then your next text to Cynthia,

14   which is at 3:30 p.m. on the same day, says, "It'll just be

15   one side with guns against another side with dildoes and

16   bongs.  I wonder who will win."

17        Did I read that correctly?

18   A.   Yes, ma'am, you did.

19   Q.   And then two more quick questions for you.

20        You stated on direct that when you entered into the

21   U.S. Capitol building you, quote, had no goal.  Is that

22   your testimony today?

23   A.   Other than to protest.

24   Q.   Okay.  And if we could pull up 110.T, please, and page

25   223, line 8.  The question -- this is your interview with the

1    FBI and NCIS.

2         "Question:  Did you think" -- I think we're missing a

3    word, but I think this means "What did you think was going to

4    happen," right?  "So you were walking in.  Did you think while

5    you guys were all walking through there they were just going

6    to continue to count votes and everything and Pence was going

7    to be like, hey, yo, Timmy, nice to see you while you're

8    walking through here?  You know, I mean."

9         And you say, "At that time."

10        Question:  "There's a process, man."

11        You answer:  "Like I said, there really was no plan.

12   Maybe I felt like, yeah, it'll do the -- you know, he'll do

13   the right thing.  He's got our back and we're going to have

14   our voices be known.  At that time, like I said, I don't even

15   think Pence had yet failed -- Pence even failed to certify

16   Trump's electors."

17        Did I read that correctly?

18   A.   Yes, ma'am.

19   Q.   So in this portion of the interview, you're talking about

20   when you entered into the Capitol that -- the question was

21   posed, did you think they were going to let you in when Mike

22   Pence was in there.  Correct?  That was the question that was

23   posed to you.

24   A.   Yes, ma'am.

25   Q.   And you did not, at that point in time, state to the FBI,

1    well, I didn't know Mike Pence was in the Capitol, did you?

2    A.   Could you repeat the question, ma'am?

3    Q.   Sure.  Let's go up a little bit.  You're talking to the

4    FBI -- and you said you spoke to them for about five -- well,

5    you were in the room for five hours?  Is that right?

6    A.   Approximately, ma'am.

7    Q.   Long conversation, right?

8    A.   Yes, ma'am.

9    Q.   Lot of time to say what you wanted to say, correct?

10   A.   I'm sorry?

11   Q.   A lot of time to say what you wanted to say.  Correct?

12   A.   Or really anything that came to mind.

13   Q.   Okay.  Can we go up a little bit farther?

14        Okay.  So the question was asked -- actually, let's start

15   a page up.  I'll give you a little more context.  I don't want

16   you to be confused.

17        Okay.  So you're talking with the agent about -- let's

18   start here at line 18 on page 222.  He says, "Like, to go into

19   the Capitol where you knew that the process was going on to

20   certify, right?  You went -- people went in there to disrupt.

21   And whether you were at the beginning or you were at the very

22   end of the line, you went in there and it caused a disruption

23   to stop the democratic process of certifying the new president

24   that won the electoral college votes.  So you went in there

25   and essentially stopped the government from working."

1     Did I read that correctly?

2     A.   Yes, ma'am, you did.

3     Q.   So that's still the question.  Next page, please.  Your

4     answer is, "Answer:  I understand where you're coming from.

5     I don't agree with the premise that -- again, from our

6     perspective, I don't agree with the premise that we were

7     disrupting.  I --"

8         There's a little bit of crosstalk, and it says,

9     "Question:  But I mean, look," and I'm going to skip down here

10    to the question again.  "But what" -- okay, and then we'll go

11    down to line 8:  "But what did you think was going to happen,

12    right?  So you're going to -- you go walking in.  Did you

13    think while all you guys were walking through there they were

14    just going to continue to count votes and everything, and

15    Pence was going to be like hey, yo, Timmy, nice to see you

16    while you're walking through here?  You know?

17        "Answer:  At that time."

18        Line 16 you say, "At that time, like I said, there really

19    was no plan."

20        Did I read that correctly?

21    A.   Yes, ma'am.

22    Q.   Now, here's my question.  You were asked about your

23    conduct once you went in to the U.S. Congress building and

24    about Mike Pence and the congress being there counting votes,

25    and in response to the FBI during your interview, you did not

1    say to them, I did not know Mike Pence was in the building.

2    Correct?

3    A.   I don't know if I -- I can't see the entire transcript,

4    but I didn't acknowledge that I knew he was in there either,

5    ma'am.

6    Q.   And you didn't -- so I have the transcript.  I'm happy

7    to give it to you if you want to take the time to look through

8    it.  I can tell you I've looked through it and I don't see you

9    saying that to the FBI.  But if you want me to put it in front

10   of you, I can give you that.

11       My question for you is, in this interview you did not

12   tell the FBI that you did not know Mike Pence was in the

13   building.  Correct?

14   A.   I'm not sure what I said throughout the entire

15   transcript, ma'am.

16   Q.   So do you think you did say it?

17   A.   I don't know.

18   Q.   Okay.  And would you like to look at the transcript?

19       THE COURT:  We're not going to --

20   BY MS. SEIFERT:

21   Q.   Let me ask you separately:  Do you recall telling them,

22   I didn't know Mike Pence was in the building?

23   A.   I don't specifically recall that, ma'am.

24   Q.   Do you recall telling them, I did not know the members

25   of Congress were in the building?

1    A.   I do not specifically recall that, ma'am.

2    Q.   Do you recall telling them what you told us today,

3    that you did not know that Congress met in the U.S. Capitol

4    building?

5    A.   I did not know that at the time, ma'am.

6    Q.   Do you recall telling the FBI that you did not know at

7    the time that Congress was in that building?

8    A.   I don't recall saying that.  I don't know.

9    Q.   And when you met with your roommate, Mr. Jacobs, did you

10   tell Mr. Jacobs that you did not know until 2:45 p.m. that day

11   that Congress was in the building?  Did you tell him that?

12   A.   I don't think I specified that, ma'am.  No.

13   Q.   And did you tell Mr. Jacobs that you did not know until

14   later that day, at 2:45 p.m., that Mike Pence was in the

15   building?

16   A.   I don't recall specifically saying that to him, no.

17            MS. SEIFERT:  No other questions.

18            THE COURT:  Thank you, Ms. Seifert.

19       Mr. Crisp, redirect?

20            MR. CRISP:  Yes, Your Honor.  Your Honor, I would ask

21   that we get a copy of the transcript.  We don't have one.  So

22   I can have my colleague look through it here briefly.

23       (Government counsel tenders transcript to defense.)

24

25

1                        REDIRECT EXAMINATION

2      BY MR. CRISP:

3      Q.   Mr. Cusanelli, let's start where your cross left off.

4      A.   Yes, sir.

5      Q.   The last question that you read from that transcript --

6      first of all, have you ever seen that transcript?

7      A.   No, sir.  I've never read through the transcript.

8      Q.   Okay.  Your access to the discovery in terms of seeing

9      this interview has been difficult at best we'll say in the

10     last 12 to 18 months?

11             MS. SEIFERT:  Objection, Your Honor.

12             THE WITNESS:  The answer is yes.

13             THE COURT:  Sorry.

14             THE WITNESS:  Sorry.

15             MS. SEIFERT:  Can we approach?

16             THE COURT:  You may approach.

17        (Bench conference.)

18             MS. SEIFERT:  I don't think it's appropriate for

19     this question.  Counsel has been had access to his client's

20     interview from the very beginning.  If he did not prep his

21     client with the interview, that is not on the government and

22     he's casting aspersions as if it is.

23        The fact that the government anticipated a few days ago

24     that he might testify and then got a transcript ready for this

25     morning is irrelevant.  Defense has that and could have gotten

1    a transcript and certainly could have watched the entirety

2    of that recording with his client.  I don't think it's fair

3    to cast as if this is a surprise that the government has laid

4    on defense.

5           MR. CRISP:  I never said the government didn't do

6    anything.  I said limited at best.

7           THE COURT:  I didn't take it as casting aspersions.

8    I'm not going to question how Mr. Crisp has or has not

9    prepared his client.  I think it's appropriate for him to

10   ask if he's seen it.  It does kind of feel like we're going

11   to invite speculation about where the defendant has been in

12   the last --

13          MR. CRISP:  I understand.  I'm okay with that, quite

14   frankly, but I'm not going any further down the road.  That

15   was the last question I was going to ask him until I moved to

16   the substantive piece of it.

17          THE COURT:  Okay.  Let's --

18          MS. SEIFERT:  I would ask that either defense counsel

19   make clear or that the government be permitted to ask -- I

20   don't know how to prove up that we provided them with a copy

21   of the interview.  Maybe the Court could instruct that he was

22   given a copy?  I mean, I don't know.  It seems like they're

23   going to be left with the impression that we didn't give him

24   something because he hasn't had access to it.  That's my

25   worry; we trapped him somehow.  And I don't think that's fair.

1          THE COURT:  Okay.  Let's keep going and we can deal

2    with this later.

3          MS. SEIFERT:  Thank you, Your Honor.

4       (End of bench conference.)

5          THE COURT:  All right.  The objection is overruled.

6    BY MR. CRISP:

7    Q.   Who was in control of the interview in terms of who asked

8    questions?

9    A.   I believe it was a joint matter between NCIS and the FBI.

10   Q.   Okay.  Were there times when you attempted to answer

11   questions and you weren't given the opportunity to elaborate?

12   A.   Yes.  I was cut off several times.

13   Q.   The question that you saw transcribed, did it contain

14   multiple premises?

15   A.   Yes.

16   Q.   Did you attempt to discuss what those multiple premises

17   were and whether you agreed with all of them?

18   A.   I did, I tried to clarify certain things.

19   Q.   Did that happen throughout the course of the

20   three-and-a-half-hour interrogation?

21   A.   Yes, sir.

22   Q.   Okay.  Did you feel like law enforcement went in with

23   an agenda as to what they were going to ask you?

24   A.   Yes.

25   Q.   Okay.  And at times when you're asked certain questions,

1    did they actually ask you specific questions about why did

2    you do this, meaning why did you go down and try and stop the

3    certification?

4    A.    It was all over the place.

5    Q.    Okay.  You were asked the question, I believe, did you

6    ever tell them something similar to what you said on direct,

7    like I never went in -- I didn't know the certification was

8    ongoing.  Right?

9    A.    Yes, sir.

10   Q.    Did you ever -- did they ever ask you if you knew?

11   A.    No.

12   Q.    Did they start with the premise that you in fact did

13   know?

14   A.    Yes.

15   Q.    Okay.  Was that how a lot of back and forth went?

16   A.    Yes, sir.

17   Q.    Okay.  So I want to go back to the beginning of the

18   cross-examination regarding Trump's speech and what you

19   remember.  Okay?

20   A.    Yes, sir.

21   Q.    Now, you were asked why -- or do you remember Trump

22   saying something about let's go cheer our brave senators,

23   Congress persons or something to that effect on, right?

24   A.    Yes, sir.

25   Q.    And you said you remember something like that but not

1    the specific language.

2    A.   That's true.

3    Q.   So my question to you is if you didn't think that he

4    meant go down to the building where they were sitting, then

5    why go down to that building at all?

6    A.   I thought -- I thought -- well, I wanted to be a part

7    of the group that was going.  I wanted to hear Trump, and

8    by going there, I thought it was going to be like a bigger

9    platform for the world to hear us, as opposed to just a park

10   or something like that.  I thought it was going to be our

11   opportunity to really get visibility.  And that's what I

12   thought it was when I got there, because I'd seen more people

13   there than maybe I'd ever seen in my life.

14   Q.   So how did you think the goal of letting the senators or

15   Congress persons know was going to be accomplished by standing

16   in that area?

17   A.   Well, there could have been media there.  There were

18   media there.  They were everywhere, actually.  I thought

19   we'd be able to project our voice.

20   Q.   Okay.  Now, we didn't get a chance to talk about your

21   conversation with the female police officer or your language,

22   vulgar language to her.

23   A.   Yes.

24   Q.   What prompted you to say what you said?

25   A.   I don't recall specifically what I thought I saw the

1    officer do, but I recall the officer making gesture -- rude
2    gestures towards us as we were getting hit.  So I was angry
3    about it.  I shouldn't have said what I said.  I was very
4    angry, and it felt like not only were we being attacked, we
5    were also being mocked for being attacked.  And I lashed out
6    about it, and I shouldn't have.
7    Q.    The video in which you are -- where the skylights are,
8    with you running around, where the police are starting to
9    interact with the protesters, okay, there's a piece where
10   you're running over to what is on the screen the right of the
11   screen.  Do you remember that?
12   A.    Yes, sir.
13   Q.    Why did you run over there?
14   A.    Everyone else was running.  We were like chickens with
15   our heads cut off.  I just wanted to see what was over there.
16   It just looked like -- you know, sensory overload.  It was
17   the same as the outside.  A lot was going on.  As soon as
18   something moves, I ran right to it.
19   Q.    And when the man who was knocked down was on the ground,
20   there are two police officers that are standing almost right
21   next to you, right?
22   A.    Yes.
23   Q.    How do you not recognize that they're police officers?
24   A.    They came real quick.  But as soon as I recognized it,
25   I backed away.

1    Q.   Okay.  And let me be very clear about something.  You

2    admit you are guilty of interfering with the police there.

3    A.   I shouldn't have done what I did, and I should not have

4    interfered with police.  And I was wrong.

5    Q.   Okay.  There were discussions about how you repeatedly

6    made reference to the Democratic Party and Jewish controlled

7    influence and things like that.  Right?

8    A.   Yes, sir.

9    Q.   And you have made those references?

10   A.   I've made a lot of references like that, yes.

11   Q.   You don't dispute that.

12   A.   No, I do not, sir.

13   Q.   All right.  Help me understand why, if you don't -- if

14   you've made these references multiple times, why are you now

15   saying you don't think it's actually true?

16   A.   I never really thought it was true.  I mean, it's just

17   ironic to me.

18   Q.   Why is it ironic?  That doesn't make sense.  How is it

19   ironic to keep saying something like that?

20   A.   It's self-deprecating humor.

21   Q.   Why is it self-deprecating?

22   A.   I'm half Jewish and half Puerto Rican.  So it's one part

23   funny, one part a way just to alleviate -- not self-loathing.

24   But it's a way that I cope with how I was raised.  It's a way

25   I can express myself.  It's part -- part of it's my

1    generation, part of it's just my sense of humor, part of

2    it's just how I grew up.  I have a small circle of friends.

3    We had similar upbringings, and that's just how we communicate.

4    It's not right.  I know it's offensive.  I know it -- I know

5    it bothers a lot of people.  I know a lot of it is repugnant,

6    it's disgusting.  But that's just how we talked.

7    Q.   You researched a lot on the internet, right?

8    A.   Yes, sir.

9    Q.   There's a lot of commentary on the internet that you

10   found.

11   A.   Yes.

12   Q.   Did you repeat that commentary?

13   A.   Often.

14   Q.   Regarding Jewish and democratic influences.

15   A.   Possibly.

16   Q.   Okay.  I believe there were discussions that you had --

17   court's indulgence.

18        You were also asked a question regarding the tweet

19   regarding what Mike Pence allegedly did or did not do.

20   Do you remember that?

21   A.   Yes, sir.

22   Q.   And I believe the question that was posed was you knew,

23   you acknowledged in some form or fashion knowing about the

24   fact that Mike Pence hadn't held up his part of the bargain,

25   according to Trump.  Right?

```
1    A.   Yes, sir.

2    Q.   Do you recall ever specifically telling anyone in this

3    interview with law enforcement on the 12th of January when

4    you got that tweet?

5    A.   No.  I don't recall that, sir.

6    Q.   It's fair to say the only reference you made was it was

7    after the conflict had already started.

8    A.   Correct.

9    Q.   You don't say outside, you don't say inside.  Right?

10        MS. SEIFERT:  Objection.  Leading.

11        THE COURT:  Sustained.

12   BY MR. CRISP:

13   Q.   Do you tell them whether it was inside?

14   A.   I don't think I do, no.

15        MS. SEIFERT:  Same objection.

16        THE COURT:  Overruled.

17        THE WITNESS:  No, sir.

18   BY MR. CRISP:

19   Q.   Do you tell them whether it was outside?

20   A.   No, sir.

21        MR. CRISP:  Your Honor, I don't have any additional

22   questions.  Thank you.

23        THE COURT:  All right.  Thank you, Mr. Crisp, and

24   thank you, Mr. Hale-Cusanelli.

25     Folks, let's take about a 10-minute break.  All right?
```

1      See you shortly.

2          (Jury out at 2:20 p.m.)

3              THE COURT:  All right.  Mr. Hale-Cusanelli, you

4      can return.

5          (Witness steps down.)

6          Mr. Crisp, do you have any additional evidence for the

7      defense?

8              MR. CRISP:  I do not, Your Honor.

9              THE COURT:  Okay.  Is the government going to be

10     seeking to put on rebuttal?

11             MS. SEIFERT:  May we have a minute to consult, please?

12             THE COURT:  Okay.

13             MS. SEIFERT:  Thank you.

14         (Government conferring.)

15             THE COURT:  Ms. Seifert.

16             MS. SEIFERT:  Yes, Your Honor.  We would like to

17     put in a limited amount of evidence that Your Honor previously

18     excluded under 404(b).  The concern the government has is that

19     defendant has opened the door to this idea that his comments

20     about other people and about Jews and whatever, that's all

21     just hyperbole, that it's all a big joke.

22         And I think some of the transcript passages -- and that

23     you can hear the defendant in his own voice talking about

24     those things, which Your Honor had excluded -- and I understand

25     the reason for Your Honor's ruling before -- but now I seek to

admit them for the purpose of allowing the jury to determine
for themselves whether this is someone who's truly talking
about hyperbole, or if these are actually, you know, truly
held beliefs.

Because my concern is he's leaving them with the impression
that it's all just a big joke, and they don't get access to
the part of the recording where he's speaking in his own voice
and they can make that determination for themselves.

THE COURT:  Sorry.  So you're asking for additional
materials to go in that -- are you asking just for a recording
of what we've seen a transcript of, or are you asking for new
material?

MS. SEIFERT:  No.  I'm asking for some of the material
that Your Honor excluded in your 403 ruling, a limited, very
small portion, where the jury can hear defendant in his own
words talking about, you know, politics and Jewish influences
and the things of that nature, because on the stand today he
made it seem like that was all just a big joke; it's all just
banter.

And the government frankly thinks that characterization
is not accurate and feels that he's opened the door to
introducing very limited portions of that audio for the jury
to hear and make a determination for themselves, not because
it goes to the ultimate issue, but it goes to the character
that he's presenting on the stand today and whether that

1      person is being truthful with them.

2             THE COURT:  Okay.  Mr. Crisp?

3             MR. CRISP:  Your Honor, because there were aspects

4      of -- I disagree.  I think because there were aspects that

5      were still in the transcript, it was appropriate for him to

6      place context on that as opposed to leave it completely

7      unaddressed.  His assertion that this was his intent in that

8      instance is appropriate and doesn't open doors.  He never

9      said I've never said anything else like that; he never said

10     anything that would be subject to impeachment.

11         He could have been asked -- you know, I even elicited

12     you've made those other comments in other contexts, so that

13     it wasn't presented in a disingenuous, this is the only time

14     you've ever said that.  So I don't believe that presenting

15     other information that Your Honor rightfully excluded is

16     relevant and is actually proper impeachment.

17            THE COURT:  Okay.

18            MS. SEIFERT:  Your Honor, on cross I asked defendant a

19     few what I thought were very simple closed-ended questions to

20     make those points, which he disagreed with me on.  I asked him

21     if he thought Joe Biden was a puppet, if he thought Joe Biden

22     and the Democratic Party were fronts for Jewish interests,

23     things that Mr. Jacobs told us, and he's denying those things

24     now and then going on in redirect to augment that.

25         He didn't just address those points.  He went on to talk

1    about he's half Jewish and this is how his friends talk and

2    they're just having banter with each other and it's just

3    funny.  He knows it might not look funny to the rest of us but

4    it's funny to him.  That's how he got himself into this box.

5    It's not because they limited themselves just to the questions

6    that I asked.  They went beyond that, he even started talking

7    about his stuff on the internet.

8         So, frankly, it's possible he's opened the door wider

9    than what the government is asking for, but I think just

10   the limited things that we would seek to introduce are some

11   limited portions where the jury can hear him discuss things

12   in his own voice, so they can decide if the person they're

13   being presented with today is a true and accurate version of

14   the defendant as he was on January 6.

15        THE COURT:  Okay.  I'm going to deny the government's

16   motion.  I think that -- you know, largely for the reasons

17   I've already stated.  I think the additional evidence would be

18   highly prejudicial with relatively low probative value.

19        I think this is all kind of -- the Jewish discussion

20   really feels to me well beyond the scope of what this case is

21   supposed to be about.  And I think, frankly, just hearing more

22   offensive things the defendant said, you know, it's not any --

23   his basic point was, yes, I say these things but I kind of --

24   that's how I talk.

25        And so I don't see how showing more offensive statements

1    really impeaches that.  I think it corroborates what he said,

2    but frankly it feels like a confusion of the issues and unduly

3    prejudicial.  So I'm going to deny the government's request.

4        Ms. Seifert, my instinct on the transcript is that -- I

5    understood your concern, but that feels like -- that ended up

6    being kind of a minor point.  We've all heard that there were

7    five hours of an interview.  I don't think it's surprising

8    that he doesn't remember it all.  I think you could

9    potentially have somebody get on the stand and say he's looked

10   through it all and there's nothing there, if you want to say

11   that.  But I kind of feel like we've -- there's nothing more

12   that needs to be done on that.  You tell me if you disagree.

13           MS. SEIFERT:  That's fine, Your Honor.

14           THE COURT:  Okay.  Ms. Fifield, are you comfortable

15   with the proposed limiting instruction?

16           MS. FIFIELD:  Yes, Your Honor.

17           THE COURT:  Okay.  And, Mr. Crisp, you're doing up your

18   statement of the case.  So what I suggest -- I'll ask

19   Ms. Chaclan -- how long do you think you need, sir?

20           MR. CRISP:  Another five minutes, maybe?

21           THE COURT:  Okay.  So I'll tell Ms. Chaclan to tell

22   the jury it's going to be another 10 minutes, and when we

23   come back I'll let you rest and then I'll instruct and we'll

24   go straight to closings.

25           MR. CRISP:  Thank you, Judge.

1          THE COURT:  Anything else we need to be discussing?

2     And just kind of for the record, government is otherwise

3     comfortable with the instructions?  Obviously, you haven't

4     gotten to see the defense theory of the case, but assuming

5     that we've got something you're comfortable with there, any

6     other objections for the record, Ms. Fifield?

7          MS. FIFIELD:  Other than waiting to see what defense

8     comes up with for a theory of the case, we are comfortable

9     with the final jury instructions.

10          THE COURT:  Okay.  And Mr. Crisp, any objections for

11     the record on the final jury instructions?

12          MR. CRISP:  No, Your Honor.

13          THE COURT:  Okay.  Great.

14          MR. CRISP:  Thank you.

15          THE COURT:  So you'll email that to all of us as soon

16     as you've got it, and we'll hope to reconvene here in 10

17     minutes.

18        (Recess from 2:31 to 2:47 p.m.)

19          THE COURT:  Ms. Seifert, it occurred to me I think

20     I need to tell the jury something about the variations of

21     obstruction.  Is your belief that they should be determining

22     guilt or innocence on obstruction, attempt, aiding and

23     abetting separately, or only one and then only go on to the

24     others if --

25          MS. SEIFERT:  You know, I thought about raising it

1    with the Court but I didn't want to confuse things at this

2    hour.  How I've done it in the past in other cases where

3    aiding and abetting was pled, is we wrote the instructions

4    to say defendant, or one he aided and abetted, did element 1,

5    defendant or one he aided and abetted, element 2.

6        THE COURT:  That's a little different than what I'm

7    asking.  Do you think, if they find the defendant guilty of

8    obstruction, should they go on to consider aiding and

9    abetting?

10        MS. SEIFERT:  No.  I don't think they should.  I think

11    they can move on.

12        THE COURT:  Okay.  So I want to say something about

13    that.

14        MS. SEIFERT:  Okay.

15        THE COURT:  So I think what I'm trying is each of the

16    above three offenses are variations of the same offense.

17        MS. SEIFERT:  Your Honor, what page are you on, please?

18        THE COURT:  Well, I'm writing this up.

19        MS. SEIFERT:  Okay.  On the fly.

20        THE COURT:  But I would include it, I'm going to add

21    something right after obstruction of official proceeding,

22    aiding and abetting.

23        MS. SEIFERT:  I see, okay.

24        THE COURT:  And I think I would say if you find the

25    defendant guilty of obstruction, skip the attempt and aiding

1    and abetting offenses and move straight to entering or

2    remaining in a restricted building.

3            MS. SEIFERT:  I would say "the other offenses."

4            THE COURT:  Okay.

5            MS. SEIFERT:  Only because I think there's some circuit

6    precedent about the order.  They can consider them in any

7    order they want.

8            THE COURT:  That's faster.  I like your version.

9    If you find him not guilty of obstruction, go on to consider

10   attempt.  If you find him guilty of attempt, skip aiding and

11   abetting and move to the other offenses.  If you find him not

12   guilty of attempt, go on to consider aiding and abetting.

13     So I'll read this all over again:  So it's "each of the above

14   three offenses are variations of the same offense.  If you find

15   the defendant guilty of obstruction, skip the attempt and aiding

16   and abetting offenses and move straight to the other offenses.

17   If you find him not guilty of obstruction, go on to consider

18   attempt.  If you find him guilty of attempt, skip aiding and

19   abetting and move to the other offenses.  If you find him

20   not guilty of attempt, go on to aiding and abetting."

21     Does that make sense to you?

22            MS. SEIFERT:  That is fine.  Does Your Honor then want

23   the verdict form to have like multiple boxes within one?

24            THE COURT:  Yeah.  We'll deal with that.

25            MS. SEIFERT:  Okay.  Great.  That makes sense.

1          THE COURT:  Mr. Crisp, does that make sense to you

2     as well?

3          MR. CRISP:  It does, Your Honor.  The only thing --

4     yes, it does.

5          THE COURT:  Okay.  Do you have a theory of the case

6     for me?

7          MR. CRISP:  I did, and I was talking with Ms. Fifield,

8     which was making me -- when we were talking about that, I

9     listed it as 1512(c)(2).  But I only said the offense -- what

10    I don't want them to do is only consider it in the limited

11    context of the substantive as opposed to all three of the

12    iterations that they can consider, because I think it applies

13    to all three of the iterations.

14       Should I say Count 1 and just list out -- which I emailed

15    it.  Should I list out the -- I was trying to be as concise as

16    possible, understanding Your Honor's preference for that, not

17    wanting to restate it -- the attempt, I only listed it as --

18         THE COURT:  So I haven't talked about the statutes.

19    I've tried to stay away from that.

20         MR. CRISP:  And that's fine.  I can write out the

21    respective charge if that would be better.

22         THE COURT:  I'm going to do it right now.  Attempt to

23    violate the obstruction offenses?

24         MR. CRISP:  Yes.  And I think it does apply to 5104 and

25    the title that I always forget, it's the disorderly conduct.

1           THE COURT:  For disorderly conduct.

2           MR. CRISP:  Disorderly conduct with the intent to

3    obstruct an official proceeding or something along those

4    lines.

5           THE COURT:  In a --

6           MR. CRISP:  Capitol building grounds.  Right.

7    Thank you.

8           THE COURT:  In a Capitol building or grounds.

9      So it is the defense theory of the case that

10   Mr. Hale-Cusanelli was not aware the certification of the

11   electoral college count was occurring in the U.S. Capitol when

12   he entered the U.S. Capitol on January 6, 2021, and that as a

13   result, he did not have the requisite intent to violent the

14   obstruction counts?

15          MR. CRISP:  Yes, sir.

16          THE COURT:  Or...

17          MR. CRISP:  The disorderly conduct count.

18          THE COURT:  Or the disorderly conduct count.  Two.

19   Do you want to say counts?

20          MR. CRISP:  Counts.  Sorry.  I forgot.

21          THE COURT:  Because I think there's also a Secret

22   Service related one.  Okay.  So you're comfortable with that?

23          MR. CRISP:  Yes, sir.

24          THE COURT:  Okay.  Ms. Chaclan, I need to send this to

25   you to print.

1        MS. FIFIELD:  Pardon me, Your Honor.  Do you mind

2   reading the full instruction so we can track what the whole

3   thing says?

4        THE COURT:  Sure.  The defendant's theory of the case?

5        MS. SEIFERT:  Yes, please.

6        THE COURT:  It is the defendant's theory of the case

7   that Mr. Hale-Cusanelli was not aware the certification of the

8   electoral college count was occurring in the U.S. Capitol when

9   he entered the U.S. Capitol on January 6, 2021, and that as a

10  result he did not have the requisite intent to violate the

11  obstruction counts or the disorderly conduct counts.  If you

12  find the government has not proved these elements beyond a

13  reasonable doubt, then you must find him not guilty of the

14  offenses listed.

15       MS. FIFIELD:  So there are two -- as we just spoke

16  about, there are two disruptive and disorderly conduct counts.

17  One of them is under 1752 and one of them is under 5104.  And

18  I'm trying to pull up all our final jury instructions right

19  now but I think they have different statements of the required

20  *mens rea*, and I don't know if that would be confusing for the

21  jurors or not.

22       THE COURT:  I'm kind of inclined just to let Mr. Crisp

23  say what he wants to say here if -- as long as it's brief,

24  but -- are you comfortable with that?

25       MR. CRISP:  As long as we can -- I think she may be

right.  I think one is more of a general intent offense and

one is more of a specific intent offense based on how it's

charged.  I don't want to misstate it.  I know it's the 5104,

and I'm pretty sure the 1752 has the general intent language.

May I go look at the actual instructions again real quick,

Judge?

THE COURT:  Yes.

MR. CRISP:  Thank you.

(Defense and government conferring.)

THE COURT:  All right.  Mr. Crisp, what are we doing?

MR. CRISP:  In order for it to apply, I think, for the

5104, we would have to change and graft in more inclusive

language in the defense theory of the case, not only that the

electoral college was ongoing, but that in fact is where --

that the Capitol building is where Congress actually sits and

conducts sessions.

So absent that language in the defense theory of the case,

I think it would be confusing to have that apply to the 5104

since it's not there.  Do you understand what I'm --

THE COURT:  So do you want me to add in and he didn't

know that Congress sat at the U.S. Capitol?

MS. FIFIELD:  If Mr. Crisp would like added to this

instruction that Mr. Hale-Cusanelli was not aware of the

certification of the electoral college count -- there's also

a word missing I think in this first sentence.  There's

1    something that doesn't make sense.

2        So it is the defense theory of the case that

3    Mr. Hale-Cusanelli was not aware -- I think "that" is missing

4    right there.

5                THE COURT:  Yeah.

6                MS. FIFIELD:  That the certification of the electoral

7    count was occurring in the U.S. Capitol, or that the

8    United States Congress is in the United States Capitol.

9                THE COURT:  Is that the language you want?

10               MS. FIFIELD:  But then we'd also have -- I don't

11   know if we have to make clear that the electoral college

12   thing goes with the obstruction count --

13               THE COURT:  I don't want to do that.  If you want me

14   to say -- I mean, they're obviously aware of his position on

15   that.

16               MR. CRISP:  Yes.  Thank you.

17               THE COURT:  Or that the U.S. Congress is in the U.S.

18   Capitol?

19               MR. CRISP:  Conducts business in the U.S. Capitol.

20               THE COURT:  Okay.

21               MS. SEIFERT:  Your Honor, may I readdress the Court on

22   the earlier issue?

23               THE COURT:  Remind me which one.

24               MS. SEIFERT:  The one, two, three theory?

25               THE COURT:  Let me just type here.

1          MS. SEIFERT:  You finish that and let me know, please.

2     (Pause.)

3          THE COURT:  Yes, ma'am.

4          MS. SEIFERT:  I am concerned that the way it is written

5     might imply that the jurors have to find special unanimity

6     with respect to Count 1.  And I think in the verdict form it's

7     just going to have Count 1, not guilty/guilty.

8          THE COURT:  But don't they?  I could be wrong on this,

9     but I thought you couldn't have half the jury think he's

10    guilty of obstruction and half the jury think he's guilty of

11    attempt.

12         MS. SEIFERT:  So that is not -- I've never done it

13    this way, because normally what we've done is defendant or one

14    he aided and abetted did X.  So I've never required them to

15    find unanimity on either defendant or one he aided and abetted.

16    So like in our other cases where we've had aiding and abetting

17    as a theory of liability, the count said that -- we added that

18    in to all the language.  For instance, in one of our cases in

19    front of Judge Cooper, I did "defendant, one he aided and

20    abetted, or a co-conspirator entered into the U.S. mission in

21    Benghazi."  And then "defendant, one he aided and abetted, or

22    a co-conspirator" -- it was very long, but that's how we

23    resolved that issue.  So we never required special unanimity

24    with respect to the theory under which defendant was guilty.

25         And I'm happy to call back and get this right right now.

1    But I just consulted with my supervisor, and we both think a

2    more appropriate instruction would be something like "attempt

3    and aiding and abetting are alternative ways in which you can

4    find the defendant guilty on Count 1.  You may consider these

5    theories in deciding whether defendant is guilty on Count 1."

6         THE COURT:  Okay.  What's your position on that,

7    Mr. Crisp?

8         MR. CRISP:  Your Honor, could you refresh my

9    recollection on how you proposed to have it done?

10         THE COURT:  I suggested that they go one by one and if

11   they find him guilty of obstruction, they just move on to the

12   next offense.  If they find him not guilty of obstruction,

13   they move down to attempt, and then so forth.

14         MR. CRISP:  And the government wants to do it

15   concurrently?  Is that what I understood?

16         THE COURT:  They're suggesting that as long as all the

17   jurors agree on some version of obstruction, that he's guilty.

18         MR. CRISP:  No.  I don't agree with that.

19         THE COURT:  All right.  So -- I mean, these are the

20   instructions the government provided me that everybody agreed

21   to.  I'm not -- I think you're stuck with this on this one.

22         MR. CRISP:  And, Judge, I'm going to reverse course

23   here.  I apologize.  Keep it simple.  No language about the

24   other offenses.  Just keep it -- on the defendant's theory of

25   the case, just strictly pertaining to the obstruction charge,

1    no reference to any of the other language we just put in.  I

2    just want to keep it clean.

3         THE COURT:  Okay.  So to violate the obstruction count?

4    Is that what you want?

5         MR. CRISP:  Counts.  But no reference to the disorderly

6    conduct counts and no additional language about Congress

7    conducting business wherever.  Just that he was not aware that

8    certification was going on at that time.  I think that will be

9    cleaner.

10        THE COURT:  Okay.

11        MS. SEIFERT:  Your Honor, I just need to make the

12   record a little bit clear on this.  In the version that the

13   government submitted and which defense agreed to, when I look

14   at the elements -- I apologize, Your Honor, the version that

15   the Court gave me for some reason got -- I don't think has the

16   page number on it, but this is obstruction of an official

17   proceeding elements section.  If you go down to the last

18   paragraph it says, "first, the defendant attempted to or did

19   obstruct."  So I think the attempt is already in how it's

20   defined, which is why I'm concerned that adding more language

21   now that the Court proposes might create confusion.

22        THE COURT:  So why do you have obstruction of official

23   proceeding attempt?  Why do you have obstruction of official

24   proceeding aiding and abetting?

25        MS. SEIFERT:  The language says he's charged with an

1    attempt to commit the crime.  An attempt is a crime even --

2    defining attempt is I believe what's happening on that page.

3    And so I don't think it's even necessarily a separate crime.

4    It's -- the first page of this set of instructions defines the

5    crime, and then the next pages define various parts of it.

6    What is an official proceeding?  What is knowingly?  What is

7    corruptly?  What is an attempt?

8        The only thing it's actually adding in is the aiding and

9    abetting theory of liability.  The other three are just

10   defining the words as they're used in the first page.  So I

11   don't know that -- I guess our position is we don't need any

12   additional language.  I think it's clear from the way you're

13   stating it to them.  And it says, for instance, in aiding and

14   abetting instruction, in the first sentence it says a person

15   may be guilty of an offense if he aided and abetted another

16   person.  So I think that's all clear.

17            THE COURT:  Okay.

18        MS. SEIFERT:  I guess we're just objecting to

19   additional language at this point.  We don't think it's

20   necessary.

21            THE COURT:  Okay.  And you're not asking for a

22   broken-out verdict form, then.

23        MS. SEIFERT:  No.  No.  I misunderstood the Court.  I

24   thought that's what the Court was saying it wanted.  But your

25   clerk showed me the form, and the way the form is is just fine

1    with the government.

2            THE COURT:  Okay.  Mr. Crisp, do you wish to be heard

3    on that?

4            MR. CRISP:  Just that I was looking at these as lesser

5    included essentially, drop counts.  Because you have an

6    attempt, which would be a lesser included of the overarching,

7    as well as the aiding and abetting.  May I see the actual

8    finding sheet?

9            THE COURT:  For the verdict sheet?

10           MR. CRISP:  Yes, sir.

11           THE COURT:  Absolutely.

12       (Defense reviewing document.)

13           MS. SEIFERT:  If I may just add for the record,

14   Your Honor, I did just speak again with my supervisor and we

15   confirmed with our appellate section that it is our position

16   that we don't think special unanimity is required.  We did

17   look at all the other cases where we've tried this same set

18   of offenses and the other judges have also not required any

19   additional language requiring that kind of unanimity.

20           THE COURT:  Okay.

21           MS. SEIFERT:  Thank you.

22           MR. CRISP:  I don't agree.  Where I'm going with

23   this -- and I cannot remember the name of it, and I wanted to

24   put on the record, if you're not going to give it, I'll state

25   the position, if you are going to agree, then --

1          THE COURT:  I'm going to give the instructions as both

2    parties provided them to me.

3          MR. CRISP:  Okay.  My position then is I believe that

4    with the verdict form as it is, you could have some jurors are

5    unanimous as to an attempt but not all, some jurors are

6    unanimous as to an aiding and abetting charge, but not all.

7    But collectively they could find he was guilty of them as a

8    whole and therefore you don't have unanimity as to each --

9          THE COURT:  All right.  That's what the government

10   wants, and it can deal with the appellate consequences.

11         MR. CRISP:  Thank you.

12         THE COURT:  Let's call in the jury.  I'm going to

13   put in your defendant's theory of the case right after the

14   elements of the offenses.  I also took out the defendant as

15   witness, and I've added in there the limiting instruction

16   that the defense proposed.

17         MS. FIFIELD:  Your Honor, just quickly before they

18   come in.  The instruction that I just received for defendant's

19   theory of the case from Ms. Chaclan references obstruction

20   counts.  There's only one obstruction count.  I don't know

21   if that's going to be confusing for the jurors.

22         THE COURT:  All right.  That's what he's asked for.

23   I'm going to keep that.

24         MS. SEIFERT:  So I might note, does Your Honor

25   instruct first or have us close first?

1           THE COURT:  Yes.  I'm going to instruct first.

2    I'm going to stop right near the end --

3           MS. SEIFERT:  Oh, wonderful.

4           THE COURT: -- then turn over -- are you closing?

5           MS. SEIFERT:  I am.

6           THE COURT:  All right.  And how long will you --

7           MS. SEIFERT:  I apologize, Your Honor.  I didn't --

8    I haven't been able to practice it since defendant took the

9    stand.  So I would think maybe 30 to 45 minutes, but the

10   stretch is not really defined.  I'll do the best I can to

11   move it along, though.

12          THE COURT:  Mr. Crisp, how long do you expect?

13          MR. CRISP:  I would say about 30 minutes, Your Honor.

14          THE COURT:  Okay.

15          MR. CRISP:  And then may I use the restroom real

16   quick before we bring the jury in?

17          THE COURT:  Yeah.  Very quickly.

18          MR. CRISP:  Thank you.

19      (Short recess.)

20      (Jury in at 3:12 p.m.)

21          THE COURT:  Welcome back, ladies and gentlemen.

22     Mr. Crisp, does the defense have any additional evidence?

23          MR. CRISP:  No, Your Honor.

24

25

JURY INSTRUCTIONS

1    THE COURT:  All right.  Ladies and gentlemen, you've

heard all of the evidence in this case.  All that we have left

is for me to read you the final jury instructions and then for

you to hear arguments from both sides.  I will tell you at the

outset you will each be receiving a copy of the instructions

so you're welcome to take notes if you wish, but no need to.

All right.  During your deliberations, you may, if you

want, refer to these instructions.  While you may refer to

any particular portion of the instructions, you are to

consider the instructions as a whole and you may not follow

some and ignore others.  If you have any questions about the

instructions, you should feel free to send me a note.  Please

return your instructions to me when your verdict is rendered.

My function is to conduct this trial in an orderly, fair

and efficient manner, to rule on questions of law, and to

instruct you on the law that applies in this case.  It is your

duty to accept the law as I instruct you.  You should consider

all the instructions as a whole.  You may not ignore or refuse

to follow any of them.

Your function as the jury is to determine what the facts

are in this case.  You are the sole judges of the facts.

While it is my responsibility to decide what is admitted as

evidence during the trial, you alone decide what weight, if

any, to give to that evidence.  You alone decide the

1    credibility or believability of the witnesses.

2        You should determine the facts without prejudice, fear,

3    sympathy, or favoritism.  You should not be improperly

4    influenced by anyone's race, ethnic origin or gender.  Decide

5    the case solely from a fair consideration of the evidence.

6        You may not take anything I might have said or done as

7    indicating how I think you should decide this case.  If you

8    believe that I have expressed or indicated any such opinion,

9    you should ignore it.  The verdict in this case is your sole

10   and exclusive responsibility.

11       If any reference by me or the attorneys to the evidence is

12   different from your memory of the evidence, it is your memory

13   that should control during your deliberations.

14       During the trial, I permitted those jurors who wanted to do

15   so to take notes.  You may take your notebooks with you to the

16   jury room and use them during your deliberations if you wish.

17   As I told you at the beginning of the trial, your notes are

18   only an aid -- are only to be used as an aid to your memory.

19   They are not evidence in the case, and they should not replace

20   your own memory of the evidence.  Those jurors who have not

21   taken notes should rely on their own memory of the evidence.

22   The notes are intended to be for the note-taker's own personal

23   use.

24       During your deliberations you may consider only the

25   evidence properly admitted in this trial.  The evidence in

this case consists of the sworn testimony of the witnesses,

the exhibits that were entered into evidence, and the facts

and testimony stipulated to by the parties.  During the trial,

you were told that the parties had stipulated, that is agreed,

to certain facts.  You should consider any stipulation of fact

to be undisputed evidence.

When you consider the evidence, you're permitted to draw

from the facts that you find have been proven such reasonable

inferences as you feel are justified in the light of your

experience.  You should give any evidence such weight as in

your judgment it is fairly entitled to receive.

The statements and arguments of the lawyers are not

evidence.  They are only intended to assist you in

understanding the evidence.  Similarly, the questions of

the lawyers are not evidence.

The indictment is merely the formal way of accusing a

person of a crime.  You must not consider the indictment as

evidence of any kind.  You may not consider it as any evidence

of guilt or draw any inference of guilt from it.

Every defendant in a criminal case is presumed to be

innocent.  This presumption of innocence remains with the

defendant throughout the trial unless and until the government

has proven he is guilty beyond a reasonable doubt.  This

burden never shifts throughout the trial.  The law does not

require Mr. Hale-Cusanelli to prove his innocence or to

1    produce any evidence at all.

2        If you find the government has proven beyond a reasonable

3    doubt every element of an offense with which

4    Mr. Hale-Cusanelli is charged, it is your duty to find him

5    guilty of that offense.

6        On the other hand, if you find the government has failed to

7    prove any element of an offense beyond a reasonable doubt, it

8    is your duty to find Mr. Hale-Cusanelli not guilty of that

9    offense.

10       The government has the burden of proving a defendant guilty

11   beyond a reasonable doubt.  In civil cases, it is only

12   necessary to prove that a fact is more likely true than not,

13   or in some cases that its truth is highly probable.  In

14   criminal cases such as this one, the government's proof must

15   be more powerful than that.  It must be beyond a reasonable

16   doubt.

17       Reasonable doubt, as the name implies, is a doubt based

18   on reason, a doubt for which you have a reason based upon the

19   evidence or lack of evidence in the case.  If, after careful,

20   honest, and impartial consideration of all the evidence, you

21   cannot say that you are firmly convinced of

22   Mr. Hale-Cusanelli's guilt, then you have a reasonable doubt.

23       Reasonable doubt is the kind of doubt that would cause a

24   reasonable person, after careful and thoughtful reflection,

25   to hesitate to act in the graver or more important matters in

life.  However, it is not an imaginary doubt, nor a doubt
based on speculation or guesswork.  It is a doubt based on
reason.  The government is not required to prove guilt beyond
all doubt or to a mathematical or scientific certainty.  Its
burden is to prove guilt beyond a reasonable doubt.

There are two types of evidence from which you may
determine what the facts are in this case: direct evidence and
circumstantial evidence.  When a witness such as an eyewitness
asserts actual knowledge of a fact, the witness's testimony
is direct evidence.  On the other hand, evidence of facts and
circumstances from which reasonable inferences may be drawn
is circumstantial evidence.

Let me give you an example:  Assume a person looked out a
window and saw that snow was falling.  If he later testified
in court about what he had seen, his testimony would be direct
evidence that snow was falling at the time he saw it happen.
Assume, however, that he looked out a window and saw no snow
on the ground, then went to sleep and saw snow on the ground
after he woke up.  His testimony about what he had seen would
be circumstantial evidence that it had snowed while he was
asleep.

The law says that both direct and circumstantial evidence
are acceptable as a means of proving a fact.  The law does not
favor one form of evidence over another.  It is for you to
decide how much weight to give to any particular evidence,

whether it is direct or circumstantial.  You are permitted to give equal weight to both.  Circumstantial evidence does not require a greater degree of certainty than direct evidence. In reaching a verdict in this case, you should consider all of the evidence presented, both direct and circumstantial.

One of the questions you were asked when we were selecting this jury was whether the nature of the charge itself would affect your ability to reach a fair and impartial verdict.  We asked you that question because you must not allow the nature of the charges to affect your verdict.  You must consider only the evidence that has been presented in this case in reaching a fair and impartial verdict.

The weight of the evidence is not necessarily determined by the number of witnesses testifying on each side.  Rather, you should consider all the facts and circumstances in evidence to determine which of the witnesses you believe.  You might find the testimony of a smaller number of witnesses on one side is more believable than the testimony of a greater number of witnesses on the other side, or you might find the opposite.

The lawyers in this case sometimes objected when the other side asked a question, made an argument or offered evidence that the objecting lawyer believed was not proper.  You must not hold such objections against the lawyer who made them, or the party she or he represents.  It is the lawyers' responsibility to object to evidence that they believe is

1    inadmissible.

2        If, during the course of the trial, I sustained an

3    objection to a lawyer's question, you should ignore the

4    question and you must not speculate as to what the answer

5    would have been.

6        If, after a witness answered a question, I ruled that the

7    answer should be stricken, you should ignore both the question

8    and the answer and they should play no part in your

9    deliberations.

10       In determining whether the government has proved the

11   charges against the defendant beyond a reasonable doubt, you

12   must consider and weigh the testimony of all the witnesses

13   who've testified before you.  You are the sole judge of the

14   credibility of the witnesses.  You alone determine whether to

15   believe any witness and the extent to which a witness should

16   be believed.

17       Judging a witness's credibility means evaluating whether

18   the witness has testified truthfully, and also whether the

19   witness accurately observed, recalled, and described the

20   matters about which the witness testified.

21       You may consider anything that in your judgment affects the

22   credibility of any witness.  For example, you may consider the

23   demeanor and behavior of the witness on the witness stand, the

24   witness's manner of testimony, whether the witness impresses

25   you as a truthful person, whether the witness impresses you as

1    having a accurate memory and recollection, whether the witness

2    has any motive for not telling the truth, whether the witness

3    had a full opportunity to observe the matters about which she

4    or he has testified, whether the witness has any interest in

5    the outcome of this case, a friendship or hostility toward

6    other people concerned with this case.

7        In evaluating the accuracy of a witness's memory, you may

8    consider the circumstances surrounding the event, including

9    any circumstances that would impair or improve the witness's

10   ability to remember the event, the time that elapsed between

11   the event and any later recollections of the event, and the

12   circumstances under which the witness was asked to recall

13   details of the event.

14       Inconsistencies or discrepancies in the testimony of a

15   witness, or between the testimony of different witnesses, may

16   or may not cause you to discredit such testimony.  Two or more

17   persons witnessing an incident or transaction may see or hear

18   it differently.  An innocent misrecollection, like a failure

19   of recollection, is not an uncommon experience.  In weighing

20   the effect of the inconsistency or discrepancy, always

21   consider whether it pertains to a matter of important or

22   unimportant detail, and whether the inconsistency or

23   discrepancy results from innocent error or intentional

24   falsehood.

25       You may consider the reasonableness or unreasonableness,

1     the probability or improbability of the testimony of a witness

2     in determining whether to accept it as true and accurate.  You

3     may consider whether the witness has been contradicted or

4     supported by other credible evidence.  If you believe that any

5     witness has shown himself or herself to be biased or

6     prejudiced for or against either side in this trial, you may

7     consider and determine whether such bias or prejudice has

8     colored the testimony of the witness so as to affect the

9     desire and capability of that witness to tell the truth.

10        You should give the testimony of each witness such weight

11    as in your judgment it is fairly entitled to receive.

12        A police officer's testimony should be evaluated by you

13    just as any other evidence in the case.  In evaluating the

14    officer's credibility, you should use the same guidelines that

15    you apply to the testimony of any witness.  In no event should

16    you give either greater or lesser weight to the testimony of

17    any witness merely because he is a police officer or a law

18    enforcement agent.

19        During the trial you have heard language -- or you may have

20    heard language used by Mr. Hale-Cusanelli which some may find

21    distasteful or offensive.  You are instructed not to use your

22    personal opinion and disagreement of the language used to find

23    Mr. Hale-Cusanelli guilty.  You are expressly instructed to

24    only consider this evidence in your determination of whether

25    the government met its burden in establishing

Mr. Hale-Cusanelli should be found guilty of the criminal
actions alleged, including whether this language establishes
his intent, knowledge, or willful conduct as required under
the charged offenses.

Recordings of conversations used by witnesses -- recordings
of conversations identified by witnesses have been received in
evidence.  Transcripts of these recorded conversations are
being furnished for your convenience and guidance as you
listen to the tapes, to clarify portions of the tapes which
are difficult to hear and help you identify speakers.

The recordings, however, are the evidence in the case.
The transcripts are not.  If you notice any difference between
the transcripts and the recordings, you must rely only on the
recordings and not the transcripts.

In addition, if you cannot determine from the recording
that particular words were spoken, you must disregard the
transcripts as far as those words are concerned.

Someone's knowledge and intent ordinarily cannot be proved
directly, because there's no way of knowing what a person is
actually thinking.  But you may infer someone's knowledge and
intent from the surrounding circumstances.  You may consider
any statement made or acts done by Mr. Hale-Cusanelli and
all other facts and circumstances received in evidence which
indicate his intent or knowledge.  You may infer, but are
not required to infer, that a person intends the natural and

probable consequences of the acts he intentionally did or did
not do.

It is entirely up to you, however, to decide what facts to
find from the evidence received during this trial.  You should
consider all of the circumstances in evidence that you think
are relevant to determine whether the government has proved
beyond a reasonable doubt that Mr. Hale-Cusanelli acted with
the necessary state of mind.

Each count of the indictment charges a separate offense.
You should consider each offense and the evidence which
applies to it separately, and you should return separate
verdicts as to each count.  The fact that you may find the
defendant guilty or not guilty on any one count of the
indictment should not influence your verdict with respect
to any other count of the indictment.

I will now describe the elements of the offenses that the
government has charged.

Count 1 of the indictment charges Timothy Hale-Cusanelli
with corruptly obstructing an official proceeding, which is a
violation of federal law.  Count 1 also charges the defendant
with attempt to obstruct or impede an official proceeding, and
aiding and abetting others to commit that offense.  I will
first explain the elements of the substantive offense along
with its associated definition, then I will explain how to
determine whether the defendant attempted the offense and

whether the defendant aided and abetted the offense.

In order to find the defendant guilty of corruptly obstructing an official proceeding, you must find that the government proved each of the following four elements beyond a reasonable doubt:

First, the defendant attempted to, or did obstruct or impede an official proceeding.

Second, the defendant intended to obstruct or impede the official proceeding.

Third, the defendant acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding.

Fourth, the defendant acted corruptly.

The term "official proceeding" includes a proceeding before Congress.  The official proceeding need not be pending or about to be instituted at the time of the offense.  If the official proceeding was not pending or about to be instituted, the government must prove beyond a reasonable doubt that the official proceeding was reasonably foreseeable to the defendant.

As used in Count 1, the term "official proceeding" means Congress's joint session to certify the electoral college vote.

A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct and does not act

through ignorance, mistake, or accident.  In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant said or did.

To act corruptly, the defendant must use unlawful means to have a wrongful or an unlawful purpose or both.  The defendant also must act with consciousness of wrongdoing.  Consciousness of wrongdoing means with an understanding or awareness that what the person is doing is wrong or unlawful.

Not all attempts to obstruct or impede an official proceeding involve acting corruptly.  For example, a witness in a court proceeding may refuse to testify by invoking his constitutional privilege against self-incrimination, thereby obstructing or impeding the proceeding.  But he does not act corruptly.

In contrast, an official who obstructs or impedes a court proceeding by bribing a witness to refuse to testify in that proceeding or by engaging in other independently unlawful conduct, does act corruptly.

In Count 1, Timothy Hale-Cusanelli is also charged with attempt to commit the crime of Obstruction of an Official Proceeding.  An attempt to commit Obstruction of an Official Proceeding is a crime even if the defendant did not actually complete the crime of Obstruction of an Official Proceeding.

In order to find the defendant guilty of attempt to commit Obstruction of an Official Proceeding you must find that the

government proved beyond a reasonable doubt each of the following two elements:

First, that the defendant intended to commit the crime of Obstruction of an Official Proceeding as I have defined that offense above; second, that the defendant took a substantial step toward committing Obstruction of an Official Proceeding, which strongly corroborates or confirms that the defendant intended to commit that crime.

With respect to the first element of attempt, you may not find the defendant guilty of attempt to commit Obstruction of an Official Proceeding merely because he thought about it. You must find the evidence proved beyond a reasonable doubt that the defendant's mental state passed beyond the stage of thinking about the crime to actually intending to commit it.

With respect to the substantial step element, you may not find the defendant guilty of attempt to commit Obstruction of an Official Proceeding merely because he made some plans or took some preparation for committing that crime. Instead, you must find the defendant took some firm, clear, undeniable action to accomplish his intent to commit Obstruction of an Official Proceeding.

However, the substantial step element does not require the government to prove the defendant did everything except the last act necessary to complete the crime.

In this case, the government further alleges that Timothy

Hale-Cusanelli aided and abetted others in committing

Obstruction of an Official Proceeding as charged in Count 1.

A person may be charged -- may be guilty of an offense if he

aided and abetted another person in committing the offense.

A person who has aided and abetted another person in committing

an offense is often called an accomplice.  The person whom the

accomplice aids and abets is known as the principal.

It is not necessary that all the people who committed the

crime be caught or identified.  It is sufficient if you find

beyond a reasonable doubt that the crime was committed by

someone and that the defendant knowingly and intentionally

aided and abetted that person in committing the crime.

In order to commit the defendant -- in order to find the

defendant guilty of Obstruction of an Official Proceeding

because he aided and abetted others in committing this

offense, you must first find that the government proved beyond

a reasonable doubt the following five requirements:

First, that others committed Obstruction of an Official

Proceeding by committing each of the elements of the offense

charged as I've explained above.

Second, that the defendant knew that Obstruction of an

Official Proceeding was going to be committed or was being

committed by others.

Third, that the defendant prove by an -- I'm sorry.  Third,

that the defendant performed an act or acts in furtherance of

1    the offense.

2        Fourth, the defendant knowingly performed that act or acts

3    for the purpose of aiding, assisting, soliciting, facilitating

4    or encouraging others in committing the offense of Obstruction

5    of an Official Proceeding.

6        Fifth, the defendant did that act or acts with the intent

7    that others commit the offense of Obstruction of an Official

8    Proceeding.

9        To show that the defendant performed an act or acts in

10   furtherance of the offense charged, the government needs to

11   show some affirmative participation by the defendant which at

12   least encouraged others to commit the offense.  That is, you

13   must find the defendant's act or acts did in some way aid,

14   assist, facilitate, or encourage others to commit the offense.

15   The defendant's act or acts need not further aid, assist,

16   facilitate, or encourage every part or phase of the offense

17   charged.  It is enough if the defendant's act or acts further

18   aid, assist, facilitate, or encourage only one or some parts

19   of the phases of the offense.  Also, the defendant's acts need

20   not themselves be against the law.

21       In deciding whether the defendant had the required

22   knowledge and intent to satisfy the fourth requirement for

23   aiding and abetting, you may consider both direct and

24   circumstantial evidence, including the defendant's words and

25   actions and other facts and circumstances.  However, evidence

that the defendant merely associated with persons involved in a criminal venture or was merely present or was merely a knowing spectator during the commission of the offense, is not enough for you to find the defendant guilty as an aider and abettor.

If the evidence shows the defendant knew that the offense was being committed or was about to be committed, but does not also prove beyond a reasonable doubt that it was the defendant's intent and purpose to aid, assist, encourage, facilitate, or otherwise associate himself with the offense, you may not find the defendant guilty of Obstruction of an Official Proceeding as an aider and abettor.

The government must prove beyond a reasonable doubt that the defendant in some way participated in the offense committed by others as something the defendant wished to bring about and to make succeed.

Count 2 of the indictment charges Timothy Hale-Cusanelli with entering or remaining in a restricted building or grounds, which is a violation of federal law.  In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt:

First, the defendant acted or -- I'm sorry.  First, the defendant entered or remained in a restricted building or grounds without lawful authority to do so.

1   Second, the defendant did so knowingly.  The term

2   "knowingly" has the same meaning as in the instruction for

3   Count 1 defining knowingly.

4       The term "restricted building or grounds" means any posted,

5   cordoned off or otherwise restricted area of the building or

6   grounds where a person protected by the Secret Service is or

7   will be temporarily visiting.

8       The term "person protected by the Secret Service" includes

9   the vice president and the immediate family of the vice

10  president.

11      Count 3 of the indictment charges Timothy Hale-Cusanelli

12  with disorderly or disruptive conduct in a restricted building

13  or grounds, which is a violation of federal law.  In order to

14  find the defendant guilty of this offense, you must find that

15  the government proved each of the following elements beyond a

16  reasonable doubt:

17      First, that the defendant engaged in disorderly or

18  disruptive conduct in any restricted building or grounds.

19      Second, that the defendant did so knowingly and with the

20  intent to impede or disrupt an orderly conduct of government

21  business or official functions.

22      Third, the defendant's conduct occurred when or so that

23  his conduct in fact impeded or disrupted the orderly conduct

24  of government business or official functions.

25      The term "restricted building or grounds" has the same

meaning as in the instruction of Count 2 defining restricted

building or grounds.  The term "knowingly" has the same

meaning as in the instruction for Count 1 defining knowingly.

Disorderly conduct occurs when a person acts in such a

manner as to cause another person to be in reasonable fear

that a person or property in a person's immediate possession

is likely to be harmed or taken, uses words likely to produce

violence on the part of others, is unreasonably loud and

disruptive under the circumstances, or interferes with another

person by jostling against or unnecessarily crowding that

person.  Disruptive conduct is a disturbance that interrupts

an event, activity, or the normal course of a process.

Count 4 of the indictment charges Timothy Hale-Cusanelli

with disorderly or disruptive conduct in a capitol building,

which is a violation of federal law.  In order to find the

defendant guilty of this offense, you must find that the

government proved each of the following elements beyond a

reasonable doubt:

First, that the defendant engaged in disorderly or

disruptive conduct in any of the United States Capitol

buildings.

Second, that the defendant did so with the intent to

impede, disrupt or disturb the orderly conduct of a session

of Congress or either house of Congress.

Third, that the defendant acted willfully and knowingly.

1    The term "United States Capitol buildings" includes but
2    is not limited to the United States Capitol located at First
3    Street Southeast in Washington, D.C.

4    The term "disorderly or disruptive conduct" has the same
5    meaning as in the instruction for Count 2 defining disorderly
6    conduct and disruptive conduct.

7    The term "knowingly" has the same meaning as in the
8    instruction for Count 1 defining knowingly.

9    A defendant acts willfully if he knew his conduct was
10   unlawful and intended to do something that the law forbids.
11   That is, to find that the defendant acted willfully, you must
12   find that the evidence proved beyond a reasonable doubt the
13   defendant acted with a purpose to disobey or disregard the
14   law.  Willfully does not, however, require proof that the
15   defendant had any evil motive or bad purpose other than the
16   purpose to disobey or disregard the law.  Nor does it require
17   proof that the defendant may be aware of the specific law or
18   rule that his conduct may be violating.

19   I instruct you that for purposes of Count 4, the orderly
20   conduct of a session of Congress or either house of Congress
21   includes all the actions of the joint session of Congress
22   convened on January 6, 2021 to certify the electoral college
23   presidential election of 2020.

24   Count 5 of the indictment charges Timothy Hale-Cusanelli
25   with parading, demonstrating, or picketing in a capitol

building, which is a violation of federal law.  In order to
find the defendant guilty of this offense, you must find that
the government proved each of the following three elements
beyond a reasonable doubt:

First, that the defendant paraded, demonstrated or picketed
in any of United States Capitol buildings.

Second, that the defendant acted willfully and knowingly.

The terms "parade" and "picket" have their ordinary
meanings.  The term "demonstrate" refers to conduct that would
disrupt the orderly business of Congress by, for example,
impeding or obstructing passageways, hearings, or meetings,
but does not include activities such as quiet praying.

The term "United States Capitol buildings" has the same
meaning as in the instruction for Count 4 defining
United States Capitol buildings.

The term "knowingly" has the same meaning as in the
instruction for Count 1 defining knowingly.

The term "willfully" has the same meaning as in the
instruction for Count 4 defining willfully.

It is the defendant's theory of the case that
Mr. Hale-Cusanelli was not aware of the certification -- was
not aware that the certification of the electoral college
count was occurring in the United States Capitol when he
entered the U.S. Capitol on January 6, 2021, and that as a
result he did not have the requisite intent to violate the

1    obstruction counts.

2        If you find that the government has not proved these

3    elements beyond a reasonable doubt, then you must find him not

4    guilty of the offenses listed.

5        A verdict must represent the considered judgment of each

6    juror, and in order to return a verdict, each juror must agree

7    on the verdict.  In other words, your verdict must be

8    unanimous.

9        You will be provided with a verdict form for use when you

10   have concluded your deliberations.  The form is not evidence

11   in this case and nothing in it should be taken to suggest or

12   convey any opinion by me as to what the verdict should be.

13   Nothing in the form replaces the instructions of law I have

14   already given you, and nothing in it replaces or modifies the

15   instructions about the elements which the government must

16   prove beyond a reasonable doubt.  The form is meant only to

17   assist you in recording your verdict.

18       During the course of this trial, a number of exhibits were

19   admitted in evidence.  Sometimes only a portion of an exhibit

20   was admitted, such as portions of a longer video, a document

21   with some words or pictures blacked out or otherwise removed,

22   or a video played without audio.  There are a variety of

23   reasons why only a portion of an exhibit is admitted,

24   including that the other portions are inadmissible or

25   implicate an individual's privacy.

As you examine the exhibits and you see or hear portions that were -- where there appear to be omissions, you should consider only the portions that were admitted.  You should not guess as to what may have been taken out or why, and you should not hold it against either party.  You are to decide the facts only from the evidence that is before you.

I will be sending into the jury room with you the exhibits that have been admitted into evidence.  You may examine any or all of them as you consider your verdict.  Please keep in mind that exhibits that were only marked for identification but were not admitted into evidence will not be given to you to examine or consider in reaching your verdict.

With that, I think I will stop and turn it over to the attorneys to give their closing arguments.  Ms. Seifert.

                    GOVERNMENT CLOSING ARGUMENT

MS. SEIFERT:  Good afternoon, ladies and gentlemen.

"I can't describe how exhilarating it was."  Those are the defendant, Timothy Hale-Cusanelli's words, a few days after he invaded the United States Capitol building.  The defendant was joyful.  He was giddy that he had illegally entered the Capitol and he had stopped the certification of President Biden's election, or as he called it, "Stopped the Steal."

Now, defendant is a military man, and for him that was mission accomplished.  Once they stopped that certification, that is exactly why he went into the building that day.

1    Make no mistake.  Defendant is at the forefront of the

2    charge that day.  He's there on the front line at the west

3    front engaging with police officers, removing a barrier and

4    bringing it to the side so he can walk up those steps on to

5    the Lower West Terrace.

6    By his own admission and in his own words, he said,

7    "advance, advance, advance," both outside and inside the

8    Capitol, to his fellow rioters, and he entered the Capitol

9    73 seconds after the initial breach.

10    He stood in the Crypt and he yelled "Stop the Steal" while

11    members of Congress met upstairs.  And he stood in the CVC,

12    the Capitol Visitor Center, under that large window upstairs

13    and repeatedly waved in rioters.  Because, again, in his own

14    words, they needed more people in the building.

15    And he advanced on the Capitol police officers standing

16    at the end of that hallway who were attempting to hold a line

17    there and prevent the rioters from getting into the House

18    tunnels.  And he interfered with Officer Matthew Shephard's

19    attempt to take a rioter to the ground after watching for

20    many seconds the entirety of Officer Shephard's conduct.

21    Defendant knew exactly what he was doing that day, and

22    this is exactly where he wanted to be: part of a, quote,

23    historical event.

24    Now, defendant came to Washington from New Jersey, and

25    when he came, he may have thought he was coming down for the

speech.  But let's be sure of one thing.  He knew when he got in the car that morning that what was happening in Washington was the certification of Joe Biden's election.  He is an ardent Trump supporter and he thoroughly believed the misinformation that was being put out about the election and the falsities about election fraud.

He was extremely knowledgeable about the process for challenging that, even stating back in December of 2020 that Georgia was sending another set of electors and that it would be up to Mike Pence to figure out what to do.

Defendant knows the legal process for challenging the election.  He knows the process is there.  The process that you heard Dan Schwager talk to you about that is Constitutionally enshrined.  There was a courts process and that was over.  There were state processes, those were over. The last process was happening in the United States Capitol that day, and defendant knew it.

But he did not want to wait for those members to take the time to debate those objections.  He and the crowd, when they heard out on the west front that Mike Pence was not going to do anything to set aside those votes, decided to take matters into their own hands.

Now, let's start with the timeline of events.  If I could have published to the jury the PowerPoint, please.

Okay.  Go to the first slide, please.

1   At 1:46 p.m. Congress is meeting in each of their

2   respective chambers where they are debating the objections to

3   the Arizona votes.  At the same time, defendant is outside on

4   the west front, on the front line, with Capitol Police

5   officers, who by his own admission had thrown OC spray or

6   whatever else at him to try to get him to stay back.  He knows

7   that that's what they were trying to do.

8   Slide, please.  Next slide.

9   At 1:50 p.m. on the west front, defendant picks up that

10  barrier and moves it to the side.  And he also takes note of

11  a rioter next to him with an extremely large metal object.

12  Defendant had told his friend after the fact that no one was

13  armed that day, but you saw and heard evidence to the

14  contrary, that in fact the rioters were intent on using

15  whatever means they had as weapons, flagpoles, the OC spray.

16  You heard all kinds of things that the officers were telling

17  you about the hand-to-hand combat and the ways in which they

18  were attacked.

19  Defendant sees other rioters with blood on their faces.

20  He sees rioters waiting in line to go up these stairs where

21  they've clearly ripped the tarps off.  Ripped those tarps down

22  to gain access to those stairs which were otherwise off

23  limits.  And he's waiting in that line to get up the stairs.

24  It takes him almost 12 minutes to climb the stairs onto the

25  Capitol.

The other protesters that day?  Some of them are going with defendant.  But the majority of them are behind him, standing on the west front, continuing to protest.  He is with that initial group that gained access up that flight of stairs.

Next slide.  At 2:12 defendant is at the top of the west front terrace.  And you can see even still the amount of people who are down on the ground in front of the Capitol. But defendant is not one of them.  He has climbed to the top and is on his way to the Senate Wing door.

And when he gets to the top of the stairs, the thing that he wants to say more than anything else?  "Trump won." Because he knows that's why he's here.  To contest the election.  Next slide.

At 2:13 p.m. the first breach of the Capitol occurs, just feet away from where defendant is in those Senate Wing doors. Play.

(Audio played.)

You can hear the stress and the concern in those officers' voice as now the Capitol has been breached and they need to go into immediate action to secure the members of Congress that they are sworn to protect.  And you heard what Officer Watts said to you yesterday.  It didn't matter if you were the first person in the door or the last.  A breach is a breach is a breach.  Every single person who walked through that door was a threat to himself, to the building, and to the members of

1    Congress who were meeting in the Capitol.

2        And defendant walks through that door 75 seconds later,

3    at 2:14 p.m. and 16 seconds.  And at the same time, just one

4    floor up on the Senate side, the Senate is evacuating.  Vice

5    President Pence is rushed off the floor.  The presiding

6    officer is rushed off the floor.  And the Senate is locked

7    down.  And a Capitol Police officer takes to the dais and

8    tells everybody to stop and to wait, and they begin the

9    emergency drills that they've run before.

10       Next slide.  Defendant, after initially turning toward

11   the Crypt, is turned back.  And I submit that when you look at

12   the video, you'll see that's because those officers are in the

13   Crypt keeping people back.  They have a point there where they

14   can hold back the rioters.

15       So he and other rioters start going the other way, down

16   the hallway toward the Senate.  You heard from Officer Watts

17   that as defendant is heading down that hallway, where's he

18   going?  He's going a direct route to the green evacuation

19   route on that floor that Officer Watts is going to need to

20   take those members of the Senate out in just a few minutes.

21       And in fact, Officer Watts, who's one floor up at this

22   point, can hear the yelling and the screaming downstairs,

23   and he is so concerned about those rioters getting up to the

24   Senate floor, that he posts up at the top of that stairwell

25   that's in the green box and he goes across the hall to the

1　　presidential room, takes out all the furniture with his

2　　coworker, and they pile and pile and pile the furniture at

3　　the top of that stairs to prevent the rioters who just got in

4　　the Senate Wing door, including the defendant, from coming up

5　　onto the Senate floor.

6　　　　And you'll watch the video and see that those same rioters

7　　who approached that way are turned back.  It's not clear from

8　　the film who turns them back, but they are definitely pushed

9　　back.  Because you can see the defendant coming back and

10　　shielding his face because something has pushed him back.

11　　　　Next slide.  Now, at 2:16 p.m., on the other side of the

12　　Capitol, members of the House are still trying to meet.  They

13　　have not yet gaveled out.  But it is clear that there is

14　　disorder.  You hear Representative Gosar standing up and

15　　saying first "Madam Speaker," and then the speaker is whisked

16　　off while he is speaking and he looks up and sees now a

17　　different presiding officer.  And he can hear, and you'll hear

18　　on the video, he can hear the different people talking in the

19　　chamber and they're shouting in the chamber and he's saying we

20　　need to have order.  But there will be no further order that

21　　day.  Next slide.

22　　　　Defendant and the other rioters he is with then, after

23　　being sent back from the Senate side, move towards the Crypt.

24　　And you saw and heard about those officers who are making that

25　　line, that perimeter basically in the center of the Crypt.

1   They are dressed in full riot gear.  They have an M4.  They

2   have "Police" all over them.  And the protesters keep coming

3   in, they keep coming in, and they fill that Crypt, and they

4   fill it and they fill it and they fill it, and they continue

5   to push and push and push and push until, at approximately

6   2:25, they overwhelm that force.

7       And you know defendant is in that crowd because you saw him

8   walk off that way, and you know he's in that crowd because at

9   2:26 he's standing on the House end of the Crypt in the middle

10  of the crowd.

11      If he's back going to the bathroom for that whole time,

12  there's no way he makes it through that room with all those

13  people.  He was with them when they pushed forward.  That's

14  how he's on the House side of the Crypt then.

15      And in the meantime, upstairs, at 2:26, Congress is still

16  in session because the House is still trying to meet.  They

17  had gaveled out and they gaveled back in and they're just

18  trying to keep doing their jobs.  Again, as Ms. Fifield told

19  you in the beginning, real people doing their real jobs that

20  day.  And it becomes clear to them after a few minutes that

21  this is not going to stand and they need to gavel out that

22  proceeding.  And then they also shelter in place, those

23  members in the House.  Next slide.

24      And at 2:26 on the Senate side, the vice president is being

25  evacuated because he and his detail have determined that it's

1    time to go.  There are rioters in the building.  And you heard
2    today from Special Agent Wade that when he took the vice
3    president down this stairwell, this stairwell that one floor
4    down is on that same floor that defendant and the other
5    rioters are on, he can hear the sound of those people and he
6    is concerned about the security of the vice president and his
7    family.  Next slide.
8        Potentially one of the things he can hear at 2:26 when he's
9    coming down the stairs is this.
10        (Video played.)
11        That's defendant and other rioters in the Crypt screaming
12    about the election, inside the U.S. Capitol.  They're there to
13    stop the steal, the steal of the presidential election.  That
14    is why they are there that day.  Make no mistake.  That was
15    absolutely why they entered the building.  And defendant, as
16    you heard from Agent Framhein, is in the front part of that
17    room.  He's not all the way -- he didn't make it all the way
18    through into that kind of anteroom because it's a big crowd
19    that's pushing that way towards the House, but he's far enough
20    over that he's next to that first row of columns.  And if you
21    look at the videos, you'll see there's a lot of people behind
22    him.  He is right in that mix.  Next slide.
23        Now, in the videos you see that those protesters -- excuse
24    me -- rioters continue on trying to go towards the House side.
25    And you'll see on the maps those two staircases that Special

1    Agent Framhein pointed out to you.  If you go out through that
2    little anteroom and you go left, there's a big grand staircase
3    that takes you upstairs, and if you go right, there's a little
4    spiral staircase that takes you upstairs.  You also heard some
5    of the officers telling you about the same thing.

6        And when they're in that anteroom, those protesters --
7    excuse me, those rioters keep getting pushed back by the
8    police.  They're sitting there, you know, being jostled by the
9    police and they are trying to access that stairwell.  And
10   because of that pinch point, if you were, that is preventing
11   the people inside the Crypt from also being able to follow.

12       There's all this back and forth.  They're huddled in there
13   in that small area being stuck in there by Capitol Police and
14   they cannot continue on.  Which means that the defendant, back
15   out in the Crypt, cannot follow.  Next slide.

16       And here's what you see on that film.  It's not until
17   approximately 2:28 that the rioters are able to break through
18   that police line and go up that staircase up towards the House
19   of Representatives.  Which means that the folks back in the
20   Crypt, including defendant, have many minutes of standing
21   there waiting, waiting to go forward where they're held back.
22   And so what does defendant do?  Next slide.

23       Actually, before we get to what defendant does, let's
24   talk about what's happening upstairs when the rioters break
25   through.  Right around 2:29 the Senate starts evacuating.

1    Play.  (Audio played.)

2        In the House at 2:36 the same thing is happening.  At

3    14:36 they call out that they're trying to evacuate because

4    individuals are coming in.

5        (Audio played.)

6        Next slide.  Now, defendant doesn't make it up to the

7    second floor because the police are there to hold those

8    rioters back.  Not everybody makes it up there.  But defendant

9    goes elsewhere.  When that line of people which you can see in

10   this image at 2:29 is still waiting to press through to go up

11   to that narrow staircase, the defendant goes the other way.

12   He goes now east towards the Capitol Visitor Center.  Next

13   slide.

14       At 2:29 you heard testimony that this garage door which

15   they're trying to bring down for security is breached.

16       Play?

17       (Audio played.)

18       Next slide.

19       Just a minute later defendant is entering that same area,

20   following the group of rioters that are headed down to the

21   CVC.  And that presents a real security issue to the Capitol

22   Police.  Next slide.

23       It does, because as you heard, the CVC has access to the

24   House and the Senate tunnels.  Defendant comes down and he

25   takes that right.  And you heard Officer Shephard told you

1    that they went right to try to draw the rioters in that

2    direction because they thought they could hold them off at

3    the pass, basically at the end of the hallway that you see

4    depicted here.

5        And when defendant comes down, he follows everyone in that

6    direction where the police officers have a post-up point at

7    the end of the hallway, and he gets to that skylight, he looks

8    up, and he starts motioning people in.  We need more people

9    down here.  That's what he tells his friend days after.

10       And you can see rioters standing on top of the glass,

11   and in his own words, he described that.  He stated, I was

12   down by the entrance of the House of Representatives, and

13   there was this glass ceiling, and there were people outside,

14   and I was motioning them to come in because we needed more

15   people.  Next slide.

16       Down here in the CVC he might be a few floors away from the

17   action in the House and the Senate, but he is no less a threat

18   to the members of Congress.  You heard from the officers and

19   the Capitol Police that where this circle is are those trains

20   to the Senate Office Buildings, and that Senator Schumer and

21   his detail were attempting to evacuate into the CVC and had to

22   turn around and run backwards where they came because there

23   were rioters in the CVC.  Rioters like the defendant.

24       You also heard from the officers that at that pinch point

25   where they posted up at the X with Officer Shephard, that if

1   they had gotten past Officer Shephard, they would have had

2   access to those House tunnels where members had retreated to

3   their offices.  And you heard from Officer Shephard that if

4   you came down that escalator and made a u-turn at the CVC,

5   you could get back to the elevators that take you all the way

6   up to the House and Senate galleries.

7       And you heard from Officer Shephard that the CVC is made

8   for tourists.  There are signs everywhere.  House, Senate,

9   gallery, all over the place.  Defendant was in the CVC for

10  approximately 10 -- more like 15 minutes down there, with

11  those officers, with those signs, and was creating a

12  distraction for the officers to contain him and the other

13  rioters in this area.

14      And because Officer Shephard and his colleagues are working

15  to contain defendant and the other rioters in the CVC, they

16  are not available to assist in other parts of the building

17  that do need assistance.  Officer Shephard told you he has his

18  radio on and he hears the calls for help.  He hears that they

19  need -- there are shots fired in the House and they need

20  additional officers.  And he is not able to go there because

21  he has to stay with his colleagues and defend against the

22  rioters who are in the CVC, rioters including the defendant.

23      And you heard from Officer Watts that he does go up when

24  he hears that call.  He goes to the third floor, to the House

25  gallery, and he is completely overwhelmed by the number of

rioters up there.  He eventually gets them all to lie prone
on the floor so he can get the members who are sheltering in
place in the House gallery out.  Next slide.

And finally, by 2:39 and 2:41, the Senate floor has been
evacuated but the House floor is still ongoing.  Next slide.

(Audio played.)

In the meantime, defendant is downstairs in the CVC
continuing to engage with Capitol Police.  He watches for
several minutes the officers at the end of that hallway, and
then he sees them come out and start engaging with a rioter.
He sees Officer Shephard tackling that rioter to the ground,
and he first runs toward them, and then when it's getting too
wild, he kind of backs up and he stands and he watches as
Officer Shephard tries to take that rioter into custody.

And what does he do?  He reaches forward and tries to grab
that rioter by the collar and pull him away.  Officer Shephard
said -- next slide -- he said -- this is the second quote:
"Did this individual who was pulling away the person on the
ground interfere in any way with your ability to take this
person on the ground under arrest?

"Answer:  It would appear he did from the video.

"Question:  Officer Shephard, if you had unlimited police
officers standing behind you at that pinch point at the
Capitol Visitor Center between yourself and the House tunnels,
how many of the rioters that were standing in front of you in

1   the hallway would you have taken into custody and arrested?

2       "Answer:  Every single one of them."

3       Because every single one of them was a threat to Congress

4   and the Capitol.  Next slide.

5       At 2:44, while Officer Shephard is dealing with the

6   defendant, upstairs in the House, the House officers --

7   security officers inside have battered up a piece of furniture

8   in front of that door and have drawn guns on the protesters

9   who are outside.  They are outnumbered, and they are needing

10  additional assistance.  Play, please.

11      (Audio played.)

12      Next slide.  At 2:44 p.m. you heard that officer say that

13  he is trapped in a room with his members and he cannot get

14  them out safely; he does not have enough manpower.  His

15  manpower is being used otherwise in the Capitol to deal with

16  people like the defendant.  Next slide.

17      Defendant does leave at 2:45.  And again, officers have

18  to post up at all the spots where he is leaving to make sure

19  he does actually go.  Those officers could be elsewhere.

20  They could be defending the folks in the House gallery or they

21  could be protecting the U.S. Senate.  But they are not available

22  because they are dealing with the rioters.  Next slide.

23      That's why at 2:46 the Senate, now left unguarded, is overrun

24  by rioters coming in, sitting in the chair on the dais, rifling

25  through members' papers, taking pictures on the House floor of

1    what was inside those desks.  Next slide.

2        And at 2:48 defendant makes it back up to the Senate Wing

3    door.  And he does not leave at 2:48, though he has an

4    opportunity to do so.  In fact, when he's down in the Visitor

5    Center there's a kind of heavily dressed militarized protester

6    who's pointing him, let's go.  And he takes direction from that

7    guy and actually does start to leave.

8        That guy leaves two and a half minutes before defendant does.

9    What does defendant do?  He stands up there for five minutes

10   watching the next set of protesters trying to come into the

11   building and riot, watching those rioters now engage with

12   police, push against police, hit against police, grabbing that

13   Trump Make America flag and waving it around.  All during the

14   time when he could have, if he wanted to, gone right out that

15   open window where other rioters were leaving at that point.

16   Next slide.

17       This case turns on knowledge and intent.  You have heard

18   actually from the Court already about this issue, and the

19   Court's instructions about knowledge and intent say as follows:

20   Someone's knowledge and intent ordinarily cannot be proved

21   directly because there's no way of knowing what a person is

22   actually thinking.  But you may infer someone's knowledge and

23   intent from the surrounding circumstances.  You may consider any

24   statement made or acts done by Mr. Hale-Cusanelli and all other

25   facts and circumstances received into evidence which indicate

his intent and knowledge.  You may infer, but are not required
to infer, that a person intends the natural and probable
consequences of acts he did or did not do.

So you may infer that he intended the natural probable
consequences of his conduct, which was to set aside, to disturb
that official proceeding.

Now, you're going to hear -- you have lots of evidence that
you can infer knowledge and intent from.  So, first -- next
slide.  Defendant had numerous concerns about the Democrats and
Joe Biden.  You heard from his roommate that he said Biden
America, Democrats Biden Jews.  The roommate says, "you're
repeating yourself."  CHS says, "You're saying they're all part
of the Jews?"  Defendant says, "Yes, of course, I give them 24
hours to leave."

Now, some of that is hyperbole, sure.  But his conversations
with the CHS, with Mr. Jacobs, are repeatedly about politics,
and he repeatedly talks about that he doesn't like the
Democratic Party, he thinks Joe Biden is a puppet, he's
concerned that that's now the President of the United States
come inauguration day.  Next slide.

He makes those concerns known in text messages to his
friends.  On October 8 of 2020 he's watching the vice
presidential debate, and in response -- his friend Finnigan
says, "It's wild to me how anyone could think that these two,
quote, people could be beneficial to our country."  The

1   defendant's response is, "Well, it's easy when you're

2   brainwashed by the media and professors and corporations."  Next

3   slide.

4       Defendant, in his statement to Mr. Jacobs, says, "The major

5   threat right now is inward.  It's not outward.  It's not Russia.

6   They're not selling my information to themselves.  It's not the

7   Soviet Union that blew up the Twin Towers and blamed it on

8   someone else.  The threat is inward."  Next slide.

9       And defendant in his messages as far back as February of 2020

10  starts talking about more radical change.  He states to his

11  friend Cynthia, "Adam Schiff is a clown but so are most of them.

12  Bernie supporters are sheep being led around by a sellout with

13  four houses.  Sometimes I wish they would try that shit so we

14  can get the civil war started already.  It'll just be one side

15  with guns and the other side with dildos and bongs.  I wonder

16  who will win."

17      Again, some of that is, you know, maybe joking, but who is

18  introducing the context, the civil war into the conversation?

19  Defendant.  Who is doing it with Mr. Jacobs?  Defendant.  He

20  has some form of him that believes in some of this more extreme

21  views of how we need to accomplish what's next.  Next slide.

22      He had this desire for radical change, and he says to the

23  CHS, "that tells me it's just a matter of time."

24      "A matter of time?"

25      "They don't want to be the pawns firing the shot."

The CHS:  "Oh, what do you mean?  To send us into some military --"

"Well, they don't want to be the ones to fire the first shot for a civil war, because they know it would be -- they'd lose hard.  All the fucking guns and resources are in, unfortunately, the Republican area."  Next slide.

And then defendant on his own accord says to his friend: "I really wish there'd be a civil war."  Again, defendant says that's all just a joke.  But he keeps interjecting this topic in.  It's not like anyone's asking him and interviewing him about civil war.  He brings this stuff up.  He says it would provide a clean slate.

And when his friend says, "Well, a whole bunch of people would die," defendant's response is, "Well, you know what Jefferson said:  The price of the tree of liberty must be refreshed by the blood of patriots and tyrants."  He's quoting our founding fathers.  Next slide.

He's very concerned about election fraud and you see that in his text messages.  Next slide.

Back in October of 2020, he is saying even before the election happens, of course their plans haven't changed. They can't win, and then they rig it.  I think Trump will win outside of massive voter fraud, which is possible with these ballots.  Next slide.

On election night itself, he sends a series of text messages,

and this is just a few, where he says things like "Trump is leading the way in the remaining states minus rigging. Definitely rigging just like Trump said.  4 a.m. they magically found 20,000 votes to push Wisconsin blue.  Arizona ballots are being invalidated because they're marked with a Sharpie as directed by election officials."

And then he goes on to name different states.  He's so specific about his concerns that he knows which states are actually having election fraud ballot issues coming up.  He watches the Arizona state legislature's hearing on election fraud.  Arizona.  The same state that Congress is considering the election objection to when defendant and his rioters entered the building.  Next slide.

And finally, even after the election, he knows about the choices that are out there.  He says "We're not going to go out without a fight.  If they pull this off, they'll expose the greatest election fraud in history."  He's back and forth. Arizona's uncalled for Biden.  And then on November 11 he says "It's getting interesting with all the shit coming out each day. It's definitely fraud.  It's just up to the Trump team to adequately adjudicate this in the courts."

But you heard from him today that he knew by January 6 the courts were done, the states were done.  It was over.  The Congress was meeting to certify the vote and that was the last stand.  Next slide.

And he knew what that meant.  He knew what the certification procedure meant.  On November 25 he says, "it's not over yet."  On December 14, he says "Georgia and Pennsylvania have sent faithless electors."  On December 14 he says, "meaning the electors are not going to vote how they were told based on the results."  He says "Georgia has competing electors, those that represent Biden and those representing Trump, and then Mike Pence gets to decide."  He knows what's going to happen on January 6.  Next slide.

And he even goes to the rally on December 12 down in Washington, D.C.  Play.

(Video played.)

Next slide.  And in the Crypt of the United States Capitol, what does he yell with his other rioters in the mob?  "Stop the Steal."  That's the chant that day.  "Stop the Steal."  You can infer that they intended the natural probable consequences of their words and actions.  Next slide.

Defendant was proud.  And you can infer that he intended it because of his pride after the fact.  He says, "I can't describe how exhilarating it was.  Let me tell you, if we had more people we could have cleared the whole building.  Stormed is a little bit of an exaggeration.  Well, it's not.  I would love to be part of a historical event."  Next slide.

His friend Finnigan texts him on January 6, "Oh, it looks cold.  But damn, people got into the Capitol building?"  Now,

this is three o'clock p.m., right after he leaves.  What does he reply?  Winky-face emoji.  He's proud.  Does he reply to Finnigan, oh gosh, yeah, I didn't even know Mike Pence was in there that day?  I didn't know the members of Congress were there.  I was super surprised 15 minutes ago when I learned for the first time that that's where the United States Congress sits, is in the U.S. Capitol building.  He doesn't say that to Finnigan.  In fact, he doesn't say that to anybody.  Next slide.

He is conscious of what he's done and he talks about his consciousness of guilt.  He tells his friend, his roommate, he is scared of getting caught.  That whole ten-year felony thing.  He says, "I mean, I'm not scared, it's just that I really don't need a ten-year felony right now."  And then he said, "I hid my pants and shirt at my friend's house in a backpack, but I still have the jacket."  Why are you hiding all of your clothes if you don't think you really did anything wrong?  Next slide.

On January 6 at 3:20, 25 minutes after he leaves the Congress, he says, "If I don't make it back, I need you to delete my Facebook.  Don't reply to this."

And then later that day, in response to a message from Andrew Choi, he says, "funny enough, I didn't see myself in there."  There's a video that he sent that he says he didn't see himself.  And he says, "I'll tell you what may or may not have happened when I get a moment."

What's with all the cagey text messages if you don't think

1    you did anything wrong?   Next slide.

2      Next slide.

3      And finally, you have seen and heard evidence of defendant's

4    corrupt behavior.   And judge gave you an instruction upon that

5    as well.   He's told you that to act corruptly the defendant must

6    use unlawful means or have wrongful and an unlawful purpose or

7    both.   He's acting in a wrong manner.   That's what corrupt

8    means.

9      Now, defendant, when he's down in the CVC, he's pulling a

10   rioter away from someone who is clearly a U.S. Capitol Police.

11   Defendant saw so many red flags that day.   So many.   And he does

12   not turn back from any of them.   He saw violence against the

13   police on the west front, and he continues.   He sees the police

14   line being broken.   He continues.   He sees nonlethal force being

15   used against protesters.   He continues.   He sees bike racks and

16   he moves them aside.   He sees people ripping through that

17   scaffolding.   He continues.   He sees officers in the Crypt with

18   M4s and he continues.   He sees officers trying to clear that

19   south -- excuse me -- that Senate Wing door back at 2:50, and

20   he just stands there and waves his Trump flag.

21     He has so many opportunities to decide and to act as if he

22   really is an innocent party here, but he does not take any of

23   them.   And we submit that the evidence shows that that's because

24   he's not.   He is acting in bad faith.   He is acting corruptly on

25   that day.

1    Now I'll just briefly talk about the defense and then we'll

2    go to the instructions and then I'll sit down.  I appreciate

3    your patience.  Next slide.  Next slide.

4    Now, the defense counsel said in his opening statement that

5    the defendant didn't know that the count was going on, which he

6    agreed could be viewed as incredible.  It is incredible.  The

7    defendant would have you believe that he did not know that the

8    large, white, domed, massive building sitting on Capitol Hill,

9    the largest building in the area, the tallest, broadest, widest

10   building around, with the huge plaza on each side, that is

11   backed up to the National Mall, and that can be seen as you walk

12   down Pennsylvania Avenue and Constitution Avenue from a mile

13   away, he did not know that that is where the U.S. Congress sits.

14   He would have you believe that when Trump stated we're going

15   to walk down to the Capitol and we're going to cheer on our

16   brave Senators and congressmen, the very instruction that he's

17   relying upon to go down to the Capitol, that he still didn't

18   know that Congress was inside.  He would have you believe that

19   when he's outside the Capitol and sees the other rioters showing

20   him that tweet that Mike Pence is not going to go along with

21   Stop the Steal, that he doesn't know Mike Pence is inside.

22   And you can look at the transcript of that question and that

23   answer that he gave the FBI.  And the government submits it's

24   clear he's talking about when he's outside the building that

25   that's when he sees that tweet.

1    And when he stands in the Crypt and he's yelling "Stop the

2    Steal" in that room, he would have you believe that he did not

3    know they were certifying votes one level up.  And when he's

4    down in the CVC, when he's passing signs everywhere that say

5    House and Senate, that he does not know that he is in the

6    building where Congress is.  Despite what Officer Shephard

7    told you, which is the CVC is made for tourists; there's signs

8    everywhere.

9    Now, it's up to you to decide what you believe of the

10   evidence.  You are the finders of fact.  But the government

11   submits that this student of American history, this student

12   of Orwell's 1984, of the U.S. Constitution, of quotes of Thomas

13   Jefferson and Benjamin Franklin, the defendant who knows and

14   said the following words about the 17th amendment of the United

15   States Constitution and the way that it allows for the Senate to

16   be elected in a conversation with a friend, he's quoting the

17   U.S. Constitution, that this man does not know that the House

18   of Representatives and the U.S. Senate meets at the U.S. Capitol

19   building.

20   This is the most important thing that he has said about

21   January 6.  The most important thing.  And it's the first time

22   he has said it.  He did not say it to his friend, roommate,

23   Jacobs, he did not say it in any of those text messages to

24   Finnigan --

25       MR. CRISP:  Your Honor, may we approach briefly?

1        THE COURT:  You may.

2    (Bench conference.)

3        MR. CRISP:  My concern is we're doing some

4  burden-shifting here, that he has an obligation to say those

5  things and do those things.  And I don't believe he does.

6  So, he didn't say this here, he didn't say this here.  I don't

7  think he had an obligation to say it at any point in time.

8        MS. SEIFERT:  I can rephrase.  That it's not in the

9  evidence that they've received, and he's saying it here, but

10  did not say it in his other statements.  I'll rephrase.

11        THE COURT:  I think it's fine.  But I think it's a good

12  idea to rephrase it.

13        MS. SEIFERT:  Okay.  I'm almost done.

14        THE COURT:  Okay.

15    (End of bench conference.)

16        MS. SEIFERT:  You will not see that statement anywhere

17  else in the evidence that was submitted to you.  It is not in

18  the text messages.  It is not in the statement to Mr. Jacobs a

19  few days after this happened.  It is not in his interview that

20  he gave to the FBI.  And that's because, the government

21  submits, that he hadn't thought of that excuse until he got

22  here and listened to the government's evidence after four days

23  of trial.

24      Now, that's up to you to decide.  You are the finders of

25  fact.  You weigh that evidence.  But the government submits

1  that you did not drop your common sense off at the courthouse

2  door.  You think about what makes sense to you and you decide

3  whether that makes sense.  Next slide.

4      We're going to talk just about the elements for a minute

5  and then I'll sit down.  Defendant is guilty because he

6  participated in that mob, both because he wanted to bring it

7  about, but also because he aided others.  And that's what the

8  judge was instructing you about aiding and abetting liability.

9  And the judge's instructions control.  But just for clarity's

10  sake I'll touch on that briefly.  Next slide.

11      What aiding and abetting means is that the defendant

12  associates with a crime, he participates in that crime as

13  something he wishes to bring about, and he intends by his

14  actions to make it succeed.  That's what he did.  Even if he

15  is not the principal person going on to the House floor that

16  day or going on to the Senate floor, or he's not the armed

17  rioter, he is aiding and abetting the entire operation because

18  as Officer Watts said, a breach is a breach is a breach.  Next

19  slide.

20      The offenses, there are five you were just instructed on.

21  And I'm not going to go over them all because you got the

22  instructions from the Court and they are very fulsome.  And

23  frankly, they're somewhat duplicative of each other, as I

24  think you heard in the instructions.  So we'll just focus on

25  Count 1, Obstruction of an Official Proceeding.  Next slide.

1    There are four elements: Obstructed or impeded official

2    proceeding; intended to obstruct; knowingly, it was not a

3    mistake or accident; and the defendant did so corruptly.

4    We've talked about all of these elements, and the government

5    submits that the burden in this case lies right here with the

6    government.  We accept that burden.

7    But, ladies and gentlemen, we submit to you that we have

8    proven that burden.  We have proven beyond a reasonable doubt

9    that the defendant did in fact obstruct that official

10   proceeding, that he intended to do it because he knew that

11   was the last stand for Trump.  He did it knowingly, not by

12   mistake, because he wanted to be a part of it.  He didn't

13   stand out on the west front and continue to chant.  He marched

14   up those stairs with that group that went in, that first

15   breach.  And he did it wrongfully and corruptly.  Next slide.

16   And he did it in this restricted building.  The one you

17   heard about.  He was on those grounds, and those clearly

18   marked signs that he knew were there.  He moved those bike

19   racks and he went in.  He saw those damaged windows and he

20   went in.  He saw those police officers deploying nonlethal

21   force, and he went in.  Next slide.

22   So in closing, the defendant might have -- I'm sorry.  Can

23   we just take this down, please?  The defendant might not have

24   decided when he left New Jersey that morning that he was going

25   to enter the Capitol.  He might not have known it then.  You

can form an intent in an instant.  He certainly knew an
official proceeding was happening.  And he was not a mere
protester that day.  He was not a spectator that day.  And he
was not a follower that day.  By the time he climbed up those
stairs, those 12 minutes it took him to get to the top of that
big staircase, he had made his choice.

He wants that Constitutionally declared procedure to end
because it's not going to work out for him.  And you should
take him at his word.  Advance, advance, advance.  He entered
the Capitol with that intent.  We ask you and the government
submits you should hold him accountable for Obstruction of an
Official Proceeding.

You should hold him accountable for putting members of
Congress, their staff, and the U.S. Capitol Police in danger
by his presence in that restricted area, and you should hold
him accountable for his and the mob's actions for defiling
that restricted historic building which the law protects.
Return the only verdict that is consistent with the evidence
in this case, which is guilty on all the charges.  Thank you.

THE COURT:  Thank you, Ms. Seifert.

Mr. Crisp.

DEFENSE CLOSING ARGUMENT

MR. CRISP:  Thank you, Your Honor.

Members, I thank you for your patience.  I will try and
keep my voice up.  I generally don't like to shout.  It's not

something I'm terribly comfortable with.  But I may drop off.
And if you cannot hear me, please raise your hand.  My natural
instinct is to speak softer.

We started out the case by talking a little bit about who
Timothy Hale-Cusanelli was.  And you got to hear a little bit
about who he was when he got on the stand and agreed to
testify.  Now, you have to understand this is the first time
he's ever been in this situation where he could be forced to
testify about an incident like this.  Where, as he says, he's
facing a felony charge.

So he has to fight his natural tendency to talk.  You heard
he had a three-and-a-half-hour-long interview with NCIS where
he just talks, because he has an audience.  And this is what
he likes to do.  And we learned about why and a little bit
about where he comes from and his background.  We didn't get
too far into it, but suffice it to say it's not an ideal one.

So his entire life has realistically been trying to gain
the attention of everyone around him because he didn't have
it from his mother or his father.  It's not an excuse, it's
not a justification.  He is offensive, he is abusive in his
language.  Nobody's defending that.

But that's not why we are here.  We are here to find out
what he knew and is he the kind of man that you may have
encountered in your experiences -- because you can't put them
aside.  In fact we encourage you to say have I run across

somebody like this in my life that just goes, just shut up.
And that's what you want to say.  But generally as a polite
society, we don't.

And as the judge said, the offensive things that he may
have said are not criminal in and of themselves.  And the
government wants to talk about them in a way because it
becomes emotional.  But that's not why you're here.

Many of the things the government has shown are jarring
and disturbing, and the witnesses discussed things in a very
emotional context.  And that was real.  And there's no
disputing that.  What happened that day was disturbing, it
was -- it jarred what we are as a country.  There is no
disputing that.  But the question again is not whether that
was emotional, it's not whether that was disturbing, it is
whether or not he knew that what he was doing when he walked
into that building was in fact disturbing that democratic
process.  That is the distinction.

So all of this stuff in closing, all of the how did you
feel about this, that is horrible and unfortunate, and seeing
a trash can get thrown at a police officer makes you cringe.
But why are they showing that?  Because they want you to lose
sight of the reality of what we're here to do.

So the question is, you're going to get a jury instruction
sheet or a verdict slip that's going to have basically one
count for the obstruction, but there's really three questions

that you have.  Did he aid others in obstructing, did he
attempt to obstruct, or did he himself obstruct.  And with
every one of those questions with those three different
aspects of the charge, the question still remains: do you
believe, after listening to him and everything you saw on the
videos, that he really knew what he was doing when he walked
into that building, other than following the crowd, finally
having a voice theoretically, shouting around, based on who
he is.

He has a superficial knowledge about politics.  You run
across people like this that will start telling you everything
they know, and you dig a little deeper and you go, he's just
kind of pulling this out of his sock.  He's that guy.  If he
runs across somebody with actual knowledge, if he actually had
a conversation with the gentleman who testified in court
Monday, it would have been amusing at best.

Now, so when that happens, he quickly gets shut down and he
resorts to bombastic, offensive, shocking behavior.  Because
that's how he gets people to accede.  And we asked about
whether you think it was possible a person could enter that
building and not know.  We talked about the emotional aspects
of this case in voir dire.  There's a reason we say, can you
put this aside?  Because you have to.  And you took an oath to
do that.

And that's why we ask you that.  Because we know that when

you start hearing this evidence, it's going to be difficult,

and we want to make sure that you're comfortable with that.

We also want to make sure that you understand that -- can you

conceive of a situation in which an individual walks into that

Capitol building and not realize that the certification was

going on?  And many of you said yes.  Why?  Because people

don't pay attention to -- they pay attention to the process

but not where the process actually happens.

Now, y'all are residents of D.C.  Many people come to this

city one or two or three times in their life, if ever, and

have no idea what building is what.  There's no big neon sign

that says this is the Capitol building, which means that the

House and the Senate sit here on this side and this side.

This is where the White House is.  Now, how do we know the

White House is there?  Because we see the president sitting

on -- in the rose garden giving speeches or talking or

whatever.

But what's interesting is if you look at the instruction

for the one offense, the disorderly conduct offense inside

the Capitol building, it says including but not limited the

one in question.  What does that mean?  By its very

definition, it means there are multiple capitol buildings.

How many people knew that?  Interesting question.  So there

are other buildings where Senate members, Congress members

can be.  It's not clear.

He is a man conflicted by his own insecurities and the
government hits on just about every one of them.  When they
talk about how his behavior's not consistent with somebody
who knew what he did was wrong, he knew what he did was wrong,
but he was so overjoyed at, oh, my gosh, I was part of all
this, and I was part of something bigger, but then there's the
other piece, I have to brag about it but I don't want to get
in trouble.  He couldn't stop himself.  He couldn't shut up to
save his life.

And this is where he is now because of that.  He had to
talk about this.  He had to brag about it.  He had to say I
had a murder weapon.  He didn't have a murder weapon.  It's a
hollow aluminum flag with a plastic ball at the end, and you
can bet if there's anything remotely close to DNA on that flag
they would have found it and brought it in here today and they
didn't.  But he wanted people to think it was, because he
wants people to think he's something that he's not, more
important than he is.

Now, I want to be very clear about one thing, please.
What he did on that day was wrong.  Period.  He was wrong to
go in the building, he was wrong to interfere with the police.
It's why we asked those questions.  You make of that what you
will with your findings.  But there's a reason why the
government charges things the way they do and they have to
prove certain things.  And they chose to charge this

particular offense.  They chose to charge an offense that
required him to know.

Now, there are things that are irrefutable, in all of this,
some of which speak to the wrongness of his conduct, some of
it just speaks to how egregious what happened that day was.
You will not hear us object to the idea that he was okay in
trying to pick up that individual with the police officer
standing there.  Wrong.  He interfered with the process.  No
question.

It is beyond doubt that he helped remove a police barrier.
Wrong.  But does that mean he did it because I know the
certification is going on in that building?  No.  It doesn't.
It means cops were telling him no, you can't come in, and he's
mad at them.  I'm mad at you because you are being mean to
these people out here.  It was a temper tantrum, for crying
out loud.  He was a juvenile with everyone else out there and
didn't want to listen to authority.  So you can't tell me --
I'm coming in.  It's like what a child does when you tell them
no.  They have to do the opposite.

He knew he should have walked away.  He's telling you that
now.  So when he says there was no plan, there was no plan.
The only plan was to oppose what the police wanted him to do.
That was the plan.  Period.

Occupy the building?  What do you see him doing?  Following
the police everywhere they went.  At least as it pertains to

him.  Do you ever see him and does the government ever make
the argument that he ever tried to go onto the second floor
or the third floor?  If he was truly trying to stop the
certification and truly wanted to make his voice heard where
he knew Congress was, why didn't he go look for the Congress
floor, whether it be the Senate or the House, and say stop
what you're doing, this is wrong.

But he didn't.  He milled around.  We showed you what we
showed you today through his testimony to say he spent five
minutes wandering around the Crypt looking at statues.  And if
any of you have ever been inside there, it is a fascinating
building.  You could probably spend two weeks looking at
everything in that building.

He spends a few minutes meandering around the Senate wing,
walking one way and walking another way.  And at the very end
when he's going to leave, a big surge of people come in, he
gets distracted, he doesn't walk out, and ironically, just a
little note of irony here, he goes and hides behind the police
that 30 minutes ago he'd been fighting.  Little ironic.

And then he sees a flag, a shiny little bauble on the
ground that distracts him yet further and he wants to wave
that flag another few minutes.  And he finally leaves the
building a couple minutes later.  But he doesn't do anything
except stand there and wave the flag for a few minutes.

Now, putting all the emotional components aside, he talked

for three and a half hours, as I said, with NCIS.  You would
think if he said anything problematic, indicting in that
statement, the government has the ability to put that in and
they chose not to.  They are the gatekeepers.  The rules of
evidence don't allow the defense to do anything with that.

    If it was as bad as they want you to say, that
out-of-context little snippet is all they gave you out of
three and a half hours.  Why?  Especially when you have a guy
who liked an audience.  And he had interrogators talking to
him because they wanted to know what he knew.

    You saw a little bit of that.  It's like trying to herd a
cat.  Multiple cats.  And when he got inside the building,
his conduct clearly shows he had no idea what was going on.
Why is the idea that he says I had no idea of what was
happening in that building credible?  Let's look at a couple
things.  He was dancing.  He thought this was a joke at one
point.  He does a little jig down by the skylights.  Come on
down.  We need more people.

    That is offensive, that is not right, but it doesn't show
that he knew what you have to believe he knew.  And the
interesting thing is the government wanted to cross him on the
fact that he, in his three-and-a-half-hour interview with NCIS
and FBI, he never denied knowing Congress was in session.

    Think about how an interrogation actually works.  They're
not there to have a cup of coffee with him because they think

he's a great guy.  They have an agenda, they're going to ask him questions.  They're going to make certain premises and presumptions.

That was the most compound of compound questions they asked him.  How many times do you think that kept going and going and going?  He tries to give an answer and they cut it off and they redirect him.  Again, wouldn't you love to see what's in there?

How else do we know he was credible?  What does he say he was telling the police near the entrance to the House of Representatives?  I was telling them I was mad at how they were treating us.  Not let me get Congress.  Let me go see where the House of Representatives are.  He had an audience. He never said I was telling them we need to stop the certification and you need to go in there and tell those Congress person -- that never happened.

The other interesting thing about this is, again -- and this ties in to how a trial works and the government's burden, which is beyond all reasonable doubt.  If you have a reasonable doubt as to any element of these offenses, you must acquit.  If you think, he might not have, that's a reasonable doubt.

The government wants to show a couple things.  They want to make you think that before he went into that building he knew that the election had already been certified, because of some

tweet.  Now, you all probably know when that tweet likely
occurred, and it was well after two o'clock.  But let me tell
you something.  Government has the ability to find that tweet
because they found everything else.  And they showed a
timeline of when he was in, where he was here, where he was
here.

And I would submit to you that that tweet did not occur
when he was outside.  If it did, they would have tied him to
that moment in time irrefutably.  It happened when he was in
the Crypt, well after two o'clock.  That is consistent with
what he said.  They could have put the tweet from President
Trump in.  Excuse me, former President Trump.

Now, the other thing the government wants you to accept is
that he wanted this to be a civil war, or he wanted a civil
war.  The people we think of as civil warmongers -- this has
been a discussion ever since unfortunately President Trump
engaged in divisive behavior throughout the course of his
presidency and it started becoming a topic.  You heard it from
various pundits.  He wasn't the first person to ever bring
this up, is the point of all this.

He doesn't own a firearm.  They never found any weapons in
his home when they searched it.  Allegedly, they had concerns
about him as a threat, so they have all these people go to
take him down because he had access to these Naval weapons.
Nothing.  He is such a civil warmonger and wants death and

destruction, that he owns a knife and a baseball bat.  That is

not consistent with somebody who wants war and who thinks it's

really coming.  That's a guy with 20,000 guns in his basement

with a hundred thousand rounds of ammo.  That is not

Mr. Cusanelli.

He fomented this discussion.  The other thing -- you'll

have the transcript to look at.  Again, go back to your

knowledge of people you've run across like Mr. Hale-Cusanelli.

They have to spout off, they have to rant, they have to do

their thing, and then they slowly calm down, and that's what

you see.

He makes all these dumb statements and then he gets to a

more reasoned -- and you don't have to agree with it but at

least it's not offensive on its face, when he talks about how

the government should be structured and how this should work.

But then he goes off again.  That is what you will see when

you have a chance to read through the entire transcript.

And at the end of every one of those calmer discussions

he says, look, I don't want that, but I think it's going to

happen because both sides are mad and can't stop.

Now, here's another piece again that goes to the

government's burden.  You heard people say that there are

signs everywhere, but you never saw them on the videos, and

why didn't the government bring in a picture in the Visitor

Center, that is open to the public, saying look at these

signs?  They could do it with the signs that were on the bike

racks because you saw blowups of them.  But why didn't they

bring in signs that clearly say, right where those police

officers were allegedly standing, here is the House of

Representatives entrance, this is this direction.  You didn't

see those signs.  But they could have.

He talks to his roommate, Mr. Jacobs, on 12 January, about

six days after this happens.  And he makes a bunch of other

embellished statements, he just can't help himself.  And he

says, yeah, I was right by where the House was or whatever.

Six days to see all the publicity in this case and to figure

out he's a wanted insurrectionist, domestic terrorism, he

talks about.  He's terrified.  He's been reading nothing but

press releases about him and what's going to happen to him

because he knows where he was in the building and he finds

out, oh, my gosh, that's what's going on.

The story that we started with when he goes down to see

President Trump, walks his way down, is consistent with the

man that you heard today.  He's simplistic in his thought

processes, he doesn't think much more than beyond the next

10 seconds in front of him, and he reacts.

And that's what he described.  I get down there, he sees

the cops attacking, not thinking, geez, maybe the protesters

started it, and just forms an opinion based on that and then

starts to react.  He thinks the president's going to be down

there, he's going to have this big massive platform where

everyone can hear.  He's not a terribly complex guy.

It is not shocking, should not be shocking to you, that he

didn't realize or put two and two together or four and four

and come up with what was really going on in that building.

He knew what they were doing but not where.

Members of the jury, I ask that you will find him not

guilty of the offenses of obstruction.  And I also ask that

you look closely at the disorder obstruction -- excuse me --

the disorder offense in a capitol building, and look at the

elements there as to what he was required to know.  Nobody's

saying he wasn't wrong, that he didn't commit a crime.  But

the question is did he commit the crime the government chose

to charge him with.  And as to those offenses we would say he

is not guilty.  Thank you.

THE COURT:  Thank you, Mr. Crisp.

Could the attorneys approach for a moment?

(Bench conference.)

THE COURT:  All right.  I want to finish up by 5:30.

I've got a couple instructions left.  I realize I didn't say

the statements of the defendant as evidence, so I'm just going

to add that in.  But the other ones that I have left...

MS. SEIFERT:  I think I can do it in 10 minutes,

Your Honor.

THE COURT:  Perfect.

1       MS. SEIFERT:  Okay.  Do we need to give the jury a

2   bathroom break?

3       THE COURT:  If you can do it in 10 minutes, I think we

4   can take another break.  Otherwise, are you all comfortable

5   with the instructions?

6       MR. CRISP:  Which one did we miss, Judge?

7       THE COURT:  Statement of defendant.

8       MR. CRISP:  Yes.  Thank you.

9       THE COURT:  So 3 and 14.

10       MS. SEIFERT:  Four and 14, Your Honor.

11       THE COURT:  So --

12       MS. SEIFERT:  The woman in the purple is No. 4.  She

13   is the alternate.  And the gentleman in 14 wearing the pink

14   shirt --

15       (End of bench conference.)

16       THE COURT:  Folks, go ahead and take a break.  Can we

17   do five minutes so we can get y'all out of here?

18       (Jury out at 5:02 p.m.)

19       (Bench conference.)

20       MS. SEIFERT:  Hang on, Your Honor.  One second.

21       MR. CRISP:  One of them switched up at one point,

22   right?  Then we switched where they were sitting because they

23   sat in the wrong seat and we just said let's just switch it

24   up.  I think it went from -- it messed with the numbering.

25       MS. SEIFERT:  We changed the seat, not the person.

My notes indicate -- I think they're in the wrong seats,

Your Honor.  I think you're right, but I think they're in the

wrong seats.  My notes indicate that it should be juror 1458

and then it should be juror 616.  Is that who you have in seat

14?

THE COURT:  That's the other one.

MS. SEIFERT:  So you're right.  It's just they're

not -- these jurors are both --

THE COURT:  They're switched?

MS. SEIFERT:  No, they're just both very similar in age

so I didn't recognize they were switched until now.  But it

should be 1458 and 616.  That's what my notes indicate.

Wherever they're sitting, those are the two.

THE COURT:  Do you think she's not in seat No. 3?

MS. SEIFERT:  Well, I don't know.  We had agreed on

seat 4 being where the alternate was going to sit.  So if

she's in seat 3, fine.  I don't care where she is.  But yes,

it's 1458 and 616.

MS. FIFIELD:  There's two older women who are sitting

next to each other.  One of them is wearing purple.  It's not

her.

MS. SEIFERT:  I don't know that that's right.  There's

two women.  One is 71, one is 75.  They're both white women.

THE COURT:  I'll call upon them by their juror numbers.

MR. CRISP:  Okay.  But it's 4 and 9, right?

1        THE COURT:  Well, no, that's what we're not sure of.

2        MS. SEIFERT:  It's 616 and 1458.  I'm just not sure

3    she's in the right seat.  It's supposed to be 4 because that

4    was the number we picked.  But we're all in agreement those

5    are the two numbers.

6        THE COURT:  And we can go off the record, Bryan.

7        (End of bench conference.)

8        (Off-the-record discussion.)

9        (Recess from 5:04 to 5:09 p.m.)

10        THE COURT:  And so to be clear, we're not going to

11    start deliberations today.  I'll excuse the two alternates and

12    then ask everybody else to come back at nine o'clock tomorrow.

13        MR. CRISP:  Yes, Your Honor.

14        (Jury in at 5:09 p.m.)

15        THE COURT:  Welcome back, ladies and gentlemen.  We'll

16    now hear brief rebuttal from the government.  Ms. Seifert.

17                    GOVERNMENT REBUTTAL ARGUMENT

18        MS. SEIFERT:  Ladies and gentlemen, the defendant is

19    not here today because of his ugly words.  That is not what we

20    are asking you to convict him on.  We are asking you to

21    convict him for his conduct on January 6, not for First

22    Amendment activity.  He's not out in this crowd, outside of

23    the restricted area, doing protected speech.  He is inside

24    obstructing an official proceeding.  That is the conduct we

25    ask you to consider.  And you can consider all of his words

and how that relates to his conduct to assess his mental state.

Is it possible that someone came upon the United States Capitol on January 6 and did not know what was going on?  Is it possible?  Sure.  It's possible.  But is it possible that this man came upon the U.S. Capitol on January 6 and did not know what was going on inside?  The evidence shows that it's not.  He knew exactly what was going on.  Yes, there are multiple buildings in the United States Capitol complex, but there is one really big building right there in the center with the huge dome.

It is the tallest, biggest, grandest building around, and it is where Congress sits.  And this educated history major, American government, you know -- he's willing to talk all about politics with his friends but he doesn't know that the House and Senate are inside that building?  Is that credible?  Is that believable?  You can consider everything defendant said on the stand to decide if what he's saying on that point is true.  For instance, defense counsel told you that the defendant -- I believe he said something like admitted or was okay with the fact that he was interfering with police.

Now, your recollection controls, ladies and gentlemen, but that's not what I recall.  When I asked defendant about his statement with respect to his interference with Officer

Shephard, he stated he didn't know Officer Shephard was a police officer until after he let go of that rioter.  He said he pulled him away, and it wasn't until after he dropped the rioter he recognized that he was a police officer.

Is that credible?  Is that believable to you?  You saw on the video all the opportunities that defendant had to see Officer Shephard engage with that rioter, and yet he stood on the stand here today and would not admit to you that he knew Shephard was a police officer, because he did not want to admit to you that he was interfering with and impeding a law enforcement officer that day.  He did not take responsibility for that conduct.  He walked away very carefully from that conduct.  And you should consider that when you're considering the entirety of his statement on the stand, whether he's being truthful with you, the finder of fact.

Now, defendant says that he didn't know until 2:45 that they're at the House of Representatives -- excuse me -- that Congress is in the Capitol.  That's what his statement was. An officer tells me at 2:45.  You heard from Officer Shephard, all those signs clearly labeled everywhere.  We didn't ask him about exactly where the signs were because we didn't hear until today, of course, that that was what defendant was saying, that he didn't know what was going on in the Visitor Center.

But you did hear from Officer Shephard.  He said it's for

tourists, signs everywhere.  He even marked for you on the
map those Cs, which is very close to where the defendant was
standing, where there's a check-in desk.  Check-in desk to go
up to the Senate and House galleries.  Everything is clearly
labeled.

      And you heard the defendant said to his friend a few days
later, "I know I used a lot of hand signals.  There were some
people who were in a room right before like the entrance to
the House of Representatives, and there's like this glass
ceiling and there's people standing on it and I'm like trying
to get their attention.  Like, yo, we need more people down
here.  And that's kind of when it fell apart."

      Defendant didn't say that the officer told him this is the
entrance to the House of Representatives.  His claim is that
at 2:45 an officer told him something to the effect of
Congress is in this building.  Where does he get this entrance
to the House?  Where's that coming from?  The government
submits it's because he's down in the CVC and he's seen the
signs that say House gallery, Senate gallery, all the things
you heard from Officer Shephard that are down there.

      He knows, ladies and gentlemen.  He knows he's in the U.S.
Congress building.  He knows that that's where they are.

      And even if defendant does not in fact find out, if you
will, until 2:45, his conduct is not consistent with that
claim.  At 2:45 -- or 2:42, here he is.  He's talking to a

bunch of police officers.  This is Government's 412.

I'm going to keep going, in the interest of your time.
Okay.  You can watch that video.  And he engages with police
at 2:42, engages, talks, talks, talks.  They're talking to
him, he's waving his fingers, talks, talks, talks, talks,
talks.  And then he backs up, stands around, walks over here,
stands around.  Okay.  If he learned at 2:42 that he's in the
U.S. Capitol and that's where Congress is, why isn't he
leaving then?  What's he doing milling around for the next
three minutes?  And, what's he doing upstairs, standing
outside the Senate Wing door, picking up the flag and waving
it around?

Defense counsel wants you to believe that defendant is like
a child with a shiny object and he's just wandering around so
impressed by the U.S. Capitol building, and oh, here's a flag,
let me wave the flag, I'm so distracted.  This man is in the
United States Army Reserve.  He's very intelligent.  And he is
milling around after talking to these officers and he doesn't
leave.  He's upstairs at the Senate Wing door.  Still he
doesn't want to leave because he still wants to be a part of
it.  He's not going to leave until it's really necessary.

So if he really believed at that time -- if he really
believed at 2:45 that that's the first time he found out that
Mike Pence is in the building, that the U.S. Congress is in
the building, then why, when he's in his interview with the

1    FBI, does the following question and answer exchange happen?

2        Question:  "Did you think while you guys were all walking

3    through there that they were just going to continue to count

4    votes and everything, and Pence was going to say, hey, yo,

5    Timmy, nice to see you walking through here?  You know, I

6    mean --"

7        He says, "At the time."

8        Question:  "Where's the thought process?"

9        "Like I said, there was no plan."

10       Why doesn't he say in response to that question, I didn't

11   even know Pence was in the building.  I didn't even know they

12   were counting votes in the building.  That's when you raise

13   it, right?  If this is your reasoning that you didn't know it

14   was illegal, you'd raise it right then, when the agent asks

15   you, Pence, voting, in the building.  They're just going to

16   let you walk around?  That's when you tell them.  But he

17   didn't raise it then.

18       He didn't raise it then, ladies and gentlemen, because this

19   is the first time he raised this, today.  This is the first

20   time that he thought that that's what he should say.

21       And you're not going to get the entirety of that

22   transcript.  But you are not to speculate about what the

23   evidence is that was not submitted to you or why it was not

24   submitted to you.  You should consider the evidence that was

25   submitted and ask yourself, based on what you've seen, has the

1  government met its burden.  We submit the government has.

2      And finally, defendant keeps -- defense counsel keeps

3  coming back to this thing, oh, he's not in any of the places

4  that matter.  Right?  He's not on the Senate floor, he's not

5  in the chair, he's not, you know, in the gallery attacking

6  members, he's not armed.  None of that matters.  A mob is a

7  mob.  And a breach is a breach.  Defendant is in that mob,

8  he's breaching the Capitol, and he's doing it for one purpose,

9  to stop the official proceeding.  To stop Joe Biden from being

10 certified as the President of the United States.

11     And what does he do when it's his time to talk to the

12 rioters?  He says advance, advance, advance.  That's his

13 mission, is to encourage them forward.

14     Hold him accountable for those words and for that conduct

15 that day.  Thank you.

16         THE COURT:  Thank you, Ms. Seifert.

17                 CLOSING JURY INSTRUCTIONS

18         THE COURT:  All right, ladies and gentlemen.  I have

19 a few final instructions for you.  I want to tell you right

20 away you're not going to deliberate today.  So I'm just going

21 to wrap up final instructions, excuse the alternates, and then

22 you'll begin your deliberations tomorrow.

23     When you do go to the jury room tomorrow, you should first

24 select a foreperson to preside over your deliberations and to

25 be your spokesperson here in court.  There are no specific

rules regarding how you should select a foreperson.  That is up to you.  However, as you go about the task, be mindful of your mission:  To reach a fair and just verdict based on the evidence.  Consider selecting a foreperson who will be able to facilitate your discussions, who can help you organize the evidence, who will encourage civility and mutual respect among all of you, who will invite each juror to speak up regarding his or her views about the evidence, and who will promote a full and fair consideration of that evidence.

The question of possible punishment of the defendant in the event of a conviction is not a concern of yours and should not enter into or influence your deliberations in any way.  The duty of imposing a sentence in the event of a conviction rests exclusively with me.  Your verdict should be based solely on the evidence in this case, and you should not consider the matter of punishment at all.

You've heard evidence that Mr. Hale-Cusanelli made statements to the police about the crime charged.  You must decide how much weight to give that statement.  For example, you may consider whether he made the statement voluntarily and understood what he was saying.  You may consider whether he was forced, threatened, or pressured, either physically or psychologically, and whether he was promised any reward or benefit for making the statement.

You may consider all the conversations between him and law

enforcement.  You may consider whether the police warned him
of his rights.  You may consider where and when the statement
was given, the duration of any questioning, and who was
present during some or all of the questioning.  You may
consider the age, experience, education and intelligence, and
the physical and mental condition of the defendant.

I would remind you that in some cases, although not
necessarily this one, there may be reports in the newspaper or
on the radio, internet, or television concerning this case.
If there should be such media coverage in this case, you may
be tempted to read, listen to, or watch it.  You must not
read, listen to, or watch such reports because you must decide
this case solely on the evidence presented in this courtroom.

If any publicity about this trial inadvertently comes to
your attention, do not discuss it with the other jurors or
anyone else.  Just let me or my clerk know as soon after it
happens as you can, and I will briefly discuss it with you in
private.

As you retire to the jury room to deliberate, I also wish
to remind you of an instruction I gave you at the beginning of
the trial.  During deliberations, you may not communicate with
anyone not on the jury about this case.  This includes any
electronic communication such as email or text or any blogging
about the case.  In addition, you may not conduct any
independent investigation during deliberations.  This means

 1     you may not conduct any research in person or electronically

 2     via the internet or in any other way.

 3         If it becomes necessary during your deliberations to

 4     communicate with me, you may send a note by the clerk or

 5     marshal, signed by your foreperson or by one or more members

 6     of the jury.  No member of the jury should try to communicate

 7     with me except by such a signed note, and I will never

 8     communicate with any member of the jury on any matter

 9     concerning the merits of this case except in writing or orally

10     here in open court.

11         Bear in mind also that you are never, under any

12     circumstances, to reveal to any person, not the clerk, not the

13     marshal, not me, how jurors are voting until after you've

14     reached a unanimous verdict.  This means that you should never

15     tell me, in writing or in open court, how the jury is divided

16     on any matter, for example, 6-6, or 7-5, or 11-1 or in any

17     other fashion, whether the vote is for conviction or acquittal

18     or on any other issue in this case.

19         The attitude and conduct of jurors at the beginning of

20     their deliberations are matters of considerable importance.

21     It may not be useful for a juror upon entering the jury room

22     to voice a strong expression of an opinion on the case, or to

23     announce a determination to stand for a certain verdict.  When

24     one does that at the outset, a sense of pride may cause that

25     juror to hesitate to back away from an announced position

1  after a discussion of the case.

2      Furthermore, many juries find it useful to avoid an initial

3  vote upon retiring to the jury room.  Calmly reviewing and

4  discussing the case at the beginning of deliberations is often

5  a more useful way to proceed.  Remember that you are not

6  partisans or advocates in this matter, but you are judges of

7  the facts.

8      The last thing I must do before you all retire for the

9  evening is to excuse the alternate jurors.  As I told you

10  before, the selection of alternates was an entirely random

11  process.  It's nothing personal.  We selected two seats to be

12  the alternate seats before any of you entered the courtroom.

13  Since the rest of you have remained healthy and attentive, I

14  can now excuse jurors 1458 and 0616.

15      Before you two leave, I will ask you to tear out a page

16  from your notebook and to write down your name and daytime

17  phone number, and to give this to Ms. Chaclan.  I do this

18  because it is possible, although unlikely, that we will need

19  to summon you back to rejoin the jury in case something

20  happens to a regular juror.  Since that possibility exists,

21  I'm also going to instruct you not to discuss the case with

22  anyone until we call you.

23      My earlier instruction on the use of the internet still

24  applies.  Do not research this case or communicate about it on

25  the internet.  In all likelihood we will be calling to tell

1  you there's been a verdict, and we'll of course tell you what

2  the verdict is, and that you're now free to discuss the case.

3  There is, however, the small chance that we will need to bring

4  one or both of you back to the jury.  Thank you so much to

5  both of you for your service, and I'll ask you just to step

6  out with Ms. Chaclan.

7      For the remaining 12 of you, I'll excuse you all for the

8  evening, ask you to be back at nine o'clock tomorrow.

9  Remember, you should only be deliberating when all 12 of you

10  are together.  That means if one person is late, you need to

11  wait until the 12th person arrives.  Feel free to take

12  bathroom breaks as you need throughout the day, but when one

13  person takes a break, you need to stop deliberating on the

14  case.  We'll have the evidence and the jury instructions to

15  you pretty shortly after you arrive tomorrow morning.

16      All right, folks.  Have a good evening.  Thank you so much

17  for your patience with us.

18      (Jury out at 5:28 p.m.)

19          THE COURT:  All right.  I'll ask you all to be here at

20  nine o'clock tomorrow, or at least a attorney from both sides,

21  to go over with Ms. Chaclan and Mr. Dibblee the exhibits, make

22  sure we're all good.  We'll have copies of the jury

23  instructions to send back and a verdict form.  And then just

24  for the remainder of the day make sure Ms. Chaclan can contact

25  you and you're about 15 minutes away.

1          MS. SEIFERT:  Your Honor, with respect to the evidence,

2     are we doing -- I think we're doing the laptop, the clean

3     laptop for the jury.  We also have paper exhibits.  Does the

4     court have a preference if we send the paper exhibits back as

5     well?

6          THE COURT:  I don't have a preference on that.

7          MS. SEIFERT:  Okay.  We'll just ask defense.

8          THE COURT:  Just make sure you all are comfortable that

9     you have only the evidence that's been admitted.

10         MS. SEIFERT:  Yes, Your Honor.

11         THE COURT:  Mr. Crisp, anything else we need to

12    discuss?

13         MR. CRISP:  No, Your Honor.

14         THE COURT:  Okay.  Just, the jury will start

15    deliberating when they arrive.  You know, if we don't have a

16    verdict by the end of the day, I think I would ask everybody

17    to be back.  I'll let you know, to dismiss from the courtroom.

18         MS. SEIFERT:  Okay.  Thank you.

19         THE COURT:  Thank you.  Very well argued, all three of

20    you.  Nice job.

21         (Proceedings adjourned at 5:30 p.m.)

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.


/s/ Bryan A. Wayne
Bryan A. Wayne

## /

**/s** [1] - 1089:9

## 0

**0616** [1] - 1086:14

## 1

**1** [16] - 996:4, 998:14, 1003:6, 1003:7, 1004:4, 1004:5, 1020:18, 1020:20, 1021:21, 1022:19, 1024:2, 1027:3, 1028:3, 1029:8, 1030:17, 1058:25
**10** [9] - 960:7, 960:15, 960:23, 994:22, 995:16, 1044:10, 1072:21, 1073:23, 1074:3
**10-minute** [1] - 989:25
**100.T** [5] - 960:7, 960:15, 960:23, 973:8, 974:6
**1010** [1] - 957:7
**1032** [1] - 957:8
**1060** [1] - 957:9
**1076** [1] - 957:10
**1082** [1] - 957:11
**11** [1] - 1051:18
**11-1** [1] - 1085:16
**110.T** [1] - 975:24
**12** [7] - 981:10, 1035:24, 1052:10, 1060:5, 1072:7, 1087:7, 1087:9
**12th** [2] - 989:3, 1087:11
**13:23** [2] - 964:23, 965:19
**14** [6] - 1052:3, 1052:4, 1074:9, 1074:10, 1074:13, 1075:5
**1458** [5] - 1075:3, 1075:12, 1075:18, 1076:2, 1086:14
**14:36** [1] - 1042:3
**15** [3] - 1044:10, 1053:5, 1087:25
**1512(c)(2)** [1] - 998:9
**16** [2] - 978:18, 1037:3
**17** [1] - 973:13
**17110** [1] - 956:18
**1752** [2] - 1000:17,

---

1001:4
**17th** [1] - 1056:14
**18** [4] - 973:9, 977:18, 981:10
**1984** [1] - 1056:12
**1:33** [1] - 956:6
**1:36** [1] - 959:14
**1:46** [1] - 1035:1
**1:50** [1] - 1035:9

## 2

**2** [5] - 974:22, 996:5, 1026:17, 1028:1, 1029:5
**20** [2] - 964:11, 974:6
**20,000** [2] - 1051:4, 1071:3
**20001** [1] - 956:21
**2017** [3] - 972:10, 972:12, 972:13
**202** [2] - 956:15, 956:21
**2020** [6] - 974:24, 1029:23, 1034:8, 1048:22, 1049:9, 1050:20
**2021** [5] - 972:2, 999:12, 1000:9, 1029:22, 1030:24
**2022** [1] - 956:6
**20530** [1] - 956:15
**21-0037** [1] - 956:4
**222** [1] - 977:18
**223** [1] - 975:25
**24** [3] - 973:9, 973:13, 1048:13
**25** [3] - 974:6, 1052:2, 1053:17
**252-7566** [1] - 956:15
**26** [1] - 956:6
**2:12** [1] - 1036:5
**2:13** [1] - 1036:14
**2:14** [1] - 1037:3
**2:16** [1] - 1038:11
**2:20** [1] - 990:2
**2:25** [1] - 1039:6
**2:26** [4] - 1039:9, 1039:15, 1039:24, 1040:8
**2:28** [1] - 1041:17
**2:29** [3] - 1041:25, 1042:10, 1042:14
**2:31** [1] - 995:18
**2:33** [1] - 964:15
**2:33:51** [1] - 964:7
**2:35** [1] - 960:1
**2:36** [1] - 1042:2
**2:39** [1] - 1045:4

---

**2:39:26** [1] - 966:19
**2:39:37** [1] - 967:9
**2:39:41** [1] - 968:13
**2:39:46** [1] - 968:22
**2:40** [1] - 960:1
**2:41** [1] - 1045:4
**2:42** [3] - 1079:25, 1080:4, 1080:7
**2:44** [2] - 1046:5, 1046:12
**2:45** [9] - 980:10, 980:14, 1046:17, 1078:16, 1078:19, 1079:15, 1079:24, 1079:25, 1080:23
**2:46** [1] - 1046:23
**2:47** [1] - 995:18
**2:48** [2] - 1047:2, 1047:3
**2:50** [1] - 1054:19

## 3

**3** [4] - 1027:11, 1074:9, 1075:14, 1075:17
**30** [5] - 964:16, 964:19, 1009:9, 1009:13, 1067:19
**333** [1] - 956:20
**350.5** [1] - 974:21
**354-3186** [1] - 974:22, 1075:23
**3:12** [1] - 1009:20
**3:20** [1] - 1053:17
**3:30** [1] - 975:14

## 4

**4** [10] - 956:9, 1028:13, 1029:19, 1030:14, 1030:19, 1051:3, 1074:12, 1075:16, 1075:25, 1076:3
**403** [1] - 991:14
**4031** [1] - 956:17
**404(b)** [1] - 990:18
**411** [2] - 963:22, 964:7
**412** [1] - 1080:1
**412-4676** [1] - 956:18
**45** [1] - 1009:9
**4704-A** [1] - 956:20

## 5

**5** [1] - 1029:24
**5104** [5] - 998:24, 1000:17, 1001:3, 1001:12, 1001:18

---

**5:02** [1] - 1074:18
**5:04** [1] - 1076:9
**5:09** [2] - 1076:9, 1076:14
**5:28** [1] - 1087:18
**5:30** [2] - 1073:19, 1088:21

## 6

**6** [16] - 960:2, 971:20, 972:2, 993:14, 999:12, 1000:9, 1029:22, 1030:24, 1051:22, 1052:9, 1052:24, 1053:17, 1056:21, 1076:21, 1077:4, 1077:6
**6-6** [1] - 1085:16
**601** [1] - 956:14
**616** [4] - 1075:4, 1075:12, 1075:18, 1076:2

## 7

**7-5** [1] - 1085:16
**71** [1] - 1075:23
**717** [1] - 956:18
**73** [1] - 1033:9
**75** [2] - 1037:2, 1075:23

## 8

**8** [3] - 975:25, 978:11, 1048:22

## 9

**9** [3] - 960:7, 960:24, 1075:25
**959** [1] - 957:3
**981** [1] - 957:4

## A

**a.m** [1] - 1051:3
**abets** [1] - 1024:7
**abetted** [13] - 996:4, 996:5, 1003:14, 1003:15, 1003:20, 1003:21, 1006:15, 1021:1, 1024:1, 1024:4, 1024:5, 1024:12, 1024:15
**abetting** [22] - 995:23,

---

996:3, 996:9, 996:22, 997:1, 997:11, 997:12, 997:16, 997:19, 997:20, 1003:16, 1004:3, 1005:24, 1006:9, 1006:14, 1007:7, 1008:6, 1020:22, 1025:23, 1058:8, 1058:11, 1058:17
**abettor** [2] - 1026:5, 1026:12
**ability** [5] - 1015:8, 1017:10, 1045:19, 1068:3, 1070:3
**able** [6] - 985:19, 1009:8, 1041:11, 1041:17, 1044:20, 1083:4
**above-entitled** [1] - 1089:5
**absent** [1] - 1001:17
**absolutely** [2] - 1007:11, 1040:15
**abusive** [1] - 1061:20
**accede** [1] - 1063:19
**accept** [4] - 1010:18, 1018:2, 1059:6, 1070:13
**acceptable** [1] - 1014:23
**access** [10] - 981:8, 981:19, 982:24, 991:6, 1035:22, 1036:4, 1041:9, 1042:23, 1044:2, 1070:24
**accident** [2] - 1022:1, 1059:3
**accomplice** [2] - 1024:6, 1024:7
**accomplish** [2] - 1023:20, 1049:21
**accomplished** [2] - 985:15, 1032:24
**accord** [1] - 1050:7
**according** [1] - 988:25
**accountable** [4] - 1060:11, 1060:13, 1060:16, 1082:14
**accuracy** [1] - 1017:7
**accurate** [4] - 991:21, 993:13, 1017:1, 1018:2
**accurately** [1] - 1016:19
**accusing** [1] - 1012:16
**acknowledge** [1] -

979:4
**acknowledged** [1] - 988:23
**acquit** [1] - 1069:21
**acquittal** [1] - 1085:17
**act** [16] - 1013:25, 1021:25, 1022:4, 1022:6, 1022:13, 1022:18, 1023:24, 1024:25, 1025:2, 1025:6, 1025:9, 1025:13, 1025:15, 1025:17, 1054:5, 1054:21
**acted** [9] - 1020:7, 1021:10, 1021:13, 1022:2, 1026:23, 1028:25, 1029:11, 1029:13, 1030:7
**acting** [4] - 1022:10, 1054:7, 1054:24
**action** [3] - 1023:20, 1036:20, 1043:17
**actions** [6] - 1019:2, 1025:25, 1029:21, 1052:17, 1058:14, 1060:16
**activities** [1] - 1030:12
**activity** [2] - 1028:12, 1076:22
**acts** [15] - 1019:22, 1020:1, 1021:24, 1024:25, 1025:2, 1025:6, 1025:9, 1025:13, 1025:15, 1025:17, 1025:19, 1028:4, 1029:9, 1047:24, 1048:3
**actual** [4] - 1001:5, 1007:7, 1014:9, 1063:14
**Adam** [2] - 975:2, 1049:11
**add** [4] - 996:20, 1001:20, 1007:13, 1073:22
**added** [3] - 1001:22, 1003:17, 1008:15
**adding** [2] - 1005:20, 1006:8
**addition** [2] - 1019:15, 1084:24
**additional** [11] - 989:21, 990:6, 991:9, 993:17, 1005:6, 1006:12, 1006:19, 1007:19, 1009:22, 1044:20, 1046:10
**Address** [1] - 972:23

**address** [1] - 992:25
**adequately** [1] - 1051:21
**adjourned** [1] - 1088:21
**adjudicate** [1] - 1051:21
**administration** [1] - 969:14
**admission** [2] - 1033:6, 1035:5
**admit** [4] - 987:2, 991:1, 1078:8, 1078:10
**admitted** [11] - 960:16, 1010:23, 1011:25, 1031:19, 1031:20, 1031:23, 1032:3, 1032:8, 1032:11, 1077:21, 1088:9
**adrenaline** [1] - 973:17
**advance** [9] - 1033:7, 1060:9, 1082:12
**advanced** [1] - 1033:15
**advocates** [1] - 1086:6
**affect** [3] - 1015:8, 1015:10, 1018:8
**affected** [1] - 962:25
**affects** [1] - 1016:21
**Afternoon** [1] - 956:7
**afternoon** [2] - 964:4, 1032:16
**age** [2] - 1075:10, 1084:5
**agenda** [2] - 983:23, 1069:1
**Agent** [3] - 1040:2, 1040:16, 1041:1
**agent** [3] - 977:17, 1018:18, 1081:14
**ago** [3] - 981:23, 1053:5, 1067:19
**agree** [8] - 978:5, 978:6, 1004:17, 1004:18, 1007:22, 1007:25, 1031:6, 1071:13
**agreed** [7] - 983:17, 1004:20, 1005:13, 1012:4, 1055:6, 1061:6, 1075:15
**agreeing** [1] - 970:3
**agreement** [1] - 1076:4
**ahead** [2] - 965:9, 1074:16
**aid** [7] - 1011:18, 1025:13, 1025:15,

1025:18, 1026:9, 1063:1
**aided** [15] - 956:24, 996:4, 996:5, 1003:14, 1003:15, 1003:19, 1003:21, 1006:15, 1021:1, 1024:1, 1024:4, 1024:5, 1024:12, 1024:15, 1058:7
**aider** [2] - 1026:4, 1026:12
**aiding** [23] - 995:22, 996:3, 996:8, 996:22, 996:25, 997:10, 997:12, 997:15, 997:18, 997:20, 1003:16, 1004:3, 1005:24, 1006:8, 1006:13, 1007:7, 1008:6, 1020:22, 1025:3, 1025:23, 1058:8, 1058:11, 1058:17
**aids** [1] - 1024:7
**alleged** [1] - 1019:2
**allegedly** [3] - 988:19, 1070:22, 1072:4
**alleges** [1] - 1023:25
**alleviate** [1] - 987:23
**allow** [2] - 1015:9, 1068:5
**allowing** [1] - 991:1
**allows** [1] - 1056:15
**almost** [3] - 986:20, 1035:24, 1057:13
**alone** [3] - 1010:24, 1010:25, 1016:14
**alterations** [1] - 959:4
**alternate** [4] - 1074:13, 1075:16, 1086:9, 1086:12
**alternates** [3] - 1076:11, 1082:21, 1086:10
**alternative** [1] - 1004:3
**aluminum** [1] - 1065:13
**Amendment** [1] - 1076:22
**amendment** [1] - 1056:14
**America** [4] - 973:22, 973:24, 1047:13, 1048:11
**AMERICA** [1] - 956:3
**American** [2] - 1056:11, 1077:14
**ammo** [1] - 1071:4

**amount** [2] - 990:17, 1036:6
**amusing** [1] - 1063:16
**Andrew** [1] - 1053:20
**angry** [2] - 986:2, 986:4
**announce** [1] - 1085:23
**announced** [1] - 1085:25
**Answer** [1] - 978:4
**answer** [14] - 963:7, 976:11, 978:4, 978:17, 981:12, 983:10, 1016:4, 1016:7, 1016:8, 1045:21, 1046:2, 1055:23, 1069:6, 1081:1
**answered** [1] - 1016:6
**anteroom** [3] - 1040:18, 1041:2, 1041:6
**anticipated** [1] - 981:23
**anyway** [1] - 963:16
**apart** [1] - 1079:12
**apologies** [1] - 959:1
**apologize** [4] - 961:12, 1004:23, 1005:14, 1009:7
**appear** [3] - 966:5, 1032:2, 1045:21
**APPEARANCES** [1] - 956:12
**appellate** [2] - 1007:15, 1008:10
**applies** [4] - 998:12, 1010:17, 1020:11, 1086:24
**apply** [4] - 998:24, 1001:11, 1001:18, 1018:15
**appreciate** [2] - 959:1, 1055:2
**approach** [5] - 960:19, 981:15, 981:16, 1056:25, 1073:17
**approached** [1] - 1038:7
**appropriate** [5] - 981:18, 982:9, 992:5, 992:8, 1004:2
**ardent** [1] - 1034:4
**area** [9] - 985:16, 1027:5, 1041:13, 1042:19, 1044:13, 1050:6, 1055:9, 1060:15, 1076:23
**argued** [1] - 1088:19

**ARGUMENT** [3] - 1032:15, 1060:22, 1076:17
**Argument** [2] - 957:8, 957:10
**argument** [3] - 958:4, 1015:21, 1067:2
**Argument........................** [1] - 957:9
**arguments** [3] - 1010:5, 1012:12, 1032:14
**Arizona** [6] - 971:17, 971:18, 1035:3, 1051:4, 1051:10, 1051:11
**Arizona's** [1] - 1051:18
**arm** [1] - 965:24
**armed** [4] - 969:5, 1035:13, 1058:16, 1082:6
**Army** [1] - 1080:17
**arrest** [1] - 1045:20
**arrested** [1] - 1046:1
**arrive** [2] - 1087:15, 1088:15
**arrives** [1] - 1087:11
**aside** [6] - 1034:21, 1048:5, 1054:16, 1061:25, 1063:23, 1067:25
**asleep** [1] - 1014:21
**aspects** [4] - 992:3, 992:4, 1063:4, 1063:21
**aspersions** [2] - 981:22, 982:7
**assertion** [1] - 992:7
**asserts** [1] - 1014:9
**assess** [1] - 1077:1
**assist** [7] - 1012:13, 1025:14, 1025:15, 1025:18, 1026:9, 1031:17, 1044:16
**assistance** [2] - 1044:17, 1046:10
**assisting** [1] - 1025:3
**associate** [1] - 1026:10
**associated** [2] - 1020:24, 1026:1
**associates** [1] - 1058:12
**Associates** [1] - 956:17
**assume** [2] - 1014:13, 1014:17
**assuming** [1] - 995:4
**attacked** [3] - 986:4,

986:5, 1035:18
**attacking** [2] -
1072:23, 1082:5
**attempt** [32] - 983:16,
995:22, 996:25,
997:10, 997:12,
997:15, 997:18,
997:20, 998:17,
998:22, 1003:11,
1004:2, 1004:13,
1005:19, 1005:23,
1006:1, 1006:2,
1006:7, 1007:6,
1008:5, 1020:21,
1022:20, 1022:21,
1022:24, 1023:9,
1023:10, 1023:16,
1033:19, 1063:2
**attempted** [4] -
983:10, 1005:18,
1020:25, 1021:6
**attempting** [3] -
965:24, 1033:16,
1043:21
**attempts** [1] - 1022:9
**attention** [5] -
1061:18, 1064:7,
1079:11, 1084:15
**attentive** [1] - 1086:13
**attitude** [1] - 1085:19
**attorney** [1] - 1087:20
**Attorney's** [1] - 956:14
**attorneys** [3] -
1011:11, 1032:14,
1073:17
**audience** [3] -
1061:13, 1068:9,
1069:13
**audio** [8] - 991:22,
1031:22, 1036:17,
1042:1, 1042:5,
1042:17, 1045:6,
1046:11
**augment** [1] - 992:24
**AUSA** [2] - 956:13,
956:13
**authority** [2] -
1026:25, 1066:17
**available** [2] -
1044:16, 1046:21
**Avenue** [3] - 956:20,
1055:12
**avoid** [1] - 1086:2
**aware** [11] - 958:7,
999:10, 1000:7,
1001:23, 1002:3,
1002:14, 1005:7,
1021:25, 1029:17,
1030:21, 1030:22
**awareness** [2] -

1021:10, 1022:7

# B

**backed** [3] - 967:8,
986:25, 1055:11
**background** [3] -
962:11, 963:2,
1061:15
**backpack** [1] -
1053:14
**backs** [2] - 1045:13,
1080:6
**backwards** [1] -
1043:22
**bad** [3] - 1029:15,
1054:24, 1068:6
**ball** [1] - 1065:13
**ballot** [1] - 1051:9
**ballots** [4] - 971:10,
971:18, 1050:24,
1051:4
**bangs** [3] - 962:2,
962:14, 963:4
**banter** [2] - 991:19,
993:2
**bargain** [1] - 988:24
**barrier** [3] - 1033:3,
1035:10, 1066:10
**baseball** [1] - 1071:1
**based** [12] - 972:6,
1001:2, 1013:17,
1013:18, 1014:2,
1052:5, 1063:8,
1072:24, 1081:25,
1083:3, 1083:14
**basement** [1] - 1071:3
**basic** [1] - 993:23
**bat** [1] - 1071:1
**bathroom** [3] -
1039:11, 1074:2,
1087:12
**battered** [1] - 1046:7
**bauble** [1] - 1067:20
**bear** [1] - 1085:11
**becomes** [3] -
1039:20, 1062:7,
1085:3
**becoming** [1] -
1070:18
**BEFORE** [1] - 956:10
**begin** [2] - 1037:8,
1082:22
**beginning** [8] -
977:21, 981:20,
984:17, 1011:17,
1039:19, 1084:20,
1085:19, 1086:4
**behavior** [4] -

1016:23, 1054:4,
1063:18, 1070:17
**behavior's** [1] -
1065:3
**behind** [4] - 1036:2,
1040:21, 1045:23,
1067:18
**beholden** [1] - 970:8
**belief** [1] - 995:21
**beliefs** [1] - 991:4
**believability** [1] -
1011:1
**believable** [3] -
1015:18, 1077:17,
1078:5
**believes** [1] - 1049:20
**Bench** [4] - 981:17,
1057:2, 1073:18,
1074:19
**bench** [4] - 983:4,
1057:15, 1074:15,
1076:7
**beneficial** [1] -
1048:25
**benefit** [1] - 1083:24
**Benghazi** [1] -
1003:21
**Benjamin** [1] -
1056:13
**Bernie** [2] - 975:8,
1049:12
**best** [4] - 981:9, 982:6,
1009:10, 1063:16
**bet** [1] - 1065:14
**better** [1] - 998:21
**between** [6] - 983:9,
1017:10, 1017:15,
1019:12, 1045:24,
1083:25
**beyond** [32] - 993:6,
993:20, 1000:12,
1012:23, 1013:2,
1013:7, 1013:11,
1013:15, 1014:3,
1014:5, 1016:11,
1020:7, 1021:4,
1021:18, 1023:1,
1023:12, 1023:13,
1024:10, 1024:16,
1026:8, 1026:13,
1026:21, 1027:15,
1028:17, 1029:12,
1030:4, 1031:3,
1031:16, 1059:8,
1066:10, 1069:19,
1072:20
**bias** [1] - 1018:7
**biased** [1] - 1018:5
**Biden** [20] - 969:13,
969:22, 970:1,

970:5, 970:12,
970:13, 971:4,
971:10, 971:14,
971:21, 972:4,
992:21, 1048:10,
1048:11, 1048:18,
1051:18, 1052:7,
1082:9
**Biden's** [3] - 970:24,
1032:22, 1034:3
**big** [10] - 990:21,
991:6, 991:18,
1040:18, 1041:2,
1060:6, 1064:11,
1067:16, 1073:1,
1077:10
**bigger** [2] - 985:8,
1065:6
**biggest** [2] - 970:19,
1077:12
**bike** [3] - 1054:15,
1059:18, 1072:1
**bit** [11] - 964:23,
969:8, 977:3,
977:13, 978:8,
1005:12, 1052:22,
1061:4, 1061:5,
1061:14, 1068:11
**black** [3] - 966:15,
968:16, 969:4
**blacked** [1] - 1031:21
**blamed** [1] - 1049:7
**blew** [1] - 1049:7
**blogging** [1] - 1084:23
**blood** [2] - 1035:19,
1050:16
**blowups** [1] - 1072:2
**blue** [1] - 1051:4
**body** [2] - 967:23,
968:24
**bombastic** [1] -
1063:18
**bongs** [2] - 975:16,
1049:15
**book** [2] - 959:3,
959:5, 959:6
**bother** [1] - 970:14
**bothers** [1] - 988:5
**bottom** [3] - 973:12,
974:22, 974:23
**box** [2] - 993:4,
1037:25
**boxes** [1] - 997:23
**brag** [2] - 1065:7,
1065:11
**brainwashed** [1] -
1049:2
**brave** [2] - 984:22,
1055:16
**breach** [11] - 1033:9,

1036:14, 1036:23,
1036:24, 1058:18,
1059:15, 1082:7
**breached** [2] -
1036:19, 1042:15
**breaching** [1] - 1082:8
**break** [7] - 989:25,
1041:17, 1041:24,
1074:2, 1074:4,
1074:16, 1087:13
**breaks** [1] - 1087:12
**bribing** [1] - 1022:16
**brief** [2] - 1000:23,
1076:16
**briefly** [6] - 958:22,
980:22, 1055:1,
1056:25, 1058:10,
1084:17
**bring** [13] - 960:17,
973:7, 974:3,
974:15, 1009:16,
1026:16, 1042:15,
1058:6, 1058:13,
1070:19, 1071:24,
1072:3, 1087:3
**bringing** [1] - 1033:4
**brings** [1] - 1050:11
**broadest** [1] - 1055:9
**broke** [2] - 959:25,
960:12
**broken** [2] - 1006:22,
1054:14
**broken-out** [1] -
1006:22
**brought** [3] - 973:5,
974:19, 1065:15
**Bryan** [3] - 1076:6,
1089:9, 1089:9
**BRYAN** [2] - 956:19,
1089:3
**building** [84] - 961:8,
961:14, 961:17,
961:18, 961:19,
971:24, 972:3,
972:15, 975:21,
978:23, 979:1,
979:13, 979:22,
979:25, 980:4,
980:7, 980:11,
980:15, 985:4,
985:5, 997:2, 999:6,
999:8, 1001:15,
1026:18, 1026:24,
1027:4, 1027:5,
1027:12, 1027:18,
1027:25, 1028:2,
1028:14, 1030:1,
1032:19, 1032:25,
1033:14, 1036:25,
1040:1, 1040:15,

1044:16, 1047:11,
1051:13, 1052:21,
1052:25, 1053:7,
1055:8, 1055:9,
1055:10, 1055:24,
1056:6, 1056:19,
1059:16, 1060:17,
1062:16, 1063:7,
1063:21, 1064:5,
1064:11, 1064:12,
1064:20, 1065:21,
1066:12, 1066:24,
1067:12, 1067:13,
1067:23, 1068:12,
1068:15, 1069:24,
1072:15, 1073:5,
1073:10, 1077:10,
1077:12, 1077:16,
1079:16, 1079:22,
1080:15, 1080:24,
1080:25, 1081:11,
1081:12, 1081:15
**buildings** [8] -
1028:21, 1029:1,
1030:6, 1030:13,
1030:15, 1064:22,
1064:24, 1077:9
**Buildings** [1] -
1043:20
**bunch** [3] - 1050:13,
1072:8, 1080:1
**burden** [11] - 1012:24,
1013:10, 1014:5,
1018:25, 1057:4,
1059:5, 1059:6,
1059:8, 1069:18,
1071:22, 1082:1
**burden-shifting** [1] -
1057:4
**business** [5] -
1002:19, 1005:7,
1027:21, 1027:24,
1030:10
**BY** [8] - 959:24,
960:22, 964:6,
979:20, 981:2,
983:6, 989:12,
989:18

**C**

**cagey** [1] - 1053:25
**calm** [1] - 1071:10
**calmer** [1] - 1071:18
**calmly** [1] - 1086:3
**camera** [2] - 968:4,
968:14
**cannot** [9] - 1007:23,
1013:21, 1019:15,
1019:18, 1041:14,

1041:15, 1046:13,
1047:20, 1061:2
**capability** [1] - 1018:9
**Capitol** [76] - 961:19,
961:22, 971:24,
972:3, 972:14,
973:12, 975:21,
976:20, 977:1,
977:19, 980:3,
999:8, 999:11,
999:12, 1000:8,
1000:9, 1001:15,
1001:21, 1002:7,
1002:8, 1002:18,
1002:19, 1028:20,
1029:1, 1029:2,
1030:6, 1030:13,
1030:15, 1030:23,
1030:24, 1032:19,
1032:21, 1033:8,
1033:12, 1033:15,
1034:16, 1035:4,
1035:25, 1036:7,
1036:14, 1036:19,
1037:1, 1037:7,
1038:12, 1040:12,
1041:13, 1042:12,
1042:21, 1043:19,
1045:8, 1045:24,
1046:4, 1046:15,
1052:13, 1052:25,
1053:7, 1054:10,
1055:8, 1055:15,
1055:17, 1055:19,
1056:18, 1059:25,
1060:10, 1060:14,
1064:5, 1064:12,
1064:20, 1077:4,
1077:6, 1077:9,
1078:18, 1080:8,
1080:15, 1082:8
**capitol** [5] - 999:6,
1028:14, 1029:25,
1064:22, 1073:10
**Capitol's** [1] - 962:17
**car** [1] - 1034:2
**care** [1] - 1075:17
**careful** [2] - 1013:19,
1013:24
**carefully** [1] - 1078:12
**case** [60] - 958:3,
958:5, 959:12,
993:20, 994:18,
995:4, 995:8, 998:5,
999:9, 1000:4,
1000:6, 1001:13,
1001:17, 1002:2,
1004:25, 1008:13,
1008:19, 1010:3,
1010:17, 1010:22,

1011:5, 1011:7,
1011:9, 1011:19,
1012:1, 1012:20,
1013:19, 1014:7,
1015:4, 1015:11,
1015:20, 1017:5,
1017:6, 1018:13,
1019:11, 1023:25,
1030:20, 1031:11,
1047:17, 1059:5,
1060:19, 1061:4,
1063:22, 1072:11,
1083:15, 1084:9,
1084:10, 1084:13,
1084:22, 1084:24,
1085:9, 1085:18,
1085:22, 1086:1,
1086:4, 1086:19,
1086:21, 1086:24,
1087:2, 1087:14
**cases** [8] - 996:2,
1003:16, 1003:18,
1007:17, 1013:11,
1013:13, 1013:14,
1084:7
**Casillas** [2] - 963:22,
965:18
**cast** [1] - 982:3
**casting** [2] - 981:22,
982:7
**cat** [1] - 1068:12
**cats** [1] - 1068:12
**caught** [2] - 1024:9,
1053:11
**caused** [2] - 962:6,
977:22
**ceiling** [2] - 1043:13,
1079:10
**center** [4] - 965:11,
967:9, 1038:25,
1077:10
**Center** [6] - 1033:12,
1042:12, 1045:24,
1047:5, 1071:25,
1078:24
**certain** [6] - 983:18,
983:25, 1012:5,
1065:25, 1069:2,
1085:23
**certainly** [3] - 959:8,
982:1, 1060:1
**certainty** [1] - 1014:4,
1015:3
**CERTIFICATE** [1] -
1089:2
**certification** [19] -
958:7, 971:25,
984:3, 984:7,
999:10, 1000:7,
1001:24, 1002:6,

1005:8, 1030:21,
1030:22, 1032:21,
1032:24, 1034:3,
1052:1, 1064:5,
1066:12, 1067:4,
1069:15
**certified** [3] - 971:1,
1069:25, 1082:10
**certify** [6] - 976:15,
977:20, 1021:22,
1029:22, 1051:24,
1089:3
**certifying** [2] - 977:23,
1056:3
**Chaclan** [8] - 994:19,
994:21, 999:24,
1008:19, 1086:17,
1087:6, 1087:21,
1087:24
**chair** [2] - 1046:24,
1082:5
**challenged** [1] -
971:15
**challenging** [2] -
1034:8, 1034:11
**chamber** [2] - 1038:19
**chambers** [1] - 1035:2
**chance** [3] - 985:20,
1071:17, 1087:3
**change** [3] - 1001:12,
1049:10, 1049:22
**changed** [2] -
1050:21, 1074:25
**chant** [2] - 1052:15,
1059:13
**character** [1] - 991:24
**characterization** [2] -
969:23, 991:20
**charge** [10] - 998:21,
1004:25, 1008:6,
1015:7, 1033:2,
1061:10, 1063:4,
1065:25, 1066:1,
1073:14
**charged** [12] - 1001:3,
1005:25, 1013:4,
1019:4, 1020:17,
1022:19, 1024:2,
1024:3, 1024:20,
1025:10, 1025:17,
1083:18
**charges** [11] -
1015:10, 1016:11,
1020:9, 1020:18,
1020:20, 1026:17,
1027:11, 1028:13,
1029:24, 1060:19,
1065:24
**check** [2] - 1079:3
**check-in** [2] - 1079:3

**cheer** [2] - 984:22,
1055:15
**chickens** [1] - 986:14
**child** [2] - 1066:18,
1080:14
**Choi** [1] - 1053:21
**choice** [1] - 1060:6
**choices** [1] - 1051:15
**chose** [4] - 1065:25,
1066:1, 1068:4,
1073:13
**CHS** [10] - 973:19,
973:21, 973:24,
974:10, 974:12,
974:18, 1048:12,
1048:16, 1049:23,
1050:1
**circle** [2] - 988:2,
1043:19
**circuit** [1] - 997:5
**circumstances** [13] -
1014:11, 1015:15,
1017:8, 1017:9,
1017:12, 1019:21,
1019:23, 1020:5,
1025:25, 1028:9,
1047:23, 1047:25,
1085:12
**circumstantial** [8] -
1014:8, 1014:12,
1014:20, 1014:22,
1015:1, 1015:2,
1015:5, 1025:24
**city** [1] - 1064:10
**Civil** [2] - 973:23,
973:24
**civil** [17] - 973:2,
973:5, 974:9,
974:10, 974:16,
974:19, 975:10,
1013:11, 1049:14,
1049:18, 1050:4,
1050:8, 1050:11,
1070:14, 1070:15,
1070:25
**civility** [1] - 1083:6
**claim** [2] - 1079:14,
1079:25
**clarify** [2] - 983:18,
1019:9
**clarity's** [1] - 1058:9
**clean** [4] - 974:14,
1005:2, 1050:12,
1088:2
**cleaner** [1] - 1005:9
**clear** [15] - 982:19,
987:1, 1002:11,
1005:12, 1006:12,
1006:16, 1023:19,
1038:7, 1038:13,

1039:20, 1054:18, 1055:24, 1064:25, 1065:19, 1076:10
**cleared** [3] - 961:8, 961:14, 1052:21
**clearing** [1] - 961:18
**clearly** [7] - 1035:21, 1054:10, 1059:17, 1068:13, 1072:3, 1078:20, 1079:4
**clerk** [4] - 1006:25, 1084:16, 1085:4, 1085:12
**client** [3] - 981:21, 982:2, 982:9
**client's** [1] - 981:19
**climb** [1] - 1035:24
**climbed** [3] - 964:16, 1036:8, 1060:4
**close** [6] - 962:21, 962:25, 969:9, 1008:25, 1065:14, 1079:2
**closed** [1] - 992:19
**closed-ended** [1] - 992:19
**closely** [1] - 1073:9
**closer** [1] - 967:2
**CLOSING** [3] - 1032:15, 1060:22, 1082:17
**Closing** [3] - 957:8, 957:9, 957:11
**closing** [5] - 958:4, 1009:4, 1032:14, 1059:22, 1062:18
**closings** [2] - 959:10, 994:24
**clothes** [1] - 1053:15
**clown** [2] - 975:2, 1049:11
**co** [2] - 1003:20, 1003:22
**co-conspirator** [2] - 1003:20, 1003:22
**coffee** [1] - 1068:25
**cold** [1] - 1052:25
**collar** [1] - 1045:16
**colleague** [1] - 980:22
**colleagues** [2] - 1044:14, 1044:21
**collectively** [1] - 1008:7
**college** [9] - 977:24, 999:11, 1000:8, 1001:14, 1001:24, 1002:11, 1021:22, 1029:22, 1030:22
**colored** [1] - 1018:8
**COLUMBIA** [1] - 956:1

**columns** [1] - 1040:20
**combat** [1] - 1035:17
**comfortable** [10] - 994:14, 995:3, 995:5, 995:8, 999:22, 1000:24, 1061:1, 1064:2, 1074:4, 1088:8
**coming** [15] - 978:4, 1033:25, 1038:4, 1038:9, 1039:2, 1039:3, 1040:9, 1042:4, 1046:24, 1051:9, 1051:19, 1066:18, 1071:3, 1079:17, 1082:3
**commentary** [2] - 988:9, 988:12
**comments** [2] - 990:19, 992:12
**commission** [1] - 1026:3
**commit** [17] - 1006:1, 1020:22, 1022:20, 1022:21, 1022:24, 1023:3, 1023:8, 1023:10, 1023:14, 1023:16, 1023:20, 1024:13, 1025:7, 1025:12, 1025:14, 1073:12, 1073:13
**committed** [8] - 1024:8, 1024:10, 1024:18, 1024:22, 1024:23, 1026:7, 1026:15
**committing** [9] - 1023:6, 1023:18, 1024:1, 1024:4, 1024:5, 1024:12, 1024:15, 1024:19, 1025:4
**common** [1] - 1058:1
**commotion** [1] - 967:12
**communicate** [7] - 963:11, 988:3, 1084:21, 1085:4, 1085:6, 1085:8, 1086:24
**communication** [1] - 1084:23
**competing** [1] - 1052:6
**complete** [2] - 1022:23, 1023:24
**completely** [2] - 992:6, 1044:25
**complex** [2] - 1073:2, 1077:9

**components** [1] - 1067:25
**compound** [2] - 1069:4
**comprehend** [1] - 962:6
**computer** [1] - 956:24
**computer-aided** [1] - 956:24
**conceive** [1] - 1064:4
**concern** [6] - 990:18, 991:5, 994:5, 1036:18, 1057:3, 1083:11
**concerned** [8] - 1003:4, 1005:20, 1017:6, 1019:17, 1037:23, 1040:6, 1048:19, 1050:18
**concerning** [2] - 1084:9, 1085:9
**concerns** [4] - 1048:9, 1048:21, 1051:8, 1070:22
**concise** [1] - 998:15
**concluded** [1] - 1031:10
**concurrently** [1] - 1004:15
**condense** [1] - 958:11
**condition** [1] - 1084:6
**conduct** [48] - 960:1, 978:23, 998:25, 999:1, 999:2, 999:17, 999:18, 1000:11, 1000:16, 1005:6, 1010:15, 1019:3, 1021:11, 1021:25, 1022:18, 1027:12, 1027:18, 1027:20, 1027:22, 1027:23, 1028:4, 1028:11, 1028:14, 1028:20, 1028:23, 1029:4, 1029:6, 1029:9, 1029:18, 1029:20, 1030:9, 1033:20, 1048:5, 1064:19, 1066:4, 1068:13, 1076:21, 1076:24, 1077:1, 1078:12, 1078:13, 1079:24, 1082:14, 1084:24, 1085:1, 1085:19
**conducting** [1] - 1005:7
**conducts** [2] - 1001:16, 1002:19
**conference** [8] -

981:17, 983:4, 1057:2, 1057:15, 1073:18, 1074:15, 1074:19, 1076:7
**conferring** [3] - 958:25, 990:14, 1001:9
**confirmed** [1] - 1007:15
**confirms** [1] - 1023:7
**conflict** [1] - 989:7
**conflicted** [1] - 1065:1
**confrontation** [1] - 962:5
**confronted** [1] - 961:22
**confuse** [1] - 996:1
**confused** [1] - 977:16
**confusing** [3] - 1000:20, 1001:18, 1008:21
**confusion** [2] - 994:2, 1005:21
**Congress** [47] - 978:23, 979:25, 980:3, 980:7, 980:11, 984:23, 985:15, 1001:15, 1001:21, 1002:8, 1002:17, 1005:6, 1021:15, 1028:24, 1029:20, 1029:21, 1030:10, 1033:11, 1035:1, 1036:20, 1037:1, 1039:15, 1043:18, 1046:3, 1051:11, 1051:24, 1053:4, 1053:6, 1053:18, 1055:13, 1055:18, 1056:6, 1060:14, 1064:24, 1067:5, 1068:23, 1069:12, 1069:16, 1077:13, 1078:18, 1079:16, 1079:22, 1080:8, 1080:24
**congress** [1] - 978:24
**Congress's** [1] - 1021:22
**congressmen** [1] - 1055:16
**conscious** [1] - 1053:9
**consciousness** [3] - 1022:6, 1053:10
**consequences** [5] - 1008:10, 1020:1, 1048:3, 1048:5, 1052:16
**consider** [49] - 996:8,

997:6, 997:9, 997:12, 997:17, 998:10, 998:12, 1004:4, 1010:11, 1010:18, 1011:24, 1012:5, 1012:7, 1012:17, 1012:18, 1015:4, 1015:10, 1015:15, 1016:12, 1016:21, 1016:22, 1017:8, 1017:21, 1017:25, 1018:3, 1018:7, 1018:24, 1019:21, 1020:5, 1020:10, 1022:2, 1025:23, 1032:3, 1032:9, 1032:12, 1047:23, 1076:25, 1077:17, 1078:13, 1081:24, 1083:4, 1083:15, 1083:20, 1083:21, 1083:25, 1084:1, 1084:2, 1084:5
**considerable** [1] - 1085:20
**consideration** [3] - 1011:5, 1013:20, 1083:9
**considered** [1] - 1031:5
**considering** [2] - 1051:11, 1078:13
**consistent** [7] - 959:6, 1060:18, 1065:3, 1070:10, 1071:2, 1072:18, 1079:24
**consists** [1] - 1012:1
**conspirator** [2] - 1003:20, 1003:22
**Constitution** [5] - 956:20, 1055:12, 1056:12, 1056:15, 1056:17
**constitutional** [1] - 1022:12
**Constitutionally** [2] - 1034:14, 1060:7
**consult** [1] - 990:11
**consulted** [1] - 1004:1
**Cont'** [1] - 957:3
**contact** [1] - 1087:24
**contain** [3] - 983:13, 1044:12, 1044:15
**contest** [1] - 1036:12
**context** [8] - 969:25, 970:2, 977:15, 992:6, 998:11, 1049:18, 1062:10, 1068:7

contexts [1] - 992:12
continue [7] - 976:6,
978:14, 1039:4,
1040:24, 1041:14,
1059:13, 1081:3
CONTINUED [1] -
959:23
continues [6] -
973:16, 1054:13,
1054:14, 1054:15,
1054:17, 1054:18
continuing [2] -
1036:3, 1045:8
contradicted [1] -
1018:3
contrary [1] - 1035:14
contrast [1] - 1022:15
control [3] - 983:7,
1011:13, 1058:9
controlled [1] - 987:6
controls [1] - 1077:23
convened [1] -
1029:22
convenience [1] -
1019:8
conversation [14] -
960:9, 960:14,
961:6, 970:4, 973:4,
973:5, 974:4,
974:15, 974:18,
977:7, 985:21,
1049:18, 1056:16,
1063:15
conversations [5] -
1019:5, 1019:6,
1019:7, 1048:15,
1083:25
convey [1] - 1031:12
convict [2] - 1076:20,
1076:21
conviction [3] -
1083:11, 1083:13,
1085:17
convinced [1] -
1013:21
Cooper [1] - 1003:19
cope [1] - 987:24
copies [1] - 1087:22
cops [2] - 1066:13,
1072:23
copy [5] - 959:5,
980:21, 982:20,
982:22, 1010:6
cordoned [1] - 1027:5
corporate [1] - 970:8
corporations [2] -
970:6, 1049:2
correct [58] - 961:5,
961:8, 961:19,
961:20, 961:25,

962:1, 962:3, 962:4,
962:12, 962:15,
962:19, 962:23,
962:25, 963:5,
963:12, 963:14,
963:16, 964:9,
964:17, 964:20,
965:25, 966:1,
967:12, 967:21,
968:14, 968:15,
968:17, 969:1,
969:11, 969:13,
969:15, 969:19,
970:1, 970:25,
971:5, 971:11,
971:15, 971:18,
971:21, 971:24,
972:4, 972:6,
972:10, 972:11,
972:12, 972:15,
972:21, 974:4,
974:5, 974:16,
974:17, 976:22,
977:9, 977:11,
979:2, 979:13,
989:8, 1089:4
Correct [2] - 966:16,
968:7
correctly [7] - 961:4,
974:1, 975:11,
975:17, 976:17,
978:1, 978:20
corroborates [2] -
994:1, 1023:7
corrupt [2] - 1054:4,
1054:7
corruptly [12] -
1006:7, 1020:19,
1021:2, 1021:13,
1022:4, 1022:10,
1022:14, 1022:18,
1054:5, 1054:24,
1059:3, 1059:15
counsel [8] - 958:25,
980:23, 981:19,
982:18, 1055:4,
1077:19, 1080:13,
1082:2
Count [24] - 998:14,
1003:6, 1003:7,
1004:4, 1004:5,
1020:18, 1020:20,
1021:21, 1022:19,
1024:2, 1026:17,
1027:3, 1027:11,
1028:1, 1028:3,
1028:13, 1029:5,
1029:8, 1029:19,
1029:24, 1030:14,
1030:17, 1030:19,

1058:25
count [20] - 976:6,
978:14, 999:11,
999:17, 999:18,
1000:8, 1001:24,
1002:7, 1002:12,
1003:17, 1005:3,
1008:20, 1020:9,
1020:12, 1020:13,
1020:15, 1030:23,
1055:5, 1062:25,
1081:3
counter [2] - 964:7,
964:23
counting [2] - 978:24,
1081:12
country [2] - 1048:25,
1062:12
counts [11] - 999:14,
999:19, 999:20,
1000:11, 1000:16,
1005:5, 1005:6,
1007:5, 1008:20,
1031:1
couple [4] - 1067:23,
1068:15, 1069:23,
1073:20
course [1] - 983:19,
1004:22, 1016:2,
1028:12, 1031:18,
1048:13, 1050:21,
1070:17, 1078:22,
1087:1
COURT [127] - 956:1,
958:2, 958:12,
958:16, 958:18,
958:24, 959:8,
959:15, 959:21,
960:20, 964:1,
964:3, 979:19,
980:18, 981:13,
981:16, 982:7,
982:17, 983:1,
983:5, 989:11,
989:16, 989:23,
990:3, 990:9,
990:12, 990:15,
991:9, 992:2,
992:17, 993:15,
994:14, 994:17,
994:21, 995:1,
995:10, 995:13,
995:15, 995:19,
996:6, 996:12,
996:15, 996:18,
996:20, 996:24,
997:4, 997:8,
997:24, 998:1,
998:5, 998:18,
998:22, 999:1,

999:5, 999:8,
999:16, 999:18,
999:21, 999:24,
1000:4, 1000:6,
1000:22, 1001:7,
1001:10, 1001:20,
1002:5, 1002:9,
1002:13, 1002:17,
1002:20, 1002:23,
1002:25, 1003:3,
1003:8, 1004:6,
1004:10, 1004:16,
1004:19, 1005:3,
1005:10, 1005:22,
1006:17, 1006:21,
1007:2, 1007:9,
1007:11, 1007:20,
1008:1, 1008:9,
1008:12, 1008:22,
1009:1, 1009:4,
1009:6, 1009:12,
1009:14, 1009:17,
1009:21, 1010:2,
1057:1, 1057:11,
1057:14, 1060:20,
1073:16, 1073:19,
1073:25, 1074:3,
1074:7, 1074:9,
1074:11, 1074:16,
1075:6, 1075:9,
1075:14, 1075:24,
1076:1, 1076:6,
1076:10, 1076:15,
1082:16, 1082:18,
1087:19, 1088:6,
1088:8, 1088:11,
1088:14, 1088:19
court [10] - 963:19,
971:15, 1014:15,
1022:11, 1022:15,
1063:15, 1082:25,
1085:10, 1085:15,
1088:4
Court [11] - 956:19,
982:21, 996:1,
1002:21, 1005:15,
1005:21, 1006:23,
1006:24, 1047:18,
1058:22, 1089:3
court's [1] - 988:17
Court's [1] - 1047:19
courthouse [1] -
1058:1
Courthouse [1] -
956:20
courtroom [3] -
1084:13, 1086:12,
1088:17
courts [3] - 1034:14,
1051:21, 1051:23

coverage [1] -
1084:10
coworker [1] - 1038:2
CR [1] - 956:4
create [1] - 1005:21
creating [1] - 1044:11
credibility [5] -
1011:1, 1016:14,
1016:17, 1016:22,
1018:14
credible [5] - 1018:4,
1068:15, 1069:9,
1077:17, 1078:5
crime [21] - 1006:1,
1006:3, 1006:5,
1012:17, 1022:20,
1022:22, 1022:23,
1023:3, 1023:8,
1023:14, 1023:18,
1023:24, 1024:9,
1024:10, 1024:12,
1058:12, 1073:12,
1073:13, 1083:18
criminal [5] - 1012:20,
1013:14, 1019:1,
1026:2, 1062:5
cringe [1] - 1062:20
CRISP [55] - 956:16,
958:10, 959:13,
980:20, 981:2,
982:5, 982:13,
983:6, 989:12,
989:18, 989:21,
990:8, 992:3,
994:20, 994:25,
995:12, 995:14,
998:3, 998:7,
998:20, 998:24,
999:2, 999:6,
995:15, 999:17,
999:20, 999:23,
1000:25, 1001:8,
1001:11, 1002:16,
1002:19, 1004:8,
1004:14, 1004:18,
1004:22, 1005:5,
1007:4, 1007:10,
1007:22, 1008:3,
1008:11, 1009:13,
1009:15, 1009:18,
1009:23, 1056:25,
1057:3, 1060:23,
1074:6, 1074:8,
1074:21, 1075:25,
1076:13, 1088:13
Crisp [22] - 956:17,
958:2, 958:23,
959:11, 980:19,
982:8, 989:23,
990:6, 992:2,

994:17, 995:10, 998:1, 1000:22, 1001:10, 1001:22, 1004:7, 1007:2, 1009:12, 1009:22, 1060:21, 1073:16, 1088:11

**cross** [5] - 959:16, 981:3, 984:18, 992:18, 1068:21

**Cross** [1] - 957:3

**CROSS** [1] - 959:23

**Cross-Examination** [1] - 957:3

**cross-examination** [2] - 959:16, 984:18

**CROSS-EXAMINATION** [1] - 959:23

**crosstalk** [1] - 978:8

**crowd** [7] - 1034:19, 1039:7, 1039:8, 1039:10, 1040:18, 1063:7, 1076:22

**crowding** [1] - 1028:10

**CRR** [1] - 956:19

**crying** [1] - 1066:15

**Crypt** [17] - 1033:10, 1037:11, 1037:13, 1038:23, 1038:25, 1039:3, 1039:9, 1039:14, 1040:11, 1041:11, 1041:15, 1041:20, 1052:13, 1054:17, 1056:1, 1067:10, 1070:10

**CS** [1] - 961:24

**Cs** [1] - 1079:2

**cup** [1] - 1068:25

**current** [2] - 969:13, 969:14

**CUSANELLI** [2] - 956:6, 957:3

**Cusanelli** [36] - 958:18, 959:18, 959:25, 964:8, 964:15, 965:20, 973:14, 974:8, 981:3, 989:24, 990:3, 999:10, 1000:7, 1001:23, 1002:3, 1012:25, 1013:4, 1013:8, 1018:20, 1018:23, 1019:1, 1019:22, 1020:7, 1020:18, 1022:19, 1024:1, 1026:17, 1027:11, 1028:13, 1029:24,

1030:21, 1047:24, 1061:5, 1071:5, 1071:8, 1083:17

**Cusanelli's** [2] - 1013:22, 1032:18

**custody** [2] - 1045:14, 1046:1

**cut** [3] - 983:12, 986:15, 1069:6

**cuts** [1] - 967:25

**CVC** [16] - 1033:11, 1042:21, 1042:23, 1043:16, 1043:21, 1043:23, 1044:4, 1044:7, 1044:9, 1044:15, 1044:22, 1045:7, 1054:9, 1056:4, 1056:7, 1079:18

**Cynthia** [3] - 975:2, 975:13, 1049:11

# D

**D.C** [5] - 956:5, 972:19, 1029:3, 1052:11, 1064:9

**dais** [2] - 1037:7, 1046:24

**damaged** [1] - 1059:19

**damn** [1] - 1052:25

**Dan** [1] - 1034:13

**dancing** [1] - 1068:16

**danger** [1] - 1060:14

**DAY** [1] - 956:9

**days** [8] - 981:23, 1032:18, 1043:9, 1057:19, 1057:22, 1072:8, 1072:11, 1079:6

**daytime** [1] - 1086:16

**DC** [2] - 956:15, 956:21

**deal** [4] - 983:1, 997:24, 1008:10, 1046:15

**dealing** [2] - 1046:5, 1046:22

**death** [1] - 1070:25

**debate** [2] - 1034:19, 1048:23

**debates** [1] - 972:21

**debating** [1] - 1035:2

**December** [4] - 1034:8, 1052:3, 1052:4, 1052:10

**decide** [17] - 993:12, 1010:23, 1010:24,

1010:25, 1011:4, 1011:7, 1014:25, 1020:3, 1032:5, 1052:8, 1054:21, 1056:9, 1057:24, 1058:2, 1077:18, 1083:19, 1084:12

**decided** [2] - 1034:21, 1059:24

**deciding** [3] - 1004:5, 1022:1, 1025:21

**declared** [1] - 1060:7

**deeper** [1] - 1063:12

**defend** [1] - 1044:21

**Defendant** [3] - 956:7, 956:16, 1048:13

**defendant** [173] - 958:17, 959:17, 982:11, 990:19, 990:23, 991:15, 992:18, 993:14, 993:22, 996:4, 996:5, 996:7, 996:25, 997:15, 1003:13, 1003:15, 1003:19, 1003:21, 1003:24, 1004:4, 1004:5, 1005:18, 1008:14, 1009:8, 1012:20, 1012:22, 1013:10, 1016:11, 1020:13, 1020:20, 1020:25, 1021:1, 1021:2, 1021:6, 1021:8, 1021:10, 1021:13, 1021:20, 1022:2, 1022:3, 1022:4, 1022:5, 1022:22, 1022:24, 1023:3, 1023:5, 1023:7, 1023:10, 1023:16, 1023:19, 1023:23, 1024:11, 1024:13, 1024:14, 1024:21, 1024:24, 1024:25, 1025:2, 1025:6, 1025:9, 1025:11, 1025:21, 1026:1, 1026:4, 1026:6, 1026:11, 1026:14, 1026:15, 1026:20, 1026:23, 1026:24, 1027:1, 1027:14, 1027:17, 1027:19, 1028:16, 1028:19, 1028:22, 1028:25, 1029:9, 1029:11, 1029:13, 1029:15, 1029:17, 1030:2, 1030:5,

1030:7, 1032:18, 1032:19, 1032:23, 1033:1, 1033:21, 1033:24, 1034:11, 1034:17, 1035:3, 1035:9, 1035:12, 1035:19, 1036:2, 1036:5, 1036:8, 1036:15, 1037:2, 1037:10, 1037:17, 1038:4, 1038:9, 1038:22, 1039:7, 1040:4, 1040:11, 1040:15, 1041:14, 1041:20, 1041:22, 1041:23, 1042:6, 1042:8, 1042:11, 1042:19, 1042:24, 1043:5, 1043:23, 1044:9, 1044:15, 1044:22, 1045:7, 1046:6, 1046:16, 1046:17, 1047:2, 1047:8, 1047:9, 1048:9, 1049:4, 1049:9, 1049:19, 1050:7, 1050:8, 1051:12, 1052:18, 1054:5, 1054:9, 1054:11, 1055:5, 1055:7, 1056:13, 1058:5, 1058:11, 1059:3, 1059:9, 1059:22, 1059:23, 1073:21, 1074:7, 1076:18, 1077:18, 1077:20, 1077:24, 1078:6, 1078:16, 1078:22, 1079:2, 1079:6, 1079:13, 1079:23, 1080:13, 1082:2, 1082:7, 1083:10, 1084:6

**defendant's** [18] - 959:12, 1000:4, 1000:6, 1004:24, 1008:13, 1008:18, 1023:13, 1025:13, 1025:15, 1025:17, 1025:19, 1025:24, 1026:9, 1027:22, 1030:20, 1049:1, 1050:14, 1054:3

**defending** [2] - 1046:20, 1061:21

**Defense** [1] - 957:9

**DEFENSE** [1] - 1060:22

**defense** [26] - 958:3, 958:4, 959:2,

980:23, 981:25, 982:4, 982:18, 990:7, 995:4, 995:7, 999:9, 1001:9, 1001:13, 1001:17, 1002:2, 1005:13, 1007:12, 1008:16, 1009:22, 1055:1, 1055:4, 1068:5, 1077:19, 1080:13, 1082:2, 1088:7

**defiling** [1] - 1060:16

**define** [1] - 1006:5

**defined** [3] - 1005:20, 1009:10, 1023:4

**defines** [1] - 1006:4

**defining** [10] - 1006:2, 1006:10, 1027:3, 1028:1, 1028:3, 1029:5, 1029:8, 1030:14, 1030:17, 1030:19

**definitely** [4] - 970:8, 1038:8, 1051:3, 1051:20

**definition** [2] - 1020:24, 1064:22

**degree** [1] - 1015:3

**delete** [1] - 1053:19

**deliberate** [2] - 1082:20, 1084:19

**deliberating** [3] - 1087:9, 1087:13, 1088:15

**deliberations** [15] - 1010:8, 1011:13, 1011:16, 1011:24, 1016:9, 1031:10, 1076:11, 1082:22, 1082:24, 1083:12, 1084:21, 1084:25, 1085:3, 1085:20, 1086:4

**demeanor** [1] - 1016:23

**democratic** [3] - 977:23, 988:14, 1062:16

**Democratic** [5] - 970:12, 970:21, 987:6, 992:22, 1048:18

**Democrats** [4] - 975:3, 975:5, 1048:9, 1048:11

**demonstrate** [1] - 1030:9

**demonstrated** [1] - 1030:5

**demonstrating** [1] -

1029:25
**denied** [1] - 1068:23
**denies** [1] - 958:6
**deny** [2] - 993:15, 994:3
**denying** [1] - 992:23
**depicted** [1] - 1043:4
**deployed** [4] - 962:18, 962:22, 963:11, 964:20
**deploying** [1] - 1059:20
**deprecating** [2] - 987:20, 987:21
**derogatory** [1] - 969:17
**describe** [5] - 973:15, 973:18, 1020:16, 1032:17, 1052:19
**described** [3] - 1016:19, 1043:11, 1072:22
**desire** [2] - 1018:9, 1049:22
**desk** [2] - 1079:3
**desks** [1] - 1047:1
**despite** [1] - 1056:6
**destruction** [1] - 1071:1
**detail** [3] - 1017:22, 1039:25, 1043:21
**details** [1] - 1017:13
**determination** [4] - 991:8, 991:23, 1018:24, 1085:23
**determine** [10] - 991:1, 1010:21, 1011:2, 1014:7, 1015:16, 1016:14, 1018:7, 1019:15, 1020:6, 1020:25
**determined** [2] - 1015:13, 1039:25
**determining** [3] - 995:21, 1016:10, 1018:2
**Dibble** [1] - 1087:21
**die** [1] - 1050:14
**difference** [1] - 1019:12
**different** [9] - 960:17, 996:6, 1000:19, 1011:12, 1017:15, 1038:17, 1038:18, 1051:7, 1063:3
**differently** [1] - 1017:18
**difficult** [3] - 981:9, 1019:10, 1064:1
**dig** [1] - 1063:12

**dildoes** [1] - 975:15
**dildos** [1] - 1049:15
**dire** [1] - 1063:22
**direct** [15] - 961:21, 962:5, 965:21, 973:1, 975:20, 984:6, 1014:7, 1014:10, 1014:15, 1014:22, 1015:1, 1015:3, 1015:5, 1025:23, 1037:18
**directed** [1] - 1051:6
**direction** [7] - 966:20, 967:11, 967:20, 1043:2, 1043:6, 1047:6, 1072:5
**directly** [3] - 968:16, 1019:19, 1047:21
**disagree** [2] - 992:4, 994:12
**disagreed** [1] - 992:20
**disagreement** [1] - 1018:22
**discovery** [1] - 981:8
**discredit** [1] - 1017:16
**discrepancies** [1] - 1017:14
**discrepancy** [2] - 1017:20, 1017:23
**discuss** [7] - 983:16, 993:11, 1084:15, 1084:17, 1086:21, 1087:2, 1088:12
**discussed** [2] - 971:14, 1062:9
**discussing** [3] - 959:25, 995:1, 1086:4
**discussion** [5] - 993:19, 1070:16, 1071:6, 1076:8, 1086:1
**discussions** [4] - 987:5, 988:16, 1071:18, 1083:5
**disgusting** [1] - 988:6
**disingenuous** [1] - 992:13
**dismiss** [1] - 1088:17
**disobey** [2] - 1029:13, 1029:16
**disorder** [3] - 1038:14, 1073:9, 1073:10
**disorderly** [16] - 998:25, 999:1, 999:2, 999:17, 999:18, 1000:11, 1000:16, 1005:5, 1027:12, 1027:17, 1028:4, 1028:14,

1028:19, 1029:4, 1029:5, 1064:19
**dispute** [1] - 987:11
**disputing** [2] - 1062:11, 1062:13
**disregard** [3] - 1019:16, 1029:13, 1029:16
**disrupt** [4] - 977:20, 1027:20, 1028:23, 1030:10
**disrupted** [1] - 1027:23
**disrupting** [1] - 978:7
**disruption** [1] - 977:22
**disruptive** [9] - 1000:16, 1027:12, 1027:18, 1028:9, 1028:11, 1028:14, 1028:20, 1029:4, 1029:6
**distasteful** [1] - 1018:21
**distinction** [1] - 1062:17
**distracted** [2] - 1067:17, 1080:16
**distraction** [1] - 1044:12
**distracts** [1] - 1067:21
**DISTRICT** [3] - 956:1, 956:1, 956:10
**disturb** [2] - 1028:23, 1048:5
**disturbance** [1] - 1028:11
**disturbing** [4] - 1062:9, 1062:11, 1062:14, 1062:16
**divided** [1] - 1085:15
**divisive** [1] - 1070:17
**DNA** [1] - 1065:14
**document** [2] - 1007:12, 1031:20
**dome** [1] - 1077:11
**domed** [1] - 1055:8
**domestic** [1] - 1072:12
**Donald** [2] - 969:11, 972:9
**done** [13] - 987:3, 994:12, 996:2, 1003:12, 1003:13, 1004:9, 1011:6, 1019:22, 1047:24, 1051:23, 1053:9, 1057:13
**door** [15] - 990:19, 991:21, 993:8,

1036:9, 1036:23, 1036:24, 1037:2, 1038:4, 1042:14, 1046:8, 1047:3, 1054:19, 1058:2, 1080:11, 1080:19
**doors** [2] - 992:8, 1036:15
**doubt** [39] - 1000:13, 1012:23, 1013:3, 1013:7, 1013:11, 1013:16, 1013:17, 1013:18, 1013:22, 1013:23, 1014:1, 1014:2, 1014:4, 1014:5, 1016:11, 1020:7, 1021:5, 1021:18, 1023:1, 1023:12, 1024:10, 1024:17, 1026:8, 1026:13, 1026:22, 1027:16, 1028:18, 1029:12, 1030:4, 1031:3, 1031:16, 1059:8, 1066:10, 1069:19, 1069:20, 1069:22
**down** [60] - 958:11, 959:11, 960:6, 960:8, 961:1, 969:7, 974:6, 974:22, 974:23, 978:9, 978:11, 982:14, 984:2, 985:4, 985:5, 986:19, 990:5, 1004:13, 1005:17, 1033:25, 1035:21, 1036:7, 1037:7, 1037:15, 1037:17, 1040:3, 1040:4, 1040:9, 1042:15, 1042:20, 1042:24, 1043:5, 1043:9, 1043:12, 1043:16, 1044:4, 1044:10, 1047:4, 1052:10, 1054:9, 1055:2, 1055:12, 1055:15, 1055:17, 1056:4, 1058:5, 1059:23, 1063:17, 1068:17, 1068:18, 1070:24, 1071:10, 1072:17, 1072:18, 1072:22, 1072:25, 1079:11, 1079:18, 1079:20, 1086:16
**downstairs** [2] - 1037:22, 1045:7
**draw** [3] - 1012:7,

1012:19, 1043:1
**drawn** [2] - 1014:11, 1046:8
**dressed** [2] - 1039:1, 1047:5
**drills** [1] - 1037:9
**drop** [3] - 1007:5, 1058:1, 1061:1
**dropped** [1] - 1078:3
**dumb** [1] - 1071:12
**duplicative** [1] - 1058:23
**duration** [1] - 1084:3
**during** [18] - 978:25, 1010:8, 1010:24, 1011:13, 1011:14, 1011:16, 1011:24, 1012:3, 1016:2, 1018:19, 1020:4, 1026:3, 1031:18, 1047:13, 1084:4, 1084:21, 1084:25, 1085:3
**duty** [4] - 1010:18, 1013:4, 1013:8, 1083:13

## E

**east** [1] - 1042:12
**easy** [1] - 1049:1
**educated** [1] - 1077:13
**education** [1] - 1084:5
**effect** [4] - 984:23, 1017:20, 1021:11, 1079:15
**efficient** [1] - 1010:16
**egregious** [1] - 1066:5
**either** [9] - 979:4, 982:18, 1003:15, 1018:6, 1018:16, 1028:24, 1029:20, 1032:5, 1083:22
**elaborate** [1] - 983:11
**elapsed** [1] - 1017:10
**elected** [2] - 971:4, 1056:16
**election** [33] - 970:24, 971:3, 971:4, 971:5, 971:7, 971:8, 971:13, 971:14, 971:21, 972:1, 972:3, 972:5, 974:25, 975:1, 1029:23, 1032:22, 1034:3, 1034:5, 1034:6, 1034:12, 1036:13, 1040:12,

1040:13, 1050:18, 1050:21, 1050:25, 1051:6, 1051:9, 1051:10, 1051:12, 1051:14, 1051:17, 1069:25

**electoral** [10] - 977:24, 999:11, 1000:8, 1001:14, 1001:24, 1002:6, 1002:11, 1021:22, 1029:22, 1030:22

**electors** [5] - 976:16, 1034:9, 1052:4, 1052:5, 1052:6

**electronic** [1] - 1084:23

**electronically** [1] - 1085:1

**element** [10] - 958:9, 996:4, 996:5, 1013:3, 1013:7, 1023:9, 1023:15, 1023:22, 1069:20

**elements** [19] - 1000:12, 1005:14, 1005:17, 1008:14, 1020:16, 1020:23, 1021:4, 1023:2, 1024:19, 1026:21, 1027:15, 1028:17, 1030:3, 1031:3, 1031:15, 1058:4, 1059:1, 1059:4, 1073:11

**elevators** [1] - 1044:5

**elicited** [1] - 992:11

**elsewhere** [2] - 1042:9, 1046:19

**email** [2] - 995:15, 1084:23

**emailed** [1] - 998:14

**embellished** [1] - 1072:9

**emergency** [1] - 1037:9

**emoji** [1] - 1053:2

**emotional** [5] - 1062:7, 1062:10, 1062:14, 1063:21, 1067:25

**encountered** [1] - 1061:24

**encourage** [7] - 1025:14, 1025:16, 1025:18, 1026:9, 1061:25, 1082:13, 1083:6

**encouraged** [1] - 1025:12

**encouraging** [1] - 1025:4

**end** [13] - 968:6, 977:22, 1009:2, 1033:16, 1039:9, 1043:3, 1043:7, 1045:9, 1060:7, 1065:13, 1067:15, 1071:18, 1088:16

**End** [4] - 983:4, 1057:15, 1074:15, 1076:7

**ended** [2] - 992:19, 994:5

**enforcement** [5] - 983:22, 989:3, 1018:18, 1078:11, 1084:1

**engage** [3] - 1045:8, 1047:11, 1078:7

**engaged** [3] - 1027:17, 1028:19, 1070:17

**engages** [2] - 1080:3, 1080:4

**engaging** [3] - 1022:17, 1033:3, 1045:10

**enshrined** [1] - 1034:14

**enter** [3] - 1059:25, 1063:20, 1083:12

**entered** [16] - 971:23, 972:2, 975:20, 976:20, 999:12, 1000:9, 1003:20, 1012:2, 1026:24, 1030:24, 1032:20, 1033:8, 1040:15, 1051:12, 1060:9, 1086:12

**entering** [4] - 997:1, 1026:18, 1042:19, 1085:21

**enters** [1] - 958:17

**entire** [5] - 979:3, 979:14, 1058:17, 1061:17, 1071:17

**entirely** [2] - 1020:3, 1086:10

**entirety** [4] - 982:1, 1033:20, 1078:14, 1081:21

**entitled** [3] - 1012:11, 1018:11, 1089:5

**entrance** [6] - 1043:12, 1069:10, 1072:5, 1079:8, 1079:14, 1079:16

**equal** [1] - 1015:2

**error** [1] - 1017:23

**escalator** [1] - 1044:4

**especially** [1] - 1068:8

**ESQ** [1] - 956:16

**essentially** [2] - 977:25, 1007:5

**establishes** [1] - 1019:2

**establishing** [1] - 1018:25

**ethnic** [1] - 1011:4

**evacuate** [2] - 1042:3, 1043:21

**evacuated** [2] - 1039:25, 1045:5

**evacuating** [2] - 1037:4, 1041:25

**evacuation** [1] - 1037:18

**evaluated** [1] - 1018:12

**evaluating** [3] - 1016:17, 1017:7, 1018:13

**evening** [3] - 1086:9, 1087:8, 1087:16

**event** [11] - 1017:8, 1017:10, 1017:11, 1017:13, 1018:15, 1028:12, 1033:23, 1052:23, 1083:11, 1083:13

**events** [1] - 1034:23

**eventually** [1] - 1045:1

**everywhere** [8] - 985:18, 1044:8, 1056:4, 1056:8, 1066:25, 1071:23, 1078:20, 1079:1

**evidence** [95] - 973:9, 990:6, 990:17, 993:17, 1009:22, 1010:3, 1010:24, 1010:25, 1011:5, 1011:11, 1011:12, 1011:19, 1011:20, 1011:21, 1011:25, 1012:2, 1012:6, 1012:7, 1012:10, 1012:13, 1012:14, 1012:15, 1012:18, 1013:1, 1013:19, 1013:20, 1014:6, 1014:7, 1014:8, 1014:10, 1014:12, 1014:16, 1014:20, 1014:22, 1014:24, 1014:25, 1015:2, 1015:3, 1015:5, 1015:11, 1015:13,

1015:15, 1015:21, 1015:25, 1018:4, 1018:13, 1018:24, 1019:7, 1019:11, 1019:23, 1020:4, 1020:5, 1020:10, 1022:3, 1023:12, 1025:24, 1025:25, 1026:6, 1029:12, 1031:10, 1031:19, 1032:6, 1032:8, 1032:11, 1035:13, 1047:25, 1048:7, 1054:3, 1054:23, 1056:10, 1057:9, 1057:17, 1057:22, 1057:25, 1060:18, 1064:1, 1068:5, 1073:21, 1077:7, 1081:23, 1081:24, 1083:4, 1083:6, 1083:8, 1083:9, 1083:15, 1083:17, 1084:13, 1087:14, 1088:1, 1088:9

**evil** [1] - 1029:15

**exactly** [5] - 1032:25, 1033:21, 1033:22, 1077:8, 1078:21

**exaggeration** [1] - 1052:22

**Examination** [1] - 957:3

**examination** [2] - 959:16, 984:18

**EXAMINATION** [2] - 959:23, 981:1

**Examination.............** . [1] - 957:4

**examine** [3] - 1032:1, 1032:8, 1032:12

**example** [6] - 1014:13, 1016:22, 1022:10, 1030:10, 1083:19, 1085:16

**except** [4] - 1023:23, 1067:24, 1085:7, 1085:9

**exchange** [1] - 1081:1

**excluded** [4] - 990:18, 990:24, 991:14, 992:15

**exclusive** [1] - 1011:10

**exclusively** [1] - 1083:14

**excuse** [13] - 1040:23, 1041:7, 1054:19, 1057:21, 1061:19, 1070:12, 1073:9,

1076:11, 1078:17, 1082:21, 1086:9, 1086:14, 1087:7

**exhibit** [3] - 969:7, 1031:19, 1031:23

**exhibits** [8] - 1012:2, 1031:18, 1032:1, 1032:7, 1032:10, 1087:21, 1088:3, 1088:4

**exhilarating** [3] - 973:15, 1032:17, 1052:20

**exists** [1] - 1086:20

**expect** [1] - 1009:12

**experience** [4] - 958:4, 1012:10, 1017:19, 1084:5

**experiences** [1] - 1061:24

**explain** [3] - 970:17, 1020:23, 1020:24

**explained** [1] - 1024:20

**expose** [1] - 1051:16

**express** [1] - 987:25

**expressed** [1] - 1011:8

**expression** [1] - 1085:22

**expressly** [1] - 1018:23

**extent** [2] - 959:6, 1016:15

**extreme** [1] - 1049:20

**extremely** [2] - 1034:7, 1035:11

**eye** [2] - 964:25, 965:8

**eyewitness** [1] - 1014:8

## F

**face** [7] - 961:25, 967:20, 967:24, 968:3, 1038:10, 1053:2, 1071:14

**Facebook** [1] - 1053:19

**faces** [1] - 1035:19

**facilitate** [5] - 1025:14, 1025:16, 1025:18, 1026:10, 1083:5

**facilitating** [1] - 1025:3

**facing** [4] - 967:13, 968:14, 968:25, 1061:10

**fact** [28] - 960:9,
971:7, 971:9,
981:23, 984:12,
988:24, 1001:14,
1012:5, 1013:12,
1014:9, 1014:23,
1020:12, 1027:23,
1035:12, 1035:14,
1037:21, 1047:4,
1052:19, 1053:8,
1056:10, 1057:25,
1059:9, 1061:25,
1062:16, 1068:22,
1077:21, 1078:15,
1079:23
**facts** [15] - 1010:21,
1010:22, 1011:2,
1012:2, 1012:5,
1012:8, 1014:7,
1014:10, 1015:15,
1019:23, 1020:3,
1025:25, 1032:6,
1047:25, 1086:7
**failed** [3] - 976:15,
1013:6
**failure** [1] - 1017:18
**fair** [15] - 967:3, 968:3,
969:10, 969:17,
969:22, 970:7,
982:2, 982:25,
989:6, 1010:15,
1011:5, 1015:8,
1015:12, 1083:3,
1083:9
**fairly** [2] - 1012:11,
1018:11
**faith** [1] - 1054:24
**faithless** [1] - 1052:4
**falling** [2] - 1014:14,
1014:16
**falsehood** [1] -
1017:24
**falsities** [1] - 1034:6
**familiar** [1] - 962:11
**family** [2] - 1027:9,
1040:7
**fan** [1] - 969:14
**far** [4] - 1019:17,
1040:19, 1049:9,
1061:16
**fascinating** [1] -
1067:11
**fashion** [2] - 988:23,
1085:17
**fast** [1] - 964:22
**fast-forward** [1] -
964:22
**faster** [1] - 997:8
**father** [1] - 1061:19
**fathers** [1] - 1050:17

**favor** [1] - 1014:24
**favoritism** [1] - 1011:3
**FBI** [12] - 976:1,
976:25, 977:4,
978:25, 979:9,
979:12, 980:6,
983:9, 1055:23,
1057:20, 1068:23,
1081:1
**fear** [2] - 1011:2,
1028:5
**February** [2] - 974:24,
1049:9
**federal** [5] - 1020:20,
1026:19, 1027:13,
1028:15, 1030:1
**feet** [1] - 1036:15
**fell** [1] - 1079:12
**fellow** [1] - 1033:8
**felony** [3] - 1053:11,
1053:13, 1061:10
**felt** [2] - 976:12, 986:4
**female** [1] - 985:21
**few** [13] - 981:23,
992:19, 1032:18,
1037:20, 1039:20,
1043:16, 1051:1,
1057:19, 1067:14,
1067:22, 1067:24,
1079:6, 1082:19
**FIFIELD** [12] - 956:13,
958:22, 959:1,
994:16, 995:7,
1000:1, 1000:15,
1001:22, 1002:6,
1002:10, 1008:17,
1075:19
**Fifield** [5] - 958:15,
994:14, 995:6,
998:7, 1039:18
**fifth** [1] - 1025:6
**fight** [2] - 1051:16,
1061:11
**fighting** [1] - 1067:19
**figure** [2] - 1034:10,
1072:11
**fill** [4] - 1039:3, 1039:4
**film** [2] - 1038:8,
1041:16
**final** [6] - 995:9,
995:11, 1000:18,
1010:4, 1082:19,
1082:21
**finally** [6] - 1045:4,
1051:14, 1054:3,
1063:7, 1067:22,
1082:2
**finder** [1] - 1078:15
**finders** [2] - 1056:10,
1057:24

**findings** [1] - 1065:23
**fine** [7] - 958:10,
994:13, 997:22,
998:20, 1006:25,
1057:11, 1075:17
**fingers** [1] - 1080:5
**finish** [2] - 1003:1,
1073:19
**Finnigan** [5] -
1048:23, 1052:24,
1053:3, 1053:8,
1056:24
**fire** [1] - 1050:3
**firearm** [1] - 1070:21
**fired** [1] - 1044:19
**firing** [1] - 1049:25
**firm** [1] - 1023:19
**firmly** [1] - 1013:21
**First** [2] - 1029:2,
1076:21
**first** [40] - 960:2,
973:7, 974:3, 981:6,
1001:25, 1005:18,
1006:4, 1006:10,
1006:14, 1008:25,
1009:1, 1020:23,
1021:6, 1023:3,
1023:9, 1024:16,
1024:18, 1026:23,
1027:17, 1028:19,
1030:5, 1034:25,
1036:14, 1036:22,
1038:15, 1040:20,
1045:12, 1048:8,
1050:3, 1053:6,
1056:21, 1059:14,
1061:7, 1070:19,
1080:23, 1081:19,
1082:23
**five** [9] - 977:4, 977:5,
994:7, 994:20,
1024:17, 1047:9,
1058:20, 1067:9,
1074:17
**flag** [10] - 1047:13,
1054:20, 1065:13,
1065:14, 1067:20,
1067:22, 1067:24,
1080:11, 1080:15,
1080:16
**flagpoles** [1] -
1035:15
**flags** [1] - 1054:11
**flash** [3] - 962:2,
962:14, 963:4
**flight** [1] - 1036:4
**floor** [21] - 1037:4,
1037:5, 1037:6,
1037:19, 1037:21,
1037:24, 1038:5,

1040:3, 1040:4,
1042:7, 1044:24,
1045:2, 1045:4,
1045:5, 1046:25,
1058:15, 1058:16,
1067:2, 1067:3,
1067:6, 1082:4
**floors** [1] - 1043:16
**fly** [1] - 996:19
**focus** [1] - 1058:24
**folks** [8] - 966:20,
967:2, 967:15,
989:25, 1041:19,
1046:20, 1074:16,
1087:16
**follow** [4] - 1010:11,
1010:20, 1041:11,
1041:15
**follower** [1] - 1060:4
**following** [12] -
1021:4, 1023:2,
1024:17, 1026:21,
1027:15, 1028:17,
1030:3, 1042:20,
1056:14, 1063:7,
1066:24, 1081:1
**follows** [2] - 1043:5,
1047:19
**fomented** [1] - 1071:6
**FOR** [1] - 956:1
**forbids** [1] - 1029:10
**force** [7] - 962:12,
962:14, 963:3,
963:12, 1039:6,
1054:14, 1059:21
**forced** [2] - 1061:8,
1083:22
**forefront** [1] - 1033:1
**foregoing** [1] - 1089:4
**foreperson** [4] -
1082:24, 1083:1,
1083:4, 1085:5
**foreseeable** [1] -
1021:19
**forget** [1] - 998:25
**forgot** [1] - 999:20
**form** [15] - 988:23,
997:23, 1003:6,
1006:22, 1006:25,
1008:4, 1014:24,
1031:9, 1031:10,
1031:13, 1031:16,
1049:20, 1060:1,
1087:23
**formal** [1] - 1012:16
**former** [1] - 1070:12
**forms** [1] - 1072:24
**forth** [4] - 984:15,
1004:13, 1041:12,
1051:17

**forward** [7] - 963:5,
963:16, 964:22,
1039:13, 1041:21,
1045:15, 1082:13
**founding** [1] - 1050:17
**four** [8] - 975:9,
1021:4, 1049:13,
1057:22, 1059:1,
1073:4, 1074:10
**fourth** [3] - 1021:13,
1025:2, 1025:22
**Framhein** [2] -
1040:16, 1041:1
**Franklin** [1] - 1056:13
**frankly** [6] - 982:14,
991:20, 993:8,
993:21, 994:2,
1058:23
**fraud** [9] - 971:5,
972:6, 1034:6,
1050:18, 1050:23,
1051:9, 1051:11,
1051:17, 1051:20
**free** [3] - 1010:13,
1087:2, 1087:11
**friend** [12] - 975:2,
1035:12, 1043:9,
1048:23, 1049:11,
1050:7, 1050:13,
1052:24, 1053:10,
1056:16, 1056:22,
1079:6
**friend's** [1] - 1053:14
**friends** [7] - 969:19,
971:9, 974:19,
988:2, 993:1,
1048:22, 1077:15
**friendship** [1] - 1017:5
**front** [26] - 962:17,
962:18, 962:22,
964:16, 968:1,
968:17, 970:6,
970:14, 970:15,
979:9, 1003:19,
1033:2, 1033:3,
1034:20, 1035:4,
1035:9, 1036:3,
1036:6, 1036:7,
1040:16, 1045:25,
1046:8, 1054:13,
1059:13, 1072:21
**Front** [1] - 956:17
**fronts** [1] - 992:22
**fucking** [3] - 973:17,
1050:5
**full** [4] - 1000:2,
1017:3, 1039:1,
1083:9
**fulsome** [1] - 1058:22
**function** [2] - 1010:15,

**1010**:21
**functions** [2] -
1027:21, 1027:24
**funny** [5] - 987:23,
993:3, 993:4,
1053:21
**furnished** [1] - 1019:8
**furniture** [3] - 1038:1,
1038:2, 1046:7
**furtherance** [2] -
1024:25, 1025:10
**furthermore** [1] -
1086:2

## G

**gain** [2] - 1035:22,
1061:17
**gained** [1] - 1036:4
**galleries** [2] - 1044:6,
1079:4
**gallery** [7] - 1044:9,
1044:25, 1045:3,
1046:20, 1079:19,
1082:5
**garage** [1] - 1042:14
**garden** [1] - 1064:16
**gatekeepers** [1] -
1068:4
**gavel** [1] - 1039:21
**gaveled** [3] - 1038:13,
1039:17
**gear** [1] - 1039:1
**geez** [1] - 1072:23
**gender** [1] - 1011:4
**general** [2] - 1001:1,
1001:4
**generally** [2] -
1060:25, 1062:2
**generation** [1] - 988:1
**gentleman** [2] -
1063:15, 1074:13
**gentlemen** [11] -
959:16, 1009:21,
1010:2, 1032:16,
1059:7, 1076:15,
1076:18, 1077:23,
1079:21, 1081:18,
1082:18
**Georgia** [3] - 1034:9,
1052:3, 1052:6
**gesture** [1] - 986:1
**gestures** [1] - 986:2
**giddy** [1] - 1032:20
**given** [5] - 982:22,
983:11, 1031:14,
1032:11, 1084:3
**glass** [3] - 1043:10,
1043:13, 1079:9

**goal** [2] - 975:21,
985:14
**Gosar** [1] - 1038:14
**gosh** [3] - 1053:3,
1065:5, 1072:16
**government** [71] -
959:7, 977:25,
980:23, 981:21,
981:23, 982:3,
982:5, 982:19,
990:9, 990:14,
990:18, 991:20,
993:9, 995:2,
1000:12, 1001:9,
1004:14, 1004:20,
1005:13, 1007:1,
1008:9, 1012:22,
1013:2, 1013:6,
1013:10, 1014:3,
1016:10, 1018:25,
1020:6, 1020:17,
1021:4, 1021:18,
1023:1, 1023:23,
1023:25, 1024:16,
1025:10, 1026:13,
1026:21, 1027:15,
1027:20, 1027:24,
1028:17, 1030:3,
1031:2, 1031:15,
1055:23, 1056:10,
1057:20, 1057:25,
1059:4, 1059:6,
1060:10, 1062:6,
1062:8, 1065:2,
1065:24, 1067:1,
1068:3, 1068:21,
1069:23, 1070:3,
1070:13, 1071:15,
1071:24, 1073:13,
1076:16, 1077:14,
1079:17, 1082:1
**Government** [3] -
956:13, 957:8,
957:10
**GOVERNMENT** [2] -
1032:15, 1076:17
**government's** [6] -
993:15, 994:3,
1013:14, 1057:22,
1069:18, 1071:22
**Government's** [1] -
1080:1
**grab** [1] - 1045:15
**grabbing** [1] - 1047:12
**graft** [1] - 1001:12
**grand** [1] - 1041:2
**grandest** [1] - 1077:12
**graver** [1] - 1013:25
**gray** [1] - 965:6
**great** [4] - 958:12,

995:13, 997:25,
1069:1
**greater** [3] - 1015:3,
1015:18, 1018:16
**greatest** [1] - 1051:17
**green** [2] - 1037:18,
1037:25
**grew** [1] - 988:2
**ground** [13] - 965:22,
966:13, 967:3,
968:25, 986:19,
1014:18, 1033:19,
1036:7, 1045:11,
1045:19, 1045:20,
1067:21
**grounds** [11] - 999:6,
999:8, 1026:19,
1026:25, 1027:4,
1027:6, 1027:13,
1027:18, 1027:25,
1028:2, 1059:17
**group** [4] - 985:7,
1036:4, 1042:20,
1059:14
**guess** [3] - 1006:11,
1006:18, 1032:4
**guesswork** [1] -
1014:2
**guidance** [1] - 1019:8
**guidelines** [1] -
1018:14
**guilt** [7] - 995:22,
1012:19, 1013:22,
1014:3, 1014:5,
1053:10
**guilty** [46] - 987:2,
996:7, 996:25,
997:9, 997:10,
997:12, 997:15,
997:17, 997:18,
997:20, 1000:13,
1003:10, 1003:24,
1004:4, 1004:5,
1004:11, 1004:12,
1004:17, 1006:15,
1008:7, 1012:23,
1013:5, 1013:8,
1013:10, 1018:23,
1019:1, 1020:13,
1021:2, 1022:24,
1023:10, 1023:16,
1024:3, 1024:14,
1026:4, 1026:11,
1026:20, 1027:14,
1028:16, 1030:2,
1031:4, 1058:5,
1060:19, 1073:8,
1073:15
**guilty/guilty** [1] -
1003:7

**guns** [5] - 975:15,
1046:8, 1049:15,
1050:5, 1071:3
**guy** [7] - 1047:7,
1047:8, 1063:13,
1068:8, 1069:1,
1071:3, 1073:2
**guys** [3] - 976:5,
978:13, 1081:2

## H

**HALE** [2] - 956:6,
957:3
**Hale** [36] - 958:18,
959:18, 959:25,
964:8, 964:15,
965:20, 973:14,
974:8, 989:24,
990:3, 999:10,
1000:7, 1001:23,
1002:3, 1012:25,
1013:4, 1013:8,
1013:22, 1018:20,
1018:23, 1019:1,
1019:22, 1020:7,
1020:18, 1022:19,
1024:1, 1026:17,
1027:11, 1028:13,
1029:24, 1030:21,
1032:18, 1047:24,
1061:5, 1071:8,
1083:17
**HALE-CUSANELLI** [2]
- 956:6, 957:3
**Hale-Cusanelli** [34] -
958:18, 959:18,
959:25, 964:8,
964:15, 965:20,
973:14, 974:8,
989:24, 990:3,
999:10, 1000:7,
1001:23, 1002:3,
1012:25, 1013:4,
1013:8, 1018:20,
1018:23, 1019:1,
1019:22, 1020:7,
1020:18, 1022:19,
1024:1, 1026:17,
1027:11, 1028:13,
1029:24, 1030:21,
1047:24, 1061:5,
1071:8, 1083:17
**Hale-Cusanelli's** [2] -
1013:22, 1032:18
**half** [11] - 983:20,
987:22, 993:1,
1003:9, 1003:10,
1047:8, 1061:12,
1068:1, 1068:8,

1068:22
**hall** [1] - 1037:25
**hallway** [9] - 967:14,
968:6, 1033:16,
1037:16, 1037:17,
1043:3, 1043:7,
1045:9, 1046:1
**hand** [6] - 1013:6,
1014:10, 1035:17,
1061:2, 1079:7
**hand-to-hand** [1] -
1035:17
**handling** [1] - 958:15
**hands** [1] - 1034:22
**hang** [1] - 1074:20
**happy** [4] - 958:8,
958:10, 979:6,
1003:25
**hard** [1] - 1050:5
**harder** [1] - 962:6
**harmed** [1] - 1028:7
**Harris** [1] - 969:15
**Harrisburg** [1] -
956:18
**headed** [1] - 1042:20
**heading** [1] - 1037:17
**heads** [1] - 986:15
**healthy** [1] - 1086:13
**hear** [26] - 985:7,
985:9, 990:23,
991:15, 991:23,
993:11, 1010:5,
1017:17, 1019:10,
1032:1, 1036:18,
1037:22, 1038:14,
1038:17, 1038:18,
1040:5, 1040:8,
1048:7, 1061:2,
1061:5, 1066:6,
1073:2, 1076:16,
1078:21, 1078:25
**heard** [41] - 969:21,
970:5, 994:6,
1007:2, 1010:3,
1018:19, 1018:20,
1034:13, 1034:20,
1035:13, 1035:16,
1036:21, 1037:16,
1038:24, 1040:1,
1040:16, 1041:4,
1042:14, 1042:23,
1042:25, 1043:18,
1043:24, 1044:3,
1044:7, 1044:23,
1046:12, 1047:17,
1048:10, 1051:22,
1054:3, 1058:24,
1059:17, 1061:11,
1067:4, 1070:18,
1071:22, 1072:19,

1078:19, 1079:6, 1079:20, 1083:17
**hearing** [3] - 993:21, 1051:10, 1064:1
**hearings** [1] - 1030:11
**hears** [3] - 1044:18, 1044:24
**heavily** [1] - 1047:5
**held** [3] - 988:24, 991:4, 1041:21
**help** [5] - 987:13, 1019:10, 1044:18, 1072:9, 1083:5
**helped** [1] - 1066:10
**herd** [1] - 1068:11
**herself** [1] - 1018:5
**hesitate** [2] - 1013:25, 1085:25
**hid** [1] - 1053:13
**hides** [1] - 1067:18
**hiding** [1] - 1053:15
**higher** [1] - 973:10
**highly** [1] - 993:18, 1013:13
**Hill** [1] - 1055:8
**himself** [8] - 993:4, 1018:5, 1026:10, 1036:25, 1053:22, 1063:2, 1065:8, 1072:9
**historic** [1] - 1060:17
**historical** [2] - 1033:23, 1052:23
**history** [3] - 1051:17, 1056:11, 1077:13
**hit** [2] - 986:2, 1047:12
**hits** [1] - 1065:2
**hold** [10] - 1015:23, 1032:5, 1033:16, 1037:14, 1042:7, 1043:2, 1060:11, 1060:13, 1060:15, 1082:14
**hollow** [1] - 1065:13
**home** [1] - 1070:22
**honest** [2] - 970:17, 1013:20
**honestly** [1] - 970:16
**Honor** [48] - 958:15, 958:20, 959:1, 959:13, 959:20, 959:22, 963:25, 969:8, 980:20, 981:11, 983:3, 989:21, 990:8, 990:16, 990:17, 990:24, 991:14, 992:3, 992:15, 992:18, 994:13, 994:16, 995:12,

996:17, 997:22, 998:3, 1000:1, 1002:21, 1004:8, 1005:11, 1005:14, 1007:14, 1008:17, 1008:24, 1009:7, 1009:13, 1009:23, 1056:25, 1060:23, 1073:24, 1074:10, 1074:20, 1075:2, 1076:13, 1088:1, 1088:10, 1088:13
**Honor's** [2] - 990:25, 998:16
**HONORABLE** [1] - 956:10
**hope** [1] - 995:16
**horrible** [1] - 1062:19
**hostility** [1] - 1017:5
**hour** [4] - 983:20, 996:2, 1061:12, 1068:22
**hours** [5] - 977:5, 994:7, 1048:14, 1068:1, 1068:8
**house** [3] - 1028:24, 1029:20, 1053:14
**House** [43] - 1033:17, 1038:12, 1039:9, 1039:14, 1039:16, 1039:23, 1040:19, 1040:24, 1041:18, 1042:2, 1042:24, 1043:12, 1043:17, 1044:2, 1044:6, 1044:8, 1044:19, 1044:24, 1045:3, 1045:5, 1045:24, 1046:6, 1046:20, 1046:25, 1056:5, 1056:17, 1058:15, 1064:13, 1064:14, 1064:15, 1067:6, 1069:10, 1069:13, 1072:4, 1072:10, 1077:16, 1078:17, 1079:4, 1079:9, 1079:14, 1079:17, 1079:19
**houses** [2] - 975:9, 1049:13
**huddled** [1] - 1041:12
**huge** [2] - 1055:10, 1077:11
**humor** [3] - 970:23, 987:20, 988:1
**hundred** [1] - 1071:4
**hyperbole** [3] - 990:21, 991:3, 1048:15

**I**

**idea** [7] - 990:19, 1057:12, 1064:11, 1066:6, 1068:13, 1068:14
**ideal** [1] - 1061:16
**identification** [1] - 1032:10
**identified** [2] - 1019:6, 1024:9
**identify** [1] - 1019:10
**ignorance** [1] - 1022:1
**ignore** [5] - 1010:12, 1010:19, 1011:9, 1016:3, 1016:7
**illegal** [1] - 1081:14
**illegally** [1] - 1032:20
**illegitimate** [4] - 970:24, 971:18, 971:21, 972:4
**image** [1] - 1042:10
**imaginary** [1] - 1014:1
**immediate** [3] - 1027:9, 1028:6, 1036:20
**impair** [1] - 1017:9
**impartial** [3] - 1013:20, 1015:8, 1015:12
**impeaches** [1] - 994:1
**impeachment** [2] - 992:10, 992:16
**impede** [7] - 1020:21, 1021:7, 1021:8, 1021:12, 1022:9, 1027:20, 1028:23
**impeded** [2] - 1027:23, 1059:1
**impedes** [1] - 1022:15
**impeding** [3] - 1022:13, 1030:11, 1078:10
**implicate** [1] - 1031:25
**implies** [1] - 1013:17
**imply** [1] - 1003:5
**importance** [1] - 1085:20
**important** [5] - 1013:25, 1017:21, 1056:20, 1056:21, 1065:18
**imposing** [1] - 1083:13
**impressed** [1] - 1080:15
**impresses** [2] - 1016:24, 1016:25

**impression** [2] - 982:23, 991:5
**improbability** [1] - 1018:1
**improperly** [1] - 1011:3
**improve** [1] - 1017:9
**inadmissible** [2] - 1016:1, 1031:24
**inadvertently** [1] - 1084:14
**inaugural** [2] - 972:9, 972:14
**inauguration** [1] - 1048:20
**incident** [2] - 1017:17, 1061:9
**inclined** [1] - 1000:22
**include** [2] - 996:20, 1030:12
**included** [2] - 1007:5, 1007:6
**includes** [5] - 1021:14, 1027:8, 1029:1, 1029:21, 1084:22
**including** [9] - 1017:8, 1019:2, 1022:3, 1025:24, 1031:24, 1038:4, 1041:20, 1044:22, 1064:20
**inclusive** [1] - 1001:12
**inconsistencies** [1] - 1017:14
**inconsistency** [2] - 1017:20, 1017:22
**incredible** [1] - 1055:6
**incrimination** [1] - 1022:12
**independent** [1] - 1084:25
**independently** [1] - 1022:17
**indicate** [5] - 1019:24, 1047:25, 1075:1, 1075:3, 1075:12
**indicated** [1] - 1011:8
**indicates** [1] - 963:24
**indicating** [1] - 1011:7
**indicting** [1] - 1068:2
**indictment** [10] - 1012:16, 1012:17, 1020:9, 1020:14, 1020:15, 1020:18, 1026:17, 1027:11, 1028:13, 1029:24
**individual** [4] - 968:25, 1045:18, 1064:4, 1066:7
**individual's** [1] -

1031:25
**individuals** [7] - 965:21, 966:5, 966:13, 968:16, 969:4, 969:18, 1042:4
**indulgence** [1] - 988:17
**infer** [10] - 1019:20, 1019:24, 1019:25, 1047:22, 1048:1, 1048:2, 1048:4, 1048:8, 1052:16, 1052:18
**inference** [1] - 1012:19
**inferences** [2] - 1012:9, 1014:11
**influence** [3] - 987:7, 1020:14, 1083:12
**influenced** [1] - 1011:4
**influences** [2] - 988:14, 991:16
**information** [2] - 992:15, 1049:6
**informed** [2] - 972:8, 972:20
**initial** [3] - 1033:9, 1036:4, 1086:2
**innocence** [3] - 995:22, 1012:21, 1012:25
**innocent** [4] - 1012:21, 1017:18, 1017:23, 1054:22
**insecurities** [1] - 1065:1
**inside** [15] - 989:9, 989:13, 1033:7, 1040:12, 1041:11, 1046:7, 1047:1, 1055:18, 1055:21, 1064:19, 1067:11, 1068:12, 1076:23, 1077:7, 1077:16
**instance** [7] - 966:8, 971:17, 974:21, 992:8, 1003:18, 1006:13, 1077:19
**instant** [1] - 1060:1
**instead** [1] - 1023:18
**instinct** [2] - 994:4, 1061:3
**instituted** [2] - 1021:16, 1021:17
**instruct** [8] - 982:21, 994:23, 1008:25, 1009:1, 1010:17, 1010:18, 1029:19,

1086:21
**instructed** [3] -
1018:21, 1018:23,
1058:20
**instructing** [1] -
1058:8
**instruction** [24] -
958:14, 959:3,
959:5, 994:15,
1000:2, 1001:23,
1004:2, 1006:14,
1008:15, 1008:18,
1027:2, 1028:1,
1028:3, 1029:5,
1029:8, 1030:14,
1030:17, 1030:19,
1054:4, 1055:16,
1062:23, 1064:18,
1084:20, 1086:23
**INSTRUCTIONS** [2] -
1010:1, 1082:17
**Instructions** [2] -
957:7, 957:11
**instructions** [30] -
995:3, 995:9,
995:11, 996:3,
1000:18, 1001:5,
1004:20, 1006:4,
1008:1, 1010:4,
1010:6, 1010:9,
1010:10, 1010:11,
1010:13, 1010:14,
1010:19, 1031:13,
1031:15, 1047:19,
1055:2, 1058:9,
1058:22, 1058:24,
1073:20, 1074:5,
1082:19, 1082:21,
1087:14, 1087:23
**insurrectionist** [1] -
1072:12
**intelligence** [1] -
1084:5
**intelligent** [1] -
1080:17
**intended** [11] -
1011:22, 1012:13,
1021:8, 1023:3,
1023:8, 1029:10,
1048:4, 1052:16,
1052:18, 1059:2,
1059:10
**intending** [1] -
1023:14
**intends** [3] - 1019:25,
1048:2, 1058:13
**intent** [27] - 992:7,
999:2, 999:13,
1000:10, 1001:1,
1001:2, 1001:4,

1019:3, 1019:18,
1019:21, 1019:24,
1023:20, 1025:6,
1025:22, 1026:9,
1027:20, 1028:22,
1030:25, 1035:14,
1047:17, 1047:19,
1047:20, 1047:23,
1048:1, 1048:8,
1060:1, 1060:10
**intentional** [1] -
1017:23
**intentionally** [2] -
1020:1, 1024:11
**interact** [1] - 986:9
**interest** [2] - 1017:4,
1080:2
**interesting** [5] -
1051:19, 1064:18,
1064:23, 1068:21,
1069:17
**interests** [7] - 970:7,
970:8, 970:14,
970:15, 970:18,
970:22, 992:22
**interfere** [2] - 1045:19,
1065:21
**interfered** [4] - 965:23,
987:4, 1033:18,
1066:8
**interference** [1] -
1077:25
**interferes** [1] - 1028:9
**interfering** [3] - 987:2,
1077:21, 1078:10
**interjecting** [1] -
1050:9
**internet** [7] - 988:7,
988:9, 993:7,
1084:9, 1085:2,
1086:23, 1086:25
**interrogation** [2] -
983:20, 1068:24
**interrogators** [1] -
1068:9
**interrupts** [1] -
1028:11
**intertwined** [1] -
970:22
**interview** [15] -
975:25, 976:19,
978:25, 979:11,
981:9, 981:20,
981:21, 982:21,
983:7, 989:3, 994:7,
1057:19, 1061:12,
1068:22, 1080:25
**interviewing** [1] -
1050:10
**introduce** [1] - 993:10

**introducing** [2] -
991:22, 1049:18
**invaded** [1] - 1032:19
**invalidated** [1] -
1051:5
**investigated** [1] -
971:2
**investigation** [1] -
1084:25
**invite** [2] - 982:11,
1083:7
**invoking** [1] - 1022:11
**involve** [1] - 1022:10
**involved** [1] - 1026:1
**inward** [2] - 1049:5,
1049:8
**ironic** [5] - 970:23,
987:17, 987:18,
987:19, 1067:19
**ironically** [1] -
1067:17
**irony** [2] - 970:10,
1067:18
**irrefutable** [1] - 1066:3
**irrefutably** [1] - 1070:9
**irrelevant** [1] - 981:25
**Israel** [1] - 970:20
**issue** [6] - 991:24,
1002:22, 1003:23,
1042:21, 1047:18,
1085:18
**issues** [2] - 994:2,
1051:9
**It'll** [1] - 975:14
**it'll** [2] - 976:12,
1049:14
**items** [5] - 962:6,
962:18, 962:22,
963:3, 964:20
**iterations** [2] - 998:12,
998:13
**itself** [4] - 974:25,
975:1, 1015:7,
1050:25

## J

**jacket** [1] - 1053:15
**Jacobs** [17] - 960:5,
960:24, 961:7,
961:13, 961:18,
970:4, 973:4, 980:9,
980:10, 980:13,
992:23, 1048:16,
1049:4, 1049:19,
1056:23, 1057:18,
1072:7
**January** [20] - 960:2,
971:20, 971:22,

972:2, 972:12,
989:3, 993:14,
999:12, 1000:9,
1029:22, 1030:24,
1051:22, 1052:9,
1052:24, 1053:17,
1056:21, 1072:7,
1076:21, 1077:4,
1077:6
**jarred** [1] - 1062:12
**jarring** [1] - 1062:8
**Jefferson** [2] -
1050:15, 1056:13
**Jersey** [2] - 1033:24,
1059:24
**Jewish** [13] - 970:7,
970:9, 970:14,
970:15, 970:18,
970:22, 987:6,
987:22, 988:14,
991:16, 992:22,
993:1, 993:19
**Jews** [3] - 990:20,
1048:11, 1048:13
**jig** [1] - 1068:17
**job** [1] - 1088:20
**jobs** [2] - 1039:18,
1039:19
**Joe** [16] - 969:22,
970:1, 970:5,
970:12, 970:13,
970:24, 971:4,
971:14, 971:21,
972:4, 992:21,
1034:3, 1048:10,
1048:18, 1082:9
**joint** [3] - 983:9,
1021:22, 1029:21
**joke** [5] - 990:21,
991:6, 991:18,
1050:9, 1068:16
**joking** [1] - 1049:17
**JONATHAN** [1] -
956:16
**jostled** [1] - 1041:8
**jostling** [1] - 1028:10
**joyful** [1] - 1032:20
**Judge** [6] - 958:10,
994:25, 1001:6,
1003:19, 1004:22,
1074:6
**JUDGE** [1] - 956:10
**judge** [4] - 1016:13,
1054:4, 1058:8,
1062:4
**judge's** [1] - 1058:9
**judges** [3] - 1007:18,
1010:22, 1086:6
**judging** [1] - 1016:17
**judgment** [4] -

1012:11, 1016:21,
1018:11, 1031:5
**juries** [1] - 1086:2
**juror** [9] - 1031:6,
1075:3, 1075:4,
1075:24, 1083:7,
1085:21, 1085:25,
1086:20
**jurors** [14] - 1000:21,
1003:5, 1004:17,
1008:4, 1008:5,
1008:21, 1011:14,
1011:20, 1075:8,
1084:15, 1085:13,
1085:19, 1086:9,
1086:14
**jury** [46] - 957:7,
959:14, 960:16,
963:24, 990:2,
991:1, 991:15,
991:22, 993:11,
994:22, 995:9,
995:11, 995:20,
1000:18, 1003:9,
1003:10, 1008:12,
1009:16, 1009:20,
1010:4, 1010:21,
1011:16, 1015:7,
1032:7, 1034:24,
1062:23, 1073:7,
1074:1, 1074:18,
1076:14, 1082:23,
1084:19, 1084:22,
1085:6, 1085:8,
1085:15, 1085:21,
1086:3, 1086:19,
1087:4, 1087:14,
1087:18, 1087:22,
1088:3, 1088:14
**JURY** [3] - 956:9,
1010:1, 1082:17
**Jury** [1] - 957:11
**justification** [1] -
1061:20
**justified** [1] - 1012:9
**juvenile** [1] - 1066:16

## K

**KAREN** [1] - 956:13
**KATHRYN** [1] - 956:13
**keep** [15] - 964:25,
965:8, 983:1,
987:19, 1004:23,
1004:24, 1005:2,
1008:23, 1032:9,
1039:2, 1039:3,
1039:18, 1041:7,
1060:25, 1080:2
**keeping** [1] - 1037:13

**keeps** [3] - 1050:9, 1082:2
**kept** [1] - 1069:5
**kind** [17] - 961:25, 982:10, 993:19, 993:23, 994:6, 994:11, 995:2, 1000:22, 1007:19, 1012:18, 1013:23, 1040:18, 1045:13, 1047:5, 1061:23, 1063:13, 1079:12
**kinds** [1] - 1035:16
**knife** [1] - 1071:1
**knocked** [1] - 986:19
**knowing** [5] - 988:23, 1019:19, 1026:3, 1047:21, 1068:23
**knowingly** [20] - 1006:6, 1021:10, 1021:24, 1022:2, 1024:11, 1025:2, 1027:1, 1027:2, 1027:3, 1027:19, 1028:2, 1028:3, 1028:25, 1029:7, 1029:8, 1030:7, 1030:16, 1030:17, 1059:2, 1059:11
**knowledge** [16] - 958:7, 1014:9, 1019:3, 1019:18, 1019:20, 1019:24, 1025:22, 1047:17, 1047:19, 1047:20, 1047:22, 1048:1, 1048:8, 1063:10, 1063:14, 1071:8
**knowledgeable** [1] - 1034:7
**known** [4] - 976:14, 1024:7, 1048:21, 1059:25
**knows** [13] - 993:3, 1034:11, 1034:12, 1035:6, 1036:12, 1051:8, 1051:14, 1052:8, 1056:13, 1072:15, 1079:21, 1079:22

## L

**labeled** [2] - 1078:20, 1079:5
**lack** [1] - 1013:19
**ladies** [11] - 959:15, 1009:21, 1010:2, 1032:16, 1059:7, 1076:15, 1076:18,

1077:23, 1079:21, 1081:18, 1082:18
**lady** [1] - 966:8
**laid** [1] - 982:3
**language** [21] - 985:1, 985:21, 985:22, 1001:4, 1001:13, 1001:17, 1002:9, 1003:18, 1004:23, 1005:1, 1005:6, 1005:20, 1005:25, 1006:12, 1006:19, 1007:19, 1018:19, 1018:20, 1018:22, 1019:2, 1061:21
**laptop** [2] - 1088:2, 1088:3
**large** [3] - 1033:12, 1035:11, 1055:8
**largely** [1] - 993:16
**largest** [1] - 1055:9
**lashed** [1] - 986:5
**last** [13] - 959:9, 959:10, 981:5, 981:10, 982:12, 982:15, 1005:17, 1023:24, 1034:16, 1036:23, 1051:24, 1059:11, 1086:8
**last-minute** [1] - 959:10
**late** [1] - 1087:10
**law** [23] - 983:22, 989:3, 1010:16, 1010:17, 1010:18, 1012:24, 1014:22, 1014:23, 1018:17, 1020:20, 1025:20, 1026:19, 1027:13, 1028:15, 1029:10, 1029:14, 1029:16, 1029:17, 1030:1, 1031:13, 1060:17, 1078:10, 1083:25
**lawful** [1] - 1026:25
**lawyer** [2] - 1015:22, 1015:23
**lawyer's** [1] - 1016:3
**lawyers** [3] - 1012:12, 1012:15, 1015:20
**lawyers'** [1] - 1015:24
**leading** [2] - 989:10, 1051:2
**learned** [3] - 1053:5, 1061:14, 1080:7
**least** [4] - 1025:12, 1066:25, 1071:14, 1087:20
**leave** [10] - 992:6, 1046:17, 1047:3,

1047:7, 1048:14, 1067:16, 1080:19, 1080:20, 1080:21, 1086:15
**leaves** [4] - 1047:8, 1053:1, 1053:17, 1067:22
**leaving** [4] - 991:5, 1046:18, 1047:15, 1080:9
**led** [3] - 962:9, 975:8, 1049:12
**left** [8] - 963:6, 981:3, 982:23, 1010:3, 1041:2, 1046:23, 1059:24, 1073:20
**left..** [1] - 1073:22
**legal** [1] - 1034:11
**legislature's** [1] - 1051:10
**legitimate** [1] - 971:1
**less** [2] - 958:5, 1043:17
**lesser** [3] - 1007:4, 1007:6, 1018:16
**letting** [1] - 985:14
**level** [1] - 1056:3
**liability** [3] - 1003:17, 1006:9, 1058:8
**liberty** [1] - 1050:15
**lie** [1] - 1045:1
**lies** [1] - 1059:5
**life** [6] - 985:13, 1014:1, 1061:17, 1062:1, 1064:10, 1065:9
**light** [1] - 1012:9
**likelihood** [1] - 1086:25
**likely** [5] - 966:21, 1013:12, 1028:7, 1070:1
**limited** [10] - 982:6, 990:17, 991:14, 991:22, 993:5, 993:10, 993:11, 998:10, 1029:2, 1064:20
**limiting** [3] - 958:14, 994:15, 1008:15
**limits** [1] - 1035:23
**line** [20] - 960:7, 960:24, 962:17, 973:9, 974:6, 975:25, 977:18, 977:22, 978:11, 978:18, 1033:2, 1033:16, 1035:4, 1035:20, 1035:23, 1038:25, 1041:18,

1042:9, 1054:14
**lines** [2] - 959:9, 999:4
**list** [2] - 998:14, 998:15
**listed** [4] - 998:9, 998:17, 1000:14, 1031:4
**listen** [4] - 1019:9, 1066:17, 1084:11, 1084:12
**listened** [1] - 1057:22
**listening** [1] - 1063:5
**LLC** [1] - 956:17
**loathing** [1] - 987:23
**located** [1] - 1029:2
**location** [1] - 967:8
**locked** [1] - 1037:6
**look** [21] - 958:3, 959:9, 978:9, 979:7, 979:18, 980:22, 993:3, 1001:5, 1005:13, 1007:17, 1037:11, 1040:21, 1055:22, 1064:18, 1067:5, 1068:15, 1071:7, 1071:19, 1071:25, 1073:9, 1073:10
**looked** [5] - 979:8, 986:16, 994:9, 1014:13, 1014:17
**looking** [5] - 959:4, 966:19, 1007:4, 1067:10, 1067:12
**looks** [5] - 959:8, 967:25, 1038:16, 1043:7, 1052:24
**lose** [2] - 1050:4, 1062:21
**loud** [2] - 1028:8, 1066:16
**LOUIS** [1] - 956:6
**love** [2] - 1052:22, 1069:7
**low** [1] - 993:18
**Lower** [1] - 1033:5
**lunch** [1] - 960:12

## M

**M4** [1] - 1039:1
**M4s** [1] - 1054:18
**ma'am** [74] - 960:14, 961:16, 961:20, 961:24, 962:4, 962:8, 962:10, 962:13, 962:16, 962:24, 963:1, 963:9, 963:15,

963:17, 963:20, 964:10, 964:21, 965:2, 965:5, 965:7, 965:12, 965:17, 966:9, 966:14, 966:18, 967:1, 967:4, 967:10, 967:19, 967:25, 968:2, 968:5, 968:12, 968:23, 969:2, 969:6, 969:12, 969:16, 969:20, 970:2, 970:16, 971:6, 971:12, 971:16, 971:22, 972:1, 972:5, 972:7, 972:11, 972:13, 972:16, 972:22, 973:3, 973:6, 974:2, 974:5, 974:17, 975:12, 975:18, 976:18, 976:24, 977:2, 977:6, 977:8, 978:2, 978:21, 979:5, 979:15, 979:23, 980:1, 980:5, 980:12, 1003:3
**mad** [4] - 1066:14, 1069:11, 1071:20
**Madam** [1] - 1038:15
**magically** [1] - 1051:3
**major** [2] - 1049:4, 1077:14
**majority** [1] - 1036:2
**Mall** [1] - 1055:11
**man** [9] - 976:10, 986:19, 1032:23, 1056:17, 1061:23, 1065:1, 1072:19, 1077:6, 1080:16
**manner** [4] - 1010:16, 1016:24, 1028:5, 1054:7
**manpower** [2] - 1046:14, 1046:15
**map** [1] - 1079:2
**maps** [1] - 1040:25
**marched** [1] - 1059:13
**marked** [4] - 1032:10, 1051:5, 1059:18, 1079:1
**marshal** [2] - 1085:5, 1085:13
**massive** [3] - 1050:23, 1055:8, 1073:1
**material** [2] - 991:12, 991:13
**materials** [1] - 991:10

**mathematical** [1] - 1014:4
**matter** [11] - 983:9, 1017:21, 1036:22, 1049:23, 1049:24, 1082:4, 1083:16, 1085:8, 1085:16, 1086:6, 1089:5
**matters** [6] - 1013:25, 1016:20, 1017:3, 1034:21, 1082:6, 1085:20
**Matthew** [1] - 1033:18
**MCFADDEN** [1] - 956:10
**mean** [15] - 973:19, 975:3, 975:5, 976:8, 978:9, 982:22, 987:16, 1002:14, 1004:19, 1050:1, 1053:12, 1064:21, 1066:11, 1066:14, 1081:6
**meandering** [1] - 1067:14
**meaning** [10] - 984:2, 1027:2, 1028:1, 1028:3, 1029:5, 1029:7, 1030:14, 1030:16, 1030:18, 1052:4
**meanings** [1] - 1030:9
**means** [20] - 970:2, 976:3, 1014:23, 1016:17, 1021:21, 1022:4, 1022:7, 1027:4, 1035:15, 1041:14, 1041:19, 1054:6, 1054:8, 1058:11, 1064:12, 1064:22, 1066:13, 1084:25, 1085:14, 1087:10
**meant** [5] - 969:25, 985:4, 1031:16, 1052:1, 1052:2
**meantime** [2] - 1039:15, 1045:7
**media** [4] - 985:17, 985:18, 1049:2, 1084:10
**meet** [2] - 1038:12, 1039:16
**meeting** [3] - 1035:1, 1037:1, 1051:24
**meetings** [1] - 1030:11
**meets** [1] - 1056:18
**member** [2] - 1085:6, 1085:8

**members** [20] - 979:24, 1033:11, 1034:18, 1036:20, 1036:25, 1037:20, 1038:12, 1039:23, 1043:18, 1044:2, 1045:2, 1046:13, 1053:4, 1060:13, 1060:24, 1064:24, 1073:7, 1082:6, 1085:5
**members'** [1] - 1046:25
**memory** [7] - 1011:12, 1011:18, 1011:20, 1011:21, 1017:1, 1017:7
**mens** [1] - 1000:20
**mental** [3] - 1023:13, 1077:1, 1084:6
**mentioned** [4] - 961:9, 961:21, 962:2, 972:8
**mere** [1] - 1060:2
**merely** [7] - 1012:16, 1018:17, 1023:11, 1023:17, 1026:1, 1026:2
**merits** [1] - 1085:9
**message** [2] - 974:24, 1053:20
**messages** [10] - 969:18, 971:8, 971:13, 1048:21, 1049:9, 1050:19, 1050:25, 1053:25, 1056:23, 1057:18
**messed** [1] - 1074:24
**met** [5] - 980:3, 980:9, 1018:25, 1033:11, 1082:1
**metal** [1] - 1035:11
**middle** [1] - 1039:9
**might** [14] - 962:9, 981:24, 993:3, 1003:5, 1005:21, 1008:24, 1011:6, 1015:16, 1015:19, 1043:16, 1059:22, 1059:23, 1059:25, 1069:21
**Mike** [16] - 976:21, 977:1, 978:24, 979:1, 979:12, 979:22, 980:14, 988:19, 988:24, 1034:10, 1034:20, 1052:8, 1053:3, 1055:20, 1055:21, 1080:24
**mile** [1] - 1055:12

**militarized** [1] - 1047:5
**military** [2] - 1032:23, 1050:2
**milled** [1] - 1067:8
**milling** [2] - 1080:9, 1080:18
**mind** [8] - 958:22, 962:18, 965:18, 977:12, 1000:1, 1020:8, 1032:9, 1085:11
**mindful** [1] - 1083:2
**minor** [1] - 994:6
**minus** [1] - 1051:2
**minute** [4] - 959:10, 990:11, 1042:19, 1058:4
**minutes** [29] - 964:16, 964:19, 994:20, 994:22, 995:17, 1009:9, 1009:13, 1035:24, 1037:20, 1039:20, 1041:20, 1044:10, 1045:9, 1047:8, 1047:9, 1053:5, 1053:17, 1060:5, 1067:10, 1067:14, 1067:19, 1067:22, 1067:23, 1067:24, 1073:23, 1074:3, 1074:17, 1080:10, 1087:25
**misinformation** [1] - 1034:5
**misrecollection** [1] - 1017:18
**miss** [1] - 1074:6
**missing** [4] - 971:9, 976:2, 1001:25, 1002:3
**mission** [4] - 1003:20, 1032:24, 1082:13, 1083:3
**misstate** [1] - 1001:3
**mistake** [5] - 1022:1, 1033:1, 1040:14, 1059:3, 1059:12
**misunderstood** [1] - 1006:23
**mix** [1] - 1040:22
**mob** [5] - 1052:14, 1058:6, 1082:6, 1082:7
**mob's** [1] - 1060:16
**mocked** [1] - 986:5
**modifies** [1] - 1031:14
**moment** [4] - 959:6, 1053:24, 1070:9, 1073:17

**Monday** [1] - 1063:16
**months** [2] - 975:1, 981:10
**morning** [5] - 971:7, 981:25, 1034:2, 1059:24, 1087:15
**most** [8] - 966:21, 970:18, 972:22, 975:2, 1049:11, 1056:20, 1056:21, 1069:4
**mother** [1] - 1061:19
**motion** [2] - 960:4, 993:16
**motioning** [3] - 966:6, 1043:8, 1043:14
**motive** [2] - 1017:2, 1029:15
**move** [10] - 963:8, 996:11, 997:1, 997:11, 997:16, 997:19, 1004:11, 1004:13, 1009:11, 1038:23
**moved** [2] - 982:15, 1059:18
**moves** [3] - 986:18, 1035:10, 1054:16
**MR** [54] - 958:10, 959:13, 980:20, 981:2, 982:5, 982:13, 983:6, 989:12, 989:18, 989:21, 990:8, 992:3, 994:20, 994:25, 995:12, 995:14, 998:3, 998:7, 998:20, 998:24, 999:2, 999:6, 999:15, 999:17, 999:20, 999:23, 1000:25, 1001:8, 1001:11, 1002:16, 1002:19, 1004:8, 1004:14, 1004:18, 1004:22, 1005:5, 1007:4, 1007:10, 1007:22, 1008:3, 1008:11, 1009:13, 1009:15, 1009:18, 1009:23, 1056:25, 1057:3, 1060:23, 1074:6, 1074:8, 1074:21, 1075:25, 1076:13, 1088:13
**MS** [81] - 958:15, 958:22, 959:1, 959:22, 959:24, 960:19, 960:21,

960:22, 963:25, 964:5, 964:6, 979:20, 980:17, 981:11, 981:15, 981:18, 982:18, 983:3, 989:10, 989:15, 990:11, 990:13, 990:16, 991:13, 992:18, 994:13, 994:16, 995:7, 995:25, 996:10, 996:14, 996:17, 996:19, 996:23, 997:3, 997:5, 997:22, 997:25, 1000:1, 1000:5, 1000:15, 1001:22, 1002:6, 1002:10, 1002:21, 1002:24, 1003:1, 1003:4, 1003:12, 1005:11, 1005:25, 1006:18, 1006:23, 1007:13, 1007:21, 1008:17, 1008:24, 1009:3, 1009:5, 1009:7, 1032:16, 1057:8, 1057:13, 1057:16, 1073:23, 1074:1, 1074:10, 1074:12, 1074:20, 1074:25, 1075:7, 1075:10, 1075:15, 1075:19, 1075:22, 1076:2, 1076:18, 1088:1, 1088:7, 1088:10, 1088:18
**multiple** [7] - 983:14, 983:16, 987:14, 997:23, 1064:22, 1068:12, 1077:9
**murder** [2] - 1065:12
**must** [38] - 1000:13, 1012:17, 1013:14, 1013:15, 1015:9, 1015:10, 1015:22, 1016:4, 1016:12, 1019:13, 1019:16, 1021:3, 1021:18, 1022:4, 1022:6, 1022:25, 1023:12, 1023:19, 1024:16, 1025:13, 1026:13, 1026:20, 1027:14, 1028:16, 1029:11, 1030:2, 1031:3, 1031:5, 1031:6, 1031:7, 1031:15, 1050:15, 1054:5, 1069:20, 1083:18, 1084:11, 1084:12,

1086:8
**mutual** [1] - 1083:6

# N

**name** [4] - 1007:23, 1013:17, 1051:7, 1086:16
**narrow** [1] - 1042:10
**narrowed** [1] - 959:11
**narrowed-down** [1] - 959:11
**National** [1] - 1055:11
**natural** [7] - 1019:25, 1021:11, 1048:2, 1048:4, 1052:16, 1061:2, 1061:11
**nature** [4] - 991:17, 1015:7, 1015:9, 1021:25
**Naval** [1] - 1070:24
**NCIS** [5] - 976:1, 983:9, 1061:12, 1068:1, 1068:22
**near** [2] - 1009:2, 1069:10
**necessarily** [3] - 1006:3, 1015:13, 1084:8
**necessary** [7] - 1006:20, 1013:12, 1020:8, 1023:24, 1024:8, 1080:21, 1085:3
**need** [34] - 960:8, 961:1, 994:19, 995:1, 995:20, 999:24, 1005:11, 1006:11, 1010:7, 1021:15, 1025:15, 1025:19, 1036:19, 1037:19, 1038:20, 1039:21, 1043:8, 1044:17, 1044:19, 1049:21, 1053:13, 1053:18, 1068:18, 1069:14, 1069:15, 1074:1, 1079:11, 1086:18, 1087:3, 1087:10, 1087:12, 1087:13, 1088:11
**needed** [3] - 971:14, 1033:14, 1043:14
**needing** [1] - 1046:9
**needs** [2] - 994:12, 1025:10
**neon** [1] - 1064:11
**never** [20] - 970:9, 981:7, 982:5, 984:7,

987:16, 992:8, 992:9, 1003:12, 1003:14, 1003:23, 1012:24, 1068:23, 1069:14, 1069:16, 1070:21, 1071:23, 1085:7, 1085:11, 1085:14
**new** [2] - 977:23, 991:11
**New** [2] - 1033:24, 1059:24
**newspaper** [1] - 1084:8
**next** [66] - 973:16, 975:13, 978:3, 986:21, 1004:12, 1006:5, 1035:8, 1035:11, 1036:5, 1036:13, 1037:10, 1038:11, 1038:21, 1039:23, 1040:7, 1040:20, 1040:22, 1041:15, 1041:22, 1042:6, 1042:12, 1042:18, 1042:22, 1043:15, 1045:3, 1045:5, 1045:17, 1046:4, 1046:12, 1046:16, 1046:22, 1047:1, 1047:10, 1047:16, 1048:8, 1048:20, 1049:2, 1049:8, 1049:21, 1050:6, 1050:17, 1050:19, 1050:24, 1051:13, 1051:25, 1052:9, 1052:13, 1052:17, 1052:23, 1053:8, 1053:16, 1054:1, 1054:2, 1055:3, 1058:3, 1058:10, 1058:18, 1058:25, 1059:15, 1059:21, 1072:20, 1075:20, 1080:9
**nice** [4] - 976:7, 978:15, 1081:5, 1088:20
**night** [3] - 971:3, 971:7, 1050:25
**nine** [3] - 1076:12, 1087:8, 1087:20
**nobody's** [2] - 1061:21, 1073:11
**none** [1] - 1082:6
**nonlethal** [6] - 962:12, 962:14, 963:3, 963:12, 1054:14, 1059:20

**normal** [1] - 1028:12
**normally** [1] - 1003:13
**North** [1] - 956:17
**note** [7] - 1008:24, 1010:13, 1011:22, 1035:10, 1067:18, 1085:4, 1085:7
**note-taker's** [1] - 1011:22
**notebook** [1] - 1086:16
**notebooks** [1] - 1011:15
**notes** [8] - 1010:7, 1011:15, 1011:17, 1011:21, 1011:22, 1075:1, 1075:3, 1075:12
**nothing** [8] - 994:10, 994:11, 1031:11, 1031:13, 1031:14, 1070:25, 1072:13, 1086:11
**notice** [1] - 1019:12
**November** [2] - 1051:18, 1052:2
**number** [8] - 1005:16, 1015:14, 1015:17, 1015:18, 1031:18, 1044:25, 1076:4, 1086:17
**numbering** [1] - 1074:24
**numbers** [2] - 1075:24, 1076:5
**numerous** [3] - 971:8, 971:13, 1048:9
**NW** [2] - 956:14, 956:20

# O

**o'clock** [6] - 1053:1, 1070:2, 1070:10, 1076:12, 1087:8, 1087:20
**oath** [2] - 959:19, 1063:23
**object** [5] - 959:7, 1015:25, 1035:11, 1066:6, 1080:14
**objected** [1] - 1015:20
**objecting** [2] - 1006:18, 1015:22
**objection** [7] - 958:13, 981:11, 983:5, 989:10, 989:15, 1016:3, 1051:12
**objections** [6] -

959:10, 995:6, 995:10, 1015:23, 1034:19, 1035:2
**obligation** [2] - 1057:4, 1057:7
**observe** [1] - 1017:3
**observed** [1] - 1016:19
**obstruct** [11] - 999:3, 1005:19, 1020:21, 1021:6, 1021:8, 1021:12, 1022:9, 1059:2, 1059:9, 1063:2
**obstructed** [1] - 1059:1
**obstructing** [6] - 1020:19, 1021:3, 1022:13, 1030:11, 1063:1, 1076:24
**obstruction** [27] - 995:21, 995:22, 996:8, 996:21, 996:25, 997:9, 997:15, 997:17, 998:23, 999:14, 1000:11, 1002:12, 1003:10, 1004:11, 1004:12, 1004:17, 1004:25, 1005:3, 1005:16, 1005:22, 1005:23, 1008:19, 1008:20, 1031:1, 1062:25, 1073:8, 1073:9
**Obstruction** [18] - 1022:20, 1022:21, 1022:23, 1022:25, 1023:4, 1023:6, 1023:10, 1023:16, 1023:20, 1024:2, 1024:14, 1024:18, 1024:21, 1025:4, 1025:7, 1026:11, 1058:25, 1060:11
**obstructs** [1] - 1022:15
**obtained** [1] - 959:3
**obviously** [2] - 995:3, 1002:14
**OC** [5] - 961:23, 962:12, 963:3, 1035:5, 1035:15
**occupy** [1] - 1066:24
**occur** [1] - 1070:7
**occurred** [3] - 995:19, 1027:22, 1070:2
**occurring** [4] - 999:11, 1000:8, 1002:7, 1030:23

**occurs** [2] - 1028:4, 1036:14
**October** [2] - 1048:22, 1050:20
**OF** [3] - 956:1, 956:3, 956:9
**Off-the-record** [1] - 1076:8
**offense** [45] - 996:16, 997:14, 998:9, 1001:1, 1001:2, 1004:12, 1006:15, 1013:3, 1013:5, 1013:7, 1013:9, 1020:9, 1020:10, 1020:22, 1020:23, 1020:25, 1021:1, 1021:16, 1023:5, 1024:3, 1024:4, 1024:6, 1024:16, 1024:19, 1025:1, 1025:4, 1025:7, 1025:10, 1025:12, 1025:14, 1025:16, 1025:19, 1026:3, 1026:6, 1026:10, 1026:14, 1026:20, 1027:14, 1028:16, 1030:2, 1064:19, 1066:1, 1073:10
**offenses** [20] - 996:16, 997:1, 997:3, 997:11, 997:14, 997:16, 997:19, 998:23, 1000:14, 1004:24, 1007:18, 1008:14, 1019:4, 1020:16, 1031:4, 1058:20, 1069:20, 1073:8, 1073:14
**offensive** [9] - 988:4, 993:22, 993:25, 1018:21, 1061:20, 1062:4, 1063:18, 1068:19, 1071:14
**offered** [1] - 1015:21
**Office** [2] - 956:14, 1043:20
**Officer** [27] - 1033:18, 1033:20, 1036:21, 1037:16, 1037:19, 1037:21, 1042:25, 1043:25, 1044:1, 1044:3, 1044:7, 1044:14, 1044:17, 1044:23, 1045:11, 1045:14, 1045:16, 1045:22, 1046:5, 1056:6, 1058:18, 1077:25, 1078:1,

1078:7, 1078:19, 1078:25, 1079:20
**officer** [17] - 985:21, 986:1, 1018:17, 1037:6, 1037:7, 1038:17, 1046:12, 1062:20, 1066:7, 1078:2, 1078:4, 1078:9, 1078:11, 1078:19, 1079:13, 1079:15
**officer's** [2] - 1018:12, 1018:14
**officers** [30] - 965:22, 965:23, 969:5, 986:20, 986:23, 1033:3, 1033:15, 1035:5, 1035:16, 1037:12, 1038:24, 1041:5, 1043:6, 1043:18, 1043:24, 1044:11, 1044:12, 1044:20, 1045:9, 1045:23, 1046:6, 1046:7, 1046:17, 1046:19, 1054:17, 1054:18, 1059:20, 1072:4, 1080:1, 1080:18
**officers'** [1] - 1036:18
**offices** [1] - 1044:3
**Official** [19] - 1022:20, 1022:21, 1022:23, 1022:25, 1023:4, 1023:6, 1023:11, 1023:17, 1023:21, 1024:2, 1024:14, 1024:18, 1024:22, 1025:5, 1025:7, 1026:12, 1058:25, 1060:12, 1089:3
**official** [27] - 996:21, 999:3, 1005:16, 1005:22, 1005:23, 1006:6, 1020:19, 1020:21, 1021:3, 1021:7, 1021:9, 1021:12, 1021:14, 1021:15, 1021:17, 1021:19, 1021:21, 1022:9, 1022:15, 1027:21, 1027:24, 1048:6, 1059:1, 1059:9, 1060:2, 1076:24, 1082:9
**officials** [1] - 1051:6
**often** [3] - 988:13, 1024:6, 1086:4
**older** [1] - 1075:19
**omissions** [1] -

1032:2
**once** [3] - 964:24, 978:23, 1032:24
**one** [70] - 973:12, 975:15, 980:21, 987:22, 987:23, 995:23, 996:4, 996:5, 997:23, 999:22, 1000:17, 1001:1, 1001:2, 1002:23, 1002:24, 1003:13, 1003:15, 1003:18, 1003:19, 1003:21, 1004:10, 1004:21, 1008:20, 1013:14, 1014:24, 1015:6, 1015:17, 1020:13, 1025:18, 1034:1, 1035:12, 1036:8, 1037:3, 1037:21, 1040:3, 1040:8, 1046:2, 1046:3, 1049:14, 1056:3, 1059:16, 1061:16, 1062:24, 1063:3, 1064:10, 1064:19, 1064:21, 1065:2, 1065:19, 1067:15, 1068:16, 1071:18, 1074:6, 1074:20, 1074:21, 1075:6, 1075:20, 1075:23, 1077:10, 1082:8, 1084:8, 1085:5, 1085:24, 1087:4, 1087:10, 1087:12
**ones** [3] - 966:7, 1050:3, 1073:22
**ongoing** [3] - 984:8, 1001:14, 1045:5
**open** [5] - 992:8, 1047:15, 1071:25, 1085:10, 1085:15
**opened** [3] - 990:19, 991:21, 993:8
**opening** [1] - 1055:4
**operation** [1] - 1058:17
**opinion** [5] - 1011:8, 1018:22, 1031:12, 1072:24, 1085:22
**opportunities** [2] - 1054:21, 1078:6
**opportunity** [4] - 983:11, 985:11, 1017:3, 1047:4
**oppose** [1] - 1066:22
**opposed** [3] - 985:9, 992:6, 998:11

**opposite** [2] - 1015:19, 1066:19
**or..** [1] - 999:16
**orally** [1] - 1085:9
**order** [14] - 997:6, 997:7, 1001:11, 1021:2, 1022:24, 1024:13, 1026:19, 1027:13, 1028:15, 1030:1, 1031:6, 1038:20
**orderly** [6] - 1010:15, 1027:20, 1027:23, 1028:23, 1029:19, 1030:10
**ordinarily** [2] - 1019:18, 1047:20
**ordinary** [1] - 1030:8
**organize** [1] - 1083:5
**oriented** [1] - 967:11
**origin** [1] - 1011:4
**Orwell's** [1] - 1056:12
**otherwise** [7] - 995:2, 1026:10, 1027:5, 1031:21, 1035:22, 1046:15, 1074:4
**out-of-context** [1] - 1068:7
**outcome** [1] - 1017:5
**outfits** [1] - 966:15
**outnumbered** [1] - 1046:9
**outset** [2] - 1010:6, 1085:24
**outside** [14] - 961:22, 986:17, 989:9, 989:19, 1033:7, 1035:3, 1043:13, 1046:9, 1050:23, 1055:19, 1055:24, 1070:8, 1076:22, 1080:11
**outward** [1] - 1049:5
**overarching** [1] - 1007:6
**overjoyed** [1] - 1065:5
**overload** [1] - 986:16
**overruled** [2] - 983:5, 989:16
**overrun** [1] - 1046:23
**overwhelm** [1] - 1039:6
**overwhelmed** [1] - 1044:25
**own** [16] - 990:23, 991:7, 991:15, 993:12, 1011:20, 1011:21, 1011:22, 1033:6, 1033:13, 1034:22, 1035:5,

1043:11, 1050:7, 1065:1, 1070:21
**owns** [1] - 1071:1

**P**

**p.m** [24] - 956:6, 959:14, 960:1, 967:9, 968:13, 968:22, 975:14, 980:10, 980:14, 990:2, 996:18, 1009:20, 1035:1, 1035:9, 1036:14, 1037:3, 1038:11, 1046:12, 1053:1, 1074:18, 1076:9, 1076:14, 1087:18, 1088:21
**PA** [1] - 956:18
**page** [22] - 960:7, 960:15, 960:23, 973:9, 973:11, 973:12, 973:13, 973:16, 974:6, 974:22, 974:23, 975:13, 975:24, 977:15, 977:18, 978:3, 996:17, 1005:16, 1006:2, 1006:4, 1006:10, 1086:15
**pages** [2] - 1006:5, 1089:4
**pants** [1] - 1053:14
**paper** [2] - 1088:3, 1088:4
**papers** [1] - 1046:25
**parade** [2] - 972:19, 1030:8
**paraded** [1] - 1030:5
**parading** [1] - 1029:25
**paragraph** [2] - 958:5, 1005:18
**pardon** [1] - 1000:1
**park** [1] - 985:9
**part** [20] - 985:6, 987:22, 987:23, 987:25, 988:1, 988:24, 991:7, 1016:8, 1025:16, 1028:8, 1033:22, 1040:16, 1048:12, 1052:23, 1059:12, 1065:5, 1065:6, 1080:20
**participated** [2] - 1026:14, 1058:6
**participates** [1] -

1058:12
**participation** [1] - 1025:11
**particular** [4] - 1010:10, 1014:25, 1019:16, 1066:1
**parties** [3] - 1008:2, 1012:3, 1012:4
**partisans** [1] - 1086:6
**parts** [3] - 1006:5, 1025:18, 1044:16
**Party** [4] - 970:21, 987:6, 992:22, 1048:18
**party** [3] - 1015:24, 1032:5, 1054:22
**pass** [1] - 1043:3
**passages** [1] - 990:22
**passageways** [1] - 1030:11
**passed** [1] - 1023:13
**passing** [1] - 1056:4
**past** [2] - 996:2, 1044:1
**patience** [4] - 959:2, 1055:3, 1060:24, 1087:17
**patriots** [1] - 1050:16
**Pause** [2] - 964:2, 1003:2
**pause** [9] - 964:14, 965:1, 965:15, 966:4, 966:12, 966:24, 967:7, 968:10, 968:21
**pawns** [1] - 1049:25
**pay** [2] - 1064:7
**Pence** [2] - 976:6, 976:15, 976:22, 977:1, 978:15, 978:24, 979:1, 979:12, 979:22, 980:14, 988:19, 988:24, 1034:10, 1034:20, 1037:5, 1052:8, 1053:3, 1055:20, 1055:21, 1080:24, 1081:4, 1081:11, 1081:15
**pending** [2] - 1021:15, 1021:17
**Pennsylvania** [2] - 1052:3, 1055:12
**people** [52] - 960:6, 960:8, 960:25, 961:1, 961:7, 961:14, 963:4, 966:6, 969:1, 977:20, 985:12, 988:5, 990:20,

1017:6, 1024:8,
1033:14, 1036:7,
1037:13, 1038:18,
1039:13, 1039:19,
1040:5, 1040:21,
1041:11, 1042:9,
1043:8, 1043:13,
1043:15, 1046:16,
1048:25, 1050:13,
1052:20, 1052:25,
1054:16, 1063:11,
1063:19, 1064:6,
1064:9, 1064:23,
1065:16, 1065:17,
1066:15, 1067:16,
1068:18, 1070:15,
1070:23, 1071:8,
1071:22, 1079:8,
1079:10, 1079:11
**perfect** [1] - 1073:25
**performed** [3] -
1024:25, 1025:2,
1025:9
**perimeter** [1] -
1038:25
**period** [2] - 1065:20,
1066:23
**permitted** [4] - 982:19,
1011:14, 1012:7,
1015:1
**person** [43] - 973:7,
974:3, 992:1,
993:12, 1006:14,
1006:16, 1012:17,
1013:24, 1014:13,
1016:25, 1019:19,
1019:25, 1021:24,
1022:8, 1024:3,
1024:4, 1024:5,
1024:6, 1024:12,
1027:6, 1027:8,
1028:4, 1028:5,
1028:6, 1028:10,
1028:11, 1036:23,
1036:24, 1045:18,
1045:20, 1047:21,
1048:2, 1058:15,
1063:20, 1069:16,
1070:19, 1074:25,
1085:1, 1085:12,
1087:10, 1087:11,
1087:13
**person's** [1] - 1028:6
**personal** [3] -
1011:22, 1018:22,
1086:11
**persons** [4] - 984:23,
985:15, 1017:17,
1026:1
**perspective** [1] -

978:6
**pertaining** [1] -
1004:25
**pertains** [2] - 1017:21,
1066:25
**phase** [1] - 1025:16
**phases** [1] - 1025:19
**phone** [1] - 1086:17
**physical** [1] - 1084:6
**physically** [1] -
1083:22
**pick** [1] - 1066:7
**picked** [1] - 1076:4
**picket** [1] - 1030:8
**picketed** [1] - 1030:5
**picketing** [1] -
1029:25
**picking** [1] - 1080:11
**picks** [1] - 1035:9
**picture** [1] - 1071:24
**pictures** [2] - 1031:21,
1046:25
**piece** [5] - 982:16,
986:9, 1046:7,
1065:7, 1071:21
**pile** [3] - 1038:2
**pinch** [3] - 1041:10,
1043:24, 1045:23
**pink** [1] - 1074:13
**place** [5] - 984:4,
992:6, 1039:22,
1044:9, 1045:3
**places** [1] - 1082:3
**placing** [1] - 965:23
**Plaintiff** [1] - 956:4
**plan** [7] - 976:11,
978:19, 1066:21,
1066:22, 1066:23,
1081:9
**plans** [2] - 1023:17,
1050:21
**plastic** [1] - 1065:13
**platform** [2] - 985:9,
1073:1
**play** [17] - 964:11,
964:24, 965:9,
965:13, 965:20,
966:2, 966:10,
966:22, 967:5,
968:8, 968:19,
1035:16, 1036:16,
1042:1, 1042:16,
1046:10, 1052:11
**played** [19] - 964:13,
965:3, 965:10,
965:14, 966:3,
966:11, 966:23,
967:6, 968:9,
968:20, 1031:22,
1036:17, 1040:10,

1042:1, 1042:5,
1042:17, 1045:6,
1046:11, 1052:12
**playing** [1] - 963:23
**plaza** [1] - 1055:10
**pled** [1] - 996:3
**point** [17] - 969:4,
976:25, 993:23,
994:6, 1006:19,
1037:13, 1037:22,
1041:10, 1043:6,
1043:24, 1045:23,
1047:15, 1057:7,
1068:17, 1070:20,
1074:21, 1077:19
**pointed** [2] - 967:20,
1041:1
**pointing** [2] - 968:3,
1047:6
**points** [2] - 992:20,
992:25
**Police** [9] - 1035:4,
1037:7, 1039:2,
1041:13, 1042:22,
1043:19, 1045:8,
1054:10, 1060:14
**police** [45] - 962:22,
963:3, 963:10,
965:22, 965:23,
969:5, 985:21,
986:8, 986:20,
986:23, 987:2,
987:4, 1018:12,
1018:17, 1033:3,
1033:15, 1041:8,
1041:9, 1041:18,
1042:7, 1043:6,
1045:22, 1047:12,
1054:13, 1059:20,
1062:20, 1065:21,
1066:7, 1066:10,
1066:22, 1066:25,
1067:18, 1069:10,
1072:3, 1077:22,
1078:2, 1078:4,
1078:9, 1080:1,
1080:3, 1083:18,
1084:1
**polite** [1] - 1062:2
**politically** [2] - 972:8,
972:20
**politics** [5] - 969:10,
991:16, 1048:16,
1063:10, 1077:15
**portion** [5] - 976:19,
991:15, 1010:10,
1031:19, 1031:23
**portions** [7] - 991:22,
993:11, 1019:9,
1031:20, 1031:24,

1032:1, 1032:3
**posed** [3] - 976:21,
976:23, 988:22
**position** [7] - 1002:14,
1004:6, 1006:11,
1007:15, 1007:25,
1008:3, 1085:25
**possession** [1] -
1028:6
**possibility** [1] -
1086:20
**possible** [10] - 993:8,
998:16, 1050:23,
1063:20, 1077:3,
1077:5, 1083:10,
1086:18
**possibly** [1] - 988:15
**post** [2] - 1043:6,
1046:18
**post-up** [1] - 1043:6
**posted** [2] - 1027:4,
1043:25
**posts** [1] - 1037:24
**potentially** [2] - 994:9,
1040:8
**powerful** [1] - 1013:15
**PowerPoint** [1] -
1034:24
**practice** [1] - 1009:8
**praying** [1] - 1030:12
**precedent** [1] - 997:6
**preference** [3] -
998:16, 1088:4,
1088:6
**prejudice** [2] - 1011:2,
1018:7
**prejudiced** [1] -
1018:6
**prejudicial** [2] -
993:18, 994:3
**premise** [3] - 978:5,
978:6, 984:12
**premises** [3] - 983:14,
983:16, 1069:2
**prep** [1] - 981:20
**preparation** [1] -
1023:18
**prepared** [1] - 982:9
**presence** [1] -
1060:15
**present** [2] - 1026:2,
1084:4
**presented** [5] -
992:13, 993:13,
1015:5, 1015:11,
1084:13
**presenting** [2] -
991:25, 992:14
**presents** [1] - 1042:21
**preside** [1] - 1082:24

**presidency** [1] -
1070:18
**President** [11] -
969:13, 969:15,
972:24, 1032:21,
1037:5, 1048:19,
1070:11, 1070:12,
1070:16, 1072:18,
1082:10
**president** [7] - 977:23,
1027:9, 1027:10,
1039:24, 1040:3,
1040:6, 1064:15
**president's** [1] -
1072:25
**presidential** [5] -
972:21, 1029:23,
1038:1, 1040:13,
1048:23
**presiding** [2] - 1037:5,
1038:17
**press** [3] - 966:10,
1042:10, 1072:14
**pressured** [1] -
1083:22
**presumed** [1] -
1012:20
**presumption** [1] -
1012:21
**presumptions** [1] -
1069:3
**pretty** [3] - 969:17,
1001:4, 1087:15
**prevent** [2] - 1033:17,
1038:3
**preventing** [1] -
1041:10
**previously** [2] - 972:9,
990:17
**price** [1] - 1050:15
**pride** [2] - 1052:19,
1085:24
**principal** [2] - 1024:7,
1058:15
**print** [1] - 999:25
**privacy** [1] - 1031:25
**private** [1] - 1084:18
**privilege** [1] - 1022:12
**probability** [1] -
1018:1
**probable** [6] -
1013:13, 1020:1,
1021:11, 1048:2,
1048:4, 1052:16
**probative** [1] - 993:18
**problem** [2] - 970:11,
970:13
**problematic** [1] -
1068:2
**procedure** [2] -

1052:2, 1060:7
**proceed** [1] - 1086:5
**proceeded** [1] -
963:16
**Proceeding** [18] -
1022:21, 1022:22,
1022:23, 1022:25,
1023:4, 1023:6,
1023:11, 1023:17,
1023:21, 1024:2,
1024:14, 1024:19,
1024:22, 1025:5,
1025:8, 1026:12,
1058:25, 1060:12
**proceeding** [30] -
996:21, 999:3,
1005:17, 1005:23,
1005:24, 1006:6,
1020:19, 1020:21,
1021:3, 1021:7,
1021:9, 1021:12,
1021:14, 1021:15,
1021:17, 1021:19,
1021:21, 1022:10,
1022:11, 1022:13,
1022:16, 1022:17,
1039:22, 1048:6,
1059:2, 1059:10,
1060:2, 1076:24,
1082:9
**Proceedings** [1] -
956:24
**proceedings** [2] -
1088:21, 1089:5
**process** [16] - 976:10,
977:19, 977:23,
1028:12, 1034:7,
1034:11, 1034:12,
1034:14, 1034:16,
1062:17, 1064:7,
1064:8, 1066:8,
1081:8, 1086:11
**processes** [2] -
1034:15, 1072:20
**produce** [2] - 1013:1,
1028:7
**produced** [1] - 956:24
**professors** [1] -
1049:2
**progressing** [1] -
963:5
**project** [1] - 985:19
**promised** [1] -
1083:23
**promote** [1] - 1083:8
**prompted** [1] - 985:24
**prone** [1] - 1045:1
**proof** [3] - 1013:14,
1029:14, 1029:17
**proper** [2] - 992:16,

1015:22
**properly** [1] - 1011:25
**property** [1] - 1028:6
**proposed** [4] - 958:13,
994:15, 1004:9,
1008:16
**proposes** [1] -
1005:21
**protect** [1] - 1036:21
**protected** [3] - 1027:6,
1027:8, 1076:23
**protecting** [1] -
1046:21
**protects** [1] - 1060:17
**protest** [2] - 975:23,
1036:3
**protester** [2] - 1047:5,
1060:3
**protesters** [9] - 986:9,
1036:1, 1039:2,
1040:23, 1041:6,
1046:8, 1047:10,
1054:15, 1072:23
**proud** [1] - 1052:18,
1053:2
**prove** [13] - 982:20,
1012:25, 1013:7,
1013:12, 1014:3,
1014:5, 1021:18,
1023:23, 1024:24,
1026:8, 1026:13,
1031:16, 1065:25
**proved** [15] - 1000:12,
1016:10, 1019:18,
1020:6, 1021:4,
1023:1, 1023:12,
1024:16, 1026:21,
1027:15, 1028:17,
1029:12, 1030:3,
1031:2, 1047:20
**proven** [5] - 1012:8,
1012:23, 1013:2,
1059:8
**provide** [3] - 974:13,
1050:12
**provided** [4] - 982:20,
1004:20, 1008:2,
1031:9
**proving** [2] - 1013:10,
1014:23
**proximity** [1] - 962:21
**psychologically** [1] -
1083:23
**public** [1] - 1071:25
**publicity** [2] -
1072:11, 1084:14
**published** [1] -
1034:24
**Puerto** [1] - 987:22
**pull** [6] - 960:15,

965:24, 975:24,
1000:18, 1045:16,
1051:16
**pulled** [1] - 1078:3
**pulling** [3] - 1045:18,
1054:9, 1063:13
**pundits** [1] - 1070:19
**punishment** [2] -
1083:10, 1083:16
**puppet** [6] - 969:22,
969:24, 970:1,
970:6, 992:21,
1048:18
**purple** [2] - 1074:12,
1075:20
**purpose** [10] - 973:17,
991:1, 1022:5,
1025:3, 1026:9,
1029:13, 1029:15,
1029:16, 1054:6,
1062:8
**purposes** [1] -
1029:19
**push** [6] - 1039:5,
1047:12, 1051:4
**pushed** [4] - 1038:8,
1038:10, 1039:13,
1041:7
**pushing** [1] - 1040:19
**put** [13] - 967:15,
979:9, 990:10,
990:17, 1005:1,
1007:24, 1008:13,
1034:5, 1061:24,
1063:23, 1068:3,
1070:11, 1073:4
**putting** [2] - 1060:13,
1067:25

## Q

**quantify** [1] - 969:24
**questioning** [2] -
1084:3, 1084:4
**questions** [19] - 965:1,
975:19, 980:17,
983:8, 983:11,
983:25, 984:1,
989:22, 992:19,
993:5, 1010:12,
1010:16, 1012:14,
1015:6, 1062:25,
1063:3, 1065:22,
1069:2, 1069:4
**quick** [4] - 975:19,
986:24, 1001:5,
1009:16
**quickly** [3] - 1008:17,
1009:17, 1063:17

**quiet** [1] - 1030:12
**quite** [2] - 967:13,
982:13
**quote** [4] - 975:21,
1033:22, 1045:17,
1048:25
**quoted** [1] - 960:6
**quotes** [1] - 1056:12
**quoting** [2] - 1050:16,
1056:16

## R

**race** [1] - 1011:4
**racks** [3] - 1054:15,
1059:19, 1072:2
**radical** [2] - 1049:10,
1049:22
**radio** [2] - 1044:18,
1084:9
**raise** [5] - 1061:2,
1081:12, 1081:14,
1081:17, 1081:18
**raised** [2] - 987:24,
1081:19
**raising** [1] - 995:25
**rally** [1] - 1052:10
**ran** [1] - 986:18
**random** [1] - 1086:10
**rant** [1] - 1071:9
**rather** [1] - 1015:14
**rea** [1] - 1000:20
**reach** [2] - 1015:8,
1083:3
**reached** [1] - 1085:14
**reaches** [1] - 1045:15
**reaching** [3] - 1015:4,
1015:11, 1032:12
**react** [1] - 1072:25
**reacts** [1] - 1072:21
**read** [15] - 960:18,
961:4, 974:1,
975:11, 975:17,
976:17, 978:1,
978:20, 981:5,
981:7, 997:13,
1010:4, 1071:17,
1084:11, 1084:12
**readdress** [1] -
1002:21
**reading** [3] - 974:7,
1000:2, 1072:13
**ready** [2] - 959:16,
981:24
**real** [7] - 986:24,
1001:5, 1009:15,
1039:19, 1042:21,
1062:10
**realistically** [1] -

1061:17
**reality** [1] - 1062:22
**realize** [3] - 1064:5,
1073:4, 1073:20
**realizes** [1] - 1021:24
**really** [25] - 967:17,
972:18, 973:14,
974:8, 974:10,
976:11, 977:12,
978:18, 985:11,
987:16, 993:20,
994:1, 1009:10,
1050:8, 1053:12,
1053:16, 1054:22,
1062:25, 1063:6,
1071:3, 1073:5,
1077:10, 1080:21,
1080:22
**reason** [7] - 990:25,
1005:15, 1013:18,
1014:3, 1063:22,
1065:23
**reasonable** [35] -
1000:13, 1012:8,
1012:23, 1013:2,
1013:7, 1013:11,
1013:15, 1013:17,
1013:22, 1013:23,
1013:24, 1014:5,
1014:11, 1016:11,
1020:7, 1021:5,
1021:18, 1023:1,
1023:12, 1024:10,
1024:17, 1026:8,
1026:13, 1026:22,
1027:16, 1028:5,
1028:18, 1029:12,
1030:4, 1031:3,
1031:16, 1059:8,
1069:19, 1069:20,
1069:21
**reasonableness** [1] -
1017:25
**reasonably** [1] -
1021:19
**reasoned** [1] -
1071:13
**reasoning** [1] -
1081:13
**reasons** [2] - 993:16,
1031:23
**Rebuttal** [1] - 957:10
**REBUTTAL** [1] -
1076:17
**rebuttal** [2] - 990:10,
1076:16
**recalled** [1] - 1016:19
**receive** [2] - 1012:11,
1018:11
**received** [6] - 1008:18,

1019:6, 1019:23, 1020:4, 1047:25, 1057:9
**receiving** [1] - 1010:6
**Recess** [2] - 995:18, 1076:9
**recess** [1] - 1009:19
**recognize** [8] - 964:8, 965:4, 965:11, 965:16, 965:21, 969:3, 986:23, 1075:11
**recognized** [2] - 986:24, 1078:4
**recollection** [4] - 1004:9, 1017:1, 1017:19, 1077:23
**recollections** [1] - 1017:11
**reconvene** [1] - 995:16
**record** [10] - 968:13, 995:2, 995:6, 995:11, 1005:12, 1007:13, 1007:24, 1076:6, 1076:8, 1089:5
**recorded** [1] - 1019:7
**recording** [5] - 982:2, 991:7, 991:10, 1019:15, 1031:17
**recordings** [5] - 1019:5, 1019:11, 1019:13, 1019:14
**recreate** [1] - 973:19
**red** [4] - 959:3, 959:5, 959:6, 1054:11
**Redirect** [1] - 957:4
**REDIRECT** [1] - 981:1
**redirect** [3] - 980:19, 992:24, 1069:7
**refer** [2] - 1010:9
**reference** [5] - 987:6, 989:6, 1005:1, 1005:5, 1011:11
**references** [4] - 987:9, 987:10, 987:14, 1008:19
**referring** [1] - 975:6
**refers** [1] - 1030:9
**reflection** [1] - 1013:24
**refresh** [1] - 1004:8
**refreshed** [1] - 1050:16
**refuse** [3] - 1010:19, 1022:11, 1022:16
**regarding** [6] - 984:18, 988:14, 988:18, 988:19,

1083:1, 1083:7
**regular** [1] - 1086:20
**rejoin** [1] - 1086:19
**related** [1] - 999:22
**relates** [1] - 1077:1
**relative** [1] - 974:25
**relatively** [1] - 993:18
**releases** [1] - 1072:14
**relevant** [2] - 992:16, 1020:6
**rely** [2] - 1011:21, 1019:13
**relying** [1] - 1055:17
**remainder** [1] - 1087:24
**remained** [2] - 1026:24, 1086:13
**remaining** [4] - 997:2, 1026:18, 1051:2, 1087:7
**remains** [2] - 1012:21, 1063:4
**remember** [12] - 960:13, 972:18, 984:19, 984:21, 984:25, 986:11, 988:20, 994:8, 1007:23, 1017:10, 1086:5, 1087:9
**remind** [4] - 959:18, 1002:23, 1084:7, 1084:20
**remotely** [1] - 1065:14
**remove** [1] - 1066:10
**removed** [1] - 1031:21
**removing** [1] - 1033:3
**rendered** [1] - 1010:14
**repeat** [3] - 962:20, 977:2, 988:12
**repeatedly** [4] - 987:5, 1033:13, 1048:16, 1048:17
**repeating** [1] - 1048:12
**rephrase** [4] - 962:21, 1057:8, 1057:10, 1057:12
**replace** [1] - 1011:19
**replaces** [2] - 1031:13, 1031:14
**reply** [3] - 1053:2, 1053:19
**reported** [1] - 956:24
**reporter** [1] - 963:19
**Reporter** [2] - 956:19, 989:3
**reports** [2] - 1084:8, 1084:12
**represent** [1] - 1031:5, 1052:7

**Representative** [1] - 1038:14
**Representatives** [9] - 1041:19, 1043:12, 1056:18, 1069:11, 1069:13, 1072:5, 1078:17, 1079:9, 1079:14
**representing** [1] - 1052:7
**represents** [1] - 1015:24
**Republican** [1] - 1050:6
**Republicans** [2] - 970:17, 970:19
**repugnant** [1] - 988:5
**request** [1] - 994:3
**require** [5] - 1012:25, 1015:3, 1023:22, 1029:14, 1029:16
**required** [12] - 1000:19, 1003:14, 1003:23, 1007:16, 1007:18, 1014:3, 1019:3, 1019:25, 1025:21, 1048:1, 1066:2, 1073:11
**requirement** [1] - 1025:22
**requirements** [1] - 1024:17
**requiring** [1] - 1007:19
**requisite** [4] - 958:7, 999:13, 1000:10, 1030:25
**research** [2] - 1085:1, 1086:24
**researched** [1] - 988:7
**Reserve** [1] - 1080:17
**residents** [1] - 1064:9
**resolved** [1] - 1003:23
**resorts** [1] - 1063:18
**resources** [1] - 1050:5
**respect** [8] - 1003:6, 1003:24, 1020:14, 1023:9, 1023:15, 1077:25, 1083:6, 1088:1
**respective** [2] - 998:21, 1035:2
**response** [6] - 978:25, 1048:23, 1049:1, 1050:14, 1053:20, 1081:10
**responsibility** [4] - 1010:23, 1011:10, 1015:25, 1078:11
**rest** [3] - 993:3,

994:23, 1086:13
**restate** [1] - 998:17
**restricted** [13] - 997:2, 1026:18, 1026:24, 1027:4, 1027:5, 1027:12, 1027:18, 1027:25, 1028:1, 1059:16, 1060:15, 1060:17, 1076:23
**restroom** [1] - 1009:15
**rests** [1] - 1083:13
**result** [3] - 999:13, 1000:10, 1030:25
**results** [2] - 1017:23, 1052:6
**resume** [1] - 959:16
**resumes** [1] - 958:21
**retire** [2] - 1084:19, 1086:8
**retiring** [1] - 1086:3
**retreated** [1] - 1044:2
**return** [5] - 990:4, 1010:14, 1020:11, 1031:6, 1060:18
**reveal** [1] - 1085:12
**reverse** [1] - 1004:22
**reviewing** [2] - 1007:12, 1086:3
**reward** [1] - 1083:23
**Rican** [1] - 987:22
**rifling** [1] - 1046:24
**rig** [1] - 1050:22
**rigged** [1] - 971:10
**rigging** [2] - 1051:2, 1051:3
**rightfully** [1] - 992:15
**rights** [1] - 1084:2
**riot** [2] - 1039:1, 1047:11
**rioter** [13] - 965:22, 965:24, 1033:19, 1035:11, 1045:10, 1045:11, 1045:14, 1045:16, 1054:10, 1058:17, 1078:2, 1078:4, 1078:7
**rioters** [39] - 1033:8, 1033:13, 1033:17, 1035:14, 1035:19, 1035:20, 1037:14, 1037:15, 1037:23, 1038:3, 1038:6, 1038:22, 1040:1, 1040:5, 1040:11, 1040:24, 1041:7, 1041:17, 1041:24, 1042:8, 1042:20, 1043:1, 1043:10, 1043:23, 1044:13, 1044:15, 1044:22,

1045:1, 1045:25, 1046:22, 1046:24, 1047:11, 1047:15, 1051:12, 1052:14, 1055:19, 1082:12
**ripped** [1] - 1035:21
**ripping** [1] - 1054:16
**road** [1] - 982:14
**room** [14] - 966:25, 977:5, 1011:16, 1032:7, 1038:1, 1039:12, 1040:17, 1046:13, 1056:2, 1079:8, 1082:23, 1084:19, 1085:21, 1086:3
**Room** [1] - 956:20
**roommate** [9] - 960:5, 960:24, 969:21, 980:9, 1048:10, 1048:11, 1053:10, 1056:22, 1072:7
**rose** [1] - 1064:16
**rounds** [1] - 1071:4
**route** [2] - 1037:18, 1037:19
**row** [1] - 1040:20
**RPR** [1] - 956:19
**rude** [1] - 986:1
**rule** [2] - 1010:16, 1029:18
**ruled** [1] - 1016:6
**rules** [2] - 1068:4, 1083:1
**ruling** [2] - 990:25, 991:14
**run** [7] - 966:25, 986:13, 1037:9, 1043:22, 1061:25, 1063:10, 1071:8
**running** [3] - 986:8, 986:10, 986:14
**runs** [2] - 1045:12, 1063:14
**rush** [2] - 973:16, 973:17
**rushed** [2] - 1037:5, 1037:6
**Russia** [1] - 1049:5

---

# S

**safely** [1] - 1046:14
**sake** [2] - 963:19, 1058:10
**sat** [2] - 1001:21, 1074:23
**satisfy** [1] - 1025:22
**save** [1] - 1065:9

**saw** [18] - 983:13, 985:25, 1014:14, 1014:16, 1014:17, 1014:18, 1035:13, 1038:24, 1039:7, 1054:11, 1054:12, 1059:19, 1059:20, 1063:5, 1068:11, 1071:23, 1072:2, 1078:5

**scaffolding** [1] - 1054:17

**scared** [2] - 1053:11, 1053:12

**Schiff** [2] - 975:2, 1049:11

**Schumer** [1] - 1043:20

**Schwager** [1] - 1034:13

**scientific** [1] - 1014:4

**scope** [1] - 993:20

**screaming** [2] - 1037:22, 1040:11

**screen** [4] - 964:8, 967:24, 986:10, 986:11

**searched** [1] - 1070:22

**seat** [7] - 1074:23, 1074:25, 1075:4, 1075:14, 1075:16, 1075:17, 1076:3

**seats** [4] - 1075:1, 1075:3, 1086:11, 1086:12

**second** [11] - 1021:8, 1023:5, 1024:21, 1027:1, 1027:19, 1028:22, 1030:7, 1042:7, 1045:17, 1067:2, 1074:20

**secondly** [1] - 960:4

**seconds** [6] - 964:11, 1033:9, 1033:20, 1037:2, 1037:3, 1072:21

**Secret** [3] - 999:21, 1027:6, 1027:8

**section** [2] - 1005:17, 1007:15

**secure** [1] - 1036:20

**security** [4] - 1040:6, 1042:15, 1042:21, 1046:7

**see** [52] - 966:5, 966:8, 966:13, 966:17, 966:25, 967:8, 967:15, 967:18, 967:24, 968:11, 968:12, 968:22,

976:7, 978:15, 979:3, 979:8, 986:15, 990:1, 993:25, 995:4, 995:7, 996:23, 1007:7, 1017:17, 1032:1, 1036:6, 1037:12, 1038:6, 1038:9, 1040:21, 1040:23, 1040:25, 1041:16, 1042:9, 1043:3, 1043:10, 1050:18, 1053:21, 1053:22, 1057:16, 1064:15, 1066:24, 1067:1, 1069:7, 1069:12, 1071:11, 1071:16, 1072:6, 1072:11, 1072:17, 1078:6, 1081:5

**seeing** [2] - 981:8, 1062:19

**seek** [2] - 990:25, 993:10

**seeking** [1] - 990:10

**seem** [1] - 991:18

**sees** [15] - 1035:19, 1035:20, 1038:16, 1045:10, 1045:11, 1054:13, 1054:14, 1054:15, 1054:16, 1054:17, 1054:18, 1055:19, 1055:25, 1067:20, 1072:22

**Seifert** [10] - 958:13, 959:21, 980:18, 990:15, 994:4, 995:19, 1032:14, 1060:20, 1076:16, 1082:16

**SEIFERT** [71] - 956:13, 958:15, 959:22, 959:24, 960:19, 960:21, 960:22, 963:25, 964:5, 964:6, 979:20, 980:17, 981:11, 981:15, 981:18, 982:18, 983:3, 989:10, 989:15, 990:11, 990:13, 990:16, 991:13, 992:18, 994:13, 995:25, 996:10, 996:14, 996:17, 996:19, 996:23, 997:3, 997:5, 997:22, 997:25, 1000:5, 1002:21, 1002:24,

1003:1, 1003:4, 1003:12, 1005:11, 1005:25, 1006:18, 1006:23, 1007:13, 1007:21, 1008:24, 1009:3, 1009:5, 1009:7, 1032:16, 1057:8, 1057:13, 1057:16, 1073:23, 1074:1, 1074:10, 1074:12, 1074:20, 1074:25, 1075:7, 1075:10, 1075:15, 1075:22, 1076:2, 1076:18, 1088:1, 1088:7, 1088:10, 1088:18

**select** [2] - 1082:24, 1083:1

**selected** [1] - 1086:11

**selecting** [2] - 1015:6, 1083:4

**selection** [1] - 1086:10

**self** [4] - 987:20, 987:21, 987:23, 1022:12

**self-deprecating** [2] - 987:20, 987:21

**self-incrimination** [1] - 1022:12

**self-loathing** [1] - 987:23

**selling** [1] - 1049:6

**sellout** [2] - 975:9, 1049:12

**Senate** [37] - 1036:9, 1036:15, 1037:4, 1037:6, 1037:16, 1037:20, 1037:24, 1038:4, 1038:5, 1038:23, 1039:24, 1041:25, 1042:24, 1043:17, 1043:20, 1044:6, 1044:8, 1045:4, 1046:21, 1046:23, 1047:2, 1054:19, 1056:5, 1056:15, 1056:18, 1058:16, 1064:13, 1064:24, 1067:6, 1067:14, 1077:16, 1079:4, 1079:19, 1080:11, 1080:19, 1082:4

**Senator** [1] - 1043:20

**Senators** [1] - 1055:16

**senators** [2] - 984:22, 985:14

**send** [6] - 999:24,

1010:13, 1050:1, 1085:4, 1087:23, 1088:4

**sending** [2] - 1032:7, 1034:9

**sends** [1] - 1050:25

**sense** [11] - 970:16, 987:18, 988:1, 997:21, 997:25, 998:1, 1002:1, 1058:1, 1058:2, 1058:3, 1085:24

**sensory** [1] - 986:16

**sent** [4] - 971:8, 1038:23, 1052:3, 1053:22

**sentence** [3] - 1001:25, 1006:14, 1083:13

**separate** [3] - 1006:3, 1020:9, 1020:11

**separately** [3] - 979:21, 995:23, 1020:11

**series** [1] - 1050:25

**Service** [3] - 999:22, 1027:6, 1027:8

**service** [1] - 1087:5

**session** [6] - 1021:22, 1028:23, 1029:20, 1029:21, 1039:16, 1068:23

**Session** [1] - 956:7

**sessions** [1] - 1001:16

**set** [6] - 1006:4, 1007:17, 1034:9, 1034:21, 1047:10, 1048:5

**several** [3] - 975:1, 983:12, 1045:9

**Sharpie** [1] - 1051:5

**sheep** [2] - 975:8, 1049:12

**sheet** [3] - 1007:8, 1007:9, 1062:24

**shelter** [1] - 1039:22

**sheltering** [1] - 1045:2

**Shephard** [20] - 1042:25, 1043:25, 1044:1, 1044:3, 1044:7, 1044:14, 1044:17, 1045:11, 1045:14, 1045:16, 1045:22, 1046:5, 1056:6, 1078:1, 1078:7, 1078:9, 1078:19, 1078:25, 1079:20

**Shephard's** [2] - 1033:18, 1033:20

**shielding** [1] - 1038:10

**shifting** [1] - 1057:4

**shifts** [1] - 1012:24

**shiny** [2] - 1067:20, 1080:14

**shirt** [2] - 1053:14, 1074:14

**shit** [3] - 975:10, 1049:13, 1051:19

**shocking** [3] - 1063:18, 1073:3

**short** [1] - 1009:19

**shorthand** [1] - 956:24

**shortly** [2] - 990:1, 1087:15

**shot** [2] - 1049:25, 1050:3

**shots** [1] - 1044:19

**shoulders** [1] - 967:25

**shout** [1] - 1060:25

**shouting** [2] - 1038:19, 1063:8

**show** [4] - 1025:9, 1025:11, 1068:19, 1069:23

**showed** [4] - 1006:25, 1067:8, 1067:9, 1070:4

**showing** [4] - 971:10, 993:25, 1055:19, 1062:21

**shown** [3] - 960:16, 1018:5, 1062:8

**shows** [4] - 1026:6, 1054:23, 1068:13, 1077:7

**shut** [3] - 1062:1, 1063:17, 1065:8

**side** [22] - 966:25, 967:14, 975:15, 1015:14, 1015:17, 1015:19, 1015:21, 1018:6, 1033:4, 1035:10, 1037:4, 1038:11, 1038:23, 1039:14, 1039:24, 1040:24, 1049:14, 1049:15, 1055:10, 1064:13

**sides** [3] - 1010:5, 1071:20, 1087:20

**sight** [1] - 1062:22

**sign** [1] - 1064:11

**signals** [1] - 1079:7

**signed** [2] - 1085:5, 1085:7

**signs** [14] - 1044:8, 1044:11, 1056:4,

1056:7, 1059:18, 1071:23, 1072:1, 1072:3, 1072:6, 1078:20, 1078:21, 1079:1, 1079:19
**similar** [3] - 984:6, 988:3, 1075:10
**similarly** [1] - 1012:14
**simple** [2] - 992:19, 1004:23
**simplistic** [1] - 1072:19
**single** [3] - 1036:24, 1046:2, 1046:3
**sit** [4] - 1055:2, 1058:5, 1064:13, 1075:16
**sits** [4] - 1001:15, 1053:7, 1055:13, 1077:13
**sitting** [8] - 985:4, 1041:8, 1046:24, 1055:8, 1064:15, 1074:22, 1075:13, 1075:19
**situation** [2] - 1061:8, 1064:4
**six** [2] - 1072:8, 1072:11
**skip** [5] - 978:9, 996:25, 997:10, 997:15, 997:18
**skylight** [2] - 960:3, 1043:7
**skylights** [2] - 986:7, 1068:17
**slate** [2] - 974:14, 1050:12
**sleep** [2] - 964:4, 1014:18
**slide** [54] - 1034:25, 1035:8, 1036:5, 1036:13, 1037:10, 1038:11, 1038:21, 1039:23, 1040:7, 1040:22, 1041:15, 1041:22, 1042:6, 1042:13, 1042:18, 1042:22, 1043:15, 1045:3, 1045:5, 1045:17, 1046:4, 1046:12, 1046:16, 1046:22, 1047:1, 1047:16, 1048:9, 1048:20, 1049:3, 1049:8, 1049:21, 1050:6, 1050:17, 1050:19, 1050:24, 1051:13, 1051:25, 1052:9, 1052:13,

1052:17, 1052:23, 1053:8, 1053:16, 1054:1, 1054:2, 1055:3, 1058:3, 1058:10, 1058:19, 1058:25, 1059:15, 1059:21
**slip** [1] - 1062:24
**slowly** [1] - 1071:10
**small** [4] - 988:2, 991:15, 1041:13, 1087:3
**smaller** [1] - 1015:17
**snippet** [1] - 1068:7
**snow** [4] - 1014:14, 1014:16, 1014:17, 1014:18
**snowed** [1] - 1014:20
**society** [1] - 1062:3
**sock** [1] - 1063:13
**softer** [1] - 1061:3
**sole** [3] - 1010:22, 1011:9, 1016:13
**solely** [3] - 1011:5, 1083:14, 1084:13
**soliciting** [1] - 1025:3
**someone** [5] - 991:2, 1024:11, 1049:8, 1054:10, 1077:3
**sometimes** [4] - 975:9, 1015:20, 1031:19, 1049:13
**somewhat** [1] - 1058:23
**somewhere** [1] - 972:19
**soon** [4] - 986:17, 986:24, 995:15, 1084:16
**sorry** [14] - 961:10, 962:20, 970:12, 973:9, 974:22, 975:4, 977:10, 981:13, 981:14, 991:9, 999:20, 1024:24, 1026:23, 1059:22
**sound** [1] - 1040:5
**sounds** [3] - 961:20, 966:1, 971:19
**south** [1] - 1054:19
**Southeast** [1] - 1029:3
**Soviet** [1] - 1049:7
**Speaker** [1] - 1038:15
**speaker** [1] - 1038:15
**speakers** [1] - 1019:10
**speaking** [3] - 961:17, 991:7, 1038:16
**speaks** [1] - 1066:5
**special** [3] - 1003:5,

1003:23, 1007:16
**Special** [2] - 1040:2, 1040:25
**specific** [8] - 959:5, 960:13, 984:1, 985:1, 1001:2, 1029:17, 1051:8, 1082:25
**specifically** [7] - 960:1, 970:10, 979:23, 980:1, 980:16, 985:25, 989:2
**specified** [1] - 980:12
**spectator** [2] - 1026:3, 1060:3
**speculate** [2] - 1016:4, 1081:22
**speculation** [2] - 982:11, 1014:2
**speech** [3] - 984:18, 1034:1, 1076:23
**speeches** [1] - 1064:16
**spend** [1] - 1067:12
**spends** [1] - 1067:14
**spent** [1] - 1067:9
**spiral** [1] - 1041:4
**spoken** [1] - 1019:16
**spokesperson** [1] - 1082:25
**spots** [1] - 1046:18
**spout** [1] - 1071:9
**spray** [7] - 961:23, 961:24, 961:25, 962:12, 963:3, 1035:5, 1035:15
**staff** [1] - 1060:14
**stage** [1] - 1023:13
**staircase** [3] - 1041:2, 1041:4, 1041:18, 1042:11, 1060:6
**staircases** [1] - 1040:25
**stairs** [11] - 964:16, 1035:20, 1035:22, 1035:23, 1035:24, 1036:4, 1036:10, 1038:3, 1040:9, 1059:14, 1060:5
**stairwell** [4] - 1037:24, 1040:3, 1041:9
**stand** [17] - 958:19, 958:21, 991:17, 991:25, 994:9, 1009:9, 1016:23, 1039:21, 1051:25, 1059:11, 1059:13, 1061:6, 1067:24, 1077:18, 1078:8,

1078:14, 1085:23
**standing** [18] - 960:3, 961:22, 965:8, 985:15, 986:20, 1033:15, 1036:2, 1038:14, 1039:9, 1041:20, 1043:10, 1045:23, 1045:25, 1066:8, 1072:4, 1079:3, 1079:10, 1080:10
**stands** [6] - 1045:13, 1047:9, 1054:20, 1056:1, 1080:6, 1080:7
**start** [14] - 960:2, 963:22, 970:12, 973:10, 973:13, 974:7, 975:10, 977:14, 977:18, 981:3, 984:12, 1034:23, 1037:15, 1045:10, 1047:7, 1063:11, 1064:1, 1076:11, 1088:14
**started** [8] - 975:10, 989:7, 993:6, 1049:14, 1061:4, 1070:18, 1072:17, 1072:24
**starting** [1] - 986:8
**starts** [4] - 1041:25, 1043:8, 1049:10, 1072:25
**State** [1] - 972:23
**state** [10] - 969:21, 975:1, 976:25, 1007:24, 1020:8, 1023:13, 1034:15, 1051:10, 1051:11, 1077:2
**statement** [19] - 961:2, 961:3, 961:5, 994:18, 1019:22, 1047:24, 1049:4, 1055:4, 1057:16, 1057:18, 1068:3, 1074:7, 1077:25, 1078:14, 1078:18, 1083:19, 1083:20, 1083:24, 1084:2
**statements** [8] - 993:25, 1000:19, 1012:12, 1057:10, 1071:12, 1072:9, 1073:21, 1083:18
**states** [5] - 1049:10, 1051:2, 1051:7, 1051:8, 1051:23
**STATES** [3] - 956:1,

956:3, 956:10
**States** [22] - 969:5, 971:23, 972:3, 1002:8, 1028:20, 1029:1, 1029:2, 1030:6, 1030:13, 1030:15, 1030:23, 1032:19, 1034:16, 1048:19, 1052:13, 1053:6, 1056:15, 1077:3, 1077:9, 1080:17, 1082:10
**stating** [2] - 1006:13, 1034:8
**statues** [1] - 1067:10
**statutes** [1] - 998:18
**stay** [3] - 998:19, 1035:6, 1044:21
**steal** [1] - 1040:13
**Steal** [6] - 1032:22, 1033:10, 1052:15, 1055:21, 1056:2
**stenotype** [1] - 956:24
**step** [4] - 1023:6, 1023:15, 1023:22, 1087:5
**steps** [2] - 990:5, 1033:4
**still** [19] - 959:18, 967:11, 967:13, 967:20, 968:13, 978:3, 992:5, 1036:6, 1038:12, 1039:15, 1039:16, 1042:10, 1045:5, 1053:14, 1055:17, 1063:4, 1080:19, 1080:20, 1086:23
**stipulated** [2] - 1012:3, 1012:4
**stipulation** [1] - 1012:5
**stood** [3] - 1033:10, 1033:11, 1078:7
**stop** [15] - 963:4, 977:23, 984:2, 1009:2, 1032:13, 1037:8, 1040:13, 1065:8, 1067:3, 1067:6, 1069:14, 1071:20, 1082:9, 1087:13
**Stop** [5] - 1033:10, 1052:14, 1052:15, 1055:21, 1056:1
**stopped** [3] - 977:25, 1032:21, 1032:24
**Stopped** [1] - 1032:22
**stormed** [1] - 1052:21
**story** [1] - 1072:17

**straight** [3] - 994:24, 997:1, 997:16
**Street** [3] - 956:14, 956:17, 1029:3
**stress** [1] - 1036:18
**stretch** [1] - 1009:10
**stricken** [1] - 1016:7
**strictly** [1] - 1004:25
**strong** [1] - 1085:22
**strongly** [1] - 1023:7
**structured** [1] - 1071:15
**stuck** [2] - 1004:21, 1041:13
**student** [2] - 1056:11
**stuff** [3] - 993:7, 1050:11, 1062:18
**subject** [1] - 992:10
**submit** [5] - 1037:11, 1054:23, 1059:7, 1070:7, 1082:1
**submits** [7] - 1055:23, 1056:11, 1057:21, 1057:25, 1059:5, 1060:11, 1079:18
**submitted** [5] - 1005:13, 1057:17, 1081:23, 1081:24, 1081:25
**substantial** [3] - 1023:5, 1023:15, 1023:22
**substantive** [4] - 959:4, 982:16, 998:11, 1020:23
**succeed** [2] - 1026:16, 1058:14
**suffice** [1] - 1061:16
**sufficient** [1] - 1024:9
**suggest** [2] - 994:18, 1031:11
**suggested** [1] - 1004:10
**suggesting** [1] - 1004:16
**suit** [2] - 965:6, 968:1
**summon** [1] - 1086:19
**super** [1] - 1053:5
**superficial** [1] - 1063:10
**supervisor** [2] - 1004:1, 1007:14
**supported** [1] - 1018:4
**supporter** [2] - 969:11, 1034:4
**supporters** [3] - 970:19, 975:8, 1049:12
**supports** [1] - 970:18

**supposed** [2] - 993:21, 1076:3
**surge** [1] - 1067:16
**surprise** [1] - 982:3
**surprised** [1] - 1053:5
**surprising** [1] - 994:7
**surrounding** [3] - 1017:8, 1019:21, 1047:23
**sustained** [2] - 989:11, 1016:2
**switch** [1] - 1074:23
**switched** [4] - 1074:21, 1074:22, 1075:9, 1075:11
**sworn** [2] - 1012:1, 1036:21
**sympathy** [1] - 1011:3
**system** [2] - 964:3, 971:15

## T

**tackling** [1] - 1045:11
**taker's** [1] - 1011:22
**talks** [14] - 1048:17, 1053:9, 1061:13, 1071:14, 1072:7, 1072:13, 1080:4, 1080:5, 1080:6
**tallest** [2] - 1055:9, 1077:12
**tantrum** [1] - 1066:15
**tapes** [1] - 1019:9
**tarps** [2] - 1035:21
**task** [1] - 1083:2
**team** [1] - 1051:20
**tear** [1] - 1086:15
**television** [1] - 1084:9
**temper** [1] - 1066:15
**temporarily** [1] - 1027:7
**tempted** [1] - 1084:11
**ten** [2] - 1053:11, 1053:13
**ten-year** [2] - 1053:11, 1053:13
**tendency** [1] - 1061:11
**tenders** [1] - 980:23
**term** [14] - 1021:14, 1021:21, 1027:1, 1027:4, 1027:8, 1027:25, 1028:2, 1029:1, 1029:4, 1029:7, 1030:9, 1030:13, 1030:16, 1030:18
**terms** [3] - 981:8,

983:7, 1030:8
**Terrace** [1] - 1033:5
**terrace** [1] - 1036:6
**terribly** [2] - 1061:1, 1073:2
**terrified** [1] - 1072:13
**terrorism** [1] - 1072:12
**testified** [6] - 1014:14, 1016:13, 1016:18, 1016:20, 1017:4, 1063:15
**testify** [5] - 981:24, 1022:11, 1022:16, 1061:7, 1061:9
**testifying** [1] - 1015:14
**testimony** [32] - 961:21, 962:5, 962:7, 962:8, 964:19, 965:20, 965:25, 969:3, 970:11, 971:17, 973:2, 975:22, 1012:1, 1012:3, 1014:9, 1014:15, 1014:19, 1015:17, 1015:18, 1016:12, 1016:24, 1017:14, 1017:15, 1017:16, 1018:1, 1018:8, 1018:10, 1018:12, 1018:15, 1018:16, 1042:14, 1067:9
**TESTIMONY** [1] - 957:2
**text** [11] - 969:18, 971:8, 974:24, 975:13, 1048:21, 1050:19, 1050:25, 1053:25, 1056:23, 1057:18, 1084:23
**texts** [1] - 1052:24
**THE** [133] - 956:1, 956:10, 958:2, 958:12, 958:16, 958:18, 958:20, 958:24, 959:8, 959:15, 959:20, 959:21, 960:20, 964:1, 964:3, 979:19, 980:18, 981:12, 981:13, 981:14, 981:16, 982:7, 982:17, 983:1, 983:5, 989:11, 989:16, 989:17, 989:23, 990:3, 990:9, 990:12, 990:15,

991:9, 992:2, 992:17, 993:15, 994:14, 994:17, 994:21, 995:1, 995:10, 995:13, 995:15, 995:19, 996:6, 996:12, 996:15, 996:18, 996:20, 996:24, 997:4, 997:8, 997:24, 998:1, 998:5, 998:18, 998:22, 999:1, 999:5, 999:8, 999:16, 999:18, 999:21, 999:24, 1000:4, 1000:6, 1000:22, 1001:7, 1001:10, 1001:20, 1002:5, 1002:9, 1002:13, 1002:17, 1002:20, 1002:23, 1002:25, 1003:3, 1003:8, 1004:6, 1004:10, 1004:16, 1004:19, 1005:3, 1005:10, 1005:22, 1006:17, 1006:21, 1007:2, 1007:9, 1007:11, 1007:20, 1008:1, 1008:9, 1008:12, 1008:22, 1009:1, 1009:4, 1009:6, 1009:12, 1009:14, 1009:17, 1009:21, 1010:2, 1057:1, 1057:11, 1057:14, 1060:20, 1073:16, 1073:19, 1073:25, 1074:3, 1074:7, 1074:9, 1074:11, 1074:16, 1075:6, 1075:9, 1075:14, 1075:24, 1076:1, 1076:6, 1076:10, 1076:15, 1082:16, 1082:18, 1087:19, 1088:6, 1088:8, 1088:11, 1088:14, 1088:19
**themselves** [7] - 991:2, 991:8, 991:23, 993:5, 1025:20, 1049:6, 1062:5
**theoretically** [1] - 1063:8
**theories** [2] - 958:4, 1004:5
**theory** [19] - 958:3, 959:12, 995:4,

995:8, 998:5, 999:9, 1000:4, 1000:6, 1001:13, 1001:17, 1002:2, 1002:24, 1003:17, 1003:24, 1004:24, 1006:9, 1008:13, 1008:19, 1030:20
**there'd** [2] - 974:8, 1050:8
**thereby** [1] - 1022:12
**therefore** [1] - 1008:8
**they've** [2] - 1035:21, 1037:9, 1057:9
**thinking** [6] - 961:1, 963:13, 1019:20, 1023:14, 1047:22, 1072:23
**thinks** [4] - 991:20, 1048:18, 1071:2, 1072:25
**third** [7] - 1021:10, 1024:24, 1027:22, 1028:25, 1044:24, 1067:3
**Thomas** [1] - 1056:12
**thoroughly** [1] - 1034:4
**thoughtful** [1] - 1013:24
**thousand** [1] - 1071:4
**thousands** [1] - 971:10
**threat** [6] - 1036:25, 1043:17, 1046:3, 1049:5, 1049:8, 1070:23
**threatened** [1] - 1083:22
**three** [18] - 983:20, 996:16, 997:14, 998:11, 998:13, 1002:24, 1006:9, 1030:3, 1053:1, 1061:12, 1062:25, 1063:3, 1064:10, 1068:1, 1068:8, 1068:22, 1080:10, 1088:19
**three-and-a-half-hour** [2] - 983:20, 1068:22
**three-and-a-half-hour-long** [1] - 1061:12
**throughout** [6] - 979:14, 983:19, 1012:22, 1012:24, 1070:17, 1087:12
**thrown** [2] - 1035:5,

1062:20
**Thursday** [1] - 956:6
**tied** [1] - 1070:8
**ties** [1] - 1069:18
**timeline** [2] - 1034:23, 1070:5
**Timmy** [1] - 976:7, 978:15, 1081:5
**Timothy** [9] - 1020:18, 1022:19, 1023:25, 1026:17, 1027:11, 1028:13, 1029:24, 1032:18, 1061:5
**TIMOTHY** [2] - 956:6, 957:3
**tired** [1] - 964:3
**title** [1] - 998:25
**TNM** [1] - 956:4
**today** [18] - 970:11, 973:2, 975:22, 980:2, 991:17, 991:25, 993:13, 1040:2, 1051:22, 1065:15, 1067:9, 1072:19, 1076:11, 1076:19, 1078:8, 1078:22, 1081:19, 1082:20
**together** [2] - 1073:4, 1087:10
**tomorrow** [6] - 1076:12, 1082:22, 1082:23, 1087:8, 1087:15, 1087:20
**took** [10] - 958:2, 965:22, 1008:14, 1009:8, 1023:5, 1023:18, 1023:19, 1040:2, 1060:5, 1063:23
**top** [7] - 1036:5, 1036:8, 1036:10, 1037:24, 1038:3, 1043:10, 1060:5
**topic** [2] - 1050:9, 1070:18
**touch** [1] - 1058:10
**tourists** [3] - 1044:8, 1056:7, 1079:1
**toward** [5] - 1017:5, 1023:6, 1037:10, 1037:16, 1045:12
**towards** [7] - 968:6, 986:2, 1038:23, 1040:19, 1040:24, 1041:18, 1042:12
**Towers** [1] - 1049:7
**track** [1] - 1000:2
**trains** [1] - 1043:19
**transaction** [1] -

1017:17
**transcribed** [1] - 983:13
**TRANSCRIPT** [1] - 956:9
**Transcript** [1] - 956:24
**transcript** [25] - 960:6, 960:10, 960:18, 960:23, 961:11, 979:3, 979:6, 979:15, 979:18, 980:21, 980:23, 981:5, 981:6, 981:7, 981:24, 982:1, 990:22, 991:11, 992:5, 994:4, 1055:22, 1071:7, 1071:17, 1081:22, 1089:4
**transcription** [1] - 956:24
**transcripts** [5] - 1019:7, 1019:12, 1019:13, 1019:14, 1019:17
**trapped** [2] - 982:25, 1046:13
**trash** [1] - 1062:20
**treating** [1] - 1069:12
**tree** [1] - 1050:15
**TREVOR** [1] - 956:10
**trial** [17] - 1010:15, 1010:24, 1011:14, 1011:17, 1011:25, 1012:3, 1012:22, 1012:24, 1016:2, 1018:6, 1018:19, 1020:4, 1031:18, 1057:23, 1069:18, 1084:14, 1084:21
**TRIAL** [1] - 956:9
**tried** [4] - 983:18, 998:19, 1007:17, 1067:2
**tries** [3] - 1045:14, 1045:15, 1069:6
**trouble** [1] - 1065:8
**true** [7] - 985:2, 987:15, 987:16, 993:13, 1013:12, 1018:2, 1077:19
**truly** [4] - 991:2, 991:3, 1067:3, 1067:4
**Trump** [21] - 969:11, 972:9, 972:24, 984:21, 985:7, 988:25, 1034:4, 1036:11, 1047:13, 1050:22, 1051:1,

1051:3, 1051:20, 1052:7, 1054:20, 1055:14, 1059:11, 1070:12, 1070:16, 1072:18
**Trump's** [2] - 976:16, 984:18
**truth** [3] - 1013:13, 1017:2, 1018:9
**truthful** [3] - 992:1, 1016:25, 1078:15
**truthfully** [1] - 1016:18
**try** [7] - 975:9, 984:2, 1035:6, 1043:1, 1049:13, 1060:24, 1085:6
**trying** [21] - 960:5, 963:4, 963:10, 996:15, 998:15, 1000:18, 1035:7, 1038:12, 1039:16, 1039:18, 1040:24, 1041:9, 1042:3, 1042:15, 1047:10, 1054:18, 1061:17, 1066:7, 1067:3, 1068:11, 1079:10
**tunnels** [4] - 1033:18, 1042:24, 1044:2, 1045:24
**turn** [6] - 963:25, 1009:4, 1032:13, 1043:22, 1044:4, 1054:12
**turned** [3] - 968:24, 1037:11, 1038:7
**turning** [1] - 1037:10
**turns** [2] - 1038:8, 1047:17
**TV** [1] - 963:25
**tweet** [9] - 988:18, 989:4, 1055:20, 1055:25, 1070:1, 1070:3, 1070:7, 1070:11
**Twin** [1] - 1049:7
**two** [27] - 968:25, 969:18, 975:19, 986:20, 999:18, 1000:15, 1000:16, 1002:24, 1014:6, 1017:16, 1023:2, 1040:25, 1047:8, 1048:24, 1064:10, 1067:12, 1070:2, 1070:10, 1073:4, 1075:13, 1075:19, 1075:23, 1076:5, 1076:11, 1086:11, 1086:15

**type** [1] - 1002:25
**types** [1] - 1014:6
**tyrants** [1] - 1050:16

**U**

**u-turn** [1] - 1044:4
**U.S** [34] - 956:14, 956:20, 961:19, 962:17, 972:14, 975:21, 978:23, 980:3, 999:11, 999:12, 1000:8, 1000:9, 1001:21, 1002:7, 1002:17, 1002:19, 1003:20, 1030:24, 1040:12, 1046:21, 1053:7, 1054:10, 1055:13, 1056:12, 1056:17, 1056:18, 1060:14, 1077:6, 1079:21, 1080:8, 1080:15, 1080:24
**ugly** [1] - 1076:19
**ultimate** [1] - 991:24
**unaddressed** [1] - 992:7
**unanimity** [6] - 1003:5, 1003:15, 1003:23, 1007:16, 1007:19, 1008:8
**unanimous** [4] - 1008:5, 1008:6, 1031:8, 1085:14
**uncalled** [1] - 1051:18
**uncommon** [1] - 1017:19
**undeniable** [1] - 1023:19
**under** [11] - 959:18, 990:18, 1000:17, 1003:24, 1017:12, 1019:3, 1028:9, 1033:12, 1045:20, 1085:11
**underneath** [1] - 960:3
**understood** [3] - 994:5, 1004:15, 1083:21
**undisputed** [1] - 1012:6
**unduly** [1] - 994:2
**unfortunate** [1] - 1062:19
**unfortunately** [2] - 1050:5, 1070:16
**unguarded** [1] -

1046:23
**unimportant** [1] - 1017:22
**Union** [2] - 972:23, 1049:7
**United** [22] - 969:5, 971:23, 972:3, 1002:8, 1028:20, 1029:1, 1029:2, 1030:6, 1030:13, 1030:15, 1030:23, 1032:19, 1034:16, 1048:19, 1052:13, 1053:6, 1056:14, 1077:3, 1077:9, 1080:17, 1082:10
**UNITED** [3] - 956:1, 956:3, 956:10
**unlawful** [7] - 1022:4, 1022:5, 1022:8, 1022:17, 1029:10, 1054:6
**unless** [1] - 1012:22
**unlikely** [1] - 1086:18
**unlimited** [1] - 1045:22
**unnecessarily** [1] - 1028:10
**unreasonableness** [1] - 1017:25
**unreasonably** [1] - 1028:8
**up** [80] - 960:15, 962:9, 964:16, 965:4, 967:8, 969:9, 971:10, 973:7, 973:10, 974:3, 974:15, 974:19, 975:24, 977:3, 977:13, 977:15, 982:20, 988:2, 988:24, 994:5, 994:17, 995:8, 996:18, 1000:18, 1014:19, 1020:3, 1033:4, 1034:10, 1035:9, 1035:20, 1035:23, 1036:4, 1037:4, 1037:21, 1037:23, 1037:24, 1038:4, 1038:14, 1038:16, 1041:18, 1042:6, 1042:8, 1042:10, 1043:6, 1043:8, 1043:25, 1044:6, 1044:23, 1045:1, 1045:13, 1046:7, 1046:18, 1047:2, 1047:9, 1049:7, 1050:11,

1051:9, 1051:20, 1055:11, 1056:3, 1056:9, 1057:24, 1059:14, 1060:4, 1060:25, 1062:1, 1065:8, 1066:7, 1070:20, 1073:5, 1073:19, 1074:21, 1074:24, 1079:4, 1080:6, 1080:11, 1082:21, 1083:2, 1083:7
**upbringings** [1] - 988:3
**upstairs** [9] - 1033:11, 1033:12, 1039:15, 1041:3, 1041:4, 1041:24, 1046:6, 1080:10, 1080:19
**useful** [3] - 1085:21, 1086:2, 1086:5
**uses** [1] - 1028:7

## V

**value** [1] - 993:18
**variations** [3] - 995:20, 996:16, 997:14
**variety** [1] - 1031:22
**various** [2] - 1006:5, 1070:19
**venture** [1] - 1026:2
**verdict** [31] - 997:23, 1003:6, 1006:22, 1007:9, 1008:4, 1010:14, 1011:9, 1015:4, 1015:8, 1015:10, 1015:12, 1020:14, 1031:5, 1031:6, 1031:7, 1031:9, 1031:12, 1031:17, 1032:9, 1032:12, 1060:18, 1062:24, 1083:3, 1083:14, 1085:14, 1085:23, 1087:1, 1087:2, 1087:23, 1088:16
**verdicts** [1] - 1020:12
**version** [6] - 959:11, 993:13, 997:8, 1004:17, 1005:12, 1005:14
**via** [1] - 1085:2
**vice** [6] - 1027:9, 1039:24, 1040:2, 1040:6, 1048:22
**Vice** [2] - 969:15, 1037:4

**Video** [9] - 965:10, 965:14, 966:3, 966:11, 966:23, 967:6, 968:9, 968:20, 1052:12
**video** [21] - 963:21, 963:23, 963:24, 964:11, 964:13, 964:22, 964:25, 965:1, 965:3, 966:2, 986:7, 1031:20, 1031:22, 1037:12, 1038:6, 1038:18, 1040:10, 1045:21, 1053:22, 1078:6, 1080:3
**videos** [4] - 1040:21, 1040:23, 1063:6, 1071:23
**viewed** [1] - 1055:6
**views** [3] - 969:23, 1049:21, 1083:8
**violate** [4] - 998:23, 1000:10, 1005:3, 1030:25
**violating** [1] - 1029:18
**violation** [5] - 1020:20, 1026:19, 1027:13, 1028:15, 1030:1
**violence** [2] - 1028:8, 1054:12
**violent** [1] - 999:13
**visibility** [1] - 985:11
**visiting** [1] - 1027:7
**Visitor** [6] - 1033:12, 1042:12, 1045:24, 1047:4, 1071:24, 1078:23
**voice** [9] - 985:19, 990:23, 991:7, 993:12, 1036:19, 1060:25, 1063:8, 1067:4, 1085:22
**voices** [1] - 976:14
**voir** [1] - 1063:22
**voluntarily** [1] - 1083:20
**vote** [5] - 1021:23, 1051:24, 1052:5, 1085:17, 1086:3
**voter** [2] - 972:6, 1050:23
**votes** [12] - 971:9, 971:10, 976:6, 977:24, 978:14, 978:24, 1034:21, 1035:3, 1051:4, 1056:3, 1081:4, 1081:12

**voting** [2] - 1081:15, 1085:13
**vulgar** [1] - 985:22

## W

**Wade** [1] - 1040:2
**wait** [3] - 1034:18, 1037:8, 1087:11
**waiting** [6] - 995:7, 1035:20, 1035:23, 1041:21, 1042:10
**walk** [6] - 1033:4, 1039:8, 1055:11, 1055:15, 1067:17, 1081:16
**walked** [5] - 1036:24, 1062:15, 1063:6, 1066:20, 1078:12
**walking** [10] - 976:4, 976:5, 976:8, 978:12, 978:13, 978:16, 1067:15, 1081:2, 1081:5
**walks** [4] - 1037:2, 1064:4, 1072:18, 1080:6
**wandering** [2] - 1067:10, 1080:14
**wants** [14] - 1000:23, 1004:14, 1008:10, 1036:11, 1060:7, 1062:6, 1065:17, 1067:21, 1069:23, 1070:13, 1070:25, 1071:2, 1080:13, 1080:20
**War** [1] - 973:20
**war** [16] - 973:2, 973:5, 973:23, 974:9, 974:10, 974:16, 974:19, 975:10, 1049:14, 1049:18, 1050:4, 1050:8, 1050:11, 1070:14, 1070:15, 1071:2
**war's** [2] - 973:21, 973:24
**warmonger** [1] - 1070:25
**warmongers** [1] - 1070:15
**warned** [1] - 1084:1
**Washington** [8] - 956:5, 956:15, 956:21, 972:19, 1029:3, 1033:24, 1034:2, 1052:11

**watch** [4] - 1038:6, 1080:3, 1084:11, 1084:12
**watched** [4] - 971:17, 972:20, 972:23, 982:1
**watches** [3] - 1045:8, 1045:13, 1051:10
**watching** [4] - 1033:19, 1047:10, 1047:11, 1048:22
**Watts** [6] - 1036:21, 1037:16, 1037:19, 1037:21, 1044:23, 1058:18
**wave** [3] - 1067:21, 1067:24, 1080:16
**waved** [1] - 1033:13
**waves** [1] - 1054:20
**waving** [4] - 960:4, 1047:13, 1080:5, 1080:11
**Wayne** [2] - 1089:9, 1089:9
**WAYNE** [2] - 956:19, 1089:3
**ways** [2] - 1004:3, 1035:17
**weapon** [2] - 1065:12
**weapons** [3] - 1035:15, 1070:21, 1070:24
**wearing** [4] - 965:6, 966:15, 1074:13, 1075:20
**weeks** [1] - 1067:12
**weigh** [2] - 1016:12, 1057:25
**weighing** [1] - 1017:19
**weight** [8] - 1010:24, 1012:10, 1014:25, 1015:2, 1015:13, 1018:10, 1018:16, 1083:19
**welcome** [4] - 959:15, 1009:21, 1010:7, 1076:15
**West** [1] - 1033:5
**west** [11] - 962:18, 962:22, 964:16, 1033:2, 1034:20, 1035:4, 1035:9, 1036:3, 1036:5, 1054:13, 1059:13
**whisked** [1] - 1038:15
**white** [2] - 1055:8, 1075:23
**White** [1] - 1064:14, 1064:15

**who've** [1] - 1016:13
**whole** [8] - 1000:2, 1008:8, 1010:11, 1010:19, 1039:11, 1050:13, 1052:21, 1053:11
**wider** [1] - 993:8
**widest** [1] - 1055:9
**wild** [2] - 1045:13, 1048:24
**willful** [1] - 1019:3
**willfully** [7] - 1028:25, 1029:9, 1029:11, 1029:14, 1030:7, 1030:18, 1030:19
**willing** [1] - 1077:14
**win** [4] - 975:16, 1049:16, 1050:22
**window** [4] - 1014:14, 1014:17, 1033:12, 1047:15
**windows** [1] - 1059:19
**wing** [1] - 1067:14
**Wing** [7] - 1036:9, 1036:15, 1038:4, 1047:2, 1054:19, 1080:11, 1080:19
**winky** [1] - 1053:2
**winky-face** [1] - 1053:2
**Wisconsin** [1] - 1051:4
**wish** [9] - 974:8, 974:10, 975:9, 1007:2, 1010:7, 1011:16, 1049:13, 1050:8, 1084:19
**wished** [1] - 1026:15
**wishes** [1] - 1058:13
**witness** [29] - 960:19, 1008:15, 1014:8, 1016:6, 1016:15, 1016:18, 1016:19, 1016:20, 1016:22, 1016:23, 1016:24, 1016:25, 1017:1, 1017:2, 1017:4, 1017:12, 1017:15, 1018:1, 1018:3, 1018:5, 1018:8, 1018:9, 1018:10, 1018:15, 1018:17, 1022:10, 1022:16
**WITNESS** [5] - 958:20, 959:20, 981:12, 981:14, 989:17
**Witness** [2] - 958:21, 990:5
**witness's** [5] - 1014:9, 1016:17, 1016:24,

1017:7, 1017:9
**witnesses** [12] - 1011:1, 1012:1, 1015:14, 1015:16, 1015:17, 1015:19, 1016:12, 1016:14, 1017:15, 1019:5, 1019:6, 1062:9
**witnessing** [1] - 1017:17
**woke** [1] - 1014:19
**woman** [1] - 1074:12
**women** [3] - 1075:19, 1075:23
**won** [2] - 977:24, 1036:11
**wonder** [2] - 975:16, 1049:15
**wonderful** [1] - 1009:3
**word** [3] - 976:3, 1001:25, 1060:9
**words** [19] - 960:7, 960:13, 991:16, 1006:10, 1019:16, 1019:17, 1025:24, 1028:7, 1031:7, 1031:21, 1032:18, 1033:6, 1033:14, 1043:11, 1052:17, 1056:14, 1076:19, 1076:25, 1082:14
**works** [2] - 1068:24, 1069:18
**world** [1] - 985:9
**worry** [1] - 982:25
**wrap** [1] - 1082:21
**wrapping** [1] - 969:9
**write** [2] - 998:20, 1086:16
**writing** [3] - 996:18, 1085:9, 1085:15
**written** [1] - 1003:4
**wrongdoing** [2] - 1022:6, 1022:7
**wrongful** [2] - 1022:5, 1054:6
**wrongfully** [1] - 1059:15
**wrongness** [1] - 1066:4
**wrote** [1] - 996:3

## Y

**y'all** [2] - 1064:9, 1074:17
**year** [2] - 1053:11, 1053:13
**yell** [1] - 1052:14
**yelled** [1] - 1033:10
**yelling** [2] - 1037:22, 1056:1
**yesterday** [3] - 969:21, 970:4, 1036:22
**yo** [6] - 960:8, 961:1, 976:7, 978:15, 1079:11, 1081:4
**young** [1] - 966:8
**yourself** [10] - 964:8, 965:4, 965:11, 965:16, 966:17, 968:11, 968:22, 1045:24, 1048:12, 1081:25