# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cr-37-TNM |
| | ) | |
| | ) | |
| TIMOTHY HALE-CUSANELLI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT HALE-CUSANELLI'S MOTION FOR JUDGMENT OF ACQUITTAL
AND MOTION FOR A NEW TRIAL**

## Table of Contents

Introduction ........................................................................................... 1

The Superseding Indictment, pretrial hearings, and trial .......................... 3

    A.    The Superseding Indictment ........................................................ 3

    B.    Pretrial rulings on Rule 404(b) evidence and Defendant's motion
           to dismiss ................................................................................. 3

    C.    Trial ......................................................................................... 6

           1.    The Defendant's racist, misogynist, and anti-Semitic statements ..... 7

           2.    Evidence concerning the Defendant's obstruction *vel non* of the
                 joint session ........................................................................ 13

           3.    The jury instructions, verdict, and poll of the jury ...................... 16

Argument ............................................................................................. 18

    I.    Standard for Rule 29 and Rule 33 motions .................................... 18

    II.    A judgment of acquittal should be entered on Count One because the
          government presented no evidence of an "official proceeding" under
          Section 1512(c)(2) .................................................................... 18

           A.    The plain meaning of "proceeding" contemplates investigations
                and evidence; the court erred in *Montgomery* in concluding that
                the joint session was a Chapter 73 proceeding ........................ 18

           B.    *Montgomery* erred in holding that the *Ermoian/Kelley* construction
                of "proceeding" is inconsistent with "what Congress does" ........ 28

    III.    A judgment of acquittal should be entered on Count One because
          the government did not present evidence showing the Defendant's
          acts affected the integrity or availability of evidence .................... 36

           A.    The text of § 1512(c) does not support the government's
                interpretation ...................................................................... 37

           B.    *Miller* was plainly correct on statutory context and history ........ 46

    IV.    A judgment of acquittal should be entered on Count One because the
          government did not present evidence sufficient to establish that the

Defendant acted "corruptly" ................................................................ 49

    A.    "Corruptly" has been equated with "wrongfully" only in the
administration of justice context ............................................... 50

    B.    *Poindexter* required the government to prove additionally that the
Defendant committed transitive obstruction ........................... 53

V.    The evidence was insufficient to establish that the Defendant obstructed
the joint session and the jury should have been given a special unanimity
instruction on Count One because the attempt crime was bundled with the
completed offense ............................................................................. 54

VI.    Even if the evidence were sufficient in the above respects, at the
least the Court would be left with serious ambiguity or unconstitutional
vagueness ......................................................................................... 56

VII.    If the Court does not enter a judgment of acquittal on Count One, it should
alternatively order a new trial ......................................................... 58

    A.    The government's racism, anti-Semitism, and misogyny evidence
violated the Court's pretrial ruling and the Defendant's substantial
rights .......................................................................................... 58

    B.    The government's opening statement and closing argument
contained statements of fact not supported by proper evidence
introduced at trial ..................................................................... 60

    C.    The Count One verdict must be set aside because the "corruptly"
instruction gave the jury an impermissible ground for conviction ..... 61

    D.    The admission of Schwager's invalid testimony prejudiced the
Defendant's substantial rights ................................................... 63

Conclusion .................................................................................................. 64

**Introduction**

On May 27, the jury returned a verdict finding Hale-Cusanelli guilty on Counts One through Five of the Superseding Indictment.  He now moves for a judgment notwithstanding the guilty verdict on Count One, an offense under 18 U.S.C. § 1512(c)(2).  Fed. R. Crim. P. 29(c).  Alternatively, he moves for a new trial required by the interest of justice.  Fed. R. Crim. P. 33.

The evidence was insufficient to sustain a conviction on Count One for several reasons.  First, it did not establish an "official proceeding."  For over a century before January 6, no court had found the existence of a "proceeding" under Chapter 73—titled "Obstruction of Justice"— that did not involve an investigation or evidence.  Interference with those things is an irreducible element of an obstruction of justice offense in federal courts.  Because the evidence did not show that the joint session of Congress on January 6 involved either of them, a judgment of acquittal should be entered.  Other judges in this district have disagreed, holding that Congress could have used the terms "inquiry or investigation" to define "proceeding" in § 1512 but did not do so.  Thus, by "proceeding" Congress meant any sort of formal assembly (at least in the case of a congressional proceeding).  That logic assumes what it aims to demonstrate: that a Chapter 73 "proceeding" does not necessarily entail an "inquiry or investigation."  When Congress uses the language of one statute in a related law, courts presume that the legislature intended the same meaning in both.  Similarly, courts presume that, when it passes legislation, Congress is aware of the construction placed on preexisting statutory terms by case law.  When the legislation creating § 1512(c)(2) was enacted, Chapter 73's "proceedings" had always been defined by courts to entail investigations and evidence.  The government's construction confuses function and form. Chapter 73's laws are concerned with protecting a specific function—administering justice—not any form that may be likened to the forms of justice at superficial levels of generality (e.g., while

1

sitting at a Capitol dais the President of the Senate "looks like a judge").  The function of a

Chapter 73 "proceeding" is to find facts and render judgments about them.  That is what defines

those proceedings.  In the context of Congress, that means inquiries and investigations.

Second, the evidence was insufficient to establish that the Defendant's acts affected the

integrity or availability of evidence in an official proceeding.  The government's novel

construction of § 1512—which decouples a statute titled "Tampering with a witness, victim or

informant" from any relationship to evidence—runs counter to text, canons of construction,

Supreme Court decisions, statutory context, legislative history and common sense.

Third, the evidence was insufficient to establish that the Defendant acted with the intent

to obtain an unlawful advantage for himself or an associate.  Thus, under the well-established

definition of the term, the evidence did not establish that he acted "corruptly."  That is why, in

the vernacular, one may sensibly refer to (say) "corrupt" businessmen, public officials, or

litigants who benefit themselves contrary to law.  But if one refers to "corrupt" political

protesters, one is not talking sense.

All these issues are symptomatic of the same disease: prosecuting protest at the Capitol

with an obstruction-of-justice statute is a category mistake with unwelcome consequences.

Even if judgment notwithstanding the guilty verdict on Count One were unwarranted, a

new trial would be required.  Wagering that the Court would sooner see its own pretrial Rule

404(b) ruling violated than order a new trial, the government repeatedly introduced highly

inflammatory "evidence" depicting the Defendant's derogatory comments about racial and ethnic

minorities.  Those minorities were empaneled on the jury itself.  Envenoming the proceedings

further, the government brandished this vile material in both its opening and closing statements,

prompting at least one minority juror to throw up his hands in emotion.  The interest of justice

demands a new trial on account of the calculated misuse of this improper material alone.

Additionally, even if the Court does not accept the Defendant's construction of § 1512(c)'s

"corruptly," a jury instruction defined that term to mean, among other things, acting with any

"wrongful" purpose.  But even the § 1512(c) decisions on which the Court has relied rejected

that value-laden definition for its vagueness.  Because the jury was given an impermissible

ground for conviction, the verdict on Count One must be set aside.

**The Superseding Indictment, pretrial hearings, and trial**

### A.      The Superseding Indictment

The Superseding Indictment was filed on March 9, 2022, charging the Defendant on five

Counts: (1) Count One: Obstruction of an official proceeding, 18 U.S.C. § 1512(c)(2), and

attempting to commit, and aiding and abetting the commission of, the same offense; (2) Count

Two: Entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); (3)

Count Three: Disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. §

1752(a)(2); (4) Count Four: Disorderly conduct in a Capitol Building, 40 U.S.C. §

5104(e)(2)(D); and (5) Count Five: Parading, demonstrating, or picketing in a Capitol Building,

40 U.S.C. § 5104(e)(2)(G).  Superseding Indictment, ECF No. 59.

### B.      Pretrial rulings on Rule 404(b) evidence and Defendant's motion to dismiss

On September 30, 2021, the government served notice on the defense that it intended to

introduce at trial evidence that would fall under Federal Rule of Evidence 404(b).  The

Defendant moved to exclude the material from trial.  ECF No. 63.  This included multiple texts

and recorded statements from the Defendant that an impartial observer might regard as anti-

Semitic, racist and misogynist.  They included statements and actions where the Defendant, in

the government's words,

- "Expressed a belief in Jewish control of and influence on major national institutions, including major tech companies, media, and government";

- When asked who was responsible for the terror attacks of 9/11, the Defendant replied, "I don't know, but I bet they had big noses";

- Attributed the "divide in America" to "The Democrats, Joe Biden, the Jews";

- "Openly espoused a white supremacist and Nazi sympathizer ideology in conversations with coworkers and in social media postings";

- "Coworkers observed Defendant adopt what they referred to as a 'Hitler mustache' and a combover hairstyle, from which they inferred that Defendant aimed to impersonate Adolf Hitler and idealized Nazi Germany";

- Told coworkers that "'if [Defendant] was a Nazi [at] the time [], [Defendant] would kill all the Jews and eat them for breakfast, lunch and dinner, and he wouldn't need to season them because the salt from their tears would make it flavorful enough'";

- Told coworkers that "Jews, women, and blacks were on the bottom of the totem pole."

ECF No. 68, pp. 2-5.

These statements the government put into the public record of this case in an effort, it said, to introduce them at trial under Rule 404(b). ECF No. 68. The government's stated basis for using this "evidence" at trial—and for filing it publicly where it would be viewed by the press and thus the venire whether or not it was admitted at trial—was as follows. The racist and anti-Semitic comments "demonstrate Defendant's corrupt state of mind and a nexus to Congress's certification of the Electoral College vote." *Id.* at 8.

4

In a hearing on May 6, the Court excluded this "evidence" from trial.  It is hard to see how the Court could have done otherwise consistent with the Federal Rules of Evidence.  The Court focused on Rule 403.  It found that the Defendant's "comments about Jews, minorities and women" were "of limited probative value."  5/6/2022 Hr'g Tr. at 13:9-14.  The Court explained,

> The Government wishes to show the jury that part of Mr. Hale-Cusanelli's motive was to overturn a government that he believes is controlled by Jews.  But Mr. Hale Cusanelli's other statements about sparking a civil war and wanting a clean slate already show a subversive motive.  Indeed, those statements are more directly related to the charges than his anti-Semitic statements.  His animus towards Jews is therefore cumulative and somewhat tangential to the desire to overturn an election.

 5/6/2022 Hr'g Tr. at 13:16-23.

But the problem was not just low probative value.  The Defendant's "statements about Jews," the Court held, "will likely evoke a strong negative emotional response from any reasonable juror." 5/6/2022 Hr'g Tr. at 14:1.  The Court went on,

> Decent society abhors anti-Semitic remarks.  Anyone who hears them will almost automatically make negative assumptions about the speaker that will make it difficult for the juror to separate that impression from guilt or innocence as to a particular charge.  As the D.C. Circuit has noted, discussions about racial bias "threaten the fairness of a trial." That is *United States v. Doe*, 903 F.2d 16, 22 (D.C. Cir. 1990).  The Court cannot "treat lightly the risk that racial bias may influence a jury's verdict in this criminal case." *Id.* at 21.
>
> That potential for influence is present here.  The visceral reaction to the defendant's statements is exactly the kind of response that might "lure the jury" into declaring him guilty.  That's *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013).  Specifically, the jury might judge Mr. Hale-Cusanelli for being a bigot rather than obstructing an official proceeding or entering a restricted area.  I also looked to *United States v. Hazelwood*, 979 F.3d 398, 413 (6th Cir. 2020) [same].
>
> And Mr. Hale-Cusanelli's alleged statements are odious enough that, as Justice Cardozo would say, their "reverberating clang" might "drown all weaker sounds" presented by the rest of the evidence.  That's from *Shepard v. United States*, 290 U.S. 96, 104 (1933).  Because Mr. Hale-Cusanelli's statements about Jews and the Nazi party are unfairly prejudicial to him and are of limited probative value, the Court holds that Rule 403 bars their admission. . . .

5/6/2022 Hr'g Tr. at 14-15.

5

Accordingly, the Court granted the Defendant's motion to exclude all "his alleged statements about Jews, the Nazi party, minorities or women." *Id.* at 15:9-11.

The Court also denied the Defendant's motion to dismiss Count One, the § 1512(c)(2) offense, for the following reasons. First, the Court held that the joint session of Congress to count electoral certificates was an "official proceeding." 5/6/2022 Hr'g Tr. at 3. Citing to *United States v. Sandlin*, 21-cr-88-DLF, 2021 U.S. Dist. LEXIS 237131 (D.D.C. Dec. 10, 2021), the Court determined there were "lay" and legal definitions of "proceeding," but that the joint session satisfies all of them because it "has the trappings of a formal hearing before an official body." *Id.* at 3:17-18. Second, the Court rejected the Defendant's argument that "Section 1512(c)(2)'s prohibition is limited to obstruction tried to documentary or tangible evidence." *Id.* at 4. Comparing subsections (c)(1) and (c)(2), the Court reasoned that "it is most natural to read the statute to say that (c)(1) is about interfering with the evidence used in an official proceeding, and (c)(2) is about interfering with the proceeding itself." *Id.* at 5:10-11.[1] Third, the Court rejected the Defendant's vagueness argument derived from *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991). The Court appeared to treat the argument as a facial challenge to the term "corruptly" generally, as opposed to an as-applied challenge. 5/6/2022 Hr'g Tr. at 8-9. The Court did not find "corruptly" vague in all its applications and held that *Poindexter* "does not apply to a motion to dismiss an obstruction count." *Id.* at 9:18-20.

## C.     Trial

On May 24, the Court instructed the jury on the charges before the parties' opening statements. With respect to Count One and § 1512(c)(2)'s "corruptly" element, the Court

---

[1] The Court considered additional permutations of the second argument. 5/6/2022 Hr'g Tr. at 6-7. Defendant will address those below in the argument section.

instructed the jury as follows.  "The Government must prove beyond a reasonable doubt each of the elements of the offense . . . [including that Hale-Cusanelli] acted corruptly, which means he used unlawful means or had a wrongful purpose and acted with consciousness of wrongdoing."  Tr. at 275-76.

### 1.    The Defendant's racist, misogynist, and anti-Semitic statements

The jury then heard opening statements.  The government's included this passage:

> How do we know that [Hale-Cusanelli's] intent was corrupt, that he acted with consciousness of wrongdoing?  You're going to hear from Hale-Cusanelli's roommate, Mike Jacobs. . . You'll hear [Hale-Cusanelli] say that no amount of activism will ever remove their influence.  By "their influence," you'll hear Mike Jacobs say that **when Hale-Cusanelli is referring to "their influence," what he means is Jewish interests, whom he believes are controlling President Biden and the Democratic Party**.

