**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-CR-37 (TNM)** |
| **v.** | : | |
| | : | |
| **TIMOTHY LOUIS HALE-CUSANELLI,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S**
**MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR A NEW TRIAL**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits this response to Defendant Timothy Louis Hale-Cusanelli's Motion for Judgment of Acquittal and Motion for a New Trial.  (ECF No. 103.)  The defendant asks this Court to set aside the jury's verdicts of guilty following a trial and presentation of evidence by both government and defense and enter a judgment of acquittal or, in the alternative, grant a new trial.  The defendant's arguments lack merit, and his motions should be denied.

## FACTUAL BACKGROUND

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the United States Capitol Building.  The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election.  With the Joint Session underway and with Vice President Mike Pence presiding, a large crowd gathered outside the U.S. Capitol.  At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building.  Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol,

including by breaking windows.  Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.

On January 6, 2021, Timothy Hale-Cusanelli was enlisted in the United States Army Reserves and worked as a security contractor at Naval Weapons Station Earle in Colts Neck, New Jersey, where he maintained a "Secret" security clearance.  On the morning of January 6, 2021, after working a night shift, Hale-Cusanelli drove from New Jersey to Washington, D.C., to participate in the "Stop the Steal" rally.  While in Washington, D.C., for that event, Hale-Cusanelli recorded videos of himself protesting in a variety of locations, screaming at and interfering with United States Capitol Police officers, climbing scaffolding to enter the United States Capitol Building through doors that had been kicked open by rioters, and chanting "Stop the Steal" with other rioters.  In one of these videos, Hale-Cusanelli screamed, "Fuck you! The revolution will be televised, cunt!" at police guarding the Capitol on the West Front.

Hale-Cusanelli arrived on the West Front of the Capitol between 1:30 and 1:50p.m., and he made his way to the front of the crowd there, near the base of the Northwest Scaffolding and Stairs.  It was during this time that the battle for the West Front began to rage, with rioters successively forcing Capitol Police, and later MPD, to retreat.  Hale-Cusanelli ascended the Northwest Stairs as part of the first wave of rioters after the police line at the base of the scaffolding was breached.  Hale-Cusanelli reached the Upper West Terrace around 2:12 p.m.

At approximately 2:12 p.m., the first rioter breached the Capitol building through a broken window near the Senate Wing Door.  At this time, the Joint Session was underway, and Senators were in the Senate chamber debating an objection to Arizona's electoral votes.  About the same

time that the building was breached, Vice President Mike Pence was removed from Senate Chambers and later taken to a secure location within the Capitol.

Hale-Cusanelli breached the U.S. Capitol Building through the Senate Wing Door at around 2:14 p.m., less than 90 seconds after the first rioter entered the building. Capitol closed circuit video (CCTV) shows Hale-Cusanelli first walking to the left with other rioters, in the direction of the Senate Chamber, and turning around to go the other way, towards the Capitol Crypt, shortly thereafter.

Hale-Cusanelli and a pack of rioters entered the Crypt around 2:20 p.m. where they faced off with Capitol Police holding M4 rifles who were trying to prevent their passage. One of those officers testified. The rioters overwhelmed these Capitol Police officers in minutes and spilled into the Crypt, from which they branched off into various directions. Hale-Cusanelli first moved with a crowd into the area near the Memorial Door and staircase, around 2:28 p.m., but turned around as the area became bottlenecked.

Meanwhile, Senators were being evacuated from the Senate chamber. One of the Capitol Police officers assisting with those evacuations testified. That officer and a U.S. Secret Service Agent who were on the Senate side of the building around the time of the first breach of the building testified about the din of the invading crowd and about how close the rioters, including Hale-Cusanelli, came to Vice President Pence as he was being moved and to Senators evacuating the Senate chamber.

Hale-Cusanelli made his way to the Capitol Visitor Center (CVC) around 2:34 p.m. Hale-Cusanelli can be seen on CCTV making a waving motion with his arms in the direction of the skylight, and he later told a witness that he was trying to get rioters to "advance" into the Capitol, because "we need more people." Hale-Cusanelli and the rioters he was with met a group of Capitol

Police in the CVC who were there to prevent rioters accessing tunnels and trains leading to Congressional office buildings, where members and their staffs were sheltering in place, as well as evacuation routes.  One of those Capitol Police officers attempted to take down a rioter and effectuate an arrest, when Hale-Cusanelli intervened and unsuccessfully tried to pull the rioter away from the officer.  That officer testified, saying that if Capitol Police had had enough officers and resources, they would have taken every single rioter into custody that day.

Hale-Cusanelli made his way from the CVC back to the Senate Wing Door area around 2:45 p.m.  By this time, the mob had succeeded in halting the Electoral College Certification proceeding, and rioters had entered the U.S. Senate chamber, which Capitol Police had not been able to guard because they were spread too thinly, dealing with rioters all over the building and trying to get Congressmembers to safety.  Hale-Cusanelli lingered in the area near the Senate Wing Door for a few minutes before climbing out a window to exit.  There, he picked up a large Trump flag, dropped by another rioter, and waved it while standing in a corner.  He took the flag home with him, and it was recovered as evidence.

After January 6, the Naval Criminal Investigative Service (NCIS) received information that Hale-Cusanelli had participated in the attack on the Capitol.  They enrolled Hale-Cusanelli's roommate as a confidential human source (CHS).  The CHS, at the direction of NCIS and FBI, recorded a conversation between himself and Hale-Cusanelli.  In that conversation, Hale-Cusanelli said he couldn't "describe how exhilarating it [being at the Capitol on January 6] was."  Hale-Cusanelli showed the CHS a video of himself inside the Capitol Crypt chanting, "Stop the Steal!" That video was entered into evidence.

When the CHS asked, "how do you recreate that [January 6]?" Hale-Cusanelli said, "War. Civil War," and that if there had been more rioters, they could have taken the entire Capitol

building and held it.  Hale-Cusanelli repeated later in the conversation, "I really fucking wish there'd be a civil war," followed by this exchange:

| | |
|---|---|
| CHS: | You really wish there'd be a civil war? |
| Hale-Cusanelli: | Yes. |
| CHS: | Why? |
| Hale-Cusanelli: | Because it would, it would provide a clean slate. |
| CHS: | Yeah, but then a whole bunch of fucking people would die. |
| Hale-Cusanelli: | Yeah. Well, you know, as Jefferson said, the price—the tree of liberty must be refreshed with the blood of patriots and tyrants. |

Hale-Cusanelli opined that civil war would be "the simplest solution, the most likely outcome," because "political solutions" would be insufficient to fix the country's problems in the face of "entrenched interests."  Hale-Cusanelli made clear in this conversation that, by "entrenched interests," he meant Jewish interests whom he believed were controlling the Democratic Party and Joe Biden.  Hale-Cusanelli expressed a belief that the "threat" to America was not outward, but inward:  "[Y]ou know, it's not … the Soviet Union that blew up the Twin Towers and then blamed it on a third world shithole."  The CHS asked Hale-Cusanelli what he would do if he were "King of America," which led to the following exchange:

| | |
|---|---|
| CHS: | What would you do to change what's going on right now? |
| Hale-Cusanelli: | Such as? |
| CHS: | I don't fucking know.  What -- |
| Hale-Cusanelli: | Change what's going on—what's going on? |
| CHS: | Well, like, the divide in America. The Democrats, Joe Biden, the Jews. |
| Hale-Cusanelli: | You repeated yourself. |
| CHS: | Are you saying they're all part of the Jews? |
| Hale-Cusanelli: | Of course.  I'd give them 24 hours to leave the country.  No.  But also, yes.  But no, what I would do is just arrest them all.  Not all the Jews, … a lot, but yeah.  I would purge, I would purge |

> Congress.  None of them have any purpose or use.  They're all a
> bunch of insider-trading cunts. They do nothing but vote for war
> and rape kids.  So, Congress can go…

Hale-Cusanelli continued, saying that he would then set up regional governments, like "old empires did."  Hale-Cusanelli then said that this was how the U.S. Government was supposed to be, because Thomas Jefferson said there should be a revolution every 10 years, and Benjamin Franklin said there should be a revolution every 30 years.  Hale-Cusanelli said that he believed there should be a revolution "every few generations."

Prior to January 6, 2021, Hale-Cusanelli repeatedly expressed his belief to the CHS that the 2020 Presidential Election was fraudulent and that Joe Biden was not the true winner of the election.   The government also entered into evidence text messages from Hale-Cusanelli's cellphone reflecting this belief.  For example, Hale-Cusanelli texted a friend on November 6, 2020, that "They [Trump and supporters] won't go down without a fight.  If they pull this off they'll expose the greatest election fraud in American history."

Hale-Cusanelli's text messages also reflected his deep understanding of the political process, including the electoral college and vote-counting processes.  For example, while texting a friend in the aftermath of the election, on November 25, 2020, Hale-Cusanelli said, "Georgia and Pennsylvania have sent faithless electors."  His friend asked what "faithless electors" meant.  Hale-Cusanelli replied, "Meaning the electors may not vote how they were told to based on the certified results."

At trial, Hale-Cusanelli testified in his own defense.  He claimed that he did not know that Congress sat in the U.S. Capitol Building, and therefore he was not aware that the Electoral College Proceeding was taking place there when he entered the building.  He claimed that he did not learn that Congressmembers were in the building until 2:45 when a police officer told him.  Hale-

Cusanelli also testified that, when he interfered with police in the CVC, he did not recognize them to be police officers at that time.

## **PROCEDURAL BACKGROUND**

On January 15, 2021, the defendant was charged by complaint for his actions on January 6, 2021, when large crowds breached the U.S. Capitol Building as Congress convened a Joint Session to certify the Electoral College vote in the 2020 Presidential Election.  (ECF No. 1-1.) Two weeks later, the grand jury charged him with several federal offenses based on the same conduct.  (ECF No. 9.)  The defendant was charged by Superseding Indictment with obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count One); entering and remaining in a restricted building or ground, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).  (ECF No. 59.)

