# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cr-37-TNM |
| | ) | |
| | ) | |
| TIMOTHY HALE-CUSANELLI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT HALE-CUSANELLI'S REPLY IN RESPONSE TO THE
GOVERNMENT'S OPPOSITION TO HIS MOTION FOR JUDGMENT OF
ACQUITTAL AND MOTION FOR A NEW TRIAL**

**Table of Contents**

Preliminary statement ................................................................................................ 1

Argument .................................................................................................................... 3

      I.      A judgment of acquittal should be entered on Count One as the
              government presented no evidence of an "official proceeding" under
              Section 1512(c)(2) ......................................................................... 3

      II.     A judgment of acquittal should be entered on Count One as
              the government did not present evidence showing the Defendant's
              acts affected the integrity or availability of evidence ......................... 12

      III.    A judgment of acquittal should be entered on Count One as the
              government did not present evidence sufficient to establish that the
              Defendant acted "corruptly" ........................................................ 16

      IV.    The evidence was insufficient to establish that the Defendant obstructed
              the joint session and the jury should have been given a special unanimity
              instruction on Count One ............................................................. 22

      V.     If the Court does not enter a judgment of acquittal on Count One, it should
              alternatively order a new trial ....................................................... 24

              A.     The government's racism, anti-Semitism, and misogyny evidence
                          violated the Court's pretrial ruling and the Defendant's substantial
                          rights .................................................................................. 24

              B.     The government's opening statement and closing argument
                          contained statements of fact not supported by proper evidence
                          introduced at trial ................................................................... 27

               C.     The Count One verdict must be set aside because the "corruptly"
                          instruction gave the jury an impermissible ground for conviction .... 29

               D.     The admission of Schwager's invalid testimony prejudiced the
                          Defendant's substantial rights ................................................... 30

Conclusion ................................................................................................................ 30

**Preliminary statement**

Instead of responding to Hale-Cusanelli's arguments for a judgment of acquittal, the government reproduces stock arguments it has filed in other cases. Other judges have decided for this Court that the joint session on January 6 was a Chapter 73 "proceeding," it says, and the Defendant's counterarguments rest on mere legislative history.

But it is not "scattered floor statements of legislators" alone which put the lie to its any-formal-grouping definition of § 1512's "official proceeding." The "*statutory* history," *U.S. v. Griffin*, 549 F. Supp. 3d 49, 55 (D.D.C. 2021), does that with equal clarity. To those other judges, the plain meaning of "proceeding" in § 1512 presupposes neither an investigation nor evidence, for this reason: Congress "could have" defined that statutory term using § 1505's "inquiry or investigation" language but did not. That the interpretive canon which asks what Congress could have said but did not is of doubtful utility is convincingly demonstrated here: when Congress defined "official proceeding" in 1982, Section 1512's actus rei were linked to investigations and evidence exclusively; there was no "omnibus clause" that might criminalize acts obstructive of an elusive Chapter 73 "proceeding" involving neither of those things. Surely, speculating about what a legislature "could have done but did not do" illuminates its intent with less reliability than looking to what it did do. Nor is the cause of fidelity to congressional intent promoted by turning a blind eye to a Senate Judiciary Committee report that flatly refutes the government's novel interpretation of "proceeding." The judges who have accepted that interpretation have done so by omitting determinative statutory history and circuit precedent.

Statutory definitions aside, the Court instructed the jury that the "official proceeding" here was the joint session of Congress convened on January 6. Yet the evidence showed that the joint session was suspended an hour before the Defendant entered the Capitol—for reasons

1

unconnected to protesters—and remained suspended for many hours after he departed.  Thus, no evidence, much less sufficient evidence, showed that he obstructed that "official proceeding." *Christoffel v. United States*, 338 U.S. 84, 88 (1949).  The government neither responds to this argument nor distinguishes *Christoffel*.  The issue is forfeited.

Similarly nonresponsive is the government's treatment of the "corruptly" element.  It concedes the absence of evidence showing that the Defendant acted with the intent to obtain an unlawful advantage for himself or an associate, contending instead that courts have "consistently interpreted 'corruptly' in Section 1512(c)(2) to require intent to obstruct and wrongfulness." Gov't Opp., p. 25.  Yet the government does not contest the Defendant's showing that an any-wrongful-purpose definition has only ever applied in the judicial proceeding context, where the public is on notice that *every* obstructive act is "wrongful" and thus corrupt per se—unlike in the broader congressional context.  "No court," represents the government, has adopted the Defendant's unlawful advantage definition with respect to § 1512(c).  *Id.* at 26.  In fact, the government's key Capitol case precedent found it valid, *United States v. Montgomery*, 21-cr-46-RDM, 2021 U.S. Dist. LEXIS 246750, at *70 n. 5 (D.D.C. Dec. 28, 2021), while another January 6 decision on which the government heavily relies rightly rejected the any-wrongful-purpose formula used in the jury instructions here for its vagueness.  *United States v. Sandlin*, 21-cr-88-DLF, 2021 U.S. Dist. LEXIS 237131, at *33 (D.D.C. Dec. 10, 2021).

As to Hale-Cusanelli's motion for a new trial and the government's improper use of his racist, anti-Semitic and misogynist statements before a jury comprising racial minorities, the government concedes that there might have been a trial error or two.  True, the Court had excluded pretrial all the Defendant's "alleged statements about Jews, the Nazi party, minorities or women." 5/6/2022 Hr'g Tr. at 15.  Yet whether "N*****," "kikes," "bitches," and "faggots,"

2

to name a few, fell within that exclusion "is a matter of interpretation." Gov't Opp., p. 38. Whether "sheboon being a cunt" is offensive to minority jurors demands close study, the government urges.  Thus, because the defense did not renew its objection at trial, a plain error standard applies, it argues.  And as the question whether the government's litany of racist statements satisfied Rule 403 is "subject to reasonable dispute"—despite the Court's pretrial order to the contrary—their admission could not have been plain error.  *Id.* at 40.  Hale-Cusanelli received a fair trial by an impartial jury, the government concludes without persuading.

These issues are mutually reinforcing.  The racist and anti-Semitic statements did not just violate the Federal Rules of Evidence; they handed the jury an improper factual predicate with which to find the Defendant's "wrongful purpose," itself an improper standard in context.  At trial, the government stressed a link between the racist statements and the "wrongful purpose" standard.  The government has misused the obstruction statute.  It has misused the Defendant's inflammatory statements at trial.  A judgment of acquittal should be entered on Count One or the Defendant should be given a new trial.

**Argument**

## I.   A judgment of acquittal should be entered on Count One as the government presented no evidence of an "official proceeding" under § 1512(c)(2)

Rather than confront Hale-Cusanelli's arguments concerning text, circuit precedent and statutory history, the government relies on argument from authority.  Its string citation of nonbinding decisions that have rejected his "official proceeding" interpretation consumes half a page.  Gov't Opp., p. 12.  Yet it is clear those judges were not adequately briefed on the issue.

All, or nearly all, of the government's cases holding that a "proceeding" under § 1512(c) may be defined short of an investigation and evidence rest on the same reasoning.  In the government's words, "[h]ad Congress wanted to impose a definition that more closely resembled

3

a quasi-adjudicative setting. . . it need look only a few provisions away to 18 U.S.C. § 1505, which criminalizes the obstruction of . . . 'the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by' Congress." Gov't Opp., p. 14 (quoting § 1505).[1] That the legislature did not expressly define "a proceeding before the Congress" (§ 1515(a)(1)(B)) to mean "any inquiry or investigation [] being had by" Congress must therefore signify that "official proceeding" was intended to "cover[] a broader range of proceedings than [congressional] 'inquiries and investigations. . .'" *Id.* at 15 (quoting § 1505).  Although these decisions thus arrive at a novel definition of "proceeding" by hypothesizing what Congress might have said but did not say in defining that term in §§ 1512 and 1515, not one court considered a more practical question: what did § 1512 proscribe at the time Congress defined "official proceeding" in that statute, as enacted in the Victim and Witness Protection Act of 1982 (VWPA)?

