**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-37-TNM** |
| **TIMOTHY LOUIS HALE-CUSANELLI,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Timothy Louis Hale-Cusanelli to seventy-eight (78) months' incarceration, which is roughly the midpoint of the applicable Guidelines range of 70 to 87 months, three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment for each count of conviction.

## I.   INTRODUCTION

The defendant, Timothy Hale-Cusanelli, is a former Army reservist and security contractor who held a "Secret" level security clearance when he and others sieged the United States Capitol on January 6, 2021. Hale-Cusanelli was at the front of a mob that attacked police and smashed windows and doors to breach the Capitol, which was closed to the general public due to COVID-19 restrictions. The grounds surrounding the Capitol were restricted, additionally, because a person protected by the Secret Service, Vice President Mike Pence, was visiting the Capitol to perform a constitutional function—certifying the results of the 2020 Presidential Election. Hale-Cusanelli knew that Capitol Grounds were restricted on January 6, 2021; he knew that the violence being committed against police and against the building was wrongful; he knew that

1

Congress was inside the building to certify the results of the election.   Hale-Cusanelli didn't breach the Capitol in spite of these things—he did what he did on January 6 *because*, in his mind, the 2020 Election was fraudulent, and the legal mechanisms to achieve the result that he wanted were not sufficient.   The regular order of government had to be stopped.   And it was.   Hale-Cusanelli and thousands of others, whom he urged to "advance" on the Capitol, succeeded in corruptly obstructing a constitutional, Congressional proceeding, jeopardizing the peaceful transfer of power that has been a singular hallmark of America's democratic government since the end of George Washington's second term of office.

In the days after January 6, Hale-Cusanelli told his roommate that he couldn't "describe how exhilarating" the assault on the Capitol was, that the closest thing he could compare it to was "War. Civil War."   Hale-Cusanelli described being fueled by "adrenaline, the rush, the fucking purpose."   He constructed an elaborate vision of total regime change in the United States, which he viewed as necessary to root out entrenched interests – by which he principally meant shrouded Jewish interests puppeteering the media, major corporations, the Democratic Party, Joe Biden, and the government as a whole.   He was not sorry; he was not deterred.   He was waiting for the chance to do it again, to be a part of another "historical event."

Hale-Cusanelli's cavalier regard for the truth was on full display when he took the stand in his own defense, more than sixteen months after the riot.   A student of history and government who had previously explained the intricacies of Presidential election procedure to his friends, Hale-Cusanelli falsely testified at trial that he did not know that: (a) "Congress" sat in the Capitol building; (b) the Electoral College Certification Proceeding was taking place in the building; and (c) when he entered the Capitol, members of Congress were still there, having fled and hidden from the mob.   He also falsely testified that he did not know that he interfered with police while

he was in the Capitol Visitors' Center, even though he directly impeded an in-progress arrest of another rioter.   Hale-Cusanelli lied, and the jury saw through his lies.

The attack on the United States Capitol cost half a dozen police officers their lives and cost taxpayers millions of dollars.[1]   There is no accounting for the universe of physical and emotional injuries that police officers, executing their sworn duty to protect the Capitol, suffered on January 6 and still carry to this day.   In a more abstract but equally real sense, the attack on the United States Capitol was an attack on the beating heart of democracy.   The resulting cardiac arrest may have been temporary, but it remains a harbinger of chronic challenges, and a reminder of the important function that sentences in these cases serve.

In light of those facts, the government recommends that the Court sentence Hale-Cusanelli to 78 months' incarceration, in the middle of the advisory Guidelines' range of 70-87 months as set forth in the PSR and which the government submits is the correct Guidelines calculation.   A 78-month sentence reflects the seriousness of Hale-Cusanelli's offense, the gravity of what happened to the Nation on January 6, and furthers the objectives of sentencing—promoting respect for the law, providing just punishment for the offense, affording adequate deterrence, and protecting the public from this defendant.

## II.   FACTUAL BACKGROUND

### A.  The January 6, 2021, Attack on the Capitol

On January 6, 2021, hundreds of rioters, Hale-Cusanelli among them, unlawfully broke into the U.S. Capitol building in an effort to disrupt the peaceful transfer of power after the

---

[1]      As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

November 3, 2020, presidential election.   Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety and/or sheltered fearfully in their offices; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.   Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.   *See United States v. Rachel Lynn Pert and Dana Joe Winn*, 1:21-cr-00139 (TNM), Tr. 12/20/2021 at 42 (January 6th was "a shameful event, a national embarrassment that made all of us feel less safe, less confident that our country can be governed democratically rather than by mob rule.") (statement of Judge McFadden).

As set forth in the PSR, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol.   Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020, Presidential election.   By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.   Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside.   At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.

Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.   Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended.   The proceedings resumed at approximately 8:00 p.m. after the building had been secured.   Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.   *See* PSR ¶¶ 9-14.

*Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Sentencing Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Sentencing Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.   Less than a

minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Sentencing Exhibit 1.   They flooded the area labeled "Lower West Plaza" Area C on Government's Sentencing Exhibit 1, pushing against the barricade there.



*Sentencing Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of

weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Sentencing Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.   This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were outflanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were now no manned defenses between the crowd and several entrances into the United States Capitol, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.



*Sentencing Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

**B.  Hale-Cusanelli's Role in the January 6, 2021, Attack on the Capitol**

Early in the morning on January 6, 2021, after having worked a night shift, Hale-Cusanelli drove from his home on Naval Weapons Station (NWS) Earle in Colts Neck, New Jersey, to Washington, D.C. to participate in the "Stop the Steal" rally.   On that day, Hale-Cusanelli was enlisted in the United States Army Reserves and worked as a security contractor at NWS Earle, where he maintained a "Secret" security clearance.

While in Washington, D.C. on January 6, Hale-Cusanelli recorded videos of himself protesting in a variety of locations, screaming at and interfering with United States Capitol Police officers, and chanting "Stop the Steal" with other rioters.   In one of these videos, Hale-Cusanelli screamed "Fuck you! The revolution will be televised, cunt!" at a police officer guarding the Capitol on the West Front.



*Screenshot of Government's Exhibit 304A, admitted at trial*

Hale-Cusanelli arrived on the West Front of the Capitol between 1:30 and 1:50pm.   He made his way to the front of the crowd there, near the base of the Northwest Scaffolding and Stairs. It was during this time that the battle for the West Front began to rage, with rioters successively forcing Capitol Police officers, and later MPD officers, to retreat.   Hale-Cusanelli ascended the Northwest stairs in the first wave of rioters after the police line at the base of the scaffolding was breached.   Hale-Cusanelli reached the Upper West Terrace around 2:12 p.m.

At approximately 2:12 p.m., the first rioter breached the Capitol building through a broken window near the Senate Wing Door.   At this time, the Joint Session was underway, and Senators were in the Senate chamber debating an objection to Arizona's electoral votes.   Shortly after the building was breached, Vice President Pence was removed from Senate Chambers and later taken to a secure location within the Capitol.

Hale-Cusanelli entered the U.S. Capitol building through the Senate Wing Door at around 2:14 p.m., less than 90 seconds after the first rioter entered the building.   Capitol closed circuit surveillance video (CCTV) showed Hale-Cusanelli first walking to the left with other rioters, in the direction of the Senate, then turning around to go the other way, towards the Crypt.

