**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 21-cr-37-TNM |
| | ) | |
| | ) | |
| TIMOTHY HALE-CUSANELLI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SENTENCING MEMORANDUM OF TIMOTHY HALE-CUSANELLI**

## Table of Contents

Introduction .................................................................................................... 1

Factual background ......................................................................................... 2

    A.    Hale-Cusanelli's background, family, and character ...................... 2

    B.    Hale-Cusanelli's convictions, PSR, and Guidelines calculation ...... 6

Argument ......................................................................................................... 7

    I.    Sentencing procedure ..................................................................... 7

    II.    The PSR incorrectly applied the U.S.S.G. §2J1.2 specific offense
        characteristics and §3C1.1 adjustment ......................................... 8

    III.    The § 3553(a) factors favor a downward variance ...................... 17

        A.    The nature and circumstances of the offense and the history
            and characteristics of the defendant (§ 3553(a)(1)) ................. 17

            1.    The typical § 1512(c)(2) crime does not look like
                Hale Cusanelli's ................................................... 17

            2.    Hale-Cusanelli's harsh pretrial confinement ........... 19

            3.    Hale-Cusanelli's remorse ..................................... 21

        B.    Avoiding unwarranted sentence disparities (§ 3553(a)(6)) ........ 21

        C.    The seriousness of the offense and deterrence (§ 3553(a)(2)) ..... 29

Conclusion ...................................................................................................... 29

**Introduction**

Along with thousands of protesters, Hale-Cusanelli entered the Capitol Building on January 6.  The former Army reservist had no business being there.  His misconduct fits squarely within the Title 40 offenses of which the jury found him guilty.  The Court will hear from the 32-year-old himself that he regrets his actions, deplores the violence and property destruction at the Capitol, and apologizes to members of Congress, congressional staff, and law enforcement for his part in the events.

At the same time, Hale-Cusanelli's presentence investigation report (PSR) shows that something has gone wrong in his case.  It presents a Guidelines range of 70 to 87 months' incarceration.  The path to that calculation is strewn with legal error.  Hale-Cusanelli has argued that the government misapplied § 1512(c)(2) by unprecedentedly decoupling the offense from investigations and evidence.  But even if the statute is properly charged here, the very arguments by which the government prevailed on the issue now imply that the sentencing enhancements in U.S.S.G. §2J1.2(b) do not apply as a matter of law.  As the Court put it in denying a motion to dismiss the § 1512(c)(2) charge, "Congress does not engage in . . . 'the administration of justice.'" *United States v. Montgomery*, 578 F. Supp. 3d 54 (D.D.C. 2021).  In that case, the PSR has improperly added eleven levels to Hale-Cusanelli's Guidelines range, all of which require interference with the administration of justice.  The phrase cannot mean one thing before trial and another thing afterwards; what's sauce for the goose is sauce for the gander.  And following the PSR's calculation would bring the Court into conflict with every court of appeals decision defining "administration of justice."  Nor do the enhancements apply factually.

Even as violent protesters from the 2020 riots in Oregon and elsewhere go unpunished, Hale-Cusanelli has done hard time since January 2021 for nonviolent conduct in many ways

indistinguishable from that of a Class B parading misdemeanant.  That the government has lost its sense of proportion can be seen in its request that the Probation Office apply the terrorism sentencing enhancement here.  The United States government sincerely suggested that parading-like conduct should be sentenced at 360 months to life—a penalty that would strike a Hongkonger dissident as implausibly draconian.  PSR, p. 29.  Inmates have threatened to kill Hale-Cusanelli in jail where he has spent months in solitary confinement.  His reputation was defaced—permanently—the moment the government publicized scandalous images placing him in a false light.  Saddled with a felony conviction, he will struggle throughout life to pursue career goals.  Against that background, a sentence of twenty months' incarceration, with credit for time served, would be sufficient but not greater than necessary to provide for a just punishment.  As shown below, a more severe sentence would create a number of grossly unwarranted sentence disparities.

**Factual background**

A.    **Hale-Cusanelli's background, family and employment history**

Hale-Cusanelli's upbringing was like something from *Oliver Twist*.  He was born in New Jersey in 1990 to parents who were effectively career criminals.  They divorced when he was seven years old.  Both succumbed to drug addiction.

Hale-Cusanelli's mother took no interest in his life.  PSR, ¶ 66.  His biological father was banned from their home.  As he puts it, "for the most part, I took care of myself." *Id.*  Some of the details are almost too indecent to mention.  Tim's mother would often steal from her young son and squander the money on drugs.  She would bring male companions to the home who would physically abuse Tim.  An avid reader, Tim found solace in books.  That explains the sense of despair he felt when he came home one day to find that his mother had destroyed his

entire library.  Despite all that, Tim continued financially supporting her until he was 27 years old.  At that point he cut off all contact.  His mother "was last known to reside in Kentucky" and was unemployed when Hale-Cusanelli last heard from her.  *Id.*, ¶ 63.

Tim says that his "very rough upbringing instilled a good work ethic because I didn't want to live in poverty." PSR, ¶ 68.  After obtaining a community college degree, he enlisted in the United States Army Reserve in 2009 and continued in that status until he was given a general discharge in February 2021 on account of this case.  From 2018 to January 2021, Tim served as an armed security officer for Naval Weapons Station Earle in New Jersey.

Before undersigned counsel appeared in this matter following trial, what he knew of Hale-Cusanelli's case was picked up from media reports.  Counsel was thus principally informed that the defendant was a neo-Nazi with violent tendencies, emblematic of the January 6 mob.  The stories featured an image of Hale-Cusanelli with upraised clenched fists under a toothbrush mustache.  In publicizing the photographs in pretrial motion practice the government was not unaware it was tainting the jury pool.  Alas, it had to proceed notwithstanding that unfortunate side-effect, lest the Court not grasp the evidentiary issues without a visual aid.

