1     these cases.

2              All right.  So I am going to rule on the

3     objections to the SOCs raised by the defense in terms of

4     application of those SOCs in 2J1.2 to the facts of this

5     case.  These objections are overruled.

6              I will begin the discussion with the 8-offense

7     level increase by application of the SOC provided in the

8     guideline 2J1.2(b)(1)(B).  The defendant objects to this --

9     application of this SOC for two reasons; stating, one:  At

10    no time did Defendant cause or threaten physical injury to

11    any person; and, two, just as an important, the event at

12    issue does not involve the administration of justice as it

13    was not related to a judicial or grand jury proceeding.

14    Those are quotes from the defendant's memo -- original memo,

15    at pages 9 through 10.

16              I am going to address these reasons seriatim.

17              First, the defendant argues that the SOC, at

18    2J1.2(b)(1)(B), is inapplicable because he did not at any

19    time cause or threaten physical injury to any person, which

20    is a requirement or trigger for application of that SOC.

21              In support of his position, the defendant cites

22    dictionary definitions of the term "threat," including from

23    the *Oxford English Dictionary*, which says this means to:

24    Declare, usually conditionally, one's intention of

25    inflicting injury upon a person; *Webster's Third New*

1    *International Dictionary* definition, which describes a

2    "threat" as:  Expression of an intention to inflict loss or

3    harm on another by illegal means and especially by means

4    involving coercion or duress of the person threatened; and

5    the *American Heritage* dictionary definition that a "threat"

6    means:  An expression of an intention to inflict pain,

7    injury, evil, or punishment.

8         One of these definitions requires an actual verbal

9    communication of the threatening intent.  Expression of a

10   threat can be physical, not verbal threats of harm.

11        Here, the defendant argues he did not make --

12   "make any threats to cause physical injury," though he

13   certainly did taunt and verbally harass police officers.

14        His assertion that, "there is no proof whatsoever

15   that he ever threatened to cause physical injury to anyone"

16   is contrary to the actual evidence in this case and appears

17   based on an overly limited understanding of threatening

18   conduct to require a verbal threat.

19        The defendant's physical movements inside the

20   Capitol communicated threats to law enforcement.  This was

21   not one of the rioters who, on January 6th, merely walked

22   inside the Capitol for a few minutes or seconds and then

23   left with no encounter or engagement with any law

24   enforcement officers.  The obstructive conduct to which this

25   defendant pled guilty included joining the mob and chasing

57

1    Officer Goodman up the stairs outside the Senate Chamber,

2    and then pointing and yelling at officers upstairs in the

3    Ohio Clock Corridor at a time when Officer Goodman and the

4    other officers were totally outnumbered.

5          This defendant was one in that crowd who disobeyed

6    Officer Goodman and the other police officers in the Ohio

7    Clock Corridor when they refused to disperse and leave the

8    building immediately.

9          His pursuit of Officer Goodman up the stairs into

10   the Ohio Clock Corridor, in blatant disregard for this

11   officer's instructions to stand back and leave, as the crowd

12   of angry, yelling rioters swelled around him, constituted a

13   clear and direct threat to the safety of Officer Goodman and

14   could have led to Officer Goodman's physical injury.

15         Officer Goodman describes this moment in what he

16   says, in his statement, was such a long day which, for him,

17   started at 5 a.m. that day, on January 6th.  He had already

18   seen pandemonium that looked like something from medieval

19   times, fighting hand-to-hand combat at the west front of the

20   Capitol.

21         And as Officer Goodman describes his confrontation

22   with the rioters who had breached the building at the bottom

23   of the stairs outside the Senate Chamber, he says:  The

24   rioters were yelling at me, screaming obscenities at me.

25   The rioters were saying they were for us; they just wanted

1    to take back our country.  Others were being antagonistic,

2    asking what we were going to do, shoot them?  One person

3    said:  There is one of him, and a hundred of us.

4         Officer Goodman says:  I had no idea what to

5    believe -- what to believe what their intentions were; and I

6    retreated to the top of the stairs where there was another

7    line of officers at the top of the stairs.

