1    correct, Mr. Nestler?
2             MR. NESTLER:  Yes, Your Honor.
3             THE COURT:  And same for you, Mr. Broden?
4             MR. BRODEN:  We do, Your Honor.
5             THE COURT:  And both of you agree that the driver of
6    the sentence is the obstruction of justice offense and the
7    corresponding Section 2J1.2 guideline?
8             MR. NESTLER:  Yes, Your Honor.
9             MR. BRODEN:  We do, Your Honor.
10            THE COURT:  Okay.  All right.  So under Section 2J1.2,
11   the parties agree that the base offense level is a 14.  We're
12   going to discuss in a moment whether the eight- and the three-
13   level administration of justice-related enhancement should apply
14   here.  We'll also address whether the offense was extensive in
15   scope, planning, or participation.  And we will discuss whether
16   Mr. Reffitt should be given an aggravated role enhancement as
17   well as the obstruction of justice enhancement more than once.
18        So I'm correct that the parties are in agreement on the
19   multiple-count adjustment in the PSR?  The parties also agree on
20   the acceptance of responsibility adjustment, that it does not
21   apply here given that Mr. Reffitt went to trial and contested
22   the government's factual proof?
23      Correct, Mr. Broden?
24            MR. BRODEN:  That is correct, Your Honor.
25            THE COURT:  All right.  So on all of these issues,

1   I've independently calculated the guidelines, and I've consulted
2   with the Sentencing Commission, and I too agree that Probation
3   has accurately calculated the guideline issues that we've just
4   discussed.
5       But let's start with the objections.  Let's start with the
6   administration of justice enhancement.  Mr. Nestler, you agree
7   the government bears the burden for the enhancements under
8   2J1.2?
9       MR. NESTLER:  Yes, Your Honor.
10      THE COURT:  All right.  And Mr. Broden, as I
11  understand your arguments -- I understand you clarified.  I
12  wasn't appreciating that you were arguing that the eight-level
13  enhancement shouldn't apply because I guess what you're arguing
14  or going to argue is that Mr. Reffitt's words were not a threat.
15  Is that right?  Is that the additional argument you're making
16  that wasn't clear to me in your papers?
17      MR. BRODEN:  Well, certainly, the comments he made
18  prior to arriving at the Capitol could be -- I don't think you
19  could not characterize them as threats.  How real of a threat
20  they are are something different.  But I don't think -- once he
21  arrived at the Capitol, I don't think his actions threatened to
22  cause whatever the proper term is, physical injury or property
23  damage.
24      THE COURT:  But what you're saying is the comments he
25  made about Speaker Pelosi and Senator McConnell, dragging them

1  out -- I'm not going to be able to quote it exactly, but
2  dragging them out by their heads and their heads bumping down
3  every step?
4          MR. BRODEN:  Those are threats.
5          THE COURT:  Okay.  And you do agree those are threats?
6          MR. BRODEN:  I do.
7          THE COURT:  So how does your argument on the other
8  threats help Mr. Reffitt in terms of applying the eight-level
9  enhancement?
10         MR. BRODEN:  Well, I think the eight-level enhancement
11 is for the, quote unquote, obstruction that happened at the
12 Capitol.  I don't think those threats -- I mean, had he
13 threatened somebody a day before or two days before, granted,
14 the temporal difference is a lot less, but I think we need to
15 look at what happened --
16         THE COURT:  The microphone.
17         MR. BRODEN:  I'm sorry.  I think we need to look at
18 what happened at the Capitol.
19         THE COURT:  Okay. Understood.  But your arguments are
20 going more to the 3C1.1 enhancement as opposed to the
21 eight-level enhancement?
22         MR. BRODEN:  Well, the eight-level -- the eight-level
23 is if the offense involved causing or threatening to cause
24 physical injury to a person, property damage.
25     And I don't think the offense, the offense being the