Tr. at 300:15-22 (emboldening added).

The government then proceeded to present the following "evidence" at trial.  The government called Special Agent Daniel Meyers of the Naval Criminal Investigative Service to offer testimony about the contents of the Defendant's mobile phone, including text messages he sent and received.  Tr. at 442.  Notwithstanding the Court's pretrial order excluding all Defendant's "alleged statements about Jews, the Nazi party, minorities or women," 5/6/2022 Hr'g Tr. at 15:9-11, the government proceeded to introduce the following Defendant statements and actions over the course of multiple days of trial testimony:

- A text message to one Justice Huettler: "LOL.  If true, it'd make that dumb town hall event last night make more sense.  Did you see **that bitch** try to force Trump to disavow the **deep state's involvement with the pedophilia**?" Tr. at 474:13-17 (emboldening added);

- A text message to Huettler: "It was basically just Trump arguing back and forth with **some dumb bitch**.  Yeah they're in major damage control mode over Biden's son." *Id.* at 475:14-16 (emboldening added);

- A text message to Huettler: "We know New England is **libtard central** but early results show a slight lead and LOL it's some map showing Kansas as blue." *Id.* at 476:22-25 (emboldening added);

- A text message to Huettler: "Trump is leading in all the remaining states that matter. **Minus N***** rigging which they'll try, he wins.** Trump declared a win on Twitter already but Twitter is trying to censor the tweet." *Id.* at 477:1-4 (emboldening added).



Gov't Exh. 350.2 (circle annotation added).

- A text message to Huettler: "Impossible to tell. AZ Trump ballots are being invalidated because they're marked in Sharpie as directed by election officials. GA, NC, VA, and PA, they refuse to call since yesterday. NV was closing the gap in favor of Trump. **Then again these N***** decided they won't count any more until Thursday. . ."** Tr. at 480:1-4 (emboldening added).

[Image on next page]

8



Gov't Exh. 350.2 (circle annotation added).

• A text message to Huettler: "It's not over yet. **Don't be black pilled**." Tr. at 482:20-22 (emboldening added);

• A text to "Buhan Aka God": "It was basically just **the sheboon being a cunt**[2] for an hour and silver fox Pence calling her out." *Id.* at 459:14-6 (emboldening added);



Gov't Exh. 350.4 (circle annotation added).

---

[2] "Sheboon" is a derogatory term denoting an "ugly, fat or stupid black woman." *Sheboon*. Wiktionary, The Free Dictionary, at: https://en.wiktionary.org/wiki/sheboon.

- The Defendant's text to a relative: "Fuck yeah.  That's the problem with Republicans.  **They're faggots** and let Democrats cheat all the fucking time.  Trump knows what they're doing and is gonna fight it and he should.  **Fuck these kikes.**" Tr. at 499:14-18 (emboldening added);



Gov't Exh. 350.5 (circle annotation added).

- The Defendant's text to a relative: "**This N***** got 140,000 votes magically** and Trump literally zero, as well as the third party losers.  No fucking way." Tr. at 500:11-13 (emboldening added);



Gov't Exh. 350.5 (circle annotation added).

- Defendant commented to his roommate "Mike Jacobs" that, "basically," "Joe Biden was a puppet for like corporations and **Jewish interests to basically take over our country.**" Tr. at 709:13-15 (emboldening added);

- Mike Jacobs testified that the "only topic" he could not discuss with the Defendant because of the latter's abhorrent views was "**race issues in America.**" *Id.* at 711:3-4 (emboldening added);

- Mike Jacobs: the Defendant "believes that [Democrats, Joe Biden and the Jews] are either the same person or people who are being **backed by Jewish interests within the Democratic Party**.  So . . . [they are] like **puppets for Jewish interests in America**." *Id.* at 767:9-13 (emboldening added);

```
15              MR. HALE-CUSANELLI:  Change what's going on.
16   What's going on?
17              CHS:  Well, like, the Biden America, the
18   democrats, Joe Biden, the Jews.
19              MR. HALE-CUSANELLI:  You're repeating yourself.
20              CHS:  Are you saying they're all part of the Jews?
21              MR. HALE-CUSANELLI:  Of course.  I'd give them 24
22   hours to leave.  No (indiscernible).  What I would do is
23   just arrest them all.  Not all the Jews, gotta kind of
24   accept a lot, but, yeah, I would purge Congress
25   (indiscernible) have any purpose or use.  They're all a
```

Gov't Exh. 100T at 29 (circle annotation added).

After the close of its case, the government moved the Court to introduce more of the Defendant's anti-Semitic, racist and misogynistic statements.  Tr. at 991.  Its argument went as follows.  In the Defendant's testimony he "talk[ed] about he's half Jewish and this is how his friends talk and they're just having banter with each other and it's funny." *Id.* at 993.  However, although it may be "funny to him," it was less "funny" to the government.  *Id.*  Therefore, the jury should see additional racist statements from the Defendant.  The Court rejected the government's motion in the following ruling:

> THE COURT: I'm going to deny the government's motion . . . largely for the reasons I've already stated.  I think the additional evidence would be highly prejudicial with

relatively low probative value.  I think this is all kind of—the Jewish discussion really feels to me well beyond the scope of what this case is supposed to be about. . . And so I don't see how showing more offensive statements [] impeaches [the Defendant]. . . [F]rankly it feels like a confusion of the issues and unduly prejudicial. . .

Tr. at 994.

Minutes after the Court's ruling, the government ignored it in its closing argument.   In

making its argument that the Defendant possessed the requisite criminal intent to violate §

1512(c)(2), the very first piece of "evidence" it adduced to the jury was the following:

Now . . . you have lots of evidence that you can infer knowledge and intent from.  So, first—next slide.  Defendant had numerous concerns about the Democrats and Joe Biden.  You heard from his roommate that he said Biden America, **Democrats Biden Jews**. The roommate says, "you're repeating yourself." CHS says, "**You're saying they're all part of the Jews**?" **Defendant says, "Yes, of course, I give them 24 hours to leave**."

Tr. at 1048:7-14 (emboldening added).

Next, during closing argument itself, the government appeared to show the jury the

following text message from the Defendant:



Tr. at 1051 (displaying slide depicting Gov't Exh. 350.2) (circle annotation added).

The government then emphasized to the jury that "to act corruptly" the Defendant may

either "use unlawful means" or have a "wrongful . . . purpose." *Id.* at 1054.

12

2.      **Evidence concerning the Defendant's obstruction *vel non* of the joint session**

The government offered the testimony of Daniel Schwager, former general counsel to the secretary of the United States Senate. Tr. at 401. Schwager, a lay witness, offered testimony involving his interpretation of federal statutes. *Id.* After instructing the jury on legal issues as if he were a judge, Schwager later testified as to certain factual matters on January 6.

Schwager testified that at 1:14 p.m. on January 6, the President of the Senate directed the two Houses to "withdraw from the joint session." Tr. at 423:19-20.



Gov't Exh. 508.



Gov't Exh. 508.

Schwager testified that the President of the Senate did this so the separated Houses could "debate and then vote on the objection to the counting of the Arizona certificates of vote." Tr. at 423.  He testified that until the joint session reconvened no electoral votes could be certified or rejected, under 3 U.S.C. § 15, where the Electoral Count Act (ECA) is codified.  *Id.* at 424. Schwager testified that each time the President of the Senate suspends the joint session under the ECA's certificate-objection protocol, congressmen and senators are "entitled to two hours of debate." *Id.* at 424.  Thus, "if there were 10 objections lodged by both a member and a Senator, that could be up to 20 hours of debate on those objections" before the joint session would be reconvened to certify or reject electoral certificates.  *Id.* at 425.  Relying on the ECA, Schwager testified that Congress has "got to get [the electoral certification process] done, basically, within five days.  If not, no more recesses." *Id.* at 413.

Schwager testified that the Congressional Record is a "substantially verbatim record" of congressional proceedings.  Tr. at 420.  He relied on the Record for his testimony.  *Id.*  The Record shows that after the joint session briefly reconvened on the evening of January 6, at around 11:35 p.m., the Houses separated again, for hours, to debate objections to electoral certificates until the early morning hours of January 7.  167 Cong. Rec. H94-H117 (Jan. 6, 2021). Schwager testified that congressmen and senators had previously returned to the Capitol in the "seven or eight o'clock [p.m.] timeframe" in order for the still-separated Houses "to continue the debate on the [Arizona] objection at hand and continue the joint session thereafter." Tr. at 438-39.

The government offered the testimony of Special Agent Erik Framhein in order to demonstrate when the Defendant entered the Capitol Building on January 6.  Tr. at 550.  Making reference to the Capitol CCTV footage in Government Exhibit 403, Framhein testified that the

14

Defendant entered the Capitol Building "just a little bit before 2:14:19 p.m.," *Id.* at 575:21-22, which was exactly one hour after the President of the Senate had directed the Houses to "withdraw from the joint session." 5/24/2022 Tr. at 423:19-20.  Again referring to CCTV footage, Framhein testified that the Defendant exited the Capitol Building at 2:53:57 p.m.  *Id.* at 632:8.  Thus, the Defendant was inside the building for approximately 40 minutes.  At no point in that period was the joint session convened.

The government appeared to focus on two moments inside the Capitol Building featuring the Defendant.  Making reference to CCTV footage, Framhein testified that the Defendant "waved his arms" at a skylight.  Tr. at 607 (referencing Government Exhibit 411).  The significance of this appears to have been that "there were [] individuals outside on the east front in and around the area of the skylight at the time the Defendant [was] making that motion with his arms." *Id.* at 610:18-20.   Second, after a police officer tackled a protester under the skylight, "the Defendant c[ame] over, grab[bed] the [protester] that the officer was engaged with by what appears to be his collar for a second.  Then the Defendant back[ed] off and t[ook] his hat off, put[] it in front of his face." *Id.* at 613:20-24 (referencing Government Exhibit 411).

Inspector Monique Moore, of the U.S. Capitol Police, testified generally about security at the Capitol on January 6.  Tr. at 315.  She was questioned as follows:

> Q: Inspector Moore, did it make a difference when or where any individual rioter entered the building, or was it the entry of a mob that stopped the proceedings?
>
> A: That's correct.
>
> Q: Sorry.  Can you say specifically?
>
> A: It was just the entry of the unwanted authorized guests that stopped the proceedings.

*Id.* at 396:15-21.

Officer Raymond Watts, of the U.S. Capitol Police, also testified generally about security at the Capitol on January 6.  Tr. at 665.  Officer Watts was questioned as follows:

> Q: So you as U.S. Capitol Police, the mob's out on the west front, they've yet to breach the building.  What does their presence there mean from a law enforcement perspective for the security of, for example, House members in the House gallery?
>
> A: It was an imminent danger. . . Now, granted, we've—I've been on the department like 14 years, so protests [are] not new.  Protests while members are in session actively having votes is not new.  We've done this before.  That was new.  It was imminent danger based on the actions of the individuals who breached multiple layers of the Capitol . . .
>
> . . . .
>
> Q: Officer Watts . . . my question was does it make a difference if one individual, out of many, is in the visitor center or is in the Rotunda, for example?
>
> A: No. A breach of the Capitol is a breach of the Capitol.  We have screening posts at every entrance of the Capitol . . .

*Id.* at 700:2-6; 702:4-7.

### 3.    The jury instructions, verdict, and poll of the jury

The Court instructed the jury on Count One in the following manner: "As used in Count 1, the term 'official proceedings' means Congress's joint session to certify the electoral college vote." Tr. at 1021.

Similarly, the Court instructed the jury, with respect to Count Four, that "the orderly conduct of a session of Congress or either house of Congress includes all the actions of the joint session of Congress convened on January 6, 2021 to certify the electoral college presidential election of 2020." *Id.* at 1029:19-23.

With respect to Count One's "corruptly" element, the Court instructed the jury that "to act corruptly, the defendant must use unlawful means [,] have a wrongful or an unlawful purpose or both.  The defendant also must act with consciousness of wrongdoing.  Consciousness of

16

wrongdoing means with an understanding or awareness that what the person is doing is wrong or unlawful." *Id.* at 1022:4-8.

Prior to instruction of the jury, the Defendant's counsel asked for a special unanimity instruction to cure the duplicity in Count One. *Id.* at 1003-1008. The Defendant noted that Count One bundled a completed § 1512(c)(2) offense with the separate offense of attempt to commit that crime. The government objected that the jury did not need to be unanimous as to either attempt or the completed offense, so long as they were unanimous that the government had proven one or the other offense beyond a reasonable doubt. *Id.* at 1003:4-7. The Court appeared to disagree:

> THE COURT: But don't they [have to be unanimous as to either]? I could be wrong on this, but I thought you couldn't have half the jury think he's guilty of obstruction and half the jury think he's guilty of attempt.

*Id.* at 1003:8-11.

Ultimately, however, the Court declined to instruct the jury on special unanimity. It stated, "That's what the government wants, and it can deal with the appellate consequences." *Id.* at 1008:9-10. Accordingly, the jury instructions contained these sentences concerning unanimity: "A verdict must represent the considered judgment of each juror, and in order to return a verdict, each juror must agree on the verdict. In other words, your verdict must be unanimous." *Id.* at 1031:5-8.

The jury returned a verdict of guilt on Counts One through Five. Tr. at 1121. While the Court polled the jury, the poll did not inquire whether, with respect to Count One, the jury was unanimous as to a completed § 1512(c)(2) offense (including aiding and abetting such an offense), as to attempt, or as to neither. *Id.* at 1121-22.

**Argument**

## I.     **Standard for Rule 29 and Rule 33 motions**

Rule 29 provides that "[i]f the jury has returned a guilty verdict, the court may set aside

the verdict and enter an acquittal." Fed. R. Crim. P. 29(c). Such a motion for judgment of

acquittal should be granted where the evidence is not "sufficient to permit a rational trier of fact

to find all the essential elements of the crime beyond a reasonable doubt." *United States v. Cook*,

526 F. Supp. 2d 10, 18 (D.D.C. 2007), *aff'd*, 330 Fed. Appx. 1, 2009 U.S. App. LEXIS 8384

(D.C. Cir., Apr. 21, 2009). The Court "must view the evidence in the light most favorable to the

verdict." *United States v. Campbell*, 702 F.2d 262, 264, 226 U.S. App. D.C. 283 (D.C. Cir.

1983).