On April 29, 2022, this Court held a hearing on the parties' pretrial motions, including the defendant's motion to dismiss Count 1 – Obstruction of an Official Proceeding in violation of 18 U.S.C. §  1512(c)(2), and the defendant's motion to exclude certain of the defendant's statements from the government's evidence at trial.  At a May 6, 2022, pretrial conference, this Court denied the defendant's motion to dismiss Count 1, holding that Congress's certification of the Electoral College was an "official proceeding" within the meaning of 18 U.S.C. § 1512(c)(2) and that § 1512(c)(2) was not limited to obstruction related to documentary or tangible evidence, as the defendant argued in his motion to dismiss Count 1.

Also at the May 6, 2022, pretrial conference, the Court addressed the defendant's motion to exclude certain statements by the defendant that the government would seek to introduce at trial. At issue were certain statements made by the defendant expressing a desire for a civil war to "provide a clean slate," as well as derogatory statements about Jewish people, women, and racial minorities, and statements complimentary of the Nazis. (Transcript of motion to dismiss hearing (May 6, 2022) (attached as Exhibit 1), ("Tr. May 6, 2022") at 10-16.) The Court denied in part and granted in part the defendant's motion. Assuming without deciding that Federal Rule of Evidence 404(b) applied to all of the evidence at issue,[1] this Court determined that the defendant's "political and civil war-related statements" were admissible under Rule 404(b), that they were highly probative of the defendant's motive to commit the charged offenses, and that any prejudice resulting from the introduction of such statements was not unfair. (*Id.* at 12-13.) The Court "assume[d]" that the defendant's statements about "Jews, minorities, and women" were "relevant to his motive and therefore admissible under Rule 404(b)." (*Id.* at 13.) However, the Court concluded that such statements could not be introduced at trial pursuant to Federal Rule of Evidence 403. (*Id.*) The Court held that such statements were of limited probative value and the unfair prejudice to the defendant from the introduction of statements about "Jews, the Nazi party,

---

[1]    The government argued in its opposition to the defendant's motion that the statements at issue were *not* subject to the limitations of Rule 404(b) because those statements reflecting the defendant's desire for a civil war and his belief that institutions such as the Democratic party were under the control of Jewish interests were "intrinsic" to the *mens rea* element of Count 1, Obstruction of an Official Proceeding. (ECF No. 68 at 6-8.) The Court declined to distinguish whether the statements were "intrinsic" evidence or "404(b) evidence," and reasoned that it did not have to draw such a distinction given that the government provided notice to the defendant as required by Rule 404(b). (*See* Tr. May 6, 2022, at 12 ("The Court takes from [the government's] notice that 404(b) applies to all the evidence at issue, meaning there's no need to decide the intrinsic/extrinsic distinction.").)

minorities, or women," substantially outweighed the statements' probative value. (*Id.* at 15.) As such, they would be excluded under Rule 403. (*Id.*)

Noting that "some of the lines are not as easy to draw between" admissible evidence and evidence excluded pursuant to the Court's ruling, government counsel requested the opportunity to present the Court with transcripts of the defendant's statements to facilitate a pretrial ruling on specific statements. (*Id.*) The Court directed the parties to confer and "work out" whether specific statements would be excluded by the Court's order, but said that the Court would "review anything that there's still a question on." (*Id.* at 16.) The Court stated, "If there's talk about race, religion or women or Nazis, I think those should be excised" but "if it's talking about a political party, about civil war, I think those come in." (*Id.*)

Notably, the government made clear at the May 6, 2022, hearing its intent to introduce in trial the contents of the defendant's phone (*id.* at 31), but statements contained in the defendant's text messages were not specifically addressed in the defendant's motion to exclude evidence, the government's opposition, or the Court's pretrial ruling.

Government exhibits were provided to the defense for review on a rolling basis prior to the commencement of trial. Following the Court's directive that the parties "work out" the specific applicability of the Court's pretrial order to the defendant's statements, government and defense counsel discussed and agreed upon certain redactions to Government Exhibits 100A, 100B, 100C, 100D, and 100T—the recorded conversation between the defendant and the defendant's roommate (identified herein as "CHS") and its corresponding transcript.

The defendant maintained an objection to one of the defendant's statements in the conversation with the CHS wherein the defendant states that "Democrats, Joe Biden, the Jews" are all the same. The government maintained the position that this was "a political statement that the

Democratic Party is backed by Jewish interests, and that is [the defendant's] problem with Joe Biden." (Trial Tr. at 766.)  That dispute was addressed by the Court and the parties on the record, and the statement was allowed to come in.  (*Id.*)

The defendant raised no pretrial objections to any statements included in the defendant's text messages, despite government counsel having flagged certain exhibits for defense counsel's review ahead of trial.  During trial, the defendant objected to Government Exhibits 350.3.A and 350.3.B, which were attachments to the defendant's text messages referencing the Jewish immigration to the United States and President Biden's children's marriages to Jewish individuals. (*Id.* at 483-84.)  In response to the defendant's objection, government counsel stated:

> I gave defense notice of and both of those we've talked about by email multiple times… [T]he government's position is they're both political statements.  They talk about Jewish interests with respect to the Democratic Party… I believe I raised with the Court and defense counsel that there were a few statements that crossed over between politics and Jewish concerns.  The defendant, according to the CHS, stated [on] numerous occasions that his concern with the Democratic Party is that it is a front for Jewish interests.  (*Id.*)

This Court ruled that Government Exhibit 350.3.A could be admitted but 350.3.B would be excluded.  (*Id.* at 485.)

This was the only time during the trial that defense counsel objected to and the Court ruled on the admissibility of evidence specifically on the basis of its pretrial 403 ruling.  The defendant did not object when the CHS testified about the defendant's belief in Jewish interests' control of President Biden and the Democratic Party. (*Id.* at 709.)  He did not object to any of the profane language contained in the defendant's text messages.  (*E.g.*, *id.* at 474, 475, 494.)  In fact, when asked if the defendant objected to the language, defense counsel shrugged and said, "It's there." (*Id.* at 475.)

## ARGUMENT

**I.    The defendant's motion for judgment of acquittal should be denied.**

In an extensive motion for acquittal, the defendant presses nearly identical arguments to those he advanced in his pretrial motion to dismiss Count 1, which charged him with a violation of 18 U.S.C. § 1512(c)(2).  (*See* ECF No. 62.)  This Court rejected those arguments before trial, (*see* Tr. May 6, 2022,) and the defendant provides no sound reason to reach a different result now that a jury has rendered a guilty verdict in his case at trial.  This Court should therefore deny his motion for judgment of acquittal.

### A.    Rule 29 Standard

Federal Rule of Criminal Procedure 29 permits the defendant to move for judgment of acquittal at the close of the government's case in chief or at the close of all evidence on the ground that the evidence presented is "insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  The Court must consider the evidence "in the light most favorable to the government" to determine if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Shi*, 991 F.3d 198, 205 (D.C. Cir. 2021) (emphasis in original) (citations omitted).  Stated otherwise, "a judgment of acquittal is warranted 'only when there is no evidence upon which a reasonable mind might find guilt beyond a reasonable doubt.'"  *United States v. Khanu*, 675 F. Supp. 2d 55, 60 (D.D.C. 2009) (quoting *United States v. Byfield*, 928 F.2d 1163, 1165 (D.C. Cir. 1991)).  When considering a Rule 29 motion after a verdict, the Court "must view the evidence in the light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating the credibility of witnesses, finding the facts, and drawing justifiable inferences."  *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983).  Credibility determinations are for the jury, not for the judge when deciding a motion under Rule 29.  *United*

*States v. Williamson*, 81 F. Supp. 3d 85, 89 (D.D.C. 2015); *see also Glasser v. United States*, 315 U.S. 60, 80 (1942) (courts should not "weigh the evidence or determine the credibility of witnesses").

A defendant's Rule 29 burden at the post-verdict stage is "very high," in part because evidence to support a conviction does "not need to be overwhelming." *United States v. Pasha*, 797 F.3d 1122, 1135 n.9 (D.C. Cir. 2015). Indeed, the Court owes "tremendous deference to a jury verdict." *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990). The defendant cannot surmount that demanding standard here.

**B.      The Certification of the Electoral College vote is an official proceeding**

The defendant first contends (ECF No. 103 at 18-36) that Congress's certification of the Electoral College vote on January 6, 2021, was not an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). This Court, and every judge in this District to have considered the issue, has rejected that contention. *See United Sates v. Sandlin*, No. 21-cr-88, 2021 WL 5865006, at *4 (D.D.C. Dec. 10, 2021) (Friedrich, J.); *United States v. Caldwell*, No. 21-cr-28, 2021 WL 6062718, at *7 (D.D.C. Dec. 20, 2021) (Mehta, J.); *United States v. Mostofsky*, No. 21-cr138, 2021 WL 6049891, at *10 (D.D.C. Dec. 21, 2021) (Boasberg, J.); *United States v. Montgomery*, No. 21-cr-46, 2021 WL 6134591, at *4-10 (D.D.C. Dec. 28, 2021) (Moss, J.); *United States v. Nordean*, No. 21-cr-175, 2021 WL 6134595, at *4-6 (D.D.C. Dec. 28, 2021) (Kelly, J.); *United States v. McHugh*, No. 21-cr-453, 2022 WL 296304, at *5-9 (D.D.C. Feb. 1, 2022) (Bates, J.); *United States v. Grider*, No. 21-cr-22, 2022 WL 392307, at *3-4 (D.D.C. Feb. 9, 2022) (Kollar-Kotelly, J.); *United States v. Miller*, No. 1:21-cr-119, 2022 WL 823070, at *5 (D.D.C. Mar. 7, 2022) (Nichols, J.); *United States v. Andries*, No. 21-cr-93, 2022 WL 768684, at *3-7 (D.D.C. Mar. 14, 2022) (Contreras, J.); *United States v. Puma*, No. 21-cr-454, 2022 WL 823079, at *4-9 (D.D.C. Mar. 19,

2022) (Friedman, J.); *United States v. Bingert*, 21-cr-91, 2022 WL 1659163, at *3-5 (D.D.C. May 25, 2022) (Lamberth, J.); *United States v. Williams*, 21-cr-618, 2022 WL 2237301, at *8-13 (D.D.C. June 22, 2022). Nothing in the defendant's motion counsels a different result.