---

[1] *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *17 ("Congress had the necessary vocabulary at hand and could have easily defined an 'official proceeding' [in § 1512] to include . . . a proceeding involving 'the power of inquiry or investigation,'" but did not); *United States v. Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *17 (D.D.C. Dec. 20, 2021) ("Had Congress wished to criminalize under section 1512 only those acts that obstruct its adjudicatory, investigative, or legislative proceedings, it had a ready-made template [in § 1505]."); *United States v. Nordean*, 2021 U.S. Dist. LEXIS 246752, at *19 (D.D.C. Dec. 28, 2021) ("[I]f Congress wanted to define 'official proceeding' in a way that required something more like an adjudicative setting. . . it could have imported the language it used in 18 U.S.C. § 1505."); *United States v. Grider*, 2022 U.S. Dist. LEXIS 23405, at *11 (D.D.C. Feb. 9, 2022) ("As Judge Amit Mehta explained [in *Caldwell*] . . . Congress could have just as easily borrowed language from just a few statutory sections away [in § 1505]. . ."); *United States v. Andries*, 2022 U.S. Dist. LEXIS 44794, at *21 (D.D.C. Mar. 14, 2022) ("[A] nearby provision shows that Congress would have known how to limit its definition to [investigative hearings] if it wished [as under Section 1505]."); *United States v. Bingert*, 2022 U.S. Dist. LEXIS 93790, at *11 (D.D.C. May 25, 2022) ("'[H]ad Congress intended to limit the definition of 'official proceeding' to . . . proceedings at which witnesses appear and give testimony or to proceedings related 'to the administration of justice' . . . it could easily have done so' [as in] § 1505.") (quoting *Montgomery*, 2021 U.S. Dist. LEXIS 246750 at *6).

4

That is a determinative omission, as the answer is necessary to resolve the interpretive dispute. If § 1512 then criminalized any act that obstructed, interfered with or influenced a proceeding regardless of whether it had a connection to evidence collected in an investigation—as the contemporary § 1512(c)(2) does, according to the government—then it might be sound to reason that by "a proceeding before the Congress" the legislature intended "a broader range of proceedings than [] 'inquiries and investigations. . .'" Gov't Opp., p. 15. On the other hand, if § 1512 then criminalized only those acts which affected evidence collected in an investigation, "a proceeding before the Congress" could not be properly read to encompass proceedings beyond legislative inquiries and investigations. For it is illogical to reason that in the VWPA Congress would expand the definition of a "proceeding" in an obstruction-of-justice statute to encompass congressional matters that do not involve investigations—and simultaneously create no criminal offense pertaining to those evidence-free "proceedings," so singular in Chapter 73.

In the event, the statutory history of §§ 1512 and 1515 unmistakably reveals that when Congress defined "official proceeding" in those statutes, § 1512 criminalized acts exclusively pertaining to interference with evidence in investigations. Victim and Witness Protection Act of 1982. Pub. L. No. 97-291, sec. 4, 96 Stat. 1250. All of the crimes in the original version of the statute concerned *witness testimony and evidence. Id.* (§ 1512(a), (b)). Indeed, a draft provision that would have created an "omnibus clause" for § 1512 was discarded. 128 Cong. Rec. 26,810 (1982). Examining this statutory history, one need not consult a haruspex of "scattered floor statements of legislators" to see that it does not logically follow from Congress's decision not to "import" the phrase "inquiries and investigations" in defining a "proceeding before the Congress" in § 1512 that the legislature thereby intended to expand the preexisting legal definition of "proceeding" to include assemblies not involving investigations, witnesses, or

5

evidence. *Griffin*, 549 F. Supp. 3d at 55 (stressing importance of statutory, as opposed to legislative, history).

Also uniformly omitted from the cases cited by the government is the D.C. Circuit's decision in *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) which traced the history of obstruction-of-Congress offenses back 100 years. As the Defendant showed in his Motion, that epic statutory history does not yield a ghost of support for the claim that the offense pertains to anything other than acts that interfere with Congress's power of investigation and inquiry. *Id.* at 380-82. This binding authority the government relegates to a footnote. To say that *Poindexter* conflicts with the 16 odd district court decisions on which it relies is "*overstated*," the government understates. Gov't Opp., p. 16 n. 2 (emphasis added). Overstated how? *Poindexter* "was interpreting Section 1505, rendering its discussion of limited (if any) relevance to the interpretation of 'proceeding' under Section 1512." *Id.* The government is wrong. The D.C. Circuit interpreted § 1512 and pursued its statutory lineage all of the way back to the first obstruction-of-Congress statute, passed in 1940, Section 241(a). *Poindexter*, 951 F.2d at 380. The government adds, "nothing in the history recounted in *Poindexter* [] undermines [its] plain-language interpretation" that in §§ 1512 and 1515 Congress created a new, special meaning of "proceeding"—for which it then failed to create any relevant obstruction crime. Gov't Opp., p. 16 n. 2. That is boldly false. *Poindexter*'s statutory history demonstrates beyond peradventure that it is senseless to speculate that, *sub silentio*, the VWPA created (incomplete) criminal liability where none had existed for a century.

The government contends that the cases on which it relies were right to distinguish the holding in *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994)—gospel at DOJ pre-January 6—that a "proceeding" subject to obstruction crimes is defined by its "adjudicative power or . . .

the power to enhance the[] investigation[] through the issuance of subpoenas or warrants." *Id.* at 1127. *Kelley*, the government's cases held, has no purchase here, concerning as it does § 1505—a "'different statute.'" Gov't Opp., p. 16 (quoting *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *27). Only, the government's cases at the same time inconsistently hold that the obstruction-of-Congress offenses in § 1505 and § 1512(c)(2) *overlap*—and that is as it should be. *E.g.*, *Caldwell*, 2021 U.S. Dist. LEXIS 243756, at *17 ("The broad conduct prohibited by [§ 1505] overlaps substantially, if not entirely, with section 1512(c)(2) [and] the definition of 'official proceeding' applicable to section 1512(c)(2) encompasses many (though not all[2]) of the proceedings or processes to which section . . . 1505 [is] addressed."); *United States v. McHugh*, 2022 U.S. Dist. LEXIS 78655, at *25 (D.D.C. May 2, 2022) ("*McHugh II*") ("The Court concludes, then, that § 1512(c)(2)'s language was likely adapted from the similar language of § . . . 1505.").

If, as the government's cases hold, the obstruction-of-Congress offenses in §§ 1505 and 1512(c)(2) overlap, it is nonsensical to distinguish *Kelley* on the ground that it concerns § 1505 and not § 1512(c)(2). Conversely, if the statutes do not reach the same conduct and thus *Kelley*'s definition of "proceeding" may be distinguished, the interpretation of "official proceeding" proposed by the government's cases collapses. According to those judges, an "official proceeding" is any "body" that "has convened in some formal respect for the purpose of conducting business." *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *15. Yet: are "inquir[ies] and investigation[s] [] being had by either House," § 1505, *not* bodies that have "convened in

---

[2] The only exception to overlap identified by *Caldwell* would be congressional investigations undertaken by staff, which would constitute an "investigation . . . by either House," § 1505, but not a "proceeding before the Congress." § 1515(a)(1)(B). 2021 U.S. Dist. LEXIS 243756, at *17 n. 9.

some formal respect for the purpose of conducting business"? If they are, §§ 1505 and

1512(c)(2) do overlap—in which case the question becomes why the district courts' novel

construction of "proceeding" for January 6 cases would trump that of the D.C. Circuit (and the

current Attorney General) in *Kelley*.