A pack of rioters including Hale-Cusanelli entered the Capitol Crypt around 2:20 p.m. where Capitol Police officers holding M4 rifles attempted to impede their passage, as the Crypt would provide rioters access to many different parts of the Capitol building, or as U.S. Capitol Police Officer Matthew Shephard put it at trial, the Crypt is "the heartbeat of the [Capitol] building."   The rioters overwhelmed these officers in minutes and spilled into the Crypt, from which they branched off into various directions.



*Screenshots from Government's Exhibit 405, admitted at trial, showing rioters overwhelming police in the Crypt in a period of 90 seconds between 2:24:10 p.m. and 2:25:40 p.m.*

Hale-Cusanelli first moved with a crowd into the area near the Memorial Door and staircase, around 2:28 p.m., but turned around as the area became bottlenecked.

Meanwhile, Senators were being evacuated from the Senate chamber.   U.S. Capitol Police Officer Raymond Watts assisted with those evacuations and testified at trial.   Officer Watts testified about how close rioters breaching the Senate Wing Door were to the evacuating Senators as they descended stairs in the Senate Wing:

> You could—the roar of the amount of people in there is deafening.   And you could hear them—you could hear—you could hear the commotion of the officers doing what they can to hold that line long enough to get—long enough for us to get these Senators out of harm's way.   And knowing the building the way that I do, you can tell when something that's loud is getting closer.   And I knew that we didn't have a lot of time, so much so that I had—I turned around to two members of the Senate who were evac'ing.   A lot of them are older individuals, so running isn't necessarily the easiest thing.   But understanding how close we are and how dangerous of a situation it is, I literally turned around and I said to them, Senators, I need you to move your bodies, move them now because time is not your friend.

U.S. Secret Service Agent Paul Wade testified that, as he escorted Vice President Pence and his family from the second floor near the Senate, down the stairs to a secure location within the Capitol complex, he could hear from "around the corner loud screams from the folks breaching the building."

Hale-Cusanelli made his way to the Capitol Visitors' Center (CVC) around 2:34 p.m. Hale-Cusanelli can be seen on CCTV making a waving motion with his arms in the direction of the skylight, and he later told a witness that he was trying to get rioters to "advance" into the Capitol, because "we need more people."

14



*Government's Exhibit 411B, admitted at trial, showing Hale-Cusanelli waving rioters into the Capitol building through a skylight in the Capitol Visitors' Center*

Hale-Cusanelli and the rioters he was with met a group of Capitol Police officers in the CVC who were there to prevent rioters accessing evacuation routes and tunnels and trains leading to Congressional office buildings, where members and their staffs were sheltering in place.   Officer Matthew Shephard testified that a group of rioters followed him and his fellow officers into the Capitol Visitors' Center and tried to break the police line.   The rioters carried and deployed "poles and sticks," "homemade weapons" and chemical spray.   Officer Shephard and his fellow officers attempted to detain some of the most aggressive agitators and rioters wielding chemical spray: "We decided we had to get those people with the chemical agents first because if we can't see, we don't know how to protect our firearms from getting taken and that would have been a terrible situation."   But once the officers "stepped out" to detain rioters, the situation "literally just turned into a brawl."   Officer Shephard said, "there were three of us or four of us that went out, there were probably 10 aggressors attacking us while we were trying to get specific people.   So once we stepped out, there was no going back until we dispersed that crowd."

Officer Shephard attempted to take down and arrest one of these rioters, but that rioter was "aggressively fighting back," and other rioters "attacked" Officer Shephard and another rioter who came to assist.   One of the rioters who intervened in that arrest was Hale-Cusanelli, who unsuccessfully tried to pull the rioter away from Officer Shephard.



*Government's Exhibit 411C, admitted at trial, showing Hale-Cusanelli pulling on the collar of a rioter while USCP Officer Matthew Shephard attempts to effectuate the rioter's arrest*

Officer Shephard testified that, had the Capitol Police had enough officers and resources that day, they would have taken every single rioter into custody.

Hale-Cusanelli made his way from the CVC back to the Senate Wing Door area around 2:45 p.m.   By this time, the mob had succeeded in halting the Electoral College Certification Proceeding, and rioters had entered the Senate chamber.   Capitol Police officers had been unable to secure the chamber because they were spread too thinly, dealing with rioters all over the building and trying to get Members of Congress to safety.   Hale-Cusanelli lingered in the area near the Senate Wing Door for a few minutes before climbing out a window to exit the building.   There,

he picked up a large Trump flag, dropped by another rioter, and waved it while standing in a corner. He took the flag home with him.   FBI agents later seized it as evidence.

After January 6, the Naval Criminal Investigation Service (NCIS) received information that Hale-Cusanelli had participated in the attack on the Capitol.   They enrolled Hale-Cusanelli's roommate as a confidential human source (CHS).   The CHS, at the direction of NCIS and FBI, recorded a conversation between himself and Hale-Cusanelli.   In that conversation, Hale-Cusanelli said he couldn't "describe how exhilarating it [being at the Capitol on January 6] was." Hale-Cusanelli showed the CHS a video of himself inside the Capitol Crypt chanting, "Stop the Steal!"   That video was entered into evidence.

When the CHS asked, "how do you recreate that [January 6]?" Hale-Cusanelli said, "War. Civil War," and that if there had been more rioters, they could have taken the entire Capitol building and held it.   Hale-Cusanelli repeated later in the conversation, "I really fucking wish there'd be a civil war," followed by this exchange:

| | |
|---|---|
| CHS: | You really wish there'd be a civil war? |
| Hale-Cusanelli: | Yes. |
| CHS: | Why? |
| Hale-Cusanelli: | Because it would, it would provide a clean slate. |
| CHS: | Yeah, but then a whole bunch of fucking people would die. |
| Hale-Cusanelli: | Yeah. Well, you know, as Jefferson said, the price – the tree of liberty must be refreshed with the blood of patriots and tyrants. |

Hale-Cusanelli opined that civil war would be "the simplest solution, the most likely outcome," because "political solutions" would be insufficient to fix the country's problems in the face of "entrenched interests."   Hale-Cusanelli made clear in this conversation that, by "entrenched interests," he meant Jewish interests controlling the Democratic Party and Joe Biden. Hale-Cusanelli expressed a belief that the "threat" to America was not "inward, not outward"

"[Y]ou know, it's not … the Soviet Union that blew up the Twin Towers and then blamed it on a third world shithole."   The CHS asked Hale-Cusanelli what he would do if he were "King of America," which led to the following exchange:

| | |
|---|---|
| CHS: | What would you do to change what's going on right now? |
| Hale-Cusanelli: | Such as? |
| CHS: | I don't fucking know.   What -- |
| Hale-Cusanelli: | Change what's going on – what's going on? |
| CHS: | Well, like, the divide in America. The Democrats, Joe Biden, the Jews. |
| Hale-Cusanelli: | You repeated yourself. |
| CHS: | Are you saying they're all part of the Jews? |
| Hale-Cusanelli: | Of course.   I'd give them 24 hours to leave the country.   No.   But also, yes.   But no, what I would do is just arrest them all.   Not all the Jews, … a lot, but yeah. I would purge, I would purge Congress. None of them have any purpose or use.  They're all a bunch of insider-trading cunts. They do nothing but vote for war and rape kids.   So, Congress can go… |

Hale-Cusanelli continued, saying that he would then set up regional governments, like "old Empires did."   Hale-Cusanelli then said that this was how the U.S. Government was supposed to be, because Thomas Jefferson said there should be a revolution every 10 years, and Benjamin Franklin said there should be a revolution every 30 years.   Hale-Cusanelli said that he believed there should be a revolution "every few generations."