Accordingly, one of the first things counsel did was to ask Hale-Cusanelli whether he is a neo-Nazi.  Counsel encouraged him to speak freely.  Counsel believes prosecutorial charging decisions should rarely be about anything other than the law alone.  Still, counsel does not want to represent a Nazi.  And, counsel added, if you are not a Nazi, what is that picture about?  Hale-Cusanelli's answer does suggest his case is emblematic in a way, but not in the sense suggested by the media reports.  To counsel, this aspect of his case captures the casual cynicism too often given a pass in federal prosecutions in the context of politically inflected offense conduct.

3

Hale-Cusanelli had grown frustrated with the pandemic-related lockdowns in his home state.  The governor had described his authority to impose restrictions as an "emergency power."  To a certain kind of internet-friendly history dilettante such as Hale-Cusanelli, a phrase like that often leads to commentary lending support to Godwin's law that online discussions terminate in half-witted comparisons to 1930s Berlin.  But instead of posting something trite and moving on, Hale-Cusanelli turned it into a visual joke at the politician's expense.  He shaved his mustache and struck the poses, as if to say, "Look at me, I'm a governor-tyrant with emergency powers."  It goes without saying this is distasteful, not funny—and self-sabotaging.  But reasonable minds do not ignore a distinction between sending up another person as a "Nazi" and identifying oneself as such.  To present this episode in court as evidence of the defendant's belief system is beyond cynical.

To lend some substance to the images—and further pressure the Court to detain Hale-Cusanelli pretrial—the government cited books seized from the defendant.  Who but a violent Nazi owns the dictator's autobiography and *The Turner Diaries*, the government suggested.  Except that the government omitted the volumes bookending the ones presented to the Court: the Federalist Papers, histories of Spanish colonialism, Howard Zinn, Chomsky, *Das Kapital*, and labor rights books—to name a few decidedly unfascistic examples.  If a searching agent encounters a bookshelf filled with nothing but fascist literature, counsel concedes relevance in certain circumstances.  Where an agent encounters a collection like Hale-Cusanelli's, it is grossly inappropriate for the government to selectively present *The Turner Diaries* to the court, in a public filing, as a reason to deprive the defendant of his liberty.  There is no bright-line rule for this sort of thing, but wherever the boundary is, the government trespassed here.

4

Perhaps the most efficient proof that Hale-Cusanelli has been placed in a false light comes from his coworkers.  In 2020, he ran for the position of union shop steward at Naval Weapons Station Earle.  The steward's role is to ensure that employees' civil and labor rights are maintained.  Hale-Cusanelli's rival in the election was an experienced correctional officer.  The "electorate"—the station's employees—was majority minority.  They knew about Hale-Cusanelli's mustache escapade, as it had become a running joke at the station.  Hale-Cusanelli easily won the election.  He energetically enforced the civil and labor rights of his colleagues by reaching out to a local congressman and the National Labor Relations Board on their behalf.  For example, a Muslim colleague encountered the fairly typical dilemma that he was prohibited from wearing a beard on a military base.  Hale-Cusanelli advocated for his religious right to grow facial hair.  Black coworkers incurred write-ups for conduct that others got away with and were denied time off unlike nonblack colleagues.  As steward, Hale-Cusanelli took up their cause vigorously too.  None of this is to present him as some sort of social justice paragon—he is plainly not—but the picture painted by the government is simply misleading.

Hale-Cusanelli makes no excuses for his derogatory language.  It is often childish and offensive.  Still, at trial his commentary was stripped of mitigating context.  Hale-Cusanelli regarded his roommate, whom the government turned into a CHS, as a close friend.  Many of the defendant's uses of the n-word were in conversation with the CHS, who is black.  In some ways, that makes it worse.  But what was not adequately conveyed at trial was that before the roommate became an agent for the government, he and Hale-Cusanelli simply spoke this way to each other in an ironic way.  The CHS would call the defendant white trash and Hale-Cusanelli would respond with epithets.  At least outwardly, they mutually regarded this kind of communication as amusing.  The point is that Hale-Cusanelli's intent was not malign.

The other important facet to Hale-Cusanelli's relationship with the CHS is what you might call its competitive radicalism.  The government made much at trial of the defendant's pseudo-prognostications about a coming "civil war."  Hale-Cusanelli regrets making those foolish remarks.  But what was not evident at trial was that the CHS often made similarly radical comments to Hale-Cusanelli, except from a far-left perspective.  To rile up the defendant, the CHS would cheer scenes of violence during the country's riots in the summer of 2020.  That does not excuse Hale-Cusanelli's radical-sounding commentary about a "civil war," but it does suggest a kind of psychological dynamic where these two were trying to one-up each other in the rhetorical realm.

Cynthia Hughes, who was introduced to Tim as a boy, became a mother figure to him.  Having known him for years, she summarizes his character this way:

> I have watched Tim grow and I have also watched him live a very hard and painful life. .
> .  He never made himself a victim of his circumstances. He has always been
> hardworking, loved serving his country and would give anyone the shirt off his back. Tim
> was the shop steward at his job over a group of diverse men. He proudly took this
> responsibility very seriously. He wrote letters to his congresspeople to exact change at the
> workplace. If Tim was getting himself a cup of coffee after working a 12-hour shift, he
> got it for the entire crew. He is the guy that would work an overnight shift and when his
> shift was over, he went and got everyone breakfast sandwiches. The guy you could call in
> the middle of the night if your car broke down, he is the guy you can always depend on
> no matter what, that is the true Tim Hale. There is so much more to Tim than the overly
> insensitive pictures and memes that were released from his private phone where these
> things lived. This content does not define [him]. . .

Exh. 1.  Tim, she says, "is not a danger to anyone." *Id.*

## B.    Hale-Cusanelli's convictions, PSR, and Guidelines calculation

A factual recitation of Hale-Cusanelli's trial is found in his motion for a judgment of acquittal and motion for a new trial.  ECF No. 103.