8         The defendant's yelling and taunting at the

9    officers, in the Ohio Clock Corridor, in an agitated manner

10   with his finger outstretched was threatening conduct,

11   regardless of what he precisely said and whether those words

12   contained threats of physical injury to those officers.

13        This is especially true given the surrounding

14   circumstances.  These were officers, as I said, confronted

15   with a mob of angry people shouting, shaking their fingers

16   and fists at them, and refusing to comply with instructions

17   to vacate the area; this was threatening conduct.  And that

18   is just what happened during Defendant's first illegal entry

19   inside the Capitol.

20        On his second illegal entry inside the Capitol, he

21   joined in the face-off confrontation with officers in the

22   Rotunda.  In direct defiance of the officers' attempts to

23   clear the area, he swung a plastic bottle at an officer's

24   head; sprayed liquid from his bottle across multiple

25   officers who are seen on the video footage to flinch in

1    response.  And given the amount of tear gas and other

2    chemical sprays being deployed, both by rioters and by the

3    police, you can imagine why the police officers were

4    flinching.  This was also threatening conduct.

5              Angry members of the mob including the defendant

6    escalated the situation in the Rotunda.  They refused to

7    follow the orders of the police, overwhelmed law

8    enforcement, and engaged in pushing and threatening -- the

9    bottom line is:  This is threatening conduct.

10             The defendant suggests that his conduct involving

11   the water bottle in the Rotunda is not relevant to Count 2

12   because the acts constituting obstruction of an official

13   proceeding in Count 2 happened at a different time.  As I

14   mentioned during my colloquy with Mr. Matera, this effort to

15   slice and dice his actions inside the Capitol on January 6,

16   2021, into separate little events misunderstands the overall

17   nature of Defendant's offense conduct, all of which

18   constitutes obstruction of the congressional proceeding

19   covered in Count 2.

20             The fact that 24 minutes separated Defendant's

21   first and second illegal entries into the Capitol Building

22   is inconsequential, especially given that the defendant

23   clearly stayed in close proximity to the Capitol Building

24   between initially leaving and going back in.  His actions

25   during both illegal entries inside the Capitol could likely

1    have led to physical injury to Officer Goodman, the officers

2    in the Ohio Clock Corridor, the officers the defendant

3    assaulted with his water bottle, and as part of the mob

4    pushing against police lines in the Rotunda -- all of his

5    actions that day contributed to the delay of the

6    congressional certification proceeding.

7          And all of his conduct is relevant conduct under

8    the guideline at 1B1.1 [sic], and the Court agrees with the

9    government and probation office that the defendant's

10   threatening conduct toward and assaults on multiple law

11   enforcement officers protecting the Capitol and members of

12   Congress during the certification of the 2020 Electoral

13   College vote renders this provision applicable.  And the

14   fact that he was not heard to utter explicit verbal threats

15   of physical violence towards law enforcement does not bar

16   application of the 8-level SOC in his case.

17          So, therefore, his objection to the SOC at

18   2J1.2(b)(1)(B) -- because he did not verbally threaten

19   serious injury to a person or property while engaging in his

20   obstructive conduct -- is overruled.

21          Second, he argues that the 8-offense level SOC

22   under the guideline at Section 2J1.2(b)(1)(B) does not apply

23   to him because -- and I quote, "The event in issue does not

24   involve the administration of justice as it was not related

25   to a judicial or grand jury proceeding."  That's what he

1       stated in his memorandum at pages 9 through 10.  But he also

2       subsequently expanded "administration of justice" to cover

3       both judicial and grand jury proceedings, as well as

4       quasi-judicial proceedings.

5               This objection overlaps with his objection to

6       application of the 3-offense level SOC at 2J1.2(b)(2); so I

7       am going to discuss those two SOCs in tandem, when it comes

8       to this objection of whether administration of justice

9       covers what occurred on January 6th.

10              Each SOC focuses on a distinct harm.  The

11      8-offense level SOC, at 2J1.2(b)(1)(B), requires:  Causing

12      physical injury or the threat thereof in order to obstruct

13      the administration of justice; while the 3-offense level

14      SOC, at the guideline Section 2J1.2(b)(2), requires:

15      Substantial interference with the administration of justice

16      in a manner that draws unsubstantial governmental resources.