1  obstruction that happened going up the Capitol steps to
2  allegedly stop the electoral count, I don't think that involved
3  causing or threatening to cause physical injury to a person.
4           THE COURT:  I want to make sure I'm tracking your
5  argument.
6           MR. BRODEN:  Sure.
7           THE COURT:  You concede Mr. Reffitt made the threat
8  about the speaker and Senator McConnell, and you agree that
9  that's a threat that should count in calculating the guidelines
10 under 2J1.2; correct?
11          MR. BRODEN:  I agree that those are threats.  I don't
12 agree that they should --
13          THE COURT:  Count for the eight-level enhancement?
14          MR. BRODEN:  Correct.
15          THE COURT:  Okay.  But you don't contest that he made
16 them or that they're sufficiently tied to the offense that I
17 should consider whether they cause physical injury to a person
18 or property damage -- or threaten that, rather, threaten to
19 cause physical injury to a person or property damage?  You're
20 just saying that you don't think that threat was one to cause
21 physical injury to a person or property damage?
22          MR. BRODEN:  No, it's the sufficiently tied that I
23 have a problem with.  I agree he made the threats.  I don't
24 think it's sufficiently tied to the offense of trying to
25 obstruct the counting of the electoral vote that allegedly took

1    place when he started up the stairway of the Capitol.
2             THE COURT:  Okay.  So you agree that it's a threat to
3    cause physical injury to a person?
4             MR. BRODEN:  Correct.
5             THE COURT:  But you don't agree that the threat was
6    made in order to obstruct the administration of justice; is that
7    what you're saying?
8             MR. BRODEN:  Correct.
9             THE COURT:  And what is your argument about why the
10   threat was made?  Was it to dismantle the government as a whole?
11   What is the argument there?
12            MR. BRODEN:  The argument really is that it isn't tied
13   to his actions at the Capitol.  It's hyperbole.  That's probably
14   not the best phrase for it.
15            THE COURT:  But the hyperbole argument is it's not
16   really a threat, isn't it?  I'm having a hard time not tying it
17   to his actions at the Capitol.  As you say, it was made
18   temporally close to his actions at the Capitol.  It seems like
19   you're arguing that wasn't a genuine threat, it was bluster.
20            MR. BRODEN:  Yes and no.  I mean, we're sort of
21   parsing now.  I mean, it was a threat.  Whether it was a real
22   threat, who knows.  But I don't think it is tied to the offense
23   of the obstruction.  I mean, he could have made that, you know,
24   the day after the election.  That doesn't tie it to the
25   obstruction.

1              THE COURT: But you concede that he made it at the
2    time he's at the Capitol?
3              MR. BRODEN: No. I concede he made it wherever they
4    came from, The Ellipse --
5              THE COURT: But you think that temporally that's not
6    close enough to tie it to his actions at the Capitol?
7              MR. BRODEN: Fair characterization, yes, Your Honor.
8              THE COURT: All right. So I thought you were saying
9    there wasn't a temporal problem.
10             MR. BRODEN: No, I agree that it's certainly more
11   temporally related than the examples I gave you, but I do not
12   think it's temporally sufficient.
13             THE COURT: All right. I think I understand it. Are
14   you or are you not arguing that the three-level and/or the
15   eight-level enhancement, administration of justice related
16   enhancements, overstate the seriousness of the offense?
17             MR. BRODEN: Well, we're -- there's a couple things.
18   One is we're relating -- we're objecting under the whole
19   administration of justice and whether it applies.
20             THE COURT: Right.
21             MR. BRODEN: Then to the extent we believe the
22   ultimate guideline level, if you include those, would overstate
23   the offense and would justify a variance.
24             THE COURT: And are you tying the overstatement of the
25   offense to any particular portion of the guideline calculations

1    that the Probation Office has made?

2            MR. BRODEN:  Honestly, I hadn't considered that
3    question.  I think it is fair to say that an eight-level
4    enhancement encounters a lot of different type of behavior.  So
5    to that extent, if you're asking me to tie it to, you know, why
6    I think we got so high and why a variance is in order, that's
7    sort of the big one, the eight-level one.

8            THE COURT:  All right.  So you are making that as a
9    part of your broader argument that the guideline range is too
10   severe in this case?

11           MR. BRODEN:  Right, the variance argument.  I mean, if
12   the Court agrees it applies, it applies eight levels.  It
13   doesn't give the Court an opportunity to apply less than eight
14   levels.  But I do think it would justify a variance downward.

15           THE COURT:  Okay. All right.  Before we move forward
16   with the objection to the administration of justice argument
17   here, Mr. Nestler -- and I'm going to start having you come on
18   up because we're talking more.  Come on up to the podium.  And
19   if you can just address what Mr. Broden has said regarding the
20   threat.  There are a couple of different layers to that
21   argument.  But I'm most interested right now not in the 3553(a)
22   overstatement argument but, rather, this threat's too attenuated
23   to what he did at the Capitol.