Rule 33 provides that "the court may vacate any judgment and grant a new trial if the

interest of justice so requires." Fed. R. Crim. P. 33(a). "The Rule does not define 'interests of

justice' and the courts have had little success in trying to generalize its meaning." *United States*

*v. Cabrera*, 734 F. Supp. 2d 66, 87 (D.D.C. 2010) (quoting *United States v. Kuzniar*, 881 F.2d

466, 470 (7th Cir. 1989)). "Nevertheless, courts have interpreted the rule to require a new trial

'in the interests of justice' in a variety of situations in which the substantial rights of the

defendant have been jeopardized by errors or omissions during trial." *Id.* "'Any error of

sufficient magnitude to require reversal on appeal is an adequate ground for granting a new

trial.'" *United States v. Safavian*, 644 F. Supp. 2d, 1, 8 (D.D.C. 2009) (quoting 3 WRIGHT,

KING & KLEIN, FEDERAL PRACTICE AND PROCEDURE § 556 (3d ed. 2004)).

## II.    **A judgment of acquittal should be entered on Count One because the government presented no evidence of an "official proceeding" under § 1512(c)(2)**

### A.     **The plain meaning of "proceeding" contemplates investigations and evidence; the court erred in *Montgomery* in concluding that the joint session was a Chapter 73 proceeding**

Count One required the government to prove that on January 6 the Defendant corruptly obstructed, influenced or impeded an "official proceeding." § 1512(c)(2).  That term is defined elsewhere in § 1515 as follows:

(a) As used in sections 1512 and 1513 of this title and in this section—

(1) the term "official proceeding" means—

(A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(B) a proceeding before the Congress;

(C) a proceeding before a Federal Government agency which is authorized by law; or

(D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

18 U.S.C. § 1515(a)(1).

The Court must begin with the text.  An "official proceeding" includes a "proceeding before the Congress." § 1515(a)(1)(B).  But that does not "advance[] the Court's inquiry so far," as the question then becomes what did Congress mean by "proceeding"? *United States v. Montgomery*, 21-cr-46-RDM, 2021 U.S. Dist. LEXIS 246750, at *14 (D.D.C. Dec. 28, 2021).[3] "[R]ead most broadly," the term "proceeding" means "'[a]n act or step that is part of a larger action.'" *Id.* (quoting *Proceeding*, Black's Law Dictionary (11th ed. 2019)).  But even the judges

---

[3] The Defendant focuses on the *Montgomery* decision, as most of the other decisions in this district denying motions to dismiss the § 1512(c)(2) charge filed by January 6 defendants relied heavily on *Montgomery*.

who have declined to dismiss § 1512(c)(2) charges in the January 6 investigation have held that

there "are good reasons . . . to conclude that Congress did not use the word in th[at] sweeping

sense." *Id.*  In particular,

> in each iteration of Section 1515's definition of "official proceeding," the word
> "proceeding" is followed by the preposition "before." The "proceeding" must be "before"
> a judge, court, or grand jury; "before" the Congress of the United States; "before" a
> federal agency conducting a matter "authorized by law"; or "before" an insurance
> regulator or examiner.

*Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *14.

Those prepositions led the *Montgomery* court to interpret § 1515(a)'s "proceeding" as follows:

> First. . . [t]he actions or events that constitute the "proceedings" at issue must comprise
> part of the official business of the enumerated body. The fact that the defined term
> contains the adjective "official" merely reinforces this conclusion. 18 U.S.C. §§
> 1512(c) & 1515(a)(1). Second, the phrase "proceeding before" suggests that the body has
> convened in some formal respect for the purpose of conducting that business. The Court,
> accordingly, concludes that "a proceeding before the Congress" requires more than "an
> action or series of actions" and that not every event occurring within the walls of
> Congress constitutes an "official proceeding." The "proceeding" must involve a formal
> assembly or meeting of Congress for the purpose of conducting official business. This
> interpretation accords with commonly accepted legal definitions of the word
> "proceeding," which define the word to mean, among other things, "[t]he business
> conducted by . . . [an] official body." *Proceeding*, Black's Law Dictionary (11th ed.
> 2019).

*Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *14.

Before proceeding further, it is important to take stock of the *Montgomery* court's

analysis thus far.  The first thing to observe is that its recognition of multiple meanings for

"proceeding"—and the weight placed by the court on the preposition "before" and the adjective

"official"—initially appear to be quite similar to an analysis of § 1515(a) performed by the Ninth

Circuit in *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013).  There, the court of appeals

held that an FBI investigation does not constitute an "official proceeding" under § 1515(a).  *Id.*

20

However, the similarities between *Montgomery*'s interpretation of "proceeding" and the Ninth

Circuit's end there.[4]

First, referencing multiple dictionaries, the court of appeals determined that definitions of

"proceeding" fall "into one of two categories." *Ermoian*, 752 F.3d at 1169.  The first was the

"lay" sense of the noun: "'[t]he carrying on of an action or series of actions; action, course of

action; conduct, behavior.'" *Id.* (quoting *Proceeding*, Oxford English Dictionary).  Another "lay"

definition: "'an act or step that is part of a larger action.'" *Id.* (quoting *Proceeding*, Black's Law

Dictionary 1241 (8th ed. 2004)).  By contrast, the second and final definitional grouping was the

"legal" sense, meaning "'[a] legal action or process; any act done by authority of a court of law;

a step taken by either party in a legal case,'" *id.* (quoting *Proceeding*, Oxford English

Dictionary), or "'[t]he regular and orderly progression of a lawsuit, including all acts and events

between the time of commencement and the entry of judgment; any procedural means for

seeking redress from a tribunal or agency; and the business conducted by a court or other official

body; *a hearing*.'" *Id.* (quoting *Proceeding*, Black's Law Dictionary 1241 (8th ed. 2004))

(emphasis added).

Second, rather than reasoning that § 1515(a)'s preposition "before" and its adjective

"official" indicate that "the actions or events that constitute the 'proceedings' at issue must

merely comprise part of the official business of [an] enumerated body," *Montgomery*, 2021 U.S.

Dist. LEXIS 246750, at *14, the court of appeals in *Ermoian* concluded that,

> Several aspects of the definition for "official proceeding" suggest that the *legal*—rather
> than the lay—understanding of term "proceeding" is implicated *in the statute*. For one,
> the descriptor "official" indicates a sense of formality normally associated with *legal
> proceedings*, but not necessarily with a mere "action or series of actions." *See* 18 U.S.C.
> § 1515; *see also Proceeding*, Oxford English Dictionary, *available*

---

[4] This aspect of *Montgomery*'s analysis is similar to the Court's pretrial ruling here.  5/6/2022
Hr'g Tr. at 3.

*at* http://www.oed.com. Moreover, when used to define "official proceeding," the word "proceeding" is surrounded with other words that contemplate a *legal usage* of the term, including "judge or court," "Federal grand jury," "Congress," and "Federal Government agency" . . . .

 Thus, clues in the text surrounding "proceeding"—although perhaps not conclusive—point us in a general direction. And the overall tenor of the definitions associated with the legal usage of "proceeding" supports the notion that a mere criminal investigation does not qualify as one. *See* Black's Law Dictionary 1241 (8th ed. 2004). As the commentary accompanying that definition succinctly explains, "'Proceeding' is a word much used to express the *business done in courts*" and "is an act done *by the authority or direction of the court*, express or implied." *Id*. (quoting Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3-4 (2d ed. 1899)).

*Ermoian*, 752 F.3d at 1170 (emphasis added).

Turning back to *Montgomery*, the court did allude generally to the Ninth Circuit's observation in *Ermoian* that "proceeding" has multiple meanings.  *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *19.  However, *Montgomery* framed its definition of "proceeding" as being consistent with *Ermoian*'s: "as the Court does here, the Ninth Circuit rejected the broadest reading—that is, '[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior.'" *Id.* (quoting *Proceeding*, Oxford English Dictionary (3d ed. 2007)).  The *Montgomery* court allowed that—to be sure—*Ermoian* held that "'the descriptor 'official' indicates a sense of formality normally associated with *legal proceedings*[.]'" *Id.* (quoting *Ermoian*, 752 F.3d at 1170) (emphasis added).  But, *Montgomery* hastened to add, "if anything," Congress's certification of the electoral vote is "a *more* formal (and, indeed, solemn) occasion than most 'legal proceedings.'" *Id.* (emphasis original).

In fact, *Montgomery* conflicts with *Ermoian*.  First, *Ermoian* did not merely "reject[] the broadest reading" of "proceeding." *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *19.  Rather, as indicated above, the Ninth Circuit identified two definitional categories of "proceeding": lay and legal.  The legal sense of "proceeding" meant "the business done in

courts." *Ermoian*, 752 F.3d at 1170.  *Ermoian* held that *that* "understanding of the term

'proceeding' is implicated *in the statute*" overall.  *Id.* (emphasis added).  By contrast, the

*Montgomery* court arrived at a meaning of "proceeding"— "compris[ing] part of the official

business of the enumerated body"—that fits nowhere within the court of appeals' definitional

framework for "proceeding" in *Ermoian*.

Second, the *Montgomery* court omitted from its analysis the following passage from

*Ermoian*:

> Looking more broadly to § 1512 where the term "official proceeding" is repeatedly used,
> it becomes even more apparent that a criminal investigation is not incorporated in the
> definition. Section 1512 refers to "prevent[ing] the attendance or testimony of any person
> in an official proceeding"; "prevent[ing] the production of a record, document, or other
> object, in an official proceeding"; and "be[ing] absent from an official proceeding to
> which that person has been summoned by legal process." 18 U.S.C. § 1512(a)(1)(A)-
> (B), (a)(2)(B)(iv). *The use of the terms "attendance", "testimony", "production", and
> "summon[]" when describing an official proceeding strongly implies that some formal
> hearing before a tribunal is contemplated*.

*Ermoian*, 752 F.3d at 1172 (italics and underlining added).

Those italicized terms do not support *Montgomery*'s defining of "proceeding" to mean

"the official business" of any "enumerated body"—even if it does not consider evidence or make

findings.  2021 U.S. Dist. LEXIS 246750, at *19.  To the contrary, those terms show that it was

not some "formality" per se that drove *Ermoian*, *cf. Montgomery*, 2021 U.S. Dist. LEXIS

246750, at *19 ("if anything," Congress's certification of the electoral vote is "a more *formal*

(and, indeed, solemn) occasion than most 'legal proceedings'") (emphasis added), but rather an

evidence-reviewing *function* that defined the "proceeding." To be sure, *Montgomery* held, many

or most of § 1512's provisions "contemplate[] a formal environment in which persons are called

to appear or produce documents," but "that point is not true for all parts of the statute." *Id.* at 26.

*Montgomery* then gave the following sole counterexample to contest *Ermoian*'s reasoning:

> Section 1512(d)(1) . . . prohibits hindering "any person from . . . attending . . . an official proceeding," and would thus apply, for example, to efforts to prevent judges, magistrates, members of Congress, and agency officials from attending "official proceeding[s]"— *regardless of whether* [. . .] *any "evidence" will be received.*

2021 U.S. Dist. LEXIS 246750, at *26 (emphasis added).

*Montgomery*'s proposed counterexample to *Ermoian* requires unpacking.  The Court will notice first that *Montgomery*'s citation to § 1512(d)(1) contains a good deal of ellipsis.  Without the omissions, subsection (d) provides,

> (d)Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—
>
> > (1) attending or testifying in an official proceeding;
> >
> > (2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;
> >
> > (3) arresting or seeking the arrest of another person in connection with a Federal offense; or
> >
> > (4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding . . . [shall be punished].

18 U.S.C. § 1512(d).

The Court will next notice that in making the point that subsection (d)(1) prohibits hindering "'any person from . . . attending . . . an official proceeding,'" 2021 U.S. Dist. LEXIS 246750, at *26 (quoting § 1512(d)(1)), *Montgomery* omitted the phrase "or testifying" after "attending." Of course, the word "testifying" does not support *Montgomery*'s perceived counterexample to *Ermoian*'s conclusion that all of § 1512's provisions implied that "proceeding" requires a tribunal that reviews evidence.  The Court will notice next that *Montgomery* also omitted any reference to § 1512(d)(2)-(4).  After all, those sections are

24

consistent with *Ermoian*'s *tribunal* interpretation of "proceeding." Finally, contrary to *Montgomery*, the word "attend[ance]" itself does not somehow support an inference that, although every other provision in § 1512 concerns evidence, a "proceeding" need not involve a review of it.   Throughout Chapter 73, the criminal code generally, and the Federal Rules of Criminal Procedure, the verb "attend" is consistently paired with a witness's appearance in a proceeding to give testimony, even where is not ultimately given or admitted.   *E.g.*, Fed. R. Crim. P. 17 (trial subpoena must "command the witness to *attend* and testify"; witness must be paid "*attendance* fee"; subpoena "requiring a witness to *attend* a hearing or trial may be served at any place within the United States") (emphasis added).   Contrary to *Montgomery*, then, no substantive provision in § 1512 supports an interpretation of "proceeding" that does not involve an investigation or evidence.

Third, the *Montgomery* court's reasoning creates redundancy in § 1515 that *Ermoian* avoided.   Section 1515's repeated use of the preposition "before," *Montgomery* held, "indicates that the actions or events that constitute the 'proceedings' at issue must comprise part of the official business of the enumerated body." *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *19. Added the court, "[t]he fact that the defined term contains the adjective 'official' merely reinforces this conclusion. 18 U.S.C. §§ 1512(c) & 1515(a)(1)." *Id.*   To the contrary, if the preposition "before" itself indicated that *any* official business of an enumerated body constituted a § 1515(a) "proceeding," the separate term "official" does not "reinforce [that] conclusion, *id.*— it would be superfluous.   Unlike *Montgomery*, the *Ermoian* court reasoned that the preposition "before" indicated "some formal hearing before a *tribunal*[.]" *Ermoian*, 752 F.3d at 1172 (emphasis added).   That is why an FBI investigation was not a "proceeding"—though it might well be under the *Montgomery* court's definition ("official business of a body").

*Montgomery* does not just conflict with *Ermoian*. By not considering a relevant canon of statutory construction, it conflicts with the D.C. Circuit's holding in *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994). In *Kelley*, the court of appeals considered whether an investigation opened by the Office of the Inspector General of the Agency for International Development constituted a "proceeding" as defined by the obstruction-of-justice statute § 1505. *Id.* at 1127. The D.C. Circuit identified two qualities that define such a "proceeding": "adjudicative power or . . . the power to enhance the[] investigation[] through the issuance of subpoenas or warrants." *Id.* (citing *United States v. Sutton,* 732 F.2d 1483, 1490 (10th Cir. 1984); *United States v. Vixie,* 532 F.2d 1277, 1278 (9th Cir. 1976); *United States v. Batten,* 226 F. Supp. 492, 493 (D.D.C. 1964), *cert denied,* 380 U.S. 912, 13 L. Ed. 2d 799, 85 S. Ct. 898 (1965), *reh'g denied,* 381 U.S. 930, 14 L. Ed. 2d 688, 85 S. Ct. 1557 (1965)). The government did not present evidence here that Congress's joint session on January 6 possessed adjudicative power; was an "investigation"; or had the power to issue subpoenas or warrants.