In 2002, Congress enacted Section 1512(c)'s prohibition on "Tampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807. Section 1512(c)'s prohibition applies to

[w]hoever corruptly

> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so.*

18 U.S.C. § 1512(c) (emphasis added).

An official proceeding as defined in 18 U.S.C. § 1515(a)(1) includes a "proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B). While "not every action taken within the walls of Congress" amounts to an official proceeding under that definition, "a joint session of Congress convened to verify and count the electoral vote for President and Vice President of the United States does." *Montgomery*, 2021 WL 6134591, at *4. Indeed, a "straightforward reading" of the "official proceeding" definition in Section 1515 "easily reaches the Certification of the Electoral College vote." *Caldwell*, 2021 WL 6062718 at *4.

The Certification of the Electoral College vote ("Certification") is an "official proceeding" because it is "akin to a formal hearing." *Sandlin*, 2021 WL 5865006, at *3. The formality built in the "official proceeding" definition in Section 1515(a)(1) indicates that a proceeding should both "comprise part of the business of the enumerated body" and that the body in question "has convened in some formal respect for the purpose of conducting that business." *Montgomery*, 2021

WL 6134591, at *5.  As applied to the "official proceeding" definition in Section 1515(a)(1)(B), the proceeding "must involve a formal assembly or meeting of Congress for the purpose of conducting official business."  *Id.*; *accord id.* at *9 ("the term 'official proceeding' refers to '[t]he business conducted by … [an] official body' that has formally convened for the purpose of conducting that business") (quoting *Proceeding*, Black's Law Dictionary (11th ed. 2019)).  As described in the government's response to the defendant's motion to dismiss, the Certification indubitably involves a "formal" congressional assembly that conducts official business.  (*See* ECF No. 69, at 8); *see also Montgomery*, 2021 WL 6134591, at *9 (describing Certification proceeding); *Sandlin*, 2021 WL 5865006, at *4 (noting the Certification has all "the trappings of a formal hearing before an official body"); *Caldwell*, 2021 WL 6062718 at *4 (Congress carrying out the "business" of an "official body" meets the "official proceeding" definition).

The defendant argues at length that the phrase "official proceeding" in Section 1512 applies only to proceedings that involve "investigations" and "evidence."  But this narrow reading of the statute finds no textual support when applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress."  Had Congress wanted to impose a definition that more closely resembled a quasi-adjudicative setting (as the defendant contends), it needed look only a few provisions away to 18 U.S.C. § 1505, which criminalizes, among other things, the obstruction of (i) "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency; and (ii) "the due and proper exercise of the power of inquiry under which any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees.  18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020).  If Congress wished to similarly limit the obstruction prohibition under § 1512(c)(2) to congressional investigations and the like, it could have enacted language

similar to Section 1505.  Instead, Congress chose different terms, with different meanings.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each.  We would not presume to ascribe this difference to a simple mistake in draftsmanship.").  Congress enacted broader language ("a proceeding before the Congress") that covers a broader range of proceedings than only the "inquir[ies] and investigation[s]" envisioned in Section 1505.  That broader definition includes the Electoral College vote certification that the defendant obstructed on January 6, 2021.

None of the defendant's contrary arguments has merit.  The defendant places heavy reliance on the Ninth Circuit's decision in *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013).  But *Ermoian* involved a different statutory definition, 18 U.S.C. § 1515(a)(1)*(C)*, and an entirely different issue: whether an FBI investigation counts as "a proceeding before a Federal Government agency which is authorized by law" under Section 1515(a)(1)(C).  In *Ermoian*, the Ninth Circuit reasoned at the outset that the term "proceeding" did not "conclusively resolve whether an FBI investigation qualifies" because narrower definitions of the term "would exclude criminal investigations in the field."  752 F.3d at 1170.  This case, which involves a proceeding before Congress and implicates Section 1515(a)(1)*(B)* (and not *(C)*), presents no such question.  And, in any event, the Joint Session of Congress to certify the Electoral College vote would satisfy even the narrower formulations of "proceeding" cited in *Ermoian*.  The Joint Session plainly constitutes "*business conducted* by a court *or other official body*; a *hearing*," or "[a] legal … process."  *Id.* at 1169 (emphasis added).  And there can be no serious dispute that the Joint Session is a "proceeding … authorized *by law*" or that it has the "sense of formality" that the Ninth Circuit found absent from mere criminal investigations.  *Id.* at 1170 (emphasis added).  *Ermoian* therefore provides no support for the defendant's theory.

15

The D.C. Circuit's decision in *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994) fails to support his theory as well. In *Kelley*, the D.C. Circuit held that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505. 36 F.3d at 1127. *Kelley* thus concerned "a different statute" and "different language." *Montgomery*, 2021 WL 6134591, at *8. In giving the term "proceeding" in Section 1505 the same meaning it has in Section 1512, the D.C. Circuit was simply accepting the parties' concession in that case, which neither "constitute[s] a holding" nor "illuminate[s] the issue presented" in this case. *Id.*

The defendant also argues at length that Section 1512(c)'s legislative history weighs in favor of interpreting the obstruction statute narrowly because, in enacting Section 1512(c) in 2002, Congress was principally preoccupied with closing a loophole in connection with potential investigations. Putting aside that the "best evidence of [a statute's purpose] is the statutory text adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), the obstruction statute's legislative history confirms that Congress intended "official proceeding" to reach broadly. Although Congress enacted Section 1512(c) as part of the Sarbanes-Oxley Act of 2002, Section 1512(c) adopted—but did not modify—the pre-existing definition of "official proceeding" in Section 1515(a)(1), which had been in place since 1982. *See* Victim and Witness Protection Act of 1982 ("VWPA"), Pub. Law 97-291, § 4(a), 96 Stat. 1252.[2] And, tellingly, in considering the VWPA in 2002, the Senate Judiciary

---

[2]     The defendant claims (ECF No. 103 at 29) that the D.C. Circuit's decision in *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), "conflicts with virtually everything" that judges of this Court have concluded about "official proceeding" as used in Section 1512. That claim is overstated and inaccurate. As in *Kelley*, the D.C. Circuit in *Poindexter* was interpreting Section

Committee urged the inclusion of a "broad residual clause"—in a provision that was ultimately omitted from the 1982 enactment, but that resembles the current iteration of Section 1512(c)(2)—precisely because the "purpose of preventing an obstruction or miscarriage of justice cannot be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses. There must also be protection against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice." S. Rep. 97-532, at 18 (1982). The upshot is clear: contrary to the defendant's argument, when it enacted the operative definition of "official proceeding," Congress intended that term to be construed broadly, not narrowly. And this case underscores Congress's foresight in doing so: the defendant sought to thwart justice in an unprecedented and inventive manner, by literally driving Congress out of the chamber. His criminal actions fit squarely within the legislative history of the statute.[3]

Even if the defendant's interpretation of "official proceeding" were correct, he is not entitled to acquittal on Count 1. The certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]." 3 U.S.C. § 15. That Joint Session

---

1505, rendering its discussion of limited (if any) relevance to the interpretation of "proceeding" under Section 1512. In any event, nothing in the history recounted in *Poindexter* (and at length by the defendant) undermines the plain-language interpretation described above.

[3]    Even if the defendant were correct that the obstruction statute's application to the Electoral College vote certification proceeding was not expressly anticipated by Congress at the time of enactment, that alone "does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1749 (2020) (internal quotation and alterations omitted). A statute's application may "reach[] beyond the principal evil legislators may have intended or expected to address." *Id.* (internal quotation omitted); *cf.*, *United States v. Montgomery*, 2021 WL 6134591, at *15-17 (D.D.C. Dec. 28, 2021) (Moss, J.) (rejecting a narrow understanding of Section 1512(c) based on its legislative history).

renders judgment on whether to certify the votes cast by Electors in the presidential election. Under the Constitution, the Electors create "lists" of the presidential and vice-presidential candidates, which they "sign" and "certify" before sending to Congress.  U.S. Const. amend. XII. Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count Act.  *See* 3 U.S.C. § 15.  As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it.  *Id*.  And just as a jury does not (barring a mistrial) recess until it has reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result."  3 U.S.C. § 16.  Even under the defendant's theory, Congress's certification of the Electoral College vote possesses sufficient "tribunal-like" characteristics to qualify as an "official proceeding," as several judges of this Court have already concluded.  *See Caldwell*, 2021 WL 6062718, at *11; *Nordean*, 2021 WL 6134595, at *6; *McHugh*, 2022 WL 296304, at *9.

### C.    The defendant's conduct fell within the scope of Section 1512(c)(2).

As he did in his pretrial motion to dismiss, the defendant urges this Court to adopt the reasoning of *United States v. Miller*, No. 21-cr-119, 2022 WL 823070 (D.D.C. Mar. 7, 2022) (Nichols, J.), the sole decision in which a judge of this Court has construed Section 1512(c)(2) to require proof that "the defendant ha[s] taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding."  *Id.* at *15. *Miller*'s outlier reasoning is unpersuasive for several reasons.   And even under *Miller*'s interpretation, the defendant's conviction under Section 1512(c)(2) is sound.

1.   Focusing on the word "otherwise" in Section 1512(c)(2), Judge Nichols in *Miller* identified "three possible readings" of Section 1512(c)(2).  2022 WL 823070, at *6.  First, Section 1512(c)(2) could serve as a "clean break" from Section 1512(c)(1), *id.*, a reading that "certain

courts of appeals have adopted," *id.* at *7. *Miller*, however, identified multiple "problems" with that interpretation, all rooted in the interpretation of the term "otherwise." It stated that reading "otherwise" in Section 1512(c)(2) to mean "in a different way or manner" is "inconsistent" with *Begay v. United States*, 553 U.S. 137 (2008), which considered whether driving under the influence qualified as a "violent felony" under the now-defunct residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1). 2022 WL 823070, at *7. Second, *Miller* hypothesized that Section 1512(c)(1) could "provide[] examples of conduct that violates" Section 1512(c)(2). *Id.* at *8. Third, *Miller* stated that Section 1512(c)(2) could be interpreted as a "residual clause" for Section 1512(c)(1), such that both provisions are linked by the document-destruction and evidence-tampering "conduct pr[o]scribed by" Section 1512(c)(1). *Id.* at *9. After considering Section 1512(c)'s structure, "historical development," and legislative history, *Miller* found "serious ambiguity" as to which of the two "plausible" readings—the second and third readings identified above—Congress intended. *Id.* at *15. Applying what it described as principles of "restraint," *Miller* then interpreted Section 1512(c)(2) to mean that a defendant violates the statute only when he or she "take[s] some action with respect to a document, record, or other object in order to corruptly obstruct, impede, or influence an official proceeding" (the third reading). *Id.*

*Miller*'s reasoning is unpersuasive. *Miller* ultimately turned on the court's determination that no "single obvious interpretation of the statute" controlled and that the rule of lenity was applicable and dispositive. *Id.* The rule of lenity, however, "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *see Muscarello v. United States*, 524 U.S. 125, 138-39 (1998); *Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019). Some

ambiguity is insufficient to trigger the rule of lenity; instead, a court must find "grievous ambiguity" that would otherwise compel guesswork. *See Ocasio v. United States*, 578 U.S. 282, 295 n.8 (2016) (internal quotation marks omitted). "Properly applied," then, "the rule of lenity therefore rarely if ever plays a role because, as in other contexts, 'hard interpretive conundrums, even relating to complex rules, can often be solved.'" *Wooden v. United States*, 142 S. Ct. 1063, 1074 (2022) (Kavanaugh, J., concurring).