*Poindexter* and *Kelley* aside, the government's cases say their just-so definition of

"proceeding"—any body that "has convened in some formal respect for the purpose of

conducting business," *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *15—is consistent with

legal, rather than lay, dictionary definitions of "proceeding." *Montgomery*, 2021 U.S. Dist.

LEXIS 246750, at *14.  The Defendant showed that the meaning favored by the government's

cases does not satisfy the legal definition, as construed by the Ninth Circuit.  Mot. at 21-22

(citing *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013)).  But even if the government's

interpretation of "proceeding" satisfied a fragment of a secondary or tertiary dictionary definition

(e.g., "akin to a formal hearing"), it would still amount to faux textualism.  A Justice recently put

it this way:

> [W]hen textualism is properly understood, it calls for an examination of the social context
> in which a statute was enacted because this may have an important bearing on what its
> words were understood to mean at the time of enactment. Textualists do not read statutes
> as if they were messages picked up by a powerful radio telescope from a distant and
> utterly unknown civilization. Statutes consist of communications between members of a
> particular linguistic community, one that existed in a particular place and at a particular
> time, and *these communications must therefore be interpreted as they were understood by
> that community at that time*.

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1767, 207 L. Ed. 2d 218, 263 (2020) (Alito, J.,
dissenting) (emphasis added).

Judge Easterbrook framed the same point in linguistics terms:

> Words are arbitrary signs, having meaning only to the extent writers and readers share an
> understanding. . . . Language in general, and legislation in particular, is a social enterprise
> to which both speakers and listeners contribute, drawing on background understandings

8

and the structure and circumstances of the utterance. . . Slicing a statute into phrases while ignoring . . . the setting of the enactment . . . is a formula for disaster.

*Hermann v. Cencom Cable Assocs.*, *Inc.*, 978 F.2d 978, 982 (7th Cir. 1992).

As Easterbrook put it elsewhere, "You don't have to be Ludwig Wittgenstein or Hans-Georg Gadamer to know that successful communication depends on meanings shared by interpretive communities." *Continental Can Co. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund*, 916 F. 2d 1154, 1157 (7th Cir. 1990). To sloganize it: "meaning is use," according to one of the Judge's fancy philosophers.

In the context of obstruction of justice, the relevant "interpretive community" is federal courts, prosecutors and the defense bar.  The government has not pointed to any court, prosecutor or defense lawyer, prior to or at the time of the VWPA, who had used the term "proceeding," in the obstruction-of-justice context, in a manner that did not involve an investigation or evidence. *Poindexter* showed, to the contrary, that courts had for over 100 years understood a Chapter 73 "proceeding" in the sense proposed by the Defendant.  *Poindexter*, 951 F.2d at 380-82.  To "slic[e] [§ 1515 and secondary Black's definitions] into phrases while ignoring . . . the setting of the enactment" is indeed "a formula for disaster." *Cencom Cable Assocs.*, *Inc.*, 978 F.2d at 982.

No less telling is the government's inability to account for the absurdity created by its interpretation of § 1512(c)(2).  If an "official proceeding" need not entail investigations and evidence, a great deal of ordinary legislative business would be criminalized.  Mot. at 35.  The government fails to show why the Defendant's hypothetical defendants could not be prosecuted for "corruptly influencing" congressional markups.  *Id.*

In the end, there is no way to square the government's investigation- and evidence-free definition of "official proceeding" with binding D.C. Circuit precedent, a hundred years of

9

obstruction-of-justice law, ordinary legislative business, and the internally inconsistent reasoning of the 16 district court decisions on which it relies.

Finally, the government argues that "even if the defendant's interpretation of 'official proceeding' were correct, he is not entitled to acquittal on Count One" because the joint session was "quasi-adjudicative." Gov't Opp., p. 17.  This fails for several reasons.  First, the binding definition of "proceeding" in this Circuit, in the obstruction-of-justice context, is not "any series of actions that is quasi-adjudicative."  A Chapter 73 "proceeding" occurs where (1) "investigations"; (2) "involve[] some adjudicative power" *or* (3) "the power to enhance their *investigations* through the issuance of subpoenas or warrants." *Kelley*, 36 F.3d at 1127 (emphasis added).  The government has not cited a single pre-January 6 case where a Chapter 73 "proceeding" did not entail an investigation.  None exists.  Here, the government does not contend that the joint session on January 6 was held pursuant to Congress's investigatory power. Nor could it: it has continuously argued that that is precisely why it has not charged January 6 defendants under § 1505.  A Chapter 73 "proceeding" occurs in Congress during the exercise of its power of inquiry and investigation.  To name just a few obvious examples: the Select Committee on the January 6 Attack; the committees investigating the Iran-Contra affair; and the Watergate Committee.  All of these committees had "the power to enhance their investigations through the issuance of subpoenas." *Kelley*, 36 F.3d at 1127.  That is what has defined the obstruction-of-Congress offense from its infancy. *Poindexter*, 951 F.2d at 380-82.

Nor does a joint session to count electoral certificates involve legislators who "adjudicate," quasi or simpliciter.  Courts have long distinguished between public officials' acts of judgment and their ministerial acts. *E.g.*, *Marbury v. Madison*, 5 U.S. 137 (1 Cranch) (1803). A ministerial act is one for which "a precise course [is] accurately marked out by law, and is to

10

be strictly pursued." *Id.* at 158.  An act of judgment, in contrast, "may be varied" depending on the discretion of the official.  For the particular object in view, the official exercising judgment is not "enjoined by law" to perform the act in a "precise course."  *Id.*  The government's claim that members of Congress "adjudicate" electoral votes is not only wrong; it is likely unconstitutional.[3]  The Twelfth Amendment directs that the "The President of the Senate shall, in the presence of the Senate and House of Representatives, *open all the certificates and the votes shall then be counted*.  The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed . . ." U.S. Const. amend. XII  (emphasis added).  *Counting* electoral certificates is, quintessentially, a ministerial act, not a discretionary act of "judgment." Vasan Kesavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. Rev. 1653, 1713, 1767 (2002) ("Simply put, the joint convention may not judge the acts of electors—that is, their electoral votes"); Akhil Reed Amar, *Presidents, Vice Presidents, and Death: Closing the Constitution's Succession Gap*, 48 Ark. L. Rev. 215, 229 (1995) ("In counting votes, Congress performs in effect a ministerial function. . .").[4]

---

[3] It is also deeply ironic.  The government's theory of the case is that when the former president told his supporters that Congress could lawfully reverse the 2020 election results, he was *misleading* them.  Yet in order to prosecute those supporters under § 1512(c)(2), the government finds itself arguing that Congress *does* have the power to "adjudicate" electoral votes.