Prior to January 6, 2021, Hale-Cusanelli repeatedly expressed his belief to the CHS that the 2020 Presidential Election was fraudulent and that Joe Biden was not the true winner of the election.   The government also entered into evidence text messages from Hale-Cusanelli's cellphone reflecting this belief.   For example, Hale-Cusanelli texted a friend on November 6, 2020, that "They [Trump and supporters] won't go down without a fight.   If they pull this off they'll expose the greatest election fraud in American history."

Hale-Cusanelli's text messages also reflected his deep understanding of the political process, including the Electoral College and vote-counting processes.   For example, while texting a friend in the aftermath of the election, on November 25, 2020, Hale-Cusanelli said, "Georgia and Pennsylvania have sent faithless electors."   His friend asked what "faithless electors" meant. Hale-Cusanelli replied, "Meaning the electors may not vote how they were told to based on the certified results."

*Hale-Cusanelli's Trial Testimony*

Hale-Cusanelli testified in his own defense.   He admitted that he knew before January 6 that the certification of the 2020 Presidential Election was going to be conducted on January 6, that he knew what the certification process entailed, and that he believed that the "question" of the outcome of the election would not be "resolved until the certification."   But Hale-Cusanelli claimed that he did not know that Congress sat in the U.S. Capitol building.   He said this in spite of his "extensive knowledge" about the politics, American government, and the certification.   He said this in spite of having heard President Trump's instruction on January 6 to "walk down to the Capitol … to cheer on our brave Senators and Congressmen."   He testified that, even at the moment when he was in the Crypt packed with rioters chanting "Stop the Steal," after the President told them to go to the Capitol to cheer on the Members of Congress, he did not know that Members of Congress were in the Capitol building.   Hale-Cusanelli told his roommate that, when he was standing under the skylight in the CVC, he was "like, right next to the House of Representatives," waving rioters into the building.   Yet, when asked whether he knew that he was next to the House of Representatives, Hale-Cusanelli testified that he "made that up."   He testified that he didn't see all the signs in the CVC identifying the houses of Congress and claimed that he did not learn that Members of Congress were in the building until 2:45 p.m. when a police officer told him.

Hale-Cusanelli also testified that, when he interfered with Officer Shephard's arrest in the CVC, he did not recognize Officer Shephard and his fellow officer to be police at that time, despite having been amongst the crowd of agitators in close proximity to the officers in the CVC for several minutes and having spent several seconds watching Officer Shephard take down another rioter before trying to intervene.

By their verdicts, the jury indicated that at least the first of these aspects of Hale-Cusanelli's testimony—that he was not aware that Congress and the Electoral College Proceeding were in the Capitol on January 6—was not credible.

## III.    THE CHARGES AND THE VERDICT

On March 9, 2021, a federal grand jury returned a superseding indictment charging Hale-Cusanelli with Obstruction of an Official Proceeding in violation of 18 U.S.C. §§ 1512(c)(2) and 2, Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

This Court presided over the trial from May 23 through May 27, 2022.   On May 27, the jury returned verdicts of guilty on all counts.   (ECF No. 87.)   On June 24, 2022, Hale-Cusanelli filed post-trial motions for judgment of acquittal and for a new trial, which the government opposed.   (ECF Nos. 103, 105.)   Those motions remain pending.

## IV.    STATUTORY PENALTIES

If this Court denies his post-trial motions, Hale-Cusanelli will face sentencing on five counts:   Obstruction of an Official Proceeding in violation of 18 U.S.C. §§ 1512(c)(2) and 2,

Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

As noted by the U.S. Probation Office, Hale-Cusanelli faces up to 20 years of imprisonment on Count 1, 1 year of imprisonment each on Counts 2 and 3, and six months of imprisonment each on Counts 4 and 5.   Hale-Cusanelli also faces a term of supervised release of not more than three years (multiple terms of supervised release run concurrently), and fines of up to $250,000 for Count 1, $100,000 per count for Counts 2 and 3, and up to $5,000 per count for Counts 4 and 5.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.   The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.   *Id.* at 49.

The PSR correctly calculates Hale-Cusanelli's total Sentencing Guidelines *range* but does not calculate the offense level for each count, as the Guidelines require.   The Guidelines set out the specific "order" of the analysis:   first, determine the offense guideline; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and

special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3.   U.S.S.G. §1B1.1(a)(1)-(3).   *Then*, repeat each step for each count.   U.S.S.G. §1B1.1(a)(4).   *Finally*, perform the grouping analysis in Part D of Chapter 3.   *Id.*   The PSR does not follow this procedure.   Rather, Probation started with the grouping analysis in Part D of Chapter 3, PSR ¶¶ 39-40, then did the Guidelines analysis in U.S.S.G. §1B1.1(a)(1)-(3), but only for Count One, PSR ¶¶ 42-51.

The government submits that the appropriate offense level computations for Counts One through Three[2] are as follows:

Count One: 18 U.S.C. §§ 1512(c)(2) and 2

| | | |
|---|---|---|
| **Base Offense Level** | U.S.S.G. §2J1.2(a) | 14 |
| **Specific Offense Characteristic** – "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." | U.S.S.G. §2J1.2(b)(1)(B) | +8 |
| **Specific Offense Characteristic** – "the offense resulted in substantial interference with the administration of justice." | U.S.S.G. §2J1.2(b)(2) | +3 |
| **Adjustment** – "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" | U.S.S.G. §3C1.1 | +2 |
| **Total Offense Level for Count 1** | | 27 |

---

[2]      Counts 4 and 5 are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.

Count Two: 18 U.S.C. §§ 1752(a)(1)

| | | |
|---|---|---|
| **Base Offense Level** | U.S.S.G. §2B2.3(a) | 4 |
| **Specific Offense Characteristic** – the trespass occurred "at any restricted building or grounds." | U.S.S.G. §2B2.3(b)(1)(A)(vii) | +2 |
| **Cross-reference** – "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." | U.S.S.G. §2B2.3(c)(1) | |
| "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." | U.S.S.G. §2X1.1(a) *Adjusted Base Offense Level* | 25 |
| **Adjustment** – "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" | U.S.S.G. §3C1.1 | +2 |
| **Total Offense Level for Count 2** | | 27 |

Count Three: 18 U.S.C. §§ 1752(a)(2)

| | | |
|---|---|---|
| **Base Offense Level** | U.S.S.G. §2A2.4(a) | 10 |
| **Adjustment** – "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense" | U.S.S.G. §3C1.1 | +2 |
| **Total Offense Level for Count 3** | | 12 |

As the PSR notes, Counts One, Two, and Three group together.   PSR ¶ 39.   Under

U.S.S.G. §3D1.2(a) and (c), "closely related counts" group.   Counts One, Two, and Three involve

the same victim (Congress).   U.S.S.G. §3D1.2(a).   The combined offense level for the Group is the highest offense level.   U.S.S.G. §2J1.2.   The highest offense level is 27 (for Count One). Therefore, the combined offense level for the Group is 27.

The U.S. Probation Office calculated the Hale-Cusanelli's criminal history as category I, which the government does not dispute.   PSR ¶ 57. Accordingly, based on the government's calculation of the total offense level at 27, Hale-Cusanelli's Guidelines imprisonment range is 70 to 87 months' imprisonment.   U.S.S.G. Chapter Five, Part A (Sentencing Table).