The PSR calculates the defendant's Guidelines range as follows.  After grouping Counts 1-3, the base offense level is set by the guideline for Count 1, the § 1512(c)(2) conviction, under

U.S.S.G. §2J1.2.  That level is 14.  PSR, ¶ 42.  The PSR then added two specific offense characteristics.  First, it added eight levels under U.S.S.G. §2J1.2(b)(1)(B) because "the offense involved causing or threatening physical injury to a person in order to obstruct the administration of justice." PSR, ¶ 43.  The PSR said this enhancement was satisfied because,

> the defendant directly interfered with a Capitol Police officer attempting to effectuate an arrest of another rioter. The defendant reached in and pulled on the rioter's collar as the officer took the rioter to the ground. He was also captured on CCTV openly taunting officers in the CVC with other rioters. Officers testified that the defendant and other rioters taunting, harassing, and aggressively posturing toward the officers was a threat to the officers' physical safety and the safety of members of Congress.

*Id.*

Second, it added three levels under U.S.S.G. §2J1.2(b)(2) because Hale-Cusanelli's offense "resulted in substantial interference with the administration of justice." PSR, ¶ 44. Next, the PSR added a two-level adjustment for obstruction of justice under U.S.S.G. §3C1.1.  It explained that in his trial testimony, Hale-Cusanelli  "provided materially false testimony under oath regarding his knowledge that Congress was in the Capitol building and his knowledge that he interfered with a police officer in the CVC." PSR, ¶ 47.  Thus, the PSR calculated the total offense level at 27.  In criminal history category I, Hale-Cusanelli's sentencing range was calculated at 70-87 months' incarceration.  PSR, ¶ 104.

**Argument**

**I.      Sentencing procedure**

As it knows, the Court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence.  *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).  Although the Court must first calculate the appropriate sentencing range under

the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements.  It may make its own policy judgments, even if different from those in the Guidelines.  *Kimbrough*, 552 U.S. at 101.

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661.  As the Court knows, the cardinal requirement of § 3553(a) is that the "court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

## II.   The PSR incorrectly applied the U.S.S.G. §2J1.2 specific offense characteristics and §3C1.1 adjustment

The PSR added eleven levels to Hale-Cusanelli's total offense level for two instances of interference with the "administration of justice" under U.S.S.G. §2J1.2(b) and added a two-level adjustment for obstruction of justice under §3C1.1.  Following those recommendations would result in legal and factual error.

The relevant specific offense characteristics provide as follows:

If the offense involved causing or threatening to cause physical injury to a person, or property damage, *in order to obstruct the administration of justice*, increase by 8 levels.

U.S.S.G. §2J1.2(b)(1)(B) (emphasis added).

If the offense resulted in substantial interference *with the administration of justice*, increase by 3 levels.

U.S.S.G. §2J1.2(b)(2) (emphasis added).

An application note states that "substantial interference with the administration of justice" includes:

a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. §2J1 cmt. n. 1.

8

Courts do not interpret the Guidelines in a manner different from their interpretation of statutory text. *E.g.*, *United States v. Martinez*, 870 F.3d 870 F.3d 1163, 1166 (9th Cir. 2017) ("We interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation."). Thus, the proper inquiry into meaning "will most often begin and end with the text and structure of the Guidelines." *Id.* "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011). Therefore, courts' construction of the phrase "administration of justice" as it appears in Title 18 should not differ from their interpretation of the same phrase in the Guidelines. *Id.*

Here, there is no real debate. Every circuit that has addressed the question has held that the phrase "administration of justice" refers to judicial proceedings. *United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir. 1981) ("administration of justice" commences with "a specific judicial proceeding"). The government does not explain, and cannot explain, in what sense Congress's electoral vote count on January 6 constituted a judicial proceeding.

9

The aforementioned application note to U.S.S.G. §2J1.2(b) bolsters that commonsense reading. Every example of substantial interference with the "administration of justice" involves interference with an investigation or evidence. U.S.S.G. §2J1 cmt. n. 1.

Text aside, law-of-the-case and estoppel principles foreclose application of these specific offense characteristics. As the Court knows, January 6 defendants have filed dozens of motions to dismiss the § 1512(c)(2) charge and in front of every judge of this Court. One of their arguments was that Congress's joint session to count electoral votes does not constitute an "official proceeding" under that statute because, among other reasons, it did not involve the administration of justice. In response, the government contended that the joint session did not need to entail the administration of justice to constitute an "official proceeding." And in dozens of filings, the government conceded, or all but conceded, that, in fact, the joint session did not administer justice, including in this very case. ECF No. 69, pp. 9-13 (not arguing that the joint session administered justice but that § 1512(c)(2) did not require interference with such administration); *see also United States v. William Pepe*, 21-cr-52, ECF No. 55 (D.D.C. 2021), p. 8 n. 3 (government: "the certification of the Electoral College vote is not an 'inquiry or investigation'"); *United States v. Knowlton*, 21-cr-46, ECF No. 63 (D.D.C. 2021), p. 12 (government: "The 'proceeding before Congress' is not limited to proceedings solely related to the administration of justice."); *United States v. Nordean*, 21-cr-175, ECF No. 106 (D.D.C. 2021), p. 21 (government acknowledging that although § 1512(c)(2) had "never been applied" outside the context of the administration of justice, the "unprecedently brazen attack" on the Capitol justified application outside that context).

The government's arguments on this score led the Court to positively hold that the joint session *does not administer justice*. *United States v. Montgomery*, 578 F. Supp. 3d 54 (D.D.C.

2021) ("Congress does not engage in . . . 'the administration of justice.'"); *see also United States v. Sandlin*, 575 F. Supp. 3d 16, 24 (D.D.C. 2021) ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'").