17      Both SOCs require the offense conduct in some way hinder the

18      administration of justice, a critical phase, as I've said,

19      the defendant argues is inapplicable because the business of

20      Congress, on January 6, 2021, to certify the Electoral

21      College results did not involve the administration of

22      justice because it was not related to judicial grand jury or

23      quasi-judicial -- quasi-administrative proceedings.

24              I appreciate that the phrase used in the SOCs "the

25      administration of justice" most often calls to mind court

1    proceedings where the application of law is regularly, if

2    not always, at stake.

3          The defendant is incorrect that the phrase "the

4    administration of justice" is limited to the activities of

5    courts or grand juries, or even federal agency adjudicatory

6    proceedings.

7          The defendant cites several cases in support of

8    his argument that the phrase "administration of justice"

9    applies only to judicial or grand jury proceedings but those

10   cases do not prove his point.  In particular, he relies on

11   the Supreme Court case of *U.S. v Aguilar*, 515 U.S. 593, from

12   1995, which addressed the definition of due administration

13   of justice used in 18 U.S.C. Section 1503.  This is somewhat

14   ironic since *Aguilar* emphasized the breadth of processes

15   that fall under the umbrella of the phrase of "the

16   administration of justice," which is an omnibus clause in

17   18 U.S.C. Section 1503, which -- a statute that prohibits

18   persons from endeavoring to influence, obstruct or impede

19   the due administration of justice.  And the challenge the

20   Supreme Court had in *Aguilar* was to take what they viewed as

21   a very broad phrase and to focus it more narrowly because,

22   as the Supreme Court explained, this catchall clause was far

23   more general in scope than the earlier clauses of the

24   statute, which focused on tampering with petit, grand

25   jurors, court officers, and magistrate judges.

1          In his concurrence in that case, Justice Scalia

2    explicitly rejected the idea that since all the rest of

3    Section 1503 refers only to actions directed at jurors and

4    court officers, the omnibus clause -- the catchall clause --

5    using the phrase "administration of justice" refers only to

6    actions directed at jurors and court officers.  The omnibus

7    clause could not apply to actions directed at witnesses or

8    other agents not previously named in the statute.

9          Instead, Justice Scalia explained that the omnibus

10   clause was one of the several distinct and independent

11   prohibitions contained in 1503, and explained his

12   understanding that:  The due administration of justice to

13   apply only to judicial and grand jury proceedings would

14   render it superfluous.  Thus, both the majority opinion and

15   the concurrence by Justice Scalia, clearly understood the

16   due administration of justice to be a much broader category

17   that included but was not limited to judicial proceedings

18   referenced in this statute at Section 1503.

19         In any event, as the Supreme Court has noted,

20   terms may and regularly do carry different definitions when

21   appearing in a statute versus a guideline.  See *DePierre v*

22   *United States*, 564 U.S. 70, jump cite 88, from 2011,

23   rejecting the argument that "cocaine base," as used in one

24   statute, must be given the same definition as it has under

25   the guidelines.

1          Relatedly, Mr. Matera, on behalf of the defendant,

2     cites to language in Judge Moss's decision in *U.S. v*

3     *Montgomery*, stating that:  Congress does not engage in

4     adjudicative proceedings or even quasi-adjudicative

5     proceedings or in the administration of justice aside from

6     when it investigates and tries cases of impeachment and when

7     it acts as a judge of elections returns and qualifications

8     of its own members because, as a matter of separation of

9     powers, that is not what Congress does.

10          Defendant argues this language means that even in

11     this very courthouse -- and I'm quoting from the defendant's

12     briefing, "It has been held that Congress does not engage in

13     the administration of justice."

14          *Montgomery* is irrelevant to the question of

15     whether the SOCs in the guideline at 2J1.2 for interfering

16     with the administration of justice apply to obstruction of a

17     congressional proceeding.  The issue in *Montgomery* was not

18     how to interpret the meaning of the phrase "administration

19     of justice," but to determine whether Congress's

20     certification of the Electoral College votes constituted an

21     official proceeding of Congress for purposes of the

22     obstruction statute at 18 U.S.C. Section 1512(c)(2) to

23     resolve a defendant's motion to dismiss that count of the

24     indictment.