24           MR. NESTLER:  Sure, Your Honor.  So the answer is the
25   threat is not too attenuated to when he entered the Capitol.  At

1    the Ellipse, in the hour or so before he got to the Capitol, he
2    tried to recruit other people to come with him.  And we
3    submitted the videos as exhibits at the trial.  The defendant
4    stood around almost proselytizing, having everybody stand around
5    him in a semicircle where he told everybody this is what we're
6    going to do, I'm armed, we're going to the Capitol, I'm going to
7    go drag Nancy Pelosi and Speaker McConnell out of the Capitol,
8    and we're going to do it violently.  And that was the gist of
9    what he was saying to everybody at the Ellipse immediately
10   before he went to the Capitol and tried to do those exact
11   things.
12        So we do believe that the threats that he uttered at the
13   Ellipse were tied temporally to what he did at the Capitol.  He
14   made the same comments to Rocky Hardie in the car ride from
15   Texas to D.C.  We think that's also tied.  And similar comments
16   on the Telegram threats.  But we don't even need to get to those
17   because what he said at the Ellipse counts.
18        In addition to the actual threat that came out of his
19   mouth, we do believe the defendant's conduct was also considered
20   threatening.  That is exactly what Chief Judge Howell found in
21   the *Rubenacker* case when she did overrule the defendant's
22   objection to this exact eight-level enhancement and found that
23   the defendant's conduct in that case, pointing at officers,
24   walking towards officers, was threatening conduct.
25             THE COURT:  And the failure to respond to the

1  officers' commands to stand down?

2          MR. NESTLER:  That's exactly right, Your Honor.  And
3  so we believe that also is threatening conduct.  We also will
4  point out, Your Honor, that the guideline is written broadly.
5  It's the offense involved causing.  So it's a very broad use of
6  the word "involved," and we do believe that here the offense
7  certainly involved causing or threatening to cause physical
8  injury to a person.

9       And finally, we do believe that the offense also involved
10 causing property damage.  The defendant was directly responsible
11 for the cutting down of the scaffolding near where he was both
12 to protect him and to allow the other rioters to use that
13 scaffolding to penetrate further up and go over the officers.

14         THE COURT:  But that's -- I mean, this is tied into
15 what he instructed the crowd to do behind him.  His message to
16 the crowd is come on.  It's not destroy things as you come.

17         MR. NESTLER:  Right.  But this is not talking about
18 how he directed the crowd.  This enhancement here -- we can get
19 to the 3C1.1 enhancement later, I understand.  This is if the
20 offense involved causing physical injury to a person or property
21 damage.

22         THE COURT:  So he doesn't have to be tied to it; it's
23 just an automatic?

24         MR. NESTLER:  He's tied to it, but he doesn't have to
25 be the one to instruct other people to do it.  He is benefiting

1    from it.  Going back to the 1B1.3 and just talking about the
2    conduct for which he is responsible for, he is responsible for
3    the conduct that aided and abetted him.  These other individuals
4    were cutting down scaffolding and tarps in order to protect him
5    from the less-than-lethal weapons that were coming his way.  And
6    so those people aided and abetted -- there was an
7    aiding-and-abetting relationship there.  And so even if he
8    didn't direct them to do it, the offense did involve property
9    damage.
10              THE COURT:  You know, I'm understanding what you're
11   saying about the failure to stand down and how that's
12   threatening.  It does seem to me that the guideline that says if
13   the offense involved causing or threatening to cause physical
14   injury to a person or property damage -- I mean, you're saying
15   basically he implicitly had an agreement with the other rioters,
16   and therefore, he's -- it's almost like relevant conduct
17   analysis here.  He's responsible for everything that was
18   reasonably foreseeable.
19       And can we say as we sit here now -- looking back at it,
20   it's obvious.  But as we sit here now, can we say that, one,
21   there was that sort of meeting of the minds and that it was
22   reasonably foreseeable that all of the inaugural platform,
23   et cetera, were going to be ripped down?  You think so?
24              MR. NESTLER:  I don't think we have to go to a level
25   of what property damage was reasonably foreseeable.  We believe