In *Kelley*, the defendant was also charged under § 1512. The government stipulated that a "parallel should be drawn between" § 1505 and § 1512 for purposes of defining the term "proceeding." *Kelley*, 36 F.3d at 1128. The Department of Justice appellate attorney who personally stipulated to this "parallel" was Merrick Garland. *Id.* at 1120.[5]

---

[5] That may go some way towards explaining why the Department of Justice's own Criminal Resource Manual itself rejects the government's "official proceeding" interpretation. Section 1512's "proceeding," the Manual accurately stated (before January 6), is simply a "restatement of the judicial interpretation of the word 'proceeding' in §§ 1503 and 1505," with the only difference being that in the latter provisions the proceeding had to be pending at the time of the offense. *Official Proceeding*, DOJ Manual, § 1730, https://www.justice.gov/archives/jm/criminal-resource-manual-1730-protection-government-processes-official-proceeding-requirement.

Any defense reliance on the Manual is "flawed," according to *United States v. Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *24 (D.D.C. Dec. 20, 2021). "For one, the Manual predates the

According to the *Montgomery* court, however, the D.C. Circuit's decision in *Kelley* was not "on point." 2021 U.S. Dist. LEXIS 246750, at *27. *Kelley*, *Montgomery* found, "concerns a different statute—Section 1505. . ." *Id.* To be sure, the *Montgomery* court observed, the government stipulated in *Kelley* that the term "proceeding" had a "parallel" meaning in § 1505 and § 1512. Actually, the current Attorney General stipulated that point. But that did not "illuminate the issue presented here," according to the *Montgomery* court. *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *27.

In considering *Kelley*, *Montgomery* omitted the canons of construction that "[w]hen Congress uses the language of one statute in another statute it usually intends both statutes to have the same meaning," *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1249 (D.C. Cir. 2004), and that courts "assume Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). The "assumption is that Congress knows the law— by which the Supreme Court means judicial decisions." *Avocados Plus Inc.*, 370 F.3d at 1249. In fact, later in its opinion, the *Montgomery* court implicitly identified its own error in not applying these canons in interpreting "proceeding," for it reasoned that § 1505 and § 1512(c)(2) overlapped to a great extent—and that was as it should be. *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *43 ("Chapter 73 inescapably contains numerous overlapping provisions. . .").[6] Yet,

---

enactment of section 1512(c), [as] it was last published in 1997." *Id.* *Caldwell*'s chronology was confused. As shown below, § 1515's "official proceeding" definitions were codified in 1982. And *Kelley*'s binding interpretation of "proceeding" was reached in 1994. *Kelley*, 36 F.3d at 1128. "[S]econd," *Caldwell* added, "the Manual's generalized statements cannot alter the plain meaning of the statutory text." *Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *24. However, the point is not that the Manual "alters text" but that it shows the government's interpretation of "official proceeding" is a nonce argument created for January 6 alone.

[6] It was likely similar reasoning that led the Attorney General to stipulate that *Kelley*'s interpretation of "proceeding" in § 1505, which would require a judgment of acquittal on Count One here, was "parallel to" the same term in § 1512.

to *Montgomery*, the D.C. Circuit's decision in *Kelley* is not "on point," as it. . . "concerns a different statute—Section 1505." 2021 U.S. Dist. LEXIS 246750, at *27.

Section 1512(c)(2) was codified after Congress enacted the Sarbanes-Oxley Act of 2002. Pub. L. No. 107-204, § 1102, 116 Stat. 745, 807.  Thus, so far from being "off point," the *Kelley* decision, decided in 1994, should have led the *Montgomery* court to "assum[e] . . . that Congress knows the law—by which the Supreme Court means judicial decisions." *Avocados Plus Inc.*, 370 F.3d at 1249.  Because "[w]hen Congress uses the language of one statute in another statute is usually intends both statutes to have the same meaning," *id*., the *Montgomery* court did not need to create a novel construction of the Chapter 73 term "proceeding." The D.C. Circuit had supplied a definition binding on *Montgomery* well before codification of § 1512(c): "adjudicative power or . . . the power to enhance the[] investigation[] through the issuance of subpoenas or warrants."  *Kelley*, 36 F.3d at 1128.

The *Montgomery* court did not identify any precedent supporting its defining of § 1512's "proceeding" to mean the "official business of [any] enumerated body." In over a century of Chapter 73 jurisprudence, there appears to be no precedent in which a court finds a "proceeding" that involves no investigation, no adjudication and no evidence.

**B.     *Montgomery* erred in holding that the *Ermoian/Kelley* construction of "proceeding" is inconsistent with "what Congress does"**

*Montgomery* concluded that it could not apply the *Kelley* construction of "proceeding"— "adjudicative power or . . . the power to enhance the[] investigation[] through the issuance of subpoenas or warrants," 36 F.3d at 1127—to the joint session because "[a]s a matter of separation of powers, that is not what Congress does." *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *20.  Congress legislates, it does not adjudicate, *Montgomery* advised.  The court then added another "to be sure":

> To be sure, Congress's legislative powers include the implicit authority to summon witnesses to elicit testimony, and to investigate facts about the world.  [But that power is] *in order to legislate*. . . Defendants' efforts to read "proceedings before the Congress" to mean proceedings that are "quasi-judicial" or that involve the "administration of justice," accordingly, cannot help but bring to mind the aphorism about square pegs and round holes.  Moreover, even assuming that Defendants are merely arguing by analogy, the analogy is inapt.

*Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *21 (emphasis original).

From *Montgomery*'s abbreviated analysis, one might conclude that courts in this circuit had never addressed the contours of obstruction-of-justice jurisprudence in the context of congressional proceedings.  For, although the federal obstruction laws have been in existence from at least the late nineteenth century, *Montgomery* did not anchor its definition of "proceeding" (any "official business" of Congress) in any relevant precedent.  A tertiary dictionary definition was sufficient.

It might be surprising for the reader to learn, perhaps, that the D.C. Circuit addressed these issues many decades ago in a published decision that was both binding on *Montgomery* and unmentioned by it.  In 1991 the court of appeals conducted a painstaking analysis of the entire legislative history of obstruction-of-Congress offenses—tracing it back to the 1800s—in connection with the Iran-Contra prosecutions.  *United States v. Poindexter*, 951 F.2d 369, 380-82 (D.C. Cir. 1991).  *Poindexter* conflicts with virtually everything *Montgomery* has to say about the nature of a Chapter 73 "proceeding" in the context of Congress.

From the 1980s to January 6, 2021, the only obstruction-of-Congress statute ever used in criminal prosecutions was § 1505.  *Poindexter*, 951 F.2d at 380.  Section 1505 explicitly states the type of congressional proceeding to which it applies: "the due and proper exercise of the power of inquiry under which any *inquiry or investigation* is being had by either House, or any committee of either House or any joint committee of the Congress. . ." § 1505 (emphasis added).

To *Montgomery*, this language meant that "Congress had the necessary vocabulary at hand and could have easily defined an 'official proceeding' [in § 1512] to include . . . a proceeding involving 'the power of inquiry or investigation,'" but did not. *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *17. That is mistaken. In fact, as *Poindexter* makes clear, in the context of congressional proceedings Congress and the courts had been using the terms "proceeding" and "inquiry or investigation" interchangeably prior to codification of § 1512 and § 1515:

> The terms of § 1505 were borrowed from a 1909 statute that has since become § 1503. . . The 1909 statute, codified at § 241 of the Criminal Code, read:
>
> Whoever corruptly, or by threats or force*,* or by any threatening letter or communication, shall endeavor to influence, intimidate, or impede any witness*,* in any court of the United States or before any United States commissioner or officer acting as such commissioner, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner, in the discharge of his duty, or who corruptly or by threats or force, or by any threatening letter or communication, shall influence, obstruct, or impede, or endeavor to influence, obstruct, or impede, the due administration of justice therein*,* [violates the statute].

*Poindexter*, 951 F.2d at 380.

Later, in 1940, Section 241(a), the direct predecessor of § 1505, was enacted to supplement § 241 with a parallel provision applicable to "conduct affecting *proceedings* before . . . the Congress:

> That [1] whoever corruptly, or by threats or force, or by any threatening letter or communication, shall endeavor to influence, intimidate, or impede *any witness* in any proceeding pending before any department, independent establishment, board, commission, or other agency of the United States, or *in connection with any inquiry or investigation being had by either House, or any committee of either House, or any joint committee of the Congress of the United States*, or [2] *who corruptly or by threats or force, or by any threatening letter or communication shall influence, obstruct, or impede, or endeavor to influence, obstruct, or impede* [a] the due and proper administration of the law under which such proceeding is being had before such department, independent establishment, board, commission, or other agency of the United States, *or* [b] the due and proper exercise of *the power of inquiry under which such inquiry or investigation* is being had by either House, or any committee of either House or any joint committee of the Congress of the United States [violates the statute].

*Poindexter*, 951 F.2d at 380 (quoting § 241(a)) (emphasis added).

The § 241(a) clause numbered "[1]" above "covered influencing *a witness* before . . .either House or a committee of the Congress." *Poindexter*, 951 F.2d at 381 (emphasis added). The clause numbered "[2]" "came later to be known as the 'omnibus clause,'" which "covered influencing . . . 'the due and proper exercise of the power of inquiry' by either House or a committee of the Congress." *Id.* Section 1505 later inherited this "omnibus" clause. *Id.*

As the D.C. Circuit explained the history behind §§ 241(a) and 1505,

> The Senate and House Reports and the floor debates concerning § 241(a) focused almost exclusively upon *the need to protect witnesses*. Both reports state that the proposed legislation *simply extends the protection now provided by law for witnesses in Court proceedings [under § 241], to witnesses in proceedings before either House of Congress or committees of either House (or joint committees),* and to witnesses in proceedings before administrative agencies of the Government. The need of outlawing intimidation and corruption applies to every witness.

> H.R. Rep. No. 1143, 76th Cong., 1st Sess. 1 (1939); S. Rep. No. 1135, 76th Cong., 1st Sess. 1 (1939).

> On the floor of the House, the bill's sponsor stated that it "*simply . . . outlaws intimidation, coercion, and corruption of other witnesses, just exactly as existing law protects witnesses called to testify in courts*." *See* 84 Cong. Rec. 9312 (1939) (Rep. Hobbs). *References to the need to protect non-court witnesses were made throughout the debates in both chambers. See id.* at 10526, 10910, 10911, 10912. . . .

> [A] Senator explained [that] the bill was meant to protect *witnesses* from congressional committees and boards who were "mercilessly muckraking" those *witnesses*.

*Poindexter*, 951 F.2d at 381 (emphasis added).

The D.C. Circuit then turned to § 1512's place in this statutory lineage. Created in the Victim and Witness Protection Act of 1982, Section 1512 simply received "many activities that were formerly prohibited by §§ 1503 and 1505." *Poindexter*, 951 F.2d at 382.

*Poindexter*'s next passage demonstrates that *Montgomery* (and concurring decisions in this district) were wrongly decided.  The original Senate version of § 1512 contained its own omnibus clause, closely paralleling the language of the omnibus clauses in §§ 1503 and 1505:

> (a) Whoever . . . (3) corruptly, by threats or force, or by any threatening letter of [sic] communication, intentionally influences, obstructs or impedes, or attempts to influence, obstruct or impede the (A) enforcement and prosecution of Federal law; (B) administration of a law under which an official proceeding is being or may be conducted; or (C) *exercise of a Federal legislative power of inquiry* [violates the statute].

*Poindexter*, 951 F.2d at 382 (quoting 128 Cong. Rec. 26,360 (1982)) (emphasis added).

> The court of appeals observed that a "Senate Report explained the purpose of this clause.

> The obstruction of justice statute is an outgrowth of Congressional recognition of the variety of corrupt methods by which the proper *administration of justice* may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined.

*Poindexter*, 951 F.2d at 382 (quoting 128 Cong. Rec. 26,360 (1982)) (emphasis added).

The fate of the Senate's draft omnibus clause in § 1512 is critical here.  The clause originally sat alongside § 1515, also first codified pursuant to the Victim and Witness Protection Act of 1982.  Pub. L. No. 97-291, sec. 4, 96 Stat. 1250.  The original § 1515 provided as follows,

> As used in sections 1512 and 1513 of this title and in this section—

> (1) the term "official proceeding" means—

>> (A) a proceeding before a judge or court of the United States, a United States magistrate, a bankruptcy judge, or a Federal grand jury;

>> (B) *a proceeding before the Congress*; or

>> (C) a proceeding before a Federal Government agency which is authorized by law.

Pub. L. No. 97-291, sec. 4, 96 Stat. 1252 (emphasis added).

After the "House and Senate [] compromised the differences between their versions [of § 1512][,] the resulting statute did not contain [the] omnibus clause, as had the original version."

*Poindexter*, 951 F.2d at 383.  On the floor, Senator Heinz, a lead sponsor of the bill, explained why:

> Subsection (3) of section 1512(a) of the Senate passed bill, general obstruction of justice residual clause of the intimidation section, was taken out of the bill as beyond the legitimate scope of this witness protection measure. *It also is probably duplicative of abstruction [sic] of justice statutes already on the books*.

*Poindexter*, 951 F.2d at 383 (quoting 128 Cong. Rec. 26,810 (1982)) (emphasis added).

In the Senate Report accompanying the Victim and Witness Protection Act of 1982, the Judiciary Committee explained why the term "official proceeding" was used in the statute that would be codified at 18 U.S.C. § 1515(a)(1).  Exh. 1.  Before the Omnibus Victims Protection Act of 1982, the "current law term [used in obstruction statutes] was 'legal proceedings.'" Id. By substituting "official proceedings" for "legal proceedings," the legislators intended to convey that "the statute remain applicable in civil and administrative proceedings, where warranted"— not just in "criminal proceedings." *Id*. "The term 'official proceeding' is intended to convey th[at] result." *Id.* Contrary to *Montgomery*, the 1982 Act's term "official proceeding" bears no trace of a congressional intent to expand the then-current understanding of the legal term "proceeding" to include any "official business before a body."