Under these standards, the rule of lenity is plainly "inapplicable" here. *Puma*, 2022 WL 823079, at *12 n.4. Congress made clear in Section 1512(c)(2) that it sought to protect the integrity of official proceedings—regardless of whether a defendant threatens such a proceeding by trying to interfere with the evidence before that tribunal or threatens the tribunal itself. Any such distinction produces the absurd result that a defendant who attempts to destroy a document being used or considered by a tribunal violates Section 1512(c) but a defendant who threatens to use force against the officers conducting that proceeding escapes criminal liability under the statute. Not only does the rule of lenity not require such an outcome, but such an application loses sight of a core value that animates the lenity rule: that defendants should be put on notice that their conduct is criminal and not be surprised when prosecuted. *See Wooden*, 142 S. Ct. at 1082 (Gorsuch, J., concurring) ("Lenity works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws."). It would strain credulity for any defendant who was focused on stopping an official proceeding from taking place to profess surprise that his conduct could fall within a statute that makes it a crime to "obstruct[], influence[], or impede[] [any] official proceeding or attempt[] to do so." 18 U.S.C. § 1512(c)(2). The absence of ambiguity—serious, grievous, or otherwise—is confirmed by the fact that despite Section 1512(c)(2)'s nearly 20-year existence, no other judge has found ambiguity in Section 1512(c)(2),

including, again, numerous judges on this Court considering the same law and materially identical facts.[4]

Judge Nichols's interpretation turns in substantial part on his reading of *Begay v. United States*, 553 U.S. 137 (2008), but *Begay*'s interpretation of "otherwise" in the Armed Career Criminal Act (ACCA) residual clause does not suggest—let alone compel—the interpretation *Miller* adopts. *See Montgomery*, 2021 WL 6134591, at *11 (noting that *Begay* "does little to advance" the argument that Section 1512(c)(2) must be tethered to conduct akin to document destruction in Section 1512(c)(1)). In short, "*Begay* cannot bear the weight" that *Miller* "assigns to it." *McHugh*, 2022 WL 1302880, at *5. Not only is Section 1512(c)(2) grammatically and structurally different than the ACCA residual clause,[5] *Reffitt*, 2022 WL 1404247, at *8; *McHugh*, 2022 WL 1302880, at *5, but the "remarkably agnostic" view on "otherwise" that the Supreme Court adopted in *Begay* for purposes of the ACCA residual clause, *Montgomery*, 2021 WL 6134591, at *11, suggests, if anything, that "*the government's* interpretation of 'otherwise' is the word's more natural reading," *McHugh*, 2022 WL 1302880, at *5 n.9 (emphasis in original). And just as *Begay*'s atextual engrafting of a requirement of "purposeful, 'violent,' and 'aggressive'"

---

[4]    For the same reasons, the defendant's claim (ECF No. 103 at 56-58) that Section 1512(c)(2) results in "serious ambiguity or unconstitutional vagueness" lacks merit.

[5]    It follows that Section 1512(c)(2) is a poor fit for application of the *ejusdem generis* canon that *Begay* applied to the ACCA residual clause and that the defendant urges be applied to Section 1512(c). *See McHugh*, 2022 WL 1302880, at *5 (explaining that the *ejusdem generis* canon on which *Miller* relied is "irrelevant" because rather than the "'A, B, C, or otherwise D'" structure found in the ACCA residual clause, Section 1512(c) "follows the form '(1) A, B, C, or D; or (2) otherwise E, F, or G'"). The defendant's extended discussion of the application of that statutory canon to other statutes in other cases (ECF No. 103 at 41-46) fails to undermine the straightforward analysis in *McHugh*.

conduct, 553 U.S. at 144-45, failed to "bring[] clarity" to the residual clause, *Johnson v. United States*, 576 U.S. 591, 600 (2015), so too *Miller*'s requirement that a defendant "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding is likely to engender the very ambiguity the *Miller* decision purports to avoid.

The defendant's reliance on Section 1512(c)(2)'s "statutory context and history" fares no better. In his view, Judge Nichols's correctly treated a broader interpretation of Section 1512(c) as "'[an] elephant'" in a "'mousehole.'" (ECF No. 103 at 46.) But the "'mouseholes' canon surely does not instruct courts to second-guess the plain meaning of a statute just because the judge can imagine other ways it could have been organized." *McHugh*, 2022 WL 1302880, at *8 n.14. In any event, Congress's placement of Section 1512(c)(2) among the "broad proscriptions," *Yates v. United States*, 574 U.S. 528, 541 (2015) (plurality opinion), in Section 1512 generally, and its specific placement at the end of the three provisions (Sections 1512(a), 1512(b), and 1512(c)) defining at least 20-year felonies but before the only other provision in Section 1512 that defines a less serious crime (Section 1512(d)), is fully consistent with its role as a catch-all provision designed to reach the most serious obstructive conduct not already encompassed by other obstruction prohibitions. *See McHugh*, 2022 WL 1302880, at *8 n.14.

The defendant largely repeats Judge Nichols's discussion of "substantial superfluity problems," *Miller*, 2022 WL 823070, at *12, but overlooks the "simple" explanation: when Congress enacted the "direct obstruction" provision in Section 1512(c)(2) that provision necessarily included the "indirect obstruction prohibited" in the rest of Section 1512. *McHugh*, 2022 WL 1302880, at *8. As Judge Bates explained, Congress in Section 1512(c)(2) did not "*duplicate* pre-existing provisions . . . but instead *expanded* the statute to include additional forms of obstructive conduct, necessarily creating overlap with the section's other, narrower

prohibitions." *Id.*  Congress was not required to repeal those pre-existing prohibitions and rewrite Section 1512 "to create a single, blanket obstruction offense" just to avoid overlap.  *Id.* at *9.  In other words, Section 1512(c)(2) "creates only explicable and indeed inevitable overlap rather than outright redundancy," such that the "purported superfluity" in Section 1512 "simply does not justify displacing the provision's ordinary meaning."  *Id.* at *10.  Moreover, as Judge Bates also correctly observed, "[e]ven" the Court's "narrower interpretation" of Section 1512(c)(2) would give rise to superfluity concerns; therefore the canon against surplusage, which "merely favors that interpretation which *avoids* surplusage, not the construction substituting one instance of superfluous language for another," does not counsel in favor of the Court's interpretation.  *Id.* at *9 (quoting *United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013)).

The defendant's also draws support from *Miller*'s discussion of Section 1512's historical development and legislative history.  As an initial matter, "neither sheds much light" on Section 1512(c)(2)'s scope.  *Reffitt*, 2022 WL 1404247, at *9.  What illumination historical context and legislative history does offer favors the view that Section 1512(c)(2) "creates direct liability for an individual's obstructive acts beyond those relating to physical evidence."  *Id.*  For example, the relevant verbs in Section 1512(c)(2)—"obstruct[]," "influence[]," and "impede[]"—were "likely adapted" from the "expansive prohibitions" on obstruction found in 18 U.S.C. § 1503(a) and 18 U.S.C. § 1505.  *See McHugh*, 2022 WL 1302880, at *10.  That "broader reading," moreover, finds support in floor statements of the lawmakers that enacted Section 1512(c)(2).  *See id.* at *12.  And to the extent Congress's enactment of Section 1512(a)(2)(B) just three months after the enactment of Section 1512(c) might tend to undermine the plain-language interpretation of Section 1512(c)(2),  the fact that Section 1512(a)(2) was "written and first approved" a year earlier than it was enacted—and therefore nine months before Section 1512(c)(2) was enacted—"somewhat

undermines the inference" based on Section 1512(a)(2) that *Miller* drew about Section 1512(c)(2)'s scope. *McHugh*, 2022 WL 1302880, at *9 n.17.

2. Even assuming *Miller*'s interpretation of Section 1512(c)(2) were correct, and that the government therefore must prove "[the defendant] took some action with respect to a document, record, or other object in order to corruptly obstruct, impede[,] or influence Congress's certification of the electoral vote," *Miller*, 2022 WL 823070, at *15, the evidence at trial met that requirement. The evidence established that the Certification proceeding operates through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections. For example, evidence showed Congress had before it official "ballot boxes" carried into the House chamber at the beginning of the Joint Session that contained "the Electoral College certificates" of votes from the Electors, and that a specific procedure is followed to place those certificates in the custody of the Secretary of the Senate. (Trial Tr. at 417-18, 421-22) (testimony of the General Counsel to the Secretary of the United States Senate). Evidence further established that, as rioters began to breach the restricted area around the Capitol building and grounds on January 6, 2021, legislators were evacuated from the House and Senate chambers, and the staff for the Secretary of the United States Senate "carried the ballots and other paraphernalia that we use for the Joint Session" out of the chamber to maintain custody of the ballots. (*Id.* at 430.)

### D. Ample evidence supported the jury's conclusion that the defendant acted corruptly.

The defendant argues (ECF No. 103 at 50-54) that the evidence did not suffice to establish that he acted "corruptly" for purposes of Section 1512. Styling this argument as an evidentiary challenge, however, is misleading. Rather than explain how the evidence at trial was insufficient to establish that he acted corruptly as defined in the instructions that this Court provided to the

jury, the defendant instead contends for the first time in this case that instructions defining "corruptly" were incorrect. That contention suffers from two flaws.