[4] The government asserts that the scholarship of Kesavan and Amar are "outlier[s] in the academic press." Gov't Opp., p. 47 n. 14.  It simply makes up that claim.  Amar, a Yale Law School professor, has for decades ranked among the country's leading nonpartisan constitutional scholars.  As for Kesavan's article, it is the gold standard among election law scholars and a crackerjack piece of writing to boot. Jack Beermann & Gary Lawson, *The Electoral Count Mess: The Electoral Count Act of 1887 is Unconstitutional*, 16 FIU L. Rev. 297, 301 (2022) (stating that scholars have little to add to Kesavan's "epic account of the problems with the Electoral Count Act"); Nathan L. Colvin & Edward B. Foley, *The Twelfth Amendment: A Constitutional Ticking Time Bomb*, 64 U. Miami L. Rev. 475, 478 n.7 (2010) (noting that discussion of the Electoral Count Act's constitutional defects "is brief because Vasan Kesavan has already provided a thorough analysis of the possible constitutional defects of the Electoral Count Act").

In sum, a judgment of acquittal should be entered on Count One because the evidence did not establish an "official proceeding."

## II.    A judgment of acquittal should be entered on Count One as the government did not present evidence showing that the Defendant's acts affected the integrity or availability of evidence

The Defendant's Motion demonstrated that a plain reading of the text; the canons of *ejusdem generis* and *noscitur a sociis*; the rule against surplusage; statutory history; and the Supreme Court's decisions in *Begay v. United States*, 553 U.S. 137 (2008) and *Yates v. United States*, 575 U.S. 528 (2015) tell against an interpretation of § 1512(c)(2) that would divorce the statute from any connection to evidence used in an official proceeding. Mot. at 36-48. Instead of addressing these points, the government has reproduced nonresponsive arguments filed in other cases. Gov't Opp., pp. 18-24. The Defendant will therefore make only a few brief points.

Largely conceding that its interpretation of § 1512(c)(2)—criminalizing any act that obstructs, influences or impedes a proceeding regardless of whether it affects the integrity or availability of evidence—would render the rest of the statute superfluous, the government points to Judge Bates' "simple explanation" for the sweeping surplusage problem. Gov't Opp., p. 22 (citing *McHugh II*, 2022 U.S. Dist. LEXIS 78655, at *17). As the Judge explained, the obstruction case against auditor Arthur Andersen "exposed a loophole in then-existing federal obstruction statutes." *Id.* at *17. Sections 1503(a) and 1505 contained "omnibus clauses" that reached both "direct" obstruction (the defendant himself obstructs the proceeding) and "indirect" obstruction (the defendant takes some act that causes another person to obstruct the proceeding). But those statutes required the proceeding to be already pending. By contrast, Section 1512 applied to all official proceedings, pending or not, but only criminalized "indirect" obstruction. *Id.* The Sarbanes-Oxley Act of 2002, Judge Bates continued, added § 1512(c) to create an

obstruction crime that would encompass all the forms of "indirect" obstruction in § 1512 but in a "direct" mode. Thus, had § 1512(c) existed when Arthur Andersen was prosecuted, prosecutors would not have had to "proceed under the legal fiction that [the auditor was] being prosecuted for telling other people to shred documents" since Arthur Andersen would have been charged with "destroyed evidence themselves." *Id.* at *18. However, Judge Bates added, closing this loophole necessarily meant that § 1512(c) would render the rest of § 1512 superfluous, as "every example of indirect obstruction. . . is also an example of (or an attempt at) direct obstruction." *Id.* at *21.

Judge Bates' defense of the government's interpretation does not succeed because the court appears not to have understood the sweep of the government's position. The Judge's reasoning would be sound if the government were arguing that § 1512(c)(2) simply creates a "direct" obstruction version of the "indirect" obstruction crimes in § 1512(a)(1), (a)(2), (b), and (d). In that case, § 1512(c)(2) would indeed plug the "Arthur Andersen loophole." But that is not what the government argues. For the crimes in § 1512(a)(1), (a)(2), (b), and (d) all concern acts affecting the availability or integrity of evidence in a proceeding. In contrast, the government contends that § 1512(c)(2) not only creates a "direct" crime version of the statute's other "indirect" evidence-related crimes but that it reaches acts that have no relationship to evidence— say, walking into court in a grizzly bear costume. But such acts, unrelated to evidence, have no conceptual connection to the Arthur Andersen loophole. The legislative and statutory history on which Judge Bates' analysis turns bears no trace of a congressional intent to create a crime having no relationship to evidence.

In contrast, the Defendant's straightforward construction of § 1512(c)(2) closes the Arthur Andersen loophole without paying the price of mass surplusage which Judge Bates found

to be the cost of doing business.  Following § 1512(a)(1), (a)(2), (b), and (c)(1)—all of which concern evidence impairment or availability—subsection (c)(2) criminalizes acts that "otherwise" obstruct, influence, or impede the official proceeding, i.e., acts which, though unenumerated, are criminalized for their conceptual "similar[ity] to the [preceding] examples themselves." *Begay*, 553 U.S. at 143.  Under this construction, § 1512(c)(2) creates a "direct" crime for each of the "indirect" evidence-based crimes in the rest of the statute.  But unlike in the government's interpretation, under the Defendant's construction § 1512(c)(2) does not subsume the rest of the statute because, for example, to directly "withhold a record . . . from an official proceeding," § 1512(b)(2)(A), is to "otherwise" perform the indirect crime of "induc[ing] any person to . . . withhold a record . . . from an official proceeding," *id.*, i.e., it is to perform the "indirect" crime "'in different circumstances: under other conditions.'" *United States v. Miller*, 2022 U.S. Dist. LEXIS 45696, at *16 (D.D.C. Mar. 7, 2022) (quoting *Otherwise, Webster's Third New Int'l Dictionary of the English Language Unabridged* (2002)).  And, unlike the government's interpretation, the Defendant's does not render subsection (c)(1) superfluous.  That subsection criminalizes the "direct" impairment of object evidence.  To "otherwise" obstruct an official proceeding under subsection (c)(2), the defendant impairs non-object evidence, such as by directly interfering with testimonial evidence.  Thus, under the Defendant's construction, the Arthur Anderson loophole is closed—without any surplusage.

But what if, as Judge Bates contends, subsection (c)(1) is not a "list"; does that not mean that *ejusdem generis* and therefore *Begay* do not apply here? That is a nonissue.  Even if the evidence-based crimes enumerated in subsection (c)(1) are not a "list," they are doubtless in "close company" with, and therefore inform the meaning of, subsection (c)(2) under *noscitur a*

*sociis*.  *Yates*, 575 U.S. at 545.  As are the other subsections of § 1512: all of which concern evidence impairment or availability.

Contra Judge Bates, the government's own cases demonstrate that mass surplusage is not the necessary price of closing the Arthur Andersen loophole.  While the government cites to a handful of § 1512(c)(2) cases holding that that subsection reaches interference with non-object evidence, such as testimony, it fails to adduce a single case where the subsection reached conduct having no relationship to evidence at all.  That there are no such cases, in the 20 years since the statute's enactment, conclusively tells against the government's interpretation:

- *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) (soliciting tips from corrupt cops to evade surveillance constituted evidence sufficient for jury to find "efforts were out of a desire *to influence what evidence came before the grand jury*") (emphasis added);

- *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009) (disclosing identity of undercover agent to subject of grand jury drug investigation evidence sufficient to find purpose was to "*thwart evidence from reaching the investigation*") (emphasis added);

- *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (attempting to obtain false statement *to be used in pending federal charges* sufficient to satisfy § 1512(c)(2));

- *United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009) (making false statements "*directly to the grand jury itself*" sufficient to satisfy § 1512(c)(2)) (emphasis original);

- *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) (false responses to interrogatories *that were filed in the official proceeding* sufficient to satisfy § 1512(c)(2));

- *United States v. Ring*, 628 F. Supp. 2d 195, 223 (D.D.C. 2009) (making false statements to outside counsel "so that counsel *would provide misleading information to the grand jury*") (emphasis added).