The PSR applies two specific offense characteristics as to Count 1, as well as a Chapter 3 adjustment for lying on the stand, with which the government concurs and to which Hale-Cusanelli objects.[3]   The application of these specific offense characteristics and the Chapter 3 adjustment are addressed below.

### A. Enhancements Under U.S.S.G. § 2J1.2 for Causing or Threatening to Cause Physical Injury or Property Damage and Substantial Interference With the Administration of Justice Both Apply Here.

Guidelines Section 2J1.2(b)(1)(B) provides for an eight-level enhancement when the offense involved causing or threatening to cause physical injury or property damage "in order to obstruct of the administration of justice." U.S.S.G. §2J1.2(b)(1)(B).   Guidelines Section 2J2.2(b)(2) provides for a three-level enhancement when the offense involved "substantial interference with the administration of justice."   U.S.S.G. §2J1.2(b)(2).   For the purposes of the §2J1.2 enhancements, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in turn refers to a "proceeding before the Congress," § 1515(a)(1)(B).   *See United States v. Matthew Ryan Miller*, 21-cr-75-RDM, Tr. May 23, 2022,

---

[3]      The government relies on the defendant's objections to the draft PSR in this Section.

at 16-18; *United States v. Guy Rubenacker*, 21-cr-193-BAH, Tr. May 26, 2022, at 61-66, *United States v. Guy Reffitt*, 21-cr-32-DLF, Tr. Aug. 1, 2022, at 37-47.

### 1. Causing or Threatening Physical Injury to a Person in Order to Obstruct Justice – U.S.S.G. §2J1.2(b)(1)(B)

U.S.S.G. §2J1.2(b)(1)(B) provides an enhancement in an obstruction offense where "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." Application of this specific offense characteristic encompasses relevant conduct—both the defendant's "own acts" as well as harm that resulted from jointly undertaken criminal activity. *See* U.S.S.G. §1B1.3 (defining relevant conduct as the defendant's own acts or omissions and those whom the defendant aided, abetted, counseled, commanded, induced, procured, or willfully caused, as well as "all harm that resulted" from the defendant's acts or the acts of others engaged in jointly undertaken criminal activity with the defendant). Hale-Cusanelli's relevant conduct—his own acts and conduct he aided and abetted—includes breaching the Capitol as part of the first wave of rioters, which hamstrung police from attending to additional exterior and interior breaches, and confronting, taunting, and harassing police officers in the CVC, which also held police officers' attention and prevented law enforcement resources from being used elsewhere to secure the building. For the purposes of applying specific offense characteristics, Hale-Cusanelli is responsible for the "jointly undertaken criminal activity" of those rioters with whom he worked in concert and who breached the Capitol building at the Senate Wing Door at the same time that he did. As Officer Watts put it at trial: "A breach of the Capitol is a breach of the Capitol."

More directly, two theories based on the evidence presented at trial support the application of this specific offense characteristic to Count 1:

*First*, the evidence showed that Hale-Cusanelli directed fellow rioters to "advance" on and into the Capitol as it was under siege.   Later, he told his roommate that he did this because "we need[ed] more people," and he testified at trial that he indeed encouraged rioters to "advance" into the Capitol because the rioters inside needed a greater show of force.   Hale-Cusanelli compared the Capitol siege to "civil war," leading to the following exchange between Hale-Cusanelli and his roommate (CHS):

CHS:             Civil war's not gonna happen in America.

Hale-Cusanelli:   Not yet.

CHS:             I mean, how would you, how would you even make that happen?

Hale-Cusanelli:   Let me tell you, if *we had more people*, we could've cleared the whole building.

(emphasis added).   Hale-Cusanelli's invocation of "civil war" in connection with the Capitol siege, combined with his directive to rioters to "advance" past police and into the breached building, demonstrates Hale-Cusanelli's intent to threaten—if not directly cause via his directions to other rioters—physical injury to law enforcement and/or property damage in order to obstruct the administration of justice.   Thus, by his own acts and by aiding and abetting fellow rioters, Hale-Cusanelli caused or threatened to cause physical injury to a person, or property damage, in order to obstruct the administration of justice.

*Second,* Hale-Cusanelli directly interfered with a Capitol Police officer attempting to effectuate an arrest of another rioter.   By reaching in and pulling on the rioter's collar as the officer took the rioter to the ground, Hale-Cusanelli, by his own acts, directly threatened physical injury to the rioter, to that police officer, and to another officer involved in the altercation.   And, before and after this altercation, Hale-Cusanelli is visible on CCTV openly taunting officers in the CVC as part of an aggressive crowd of rioters wielding a panoply of weapons.   Per the testimony of Officer Shephard, Hale-Cusanelli and other rioters taunting, harassing, and aggressively posturing

toward the officers was a threat to the officers' physical safety and the safety of members of Congress. *See also United States v. Greg Rubenacker*, 21-cr-193-BAH, Tr. May 26, 2022 at 56-58 (applying §2J1.2(b)(1)(B) because the defendant's "physical movements inside the Capitol communicated threats to law enforcement" and his "yelling and taunting at the officers … was threatening conduct, regardless of what he precisely said and whether those words contained threats of physical injury to those officers" in the context of an angry mob confronting police and refusing to comply with directions to leave the area).

For these reasons, ample evidence at trial demonstrated that Hale-Cusanelli and those with whom he jointly undertook his criminal activity caused and threatened to cause physical injury to persons and property damage. Nevertheless, Hale-Cusanelli argues that this enhancement does not apply because its application requires that a defendant have "intended" his acts to cause or threaten to cause assault or bodily injury. Even if such an intent requirement were read into U.S.S.G. § 2J1.2(b)(2), an interpretation unsupported by either its plain text or case law interpreting it, Hale-Cusanelli's argument fails on its own terms. Joining others breaching a secured government facility that is visibly guarded by police officers and forcibly intervening in a citizen-police encounter evinces an intent to cause or threaten physical injury or property damage.

### 2. Substantial Interference with the Administration of Justice – U.S.S.G. §2J1.2(b)(2)

The Guidelines define the term "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; *or the unnecessary expenditure of substantial governmental or court resources*." USSG § 2J1.2 cmt. n.1 (emphasis added). Hale-Cusanelli's obstruction offense involved substantial interference with the administration of justice because the offense *resulted* in the "unnecessary expenditure of

substantial governmental . . . resources."   Hale-Cusanelli's actions, and the actions of those who committed similar obstructive and disorderly and disruptive conduct, unquestionably caused substantial harm that required the substantial expenditure of government resources to address. *See* U.S.S.G. §1B1.3 (relevant conduct includes "all harm that resulted from" or "was the object of" the defendant's acts or the acts of others engaged in jointly undertaken criminal activity).

Hale-Cusanelli asserts that neither §2J1.2 enhancement applies because Hale-Cusanelli's obstruction of the official proceeding before Congress on January 6, 2021, did not involve the "administration of justice."[4]   Hale-Cusanelli is incorrect.   The "administration of justice" refers to non-judicial as well as judicial proceedings.   Courts have relied on the phrase "the unnecessary expenditure of substantial government or court resources" to apply §2J1.2(b)(2)'s three-level enhancement to interference with non-judicial proceedings and to obstruction that led to the government's expenditure of resources.   In *United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017), a court applied the specific offense characteristic after numerous federal agents "worked for several days around the clock" to bring a defendant's children back to the United States after the defendant violated an international parental kidnapping statute.   Likewise, a court applied the specific offense characteristic after defendants interfered with OSHA investigations into a workplace accident.   *See United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009).   A separate court applied the enhancement after a defendant withheld subpoenaed documents from a congressional subcommittee.   *See United States v. Weissman*, 22

---

[4]      Hale-Cusanelli also briefly reiterates an argument that this Court has soundly rejected, that the Electoral College Certification Proceeding was not an "official proceeding" within the meaning of 18 U.S.C. § 1512(c)(2).   As this Court held before trial, the Electoral College Proceeding before Congress was an official proceeding and, by their verdicts, the jury found beyond a reasonable doubt that Hale-Cusanelli corruptly obstructed it.