Having denied defendants' dismissal motions that argued the joint session needed to, but did not, administer justice, the Court cannot find, under the same tools of interpretation, that "administration of justice" now means something different under the Guidelines.  Under the law-of-the-case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 101 (2d Cir. 2009).  The doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality." *Id.*

Two judges in this district have applied the specific offense characteristics in U.S.S.G. §2J1.2(b) to January 6 defendants convicted under § 1512(c)(2).  *United States v. Reffitt*, 21-cr-32-DLF (D.D.C. Aug. 1, 2022); *United States v. Rubenacker*, 21-cr-193-BAH (D.D.C. May 26, 2022).  The rationales offered were not persuasive.  One of the judges provided this explanation:

> I get the argument that I'm sure will be argued on appeal in this case, that I erred by allowing the government to bring this obstruction charge for the official congressional proceeding in this case, that that statute doesn't apply. But once I determine that statute applies, the back of the guidelines take me to this guideline.
>
> And it seems like it would lead to unwarranted sentencing disparities to apply it, these enhancements, in only cases involving what we classically think of as administration of justice. It seems like the Commission would need to be clear that we are carving out this type of offense for me to draw the conclusion that this administration of justice language that's used as the title to Part J -- to me, it seems like shorthand for what's covered here -- somehow makes these adjustments not applicable in this context.

*Reffitt*, Sentencing Tr. at 37.

On the inconsistency between the Court's motion-to-dismiss opinion in *Sandlin* and Guidelines calculation, the Court explained,

11

I was looking at an entirely different issue. I know that the wording is the same. I also think Part J generally refers to the administration of justice, and I don't think that we can infer simply because the Commission didn't include the phrase "official proceeding of Congress" that it meant for that type of offense prosecuted under Section 1512(c)(2) to not be subject to the same aggravating factors that the commission has delineated here.

*Id.* at 38.

Judge Friedrich was a member of the Sentencing Commission. The Court's points must therefore be given serious consideration. The defense will summarize them as follows: (1) The Court may and should overlook the text of U.S.S.G. §2J1.2(b) because, in the Court's judgment, the Commission would be unlikely to draw a policy distinction between interference with judicial and congressional proceedings involving investigations and evidence, on the one hand, and interference with congressional proceedings not involving investigations or evidence, on the other hand; (2) Rightly or wrongly, the Court has denied a motion to dismiss the § 1512(c)(2) charge and one or two defendants have had the §2J1.2(b) specific offense characteristics applied to their sentences, so the principle of unwarranted sentence disparities counsels in favor of applying those enhancements to all § 1512(c)(2) defendants if factually appropriate; and (3) interpretation of "administration of justice" in the Guidelines context is "an entirely different issue" from interpretation of the same phrase used in Title 18.

Contrary to the first rationale, in the calculation-of-the-guidelines stage of sentencing the Court may not overlook the plain meaning of a guideline in order to achieve a preferred policy outcome. As indicated, the Guidelines are interpreted using the same tools of construction that are employed in the interpretation of statutory text. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177. While Judge Friedrich's sentencing policy prescriptions perhaps carry greater weight than a randomly picked judge's as the judge was a member of the Commission, the *Reffitt* court itself would agree that a judge who is a former legislator would be incorrectly applying the

law by setting aside the plain meaning of a statute enacted by the legislature of which he was a member based on his notion of what the legislature would likely do presented with a specific fact pattern.  In "statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364, 204 L. Ed. 2d 742, 750-751 (2019).  "Where [] that examination yields a clear answer, judges must stop." *Id.* (citing *Hughes Aircraft Co.* v. *Jacobson*, 525 U. S. 432, 438, 119 S. Ct. 755, 142 L. Ed. 2d 881 (1999)).  Even where courts consider materials outside the text—such as life experience—they "will never allow it to be used to muddy the meaning of clear statutory language."  *Id.* (internal quotation marks omitted).  The *Reffitt* court did not find the term "administration of justice" unclear.  It could not, as every court of appeals that has addressed the question has agreed it means judicial proceedings.  *Richardson*, 676 F.3d at 502-503; *Brenson*, 104 F.3d at 1279-80; *Warlick*, 742 F.2d at 116; *Rasheed*, 663 F.2d at 851.

But even if the Court could set aside plain meaning based on its judgment about the Commission's preferences, it should not do so here.  Contrary to the *Reffitt* court's suggestion, the Commission did not need to reference proceedings in Congress explicitly in order for the 2J1.2(b) enhancements to apply to them.  When Congress pursues inquiries and investigations under its power of inquiry, those proceedings do meet the definition of "administration of justice," as they involve investigations with the power to issue subpoenas.  *United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994).  There is nothing remarkable about the fact that the Commission did not single out the quadrennial electoral vote count proceeding specifically in the Guidelines.  It is not consistent with the rule of law to acknowledge that the legislature or Commission did not contemplate electoral vote count proceedings for these enhancements but

13

then to create a new penalty rule and apply it retroactively to conduct that occurred before the rule's creation.

That a judge had previously applied §2J1.2(b) to one January 6 defendant convicted under § 1512(c)(2) is not a persuasive reason to continue applying the enhancement to additional defendants.  First, if the initial application was mistaken, and it was, the unwarranted sentence disparity would lie in that initial case, not in the case where the judge properly interpreted the plain meaning of "administration of justice."  Second, even if an "unwarranted" sentence disparity can be said to lie in the second case, disparities between one or two defendants would not outweigh the prejudice of the erroneous Guidelines calculation.  Third, unwarranted sentence disparity analysis is a separate and posterior question to the proper Guidelines calculation. *Compare* § 3553(a)(4)(A)(i) *with* § 3553(a)(6).

Finally, it would be nonsensical to interpret "administration of justice" one way under the Guidelines and a different way in Title 18.  It is not just that the interpretive tools are the same. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177.  It is that §2J1.2 was designed to sentence offenses under § 1503.  U.S.S.G. §2J1.2 cmt Statutory Provisions.  Section 1503 contains the exact same phrase, "administration of justice." § 1503.  Administratively, it would be chaotic for the phrases to hold different meanings.