25          The phrase "administration of justice" does not

1    even appear in the statute that was under scrutiny by Judge

2    Moss in *Montgomery.*   Thus, *Montgomery* had nothing to do with

3    the guidelines.

4         As the government points out, the court in

5    *Montgomery* said nothing about the meaning of "administration

6    of justice" as used in the guideline at 2J1.2, which applies

7    to a broad swath of obstruction statutes that reach

8    obstruction of nonjudicial proceedings, or any other

9    guideline.

10        In fact, the same judge, Judge Moss, who issued

11   the *Montgomery* decision, has applied the 3-offense level SOC

12   to a defendant for his conduct at the Capitol on

13   January 6th, in *U.S. v Hodgkins*, 21-CR-188 and -- based on

14   the hearing this morning -- apparently, Judge Moss has also

15   applied it in another case earlier this week -- in *Miller*.

16        Notably, as I will discuss in more detail shortly,

17   in understanding the meaning of the phrase "administration

18   of justice," in the guideline at 2J1.2, where the actual

19   nature of the proceeding is relevant rather than the --

20   where the proceeding takes place.  On this point, I want

21   to -- you point to another part of the *Montgomery* decision,

22   which I think is actually more probative here about the

23   nature of the proceeding that was at stake on January 6th.

24        *Montgomery* emphasizes the ways that the January 6,

25   2021, proceeding before Congress had, "All the trappings of

1    a formal hearing before an official body" engaged in a

2    fact-finding process.

3           Specifically, *Montgomery* notes that the

4    certification process, "Requires the Congress formally to

5    convene to conduct official business, to consider

6    objections, and to render a final decision" at a specific

7    "time, hour and place" with the Vice President as the

8    "presiding officer."

9           It also sets a process for opening, presenting,

10   and acting upon the certificates of the electoral votes, and

11   provides rules for propounding or resolving objections, with

12   each House withdrawing to its own chamber to debate the

13   objection and render a decision.

14          Furthermore, the certificates and papers

15   purporting to be certificates of the electoral votes are

16   akin to records or documents that are produced during

17   judicial proceedings, and any objections to these

18   certificates can be analogized to evidentiary objections.

19          All of these features of the congressional

20   proceeding to count Electoral College votes fall easily

21   within the contours covered by the phrase "administration of

22   justice."

23          Next, the defendant suggests that the SOCs in

24   Section 2J1.1 -- 1.2, originated before the official

25   proceeding provision was added to the statute in Section

67

1    1512 in 2002 with the Sarbanes-Oxley Act, and were never

2    amended to encompass the concept of an official proceeding

3    under Section 1512.

4            Based on this understanding of the legislative

5    history and chronological development of the guidelines, the

6    defendant concludes that the SOCs were not drafted to apply

7    to congressional proceedings.  See the defendant's memo at

8    pages 13 and 14.  This argument simply has the legislative

9    history for the statute and the guidelines wrong.

10           The term "official proceeding," in its definition

11   as a proceeding before the Congress, has appeared in the

12   statute 18 U.S.C. Section 1512 since the statute was enacted

13   in 1982, as part of the Victim and Witness Protection Act of

14   1982; two years before any guidelines were even first

15   promulgated.

16           A straightforward, chronological understanding of

17   the statute and the guideline leads to the contrary

18   conclusion that the defendant reaches; specifically, that

19   Section 2J1.2, and its SOC enhancements, are applicable to

20   all of the statutes to which it specifically references,

21   including all convictions under 18 U.S.C. Section 1512,

22   including those arising from obstruction of official

23   proceedings of Congress.

24           The legal arguments put forward by Defendant to

25   support the position that the phrase "administration of

1    justice" in the guideline at 2J1.2 does not apply to

2    obstruction of congressional proceedings, simply do not hold

3    up under scrutiny.

4         The defendant's position must be rejected for

5    several other reasons as well.