1   it's reasonably foreseeable that property damage would have
2   occurred as a result of his offense.  And so whether it was
3   people damaging the stairs or damaging the windows or the doors
4   of the Capitol or cutting down the scaffolding or ripping apart
5   the scaffolding or the tarp, it's reasonably foreseeable, and it
6   should have been to the defendant, that his offense involved
7   causing property damage.
8           THE COURT:  So the analysis that I do in terms of his
9   state of mind for this guideline enhancement with respect to
10  property damage, is it akin to what I do in terms of
11  restitution?  Is it the same kind of analysis?  There's nearly
12  $3 million of property damage done, and he's on the hook for
13  that?
14          MR. NESTLER:  We believe he is on the hook for that,
15  for all of that property damage.  We believe that the damage to
16  the Capitol --
17          THE COURT:  You're not seeking --
18          MR. NESTLER:  We're not seeking that, but we believe
19  he is.
20          THE COURT:  But you believe he should pay a portion
21  like every other January 6 defendant; right?  I'm not arguing
22  with you now about the merits of that.  I'm just wondering if
23  it's the same -- if I agree with you on restitution, is it the
24  same analysis with respect to this guideline provision?  I don't
25  know.

1           MR. NESTLER:  We believe it is.  It is reasonably
2  foreseeable, and he does bear responsibility and culpability for
3  the conduct of others that was reasonably foreseeable in
4  committing his offense.  Even though he didn't personally break
5  a window or damage a door, we believe that he is culpable for
6  that conduct under the guideline analysis.
7           THE COURT:  Just to be clear, though, for the record,
8  there is no evidence that he himself committed any property
9  damage?
10          MR. NESTLER:  That's correct.
11          THE COURT:  Okay.  All right.  Anything else you want
12 to add on that issue, Mr. Nestler?
13          MR. NESTLER:  No.  I assume we will talk about
14 administration of justice and the definition of that separately.
15          THE COURT:  Yes.  Just a moment.
16          MR. NESTLER:  Thank you.
17          THE COURT:  Mr. Broden, let me bring you up.  Before
18 we get into the administration of justice, let me ask you about
19 the property damage argument the government is making.
20     Obviously, there's no question that there was an
21 extraordinary degree of property damage all around Mr. Reffitt.
22 The way this guideline is structured, can I hold him responsible
23 for that, because it was reasonably foreseeable -- as he ignored
24 commands of the officers and advanced up the stairs, certainly,
25 it's foreseeable people are going to follow him, and it's

1    also -- I'm asking, is it also foreseeable that some of the
2    people who followed him were going to destroy the platform to
3    the right of him as he advanced up the stairs?
4            MR. BRODEN:  Well, to the extent we're sort of talking
5    about relevant conduct, I think (a)(1)(A) would more likely
6    apply.  And the question is, did he counsel or command or induce
7    and all those words to commit property damage, and I don't think
8    there's any evidence of that.
9            THE COURT:  Wait.  Where are you directing me?
10           MR. BRODEN:  1B1.3(a)(1)(A).
11           THE COURT:  Wait.  You're in the guideline, or you're
12   in the relevant conduct guidelines?
13           MR. BRODEN:  The relevant conduct guideline.
14           THE COURT:  So tell me where you are.  1B --
15           MR. BRODEN:  1.3(a)(1)(A).  I don't know if you have
16   the same book as me, but it's 23 if you do.
17           THE COURT:  So all acts and omissions committed,
18   aided, abetted, counseled, commanded, induced, procured, or
19   willfully caused by the defendant.  Because -- so the government
20   is arguing more that this is (a)(1)(B), a jointly undertaken
21   criminal activity, a scheme, if you will, all actions and
22   omissions of others that were within the scope of the jointly
23   undertaken criminal activity in furtherance of that criminal
24   activity and reasonably foreseeable the defendant would be
25   responsible for.