All of this history is omitted from *Montgomery*.  If *Montgomery* were correct that § 1515's "a proceeding before the Congress" should not be limited to congressional inquiries and investigations, the statutory history above lacks sense.  If by "a proceeding before the Congress" the legislature specified a type of congressional "proceeding" in §§ 1512 and 1515 other than the inquiries and investigations in § 1505, the § 1512 omnibus clause Congress rejected in 1982 for being "duplicative of [o]bstruction of justice statutes already on the books" would not, in fact, have been duplicative.  *Poindexter*, 951 F.2d at 383.  As shown above, the only other relevant obstruction law "on the books" in 1982 for congressional proceedings was § 1505, which is

limited to congressional inquiries and investigations.  Thus, according to *Montgomery*, in § 1512 Congress created new protections for its proceedings that were not inquiries or investigations and simultaneously undercut them by deleting the only omnibus clause that would have reached the newly covered proceedings—on the mistaken ground that the just-drafted clause duplicated § 1505.  That is, *Montgomery*'s analysis erroneously rests on the improper assumption that Congress did not know what it was doing in 1982.  The above history shows that the obstruction of Congress offense in § 241(a), which was then transferred to § 1505 and § 1512, "extend[ed] the protection [then] provided by law for *witnesses* in court *proceedings* [under § 241], to *witnesses in proceedings* before either House of Congress or committees of either House (or joint committees)."  *Poindexter*, 951 F.2d at 381 (internal quotation and citation omitted) (emphasis added).  Nothing in this long history, stretching back to the nineteenth century, offers any support for the conclusion that Congress intended to cut the obstruction offense loose from any connection to evidence, investigations, and witnesses—by the mere addition of the phrase "a proceeding before the Congress" in 1982.[7]  Yet that is the reed on which *Montgomery* rests.

---

[7] The court in *United States v. Sandlin*, 21-cr-88-DLF, 2021 U.S. Dist. LEXIS 237131 (D.D.C. Dec. 10, 2021) also rejected a January 6 defendant's "official proceeding" argument but on somewhat different grounds.  A § 1512 "proceeding" need not entail the "administration of justice" (e.g., the ability to issue subpoenas, review evidence), *Sandlin* held.  2021 U.S. Dist. LEXIS 237131, at *12.  Rather, the "proceeding" must only be "akin to a formal hearing." *Id.* at *9.  The court did not define "hearing." *Sandlin*'s reasoning is contradictory: courts define "hearing" as, e.g., "'a proceeding of relative formality . . . generally public, with definite issues of fact or of law to be tried, *in which witnesses are heard and parties proceeded against have the right to be heard . . .*'" *U.S. ex rel. Health Choice All., LLC v. Eli Lilly & Co.*, 4 F.4th 255, 264 (5th Cir. 2021) (quoting *Hearing*, Black's Law Dictionary (5th ed. 1979)) (emphasis added).  Thus, a "formal hearing" is not to be distinguished from "the administration of justice."  To the extent *Sandlin* meant by "akin to a formal hearing" something other than "adjudicative power or . . . the power to enhance [an] investigation[] through the issuance of subpoenas or warrants," *Kelley*, 36 F.3d at 1127, the court erred under D.C. Circuit precedent.

In *Caldwell*, the court's rationale for rejecting a defendant's "official proceeding" argument appeared to center around the point that Congress "could have" used the § 1505 words

Hence, until the *Montgomery* decision, all obstruction-of-Congress cases had involved investigations and evidence, i.e., interference with Congress's investigatory power.  *E.g.*, *Poindexter*, 951 F.2d at 383 (witness lying to congressional committee); *United States v. Kanchanalak*, 37 F. Supp. 2d 1 (D.D.C. 1999) (destruction of records subpoenaed by Congress). Decoupling § 1512's "proceeding" from congressional inquiries and investigations would criminalize a great deal of protected activity and ordinary legislative business, contrary to congressional intent.  Consider the following examples:

A firearms lobbyist wheedles a senator to limit federal spending on research into gun-related fatalities.  A "markup" on relevant legislation is set to soon take place. The lobbyist gives and promises no thing of value in return.  A text from the lobbyist to his friend later turns up: "I drink too much because my work is evil."

A former politician calls a congressman of the same political party on a recorded line, saying, do whatever you have to do at this markup to block the pending legislation providing aid to children in poverty—"boy, we are evil and/or immoral comma depraved aren't we, but it will hurt our chances in 2022 if the other side gets a win."

---

"investigation or inquiry" in § 1512 but did not.  2021 U.S. Dist. LEXIS 243756, at *18.  Like *Montgomery*, *Caldwell* omitted the statutory and legislative history outlined in *Poindexter* showing that it does not make sense to reason that Congress "could have" used "investigation or inquiry" but did not.  Congress's decision in 1982 to drop the draft omnibus clause in § 1512— and the statutory context and legislative history of obstruction of Congress offenses—plainly show that "a proceeding before the Congress" has been consistently construed as synonymous with congressional inquiries and investigations since the 1940s.

The remaining decisions in this group mostly rely on the reasoning of *Montgomery*, *Sandlin*, and *Caldwell*. *United States v. Mostofsky*, 2021 WL 6049891 (D.D.C. Dec. 20, 2021); *United States v. Nordean*, 2021 WL 6134595 (D.D.C. Dec. 28, 2021); *United States v. McHugh*, 2022 WL 296304 (D.D.C. Feb. 1, 2022); *United States v. Grider*, 2022 WL 392307 (D.D.C. Feb. 2022).

According to *Montgomery*, these congressional markups are "official proceedings." *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *25.  The jury instructions here directed that § 1512(c)'s "corruptly" includes acting with a "wrongful purpose" (see *infra*). Thus, a jury may find the lobbyist and former politician guilty of a 20-year felony under § 1512(c)(2) for wrongfully "influencing" the "official proceedings" in Congress.  It should go without saying: this outcome is absurd and not intended by Congress.  And the absurdity lies in the lack of any connection between the hypothetical defendants' actions and investigations and evidence.

In sum, *Montgomery*'s construction of "proceeding" in § 1512 is contrary to text and canons of construction (*Ermoian*), D.C. Circuit precedent (*Kelley*, *Poindexter*), the statutory context (*Poindexter*), and the legislative history.  It is unsupported by case law.  Prior to January 6, no court had found a Chapter 73 "proceeding" that did not entail adjudication, investigation, or evidence.  Interference with those things is what is irreducibly meant by obstruction of justice. Because the government presented no evidence that the joint session involved those elements, a judgment of acquittal should be entered on Count One.

## III.   A judgment of acquittal should be entered on Count One because the government did not present evidence showing that the Defendant's acts affected the integrity or availability of evidence

The government's construction of § 1512(c), created for the January 6 cases alone, posits that subsection (c)(2) criminalizes any act that obstructs, influences or impedes an official proceeding, regardless of whether it affects the integrity or availability of evidence in a proceeding.  This allows the government simply to convert traditional misdemeanor offenses into a felony with a 20-year statutory maximum sentence.  Thus, "parading in the Capitol Building," 40 U.S.C. § 5104(e)(2)(G) (Class B misdemeanor), and "entry into a restricted area," 18 U.S.C. § 1752(a) (Class A misdemeanor), become felony obstruction of an official proceeding.  After all,

trespass can "influence" the "proceeding" in Congress (which, according to the government, need not entail investigations or evidence).  Under this reading, because there is no conceptual distinction between the 20-year felony and a Class B misdemeanor, the charging decision between the two rests entirely in the government's arbitrary discretion.  As a judge in this Court recently demonstrated, this nightmare of due process is not commanded by the text of § 1512(c).

### A.      The text of § 1512 does not support the government's interpretation

Here again is what § 1512(c)(2) proscribes:

(c) Whoever corruptly—

> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with intent to impair the object's integrity or availability for use in an official proceeding; or

> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

> shall be fined under this title or imprisoned not more than 20 years, or both.

§ 1512(c).

Subsection (c)(2) cannot be read in isolation.  *United States v. Miller*, 2022 U.S. Dist. LEXIS 45696, at *16 (D.D.C. Mar. 7, 2022).  On its own, subsection (c)(2) would criminalize "whoever corruptly. . . otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so. . ."  Thus, it must be read together with subsection (c)(1), and the term "otherwise" is critical to determining how the subsections relate.

*Miller* noted that when § 1512(c)(2) became law, "otherwise" had three different plausible definitions in this context: "'in a different way or manner: differently'"; "'in different circumstances: under other conditions'"; and "'in other respects.'" 2022 U.S. Dist. LEXIS 45696, at *16 (quoting *Otherwise*, *Webster's Third New Int'l Dictionary of the English Language Unabridged* (2002)).  *Miller* determined that the government's argument made use of

the first definition—"in a different way or manner"—to argue not only that subsection (c)(2) covered all acts of obstructing, influencing and impeding an official proceeding beyond those specifically enumerated in (c)(1), but also that (c)(2) encompassed the acts in (c)(1) itself (and the rest of § 1512 into the bargain). *Id.* Thus, under the government's construction, the only question is whether the defendant "corruptly . . . obstruct[ed], influenc[ed], or imped[ed] any official proceeding, or attempt[ed] to do so." *Id. Miller* called this the "clean break" reading of § 1512(c)(2). *Id.*

*Miller* found inconsistency in the clean break construction. The parties had agreed that § 1512(c)(2) cannot be read alone, given the term "otherwise."[8] But if, as the government would have it, the only question is whether the defendant "corruptly . . . obstruct[ed], influenc[ed], or imped[ed] any official proceeding, or attempt[ed] to do so," the word "otherwise" not only does no work to "link" subsection (c)(2) to (c)(1)—it is "pure surplusage." 2022 U.S. Dist. LEXIS 45696, at *17. "[U]nder [the government's] reading, subsection (c)(2) would have the same scope and effect as if Congress had instead omitted the word 'otherwise.'" *Id.* Yet "otherwise" must do some work.

*Miller* held that the clean break interpretation was inconsistent with *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015). As here, *Begay* concerned the interpretation of an "otherwise clause." For the Court's convenience, the Defendant displays the "otherwise" clause in *Begay* (§ 924(e)(2)(B)) next to the "otherwise" clause in § 1512(c)(2):

---

[8] Indeed, even contrary authority from this district is in agreement on this point. *Sandlin*, 2021 U.S. Dist. LEXIS 237131, at *14 ("Subsections (c)(1) and (c)(2) *are linked by the word 'otherwise.'*") (emphasis added); *see also Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *43 n. 6 ("[T]he subsections are separated by the word 'otherwise,' which *connects* the two provisions. . .") (emphasis added).

(B) the term "violent felony" means any crime punishable by imprisonment for a term exceeding one year. . . that—

(i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii) is **burglary, arson, or extortion, involves use of explosives**, *or otherwise* involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B) (emphasis and emboldening added).

(c) Whoever corruptly—

(1) **alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so**, **with the intent to impair the object's integrity or availability for use in an official proceeding**; *or*

(2) *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512(c) (emphasis and emboldening added).

Interpreting § 924(e)(2)(B)(ii), *Begay* held that the proximity of the listed crimes "burglary, arson, extortion, or crimes involving the use of explosives" to a general crime "otherwise involv[ing] conduct that presents a serious potential risk of physical injury to another" was sufficient to "indicate[] that [the 'otherwise' clause] covers only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.'"

*Begay*, 553 U.S. at 142 (emphasis original).  It continued:

If Congress meant the latter, i.e., if it meant the statute to be all-encompassing, it is hard to see why it would have needed to include the examples at all.  Without them, [§ 924(e)(2)(B)(ii)] would cover *all* crimes that present a "serious potential risk of physical injury." *Ibid.* Additionally, if Congress meant [§ 924(e)(2)(B)(ii)] to include *all* risky crimes, why would it have included [§ 924(e)(2)(B)(i)]? A crime which has as an element the "use, attempted use, or threatened use of physical force" against the person (as [§ 924(e)(2)(B)(i)] specifies) is likely to create "a serious potential risk of physical injury" and would seem to fall within the scope of [§ 924(e)(2)(B)(ii)]. . . .

These considerations taken together convince us that, "to give effect . . . to every clause and word" of this statute, we should read the examples as limiting the crimes that [§ 924(e)(2)(B)(ii)] covers to crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves.

*Begay*, 553 U.S. at 143 (emphasis original).

It is no different here.  If Congress meant § 1512(c)(2) to cover any act that obstructs, influences or impedes an official proceeding, "it is hard to see why it would have needed to include" subsection (c)(1) at all.  Indeed, it is hard to see why it would have needed the rest of § 1512.  *Begay* made an identical point about what would happen to § 924(e)(2)(B)(i) if the government's construction of § 924(e)(2)(B)(ii) were correct.  553 U.S. at 143.

Several judges and the government have challenged Judge Nichols' reading of *Begay* in several ways.  They are mistaken.  First, they contend that the "semicolon and line break" between (c)(1) and (c)(2) is sufficient to distinguish *Begay* from the government's interpretation here.  *United States v. McHugh*, 21-cr-453, ECF No. 64 (D.D.C. May 2, 2022).  That is wrong.  A sentencing's meaning, and thus a statute's meaning, is resolved primarily, if not exclusively, by grammar and syntax, not visual formatting.  The sentence, "the term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year . . . that . . . or otherwise involves conduct that presents a serious potential risk of physical injury to another," cannot be correctly interpreted without the above-displayed emboldened phrase in § 924(e)(2)(B)(ii) that immediately precedes "or otherwise." Identically, the sentence, "Whoever corruptly. . .or otherwise obstructs, influences or impedes any official proceeding, or attempts to do so. . .," cannot be correctly interpreted without the above-displayed emboldened phrase in § 1512(c)(1) that immediately precedes "or otherwise." The semicolon and line break in § 1512(c) do not change the meaning of the sentence that is segmented by them, though they do change its visual appearance.  The statute in *Begay* shows the error of *McHugh*'s "line break" distinction. *McHugh* would presumably agree that Section 924(e)(2)(B)(ii) cannot be read without reference

to § 924(e)(2)(B)—despite the "line break" between them.[9] The government's semicolon and line break argument was rejected in another decision on which it relies. *Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *43 n. 6.