First, it comes too late. The defendant did not propose the interpretation of "corruptly" that he now offers in his pretrial filings, his proposed jury instructions, or during the charge conference at trial. His failure to propose this definition before trial waives or at a minimum forfeits any claim to introduce this definition long after the jury returned its verdict. *See United States v. Adams*, 150 F. Supp. 3d 32, 36 (D.D.C. 2015) (Boasberg, J.); *see also* Fed. R. Crim. P. 30(d) (requiring that objections to the jury instructions be made "before the jury retires to deliberate"). He cannot now ask the Court the evaluate the evidence in light of an interpretation of "corruptly" that the jury did not consider.

Second, the defendant's proposed definition for corruptly in Section 1512(c)(2) is flawed. He principally posits (ECF No. 103 at 50) that "corruptly" must be defined to mean that the defendant acted with the intent to obtain an unlawful material advantage for himself or an associate. Since Section 1512(c)(2)'s enactment in 2002, courts have consistently interpreted "corruptly" in Section 1512(c)(2) to require intent to obstruct and wrongfulness. *See United States v. Delgado*, 984 F.3d 435, 452 (5th Cir. 2021); *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (to act "corruptly" is to act "with an improper purpose" and "with the specific intent to subvert, impede or obstruct") (quoting *United States v. Mintmire*, 507 F.3d 1273, 1289 (11th Cir. 2007)); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing") (internal quotation marks omitted); *United States v. Mann*, 701 F.3d 274, 307 (8th Cir. 2012) (same). Courts interpreting the neighboring provision, Section 1512(c)(1), have reached similar conclusions. *See United States v. Bedoy*, 827 F.3d 495,

510 (5th Cir. 2016) (a "proper definition" of "corruptly" for purposes of Section 1512(c)(1) is to act "knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice") (internal quotation marks omitted); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (upholding instruction defining "[c]orruptly" in Section 1512(c)(1) as acting "with the purpose of wrongfully impeding the due administration of justice"); *cf.* Seventh Circuit Pattern Criminal Jury Instruction for § 1512(c) ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice."). This Court, and other judges in this District who have instructed juries in cases involving Section 1512(c)(2), have defined "corruptly" in this manner. *See, e.g.*, *United States v. Reffitt*, 21-cr-32, ECF No. 119 at 25-26 (D.D.C. Mar. 7, 2022); *United States v. Robertson*, 21-cr-34, ECF No. at 12-13 (D.D.C. April 8, 2022); *United States v. Thompson*, 21-cr-161, ECF No. 83 at 25-27 (D.D.C. Apr. 14, 2022); *United States v. Williams*, 21-cr-377, ECF No. 112 at 7 (D.D.C. June 30, 2022).

By contrast, no court interpreting Section 1512(c) appears to have understood "corruptly" to require proof that the defendant acted with the intent to secure an unlawful advantage or benefit either for oneself or for another. Courts instead have adopted that interpretation when interpreting "corruptly" as used in 26 U.S.C. § 7212(a), which prohibits "corruptly . . . imped[ing]" federal tax law. *See United States v. Floyd*, 740 F.3d 22, 31 (1st Cir. 2014) (noting a "consensus among the courts of appeals that 'corruptly'" in Section 7212(a) "means acting with an intent to procure an unlawful benefit either for the actor or for some other person," and citing cases); *see also United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (adopting that interpretation of "corruptly" in Section 7212(a)); *United States v. Popkin*, 943 F.2d 1535, 1540 (11th Cir. 1991) (same); *United States v. Reeves*, 752 F.2d 995, 1001 (5th Cir. 1985) (same)). As used in Section 7212(a), the specific intent to obtain an unlawful benefit or advantage requires that the defendant knows both

that his obstructive conduct is "directed at efforts to bring about a particular advantage such as impeding the collection of one's taxes, the taxes of another, or the auditing of one's or another's tax records," *Reeves*, 752 F.2d at 998, and that the advantage is contrary to law, *see Floyd*, 740 F.3d at 31 ("unlawful benefit").

The federal courts' uniform adoption of a more specific and rigorous definition of "corruptly" in Section 7212(a) accords with other *mens rea* requirements in the criminal tax context. For example, in *Cheek v. United States*, 498 U.S. 192 (1991), the Supreme Court held that in the context of tax offenses, the term "willfully" requires proof "that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." 498 U.S. at 201. That enhanced mental requirement reflected the fact that "the complexity of the tax laws" may make it "difficult for the average citizen to know and comprehend the extent of the[ir] duties and obligations" under those laws, and thus *mens rea* requirements in criminal tax statutes should be interpreted more stringently than in other contexts. *Id.* at 199-200. A similar approach informs the interpretation of "corruptly" under Section 7212(a).

The meaning of "corruptly" in Section 7212(a) is more specific and demanding than the meaning of that term as applied in other, more general obstruction statutes—including Section 1512(c)(2). For example, Congress has defined "corruptly" in 18 U.S.C. § 1505 (prohibiting corrupt endeavors to obstruct agency proceedings and congressional inquiries and investigations) to mean "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." 18 U.S.C. § 1515(b). The Supreme Court defined the term "corruptly" in Section 1512(b) (prohibiting the corrupt persuasion of another person to withhold information from an "official proceeding") as "wrongful, immoral, depraved, or evil." *Arthur Andersen LLP*

*v. United States*, 544 U.S. 696, 705 (2005).  In the context of the general obstruction-of-justice statute, 18 U.S.C. § 1503, courts have defined the term "corruptly" to mean "knowingly and dishonestly," *United States v. Richardson,* 676 F.3d 491, 508 (5th Cir. 2012) (internal quotation marks omitted); "with an improper or evil motive," *United States v. Frank,* 354 F.3d 910, 922 (8th Cir. 2004) (internal quotation marks omitted); or, simply, "with the purpose of obstructing justice," *United States v. Cueto,* 151 F.3d 620, 630 (7th Cir. 1998) (internal quotation marks omitted).  And as noted above, "corruptly" in Section 1512(c) similarly refers to acting "with the purpose of wrongfully impeding" the proceeding.  Seventh Circuit Pattern Criminal Jury Instruction for § 1512(c).[6]

The D.C. Circuit's decisions in *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam), *withdrawn and superseded in part by United States v. North*, 920 F.2d 940 (D.C. Cir. 1990) (per curiam), and *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), which both discussed the term "corruptly" in 18 U.S.C. § 1505, do not alter this analysis.  In *North*, the D.C.

---

[6]     The term "corruptly" as used in the obstruction-of-justice statutes also differs from the use of that term in bribery statutes such as 18 U.S.C. § 201 and 18 U.S.C. § 666.  "Given the equation of bribery with a *quid pro quo,* 'corruptly' in the context of the bribery statute would appear to mean that the defendant accepts money with the specific intent of performing an official act in return." *United States v. Gatling*, 96 F.3d 1511, 1522 (D.C. Cir. 1996) (addressing conspiracy to violate Section 201); *see United States v. Suhl*, 885 F.3d 1106, 1114 n.5 (8th Cir. 2018) (upholding jury instruction in Section 666 case that defined "corruptly" as acting "with the intent that something of value be given or offered to influence an agent of the state in connection with the agent's official duties" (quoting *United States v. Jennings*, 160 F.3d 1006, 1019 (4th Cir. 1998))). At least some courts have applied the unlawful-benefit interpretation to "corruptly" in bribery cases. *See, e.g.*, *United States v. Dorri*, 15 F.3d 888, 890 (9th Cir. 1994) (upholding jury instruction in Section 201 prosecution that defined "corruptly" as an act that is "done voluntarily and intentionally to bring about either an unlawful result or a lawful result by some unlawful method with a hope or expectation of either financial gain or other benefit to one's self or to another") (internal quotation marks omitted).

Circuit rejected the defendant's claim that the jury instructions improperly limited his ability to advance a defense that he was authorized by superiors to engage in the charged conduct of obstructing Congress.  910 F.2d at 881.  In so doing, the court found no error given one instruction that identified the applicable intent—"[s]pecific intent requires that a person not only acted knowingly, voluntarily and deliberately, but that he acted with a bad purpose, having decided in his mind what he would do and that he then did something prohibited"—even though no instruction independently defined "corruptly."  *Id.* at 884 (internal quotation marks omitted).  In canvassing different potential definitions of "corruptly," the court observed that a "'corrupt' intent" could "also" include "'the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others.'"  *Id.* at 881-82 (quoting Ballentine's Law Dictionary 276 (3d ed. 1969)).  But the D.C. Circuit ultimately declined to adopt a definition because "corruptly" as used in Section 1505 was "to be understood according to [its] common meaning[], necessitating no specific definitional instructions."  *Id.* at 884.

In *Poindexter*, the D.C. Circuit suggested that "corruptly" as used in Section 1505 was "vague . . . in the absence of some narrowing gloss."  951 F.2d at 378.  After surveying legislative history (including the "[o]rigins" of Sections 1503 and 1505) and case law interpreting Section 1505, the court reversed the defendant's conviction because Section 1505 failed to provide "constitutionally required notice" that the defendant's conduct—making false and misleading statements to Congress—fell within Section 1505's scope.  *Id.* at 380, 386.  The court disclaimed any conclusion that "'corruptly'" in Section 1505 was "unconstitutionally vague as applied to all conduct."  *Id.* at 385.  And the court declined to adopt as a standard that "'corruptly' means that in acting, the defendant aimed to obtain an 'improper advantage for [himself] or someone else

inconsistent with official duty and rights of others.'" *Id.* at 385-86 (quoting *North*, 910 F.2d at 881-82).