Finally, the government contends that even if it had to prove the Defendant took some act to affect the integrity or availability of evidence, sufficient trial evidence satisfied that standard. Gov't Opp., p. 24.  That is because "evidence . . . established that, as rioters began to breach the restricted area around the Capitol Building and grounds on January 6, 2021, legislators were

evacuated from the House and Senate chambers, and the staff for the Secretary of the United States Senate 'carried the ballots and other paraphernalia that we use for the Joint Session' out of the chamber to maintain custody of the ballots." *Id*. (quoting Tr. at 430).  This argument fails for many reasons.  First, evidence that unidentified "rioters" were causally responsible for ballot removal is not evidence that the Defendant was.  Second, ballots are not "evidence."[5] Evidence is "something (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact." *Evidence*, Black's Law Dictionary (11th ed. 2019).  A ballot is not created or employed to "prove or disprove" an "alleged fact." It is "[a]n instrument, such as a paper or ball, used for casting a vote." *Ballot*, Black's Law Dictionary (11th ed. 2019). A ballot is no more a piece of evidence than an indictment is one.  And finally, as the Defendant further shows *infra*, even if the Defendant's own proven actions could somehow be said to have been causally responsible for the "movement of ballots," their movement had no causal interaction with the "official proceeding." The joint session was suspended an hour before the Defendant even reached the Capitol Building and for reasons unrelated to the "rioters." Tr. at 423:19-20.

A judgment of acquittal should be entered on Count One because no evidence showed that the Defendant's acts affected the integrity or availability of evidence.

### III.   A judgment of acquittal should be entered on Count One as the government did not present evidence sufficient to establish that the Defendant acted "corruptly"

The evidence was insufficient to prove that the Defendant acted "corruptly" because it did not show that he acted with the intent to obtain an unlawful advantage for himself or an associate.  The government's response is twofold: (1) the Defendant did not object to the jury

---

[5] As with its linguistically awkward characterization of political protesters as "corrupt," the government's description of ballots as "evidence" is a telltale symptom of a category mistake.

instruction on the "corruptly" element so his argument "comes too late"; (2) the Defendant's definition of "corruptly" is flawed. Gov't Opp., pp. 25-31. Both arguments plainly fail.

The process argument is a non sequitur. In his motion for a judgment of acquittal, the Defendant does not identify error in the *jury instructions*. Instead, he shows that insufficient evidence supported the jury verdict on Count One. A Rule 29 motion does not contend that a judgment of acquittal should be entered on account of an error at trial; it contends that an acquittal should be entered because, whatever the jury instructions did or did not say, the government did not present evidence sufficient to convince a rational jury applying established law, beyond a reasonable doubt. Fed. R. Crim. P. 29(c). Thus, the government's citation to a single case holding that a defendant forfeited a claim of error by not objecting at trial to jury instructions is inapposite. Gov't Opp., p. 25 (citing *U.S. v. Adams*, 150 F. Supp. 3d 32, 36 (D.D.C. 2015)). *Adams* concerned a motion for a new trial, not a motion for a judgment of acquittal. *Id.*

The government's argument on the merits addresses itself to a straw man. It cites a string of § 1512(c)(2) cases which equate "corruptly" with acting with a "wrongful" or "evil" purpose. Gov't Opp., pp. 25-26. But, of course, the Defendant's argument is not that such an equation is always erroneous and vague. Instead, he shows that all of the government's "wrongful purpose" cases are set in the administration of justice (i.e., judicial proceeding) context. There, "where a defendant has endeavored to obstruct a [judicial] proceeding, the advantage inconsistent with the duties and rights of others is so clear that courts have often been willing to impute the desire to obtain such an [unlawful] advantage *on a per se basis*." *United States v. Reeves*, 752 F.2d 995, 999 (5th Cir. 1985) *cert. denied*, 474 U.S. 834 (1985) (emphasis added). On the other hand, "merely prohibiting 'bad,' 'evil,' and 'improper' purposes is very probably insufficient where . .

. a statute reaches . . . a broad[er] category of circumstances." *Id*. Congressional committees are paradigmatic examples of "a broader category of circumstances," for, unlike in judicial proceedings, "[n]o one can seriously question that people constantly attempt, in innumerable ways, to obstruct or impede congressional committees." *United States v. North*, 910 F.2d 843, 882 (D.C. Cir. 1990).

The government argues that the unlawful-advantage definition exclusively applies in the tax obstruction context on account of the unique "*mens rea* requirements in the criminal tax context." Gov't Opp., p. 27. That is false. *Reeves* shows that the unlawful advantage standard has nothing to do with tax law but instead existed as a default "corruptly" definition before any "wrongful purpose" definition. *Reeves*, 752 F.2d at 999. *Reeves* is consistent with the statements of Justices and dictionary definitions of "corruptly." *Marinello v. United States*, 138 S. Ct. 1101, 1114 (2018) (Thomas, J., dissenting) ("'[C]orruptly' requires proof that the defendant not only knew he was obtaining an '*unlawful benefit*' but that his 'objective' or 'purpose' was to obtain that *unlawful benefit*.") (citing 21 Am. Jur. 2d, Criminal Law § 114 (2016)) (emphasis added); Black's Law Dictionary 414 (rev. 4th ed. 1951) ("Corruptly" "generally imports a wrongful design to acquire some pecuniary or other advantage").

The government represents, "no court interpreting Section 1512(c) appears to have understood 'corruptly' to require proof that the defendant acted with the intent to secure an unlawful advantage or benefit either for oneself or for another." Gov't Opp., p. 26. The government has not reviewed its own cases. As Judge Moss recently explained in a January 6 case involving § 1512(c)(2),

> In his separate opinion in *Aguilar*, for example, Justice Scalia quoted with approval the jury instruction given by the district court in that case: "An act is done corruptly if it's done voluntarily and intentionally to bring about an unlawful result or a lawful result by some unlawful method, *with a hope or expectation of . . . [a] benefit to oneself or a*

*benefit to another person.*" 515 U.S. at 616-17 (Scalia, J., concurring in part and dissenting in part). Because the *Aguilar* majority ruled on other grounds, it did not opine on the meaning of "corruptly." *Id.* at 598-603. *But there is no reason to doubt Justice Scalia's observation that formulations of this type are "longstanding and well-accepted," id.* at 616, and, indeed, the D.C. Circuit cited to a similar definition—"a person acts 'corruptly' when taking action 'with the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others'"—in *United States v. Pasha*, 797 F.3d 1122, 1132, 418 U.S. App. D.C. 258 (D.C. Cir. 2015) (quotation marks omitted) (quoting *United States v. North*, 910 F.2d 843, 882, 285 U.S. App. D.C. 343 (D.C. Cir. 1990), *opinion withdrawn and superseded in other part on reh'g*, 920 F.2d 940, 287 U.S. App. D.C. 146 (D.C. Cir. 1990)). *In the garden-variety disruption or parading case, in contrast, the government need not prove that the defendant sought unlawfully to obtain a benefit for himself or another person in the proceeding itself.*

*Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *70 n. 5 (emphasis added).