F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998).   And, finally, the Eleventh Circuit recently cited affirmatively to another case in which it found Section 2J1.2(b)(2) applicable where, as a result of the defendant's false grand jury testimony, the *government* was forced to identify and interview several other witnesses, review the defendant's records, and reconvene the grand jury.   *See United States v. Pegg*, 812, F. App'x 851, 860 (11th Cir. 2020) (citing *United States v. Johnson*, 485 F.3d 1264, 1271-72) (11th Cir. 2007)); *see also United States v. Meredith*, 602 F. App'x 102, 103 (4th Cir. 2015) (affirming the application of the enhancement because significant "government" resources were invested to resolve the defendant's attempts at obstruction); *United States v. Tankersley*, 296 F.3d 620, 623-24 (7th Cir. 2002) (same); *United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996), *as modified on reh'g* (Apr. 17, 1996) (same); *United States v. Voss*, 82 F.3d 1521, 1532 (10th Cir. 1996) (same).

Further, judges in this District have consistently applied specific offense characteristics related to the "administration of justice" in Capitol Riot cases as to 18 U.S.C. § 1512(c)(2).   *See United States v. Hodgkins*, 21-cr-188-RDM; *United States v. Fairlamb*, 21-cr-120-RCL; *United States v. Chansley*, 21-cr-3-RCL; and *United States v. Wilson*, 21-cr-345-RCL;   *United States v. Greg Rubenacker*, 21-cr-193-BAH.   In *Rubenacker*, Chief Judge Howell rejected the defense argument that the certification vote did not constitute "the administration of justice" with a lengthy, thorough explanation of her reasoning on the law and the facts.   *See* Sentencing Hearing on May 26, 2022, Tr. at 60-75 (Howell, C.J.).   Specifically, Chief Judge Howell concluded that, although "no definition of this phrase, 'administration of justice' is set out in the guidelines…. the lack of express reference to congressional proceedings does not mean that the sentencing commission meant to exclude such proceedings from the coverage of the SOCs with use of the phrase

'administration of justice.'   This phrase is sufficiently broad to encompass nonjudicial official proceedings, such as Congress's certification of the Electoral College … results."   *Id*. at 69-70.

On January 6, 2021, hundreds of law enforcement officers, and ultimately National Guardsmen and Guardswomen, were deployed to defend the Capitol building and grounds and then clear rioters like Hale-Cusanelli.   Rioters' invasion of the Capitol caused the evacuation of hundreds of lawmakers and the suspension of the Certification proceedings.   The repair and clean-up costs were extensive—and certainly "substantial."   The latest estimate of damages from the Architect of the Capitol, the Capitol Police, the House Chief Administrative Office, and the Senate Sergeant at Arms total at least $2,734,783.14.   In short, the breach of the United States Capitol on January 6 delayed the electoral certification by more than five hours, triggered an overwhelming police response, caused nearly three million dollars of damage to the Capitol, and required a massive security response up to and through the inauguration.   *See Ali*, 864 F.3d at 574 (noting that involvement by various agencies working through the night amounted to substantial expenditure, notwithstanding the government's failure to supply cost estimates related to these expenses).   Hale-Cusanelli's obstructive conduct both outside and inside the Capitol building on January 6 contributed to this massive expenditure of governmental resources.

The substantial interference enhancement under §2J1.2(b)(2) focuses on the end result—whether the costs of Hale-Cusanelli's obstruction were substantial.   There is no question that Hale-Cusanelli's and others' actions directly resulted in delaying the joint session of the United States Congress for the Certification of the Electoral College Vote regarding the 2020 presidential election for multiple hours, in addition to the various expenditures detailed above required to address this obstruction.

### B. Willful Obstruction of Justice by Providing Materially False Testimony at Trial – U.S.S.G. §3C1.1

Finally, Hale-Cusanelli argues that an adjustment under U.S.S.G. §3C1.1 should not apply because there is "insufficient indicia" that Hale-Cusanelli provided "willfully false testimony" at trial.   This suggestion is clearly contradicted by the trial record, Hale-Cusanelli's own testimony, and common sense.

First, Hale-Cusanelli falsely testified that he did not know that he was interfering with a police officer when he grabbed another rioter's collar and tried to pull him away while Officer Shephard attempted to effectuate an arrest.   This claim is ludicrous.   Hale-Cusanelli was in the Capitol Visitors' Center for several minutes taunting police before the officers' attempt to detain certain rioters erupted into a "brawl."   None of this would have been subtle.   And it is clear from the CCTV that Hale-Cusanelli took notice.   The footage shows Hale-Cusanelli running across the frame as a scuffle between rioters and police breaks out, then backing away, then swooping in again once Officer Shephard has taken the detained rioter to the ground.   Hale-Cusanelli clearly had eyes on all of this, and his actions as visible on camera plainly suggest his intent to interfere with the arrest (or "help" the rioter) by pulling him away from Officer Shephard's grasp.   Hale-Cusanelli's claim that he did not know what was happening, that he was interfering with police, even after being pressed on cross-examination, is completely incredible.

Second, Hale-Cusanelli falsely testified that he did not know that Congress was in the Capitol Building.   Hale-Cusanelli is an extremely well-read student of history and government. In his conversation with the CHS, for example, Hale-Cusanelli explained the difference between the House of Representatives and the Senate—how the House was designed to represent the interests of the people whereas the Senate was originally supposed to represent the interests of the states, referencing the 17th Amendment to the Constitution which established the direct election

of Senators as opposed to their appointment by state legislatures.   He went on:

> In the ancient Roman, the Roman system, you had a You had the -- you had the
> plebians, the House of Plebians who were, you know, the plebs were the common
> people. And you had the, I can't remember the name of it to save me, that was
> generally for the noble class.   In the UK you have the House of Commons, which
> commons would suggest, you know, regular people.   Then you have the House of
> Lords.   And I think they have a third. I can't remember.

Hale-Cusanelli said earlier in his conversation with the CHS that he was waving rioters

into the Capitol building from right outside the entrance to the House of Representatives.   And he

was.   He was in an area of the CVC bearing large signs indicating elevators to take visitors to the

House Gallery.   As Officer Shephard testified at trial:

> [T]he Visitor Center is made for tourists, it's made for groups, so everything is
> clearly labeled. So if they would have gotten down there, they would not have had
> to think about where they were going, they could have just looked at all the signs
> hanging from the ceiling and on the wall.

Yet, Hale-Cusanelli testified that he did not see the signs, that he made the detail about his

proximity to the House of Representatives up.   That would be an amazing coincidence if it were

true.   But it wasn't.   Hale-Cusanelli lied on the stand.