In the end, the government proceeded with its novel § 1512(c)(2) charges in the full knowledge that at sentencing it would be forced to ask the Court to bend the law.[1]  Now it asks

---

[1] In their motions to dismiss, many defendants argued at the outset that the phrase "administration of justice" in U.S.S.G. §2J1.2 is just another indication that neither Congress nor the Commission ever contemplated a Chapter 73 crime that decouples an obstruction-of-justice offense from investigations and evidence.  That is the very meaning of obstruction of justice. The government pulled the Court into this mess which forces it to overlook the plain meaning of basic legal concepts at every turn in the process.

the Court to ignore the plain meaning of "administration of justice."  The Court should not accept the invitation to violate its principles for the government's short-term policy goals.

Even if the *Reffitt* court were correct, the §2J1.2 enhancements do not apply factually. No evidence at trial showed Hale-Cusanelli "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." U.S.S.G. §2J1.2(b)(1)(B).  The PSR says that he "interfered with a Capitol Police officer attempting to effectuate an arrest of another rioter [by] reach[ing] in and pull[ing] on the rioter's collar as the officer took the rioter to the ground." PSR, ¶ 43.  Even if every part of that sentence were true, it would not constitute physical injury or property destruction.  "Threatening to cause physical injury to a person" is assault and "interference" simpliciter is not assault.  If a defendant intended his acts to interfere with a person but not threaten him or her with bodily injury, he is not guilty of assault.  *United States v. Orozco-Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990); see *also United States v. Roberts*, 915 F.2d 889, 890 (4th Cir. 1990), cert. denied, 498 U.S. 1122, 111 S. Ct. 1079, 112 L. Ed. 2d 1184 (1991).   Here, no evidence showed that Hale-Cusanelli's pulling of a rioter's collar—which occupied approximately four seconds of time— was intended to convey a threat to an officer that the defendant would physically harm him. Similarly, even if the evidence showed that Hale-Cusanelli "taunt[ed]" an officer, PSR, ¶ 43— which it does not—that would not constitute assault.

Nor does the "substantial interference" specific offense characteristic apply.  U.S.S.G. §2J1.2(b)(2).  Indeed, the PSR does not explain what facts support this enhancement.  PSR, ¶ 44. The government appears to be seeking its application in every § 1512(c)(2) case without regard to factual differences.  The common thread linking the examples of "substantial interference" with the administration of justice in the relevant application note is acts that materially affect the

15

*outcome* of the obstructed proceeding; for example, a prematurely terminated investigation or indictment procured through perjury.  U.S.S.G. §2J1 cmt. n. 1.  Here, Hale-Cusanelli's actions had no causal relationship with the outcome or duration of the joint session.  It was suspended an hour before he entered the Capitol Building and did not recommence until hours after he exited. Tr. at 423:19-20; 575:21-22; 632:8; 167 Cong. Rec. H94-H117 (Jan. 6, 2021).  The defendant assaulted no one, broke nothing, and encountered neither legislators nor congressional staff.  As shown below, his conduct was virtually indistinguishable from that of dozens or perhaps hundreds of Class B misdemeanants who entered the Capitol Building.  There is no factual basis for calling his conduct "substantially" obstructive unless the court is prepared to conclude that every protester who entered the building committed obstruction of justice.

The obstruction of justice enhancement under U.S.S.G. §3C1.1 does not apply here. First, the PSR's assertion that Hale-Cusanelli gave false testimony about "his knowledge that he interfered with a police officer in the Capitol Visitor Center" is plainly inaccurate.  PSR, ¶ 47. The defendant's testimony was not that he never saw the officer with whom he interfered. Instead, he testified, "I don't think I even realized the police were ever there *until I did.* And I backed off." Tr. at 885 (emphasis added).  It is not clear where the falsehood lies in this statement.  He acknowledged that he realized the police were attempting to apprehend the rioter whose collar he tugged before he then "backed off." If Hale-Cusanelli did not make this realization for a brief moment in the chaotic scene of the CVC "until [he] did," there is nothing implausible about that testimony, much less indicia of a deliberate falsehood.

Admittedly, Hale-Cusanelli's testimony that he thought the legislature was housed in a building called "Congress" and not the "Capitol" is an indisputably ignorant statement. Nevertheless, in applying §3C1.1 "in respect to alleged false testimony or statements by the

defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."  U.S.S.G. §3C1.1 cmt. n. 2. While counsel may have agreed with the PSR on this issue prior to January 6, he now sees doubt about this case.  Counsel has heard too many defendants and witnesses who were at the Capitol that day say they did not expect to find members of Congress inside the Capitol Building when they entered.  Some have no incentive to mislead a listener about their ignorance and others are convincing in their denials.  The fact is that a great many people are occasionally stupendously ignorant of how government works.  The government cited Hale-Cusanelli's book collection as a reason to doubt his professed ignorance.  Counsel submits that owning such books as *Das Kapital* and Howard Zinn's histories does not disprove one's ignorance of governmental process. To the contrary.

In sum, Hale-Cusanelli's total offense level is 14.  In criminal history category I, his Guidelines range is 15-21 months.

## III.    The § 3553(a) factors favor a downward variance

### A.    The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))

A number of considerations under § 3553(a)(1) warrant a downward variance[2] in Hale-Cusanelli's case: (1) The typical § 1512(c)(2) crime does not look like Hale-Cusanelli's; (2) Hale-Cusanelli's harsh pretrial confinement; and (3) his true remorse.

#### 1.    The typical § 1512(c)(2) crime does not look like Hale-Cusanelli's

---

[2] If the Court calculates Hale-Cusanelli's Guidelines range at 15-21 months' incarceration, then it would not need to downwardly vary to impose a 20-month sentence.  But if it calculates a higher range, it should downwardly vary for the reasons cited herein.

If the Court denies Hale-Cusanelli's motion for a judgment of acquittal on the § 1512(c)(2) charge, it will have concluded that such an offense may be decoupled from interference with investigations and evidence. But the fact that the Court concludes the government has merely stated an offense does not mean that this novel crime should be punished like the ordinary obstruction of justice case.