6         First, as I just mentioned, the offense to which

7    the defendant pled guilty in Count 2, obstructing,

8    including -- obstructing and impeding an official

9    proceeding, that is -- a proceeding before Congress under

10   Section 1512(c)(2), is explicitly referenced to and covered

11   by the guideline at 2J1.2 when the guidelines were first

12   promulgated.

13        And his understanding of "administration of

14   justice" is so limited that, if its narrower interpretation

15   were correct, this phrase pertains only to court and grand

16   jury proceedings and quasi-administrative proceedings; the

17   SOC enhancements would not apply to numerous other statutes

18   referred to this guideline.

19        As the government points out, if Defendant were

20   correct, this guideline and SOCs might not apply to a number

21   of other statutes covered by the guideline including:

22   18 U.S.C. Section 551, concealing or destroying invoices or

23   papers relating to imported merchandise; Section 1516,

24   obstruction of a federal audit; 1519, destruction of

25   documents in an agency investigation, or 26 U.S.C. Section

1    7212, interfering with administration of the internal

2    revenue code.

3          There is simply no indication in guideline

4    Section 2J1.2 that the SOCs containing the phrase

5    "administration of justice" were meant to apply to only some

6    of the statutes referenced to this guideline and not to

7    apply to all of the cases involving obstruction of

8    proceedings taking place outside of courts or grand juries;

9    that simply doesn't make sense.

10         So now let's turn to the phrase itself, "the

11   administration of justice," which Defendant argues is

12   limited to these judicial or quasi-judicial proceedings.

13         To be sure, no definition of this phrase,

14   "administration of justice" is set out in the guidelines.

15   And perhaps -- should the sentencing commission be fully

16   staffed again with actual commissioners who can conduct

17   business, perhaps the guideline at 2J1.2, in its

18   definitions, could be made clearer, and more explicitly

19   cover obstruction of official government proceedings,

20   including congressional proceedings that occur outside

21   courts, grand juries, or agency adjudications.

22         Yet, the lack of express reference to

23   congressional proceedings does not mean that the sentencing

24   commission meant to exclude such proceedings from the

25   coverage of the SOCs with use of the phrase "administration

1    of justice."  This phrase is sufficiently broad to encompass

2    nonjudicial official proceedings, such as Congress's

3    certification of the Electoral College votes -- results.

4          And the background notes to the guideline at 2J1.2

5    explain that the nature of "obstruction of justice," is

6    intended to be understood broadly.  There are numerous

7    offenses of varying seriousness that may constitute

8    obstruction of justice as the list of the referenced

9    offenses provided by the government already demonstrates.

10         The guideline -- the government cites several

11   cases where the SOCs have been applied to offense conduct

12   involving interference with nonjudicial proceedings and to

13   obstruction that led to the government's expenditure of

14   resources, including *U.S. v Ali*, a Seventh Circuit case from

15   2017; *U.S. v Atlantic States Cast Iron Pipe Company,* a

16   District of New Jersey case from 2009 where the J1.2

17   guideline SOCs were applied based on the defendant's

18   interference with OSHA investigations into a workplace

19   accident; and other cases.

20         The defendant points out that these cases are

21   related, however loosely, to judicial proceedings such that

22   the government has failed to show through its own cases

23   cited that the administration of justice was meant to

24   include nonjudicial proceedings.  See the defendant's

25   supplemental memo at 2 and 5.

1          These cases do show that the SOCs have generally

2     been applied to proceedings that have some kind of nexus --

3     a close nexus to a judicial or administrative hearing; they

4     do not tell us that these SOCs cannot apply to the

5     defendant's conviction for obstruction of an official

6     congressional proceeding through his involvement in the

7     Capitol riot.

8          The events of January 6th were as novel as they

9     were serious, and so the lack of precedent applying this SOC

10    to similar congressional proceedings is unsurprising, and

11    not determinative.

12         The government points to other January 6th-related

13    cases where other judges on this court have applied either

14    or both SOCs based on the defendant's obstruction of the

15    congressional proceeding, citing the case of *Scott Fairlamb*,

16    at 21-CR-120; *Jacob Chansley*, at 21-CR-3; and *Paul Hodgkins*,

17    21-CR-188; and now, I guess at this hearing, *U.S. v Miller*

18    before Judge Moss.  There is also *U.S. v Wilson*, 21-CR-345.