1          So is that the line that I have to -- or the issue I have
2     to decide, whether this is jointly undertaken criminal activity
3     or, you know, acts that he willfully caused acting alone?
4               MR. BRODEN:  Right.  And I think we're all sort of in
5     uncharted waters, and this is not the usual drug case or bank
6     robbery where it's easy to find those.  But I don't think, in
7     looking at the -- just looking at it overall and looking at the
8     purposes of the guidelines, that this constitutes jointly
9     undertaken criminal activity.  I mean, he acted by himself.
10    Now, there were thousands, if not hundreds of thousands of
11    others who were committing the same -- some of the same, some
12    different acts.  But I think 1B1.3(a)(1)(A) is the better
13    analysis.
14              THE COURT:  Okay.  In terms of jointly undertaken
15    criminal activity, you would agree that he's on the hook for
16    anything Rocky Hardie did, but as Rocky Hardie testified --
17              MR. BRODEN:  Correct.
18              THE COURT:  -- he testified that he thought all this
19    was bluster and Mr. Reffitt's prone to gross exaggerations and
20    he couldn't believe it when he walked from The Ellipse to the
21    Capitol and saw people like spiders climbing up the Capitol.
22    And my recollection is that he testified that he just watched it
23    all and walked up and touched the outside of the Capitol
24    building.  But he had -- it seemed convincing to me that he had
25    no intention of going in.  To the extent Mr. Reffitt thought

1   they had a jointly undertaken -- you know, jointly undertaken
2   criminal activity, he was not on board with that plan, he
3   thought it was preposterous and not going to happen.
4              MR. BRODEN:  Right.  And that's more sort of the
5   typical guideline analysis, that if they planned to rob a bank
6   together he would be on the hook for what Mr. Hardie did.
7              THE COURT:  So you agree he's on the hook for anything
8   Hardie did, but he's not on the hook for everybody else?
9              MR. BRODEN:  Anything that Hardie did that would have
10  been foreseeable to him, yes.
11             THE COURT:  And what about -- we will get there, but
12  on the restitution analysis, is this the analysis I do, or do I
13  look at that differently?
14             MR. BRODEN:  Candidly, the government is only asking
15  for $2,000.
16             THE COURT:  So I don't have to reach this issue?
17             MR. BRODEN:  We have bigger fish to fry than $2,000.
18             THE COURT:  So you're not going to object to a $2,000
19  restitution payment?
20             MR. BRODEN:  No, we did not object.  It was more of a
21  strategic decision in the sense that we had bigger fish to fry.
22             THE COURT:  Okay.  All right.  So let me -- one
23  moment.  I'm making notes.
24        All right.  You're arguing based on law of the case that I
25  can't apply these administration of justice enhancements, and to

1   make that argument, you're relying on my opinion in *Sandlin* and
2   the related rulings I've made in this case; right?
3   　　　　　MR. BRODEN:  Right.  And of course, there was the -- I
4   forget the -- I guess it was the *Montgomery* decision, but that
5   wasn't from this Court.  So I think it's a cleaner argument
6   that, you know, we should have some --
7   　　　　　THE COURT:  So you like Judge Moss's analysis better
8   than mine?
9   　　　　　MR. BRODEN:  Well, his wording in the motion to
10  dismiss was a little cleaner --
11  　　　　　THE COURT:  Cleaner, okay.
12  　　　　　MR. BRODEN:  -- or more precise.
13  　　　　　THE COURT:  I thought I was pretty precise.
14  　　　　　MR. BRODEN:  Well, you were.  It's just I like the
15  wording that Congress was not engaged in the administration of
16  justice, which Judge Moss put in an actual sentence, but you
17  were pretty close.
18  　　　　　THE COURT:  Well, in effect, I think that's the point
19  I was trying to make.  Judge Howell, I think, in a recent case,
20  applying these enhancements, did suggest that that defendant's
21  actions, and I think it's the defendant Mr. Nestler just
22  mentioned --
23  　　　　　MR. BRODEN:  He is cited in his -- obviously, if the
24  Court was to adopt that, then I couldn't make this argument.
25  　　　　　THE COURT:  But there's tension between that analysis

1  and my ruling.
2       But here's the thing.  There's no question, I did not
3  decide this guideline issue in any of the opinions.  This is a
4  new issue.  So I think your law of the case argument doesn't
5  work here.
6       And the question for me is, 2J1.2 is in Part J of the
7  guidelines that generally in its heading define the guideline as
8  offenses involving the administration of justice.  We all know
9  that by and large the 1512(c)(2) prosecutions involve courts,
10 grand juries, things that we think of as relating to the
11 administration of justice.  Nonetheless, the vast majority of
12 judges on this court have held that that statute does apply to
13 this context.
14            MR. BRODEN:  With one notable exception.
15            THE COURT:  With Judge Nichols's exception.  The
16 circuit will resolve that soon enough, and you've certainly
17 preserved that argument for appeal.
18      But once I've decided that this crime can be prosecuted
19 under that statute, the guidelines very clearly direct that
20 statute to 2J1.2, which is entitled "Obstruction of Justice."
21 And it's hard for me to conclude simply because the Sentencing
22 Commission didn't anticipate and incorporate every definition in
23 the statute in the shorthand, if you will, for these
24 enhancements, that that means that the Commission intended to
25 exclude this offense.  Right?