Second, a court has held, *contra* Judge Nichols, that "paragraph (c)(2) is grammatically distinct from paragraph (c)(1). Although the two provisions share a subject and an adverb ('whoever corruptly'), paragraph (c)(2) contains an independent list of verbs that take a different object ('any official proceeding') from the verbs in paragraph (c)(1) (which take the object 'a document, record, or other object')." *McHugh*, 21-cr-453, ECF No. 64, p. 8. Though they are not formally incorrect, *McHugh*'s points miss the syntactical forest for minor grammatical trees. Subsection (c) is a complete sentence. Subsection (c)(1) is not a sentence, nor is subsection (c)(2). Neither subsection is an independent clause, that is, a clause capable of forming a complete sentence on its own. Subsection (c)(2) is a dependent clause, which does not form a meaningful sentence individually. Thus, *contra McHugh*, paragraphs (c)(1) and (c)(2) are not "semantically independent." *McHugh*, 21-cr-453, ECF No. 64, p. 10.

Third, the government and a judge have contended that the *ejusdem generis* principle underlying *Begay* does not apply to § 1512(c)(2) because subsection (c)(1) does not contain a "list." *McHugh*, 21-cr-453, ECF No. 64, p. 8. "[R]ather than, 'A, B, C, or otherwise D,' section 1512(c) follows the form '(1) A, B, C, or D; or (2) otherwise, E, F, or G.'" *Id.* This analysis assumes what it tries to prove by adding makeweight numbers and a semicolon on one side of

---

[9] "Line break" is not even a legal term of statutory construction. It is a literary term denoting where one line of verse ends and another begins, a formatting decision dictated not by meaning but meter and rhyme. *Line break*, Literary Devices, https://literarydevices.com/line-break/#:~:text=A%20line%20break%20refers%20to,completes%20a%20sentence%20or%20clause. The *Sandlin* court did not explain why it applied a verse term to its legal analysis of § 1512(c)(2). 2021 U.S. Dist. LEXIS 237131, at *14.

the equation rather than explaining the interpretive principle that makes "(1) A, B, C, or D;" not a list but does make "A, B, C, or otherwise D" a list.  The canon of *ejusdem generis* holds that "where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 575 U.S. 528, 545, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015).  Turning to § 1512(c), displayed above, the Court will notice that the emboldened portion of subsection (c)(1) contains these "specific words in a statutory enumeration": "alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so. . ." § 1512(c)(1).  Those specific words are "follow[ed]" by "general words": the italicized words in subsection (c)(2), "or otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so. . ."  *McHugh* did not cite any authority holding that a "semicolon" or a "line break" neutralizes *ejusdem generis* even where those punctuation marks do not change a sentence's meaning.  In any case, *Begay* did not even formally cite *ejusdem generis*; indeed, the canon of *noscitur a sociis*—a word is known by the company it keeps—appears to have been at least equally determinative.  *Begay*, 553 U.S. at 143.  Even *McHugh* does not hold that the words in (c)(1) are not in the close "company" of (c)(2), which is a part of the same sentence.  Multiple courts have held that subsections (c)(1) and (c)(2) *are* in "close company."  *Sandlin*, 2021 U.S. Dist. LEXIS 237131, at *14; *Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *43 n. 6.  Thus, even if the words in (c)(1) are not a "list," the "otherwise clause" in (c)(2) must be construed in light of them because it is "known" by their company.  For that reason, the Supreme Court's decision in *Yates* supports Judge Nichols' decision in *Miller* no less than *Begay*.  *Yates*, 575 U.S. at 545.

*McHugh* cites to *Overdevest Nurseries, L.P.*, *v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021) for the proposition that *ejusdem generis* is "irrelevant" when the term at issue "was not even in

the same provision" as the narrower term supposedly limiting its scope.  *McHugh*, 21-cr-453,

ECF No. 64, p. 8.  But a glance at the statute in *Overdevest Nurseries, L.P.* reveals how §

1512(c)(2) is different.  Here is the statute at issue there:

> To participate in the H-2A program, an employer must first certify to the Secretary of Labor that:
>
> A. there are not sufficient workers who are *able, willing, and qualified*, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and
>
> B. the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States *similarly employed*.

*Overdevest Nurseries, L.P.*, 2 4th at 981 (citing 8 U.S.C. § 1188(a)(1)(A)-(B)) (emphasis added).

The plaintiff in *Overdevest Nurseries, L.P.* argued that *ejusdem generis* and *noscitur a*

*sociis* applied such that subsection A's "able, willing, and qualified" limited subsection B's

"similarly employed.  2 4th at 982.  The court disagreed, finding that the two sets of phrases

were not in the "same list." *Id.*  But, as the *McHugh* court itself sometimes observes, meaning is

derived mostly from grammar and syntax, not visual formatting.  *McHugh*, 21-cr-453, ECF No.

64, p. 8.  (Other times *McHugh* inconsistently suggests that rather than grammar and syntax, line

breaks determine meaning. *Id.*)  Unlike subsections (c)(1) and (c)(2) in section 1512, subsections

A and B in § 1188(a)(1) are complete sentences.  Unlike subsections (c)(1) and (c)(2) in section

1512, subsections A and B in § 1188(a)(1) are not clauses with mutually dependent meaning.

Unlike subsections (c)(1) and (c)(2) in section 1512, subsection B in § 1188(a)(1) does not

contain the adverb "otherwise," linking the two relevant subsections in meaning.  Because it is

grammar and not "line breaks" that determines meaning, *Overdevest Nurseries, L.P.* is

distinguishable.

The comparisons *McHugh* endeavors to draw between § 1512(c)(2) and § 1344, § 1952, and 28 U.S.C. § 2466(a) do not connect.

**§ 1344**.  In *Loughrin v. United States*, 573 U.S. 351, 350 (2014), the Court considered this statute:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> (1) to defraud a financial institution; or
>
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
>
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

573 U.S. at 354 (citing 18 U.S.C. § 1344).

The defendant argued that § 1344(2) had "no independent meaning" but that it merely "specifies part of what § 1344(1) already encompasses." 573 U.S. at 359.  He relied on *McNally v. United States*, 483 U.S. 350 (1987), where the Court interpreted similar language in the mail fraud statute.  *Id.*  The *Loughrin* court distinguished the mail fraud statute in *McNally* from § 1344 on the ground that the former contained two phrases strung together in a "single, unbroken sentence." *Id.*  But a distinction drawn between the outcome in *McNally* and the statute in *Loughrin* does not somehow guide the Court on the application of *Begay/Yates* to section 1512(c).  *Ejusdem generis* and *noscitur a sociis* were not even at issue in *Loughrin*.  Indeed, unlike in § 1512(c), the "specific words" in § 1344(2) *follow*—they do not *precede*—the "general term" in § 1344(1).  That is the opposite of *Ejusdem generis*.  *Yates*, 575 U.S. at 545.

**§ 1952(a).**  In *United States v. O'Hara*, 143 F. Supp. 2d 1039, 1040 (E.D. Wisc. 2001), the court considered this statute:

> (a) Whoever travels in interstate or foreign commerce . . . with intent to --

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform [such an act commits a crime].

18 U.S.C. § 1952(a).

*McHugh* notes that in *O'Hara*, the court observed that it was long "perceived" that the use of "otherwise" in § (a)(3) created a catchall provision that encompassed the crimes in § (a)(1) and (a)(2). *McHugh*, 21-cr-453, ECF No. 64, p. 11 (citing *O'Hara*, 143 F. Supp. 2d at 1042). But *McHugh* missed an important distinction. Well before *O'Hara*, "Congress increased the maximum sentence under § (a)(2) to 20 years, while leaving §§ (a)(1) and (a)(3) with a maximum sentence of 5 years." *O'Hara*, 143 F. Supp. 2d at 1041. Thus, one significant reason it was long "perceived" that the "otherwise" provision in § (a)(3) encompassed the other subsections is that it would make no sense for a defendant to argue that the lesser though more general crime in § (a)(3) is "limited" by the greater through more specific, 20-year penalty crime in § (a)(2). That is not true of subsection (c)(1) and (c)(2) of section 1512 which carry the same penalty.

**28 U.S.C. § 2466(a).** In *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004), the court considered this statute:

A judicial officer may disallow a person from using the resources of the courts of the United States in furtherance of a claim in any related civil forfeiture action or a claim in third party proceedings in any related criminal forfeiture action upon a finding that such person –

(1) after notice or knowledge of the fact that a warrant or process has been issued for his apprehension, in order to avoid criminal prosecution --

(A) purposely leaves the jurisdiction of the United States;

> (B) declines to enter or reenter the United States to submit to its jurisdiction; or
>
> (C) otherwise evades the jurisdiction of the court in which a criminal case is pending against the person;

*Collazos*, 368 F.3d at 200 (citing 28 U.S.C. § 2466(a)).

*McHugh* notes *Collazos*' holding that "'the use of the introductory word 'otherwise' indicates that the evasion referred to in subpart (C) reaches beyond the specific examples to myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of the court.'" *McHugh*, 21-cr-453, ECF No. 64, p. 12 (quoting *Collazos*, 368 F.3d at 200). But the Defendant does not dispute that subsection (c)(2) of section 1512 "reaches beyond the specific examples" in subsection (c)(1). Rather, he contends that subsection (c)(2) covers "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples" in (c)(1). *Begay*, 553 U.S. at 143. That is consistent with *Collazos*. Just as *Collazos* held that the "otherwise" clause in § 2466(a)(1)(C) must still relate to acts that "avoid the jurisdiction of the court" (like the acts proscribed in subsection (a)(1)(A) and (a)(1)(B)), the Court here should hold that subsection (c)(2) of section 1512 covers crimes that are "roughly similar in kind" to the common theme uniting the crimes in (c)(1): acts that affect the integrity and availability of evidence in a proceeding. By disconnecting § 1512(c)(2) from any relationship with evidence, it is *McHugh* that conflicts with *Collazos*.

## B. *Miller* was plainly correct on statutory context and history

*Miller* painstakingly and thoughtfully analyzed § 1512's structure, its historical development and its legislative history. 2022 U.S. Dist. LEXIS 45696, at *28-38.

First, *Miller* aptly observed that the government's construction of § 1512(c)(2) presumes Congress would "hide [an] elephant in [a] mousehole." 2022 U.S. Dist. LEXIS 45696, at *29. The other subsections of the statute criminalize discrete conduct in narrow contexts; subsection

(c)(1) continues that focus.  If subsection (c)(2) covered *any* act that obstructs, influences, or impedes an official proceeding, it would be the "only provision in § 1512 not to have a narrow focus." *Id.  Miller* might have added that it would also be the only provision in § 1512 that has no connection to the integrity or availability of evidence (object or non-object) in a proceeding. That makes little structural sense.

Second, the Court held that the government's construction of § 1512(c)(2) would make surplusage of "at least eleven subsections" of § 1512. 2022 U.S. Dist. LEXIS 45696, at *29.  The canon against surplusage holds that "all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage.'" *Independent Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000) (quoting *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995)).  "[T]he canon . . . is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. General Rev. Corp.*, 568 U.S. 371, 386 (2013) (emphasis added).  If § 1512(c)(2) covers *any act* that obstructs, influences or impedes an official proceeding, these provisions are rendered superfluous: §§1512(a)(1)(A), 1512(a)(1)(B), 1512(a)(2)(A), 1512(a)(2)(B)(i), 1512(a)(2)(B)(iii), 1512(a)(2)(B)(iv), 1512(b)(1), 1512(b)(2)(A), 1512(b)(2)(C), 1512(b)(2)(D), and 1512(d)(1).  2022 U.S. Dist. LEXIS 45696, at *29.

*McHugh* contends that this overlap was unavoidable given the following.  Subsection (c)(2) was added to § 1512 to fix the "Arthur Andersen loophole": Section 1512's earlier provisions proscribed "indirect obstruction,"e.g., corruptly persuading another person to destroy a document. § 1512(b)(2)(B).  Congress added subsection (c)(2) to cover "direct obstruction" involving those records. *McHugh*, 21-cr-453, ECF No. 64, p. 15.  That addition, *McHugh* determined, necessarily created overlap with every other provision in § 1512. *Id.* ("[E]very

example of indirect obstruction—say, threatening a witness to keep them from testifying at a hearing—is also an example of . . . direct obstruction, since the act of threatening the witness itself obstructs, influences or impedes the hearing."). *McHugh* added, "*any* attempt to close the direct obstruction loophole while working within § 1512's pre-existing structure would have created substantial overlap." *McHugh*, 21-cr-453, ECF No. 64, p.16.

*McHugh* makes at least two mistakes. First, it appears to assume what it is trying to prove—it reasons that Congress intended that § 1512(c)(2)'s direct obstruction crime would cover every type of indirect obstruction crime in § 1512 because. . . it *does* cover every other crime in the statute *under the government's interpretation*. In fact, as indicated below, Judge Nichols' review of the statutory and legislative history demonstrates that Congress gave no indication that subsection (c)(2) would apply outside the context of the object-based evidence in subsection (c)(1). Second, and more importantly, even if there were some evidence of congressional intent to suggest that subsection (c)(2)'s direct obstruction prohibition was to cover every indirect crime in the statute, that would still not support the government's theory here, which claims that § 1512(c)(2) reaches acts that have *no connection to any kind of evidence, object or otherwise*, unlike every other provision in § 1512. There was no "Arthur Andersen loophole" that Congress needed to fill with subsection (c)(2) concerning obstruction of justice *that has no relationship to evidence at all*.[10]

---

[10] *McHugh* suggests that because Chapter 73 will contain some overlap regardless of how broadly Section 1512(c)(2) is construed, the Court can overlook the fact that the government's construction of subsection (c)(2) swallows the rest of the statute and indeed much of Chapter 73. *McHugh*, 21-cr-453, ECF No. 64, p. 17. But, first, this sort of pragmatic consideration sheds no light on Congress's intent with respect to § 1512(c)(2). And, more importantly, even as a pragmatic argument, "because my room is so messy I might as well not clean it at all" is a recipe for a much messier room.

Third, *Miller* determined that the legislative history of § 1512(c) in the Sarbanes-Oxley Act of 2002 is littered with legislators' statements and reports "regarding the focus of the proposed new subsection on documents and document-shredding." 2022 U.S. Dist. LEXIS 45696, at *36-38.  Even the government has conceded that "the legislators who enacted Section 1512(c) . . . undoubtedly had document shredding foremost in mind. . ." *United States v. Miller*, 21-cr-119-CJN, ECF No. 75, p. 20.

In sum, *Miller* concluded there were "two plausible interpretations of the statute: either § 1512(c)(1) merely includes examples of conduct that violates § 1512(c)(2), or § 1512(c)(1) limits the scope of § 1512(c)(2). The text, structure, and development of the statute over time suggest that the second reading is the better one." But "[a]t the very least, the Court is left with a serious ambiguity in a criminal statute." 2022 U.S. Dist. LEXIS 45696, at *39.  In such circumstances, courts have "'traditionally exercised restraint in assessing the reach of a federal criminal statute.'" *Id.* (quoting *United States v. Aguilar*, 515 U.S. 593, 600 (1995)).  *Miller* therefore concluded that § 1512(c)(2) "must be interpreted as limited by subsection (c)(1), and thus requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding."  *Id.*  Because the government presented no evidence that the Defendant's acts affected the integrity or availability of evidence in a proceeding (object or non-object), a judgment of acquittal should be entered on Count One.