Congress's response to *Poindexter* further confirms that the term "corruptly" when applied to congressional obstruction does not require proof of an intent to secure an improper advantage or benefit. In 1996, Congress enacted the definitional provision in 18 U.S.C. § 1515(b) for the limited purpose of overruling *Poindexter*. *See* 142 Cong. Rec. 25,468 (1996) (statement of Sen. Bryan); *United States v. Kanchanalak*, 37 F. Supp. 2d 1, 3-4 (D.D.C. 1999). Rather than require proof that a defendant intended to obtain an improper advantage or benefit for himself or someone else, Congress defined "corruptly" for purposes of Section 1505 as "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." 18 U.S.C. § 1515(b).[7] That definition does not apply to Section 1512(c)(2)—which was enacted six years after Congress added the definitional provision in Section 1515(b). Nevertheless, if Congress declined to define "corruptly" with reference to an "intent to secure an improper advantage or benefit" for purposes of the congressional obstruction provision in Section 1505, there is no reason to presume that Congress intended to apply that interpretation to the term "corruptly" as used in the congressional obstruction prohibition in Section 1512(c)(2). Instead, Congress's decision to leave

---

[7]     The definition that Congress supplied in response to *Poindexter* also made no reference to influencing another individual to violate a legal duty, another definition of "corruptly" that the defendant proffers for the first time in his Rule 29 motion. (*See* ECF No. 103 at 50, 54.)

"corruptly" undefined in Section 1512(c)(2) suggests that it intended for the term to take on its common meaning, and not the narrower definition applied in criminal tax prosecutions.[8]

### E.    The Court's unanimity instruction was correct

The Court instructed the jury that "each juror must agree on the verdict" and that the verdict "must be unanimous."  (ECF No. 84 at 40.)  That instruction was correct.

The defendant appears to claim that the jury should have been given a special unanimity instruction that it had to agree on whether the defendant committed attempted obstruction or completed obstruction.  A special unanimity instruction may be appropriate to ensure that a jury unanimously agrees on an element of an offense, but no such instruction is required to ensure unanimity as to the means by which an element is accomplished.  *See Richardson v. United States*, 526 U.S. 813, 817 (1999); *see also Schad v. Arizona*, 510 U.S. 624, 639, 643-45 (1991) (jury unanimity not required between premeditated murder and felony murder charges because different theories of liability, not different elements).  Thus, a jury need not be unanimous on whether a

---

[8]    Justice Scalia's concurring opinion in *United States v. Aguilar*, 515 U.S. 593 (1995), also does not suggest a different view.  In discussing the interpretation of "corruptly" in Section 1503, Justice Scalia cited *United States v. Ogle*, 613 F.2d 233, 238 (10th Cir. 1979), in which the Tenth Circuit surveyed potential definitions of that term, including one that denoted "an act done with an intent to give some advantage [is] inconsistent with official duty and the rights of others. . . . It includes bribery but is more comprehensive; because an act may be corruptly done though the advantage to be derived from it be not offered by another."  *Aguilar*, 515 U.S. at 616 (Scalia, J., concurring) (quoting *Ogle*, 613 F.2d at 238).  But in *Ogle*, the Tenth Circuit concluded that the term "corruptly" "does not superimpose a special and additional element on the offense such as a desire to undermine the moral character of a juror," but instead that "an endeavor to influence a juror in the performance of his or her duty or to influence, obstruct or impede the due administration of justice is per se unlawful and is tantamount to doing the act corruptly."  613 F.3d at 238-39.  The government's proposed definition of "corruptly" in Section 1512(c)(2), which requires proving the defendant's consciousness of wrongdoing and specific intent to impede an official proceeding, is more stringent than the interpretation of "corruptly" approved in *Ogle*.

defendant violated a law as a principal or an aider and abettor because "[a]iding and abetting is simply one means of committing a single crime." *United States v. Garcia*, 400 F.3d 816, 820 (9th Cir. 2005). The same analysis applies here. "Attempted" obstruction is not comprised of elements distinct from "completed" obstruction.

Even if there were error, any such error is harmless. *See* Fed. R. Crim. P. 52(a). Substantial evidence established that the defendant both attempted to obstruct the Certification proceeding and did in fact obstruct it. (*See*, *e.g.*, Government Ex. 411 (video of the defendant obstructing police officers taking another individual into custody); Trial Tr. at 755 (witness testifying to defendant's obstructive behavior); Ex. 420 (video of the defendant inside the Capitol building, waving his arms to induce other rioters to enter the building); Trial Tr. at 931 (defendant testifying that this was his intent).)

## II.    The defendant's motion for a new trial should be denied.

Equally flawed is the defendant's motion for a new trial under Federal Rule of Criminal Procedure 33. A court may grant a defendant's motion to vacate the trial judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 motions are "not favored and are viewed with great caution." *United States v. Borda*, 786 F. Supp. 2d 25, 31 (D.D.C. 2011) (quoting *United States v. Blackthorne*, 378 F.3d 449, 452 (5th Cir. 2004). Application of the rule "should be … limited to situations presenting a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *Id.* at 32 (internal quotations and citations omitted)*; accord United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014) ("[G]ranting a new trial motion is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred.") (internal quotation marks omitted).

Further, to succeed on a Rule 33 motion, the defendant must show that an alleged error was "substantial, not harmless" and affected the defendant's "substantial rights." *United States v. Williams*, 825 F. Supp. 2d 128, 132 (D.D.C. 2011). To affect "substantial rights," an error must have a "substantial and injurious effect or influence in determining the … verdict." *United States v. Lawson*, 494 F.3d 1046, 1053 (D.C. Cir. 2007) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004)). This high burden for defendants is required across circuits. *See, e.g.*, *United States v. Mahmood*, 820 F.3d 177, 190 (5th Cir. 2016) ("We have stressed that motions for new trial are generally disfavored"); *United States v. Chavez*, Case No. 08-cr-746-5, 2011 WL 4852264, at *1 (N.D. Ill. Oct. 6, 2011) ("Granting a Rule 33 motion is nevertheless disfavored except in 'the most extreme cases.'") (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)); *United States v. Smith*, Case No. 07-cr-146-009, 2008 WL 2002557, at *1 (E.D. Tenn. May 7, 2008) ("Motions for new trial under Rule 33 are generally disfavored and are granted only in extraordinary circumstances").

Finally, each of the purported errors that the defendant has identified in his Rule 33 motion are subject to plain error review. The defendant raised none of these issues with the Court before or during trial. The defendant's failure to object limits this Court's review on his Rule 33 motion to "plain error that affects [the defendant's] substantial rights." Fed. R. Crim. P. 52(a); *see also United States v. McGill*, 815 F.3d 846, 877 (D.C. Cir. 2016) ("Failure to raise an objection at trial results in the forfeiture of the objection, yielding review only under the more forgiving 'plain error' standard"); *United States v. Spriggs*, 102 F.3d 1245, 1257 (D.C. Cir. 1996) ("Because appellants did not make a timely objection to [admitting evidence], we review its admission for plain error");

*United States v. Brown*, 508 F.3d 1066, 1071 (D.C. Cir. 2007) ("We review unpreserved claims only for plain error, in accordance with Federal Rule of Criminal Procedure 52(b)").[9]

For an error to be "plain," it must be "clear or obvious, rather than subject to reasonable dispute." *Puckett v. United States*, 556 U.S. 129, 135 (2009).   Each of the purported errors identified in the defendant's Rule 33 motion is neither "clear" nor "obvious;" at best they are very much "subject to reasonable dispute."   *Id.*   For these reasons and those elaborated below, the defendant's Rule 33 motion fails, and should be denied.

> ### A.   The admission of certain statements now challenged by the defendant is not a basis for a new trial.

On this Rule 33 motion, the defendant argues that he is entitled to a new trial because certain of his statements, identified in the instant motion (*see* ECF No. 103 at 10-12) (hereinafter referred to as "the challenged statements"), were improperly admitted pursuant to this Court's pretrial 403 ruling.  The defendant is incorrect.  The challenged statements were properly admitted. To the extent that any statements were not properly admitted, or any error occurred, the defendant is not entitled to a new trial on that basis.

> #### i.   The challenged statements were properly admitted at trial.

At the May 6 pretrial conference, this Court ruled that statements about "race, religion or women or Nazis," would be excluded pursuant to Federal Rule of Evidence 403, whereas "political" statements, including statements "about a political party, about civil war," would be admitted.  (Tr. May 6, 2022, at 16.)  Seeking clarification of the Court's order, the government

---

[9]   The Rule 52 plain-error standard applies to the defendant's Rule 33 motion as well as to appeals.  *See United States v. Canty*, 37 F.4th 775 (1st Cir. 2022).

stated that some of the statements that it would seek to introduce arguably fell into "both categories"—that is, some statements both expressed a "political" viewpoint and could be interpreted as racist, misogynistic, or antisemitic. (*Id.* at 15.) The Court directed the parties to "work out" the differences and raise any issues where a "question" as to the admissibility of specific statements remained. (*Id.* at 16.)

As an initial matter, every one of the statements identified in the defendant's motion were directly relevant to the defendant's knowledge, motive, and intent for committing the charged offenses, dispatching the defendant's claim that the statements "do not even satisfy the test of relevance." (*See* ECF No. 103 at 63.) Every statement expressed the defendant's political viewpoint. Many of the statements illustrated the depth of the defendant's understanding of government, politics, and, specifically, the intricacies of the electoral process. These highly relevant statements did not violate the Court's pretrial order, which expressly allowed statements expressing the defendant's political viewpoint.