The final sentence in that passage is critical. Hundreds of protesters who entered the Capitol on January 6 were charged with Class B misdemeanors, such as demonstrating in the Capitol. 42 U.S.C. § 5104(e)(2)(G). Hundreds of others who did the same thing, like the Defendant, have been charged with felony obstruction. If one "demonstrates" in the Capitol during an "official proceeding," one cannot avoid "influenc[ing]" that proceeding in some manner, or at least that is one's attempted object. § 1512(c)(2). If some element did not distinguish the two crimes, there would be no conceptual difference between a Class B misdemeanor and a felony with a 20-year statutory maximum sentence. Judge Moss was sensitive to this patent absurdity in the government's novel construction of § 1512(c)(2). The Judge therefore identified a "guardrail" in a requirement that the government, on subsection (c)(2)'s "corruptly" element, "prove that the defendant sought unlawfully to obtain a benefit for himself or another person in the proceeding itself." *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *70 n. 5; *see also Sandlin*, 2021 U.S. Dist. LEXIS 237131, at *33 (holding that construing "wrongful" broadly would lead to "difficult questions").

19

It is not hard to see why a "wrongful purpose" definition offers no such guardrail. Did the hundreds of misdemeanants who entered the Capitol *not* have a "wrongful purpose"? If they did not, why did hundreds of identically situated protesters charged under § 1512(c)(2) *have* a "wrongful purpose"? Did they not share a purpose with the misdemeanants who "demonstrated" against electoral vote certification in the Capitol? The "wrongful purpose" standard provides no notice whatsoever to future political protesters as to what constitutes the novel felony obstruction of Congress crime created in, but surely not exclusively for, these cases.

Precisely this sort of unconstitutional vagueness led the D.C. Circuit to reject a "wrongful purpose" definition of "corruptly" in the context of congressional proceedings, as opposed to the judicial proceedings in all the government's cases. *Poindexter*, 951 F.2d at 379. The government complains (Gov't Opp., p. 30) that Congress "overruled" *Poindexter* in § 1515, which states,

> As used in section 1505, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.

§ 1515(b).

The government's argument fails for multiple reasons. First, § 1515(b)'s definition applies to "section 1505." The government's positions are thus contradictory. On the one hand, it argues that the D.C. Circuit's definition of § 1505's "proceeding" in *Kelley* cannot apply to § 1512(c), because § 1505 is a "different statute." Gov't Opp., p. 16.[6] On the other, it contends that Congress's definition of "corruptly" in § 1505 presumptively applies to § 1512(c) offenses in the congressional proceeding context. *Id.* at 30. The government cannot have it both ways. If

---

[6] Similarly, it argues that *Poindexter*'s analysis of the statutory history of obstruction-of-Congress offenses is inapposite here because that case concerned § 1505. Gov't Opp., p. 16 n. 2.

the obstruction-of-Congress offenses in both statutes cover the same conduct, *Kelley*'s definition of "proceeding" controls here. If the statutes do not cover the same conduct, § 1515(b)'s definition of "corruptly" does not apply to § 1512(c). Either way, a judgment of acquittal must be entered on Count One.

Second, Congress cannot "overrule" *Poindexter*'s holding that equating "corruptly" with "acting with a wrongful purpose" is unconstitutionally vague because the D.C. Circuit's decision turned on constitutional due process. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1224 (2018) (Gorsuch, J., concurring) (demonstrating vagueness doctrine's "due process underpinnings"). The courts, not Congress, say what the law is. *Marbury*, 5 U.S. at 137. Indeed, a court in this district rejected the government's "overruling" argument. *United States v. Kanchanalak*, 37 F. Supp. 2d 1 (D.D.C. 1999). A Committee of Congress was investigating Kanchanalak for his political contributions. His obstructive acts included removing records from offices, dissolving a corporation, hiding corporate records, destroying documents and files. *Id.* at 2. Charged under § 1505, Kanchanalak moved to dismiss based on a facial challenge to § 1515(b)'s defining of "corruptly" to include "acting with an improper purpose." *Id.* That definition, he argued, was barred by *Poindexter*. The Court rejected Kanchanalak's vagueness argument—but only because it did not work as applied to his case. "Defendant may be correct that the phrase 'acting with an improper purpose' . . . does not alleviate the [vagueness] concerns expressed by [*Poindexter*]." *Id.* at 4. The problem for Kanchanalak was that his obstructive acts fell within § 1515(b)'s specific list of evidence-related "improper purposes": "making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." *Id.* (citing § 1515(b)).

The Court will notice that the part of § 1515(b) *Kanchanalak* deemed consistent with *Poindexter* perfectly aligns with the case law cited above holding that unconstitutional vagueness is avoided in equating "corruptly" with "acting with a wrongful purpose" only in the context of judicial proceedings and investigations. *Reeves*, 752 F.2d at 1001. The evidence-related "improper purposes" in *Kanchanalak* are acts corrupt per se in a judicial proceeding. *Id.*

A judgment of acquittal on Count One should be entered as no evidence showed that the Defendant acted to obtain an unlawful advantage for himself or an associate.

## IV. The evidence was insufficient to establish that the Defendant obstructed the joint session and the jury should have been given a special unanimity instruction

The Court instructed the jury that the "official proceeding" at issue was the joint session of Congress on January 6. Tr. at 1021. Trial evidence showed that the President of the Senate directed the Houses to "withdraw from the joint session" at 1:14 p.m. that day. Tr. at 423:19-20. This directive was not prompted by protesters but by procedural objections to the vote certification by members of Congress. *Id.* The joint session did not reconvene until 11:34 p.m. that day, only to then be suspended again for many hours, again due to procedural objections. 167 Cong. Rec. H94-H117 (Jan. 6, 2021). The Defendant entered the Capitol at approximately 2:14 p.m. and left 40 minutes later. Tr. at 632:8. Thus, no evidence showed that the Defendant obstructed, influenced or impeded the "official proceeding."

In virtually identical circumstances, the Supreme Court reversed a conviction in *Christoffel*. The defendant was called before a congressional committee, during the era of McCarthyism, to answer whether he was a member of the Communist Party. 338 U.S. at 85. After denying membership under oath, he was indicted for perjury. The perjury statute criminalized false testimony given to a "competent tribunal." *Id.* at 85 n. 2. The defendant argued that his conviction was invalid because a quorum of the congressional committee was not

22

present at the time of his testimony.  Thus, no false testimony was given to a "competent tribunal."  *Id.* at 86.  The Court agreed.  Looking to the House of Representatives rules, it determined that the House's quorum requirement was not satisfied by the committee at the precise time of the defendant's testimony.  *Id.* at 88.  Because the "competent tribunal" requirement was an element of the offense, the conviction was reversed.  *Id.* at 90.  Identically, the offense here required proof of an "official proceeding" which the Court defined as the "joint session to certify the electoral college vote."  Tr. at 1021.  Just as Christoffel's testimony was given at a time when the committee lacked a quorum, the Defendant's "obstructive" acts here were undertaken an hour after the joint session had been suspended for reasons not related to protesters, much less the Defendant.  Tr. at 423:19-20.

The government fails to respond to this argument.  The issue is therefore forfeited.  *E.g.*, *W. Va. Coal Workers' Pneumoconiosis Fund v. Bell*, 781 Fed. Appx. 214, 226-27 (4th Cir. 2019) (Richardson, J.) (collecting cases holding that a party's failure to respond to opposing party's salient, nonfrivolous argument works a forfeiture of the issue).