Further, Hale-Cusanelli testified that he heard President Trump's command on January 6

to march to the Capitol to cheer on Congress.   He was with rioters in the Crypt chanting "Stop the

Steal."   Another rioter informed Hale-Cusanelli about a tweet saying that Vice President Pence

"didn't have the courage" to overturn the results of the election.   He knew what that meant.   Hale-

Cusanelli texted a friend on December 14, 2020, explaining that in a case of "competing electors

… Mike Pence decides who wins."   In spite of all of this, despite having watched all of the

government's evidence establishing the depth of his knowledge about the United States Congress

and the Presidential election process, Hale-Cusanelli testified that he did not know that Congress

or the election certification proceeding was inside the Capitol building on January 6.

Incredulously, several times on direct and on cross-examination, Hale-Cusanelli testified that he had no idea why he entered the Capitol building on January 6, despite admitting that he made a conscious decision to do so.

By their verdicts, the jury found beyond a reasonable doubt that Hale-Cusanelli corruptly obstructed the Electoral College Certification Proceeding before Congress, definitively rejecting Hale-Cusanelli's poorly executed defense that he did not know that Congress or the Electoral College Certification was in the Capitol building on January 6.   Moreover, Hale-Cusanelli's suggestion that it is "not even clear" where in his testimony falsehood lies is belied by this Court's own statement at the conclusion of trial, finding Hale-Cusanelli's testimony that he "didn't know Congress met in the Capitol building and that he didn't know he was interfering with police officers at the time … highly dubious."

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).   In this case, as described below, all of the Section 3553(a) factors weigh in favor of a Guidelines of incarceration.

### A.  Nature and Circumstances of the Offense

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so

33

under the most extreme of circumstances, to which their conduct directly contributed.   The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.

The nature and circumstances of this defendant's crimes are extreme and weigh heavily towards a significant term of incarceration.   For this defendant, January 6 was about one thing – Civil War.   Civil war may not have erupted as a result of January 6, but not for Hale-Cusanelli's lack of trying.   He came to the Capitol as a belligerent.   He screamed at police outside the building, telling them that the revolution was coming.   Assuming the role of a military commander, he directed other rioters outside the building to "Advance, Advance," because, in Hale-Cusanelli's words, "we need[ed] more people."   If the rioters had "more people," Hale-Cusanelli believed they could have taken the Capitol building and held it.   What Hale-Cusanelli was imagining was nothing short of a coup d'état, the seat of the United States government taken over by rogue actors bent on disrupting the peaceful transfer of power following a lawfully conducted election.

Hale-Cusanelli was inside the Capitol for just 40 minutes—and 40 minutes was enough. In that time, between 2:14 p.m. and 2:53 p.m., the Congressional proceeding to certify the Electoral College vote was suspended, Vice President Pence was rushed from the Senate Chamber while rioters screamed, smashed windows and busted through doors, and clamored to get to lawmakers. In 40 minutes, Hale-Cusanelli drew Capitol Police like Officer Watts and Officer Shephard away from their posts and to the Capitol Visitors' Center, where Hale-Cusanelli and other agitators were in close proximity to evacuating members of Congress and the tunnels that led to their offices. While that happened, rioters invaded the floor of the Senate chamber, rifled through desks and left

a menacing threat to Vice President Pence on the dais.    No officers were available to guard the Senate because they had to choose between protecting members of Congress and protecting the building.    Capitol Police chose the latter, and they were almost too thinly stretched to do that.    In the 40 minutes that Hale-Cusanelli was inside the Capitol building, rioters were "proned out" at gunpoint while members evacuated from the House Gallery, as described by Officer Watts.    One floor below, a rioter was shot when she tried to climb through a window to get closer to other members evacuating from the House Chamber.    It did not matter whether Hale-Cusanelli saw any of this.    Regardless of whether they went inside the Capitol, every rioter in the building was a threat to police and the members of Congress:    "A breach of the Capitol is a breach of the Capitol." Every rioter cost scarce police resources, and risked significantly more death and destruction than, thankfully, occurred.

Hale-Cusanelli is personally responsible for threatening injury to officers both by leading and egging on the crowd to "advance" on the Capitol and by getting in the way of Officer Shephard's takedown of a rioter in the CVC.    That Hale-Cusanelli did not strike, stab, or beat anyone, or that he did not break government property with his own hands, is not a mitigating factor. Had Hale-Cusanelli done any of these things, he would be facing additional charges and/or penalties associated with that conduct.

On January 6, Hale-Cusanelli took the opportunity to turn desire for civil war into action. He was an enthusiastic soldier in the fight for his vision of America.    Civil war, he said, would be the "the simplest solution, the most likely outcome inevitably."    If Hale-Cusanelli became "King of America," his "solution" to give the country a "clear bill of health" would be to purge Congress and give Jews "24 hours to leave" the country.

Hale-Cusanelli is, at best, extremely tolerant of violence and death.   Though he has stated that he does not want death, he does not want civil war, in his mind, it is all "inevitable," as "the tree of liberty must be refreshed with the blood of patriots and tyrants."   Hale-Cusanelli said that "political solutions" will never be sufficient to root out entrenched interests—Democrats, the influence of major corporations, and Jews.   He said, "the system there is so entrenched, no amount of activism will ever remove their influence."   What Hale-Cusanelli was doing on January 6 was not activism, it was the preamble to his civil war.

A meaningful term of incarceration is necessary given the nature and circumstances of Hale-Cusanelli's offense.   If the greatest threat that the country faces is the violent destabilization of democratic order, it cannot be said strongly enough that the rule of law must prevail.   A meaningful term of incarceration is needed to protect the country.

### B.  Hale-Cusanelli's History and Characteristics

Hale-Cusanelli does not have any scorable criminal history.   That said, Hale-Cusanelli's background reflects a proclivity towards violence, as stated above.   Hale-Cusanelli has been arrested more than once in connection with violent incidents and in the possession of a variety of weapons, including a homemade potato gun, a push dagger, and a knife with which he allegedly stabbed his mother's boyfriend.[5]   It was this instability, proclivity for violence, and enthusiasm for civil war that led this Court to detain Hale-Cusanelli pretrial, having found by clear and convincing evidence that Hale-Cusanelli posed a danger to the community.

---

[5]     The police report noted that Hale-Cusanelli said he acted in self-defense and/or defense of his mother.   Hale-Cusanelli was not charged in connection with this incident, so the circumstances surrounding this incident were never adjudicated.

It is well established in the record at this point that Hale-Cusanelli subscribes to White-Supremacist and Nazi-Sympathizer ideologies that drive his enthusiasm for another civil war and formed the basis of this Court's pretrial determination that Hale-Cusanelli was a danger to the community.[6]   At the March 21, 2021, hearing on Hale-Cusanelli's motion for pretrial release, this Court said:   "[F]or a number of years the defendant has apparently had kind of a neo-Nazi racist ideology that has led him to use racist language, sexist language, and has been generally engaged in hateful conduct, if not necessarily violent conduct toward a number of people with whom he's had contact."   This Court noted the concerns expressed by dozens of Hale-Cusanelli's coworkers at NWS Earle and stated:   "[C]ertainly the language here goes beyond just being racist, but suggesting violence towards people who are not like Mr. Hale-Cusanelli."   This Court cited Hale-Cusanelli's history of arrests in connection with violent incidents and said, "that [these] kind of neo-Nazi beliefs—he's harbored these for a number of years, but it is some evidence of the defendant actually acting out on this, that this is not just language but actually action."   This Court determined that Hale-Cusanelli's history of violence and instability was not separate from his conduct on January 6, stating:

> I am very concerned about the statements the prosecutor pointed to after January 6th suggesting that the defendant is looking forward to a civil war. I am very concerned about his statement to the confidential source suggesting that the tree of liberty needs to be watered with the blood of patriots from time to time; that of course was a quote from Thomas Jefferson.   But … it is highly troubling.
> …
> I am concerned given all of the defendants'—all of the things he said in the past about committing violence against those who he feels are pitted against him. … [T]he defendant has been willing to put these thoughts into action in the past.