Americans have protested at the Capitol for decades. They have barged into the Capitol Building, intruded into its offices, and accosted congressman and senators. There are too many examples to cite. This conduct cannot be tolerated in a society that does not want to be ruled by King Mob. But never has the government regarded this as an obstruction of justice, even where some "formal" proceeding was then pending within the building. Such protesters have always been charged under local D.C. trespass law or Title 40. It is critical to compare the public harms created by political protest versus those created by the ordinary obstruction-of-justice offense.

Described in the simplest terms, in the obstruction-of-justice offense as it existed for at least a century before January 6 the defendant intentionally interferes either with (i) information that is destined for use by a person or persons who characterize the information in a way that carries legal implications, or with (ii) the procedure by which that information is gathered (the "investigation") or legally characterized (the "adjudication"). The nature of the harm here is that the quality of the output of the process—the legal characterization of the information—is corrupted by the defendant's interference with the downstream input or information gathering. If justice is a product, obstruction-of-justice laws are like its quality control function.

Political protest may create a public harm, such as when it transforms into a disruptive mob, but it is not the same kind of harm as ordinary obstruction of justice. As with obstruction of justice, the consequence of protest *can* be to alter the outcome of a process that produces legal

characterizations.  For example, a protester runs into a courtroom during a trial, causing a juror

to have a heart attack and die.  But unlike with ordinary obstruction of justice, such protest is not

aimed at *corrupting the input*—the information—used by the persons who legally characterize it.

It is aimed at demonstrating substantive disagreement with a particular legal characterization that

may emerge from the process.  For that reason, protesters may delay or complicate the legal

characterization, but they less frequently alter the quality of its output like the person who goes

about corrupt the input such as by shredding documents.

   This distinction has resonance here.  As indicated, Congress had suspended the joint

session an hour before Hale-Cusanelli entered the Capitol and did not resume until many hours

after he exited.  Congress ultimately completed the electoral vote count later that evening and

there is no evidence indicating that Hale-Cusanelli's presence in the building specifically had

any effect on the finalization of the 2020 presidential election.  No congressman or senator

changed his conduct because Hale-Cusanelli motioned with his arms at a skylight in the CVC or

tugged at a rioter's collar.  Nor can Hale-Cusanelli be punished for any outcome-altering effect

of the mob generally, as responsibility is individually allocated in our justice system.   There is

no evidence his intent was to interfere with the inputs used by the joint session, such as electoral

certificates.  In sum, the public harm from Hale-Cusanelli's actions specifically is quite distinct

from, and more ephemeral than, that of the defendant who suborns perjury, shreds documents, or

threatens witnesses.  He should therefore not be punished like such defendants.

### 2.      Hale-Cusanelli's harsh pretrial confinement

   A defendant's harsh pretrial confinement is a basis for a downward variance (and even a

departure).  *United States v. Jayyousi*, 657 F.3d 1085, 1118 (11th Cir. 2011) (a court "may

reduce a sentence to account for the harsh conditions of pretrial confinement"); *United States v.*

*Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (same); *Bains v. United States*, 2009 U.S. Dist. LEXIS

2018, at *8 (D.N.J. Jan. 12, 2009) (poor conditions of pretrial condition "properly treated as

grounds for a variance").

Hale-Cusanelli has been detained at the D.C. Jail since January 2021.  The harsh

conditions of confinement January 6 defendants have encountered there is well known.  Judge

Lamberth found the stories so appalling he held the warden of the jail and the Director of the

D.C. Department of Corrections in civil contempt.  *United States v. Christopher Worrell*, 21-cr-

292-RCL, ECF No. 106 (D.D.C. 2021).  The Court stated, "I find that the civil rights of the

defendant have been abridged.  I don't know if it's because he is a January 6 defendant or not,

but I find that this matter should be referred to the attorney general of the United States . . . for a

civil rights investigation." *U.S. judge says D.C. jail violated civil rights of Capitol riot defendant*,

Reuters, Oct. 13, 2021, available at: https://www.reuters.com/article/legal-us-usa-capitol-arrests-

jail/u-s-judge-says-d-c-jail-violated-civil-rights-of-capitol-riot-defendant-idUSKBN2H31OS.

Hale-Cusanelli's life has been threatened in jail, owing to the government's publication

of the Nazi-themed photographs.  For months, he has been suffering from an ear infection that

grew so bad he has trouble hearing.  The physical manifestations of the infection are too gross to

detail here.  He has not received adequate medical attention for the issue.

From February to June 2021, Hale-Cusanelli was held in solitary confinement 23 hours a

day for seven days a week.   From June 2021 to the present, he has been held in solitary 18 hours

day.  It is well established in the relevant social science literature that "prisoners subjected to

prolonged isolation may experience depression, despair, anxiety, rage, claustrophobia,

hallucinations, problems with impulse control, and/or an impaired ability to think, concentrate or

remember.  Some inmates subjected to solitary confinement develop clinical systems usually

associated with psychosis or severe affective disorders." *US: Look Critically at Widespread Use of Solitary Confinement*, Human Rights Watch, June 18, 2012, available at: https://www.hrw.org/news/2012/06/18/us-look-critically-widespread-use-solitary-confinement. Of course, those are the psychological pressures before one considers the added torment of being the target of inmates who wish to kill Hale-Cusanelli.

Hale-Cusanelli's twenty months of hard time are a reason for a downward variance.

### 3.    Hale-Cusanelli's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance.  And district courts may vary downward based on remorse without regard to whether the acceptance of responsibility adjustment under U.S.S.G. §3E1.1 is applied.  *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

As explained above, Hale-Cusanelli deeply regrets his conduct on January 6.  To the extent his actions contributed to the distress of members of Congress, their staff, or outnumbered law enforcement officers, he offers them his sincere apology.  Hale-Cusanelli would seize an opportunity to offer assistance to injured officers and to contribute to the repair of physical damage to the Capitol.  He will personally demonstrate remorse at sentencing in his allocution.