19         The defendant rightly notes that for the

20    defendants in all of these cases -- except *Miller,* which was

21    discussed and brought up today -- the defendants in the

22    cases were subject to plea agreements, and so the Court was

23    not presented with a dispute to resolve with respect to

24    application of those SOCs in those cases.

25         As I have mentioned, the guidelines themselves do

1   not provide a definition of "administration of justice"; and

2   *Black's Law Dictionary* defines the phrase "administration of

3   justice" broadly to mean, and I quote, "the maintenance of

4   right within a political community by means of the physical

5   force of the state; the state's application of the sanction

6   of force to the rule of right."  In other words, that the

7   state would use mechanisms, such as the police or

8   prosecutors, to force compliance with or maintain a right;

9   that is not necessarily tied to a court or a particular

10  tribunal.

11         In a closely-related definition, *Black's Law*

12  *Dictionary* defines the phrase "due administration of

13  justice" to mean -- and I quote, "the proper functioning and

14  integrity of a court or other tribunal and the proceedings

15  before it in accordance with the rights guaranteed to the

16  parties."  Again, this phrase is not necessarily tied to a

17  court of law, but also applies to any other tribunal.

18         The case law also provides some definitions of

19  administration of justice.  One court, the Second Circuit,

20  in the *Rosner v United States* case described this phrase to

21  mean:  Performing acts or duties required by law.

22         Another Fifth Circuit case from 2012, *U.S. v*

23  *Richardson*, defined, "due administration of justice," as I

24  quote, "The performance of acts required by law in the

25  discharge of duties such as, but not exclusively, appearing

1    as a witness and giving truthful testimony when subpoenaed."

2           Again, these case law definitions do not tie the

3    performance of acts or duties required by law to proceedings

4    in a courthouse.

5           The question for the Court to resolve then is the

6    kind of activity Congress was engaged in on January 6, 2021,

7    covered by the phrase "administration of justice"?

8           As the defendant concedes, the certification

9    process was a proceeding before Congress and, therefore, an

10   "official proceeding" for purposes of 18 U.S.C. Section

11   1512(c)(2), as I and other judges on this court have

12   uniformly held.

13          He argues that, and I quote, "No stretching of the

14   definition of justice could lead to the conclusion that

15   'administration of justice' was meant to apply to the

16   certification of an election because it was not sufficiently

17   judicial or quasi-judicial."  See his supplemental memo at

18   page 3.

19          Clearly, the certification of the Electoral

20   College votes did not take place before a court of law or an

21   executive agency adjudicator, and for the defendant that

22   settles the matter.

23          Construing the phrase "administration of law," in

24   so limited a fashion as Defendant has done, is not that

25   simple.  While the congressional certification of the

1    Electoral College results may not be the first thing that

2    comes to mind, as I've said, when one contemplates "the

3    administration of justice," the certification process

4    involves members of Congress convening to fulfill a duty

5    established under the Constitution and federal law.  In

6    other words, to perform acts or duties required by law, as

7    the Second Circuit in *Rosner* and the Fifth Circuit in

8    *Richardson*, so defined the term.

9          The certification requirement is, in fact, a

10   formal peaceful process to resolve any disputes over the

11   counting of Electoral College votes for President.

12         As Judge Moss detailed eloquently in *Montgomery*,

13   and as I have already described, this process of dispute

14   resolution provides an opportunity for objections to be

15   raised to count any state's Electoral College votes, an

16   opportunity for discussion and adjudication before the

17   process is completed.

18         This has been, in the past, a largely *pro forma*

19   process, but it has always demanded that Congress engage in

20   the process according to set rules for resolving objections,

21   before the final vote is counted, the winner declared and

22   certified as the next President of the United States.

23         We may not always think about the administration

24   of justice and the democratic process being so closely

25   intertwined, but what Congress was doing on January 6, 2021,

1    was recognizing, protecting, and upholding the democratic

2    choices of millions of voters across each of the states, as

3    it heard and resolved objections to the certification of any

4    state's exercise of their electoral votes.