1            I get the argument that I'm sure will be argued on appeal
2    in this case, that I erred by allowing the government to bring
3    this obstruction charge for the official congressional
4    proceeding in this case, that that statute doesn't apply.  But
5    once I determine that statute applies, the back of the
6    guidelines take me to this guideline.
7         And it seems like it would lead to unwarranted sentencing
8    disparities to apply it, these enhancements, in only cases
9    involving what we classically think of as administration of
10   justice.  It seems like the Commission would need to be clear
11   that we are carving out this type of offense for me to draw the
12   conclusion that this administration of justice language that's
13   used as the title to Part J -- to me, it seems like shorthand
14   for what's covered here -- somehow makes these adjustments not
15   applicable in this context.
16            MR. BRODEN:  Well, I guess the short answer to the
17   Court's question is, you know, I think we agree that the
18   Sentencing Commission didn't prepare or think of these type of
19   offenses.
20        But then the question is, if it's not clear whether it
21   applies or not, does that go to not applying the guideline or
22   applying the guideline?  And it seems to me under the rule of
23   lenity that you would not apply the guidelines.
24            THE COURT:  Even if I took the sort of plain language
25   approach and did what you're suggesting, why wouldn't I, under

1   3553(a), enhance his sentence in a commensurate amount based on
2   these enhancements?  Why wouldn't I, by analogy, get to the same
3   place under 3553(a)?
4           MR. BRODEN:  Well, because the Court has a lot more
5   discretion under 3553(a).  We talked about it a little earlier.
6   Would you apply an eight-level enhancement if you were doing it
7   under 3553(a).  You'd have a lot more discretion.  Whereas, if
8   you decide this guideline applies, you have no choice but to
9   apply an eight-level enhancement.
10          THE COURT:  But I also could say under 3553(a) that I
11  think the guideline is too high.
12          MR. BRODEN:  There's different ways to skin the cat.
13          THE COURT:  I can get there either way.  I'm just
14  making the point that even if I were to buy your argument, which
15  I am not, you can tell, on this, you still face the same problem
16  under 3553(a).  So you can still make the overstatement of the
17  offense argument with the guideline applying, just like you
18  would be arguing with me on why an eight-level enhancement
19  shouldn't apply under 3553(a).
20          MR. BRODEN:  You could make that argument for any
21  objection.  It kind of cuts into my job a little bit, but --
22          THE COURT:  Well, I just don't see -- one, I don't
23  think the law of the case applies, given that I was looking at
24  an entirely different issue.  I know that the wording is the
25  same.  I also think Part J generally refers to the

1   administration of justice, and I don't think that we can infer
2   simply because the Commission didn't include the phrase
3   "official proceeding of Congress" that it meant for that type of
4   offense prosecuted under Section 1512(c)(2) to not be subject to
5   the same aggravating factors that the Commission has delineated
6   here. So I'm denying that.
7        Is there anything more you want to say about the
8   government's argument with respect to the threat, the
9   attenuation of the threat and -- I don't know that I need to
10  reach the difficult issue regarding the property damage and how
11  I look at that under the relevant conduct guidelines. I think
12  that, in my view, the threat at the Ellipse is not too
13  attenuated to his conduct immediately thereafter. And I also
14  think his failure to stand down and follow the lawful commands
15  of the officers was threatening to them. And I think we're
16  going to hear from Officer Kerkhoff, when she gives her victim
17  impact statement, about how that impacted her as she was
18  defending the Capitol and everyone inside.
19       So I don't -- I hear your argument that, you know, maybe
20  this is an overstatement given the plus 11 under the guideline.
21  But I think the this is not a threat associated with the offense
22  is not a compelling one.
23            MR. BRODEN: That's all I have, Judge.
24            THE COURT: Okay. All right. Before I end with this,
25  you're also not disputing that clearly the three-level