**IV.     A judgment of acquittal should be entered on Count One because the government did not present evidence sufficient to establish that the Defendant acted "corruptly"**

The jury was instructed that it could find that the Defendant acted "corruptly" if he used "unlawful means" or had a "wrongful or an unlawful purpose of both." Tr. at 1022:4-8. However, because the government presented no evidence that the Defendant obstructed an

official proceeding (1) with the intent to obtain an unlawful material advantage for himself or an associate; and (2) by influencing another to violate their legal duty, the "corruptly" element was not satisfied and a judgment of acquittal must be entered on Count One.

### A. "Corruptly" has been equated with "wrongfully" only in the administration of justice context

In *United States v. Aguilar*, 515 U.S. 593, 616 (1995), the Court considered the defendant's argument that § 1503's term "corruptly" was unconstitutionally vague when defined to mean nothing more than "wrongfully." Justice Scalia's dissent was the only opinion to address the argument. In doing so, the Justice reasoned that the nature of the proceeding may determine the appropriateness of a particular definition of "corruptly" in an obstruction statute. 515 U.S. at 617. "[I]n the context of obstructing jury proceedings"—the situation in *Aguilar*—"any claim of ignorance of wrongdoing is incredible." That is because acts "intended to 'influence, obstruct, or impede, the due administration of justice' are obviously wrongful, just as they are necessarily 'corrupt.'" *Id.* In support of this context-based-definition point the Justice cited to *United States v. Reeves*, 752 F.2d 995, 1001 (5th Cir. 1985) *cert. denied*, 474 U.S. 834 (1985) and *United States v. North*, 910 F.2d 843, 882 (D.C. Cir. 1990). Those decisions show why the jury instructions here on the "corruptly" element were incorrect in the context of congressional proceedings.

*Reeves* involved tax obstruction. Section 7212 penalizes "Whoever . . . corruptly . . . obstructs or impedes . . . the due administration of [the internal revenue laws.]" 26 U.S.C. § 7212(a). Reeves knew he was under IRS criminal investigation. So, he filed a common law lien against the residence of his IRS investigator, demanding payment of $250,000. In his § 7212(a) trial, the district court "expressly adopted the definition of 'corruptly' as meaning 'with improper motive or bad or evil purpose.'" 752 F.2d at 998. The Fifth Circuit vacated his conviction.

The court of appeals began with the legal chestnut that it is context-dependent whether the "corruptly" element of an obstruction offense describes a type of act or a type of purpose. 752 F.2d at 998.  However, its review of § 1503 case law led it to the conclusion that, "ordinarily," the term "corruptly" "is not directed at actions motivated by all 'bad,' 'evil' or 'improper' purposes." *Id.*  The Fifth Circuit then grasped the nettle: why, then, do some courts seem to define "corruptly" with value-laden terms like "wrongful purpose"? They do so in "the special circumstances surrounding a criminal trial." *Id.* at 999.  Reasoned the court of appeals,

> "[T]o obstruct or impede the due administration of justice is per se unlawful and is tantamount to doing the act corruptly." *Id.* (quoting *United States v. Ogle*, 613 F.2d 233, 238 (10th Cir. 1979)).  Thus, where a defendant has endeavored to obstruct a criminal proceeding, the advantage inconsistent with the duties and rights of others is so clear that courts have often been willing to impute the desire to obtain such advantage on a per se basis.

*Reeves*, 752 F.2d at 999.

But the facts in *Reeves* did not involve a judicial proceeding.  Section 1505, covering pending judicial proceedings, "presupposes a proceeding the disruption of which will almost necessarily result in an improper advantage to one side in the case." 752 F.2d at 999.  But interference with the administration of tax laws,

> need not concern a proceeding in which a party stands to gain an improper advantage [so] there is no reason to presume that *every* annoyance or impeding of an IRS agent is done per se "corruptly."  A disgruntled taxpayer may annoy a revenue agent with no intent to gain any advantage or benefit other than the satisfaction of annoying the agent.  Such actions by taxpayers are not to be condoned, but neither are they "corrupt. . ."

752 F.2d at 999 (emphasis original).

The Fifth Circuit continued.  The court of appeals had previously "upheld section 1503 as not unconstitutional on vagueness grounds largely because the statute covers only actions related to pending judicial proceedings, thus providing adequate notice to potential violators." 752 F.2d at 999 (citing *United States v. Howard*, 569 F.2d 1331, 1336 (5th Cir. 1978)).  But "merely

prohibiting 'bad,' 'evil,' and 'improper' purposes is very probably insufficient where, as here, a statute *reaches such a broad category of circumstances*." *Id.* (emphasis added). "To interpret 'corruptly' as meaning 'with an improper motive or bad or evil purpose' would raise the potential of overbreadth in this statute because of the potential chilling effect on protected activities.  The Court has a duty to construe a federal statute to avoid constitutional questions where such a construction is reasonably possible." *Id.* at 1001 (citing *Arnett v. Kennedy*, 416 U.S. 194 (1974)).  And "where 'corruptly' is taken to require an intent to secure an unlawful advantage or benefit, the statute does not infringe on first amendment guarantees and is not overbroad." *Id.*

Reeves*'s unlawful advantage standard is the default definition, not the "wrongful purpose" definition in the jury instructions.  *Marinello v. United States*, 138 S. Ct. 1101, 1114 (2018) (Thomas, J., dissenting) ("'[C]orruptly' requires proof that the defendant not only knew he was obtaining an '*unlawful benefit*' but that his 'objective' or 'purpose' was to obtain that *unlawful benefit*.") (citing 21 Am. Jur. 2d, Criminal Law § 114 (2016)) (emphasis added). *See also* Black's Law Dictionary 414 (rev. 4th ed. 1951) ("Corruptly" "generally imports a wrongful design to acquire some pecuniary or other advantage").

In *North*, the D.C. Circuit considered the meaning of "corruptly" in the context of obstruction of Congress.  It observed that, unlike in the judicial proceedings context considered in *Aguilar*, in the context of congressional proceedings,

> No one can seriously question that people constantly attempt, in innumerable ways, to obstruct or impede congressional committees.  An executive branch official, for example, might call the chairman of a congressional committee convened to investigate some wrongdoing and say, "We both know this investigation is really designed to embarrass the President (or a Senator), not to investigate wrongdoing.  Why don't you call it off?" The official surely intends to obstruct or impede the inquiry, but it does not necessarily follow that he does so corruptly.  Similarly, a political activist might contact his representative and tell her that unless she stops spending her time pursuing a certain

investigation rather than some other legislative endeavor, the activist's group will oppose her reelection.  Again, the activist is endeavoring to impede or obstruct the investigation, but it is not necessarily doing so corruptly.

*North*, 910 F.2d at 882.

Because the government presented no evidence that the Defendant obstructed Congress with the intent to obtain some unlawful advantage for himself or an associate, a judgment of acquittal should be entered on Count One.  *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at * 70 n. 5 (holding that there is "no reason to doubt" that the unlawful-advantage definition is "longstanding and well-accepted" and distinguishing the "garden-variety parading case" from § 1512(c) cases by noting that in the former, "the government need not prove that the defendant sought unlawfully to obtain a benefit for himself or another person in the proceeding itself").  That is particularly true in light of the government's misuse of dozens of statements from the Defendant that were racist, anti-Semitic and misogynist.  *See infra*.  A "wrongful purpose" definition of "corruptly" allowed the jury to convict the Defendant because racism is wrong.  As shown above, that is not consistent with the meaning of "corruptly" as defined by obstruction-of-justice law.

## B.    *Poindexter* required the government to prove additionally that the Defendant committed transitive corruption

The D.C. Circuit has rejected a jury instruction directing that "corruptly" means acting with a "wrongful purpose" in the context of obstruction of Congress.  *Poindexter*, 951 F.2d at 379.

Considering § 1505's "corruptly," the court of appeals held,

> to read "corruptly" in an intransitive sense as "wickedly" or "immorally" would appear to render the other methods of violating [§ 1505] superfluous: surely the use of force to influence a congressional inquiry would always be "wicked" or at least "immoral."

*Poindexter*, 951 F.2d at 379.

Exactly the same surplusage problem bedevils the jury instruction's equation of "corruptly" with acting with a "wrongful purpose." If "corruptly" means "wrongfully," subsection (c)(1) is rendered superfluous. "Surely," altering or destroying documents with the intent to prevent their use in an official proceeding "would always be 'wicked' or at least 'immoral'" or "wrongful." *Poindexter*, 951 F.2d at 379.

So, in the context of congressional proceedings, *Poindexter* held that "corruptly" must be defined by acts not merely by "evil" purposes. And to avoid surplusage, the corrupt act had to be different from the act that obstructed, impeded or influenced Congress. As a result, "corruptly" was interpreted in the transitive sense—"A corrupts B, i.e., A causes B to act corruptly." 951 F.2d at 379. Thus, a defendant "corruptly" obstructs a congressional proceeding when he "influences another to violate [their] legal duty" and thereby obstructs Congress. *Id.* at 386. Critically, the transitive interpretation was essential to avoiding vagueness inherent in a purpose-based definition. For if a defendant may intransitively "corruptly . . . obstruct[] [or] influence[]" Congress, the term "corruptly" can only be defined by an impermissibly vague bad purpose, to avoid rendering superfluous the obstructive act itself. 951 F.2d at 379.

*Poindexter*'s holding has been extended to § 1512(c)(2). *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996) ("[W]e agree that . . . [*Poindexter*'s] 'transitive' reading of the word 'corruptly'" applies to § 1512).

A judgment of acquittal should be entered on Count One because the government did not present evidence that the Defendant obstructed Congress by influencing another to violate their legal duty.

**V.     The evidence was insufficient to establish that the Defendant obstructed the joint session and the jury should have been given a special unanimity instruction on Count One because the attempt crime was bundled with the completed**

**offense**

The jury was instructed that the "official proceeding" at issue was Congress's "joint session" on January 6.  Tr. at 1021.  Yet the evidence at trial plainly showed that the "joint session" was suspended an hour before the Defendant entered the Capitol and for at least fourteen hours after he left it.

As shown above, the government's witness testified that the President of the Senate directed the Houses to "withdraw from the joint session" at 1:14 p.m. on January 6.  Tr. at 423:19-20.  The joint session did not reconvene until 11:34 p.m. that day, only to then be suspended again for many hours.  167 Cong. Rec. H94-H117 (Jan. 6, 2021).  The Defendant entered the Capitol at approximately 2:14 p.m. and left 40 minutes later.  Tr. at 632:8.  Thus, it is uncontested that at no point during the Defendant's intrusion was the joint session in progress. The government presented no evidence whatsoever that *the Defendant's* actions specifically—as opposed to "the mob's" at various points in the day—prevented or delayed the reconvening of the joint session.  To the contrary, as shown above, two government law enforcement witnesses testified that it was the collective "mob" that caused inference with the activities in Congress— not an individual person such as the Defendant.  *Supra* at 16.  When a crime committed in Congress depends on the existence of a "competent tribunal," the legislature's House rules governing the requirements of such a proceeding must be satisfied.  *Christoffel v. United States*, 338 U.S. 84, 88 (1949) (reversing perjury conviction concerning false testimony given to House committee because jury was allowed to convict without finding that the committee's quorum rules were satisfied).  Here, the President of the Senate himself announced that by 1:14 p.m. the Houses had "*withdrawn* from the joint session." 167 Cong. Rec. H77 (Jan. 6, 2021) (emphasis added).

Nor can the Court conclude that a judgment of acquittal may not be entered on Count One because the jury likely found the Defendant guilty of attempt.  As the Court itself appreciated, jury unanimity was required on either attempt or the completed offense.  Tr. at 1003:8-11.  Yet attempt and the completed § 1512(c)(2) offense were bundled together in Count One and the jury did not receive a special unanimity instruction despite a defense request.  *Id.* The D.C. Circuit has announced a rule requiring an instruction on the need for unanimity on the particular acts on which a guilty verdict is based.  *E.g.*, *Hack v. United States*, 445 A.2d 634, 641 (D.C. 1982) (holding that "because of the possibility of a nonunanimous verdict, when one charge encompasses two separate incidents, the judge must instruct the jury that if a guilty verdict is returned the jurors must be unanimous as to which indictment or incidents they find the defendant guilty").  The decision not to instruct the jury specially on this point may result in vacatur on appeal.  *E.g.*, *United States v. Ramirez-Martinez*, 273 F.3d 903 (9th Cir. 2001) (holding there is duplicity problem for attempt crime to be charged in same count as completed offense and vacating conviction due to lack of special unanimity instruction), *overruled on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc).  Therefore, the attempt charge is not a reason to refrain from entering a judgment of acquittal on Count One.

## VI.   Even if the evidence were sufficient in the above respects, at the very least the Court would be left with serious ambiguity or unconstitutional vagueness

Courts have "'traditionally exercised restraint in assessing the reach of a federal criminal statute.'"  *Miller*, 2022 U.S. Dist. LEXIS 45696, at *39 (quoting *Aguilar*, 515 U.S. at 600). Under the rule of lenity, "'courts construe penal laws strictly and resolve ambiguities in favor of the defendant.'"  *Id.* (quoting *Liparota v. United States*, 471 U.S. 419, 427 (1985)); *United States v. Hite*, 950 F. Supp. 2d 23, 28 (D.D.C. 2013) (considering lenity argument made in Rule 29 motion).

Under the related constitutional doctrine of vagueness, the Court should not enforce "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (internal quotation and citation omitted). Finally, under the novel construction principle of the Due Process Clause, an "unforeseen judicial enlargement" of a statute, even if not vague, may not be applied retroactively to conduct that occurred before the enlargement. *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964).