To the extent that the defendant's complaint is that his statements contain profane language, the Court expressly allowed the profane language to come in. As one of the challenged statements[10] arose, *the government* independently sought a ruling from the Court as to the propriety of reading profane language contained in the defendant's text messages. (Trial Tr. at 474.) The Court said that it was "fine" for the witness to read the language. (*Id.*) The defendant did not object. Rather, when asked if there was any objection, defense counsel directly acknowledged the

---

[10]     "Did you see that bitch try to force Trump to disavow the deep state's involvement with the pedophilia?" (from Government Exhibit 350.2)

profanity: "It's there."   (*Id.* at 475.)   The defendant's use of profanity, as defense counsel acknowledged repeatedly throughout trial, is part and parcel of how he communicates.   If the Court excluded every one of the defendant's statements containing profane or offensive language, the Court would have excluded nearly every piece of directly relevant and highly probative evidence of the defendant's knowledge, motive, and intent in committing the charged offenses. Furthermore, any error resulting from the introduction of the defendant's inflammatory language was cured by the Court's limiting instruction to the jury.[11]   *See United States v. Long*, 328 F.3d 655, 662 (D.C. Cir. 2003) (holding, in a case concerning admission of evidence under Fed. R. Evid. 403, that "limiting instructions ordinarily suffice to protect the defendant's interests") (citing *Spencer v. Texas*, 385 U.S. 554, 561 (1967))

In addition to misconstruing the evidence, the defendant misapprehends the Court's order. In substance, the Court's pretrial ruling had two parts.   The Court ordered first that certain statements would be excluded from trial (statements about "race, religion or women or Nazis," Tr. May 6, 2022, at 16), while certain statements expressing the defendant's political view or his desire to engage in civil war or overthrow the government would be admitted as probative of his motive and intent.   Second, and critically, the Court ordered *the parties* to give effect to the first part of the order by working out the distinction between "political" and racist, misogynistic, or antisemitic

---

[11]   "During the trial you have heard language -- or you may have heard language used by Mr. Hale-Cusanelli which some may find distasteful or offensive.   You are instructed not to use your personal opinion and disagreement of the language used to find Mr. Hale-Cusanelli guilty.   You are expressly instructed to only consider this evidence in your determination of whether the government met its burden in establishing Mr. Hale-Cusanelli should be found guilty of the criminal actions alleged, including whether this language establishes his intent, knowledge, or willful conduct as required under the charged offenses."   (Trial Tr. at 1018-19.)

statements, and to the extent there was any overlap or disagreement between the parties, the Court specifically left open the possibility that it would make additional rulings on specific statements as those issues arose.

As to the first part of the order, contrary to the defendant's characterization, this Court did not "plainly grant[]" the defendant's pretrial motion to exclude "all the evidence." (ECF No. 103 at 59). Instead, the Court granted in part and denied in part the defendant's motion, ordering that "political" statements were admissible. (Tr. May 6, 2022, at 15, 16.)

The defendant's argument completely ignores the second part of the order. Per the Court's directive, the defendant had an *affirmative obligation* to give effect to the Court's ruling by engaging with the government regarding the admissibility of evidence and to raise any disputes with the Court before and during trial. And the defendant and the government did confer before trial, resulting in certain redactions to the wire recording of the conversation between the defendant and his roommate (CHS), and its corresponding transcript (Government Exhibits 100A, 100B, 100C, 100D, and 100T). The government agreed to the requested redactions; thus no disputes regarding *redactions* to the government's exhibits were raised with the Court.[12] Further, the defendant did not sit idly by during trial as the government presented its evidence—the defendant objected to the admission of two government exhibits—Exhibits 350.3.A and 350.3.B—on the basis of the Court's 403 ruling. (*See* Trial Tr. at 483.) Notably, however, the defendant did not

---

[12]   The only dispute presented to the Court regarding these exhibits involved statements that the government had not intended to include in the exhibits and the defendant wanted *added back in*. (*See* Trial Tr. at 261.) Following rulings by the Court, some of those statements were added back in, and the defendant agreed to admit Exhibits 100A, 100B, 100C, 100D, and 100T, including the redactions agreed to by the government out of court.

object to the bulk of the statements that he now argues should not have been admitted.  Indeed, nearly all of the government's exhibits were admitted based on the affirmative agreement of counsel.

For the purpose of assessing whether the challenged statements were admissible pursuant to the Court's 403 ruling, whether the defendant objected before or during trial is not merely a matter of preserving the issue for later review.  The defendant's review of the government's evidence and objection to language that he believed should be excluded under the Court's order was *essential* to giving that ruling meaning and effect.  Whether or not the challenged statements fell in or outside of the category of statements excluded by the Court's order was and is still a matter of interpretation.  The government made clear its position that evidence falling in "both categories"—that is, statements which were primarily reflective of the defendant's political view but could incidentally be perceived as racist, misogynistic, or antisemitic—were admissible, and the government sought to admit such statements (with defense counsel's agreement).  It was the defendant's responsibility to identify and object to statements that were excluded by the Court's order.  The defendant did that.

For this reason, the cases cited by the defendant to support the argument that he did not have to "object again" are inapposite.  The defendant cites *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999), for the proposition that a defendant is not required to renew evidentiary objections throughout trial where the court has made a pretrial ruling that is "explicit and definitive."  (ECF No. 103 at 59.)  But that clipped quotation misstates *Brawner*'s pertinent holding, which was that a party need not renew an objection where "the trial court has made an explicit and definitive ruling on the record of the evidentiary issues to be decided, *and has not indicated that the ruling is conditioned upon any other circumstances or evidence*."  173 F.3d at

970 (emphasis added).  As explained above, although the Court's pretrial order identified a general working principle, the Court left it up to the parties to give clarity to the line between "political," and therefore admissible, statements and statements that should be excluded as purely racist, misogynistic, and antisemitic.  And the Court itself arguably modified its pretrial ruling through exhibit-specific rulings throughout trial, as it said it would and was free to do.  *See Luce v. United States*, 469 U.S. 38, 41-42 (1984) ("The [pre-trial] ruling is subject to change when the case unfolds... Indeed even if nothing unexpected happens at trial, the district judge is free ... to alter a previous in limine ruling.").  Under those circumstances, the defendant *was* required to object to any rulings that he believed violated Rule 403 or another evidentiary rule.  But he did not object to the challenged statements and has thus not preserved any such objection for review at this point.

### ii.   To the extent any error occurred, the defendant is not entitled to a new trial.

To the extent that any of the challenged statements were improperly admitted or any error occurred, such error is not now a proper basis for a new trial.  The defendant argues here that his pretrial motion to exclude "all the evidence" relieved him of his obligation to object during trial. The defendant is incorrect.  A defense motion *in limine* for exclusion of evidence does not by itself preserve error for the purposes of a Rule 33 motion under Fed. R. Crim. P. 51, 52, and Fed. R. Evid. 103(a); such objections must be raised during trial.  *See, e.g.*, *United States v. Joost*, 133 F.3d 125, 129 (1st Cir.1998).  The defendant declined to object to admission of any of these statements both before and during trial, despite ample opportunity to review and object to the government's evidence.  In the absence of an objection preserving the error for review, the Court may only review for "plain error" "affecting substantial rights;" any lesser error "must be disregarded."  Fed. R. Crim. P. 52(b), (a).  There was no error with respect to the admission of the challenged statements.  If there was, for the reasons discussed above, it was not clear, not obvious,

and "subject to reasonable dispute," *see Puckett*, 556 U.S. at 135, and therefore, not plain.  The defendant is not entitled to a new trial on this basis.

> **B.     The government's opening statement and closing argument relied on properly admitted evidence and any misconduct on the part of the government was not plain error.**

The defendant argues that the government's opening statement and closing argument violated the defendant's substantial rights, entitling him to a new trial.  Specifically, the defendant now objects to two references by the government to the defendant's belief that Jewish interests controlled the Democratic party (ECF No. 103 at 61), and the display of a text message by the defendant that expressed his beliefs about election rigging and contained a racist slur.  (*Id.*)

The defendant's argument here relies on the assumption that the government's references to "Jewish interests" were based on improperly admitted evidence and the defendant's text message containing the references was improperly admitted.  As discussed above, this evidence was properly admitted and therefore was proper to include and reference in the government's opening statement and closing argument.  *United States v. Small*, 74 F.3d 1276, 1280 (D.C. Cir. 1996) ("[S]tatements made in opening and closing arguments to the jury [must be] supported by evidence introduced at trial.").

The defendant, in arguing that a mistrial is warranted on this basis, (*see* ECF No. 103 at 64, citing *United States v. Williams-Davis*, 90 F.3d 490, 507 (D.C. Cir. 1996)), misapprehends the legal standards applicable to his Rule 33 motion.  As discussed above, the defendant's failure to object to any of the alleged errors during trial subjects him to plain error review.  *See Williams-Davis*, 90 F.3d at 507 ("Because appellants did not object to the opening statement or seek a mistrial on the ground of taint from an improper opening statement at any point during the trial (including at the close of the government's case), we review for plain error."); *see also United*

*States v. McGill*, 815 F.3d 846, 918-19 (D.C. Cir. 2016) ("We review improper prosecutorial argument for substantial prejudice if defendants objected, and review only for plain error if they did not.").  The defendant has not shown any error, let alone a plain one, because the government properly relied on "evidence introduced at trial" in its opening and closing statements.  *See Small*, 74 F.3d at 1280; *see also United States v. Hoffman*, 964 F.2d 21, 24 (D.C. Cir. 1992) (stating that counsel may not "premise arguments on evidence which has not been admitted" or "make statements as to facts not proven").

In assessing whether the defendant is entitled to a new trial because he was sufficiently prejudiced by alleged misconduct by the government in opening statements or closing argument, the Court must analyze three factors: "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks."  *United States v. Monaghan*, 741 F.2d 1434, 1444 (D.C. Cir. 1984).  First, the government relied on properly admitted evidence, so there was no misconduct, let alone severe misconduct.  The fact that the defendant raised no objections whatsoever, during or after either statement, underscores this point.  Second, any error resulting from the introduction of the defendant's inflammatory language was cured by the Court's limiting instruction.  *See supra* at 2 n.12; *Long*, 328 F.3d at 662.  Third, based on the overwhelming weight of the evidence, the jury would have arrived at the same guilty verdicts, even if the relevant statements had never been made by the prosecution.  For each of these reasons, the defendant has not demonstrated that he is entitled to a new trial based on any alleged misconduct in opening and closing statements, and his Rule 33 motion on this basis should be denied.

**C.      This Court's "corruptly" instruction to the jury was proper and not objected to by the defendant either before or during trial.**

Similar to the challenge to the jury instructions that the defendant raises under Rule 29, he for the first time, after trial, argues that the inclusion of the word "wrongful" in the jury instructions requires a new trial.   (ECF No. 103 at 61-63.)   This Court should decline to consider the defendant's belated argument.  *See* Fed. R. Crim. P. 30(d).

In any event, that argument lacks merit.  Interpreted properly, "corruptly" as used in Section 1512(c)(2) refers to a defendant acting wrongfully and with the intent to obstruct an official proceeding.  Consistent with its ordinary meaning, to act "wrongfully" means to act in a manner that is immoral, depraved, or evil.  It also includes acting unlawfully.  An individual who acts unlawfully with intent to obstruct a congressional proceeding violates Section 1512(c)(2).