Nor is the crime of attempt a basis for denying the Defendant's motion.  Count One duplicitously combined a completed § 1512(c) offense with the separate attempt crime.  The Defendant unsuccessfully requested a special unanimity instruction, required in that circumstance.  *United States v. Ramirez-Martinez*, 273 F.3d 903, 914 (9th Cir. 2001) *overruled on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc).  Rather than distinguish *Ramirez-Martinez*, the government contends that "*aiding and abetting* is simply one means of committing a single crime." Gov't Opp., p. 32 (emphasis added).  But the duplicity arose from Count One's mash-up of a completed § 1512(c) offense and *attempt*, which *is* a distinct crime.  *United States v. Jadue*, 31 F. Supp. 3d 794, 796-97 (E.D. Va. 2014) (Trenga, J.);

*United States v. Pratt*, 351 F.3d 131, 135 (4th Cir. 2003) ("An attempt to commit a crime . . . is recognized as a crime distinct from the crime intended by the attempt. . .").

The government adds that "even if there were an error" it was harmless because "evidence established that the defendant . . . attempted to obstruct the Certification proceeding. . ." Gov't Opp., p. 32.  This is belied by the government's own evidence.  "[T]he conduct that constitutes the attempt must bear such a relationship to the underlying offense that not only is the defendant's criminal intent sufficiently inferable, *the natural consequence of his conduct is that, if uninterrupted, the underlying criminal act or offense would have been committed*." *Jadue*, 31 F. Supp. 3d at 797 (emphasis added).  Here, even assuming the Defendant's criminal intent was sufficiently inferable, the evidence could not have shown that the "natural consequence of his conduct [was] that . . . the underlying [obstruction offense] would have been committed," as the "official proceeding" was suspended an hour before—and for many hours after—the Defendant's "obstructive" acts occurred, which themselves had no causal connection to that suspension, judging from the government's evidence.  *E.g.*, *Griffin*, Judgment, 21-cr-92 (rejecting government argument that defendant's loud noises obstructed legislators since Congress had recessed before he arrived on the Capitol Grounds).

## V.      If the Court does not enter a judgment of acquittal on Count One, it should alternatively order a new trial

### A.      The government's racism, anti-Semitism and misogyny evidence violated the Court's pretrial ruling and the Defendant's substantial rights

The government strains to reconcile its use of the Defendant's inflammatory statements at trial with the Court's pretrial order excluding them.  Gov't Opp., pp. 34-39.  It fails.

First, the government says its litany of racist statements satisfied the test of relevance, as they showed "the defendant's knowledge, motive, and intent for committing the charged

offenses." Gov't Opp., p. 35.  That is belied by a glance at the statements.  The Defendant's statement calling an unidentified black woman a "sheboon being a cunt" is relevant to no issue in this case.  Gov't Exh. 350.4.  Nor is a statement calling random members of a political party unaffiliated with the current president "faggots" and "kikes." Gov't Exh. 350.5.

Second, the government says the Court's pretrial order excluding this evidence "had two parts." Gov't Opp., p. 36.  While the Court expressly excluded all the Defendant's "alleged statements about Jews, the Nazi party, minorities or women," 5/6/2022 Hr'g Tr. at 15:9-11, a special "second part" of the order directed "*the parties* to give effect to the first part of the order by working out the distinction between 'political' and racist, misogynistic, or antisemitic statements. . . ." Gov't Opp., p. 37 (emphasis original).  That is gross mischaracterization.  The Court's order had already accounted for the fact that the Defendant's "comments about Jews, minorities and women" might be "relevant to his motive. . .," 5/6/2022 Hr'g Tr. at 13—yet it still excluded them under Rule 403.  *Id.* at 15.  The government then vaguely advised the Court that with respect to some unidentified selection of the Defendant's statements, "the lines are not easy to draw between what is in category A, the acceptable evidence, and what is in category B, the evidence the Court has excluded." *Id.*  While the Court responded that the parties could continue to discuss that line, it unequivocally rejected the statements later used by the government at trial: "I mean, if there's talk about race, religion or women or Nazis, I think *those should be excised*." *Id.* at 16 (emphasis added).

Third, the government contends that the Defendant failed to "object again" to the statements at trial.  Gov't Opp., p. 38.  But even the government concedes that where a court has made an "'explicit and definitive ruling on the record of the evidentiary issue[,]'" a party need not renew an objection to the same evidence at trial.  *Id.* (quoting *United States v. Brawner*, 173

F.3d 966, 970 (6th Cir. 1999)).  The government claims that the "second part" of the Court's

order was not "definitive." *Id.*  Again, that is false.  Even special part deux made clear that "talk

about race, religion or women or Nazis . . . should be excised." 5/6/2022 Hr'g Tr. at 16.

Fourth, the government represents that if these statements had not been admitted, "the

Court would have excluded nearly every piece of directly relevant and highly probative evidence

of the defendant's knowledge, motive and intent. . ." Gov't Opp., p. 36.  Again, the Court's

pretrial order explicitly held to the contrary, that the Defendant's "other statements about

sparking a civil war and wanting a clean slate already show a subversive motive.  Indeed, those

statements are more directly related to the charges than his anti-Semitic statements." 5/6/2022

Hr'g Tr. at 13.  Moreover, the government's exhibits are littered with statements that both show

the Defendant's January 6 intent and motive and do not contain racist commentary.  Gov't Exh.

350.2; 350.4; 350.5.

The government makes no positive argument that the statements at issue satisfied Rule

403 balancing.  Nor could it.  The Court's pretrial order itself forcefully showed why they do not.

The government says these errors are not grounds for a new trial.  It contends that a

"defense motion *in limine* for exclusion of evidence does not by itself preserve error . . . under

Fed. R. Crim. P. 51, 52, and Fed. R. Evid. 103(a)."  Gov't Opp., p. 39.  Again, nearly every

circuit to address the issue has held that, following an explicit pretrial ruling like the Court's

order here, the defendant does not need to renew an objection at trial to preserve error.  *Brawner*,

173 F.3d at 970; *United States v. Williams*, 81 F.3d 1321, 1325 (4th Cir. 1996); *United States v.*

*Mejia-Alarcon*, 995 F.2d 982, 986 (10th Cir. 1993); 21 Charles Alan Wright and Kenneth W.

Graham, Jr., Federal Practice and Procedure § 5037, at 195 (1977) ("If a ruling is made at the

pretrial stage, it is 'timely' and there is no need to renew the objection at trial.").  The

government argues that the error was "cured by the Court's limiting instruction to the jury." Gov't Opp., p. 36.  In fact, a closely analogous Rule 403 decision, relied on by the Court itself in its pretrial order,[7] shows that the limiting instruction here could not have "eliminat[ed] the risk that the jury would misuse" the Defendant's many and varied racist statements.  *United States v. Hazelwood*, 979 F.3d 398, 414 (6th Cir. 2020) (vacating conviction based on admission of defendant's racist remarks despite limiting instruction); *United States v. Asher*, 910 F.3d 854, 862 (6th Cir. 2018) (same); *United States v. Jenkins*, 593 F.3d 480, 486 (6th Cir. 2010) (same); *United States v. Brown*, 490 F.2d 758, 764 (D.C. Cir. 1973) ("In criminal cases generally there has been a significantly greater acknowledgement of the weaknesses of the limiting instruction" with courts recognizing that the "limiting instruction is inadequate where the prejudicial dangers far outweigh a tenuous relevance to the issues presented in the case and where it is simply unrealistic to believe that the refined distinctions demanded by the limiting instruction can be faithfully maintained by any jury").

The erroneous admission of these vile statements warrants a new trial.  *Hazelwood*, 979 F.3d at 414.  Even if the Defendant's motion *in limine* had not preserved the issue, which it did, the error was "clear" and thus plain, as the Court's pretrial order had clearly shown why these statements failed Rule 403 balancing.  5/6/2022 Hr'g Tr. at 13-15.