---

[6]     Rather than restate every single statement or conduct manifesting Hale-Cusanelli's White-Supremacist/Nazi-Sympathizer world view, the government refers the Court to the detention filings in this matter (ECF Nos. 18, 26), and the transcript of this Court's March 21, 2021, hearing on Hale-Cusanelli's motion for pretrial release.

The Court's concerns in March 2021 remain valid today.   There is no indication that Hale-Cusanelli thinks any differently or is any less inclined to put thoughts into action today than he was a year, or more, ago.   According to reporting from inside the D.C. Jail, Hale-Cusanelli is known to draw "Nazi-style propaganda cartoons"—"such as [those] depicting Jewish people as pigs and dropping an atomic bomb on Israel."[7]   An inmate called Hale-Cusanelli's drawings "hateful and inflammatory."   Sources inside the jail also reported that Hale-Cusanelli has used the power of a fundraising organization spearheaded by his adoptive aunt to organize inmates and curry favor.   One inmate said the situation was like "the movie Mean Girls, but with racist, antisemitic extremists."

Hale-Cusanelli's history and characteristics, including his history of arrests in connection with violent incidents and history of violent rhetoric, weigh in favor of a lengthy term of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As explained above regarding the nature and circumstances of the offense, the attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8]   A lesser sentence would suggest to the public, in general, and other rioters,

---

[7]      *See*      https://www.npr.org/2022/04/14/1092580753/capitol-riot-january-6-insurrection-defendants.

[8]      Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                            at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously.   In this way, a lesser sentence could encourage further abuses.   *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.   18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.   3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.   The sentence in this case should convey to potential future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.   There is possibly no greater factor that this Court must consider.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   First, the nature and circumstances of Hale-Cusanelli's offense and his history and characteristics, as described above, clearly demonstrate his inclination to commit similar crimes in the future.   And there remains every

reason to believe that Hale-Cusanelli is willing to use violence, or facilitate the violence of others, in the course of committing such crimes.   As this Court noted when it determined that Hale-Cusanelli should be detained pretrial, there is a concern with this defendant of an "escalation of violence."   Hale-Cusanelli's enthusiasm for civil war and his well-documented history of violent rhetoric (and alleged violent conduct) demonstrate that he remains a danger and demands a significant term of incarceration to specifically deter him, but also to protect the community from him.

Second, there is little evidence of reflection or remorse on the part of this defendant. Hale-Cusanelli's self-serving statements at trial that he was wrong to enter the Capitol and that he was sorry that he did should be given the same weight as his self-serving claims that he did not know Congress was in the Capitol building—which is to say, none.   Contrition matters.   It is essential to a system that seeks to prevent crime through rehabilitation.   It is also component of measuring just punishment.   There is no indication of it here.   This demands, at the very least, a Guidelines sentence within the range of 71-87 months to deter Hale-Cusanelli from future crimes. And, if that is not possible, to incapacitate him for the safety of the community.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to

'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).   "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that Asignificantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original).   In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553(a) factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.   As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.   This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis.   In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness.

### F. Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Relatively few Capitol Riot cases involving the lead charge here—18 U.S.C. § 1512(c)(2)—have proceeded to sentencing. And most of those sentencings have followed from guilty pleas. At the outset, when comparing Capitol Riot cases with similar charges or conduct to Hale-Cusanelli's, it is important to account for how acceptance of responsibility drove those sentences.

In the case of Joshua Pruitt, 21-cr-23, Judge Kelley sentenced the defendant to 55 months in prison. This sentence was roughly in the middle of Pruitt's advisory Guidelines range, 51-63 months. Without an adjustment for acceptance of responsibility, Pruitt would have been facing a Guidelines range of 70-87 months, as Hale-Cusanelli faces here. Pruitt pleaded guilty to one count of 18 U.S.C. § 1512(c)(2). Pruitt's Guidelines included both enhancements under 2J1.2(b) for threatening physical injury and substantial interference with the administration of justice despite the fact that Pruitt did not directly engage in violent or destructive conduct himself.

At sentencing, Judge Kelley found that Pruitt was at the forefront of the mob on January 6 and that he "amped up" the crowd, like Hale-Cusanelli. Pruitt's offense conduct was aggravated by the fact that he was a member of the Proud Boys and that he engaged in preplanning and coordination with the Proud Boys. While not apples to apples, as Hale-Cusanelli is not known to be a formal member of any organized extremist group, Hale-Cusanelli's White-Supremacist/Nazi-

sympathizer ideology that fuels his desire for civil war and brought him to the Capitol on January 6 compares with the "White chauvinist" ideology espoused by the Proud Boys. Notably, while Hale-Cusanelli's and Pruitt's Guidelines range would have been the same without Pruitt's acceptance of responsibility, they do not share an offense level. Pruitt's Guidelines were elevated due to his criminal history, which put him in Category III as opposed to Hale-Cusanelli's Category I. But, as discussed elsewhere in this memorandum, Hale-Cusanelli is not without concerning history of his own, which is a significant aggravating factor.

In the case of Greg Rubenacker, 21-cr-193, Chief Judge Howell sentenced the defendant to 41 months, the bottom of his advisory Guidelines range, which was 41-51 months. Though Rubenacker pleaded guilty to the indictment in his case—which included a charge of 18 U.S.C. § 1512(c)(2)—and did not accept a plea agreement with the government, he did receive credit for acceptance of responsibility. Without that, his Guidelines range would have been 57-71 months. Rubenacker's Guidelines likewise included both enhancements under 2J1.2(b) despite the fact that Rubenacker did not directly engage in violent or destructive conduct. Chief Judge Howell found that Rubenacker's "physical movements inside the Capitol communicated threats to law enforcement" and his "yelling and taunting at the officers … was threatening conduct, regardless of what he precisely said and whether those words contained threats of physical injury to those officers" in the context of an angry mob confronting police and refusing to comply with directions to leave the area.

Duke Wilson, 21-cr-345 (RCL), Jacob Chansley, 21-cr-3 (RCL), and Scott Fairlamb, 21-cr-12 (RCL), each faced advisory Guidelines ranges of 41-51 months following their guilty pleas involving a lead charge of 18 U.S.C. § 1512(c)(2). Without acceptance of responsibility, they would have each faced a Guidelines range of 57-71 months. Judge Lamberth, who sentenced all

three, imposed incarceration sentences of 51, 41, and 41 months, respectively.

Mitigating factors present in three § 1512(c)(2) cases—*United States v. Michetti*, 21-cr-232 (CRC), *United States v. Matthew Ryan Miller*, 21-cr-75 (RDM), and *United States v. Paul Allard Hodgkins,* 21-cr-188 (RDM)—resulted in non-Guidelines sentences.[9]   Similar mitigating factors are not present here.   And, as with the cases described above, these defendants benefited from already lower Guidelines ranges due to their acceptance of responsibility.