### B.    Avoiding unwarranted sentence disparities (§ 3553(a)(6))

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).  A sentence higher than 20 months' incarceration with credit for time served would create gross unwarranted sentence disparities, along several dimensions vis-à-vis (1) violent defendants; (2) Class B parading misdemeanants; and (3) obstruction-of-justice defendants.

Hale-Cusanelli's conduct was nonviolent.  But consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021).  Leffingwell entered the Capitol Building.  *Id.*, ECF No. 31, p. 2.  But "Leffingwell was not content to merely stand inside the threshold":

> Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts to assault the Capitol.  When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, *Leffingwell struck both officers in the head.*

*Id.*, p. 2 (emphasis added).

Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.*, p. 8.  His conduct was so brazen that he was one of the few protesters arrested on the scene.  *Id.*, p. 9.  Leffingwell pled guilty to a felony offense under § 111(a)(1).  *Id.*   The government sought a sentence of 27 months' incarceration.  *Id.*, p. 2.  The Court imposed a sentence of ***six months' incarceration*** with credit for time served, followed by 24 months of supervised release.  Sentencing Hale-Cusanelli to higher than 20 months' incarceration with credit for time served would create a gross unwarranted disparity with respect to *Leffingwell.*  Unlike Leffingwell, Hale-Cusanelli did not harm anyone or intend to.

Consider *United States v. Mostofsky*, 21-cr-138-JEB (D.D.C. 2021).  Mostofsky participated in a scrum of protesters pushing on a barricade held in place by police officers; entered the Capitol Building; and then stole a police vest and shield.  He pled guilty to civil disorder under § 231(a)(3), misdemeanor theft of government property, and entry into a restricted area.  He was sentenced to ***eight months' incarceration***. Unlike Mostofsky, Hale-Cusanelli did not steal.  Hale-Cusanelli's brief pulling on the rioter's collar was not unlike

Mostofsky's brief act of pushing on a police barricade.  Sentencing Hale-Cusanelli to more than double Mostofsky's sentence would create an unwarranted disparity.

Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021).  Carrying a Confederate flag, Blair walked up to a police line outside the Capitol.  He turned towards an officer and said, "What's up motherfucker, what's up, what's up bitch?" 21-cr-186, ECF No. 55, p. 8.  When the officer came close to Blair, the defendant jabbed him with a lacrosse stick.  *Id.*  A search incident to arrest recovered a knife in the defendant's backpack.



21-cr-186, ECF No. 55, p. 8.

Blair pled guilty to a § 231(a)(3) offense.  This defendant was sentenced to ***five months' incarceration***.  Just as in *Leffingwell*, Blair's acts could only be interpreted as intended to inflict bodily injury or to threaten it.  Thus, to sentence Hale-Cusanelli over four times higher than Blair would create an unwarranted sentence disparity.

Consider *United States v. Nolan Cooke*, 22-cr-52-RCL (D.D.C. 2021).  Cooke pled guilty to a § 231(a)(3) offense.  He "helped lead the charge of rioters who broke through the police line guarding the east side of the Capitol building during the electoral vote certification. Cooke later bragged that he was one of the first to break through the barricade. Cooke and other rioters

struggled with police officers who were protecting the restricted area. Cooke pushed against the bicycle rack barrier manned by police officers and encouraged other rioters to break through the police line, yelling obscenities along the way." 22-cr-52, ECF No. 52, p. 2. But he wasn't done there. Cooke used a flagpole carrying an American flag to strike one of the Capitol windows and encouraged other rioters to "smash the windows" and "break the glass." *Id.*

Cooke was sentenced to ***a year and a day of incarceration***. Unlike Cooke, Hale-Cusanelli did not break through barricades or encourage others to do so. Unlike Cooke, Hale-Cusanelli did not destroy government property and encourage others to do the same. To impose a higher sentence on Hale-Cusanelli would create an unwarranted sentence disparity.

Consider *United States v. Moises Romero*, 21-cr-677-TSC (D.D.C. 2021). Romero pled guilty to a § 231(a)(3) offense. He "entered the restricted Capitol Grounds and took videos of rioters assaulting officers with poles and a fire extinguisher in the West Plaza. He joined a group of rioters that pushed past police to occupy bleachers set up for the inauguration, and later led a group that forcibly pushed through a makeshift police barricade at the Senate Wing Door to gain entrance to the Capitol, grabbing the edge of an officer's riot shield in the process. After spending about 15 minutes celebrating, taking videos, and entering Senator Merkley's office, Romero left the building, only to return to the east side of the Capitol, joining yet another group of rioters trying to gain entrance to the Capitol through the Rotunda Doors. The next day, Romero posted a video on social media, proudly displaying himself inside and around the Capitol Building." 21-cr-677, ECF No. 29, p. 2. Romero was sentenced to ***a year and a day of incarceration.*** Imposing a sentence higher than 20 months' incarceration on Hale-Cusanelli would create an unwarranted disparity because unlike Romero he did not engage in repeat behavior.

A sentence higher than 20 months would create another type of unwarranted disparity. Dozens of defendants who entered the Capitol Building have received sentences of probation. The probationary defendants engaged in conduct that was in many respects more serious than Hale-Cusanelli's:

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Josh & Jessica Bustle, 21cr238 | Parading in Capitol | 24 mos. probation and 24 mos. supervised release | Entered Capitol Building, remained for 20 minutes. Posted on Facebook, "Pence is a traitor. We stormed the capital (sic). . . We need a revolution!" |
| Bryan Ivey, 21cr267 | Parading in Capitol | 36 mos. probation | Entered Capitol Building through a breached window, waving additional rioters into the building, spending 30 minutes inside. |
| Valerie Ehrke, 21cr97 | Parading in Capitol | 36 mos. probation | Entered Capitol Building. |
| Andrew Bennett, 21cr227 | Parading in Capitol | 3 mos. home confinement, 24 mos. probation | Entered the Capitol Building, livestreaming the event on his Facebook page for over an hour. |
| Lori, Thomas Vinson, 21cr355 | Parading in Capitol | 5 years probation, 120 hours of community service | Entered the Capitol Building, later telling news outlet that her actions were "justified" and that she would "do this all over again." |
| Jordan Stotts, 21cr272 | Parading in Capitol | 24 mos. probation | Entered the Capitol Building, remained inside for an hour, celebrating with others and taking videos with his cell phone. |

| Glen Croy, 21cr162 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building. Chief Judge suggested at plea hearing that parading offense is not conceptually different from government's obstruction of justice charge under § 1512(c)(2) |
|---|---|---|---|
| Douglas Sweet, Cindy Fitchett, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, Fitchett filming herself saying, "We are storming the Capitol. We have broken in." |
| Eric Torrens, 21cr204 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking celebratory pictures in the Crypt. |
| Rasha Abdual-Ragheb, 21cr42 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, desiring to demonstrate against Congress. |
| Jonathan Sanders, 21cr384 | Parading in the Capitol | 36 mos. probation, 60 hours community service | Entered the Capitol Building, intending to protest presidential election |
| Michael Orangias, 21cr265 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures inside. |
| John Wilkerson, 21cr302 | Parading in the Capitol | 36 mos. probation, 60 hours of community service | Entered the Capitol Building, posting on social media, "today was a good day, we got inside the Capitol." |
| Brandon Nelson, 21cr344 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, co-defendant texting, "We stormed the Capitol and shut it down. Currently still inside" and "Patriots won't go down without a fight." |

26

| | | | |
|---|---|---|---|
| Andrew Wrigley, 21cr42 | Parading in the Capitol | 18 mos. probation | Entered the Capitol Building, taking pictures of himself inside |
| Jacob Hiles, 21cr155 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures showing him smoking "an unknown substance" inside. |
| Bruce Harrison, 21cr365 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures of himself inside. |
| Terry Brown, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, disobeyed police order to leave. |
| Felipe Marquez, 21cr136 | Disorderly conduct in the Capitol | 18 mos. probation | Entered the "hideaway" office of Senator Merkley, saying, "We only broke a couple windows." |
| Michael Rusyn, 21cr303 | Parading in the Capitol | 24 mos. probation | Among the first to enter the Capitol through a certain door, part of a group of people who shouted, "Tell Pelosi we're coming for that b****," called police traitors, and shouted "Stop the steal." |
| Andrew Hatley, 21cr98 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures with various historical statues. |
| Nicholas Reimler, 21cr239 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures of himself and friends. |
| Caleb Jones, 21cr321 | Parading in the Capitol | 2 mos. home confinement, 24 mos. probation | Entered the Capitol Building, "walking down numerous hallways and into the Capitol Rotunda." |

| Anthony R. Mariotto, 21cr94 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, posting on Facebook, "This is our house" under selfie photograph. |
|---|---|---|---|
| Michael Stepakoff, 21cr96 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, posting on social media after, "The Capitol is OUR house, not theirs." |
| Tanner Sells, 21cr549 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building. |
| Gary Edwards, 21cr366 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, including Senate office S140. |
| Zachary, Kelsey Wilson, 21cr578 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's personal office |
| Jennifer Parks, Esther Schwemmer, 21cr363 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures inside |
| Jackson Kostolsky, 21cr197 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building |
| Eduardo Gonzalez, 21cr115 | Parading in the Capitol | 24 mos. probation | Entered the Capitol, smoking marijuana inside "multiple times." |
| Israel Tutrow, 21cr310 | Parading in Capitol | 36 mos. probation | Entered the Capitol Building with a knife |

Consider the § 1512(c)(2) conviction in *United States v. Hodgkins*, 21-cr-188-RDM (D.D.C. 2021). Unlike Hale-Cusanelli, Hodgkins penetrated the Capitol all of the way to the Ohio Clock Corridor and entered the Senate chamber. He received a sentence of ***eight months' incarceration.*** Imposing a sentence more than twice as long on Hale-Cusanelli's would constitute an unwarranted sentence disparity.

In sum, a sentence higher than 20 months' incarceration with credit for time served would create many unwarranted sentence disparities.

28

### C.       The seriousness of the offense and deterrence (§ 3553(a)(2))

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

The penalties Hale-Cusanelli has already incurred as a result of this case are more than sufficient to deter him from ever again protesting inside the Capitol. As indicated above, he has served hard time in pretrial incarceration since January 2021. His life has been threatened in jail. His reputation has been permanently destroyed. And he now has a felony conviction in his record.

These developments are serious penalties for a crime involving a 40-minute trespass inside the Capitol and serve as potent specific and general deterrence. The shame Hale-Cusanelli has experienced is itself a guarantee of deterrence. *See*, *e.g.*, *United States v. Polizzi*, 549 F. Supp. 2d 308, 449 (E.D.N.Y. 2008) (specific deterrence satisfied by "intense shame created by the convictions); *United States v. Maynard*, 2020 U.S. Dist. LEXIS 179542, at *5 (E.D.N.Y. Dec. 17, 2012) (Weinstein, J.) (same).

### Conclusion

For all the foregoing reasons, Hale-Cusanelli respectfully requests a sentence no greater than 20 months' incarceration with credit for time served.

Dated: September 16, 2022                    Respectfully submitted,

*/s/ Nicholas D. Smith*_____
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway
Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorney for Timothy Hale-Cusanelli*

## Certificate of Service

I hereby certify that on the 16th day of September, 2022, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> Kathryn Fifield
> Assistant United States Attorney
> 555 4th Street, N.W.
> Washington, D.C. 20530

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> */s/ Nicholas D. Smith*
> Nicholas D. Smith (D.C. Bar No. 1029802)
> 1123 Broadway
> Suite 909
> New York, NY 10010
> Phone: (917) 902-3869
> nds@davidbsmithpllc.com
>
> *Attorney for Timothy Hale-Cusanelli*

30