5          Congress was convened to ensure that the official

6    results of the presidential election accurately reflected

7    the choices that had been made weeks earlier at the ballot

8    box.  The successful completion of that process is a stable

9    basis upon which the authority of the incoming President is

10   built.

11         Congress's tasks on January 6, 2021, fit easily

12   into the definition courts have given to the phrase

13   "administration of justice."  When Congress convened to

14   count the Electoral votes, by "performing acts or duties

15   required by law," Congress was maintaining "the right within

16   a political community," as *Black's Law Dictionary* states, to

17   have votes counted in a particular manner, using "the

18   physical force of the state" in the form of law enforcement

19   officers located in and around the Capitol to secure the

20   proceedings; though that security was severely tested and

21   breached by the actions of the defendant and others who

22   illegally entered the Capitol that day.

23         The constitutionally mandated procedure falls

24   within the meaning of the phrase "administration of

25   justice."

1          Causing or threatening injury to persons or

2     property to obstruct justice is just as serious when the

3     justice involves the fair and proper administration of the

4     laws governing congressional proceedings as when it concerns

5     courtroom proceedings.  For these reasons, both SOCs are

6     applicable to Defendant's conduct on January 6th.

7          I need to address the last argument or objection

8     that the defendant raised in the supplemental briefing that

9     the 3-offense level SOC under the guideline at 2J1.2(b)(2)

10    does not apply because there was no substantial interference

11    with the administration of justice.

12          The defendant argues it doesn't apply because, in

13    order for the enhancement to apply, the government must

14    identify a particular expenditure of governmental resources

15    which but for the defendant's conduct would not have been

16    expended, and which is substantial in amount.  See the

17    defendant's supplemental memo, at page 12, citing *U.S. v*

18    *Tackett*, the Sixth Circuit case from 1999.  And he argues

19    that the government has offered no support that it was his

20    conduct that specifically caused the need for these

21    resources to be expended.

22          *Tackett* itself -- the Sixth Circuit case from

23    1999 -- cites a district court case, *U.S. v Weissmann*, a

24    Southern District of New York case from 1998, as support for

25    its enumeration of these three requirements for application

1    of this SOC.  In *Weissmann,* the court listed, without

2    citation, the same three requirements which it says it had

3    deduced from other decisions; and, in a footnote, explained

4    that the purpose of the second element -- the but-for

5    element -- was to give meaning to the requirement in the

6    guideline application notes that the expenditure of

7    substantial governmental resources be unnecessary.

8         This but-for requirement has not been interpreted

9    to create an inflexible cause-in-fact standard, where the

10   enhancement may only be applied where the government can

11   show that a defendant's own actions were the single direct

12   reason for the substantial government expenditure.

13        Rather -- based on the text of the guideline

14   itself -- there must be a general causal tie between the

15   defendant's actions and the otherwise unnecessary

16   expenditure.  See *U.S. v Gray*, Sixth Circuit case from 2012,

17   affirming application of the 2J1.2(b)(2) SOC where the

18   defendant's falsification of documents "albeit" -- and I

19   quote, "Not standing alone, made the investigation into the

20   victim's death more difficult and delayed Defendant's trial

21   for four years."

22        This SOC is applied in cases where multiple

23   defendants engaged in obstructive conduct, where pure

24   but-for causality tied to a specific defendant's personal

25   actions would be difficult to prove.  See, for example,

1   *U.S. v Atlantic States Cast Iron Pipe Company,* 627

2   F.Supp. 2d 188, District of New Jersey, 2009.

3           Where, as here, the defendant acted in concert

4   with hundreds of other rioters to obstruct congressional

5   proceedings; no one person in the crowd could have created

6   the same degree of havoc, chaos, and disruption as the

7   collective group did, and the government need not

8   demonstrate a specific defendant as singularly responsible

9   for the unnecessary expense.

10          Instead, the government need only show a direct

11  causal line from all of the participants in the mob, which

12  includes a specific defendant, that collectively resulted in

13  a situation causing the unnecessary expenditure of

14  substantial governmental resources.