Before trial, the Court determined that the applicable lenity standard was whether the government's interpretation of § 1512(c)(2) created "grievous ambiguity." 5/6/2022 Hr'g Tr. at 8. Yet the Defendant maintains that that is not the current standard. Indeed, this Court itself recently applied a plain ambiguity standard. *United States v. Guertin*, 2022 U.S. Dist. LEXIS 12485, at *8 (D.D.C. Jan. 24, 2021) ("*[I]f there were any remaining question* whether 'obtaining money or property' can mean 'maintaining money or property,' the Court must resolve that ambiguity in Guertin's favor.") (emphasis added). The Court cited to *Yates v. United States*, 574 U.S. 528, 547-48 (2015). That was apt, for in *Yates* the Court held that "if our recourse to traditional tools of statutory construction leaves *any doubt* about the meaning of 'tangible object,' as that term is used in § 1519, we would invoke the rule that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" 575 U.S. at 547-48 (quoting *Cleveland v. United States*, 531 U.S. 12, 25, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000) (emphasis added)). The "any doubt" formulation appears to trace to Justice Scalia's dissent in *Abramski v. United States*, where the Justice observed that "contrary to the miserly [grievous ambiguity] approach, the rule of lenity applies whenever, after all legitimate tools of interpretation have been exhausted, *a reasonable doubt* persists regarding whether Congress has made the

defendant's conduct a federal crime." 573 U.S. 169, 204 (2014) (Scalia, J., dissenting) (cleaned up) (emphasis added).

Here, even if the evidence were sufficient to establish the aforementioned elements of § 1512(c)(2) under the government's construction, patent ambiguity remains for the Court. As indicated above, before January 6 no court had ever found a Chapter 73 "proceeding" not involving an investigation, adjudication, or evidence. Protesters had trespassed in the Capitol hundreds of times without being charged with "obstruction of an official proceeding." Likewise, before January 6, § 1512(c) had never reached conduct having no relationship to evidence in a proceeding. And protesters had never been accused of "corruptly" protesting under the obstruction laws. Even if the Court concludes that the government's interpretations are plausible, ambiguity and vagueness plainly remain about the issues and even if they did not, the Court should not retroactively apply the novel constructions sought by the government to conduct that occurred before any court accepted them. *Bouie*, 378 U.S. at 353.

## VII.   If the Court does not enter a judgment of acquittal on Count One, it should alternatively order a new trial

### A.   The government's racism, anti-Semitism and misogyny evidence violated the Court's pretrial ruling and the Defendant's substantial rights

The government showed the jury a parade of racist, anti-Semitic and misogynistic statements by the Defendant. *Supra* at 7-12. The jury's exposure to this grossly inappropriate "evidence" constitutes a miscarriage of justice warranting a new trial.

Pretrial, the Court itself recognized that admission of these statements "would [be] unfairly prejudicial to [the Defendant] and are of limited probative value, [so] the Court holds that Rule 403 bars their admission. . . ." 5/6/2022 Hr'g Tr. at 14-15. As the Court put it, these statements might "'lure the jury' into declaring him guilty" for being a bigot. *Id.* (quoting *Ring*,

706 F.3d at 472).  Quoting Justice Cardozo, the Court held that these statements "are odious enough that [] their 'reverberating clang' might 'drown out all weaker sounds' presented by the rest of the evidence." *Id.* (quoting *Shepard*, 290 U.S. at 104).  Indeed, in the middle of the trial itself the Court concluded that these statements were "highly prejudicial with relatively low probative value. . . [F]rankly it feels like a confusion of the issues and unduly prejudicial. . ." Tr. at 994; *see also United States v. Mostafa*, 16 F.Supp.3d 236, 266 (S.D.N.Y. 2014) (excluding under Rule 403 statements concerning Hitler and Jewish people); *United States v. Defreitas*, 2010 U.S.Dist.LEXIS 63402, at *3-4 (E.D.N.Y. 2010) (same); *United States v. Stone*, 852 F.Supp.2d 820, 835 (E.D. Mich. 2012) (same); *United States v. Ruzicka*, 2018 U.S.Dist.LEXIS 4931, at *12 (D. Minn. 2018) (same).

The government simply bulldozed through the Court's order, showing the jury statement after statement by the Defendant containing derogatory remarks about Jewish people, African Americans and women.  Multiple minorities sat on the jury.  One threw up his hands in emotion upon seeing the Defendant's statements using the word n*****.  The government will argue that the Defendant waived any error when his counsel did not object at trial, or that the issue must be reviewed through a plain error standard.  That is wrong.  Having objected to all the evidence in a pretrial motion in limine, which the Court plainly granted, defense counsel was not required to "object again" at trial.  *E.g.*, *United States v. Brawner*, 173 F.3d 977, 970 (6th Cir. 1999) ("[I]f the trial court has made an explicit and definitive ruling on the record of the evidentiary issues to be decided, and has not indicated that the ruling is conditioned upon any other circumstances or evidence, then counsel need not renew the objection at the time the evidence is offered. . . in order to preserve the error for appeal."); *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996) (same).

The Court has already held, multiple times, that this "evidence" failed the Rule 403 test. These vile statements were surrounded by alternative statements concerning the Defendant's view of the 2020 presidential election that did not contain derogatory racist remarks.  *See* Gov't Exh. 350.2, 350.4, 350.5.  The government showed these comments to the jury because of their racism, not despite it.  They do not even satisfy the test of relevance.  As indicated above, the prejudice of their admission is exacerbated by the jury instruction defining "corruptly." Because the jury was advised that any "wrongful purpose" satisfied that element, the jury could easily have determined guilt based on improperly admitted inflammatory evidence.   If the government's cynical wager that the Court would sooner overlook this calculated violation of its own pretrial order than grant a new trial is rewarded, the Rules of Evidence will have no force. *E.g.*, *Hazelton*, 979 F.3d at 402 (convictions reversed in mail fraud case where court admitted defendant's racist statements).

### B.     The government's opening statement and closing argument contained statements of fact not supported by proper evidence introduced during trial

By showcasing in its opening statement and closing argument the barred racist commentary, the government separately violated the Defendant's substantial rights, warranting a new trial.

The D.C. Circuit "has long recognized that a prosecutor is obliged 'to avoid making statements of fact to the jury not supported by proper evidence introduced during trial.'" *United States v. Williams-Davis*, 90 F.3d 490, 507, 319 U.S. App. D.C. 267 (D.C. Cir. 1996) (quoting *Gaither v. United States*, 413 F.2d 1061, 1079, 134 U.S. App. D.C. 154 (D.C. Cir. 1969)).  "'It is well established that a prosecutor may not make statements calculated to arouse the passions or prejudices of the jury.'" *United States v. Davis*, 863 F.3d 894, 907 (D.C. Cir. 2017) (quoting *United States v. Monaghan*, 741 F.2d 1434, 1440 (D.C. Cir. 1984)).  "As the

last words to the jury, the potential for prejudice from an impermissible closing statement is heightened." *Id.* (citing *United States v. Holmes*, 413 F.3d 770, 776 (8th Cir. 2005)).  The D.C. Circuit has formulated a three-part test for determining whether inappropriate opening statements and closing arguments warrant a mistrial: "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks." *Williams-Davis*, 90 F.3d at 507 (internal quotation marks and citation omitted).  Where those factors are satisfied, the government has violated the due process rights of the accused.  *Monaghan*, 741 F.2d at 1443.

As explained above, in both its opening statement and closing argument the government quoted the Defendant's anti-Semitic commentary.  In closing argument it displayed a text from the Defendant using the word n*****.  *Supra* at 12.  Particularly because the Court had explicitly excluded this material in a pretrial order, these statements to the jury were as outrageous as they were based on inadmissible evidence.  As indicated, the Defendant was not required to "object again" to these inappropriate remarks because the Court's pretrial ruling had plainly forbidden them.  *Brawner*, 173 F.3d at 970; *Williams*, 81 F.3d at 1325.  In any event, a conviction may be vacated even absent a defense objection where the government's opening and closing statements constituted "an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to around passion and prejudice," depriving the defendant of a "right to a fair trial."  *Viereck v. United States*, 318 U.S. 236, 247 (1943) (concluding that the trial court "should have stopped counsel's discourse without waiting for an objection").  Especially when coupled with the improper racism evidence preceding them, the government's inflammatory remarks to the jury warrant a new trial.

**C.    The Count One verdict must be set aside because the "corruptly" instruction gave the jury an impermissible ground for conviction**

61

Even if the Court does not enter a judgment of acquittal on Count One for lack of sufficient evidence that the Defendant acted "corruptly," it should still set aside the verdict because at least one of the grounds for conviction under that element in the jury instructions was legally invalid.

When a jury is given two possible grounds for conviction but one of those grounds is legally invalid, "and it is impossible to tell which ground the jury selected," the "proper rule to be applied is that which requires a verdict to be set aside." *Yates v. United States*, 354 U.S. 298, 312 (1957) (citing *Stromberg v. California*, 283 U.S. 359, 367-68 (1931)).

Here, even if the Court does not agree that the government was required to prove that the Defendant acted (1) with the intent to obtain an unlawful material advantage for himself or an associate; and (2) by influencing another to violate their legal duty, it should still recognize that any "wrongful purpose" was an invalid basis on which to find guilt on the "corruptly" element. The *Sandlin* decision on which the Court relied showed this.  Even though the *Sandlin* court rejected the defendant's (somewhat similar) "corruptly" argument under *Poindexter*, it still concluded that it would construe "wrongful" to mean "'independently criminal' conduct, *North* 910 F.3d at 943 (Silberman, J., concurring in part and dissenting in part) that is 'inherently malign,' *Arthur Andersen*, 544 U.S. at 704, and committed with the intent to obstruct an official proceeding. . ." *Sandlin*, 2021 U.S. Dist. LEXIS 237131, at *32.  To construe "wrongful" more broadly, *Sandlin* found, would create "difficult questions." *Id.* at *33.  As a result, the jury instructions the same judge used in another January 6 § 1512(c) case made clear that "corruptly" means "by unlawful means," not acting with any "wrongful purpose." *United States v. Guy Reffitt*, 12-cr-32-DLF, ECF No. 119 (D.D.C. 2021) (jury instruction defining "corruptly" to mean "using unlawful means" or "acting with an unlawful purpose" or both).

As shown above, instructing the jury that it could find guilt on the "corruptly" element if it found that the Defendant had any "wrongful purpose" is unconstitutionally vague, the more so where the jury could have easily rested a "wrongful purpose" finding on a raft of unfairly prejudicial racism evidence.  Because the jury was given this impermissible ground for conviction and we do not know whether it was relied on, the Court should set the verdict on Count One aside.  *Yates*, 354 U.S. at 312.

### D.   The admission of Schwager's invalid testimony prejudiced the Defendant's substantial rights

Schwager, the government's lay witness, offered testimony interpreting the Constitution and ECA for the jury.  Tr. at 409-16.  There almost is no question this was inadmissible testimony, from a lay or expert witness.  *E.g.*, *United States v. Smith*, 573 F.3d 639, 655 (8th Cir. 2009) ("It is the judge and not a witness that is to instruct the fact finder on the applicable principles of law.") (internal quotation marks and citation omitted); *United States v. Thomas*, 847 F.3d 193, 206 (5th Cir. 2017) (the Federal Rules of Evidence do not allow witnesses to "render conclusions of law"); *Marx & Co.*, *Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) ("It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge. . ."); *United States v. Amobi v. D.C. Dep't of Corr.*, 262 F.R.D. 45, 50 (D.D.C. 2009) (same).

But the admission of this testimony significantly prejudiced the Defendant.  Schwager instructed the jury that the ECA was a "law" that could be violated.  Tr. at 480.  He advised the jury that if Congress did not comply with the ECA's provisions that electoral certification occur within a set period of time, it would be breaking the "law." *Id.* at 423-24.  Apart from the fact that it was not Schwager's role to be instructing the jury on the law, he was legally mistaken.  As Schwager himself may understand, the weight of legal scholarship does not regard the ECA as a binding "law" but a precatory House rule in statutory form, under the canon of constitutional

avoidance.  *E.g.*, Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev.

1653, 1712 (2002); Akhil Reed Amar, *Presidents, Vice Presidents, and Death: Closing the*

*Constitution's Succession Gap*, 48 Ark. L. Rev. 215, 229 (1995).  Among other problems with

regarding the ECA as a law, the constitutional anti-entrenchment principle forbids one Congress

from "binding" another, i.e., enacting legislation that purportedly cannot be altered under

ordinary bicameralism and executive presentment procedure.  *United States v. Winstar Corp.*,

518 U.S. 839, 872 (1996); *INS v. Chadha*, 462 U.S. 919 (1983) (invalidating "law" not subject to

bicameralism and presentment).  That is what the ECA purports to do.  3 U.S.C. §§ 5, 15.  And

under the Rulemaking Clause, each Congress enjoys the power to set its own rules; the 117th

Congress is not bound in setting its rules by an arbitrary super legislature in the 50th Congress.

U.S. Const. Art. I, § 5, cl. 2 ("*each* House may determine the Rules of its Proceedings.")

(emphasis added).  Contrary to Schwager's misleading testimony to the jury, no presidential

election "law" is violated so long as Congress comports with the electoral procedures in the

Twelfth Amendment, the elector clauses (U.S. Const. Art. II, § 1), and the remainder of the

Constitution, in whatever manner it chooses.  Kesavan, 80 N.C. L. Rev. at 1712.  The Twelfth

Amendment provides, in pertinent part, that "The President of the Senate shall, in the presence of

the Senate and House of Representatives, open all the certificates and the votes shall then be

counted; the person having the greatest Number of votes for President, shall be the President, if

such number be a majority of the whole number of Electors appointed . . ." U.S. Const. amend.

XII.  It does not state that this proceeding must happen in a specific place, on a specific date, or

under specific certificate counting procedures.  Though other parts of the Constitution may

impose restraints on those factors, they are not militated by the "law" of the ECA.  Kesavan, 80

N.C. L. Rev. at 1712.  Schwager's improper testimony could easily have led the jury to convict

the Defendant on the basis that his corrupt "unlawful purpose" or "unlawful means" was to "violate," or involved violating, the ECA. Because this prejudicial instruction improperly came from a witness and not the Court, and because the witness wrongly interpreted the law, the Court should order a new trial.

**Conclusion**

For all the foregoing reasons, the Court should enter a judgment of acquittal on Count One. Alternatively, the Court should order a new trial.

Dated: June 24, 2022                           Respectfully submitted,

                                               */s/ Nicholas D. Smith*
                                               Nicholas D. Smith (Va. Bar No. 79745)
                                               7 East 20th Street
                                               New York, NY 10003
                                               Phone: (917) 902-3869

## Certificate of Service

I hereby certify that on the 24th day of June, 2022, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, and counsel of record were served by electronic means.

                                               */s/ Nicholas D. Smith*
                                               Nicholas D. Smith (Va. Bar No. 79745)
                                               7 East 20th Street
                                               New York, NY 10003
                                               Phone: (917) 902-3869