The terms "wrongful" or "wrongfully," which are not defined by statute, are "given their common or popular meanings." *North*, 910 F.2d at 881.  Acting wrongfully principally denotes acting "[i]n a manner contrary to the principles of justice," or "unfairly." *Wrongfully*, Oxford English Dictionary, *available* at http://www.oed.com; *see* Black's Law Dictionary, "Wrongful" (11th ed. 2019) ("[c]haracterized by unfairness or injustice"); *Masters v. United States*, 42 App. D.C. 350, 356 (D.C. Cir. 1914) (defining wrongfully as "in a manner contrary to the moral law or to justice") (internal quotation marks omitted).  In the context of the term "corruptly" as used in Section 1512, the term "wrongful" is akin to "immoral, depraved, or evil." *Andersen*, 544 U.S. at

705.  Stated otherwise, acting wrongfully for purposes of Section 1512 means acting with "consciousness of wrongdoing."[13]  *Id.* at 706.

The wrongfulness component of "corruptly" ensures that Section 1512(c)(2) "reaches only" those who have committed felony obstruction.  *Id.*  Absent evidence establishing that an individual acted with consciousness of wrongdoing, conduct that is "by itself innocuous"—for example, a friend urging another friend to invoke a Fifth Amendment right against self-incrimination or one spouse persuading another not to disclose marital confidences, *see Trammel v. United States*, 445 U.S. 40, 53 (1980)—is not "corrupt" for purposes of Section 1512.  *See Andersen*, 544 U.S. at 703-04.  The same is true of an attorney who seeks to persuade her client to withhold documents covered by the attorney-client privilege from investigative agents even though the attorney "surely intend[s]" that her client not disclose those documents to investigators.  *See id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981)).  The consciousness-of-wrongdoing standard excludes from liability under Section 1512(c) conduct that may be obstructive but "not inherently malign."  *Id.*; *cf. Matthews*, 505 F.3d at 706 (noting that jury instructions' inclusion of "the word 'wrongfully' in the definition of 'corruptly'" and the instructions' "criminalizing only the act of 'wrongfully impeding the due administration of justice' . . . directed the jury to convict only those who have no legal right to impede justice").

That limitation is particularly important where, as here, the defendant obstructed a congressional proceeding.  *See North*, 910 F.2d at 882.  For example, it would not amount to

---

[13]  The consciousness-of-wrongdoing standard announced in *Andersen* applied to the *mens rea* of "knowingly . . . corruptly" in Section 1512(b).  Although Section 1512(c)(2)'s statutory text does not include the modifier "knowingly," the statute does require that the defendant "engage in conduct knowingly."  *Friske*, 640 F.3d at 1291; *Gordon*, 710 F.3d at 1151.

wrongful—and thus corrupt—conduct for an individual to peacefully urge the chairperson of a congressional committee convened to investigate some alleged wrongdoing to stop that investigation on the ground that the investigation "is really designed to embarrass the President (or a Senator), not to investigate wrongdoing." *Id.* Similarly, a political activist might contact his representative and inform the representative that unless she stops spending her time pursuing a certain investigation rather than some other legislative endeavor, the activist's group will oppose her reelection. The activist is "endeavoring to impede or obstruct the investigation," but is not doing so wrongfully, and thus not acting "corruptly" for purposes of Section 1512(c)(2). *See id*. For the same reasons, individuals engaged in protest or speech opposing a government action may intend to obstruct a particular congressional proceeding, but they would not violate Section 1512(c)(2) unless they acted in a manner that was "wrongful, immoral, depraved, or evil." *Andersen*, 544 U.S. at 705.

Acting "wrongfully" includes acting "[c]ontrary to law" or "unlawful[ly]." Black's Law Dictionary, "Wrongful" (11th ed. 2019); *accord Wrongfully*, Oxford English Dictionary, *available* at http://www.oed.com ("[i]n an illegal or unlawful manner; contrary to the law; unlawfully; illegally"). Within the context of Section 1512(c)(2), acting wrongfully can include conduct that evinces the specific intent to obstruct an official proceeding while also independently violating the law. But the term "unlawfully" "is not the full equivalent of wrongfully" because conduct may be unlawful "without being contrary to good morals or to natural justice." *Masters*, 42 App. D.C. at 356 (emphasis and internal quotation marks omitted). Just as obstructive conduct only violates the obstruction statute when it has "a relationship in time, causation, or logic" to the official proceeding, *see United States v. Aguilar*, 515 U.S. 593, 599 (1995), so too must an individual's unlawful conduct bear a relationship to the proceeding he intends to obstruct. Jaywalking or

speeding on the way to the U.S. Capitol violates the law, but such unlawful conduct would be too attenuated to establish wrongfulness or consciousness of wrongdoing simply because the individual in question intends to obstruct a congressional proceeding upon arrival.  Moreover, "wrongful" carries a "much broader and stronger meaning" than "unlawful."  *Masters*, 42 App. D.C. at 356 (internal quotation marks omitted).  Thus, an individual whose conduct amounts to a "public welfare offense[]"—an offense "not in the nature of positive aggressions or invasions," but "in the nature of neglect where the law requires care," that does not cause "direct or immediate injury to person or property," and for which "penalties commonly are relatively small," *Morissette v. United States*, 342 U.S. 246, 255-56 (1952)—may act unlawfully without acting wrongfully.

Whatever "[c]lose cases can be imagined" under Section 1512(c)(2), *see United States v. Williams*, 553 U.S. 285, 306 (2008), the defendant's is not among them.  He did not, for example, submit to a security screening and enter a government building only to make brief speeches or sing in a "spectacle" that "'lasted approximately two to four minutes.'"  *United States v. Bronstein*, 849 F.3d 1101, 1105 (D.C. Cir. 2017) (defendants prosecuted for "'mak[ing] a harangue or oration'" in the Supreme Court in violation of 40 U.S.C. § 6134).  Instead, the defendant saw police battling and deploying crowd control measures outside of the Capitol to prevent rioters' advancing on the building (*see* Trial Tr. at 868-69) (defendant's testimony), moved barricades (*id.* at 868) (same), screamed profanity at police outside the Capitol while standing at the front of an angry mob (Ex. 304) and entered the Capitol building knowing that it was restricted.  Even when it was clear police were trying to stop rioters from entering and to clear the building, the defendant himself tried to get rioters to "advance."  (*See* Ex. 100T) (transcript of defendant's conversation with CHS.)  The trial evidence amply proved that the defendant acted corruptly to obstruct a congressional proceeding

### D.      The testimony of Dan Schwager was properly admitted.

Finally, the defendant challenges the admission of Dan Schwager's testimony, ostensibly arguing that it contained inadmissible legal conclusions—though the basis of the defendant's argument here is not a model of clarity.  As part of his testimony, Dan Schwager read into the record portions of the 12th Amendment to the United States Constitution, provisions of the United States Code, and resolutions of the United States Congress.  (Trial Tr. at 409-14.)  Based on his position in the Office of the Secretary of the Senate, Schwager also described certain procedures applicable to Congress's certification of the electoral college vote and how he and others in the Congress or the Secretary of the Senate's office carried out those procedures.  (*Id.* at 406-07, 412-16, 417-21, 423-29, 440.)

The defendant argues by implication that Schwager's testimony was inadmissible because it "render[ed] conclusions of law."  (*See* ECF No. 103 at 66.)  The cases cited by the defendant stand for the proposition that legal conclusions by experts do not "assist" the trier of fact, and therefore legal conclusions are not admissible expert opinion testimony.  *See, e.g.*, *United States v. Thomas*, 847 F.3d 193, 206 (5th Cir. 2017); *see also Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (same proposition).  As the defendant points out, Schwager was not an expert witness; therefore, these cases and this principle of law does not apply to his testimony.

Moreover, Schwager neither interpreted nor opined on provisions of law, legally or otherwise.  While his testimony described the procedure followed by members of Congress in the certification of the Electoral College vote, which was conducted in accordance with the Constitution, relevant statutes, and relevant Congressional resolutions, he neither interpreted these provisions, offered opinions on them, nor drew any legal conclusions.  (Trial Tr. at 406-07, 412-

16, 417-21).  Indeed, when asked to speak to potential implications of the law as to the objections

process, Schwager refused to state a position, stating that this fell outside "the logistics of the

proceeding, the administrative portion that I would have been responsible for." (*Id.* at 416.)  When

pressed on a specific statute's meaning, Schwager merely restated the express language of the

statute in describing the procedure followed by the Senate.  (*See id*. at 415.)  The defendant's claim

that Schwager presented "conclusions of law" as part of his description of Congressional procedure

misrepresents the witness's testimony and its content.

The defendant's argument misconstrues Schwager's actual testimony and fails to cite any

on-point legal authority.  For these reasons, the defendant is not entitled to a new trial on this basis,

and his motion should be denied.[14]

---

[14]     As elsewhere in his motion, the defendant has styled as an evidentiary challenge what
seems to be a substantive legal challenge, and not a good one.  The defendant appears to argue that
the Electoral Count Act (ECA) is either not a "law," or if it is, it is unconstitutional.  (ECF No.
103 at 63-64.)  The first argument is nonsensical—the ECA plainly is a law; it is an Act of Congress
published in the United States Code.  As to the second, while defendant correctly points to some
scholarly debate as to potential constitutional flaws with the ECA, his claim that the "weight of
the legal scholarship" argues against its constitutionality is a gross distortion.   Defendant
repeatedly cites a law review article by Vasan Kesavan as his main source of support (Vasan
Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1712 (2002)); this
article is an outlier in the academic press, having been cited a mere 44 times since its publication
over 20 years ago.  Regardless, the constitutionality of the ECA is not at issue in the instant case
and is not relevant to defendant's frivolous claim that referring to the ECA as a "law" constituted
Schwager "instruct[ing] the jury" on a question of legal interpretation.  (ECF No. 103 at 63.)

## CONCLUSION

For the reasons discussed herein, the defendant's motions for judgment of acquittal and a new trial should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Kathryn E. Fifield*
Kathryn E. Fifield
Wis. Bar No. 1097640
Trial Attorney
U.S. Department of Justice, Criminal Division
Detailed to the D.C. United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 320-0048
Kathryn.fifield@usdoj.gov

Karen P. W. Seifert
NY Bar No. 4742342
Assistant United States Attorney
National Security Section
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7527
Karen.Seifert@usdoj.gov