B.      **The government's opening statement and closing argument contained statements of fact not supported by proper evidence introduced during trial**

In closing argument, the government directed the jury, which included racial minorities, to reflect on this statement from the Defendant:

---

[7] The Court approvingly cited to *Hazelwood*.  5/6/2022 Hr'g Tr. at 14.



Tr. at 1051.

In closing argument, the government adjured the jury that the Defendant acted "corruptly" because he once stated that he would give Jews "24 hours to leave" the country.  Tr. at 1048.  As any reasonably well-educated juror knows, the Nazi Party forced Jews to leave their homelands before it started killing them.

These remarks made use of not just any improperly admitted "evidence" but exquisitely inflammatory racist hate speech and in its "last words to the jury, [where] the potential from an impermissible closing statement is heightened." *United States v. Davis*, 863 F.3d 894, 907 (D.C. Cir. 2017).  The government responds that because the Defendant failed to object, plain error review applies.  Gov't Opp., p. 40.  Once again, because the Defendant's statements highlighted in closing argument were explicitly excluded from evidence pretrial, the government is wrong. *Brawner*, 173 F.3d at 970; *Williams*, 81 F.3d at 1325; *Mejia-Alarcon*, 995 F.2d at 986.

The government argues that this misconduct was outweighed by "'the certainty of conviction absent the improper remarks.'"  Gov't Opp., p. 41 (quoting *United States v. Monaghan*, 741 F.2d 1434, 1444 (D.C .Cir. 1984)).  To the contrary, it has been the aim of this memorandum to show that the government's misuse of § 1512(c)(2) could not be more comprehensive.  Its vague and deracinated definition of "corruptly"—acting with any "wrongful

purpose"—permitted the jury to improperly find the Defendant guilty for making irrelevant statements about "N*****," "kikes," "bitches," "faggots," "libtards" and "sheboons." Indeed, in both its opening statement and closing argument the government encouraged the jury to use the improper "evidence" in exactly that way.  Tr. at 300:15-22; Tr. at 1048:7-14.

These improper remarks on their own warrant granting a new trial, but even if they did not standing alone, the cumulative impact of the admission of the previously excluded inflammatory statements combined with the government's improper remarks at opening and closing would warrant one.  *E.g.*, *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) ("The cumulative error doctrine 'provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can . . .call[] for reversal.'") (quoting *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998)).

### C.   The Count One verdict must be set aside because the "corruptly" instruction gave the jury an impermissible ground for conviction

The Defendant demonstrated *supra* that a judgment of acquittal should be entered because no evidence satisfied the "corruptly" element of Count One by showing that he acted with the intent to obtain an unlawful advantage for himself or an associate.  But if the Court does not enter an acquittal, it should order a new trial because the jury instructions permitted the fact finder to convict the Defendant on an improper "wrongful purpose" definition, making it "impossible to tell which ground the jury selected." *Yates v. United States*, 354 U.S. 298, 312 (1957).

Even if plain error review applies to this issue, Gov't Opp., p. 42, the Defendant has shown *supra* why the "wrongful purpose" definition clearly cannot apply in the context of congressional proceedings.  As he showed, two judges in this district had eschewed that definition before the Defendant's trial.  *Montgomery*, 2021 U.S. Dist. LEXIS 246750, at *70 n.

5; *see also Sandlin*, 2021 U.S. Dist. LEXIS 237131, at *33; *U.S. v. Guy Reffitt*, 12-cr-32-DLF, ECF No. 119 (D.D.C. 2021) (jury instruction defining "corruptly" to mean "using unlawful means" or "acting with an unlawful purpose" or both). Even if the erroneous instruction on its own would not warrant a new trial, when combined with the government's repeated argument to the jury that the Defendant's improperly admitted racist statements constituted a "wrongful purpose," cumulative error doctrine would warrant one. *Baker*, 432 F.3d at 1223.

> **D.     The admission of Schwager's invalid testimony prejudiced the Defendant's substantial rights**

Schwager, the government's lay witness, presented testimony interpreting the Constitution and ECA for the jury. Tr. at 409-16. The government responds that this was not an error, either because Schwager was not an expert or because he "described" law to the jury but did not "opine" on it. Gov't Opp., p. 46. Those excuses are frivolous.

As the Defendant's cases uncontroversially held, neither experts nor lay witnesses may "instruct the fact finder on the applicable principles of law." *United States v. Smith*, 573 F.3d 639, 655 (8th Cir. 2009). The claim that Schwager did not instruct the jury about "principles of law" is gaslighting. He testified in great detail about what Congress was "required" to do under the "law" of the ECA, according to Schwager. Tr. at 413 (Schwager testifying that, under the ECA, Congress has "got to get [the electoral certification process] done, basically, within five days. If not, no more recesses").

The admission of this witness-directed legal instruction prejudiced the Defendant's substantial rights. The Court had instructed the jury that the "corruptly" element would be satisfied if the Defendant's obstruction involved "unlawful means." Tr. at 1022. Schwager's legal instruction to the jury on the ECA led it to believe that if Congress did not certify electoral certificates within the timeframe he described, it would be violating the law. Tr. at 423-24, 480.

The jury could therefore find that any delay of the vote certification process, caused by the protesters, was an "unlawful means."  Yet, as the leading legal scholars on the subject have comprehensibly demonstrated, the ECA is either a precatory House rule in statutory form or an unconstitutional law.  Kesavan, 80 N.C. L. Rev. at 1793; Amar, 48 Ark. L. Rev. at 229.  It is "nonsensical," the government responds, to regard the ECA as a House rule in statutory form rather than a binding "law." Gov't Opp., p. 47 n. 14.  Another name for it is the canon of constitutional avoidance.  Kesavan, 80 N.C. L. Rev. at 1793.  To the many and varied arguments presented by the Defendant that the ECA is unconstitutional to the extent it is deemed a law, the government presents no substantive response.  Gov't Opp., p. 47 n. 14.  Accordingly, the issue is forfeited.  *W. Va. Coal Workers' Pneumoconiosis Fund*, 781 Fed. Appx. at 226-27.[8]

Considered individually, or under the cumulative error doctrine, Schwager's misleading and improper testimony is another reason to grant a new trial.

**Conclusion**

For all the foregoing reasons, the Court should enter a judgment of acquittal on Count One.  Alternatively, the Court should order a new trial.

Dated: July 21, 2022                                  Respectfully submitted,

                                                      */s/ Nicholas D. Smith*
                                                      Nicholas D. Smith (Va. Bar No. 79745)
                                                      1123 Broadway
                                                      Suite 909
                                                      New York, NY 10010
                                                      Phone: (917) 902-3869

---

[8] So constitutionally suspect is the ECA that at the time this brief was filed news broke that a Senate group had agreed to "fix" its "archaic and ambiguous flaws." *Bipartisan Senate Group Strikes Deal to Rewrite Electoral Count Act*, N.Y.Times, July 20, 2022, available at: https://www.nytimes.com/2022/07/20/us/politics/electoral-count-act-senate.html. "Why fix the ECA if it's already a perfectly constitutional law?" the government surely thought.

**Certificate of Service**

I hereby certify that on the 21st day of July, 2022, I filed the foregoing motion with the

Clerk of Court using the CM/ECF system, and counsel of record were served by electronic means.

*/s/ Nicholas D. Smith*
Nicholas D. Smith (Va. Bar No. 79745)
1123 Broadway
Suite 909
New York, NY 10010
Phone: (917) 902-3869