In addition to not benefiting from an adjustment for acceptance of responsibility, Hale-Cusanelli faces elevated Guidelines for additional aggravating conduct—namely, lying under oath while testifying in his own defense.   Otherwise, his case is comparable to other § 1512(c)(2) cases that have received Guidelines sentences.   This Court should similarly impose a Guidelines sentence within the range of 70-87 months.

---

[9]   Michetti received a sentence of 9 months, 6 months below the advisory Guidelines range of 15-21 months, which included a downward adjustment for acceptance of responsibility, an additional three levels for substantial interference with the administration of justice, but did not include eight additional levels for threatening to cause or causing injury or property damage.   The government recommended 18 months, the midpoint of the Guidelines range, but the Court varied downward because Michetti lacked any notable criminal history, is the sole caretaker of his four-year-old child, and had taken rehabilitative steps such as taking anger management classes while on pretrial release.

Miller received a sentence of 33 months after the Court varied downward from its calculated Guidelines range of 41-55 months.   That range included both enhancements under 2J1.2 and a thre-level downward adjustment for acceptance of responsibility.   Judge Moss "var[ied] downward by two [offense] levels from a level 22 to a level 20" due to Miller's young age (22 at the time of the attack on the Capitol) and his expressions of remorse which Judge Moss credited as genuine.

Hodgkins, the first felony Capitol Riot case and first § 1512(c)(2) case to proceed to sentencing, received a sentence of 8 months.   The Court varied downward 7 months from Hodgkins's 15-21 month Guidelines range because Hodgkins had "no criminal record of any type," he entered an early plea, he didn't threaten or engage in acts of violence or encourage acts of violence, and he took "significant steps towards his rehabilitation" while on pretrial release.

## VII.   RESTITUTION

Hale-Cusanelli must pay restitution under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A.   The MVRA applies to four categories of offenses: (1) crimes of violence, as defined in 18 U.S.C. § 16; (2) "offense[s] against property under [Title 18] ... including any offense committed by fraud or deceit;" (3) crimes related to tampering with consumer products; and (4) offenses related to theft of medical products.   18 U.S.C. § 3663A(c)(1)(A).   18 U.S.C. § 1752(a)(1), entering and remaining in a restricted building or grounds, is an offense against property under the MVRA, and it is one of Hale-Cusanelli's counts of conviction.[10]

If the MVRA does not apply, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[11]   *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the

---

[10]     The MVRA does not define "offense against property," but courts around the country have used a circumstance-specific approach to determine whether an offense, based on the underlying facts, is "against property."   *See United States v. Ritchie*, 858 F.3d 201, 209-10 (4th Cir. 2017); *United States v. Collins*, 854 F.3d 1324, 1333 (11th Cir. 2017); *United States v. Sawyer*, 825 F.3d 287, 292 (6th Cir. 2016); *United States v. Luis*, 765 F.3d 1061, 1066 (9th Cir. 2014); *United States v. Quarrell*, 310 F.3d 664, 678 (10th Cir. 2002).

[11]     The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

parties in a plea agreement."   *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).   Under either the MVRA or the VWPA, the Court should order Hale-Cusanelli to pay $2,000 in restitution to the Architect of the Capitol.   This amount fairly reflects Hale-Cusanelli's role in the offense and the damages resulting from his conduct.   This amount properly reflects Hale-Cusanelli's role, but also considers the various legal and factual issues associated with calculating the actual losses for property damage to the United States Capitol and incurred by law enforcement agencies, additional costs incurred for security personnel, and bodily injuries sustained by law enforcement personnel. Notably, every defendant convicted of a felony offense in connection with the attack on the Capitol has been ordered to pay at least $2,000 restitution.[12]   The riot at the United States Capitol had caused approximately $2,734,783.15 in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021.   *Id.*   Hale-Cusanelli's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

## VIII.   FINE

Hale-Cusanelli's conviction under Section 1512 subjects him to a statutory maximum fine of $250,000.   *See* 18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18

---

[12]   Where a defendant is responsible for additional specific damage, such as breaking a window or injuring an officer, the defendant must also pay restitution that reflects those specific costs.   The government does not have evidence that Hale-Cusanelli is responsible for any additional specific damage or injury.

U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   In assessing a defendant's income and earning

capacity, a sentencing court properly considers whether a defendant can or has sought to

"capitalize" on a crime that "intrigue[s]" the "American public."   *United States v. Seale*, 20 F.3d

1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case.   Hale-Cusanelli and his adoptive aunt (Cynthia Hughes)

have raised a substantial amount of money[13] through an online campaign styled as the "Patriot

Freedom Project" ("PFP").   *See* https://www.patriotfreedomproject.com/.   PFP represents itself

as a hub for collecting and distributing donations for Capitol Riot defendants and their families,

and funds raised by PFP ostensibly go to families of January 6 defendants who are "facing a

significant financial burden."   *Id.*   However, publicly available information suggests

irregularities with the organization.   PFP's website does not include a mission statement, identify

current board members, or specify the organization's activities/expenditures.[14]   Public reporting

(including from inmates at the D.C. jail) indicates that Hale-Cusanelli and his aunt are personally

---

[13]   *See*   https://www.npr.org/2022/01/20/1073061575/experts-see-red-flags-at-nonprofit-raising-big-money-for-capitol-riot-defendants (reporting that the Patriot Freedom Project had raised   "close   to   $900,000   as   of   early   December   [2021]"); https://www.marketwatch.com/story/how-some-jan-6-defendants-are-trying-to-profit-from-their-roles-in-the-u-s-capitol-siege-01660605681 (reporting on August 16, 2022, that the Patriot Freedom Project "had raised more than $1 million in contributions and paid more than $665,000 in grants and legal fees for families of Capitol riot defendants.").   As of June 17, 2022, the Patriot Freedom project is registered as a tax-exempt organization under the name "Hughes Foundation Inc." or "Hughes Advocacy Foundation."

[14]   A PFP spokesperson referred a reporter to a "Statement of Activities" on PFP's website in response   to   queries   about   PFP's   transparency.   *See* https://www.npr.org/2022/01/20/1073061575/experts-see-red-flags-at-nonprofit-raising-big-money-for-capitol-riot-defendants ("The spokesperson did not address specific concerns from family members, such as their calls with Hughes, but argued that the group was a model of transparency. They pointed to a "Statement of Activities" document posted under the "1/6 News and Updates" section of its website.").   Neither that Statement nor a comparable description of PFP's activities appears to exist.

and selectively directing funds to certain defendants who have curried Hale-Cusanelli's favor. The organization has not registered as a charity in New Jersey and has yet to file a federal Form 990 as required for tax-exempt organizations.   As such, the government has not been able to determine with certainty how much money PFP has raised or how that money has been spent.   But publicly-available information fairly supports an inference that Hale-Cusanelli and Hughes have used the January 6 attack on the Capitol and the notoriety of Hale-Cusanelli's case—which Hughes herself has exacerbated via her public and media appearances[15]—to enrich themselves, supporting the imposition of a fine.

---

[15] *See,   e.g.*,   https://www.cnn.com/2022/09/04/politics/trump-rally-nazi-sympathizer-january-6-rioter/index.html.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 78 months, which is a mid-range sentence as calculated by the government, restitution of $2,000, a fine, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:    _____/s/_____
Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Criminal Division
Detailed to the D.C. U.S. Attorney's Office
601 D St. NW
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048

Karen P. W. Seifert
Assistant United States Attorney
National Security Section
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7527
Karen.Seifert@usdoj.gov