15          As for the defendant's assertion there is no

16  "proof" -- quote, "that he was aiding and abetting any of

17  the other individuals present that day" or "had the same

18  intentions" of others who stormed the Capitol, this is

19  belied by the video evidence in this case.

20          During the melee in the Rotunda, for example, the

21  defendant used the means available to him -- his water

22  bottle, his voice, his body -- to contribute to the chaos

23  and continue the breach of the Capitol, thereby delaying the

24  completion of the Electoral College vote.

25          Whatever his intentions were when he arrived in

1    the Capitol that day, the videos make clear that this

2    defendant was an active participant in the breach,

3    contributed to the violence against police officers that

4    day; and but for the actions of the rioters that day, the

5    hundreds of law enforcement officers and National Guard

6    members called in to address the situation would not have

7    been necessary; nor would the hundreds of thousands of

8    dollars of repairs to the Capitol have been necessary.

9           His conduct contributed to this unnecessary

10   expenditure of substantial governmental resources during and

11   after the riot, and resulted in substantial interference

12   with the administration of justice.  Therefore, his actions

13   sit firmly in the category of serious offense conduct which

14   the sentencing commission determined merited greater

15   punishment.

16          As a final point, even if this Court were to find

17   that SOCs predicated on the administration of justice did

18   not apply to a congressional proceeding to certify Electoral

19   College votes, this Court is fully authorized, under the

20   guidelines in determining the appropriate sentence to

21   impose, to consider, without limitation, any information

22   concerning the conduct of the defendant, unless otherwise

23   prohibited by law.  See the guideline at 1B1.4.

24          The Court is not precluded from considering

25   information that the guidelines do not take into account in

1    determining a sentencing within the guideline range or from

2    considering that information determining whether and to what

3    extent to depart from the guidelines because the guidelines

4    were designed to address the heartland of typical cases

5    embodying the conduct each guideline describes.

6          Where conduct significantly differs from the norm,

7    the Court is not limited by what is provided in the

8    guidelines but may, in such unusual cases, impose a sentence

9    outside the recommended sentencing range.  And what happened

10   on January 6, 2021, was outside the norm and outside the

11   heartland of cases -- in fact, the first time in our history

12   where the peaceful transition of power to a new

13   administration was disrupted by mob action attacking the

14   Capitol.

15         So even if defendant were correct -- which he is

16   not -- that the SOCs in the guideline 2J1.2 did not cover

17   congressional proceedings, these SOCs capture specific harms

18   warranting an increase in sentence severity, like causing or

19   threatening physical harm to another person or so

20   interfering with a proceeding as to result in the unexpected

21   expenditure of substantial government resources; and those

22   specific harms may, by analogy, apply equally to the offense

23   conduct that occurred against our legislative branch of

24   government on January 6, 2021, and warrant corresponding

25   increases in the severity of the sentence by way of a

1     departure or a variance.

2             Okay.   Now, having resolved the objections to

3     those SOCs, that also resolves the defendant's objection

4     that the guideline at Section 2A2.2 applies because based on

5     my conclusion as to application of the two SOCs in 2J1.2,

6     that guideline produces the highest offense level and will

7     control the application of the guidelines and the

8     appropriate sentencing range here.

9             So with those objections resolved, before I turn

10    to the final calculation of the guidelines, I think I am

11    going to take a short break because my court reporter needs

12    to have a break, as well as I do.

13            Okay.   So we'll take a five-minute break.

14            (Whereupon, a recess was taken.)

15            THE COURT:   All right.   So with those objections

16    to application of the guidelines resolved, I will now review

17    how the guidelines apply in this case.

18            The highest guideline offense level for the group

19    counts is the guideline at Section 2J1.2, which provides a

20    base offense level of 14 under 2J1.2(a); plus an additional

21    8 offense levels under the SOC at 2J1.2(b)(1)(B) because the

22    offense involved causing or threatening physical injury to a

23    person, or property damage, in order to obstruct the

24    administration of justice; and 3 offense levels under the

25    SOC at the guideline 2J1.2(b)(2) because the offense